# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

JULIE V. DEGRAW,
as Personal Representative of the
ESTATE OF DONALD C. DEGRAW,
Deceased,

      Plaintiff,

v.                                          Case No. 8:18-cv-02116-T-02SPF

BOB GUALTIERI, in his individual and
supervisory capacity as Pinellas County Sheriff, and
GREGORY GOEPFERT, in his individual
capacity as Pinellas County Deputy Sheriff,

      Defendants.

_____/

## ORDER

This matter comes to the Court on Defendants' motions to dismiss Plaintiff's

First Amended Complaint. Dkts. 33, 34. The action stems from an alleged use of

excessive force by a deputy responding to a medical seizure suffered by Donald

DeGraw, now deceased. Plaintiff Julie DeGraw, Mr. DeGraw's wife and now

personal representative of his estate, alleges violations of Mr. DeGraw's Fourth

Amendment rights under 42 U.S.C. § 1983 and state tort law against Deputy

Goepfert and his employer, the Pinellas County Sheriff's Office (hereinafter

"PCSO"). Plaintiff has filed oppositions to the motions to dismiss. Dkts. 37, 38. The Court DENIES Defendants' motions to dismiss as to Counts I and II. The Court believes those issues should be decided at a summary judgment stage. Qualified immunity may well apply, but a fuller record will illustrate the merits, or lack thereof, of the claims and defenses, and this matter is best suited for review under the summary judgment procedures. Count III is DISMISSED with leave to amend.

## BACKGROUND

As alleged in Plaintiff's First Amended Complaint, Mr. DeGraw suffered post-traumatic stress disorder ("PTSD") and seizures following his experience as a medical officer in the United States Navy. Dkt. 27 ¶¶ 14-15. He appeared to have had one such seizure the morning of September 7, 2016. *Id.* ¶ 17. Mrs. DeGraw, a registered nurse, called 911 for medical assistance. *Id.* Deputies from PCSO were dispatched to Mr. DeGraw's home and asked Mr. DeGraw to come downstairs from his bedroom. *Id.* ¶ 18. "Although he remained a little confused," Mr. DeGraw came downstairs and responded to treatment by EMTs. *Id.*

Mr. DeGraw explained to the responders that he suffered from PTSD and had a bad dream. *Id.* Mrs. DeGraw "reported to the sheriff's deputy that her husband had a similar incident three-and-one-half years earlier[, . . .] had no history of violence, and that he was not a danger to her." *Id.* ¶ 19. Finding that Mr.

DeGraw did not meet Baker Act criteria and needed no further medical treatment, the responders left. *Id.*

In the afternoon of the same day, Mr. DeGraw had another seizure in his upstairs bed and his wife called 911 for assistance. *Id.* ¶ 20. Deputies Martinez and Goepfert arrived before EMTs. *Id.* ¶ 21. Mrs. DeGraw informed them that Mr. DeGraw "had a seizure, was confused, and remained upstairs in his bed," and that he "suffered from PTSD, and kept a gun under his pillow, although he had never threatened anyone with it nor ever used it in any threatening manner." *Id.*

Deputy Goepfert carried a Taser dart-firing stun gun designed to transmit up to 50,000 volts of electricity, which he armed before approaching the upstairs bedroom. *Id.* ¶ 22. Deputy Goepfert saw Mr. DeGraw in the bedroom, "just laying on the bed on his back, with his mouth all bloody (from the seizure), not doing anything, repeatedly uttering 'ahhhh' or 'yahaaa.'" *Id.* ¶ 25. Deputy Goepfert ordered Mr. DeGraw to "come towards him," at which point Mr. DeGraw sat up and went towards the deputy. *Id.* ¶¶ 25-26. Deputy Goepfert then ordered Mr. DeGraw to "'stay back on the bed,' which he did." *Id.* ¶ 26. "Mr. DeGraw, in his post-seizure confused state, then stood up and took a step toward Deputy Goepfert at which time he was ordered to 'stay there.'" *Id.*

Mr. DeGraw took another step and, from approximately three feet away, Deputy Goepfert fired his Taser into Mr. DeGraw's bare chest for two seconds. *Id.*

¶ 27. Mr. DeGraw fell to the floor. *Id.* At 16:01:08, Deputy Goepfert applied voltage from the Taser for three more seconds, another full second at 16:01:16, for five seconds at 16:01:35, and then another second at 16:01:37[1]. *Id.* ¶ 28. Deputy Goepfert stated this was designed to "just try to control him, to allow us to grab him to get him onto his stomach so we could cuff him." *Id.* ¶ 29.

When Deputy Goepfert had entered the bedroom, Deputy Martinez was in the hallway with his service firearm drawn, unable to see Mr. DeGraw. *Id.* ¶ 23. At some point, Deputy Martinez rushed to the door to see Mr. DeGraw "struggling with the stun gun wires as he fell to the floor." *Id.* ¶ 24. Deputies Goepfert and Martinez "repeatedly shouted 'Get Down' at Mr. DeGraw as he struggled to get to his feet after being shocked." *Id.*

Deputies Martinez and Street "tackled" Mr. DeGraw, then forced him facedown onto the floor as they handcuffed him. *Id.* ¶ 30. The deputies rolled Mr. DeGraw onto his back and noticed he was not moving. *Id.* ¶ 31. No effort to revive Mr. DeGraw by the Deputies was alleged; rather, the EMTs "were summoned from downstairs within a minute and a half, and efforts were begun to revive Mr. DeGraw, unsuccessfully." *Id.*

---

[1] Deputy Goepfert points out that this is likely a typo in the Amended Complaint: the final one-second Taser activation could not have occurred at 16:01:37, but instead likely occurred at 16:02:37. Dkt. 33 at 4 n.6. This discrepancy does not affect the Court's analysis.

Plaintiff alleges that "manufacturers of dart firing stun guns had recommended that they not be used in the head or chest area because of the likelihood that deployment in that area of the body can result in death or serious bodily injury, turning a weapon designed for non-lethal use into a lethal weapon." *Id.* ¶ 37. Furthermore, Plaintiff points to Florida criminal justice standards for Taser use "in which the lethal nature of deployment in the chest area is recognized, and in which it is noted that the chest area should be avoided whenever possible." *Id.* ¶ 38. Plaintiff argues the force applied by prolonged shocks to the bare chest "constituted lethal force," was excessive, and caused Mr. DeGraw's death by cardiac arrest. *Id.* ¶ 40.

Plaintiff brings three counts: Civil Rights Violation under 42 U.S.C. § 1983 Individual Capacity Use of Excessive Force against Deputy Goepfert; Individual and Supervisory Excessive Force against Sheriff Gualtieri; and State Law Wrongful Death Claim against "Pinellas County Sheriff." Dkt. 27. Defendants move to dismiss all counts.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted). In considering the motion, the court accepts all factual allegations of the complaint as true and construes them in the

light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008) (citation omitted). Courts should limit their "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (citations omitted).

## DISCUSSION

The Court finds dismissal appropriate for Count III, but not Counts I and II. The Court will handle each of Plaintiff's three counts in turn.

I.    Excessive Force Against Deputy Goepfert

Section 1983 requires a plaintiff to prove that (1) the defendants' conduct violated a constitutional right, and (2) the challenged conduct was committed "under the color of state law." *Melton v. Abston,* 841 F.3d 1207, 1220 (11th Cir. 2016). In response, Defendant Goepfert invokes qualified immunity, which protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citations omitted).

Plaintiff does not seem to dispute that, in responding to her 911 call, Deputy Goepfert was acting within the scope of his discretionary authority. *See Bates v. Harvey*, 518 F.3d 1233, 1242 (11th Cir. 2008). Thus, to overcome Deputy

Goepfert's qualified immunity, Plaintiff's allegations must demonstrate that (1) the Deputy's conduct violated a constitutional right, and (2) the right was clearly established at the time of the Deputy's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Pearson*, 555 U.S. at 236 (courts free to address inquiry in most appropriate order).

1. <u>In a light most favorable to Plaintiff, a claim is made that Deputy Goepfert violated Mr. DeGraw's Fourth Amendment rights.</u>[2]

Courts analyze Fourth Amendment excessive force claims under the "objective reasonableness standard." *Boynton v. City of Tallahassee*, 650 F. App'x 654, 660 (11th Cir. 2016) (citation omitted). To decide whether the force used was reasonable, a court must examine "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." *Id.* (citation omitted). Furthermore, the "amount of force used must be 'reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight.'" *Id.* (citation omitted).

---

[2] To the extent Plaintiff relies upon 42 U.S.C. § 1988, Fla. Stat. § 943.1717, and the Fourteenth Amendment, the Court finds that none provides a separate cause of action. *See Vasconez v. Hansell*, 871 F. Supp. 2d 1339, 1342 (M.D. Fla. 2012); *Proch v. DeRoche*, No. 3:08-cv-484, 2011 WL 6841319, *14 (N.D. Fla. Dec. 20, 2011); *Ochoa v. City of Miami*, No. 09-22455-Civ, 2010 WL 1882159, *3 (S.D. Fla. May 11, 2010). Additionally, Plaintiff does not specify how any analysis under Article 1, Section 12 of the Florida Constitution should differ from the Fourth Amendment.

It is worth noting at the outset that police were not investigating a crime. Rather, the Deputies responded to a call for medical assistance and arrived before the EMTs. Nor was there any risk of flight. With all facts and inferences accepted as true, in a light most favorable to the claim, this was a compliant, disabled subject whose death was caused by Taser electrocution.[3]

While the majority of excessive force cases involve police responding to criminal activity, the U.S. Court of Appeals for the Eleventh Circuit has seen similar cases before. In *Boynton*, for example, an officer responded to a call about a "combative" medical patient who refused to get on a stretcher in an ambulance. 650 F. App'x at 660. The patient "tensed" his body, which made it difficult for the officer to put the patient on the stretcher. *Id.* The officer used a Taser nine times, which the court found disproportionate and unreasonable. *Id.* at 660-61.

Similarly, in *Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009) an individual flagged officers on the road for assistance following an alleged shooting. 586 F.3d at 901-02. The plaintiff was not suspected of a crime, did not act belligerently, and was "largely compliant and cooperative with the officers—moving away from their vehicle when instructed, . . . stopping when instructed . . . and only attempting to disregard the officer and walk away when the officer attempted a 'custodial touch'

---

[3] The parties dispute the cause of death. Dkt. 33 at 11 n.9. At this stage, it appears in a light most favorable to the Amended Complaint that Plaintiff's decedent was electrocuted, causing cardiac arrest. The precise cause of death does not alter the Court's analysis. The allegations state a claim for excessive force and claim that the Taser was deadly force and caused death.

on [his] shoulder." *Id.* at 906. The court ultimately found that "though the initial use of force (a single Taser shock) may have been justified, the repeated tasering of [the plaintiff] into and beyond his complete physical capitulation was grossly disproportionate to any threat posed and unreasonable under the circumstances." *Id.* at 907.

Viewing Plaintiff's factual allegations in a light most favorable to Plaintiff, Mr. DeGraw, who was lying in his bed after a seizure, complied with Deputy Goepfert's order to go towards him. Mr. DeGraw then complied with Deputy Goepfert's orders to "stay back on the bed." Mr. DeGraw, in a confused state induced by the seizure, then stood once more and took two steps towards Deputy Goepfert, ignoring the Deputy's order to "stay there." In response, Deputy Goepfert fired his Taser into Mr. DeGraw's bare chest. Though Deputy Goepfert was joined by two more deputies, he continued to discharge his Taser into Mr. DeGraw's chest for a total of five times, including after Mr. DeGraw fell to the floor. Plaintiff also states the claim that the firing of a Taser into the chest area is improper technique.

Plaintiff had informed the Deputies that Mr. DeGraw suffered PTSD and kept a gun under his pillow. But importantly, there are no allegations any Deputy saw Mr. DeGraw's gun or saw him reach for the gun. Indeed, by walking towards

Deputy Goepfert, Mr. DeGraw was walking away from the gun's purported location under the pillow.

And because the Court must accept Plaintiff's factual allegations as true and construe them in a favorable light to the claim, Deputy Goepfert's characterization of Mr. DeGraw as "belligerent" and "advancing" upon him is inapt at this stage of the case. Dkt. 33 at 12, 18. Mr. DeGraw was passive—indeed, lying down in bed—until Deputy Goepfert ordered him to stand. In the most favorable light, Mr. DeGraw tried his best to comply with at times contradictory commands and appears to have physically struggled only in response to the repeated and (as alleged) excessive and lengthy voltage from the Taser.

Deputy Goepfert cites to cases where courts have found no excessive force, but none is availing. For example, the plaintiff in *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004) had been detained on a violation, refused at least five orders to retrieve documents, used profanity, yelled at the officer, and "moved around and paced in agitation." 369 F.3d at 1278. In *Barfield v. Rambosk*, 641 F. App'x 845 (11th Cir. 2015), the plaintiff, also detained for investigation, appeared "under the influence of alcohol or a controlled substance and was actively resisting the efforts to handcuff him." 641 F. App'x at 848 He moreover reached towards his waistband, which an officer feared might have indicated the plaintiff was reaching for a weapon. *Id.* at 847.

Nor is this case *Buckley v. Haddock*, 292 F. App'x 791 (11th Cir. 2008), where the plaintiff, detained beside an "active highway at night," refused to stand up and was "resisting arrest." 292 F. App'x at 794-95. That court also found it important that "the deputy resorted to using the taser only after trying to persuade [the plaintiff] to cease resisting, after attempting to lift [the plaintiff], and after repeatedly and plainly warning [the plaintiff] that a taser would be used and then giving [the plaintiff] some time to comply." *Id.* at 794; *see also Bolander v. Taser Int'l, Inc.*, No. 07-CV-80789, 2009 WL 2004379, at *8-9 (S.D. Fla. July 9, 2009) (no excessive force where the plaintiff had "run across [a] yard and tackle[d] a police car," did not comply with multiple orders to get down, was "snarling and grunting incoherently," and continued to struggle on the ground for "several minutes, kicking [an officer] in the head with his knee, and striking him on the arm with a loose handcuff").

Plaintiff's First Amended Complaint states a claim that Deputy Goepfert violated Mr. DeGraw's constitutional rights. The next question is whether this right was clearly established at the time of the incident.

2. Mr. DeGraw's Fourth Amendment right was clearly established.

"The relevant inquiry to determine whether a right is clearly established is to ask whether it would be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Oliver*, 586 F.3d at 907

(citations and quotation marks omitted). Precedent from the U.S. Supreme Court, the U.S. Court of Appeals for the Eleventh Circuit, and the Florida Supreme Court "interpreting and applying the law in similar circumstances" is relevant. *Id.* (citations omitted). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Id.* (citation omitted).

A constitutional right, however, is clearly established in the absence of case law where "the case is one of obvious clarity—i.e., where the officer's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of fact-specific case law on point." *Id.* (citations, quotation marks, and alterations omitted). This exists where "every reasonable officer in [the defendant's] position [would] conclude the force was unlawful." *Id.* (citations omitted). This inquiry is fact-based, thus most appropriate to be determined at the summary judgment stage.

The court in *Oliver*, finding *Draper* inapposite, observed the absence of relevant case law on an officer's unwarned, repeated use of a Taser in similar circumstances. *Oliver*, 586 F.3d at 907-08. The court went on to find the repeated use "so plainly unnecessary and disproportionate that no reasonable officer could have thought that this amount of force was legal under the circumstances." *Id.* at 908. *Oliver*, in short, stands for the proposition that "tasering [an individual] at

least eight and as many as eleven or twelve times over a two-minute span without attempting to arrest or otherwise subdue the [individual]," including after the individual writhed in pain and had "gone limp and immobilized," is excessive force. *Id.*

Even if *Oliver*'s facts are ultimately too dissimilar from those presented here, there is a wide variety of pre-2016 cases that protect a passive or compliant individual's right against force. *See e.g.*, *Saunders v. Duke*, 766 F.3d 1262 (11th Cir. 2014); *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919 (11th Cir. 2000); *Hadley v. Gutierrez*, 526 F.3d 1324 (11th Cir. 2008); *Galvez v. Bruce*, 552 F.3d 1238 (11th Cir. 2008); *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002); *Slicker v. Jackson*, 215 F.3d 1225 (11th Cir. 2000); *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997). As discussed, in a light most favorable to Plaintiff, the allegations are that Mr. DeGraw attempted to comply with Deputy Goepfert's commands and did not physically struggle until he was first struck with the Taser; Mr. DeGraw's two steps towards Deputy Goepfert and a suggestion of a firearm under a pillow, without more, is insufficient on these claims as the Court must construe them to warrant the use of such force.

In sum, the right of such an individual to be free from five Taser discharges into a bare chest was clearly established by September 7, 2016. The request to dismiss Count I is denied.

II.    Claims Against Sheriff Gualtieri

Count II is styled as an "Individual and Supervisory Excessive Force Claim" against Sheriff Gualtieri. Dkt. 27 at 11. The Amended Complaint states Sheriff Gualtieri "is sued in his individual capacity for his history of supervisory acts which caused or contributed to Mr. DeGraw's death, and in his supervisory capacity, as he is responsible for enforcing customs and policies in the [PCSO] which allowed the acts of his deputies to result in deliberate indifference to constitutional rights of citizens, acts which the Sheriff had the ability to stop by exercising his supervisory authority." *Id.* In her response to Sheriff Gualtieri's Motion to Dismiss, Plaintiff clarifies she is raising a claim under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Dkt. 38 at 4-5.

As an initial matter, an individual can sue an official in either his individual or official capacity. "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1308 (11th Cir. 2009) (citation omitted). A supervisor "can be held personally liable when either (1) the supervisor personally participates in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation." *Id.* (citation omitted). This connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need

14

to correct the alleged deprivation, and he fails to do so," the supervisor's "custom or policy . . . result[s] in deliberate indifference to constitutional rights," or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."[4] *Cottone v. Jenne*, 326 F.3d 1352, 1360-61 (11th Cir. 2003) (citations and quotation marks omitted). Qualified immunity might then be available. *See Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991).

In contrast, a § 1983 suit against an officer in his official capacity is "another way of pleading an action against an entity of which an officer is an agent." *Busby*, 931 F.2d at 776 (citation omitted). A plaintiff must establish "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *Gurrera v. Palm Beach Cty. Sheriff's Office*, 657 F. App'x 886, 893 (11th Cir. 2016) (citations omitted). In these circumstances, qualified immunity is not available. *See Owen v. City of Independence, Mo.*, 445 U.S. 622, 657 (1980).

Though ambiguous from the Amended Complaint, Plaintiff appears to bring both a supervisory individual capacity as well as an official capacity claim against

---

[4] It is worth noting that liability under a custom or policy theory seems to exist for both supervisory individual capacity liability and official capacity against a municipality under *Monell*. And under neither is a *respondeat superior* theory available.

Sheriff Gualtieri. Sheriff Gualtieri nonetheless acknowledges the purported *Monell* claim and is on notice. Dkt. 34 at 3. As such, based on the entirety of the allegations and Plaintiff's papers, the Court will construe the claims against Sheriff Gualtieri as an individual capacity claim against Sheriff Gualtieri and an official capacity claim effectively against the PCSO at this stage. Whether these allegations can pass muster once facts are fleshed out remains to be seen.

For both claims, the thrust of Plaintiff's theory is the same: Sheriff Gualtieri's policies or customs concerning Taser use, especially allowing deputies "discretion to use their dart-fired stun guns in the chest area, under the circumstances presented to them in the field, without forbidding their use in the chest area whenever reasonably possible," constituted deliberate indifference to constitutional rights. Dkt. 27 at 11-12.[5] Plaintiff alleges that targeting the chest area is well known to be improper. The Court agrees the allegations are sufficient to pass the motion to dismiss stage.

Plaintiff asserts that the Sheriff "had known since at least 2015, that his . . . deputies engaged in the practice if [sic] using stun guns in the chest area" and that he did not forbid the practice. Dkt. 27 at 12; *see C.P. by & through Perez v. Collier Cty.*, 145 F. Supp. 3d 1085, 1098-99 (M.D. Fla. 2015) (denying motion to dismiss

---

[5] Plaintiff acknowledges there is no allegation Sheriff Gualtieri "was on-scene or took any action with respect to Plaintiff or the events of September 7,2016." Dkt. 38 at 3.

individual capacity claim against a sheriff where there were allegations of a "history of widespread abuse . . . as to the improper and unjustified use of force and deployment of 'tasers'"); *Steen v. City of Pensacola*, 809 F. Supp. 2d 1342, 1348 (N.D. Fla. 2011) (noting that a claim a supervisor "knew that his officers were using tasers in such a way that posed a serious risk of personal injury" and allowing the excessive and unreasonable force appeared to be sufficient to establish individual supervisory liability). Though in terms of "history of widespread abuse" the allegations here fall short of other cases where courts did not find a *Monell* claim, *e.g.*, *Casado v. Miami-Dade Cty.*, 340 F. Supp. 3d 1320 (S.D. Fla. 2018), the Court nonetheless is reluctant to dismiss Count II on an undeveloped record.

"[I]n a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference." *Connick v. Thompson*, 563 U.S. 51, 63 (2011). This may exist where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). The Court in *Canton* looked to deadly force training as an example:

> [C]ity policymakers know to a moral certainty that their police
> officers will be required to arrest fleeing felons. The city has armed its

officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* at 390 n.10.

Subsequent courts have extended this rationale to other contexts. *See e.g.*, *Waller v. City of Middletown*, 89 F. Supp. 3d 279, 285 (D. Conn. 2015) (training on searches inside a residence); *Chamberlain v. City of White Plains,* 986 F. Supp. 2d 363, 392-93 (S.D.N.Y.2013) (training on dealing with emotionally disturbed persons).

In the Eleventh Circuit, a "single instance of unconstitutional conduct can create *Monell* liability only when proof of the incident includes proof that it was caused by an existing unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Martin v. City of Macon Georgia*, 702 F. App'x 941, 944 (11th Cir. 2017) (citation and quotation marks omitted). While "a single instance of unconstitutional behavior cannot establish proof of the policy itself," *id.*, Plaintiff alleges the Sheriff knew of the allegedly unconstitutional behavior as early as 2015. The Amended Complaint further equates the use of a Taser as deadly force which must be proven on the facts to be developed. The abuse of the weapon can result in such serious injury that a failure to train could properly be characterized as deliberate indifference. Rather than speculate, the Court prefers to rule on a fleshed-out record.

The same analysis applies to any qualified immunity defense for the individual capacity claims against Sheriff Gualtieri. Defendant cites to no authority for the proposition that a policy that allows for conduct in violation of clearly established constitutional rights does not thereby violate clearly established law. It is not enough, as Sheriff Gualtieri suggests, to merely note an absence of case law forbidding the use of a Taser on the chest area. Dkt. 42 at 3-4. The proper inquiry is, instead, whether a policy that would allow for multiple, prolonged deployments of a Taser on the bare chest of a disabled individual, as alleged, would violate clearly established constitutional rights. The Court finds that, for reasons discussed above and with all facts and inferences favoring the claim, it would.

It is at least plausible that a policy or custom of allowing the use of a Taser on a bare chest caused the violation of Mr. DeGraw's constitutional rights. The request to dismiss Count II is denied.

III.    State Law Claims

Count III is titled "State Law Wrongful Death Claim – Pinellas County Sheriff." Dkt. 27 at 13. The language suggests this is against Sheriff Gualtieri, though it is unclear whether in his official or individual capacity. The Amended Complaint notes that the "Sheriff of Pinellas County is a constitutionally created office of Pinellas County," which has waived sovereign immunity for the "operational acts of his officers and employees pursuant to Section 768.28 Florida

19

Statutes (2018)." *Id.* Plaintiff further alleges the Deputies "negligently attempted to gain custody and control" over Mr. DeGraw, and as a "direct and proximate result of tasering" him "negligently caused or contributed to Mr. DeGraw's death." *Id.* at 14. She seeks compensatory damages against the Pinellas County Sheriff's Office. *Id.* The Court construes this as an official capacity claim.

A second deficiency is the theory of liability. Count III is framed in terms of negligence, yet it is well settled that negligent use of excessive force is not a proper cause of action. *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1294 (11th Cir. 2009) (citations omitted). Instead, excessive force claims by their very nature require intentional conduct, and thus lie, if at all, in the realm of battery. *City of Miami v. Sanders*, 672 So. 2d 46, 48 (Fla. 3d DCA 1996) (citations omitted). Based on the allegations, moreover, there is no "negligence component" of Deputy Goepfert's conduct that "pertain[s] to something other than the actual application of force . . . ." *Id.*; *see also Bolander*, 2009 WL 2004379, at *16-18 (noting possibility for negligence liability against officers who take individuals into custody).

In her response to the motions to dismiss, Plaintiff asserts that "the Defendant Sheriff's deputies were improperly trained as it is alleged that the Sheriff failed to prohibit the practices of unsafe Taser use." Dkt. 38 at 9. This sounds in negligent supervision or training, not negligence of the on-scene

Deputies. This is problematic because, first, the Amended Complaint does not appear to plead negligent training.

Secondly, in *Lewis v. City of St. Petersburg*, 260 F.3d 1260 (11th Cir. 2001), the court found that the enactment of policies, such as training on use of force, constitutes a discretionary, rather than operational, function and is thus protected by Florida's sovereign immunity. 260 F.3d at 1266. Like in *Lewis*, Plaintiff's claim here seems to relate to "decisions regarding what to include in the training of its police officers," *id.*, and not the implementation or operation of the training, *see, e.g., Swofford v. Eslinger*, 686 F. Supp. 2d 1277, 1290 (M.D. Fla. 2009). As such, Count III of the Amended Complaint is dismissed with leave to amend consistent with the above.

## CONCLUSION

The Court DENIES Defendants' motions to dismiss as to Counts I and II. The bare minimum required to state a claim has been met. Complicated issues of the use of force and qualified immunity are best addressed at the summary judgment stage. Notwithstanding the Court's Order on January 15, 2019, Count III is DISMISSED with leave to amend within fifteen (15) days of this Order.

**DONE AND ORDERED** at Tampa, Florida, on January 17, 2019.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record