In The Matter Of:

# DeGraw

vs

# Gualtieri, et al.

# Deposition of
# D.P. Van Blaricom
# January 30, 2020



**Central Court Reporting**
800.442.DEPO
Support@centralcourtreporting.com
www.centralcourtreporting.com

1               UNITED STATES DISTRICT COURT

2               MIDDLE DISTRICT OF FLORIDA

3                  TAMPA DIVISION

4  _____

5  JULIE V. DEGRAW,

6   Plaintiff,

7

8   vs.                 No. 8:18-cv-02116-WFJ-SPF

9

10  BOB GUALTIERI, et al.,

11  Defendant.

12 _____

13          Deposition Upon Oral Examination

14                    Of

15              D.P. VAN BLARICOM

16 _____

17               January 30, 2020

18    10900 NE 8th Street, 2nd Floor Conference Room

19            Bellevue, Washington

20

21

22

23            **CERTIFIED COPY**

24

Reported by:
25  Julie C. Oswald, WA State CSR No. 2709

 1   APPEARANCES:

 2   FOR THE PLAINTIFF:

 3   Inguna Varslavane-Callahan
     Attorney at Law
 4   440 Central Avenue, #203
     St. Petersburg, Florida  33701
 5   Phone:  727-209-1504
     Email:  icallahan@clftrialattorneys.com
 6


 7
     FOR THE DEFENDANT:
 8
     Paul G. Rozelle
 9   Attorney at Law
     Pinellas County Sheriff's Office
10   10750 Ulmerton Road
     Largo, Florida  33778
11   Phone:  727-582-6274
     Email:  prozelle@pcsonet.com
12


13
     EXAMINATION INDEX
14
     BY MR. ROZELLE:   PAGE 3
15


16
     EXHIBIT INDEX
17
     No.        Description
18   42     18 page report of D.P. Van Blaricom   Page 3

19

20

21

22

23

24

25



 1              Bellevue, Washington

 2         (Marked Deposition Exhibit 42).

 3

 4    EXAMINATION

 5    BY MR. ROZELLE:

 6    Q.   Good morning, Mr. VanBlaricom.

 7    A.   Good morning, sir.

 8    Q.   My name is Paul Rozelle.  I'm a lawyer with

 9 the Pinellas County Sheriff's Office and I represent

10 Sheriff Gualtieri and Deputies Goepfert and Martinez

11 and Sergeant Street in this case that's been brought

12 against them in connection with the use of force of

13 Deputy Goepfert and we are here this morning to take

14 your deposition as an expert witness because you have

15 been retained by the plaintiff in this case.

16         Do you understand that's why you are here, to

17 give testimony today?

18    A.   Yes, sir.

19    Q.   Would you state your full name for the

20 record?

21    A.   Donald Perry VanBlaricom,

22 V-A-N-B-L-A-R-I-C-O-M.

23    Q.   Before we got started on the record here

24 today I marked what is a composite exhibit, 42, to

25 your deposition.  Would you please take a look at that



1  and let me know when you are ready?

2      A.   Yes, I'm familiar with it.

3      Q.   What is Exhibit 42?

4      A.   It's my report in this matter.

5      Q.   If you page through it, we will get oriented

6  to these materials and then I will ask you some

7  questions about it.  It looks like you have an 18-page

8  report, is that correct?

9      A.   Correct.

10     Q.   Is that the only report that you have

11 prepared in connection with your work on this matter?

12     A.   Yes, sir.

13     Q.   There are no supplements or anything that

14 come after this report which I see is dated here

15 November 21, 2019 on the first page?

16     A.   Yes.

17     Q.   No supplements or changes of any kind since

18 this November 21, 2019 report that is part of Exhibit

19 42?

20     A.   Correct.

21     Q.   If you flip behind that the next document is

22 Exhibit A.  Do you see that?

23     A.   Yes.

24     Q.   What is that?

25     A.   CV.



1      Q.   It's eight pages, it looks like.

2      A.   Yes.

3      Q.   Exhibit B is your schedule of fees for

4    services?

5      A.   Correct.

6      Q.   Is that current?

7      A.   Yes, sir.

8      Q.   And Exhibit C is four pages of Rule 26 (a)

9    (2) (B) testimony at trial in the deposition for the

10   proceeding before you, is that correct?

11     A.   Correct.

12     Q.   I had the opportunity to go through some

13   materials that you brought with you to your deposition

14   today and those are present with us on the conference

15   table and it's three manilla folders, the first of

16   which is pretty thin, maybe an eighth of a inch, and

17   that appears to be the same thing evidently that

18   Exhibit 42 is, is that correct?

19     A.   Yes, sir.

20     Q.   The other two folders that are approximately

21   six or seven inches thick appeared to me to be various

22   materials that you reviewed in connection with your

23   work on this matter, is that accurate?

24     A.   Correct.

25     Q.   There are probably 100 or so with sticky



 1  notes on those materials.  Are those all yours?

 2       A.   Yes.

 3       Q.   That's your handwriting?

 4       A.   Yes.

 5       Q.   There is also handwriting throughout those

 6  materials.  Is that all yours?

 7       A.   Yes, sir.

 8       Q.   Three of those documents appear to have some

 9  handwritten notes that were on a small sheet of paper

10  that were stapled to the front of them and those

11  documents were the taser downloads for Deputies

12  Martinez and Goepfert.  Were those your notes?

13       A.   Yes, sir.

14       Q.   Other than those three sheets of paper and

15  the sticky notes do you have any other notes that you

16  have made in connection with your work on this matter?

17       A.   No.

18       Q.   Other than these documents that are here with

19  us on the conference room table are there any other

20  documents or materials that you reviewed in connection

21  with your work on this matter?

22       A.   No, sir.

23       Q.   Look at Exhibit 42, your report, the first

24  two pages under paragraph number 4 and then there are

25  some sub paragraphs.  It appears that you have



 1  identified the materials that you reviewed in

 2  connection with your work on this matter, at least the

 3  materials that you had reviewed at the time that you

 4  rendered this report in November of 2019, is that

 5  correct?

 6      A.   Yes, sir.

 7      Q.   Was there anything else in rendering the

 8  opinions that are present in this report that you

 9  reviewed that is not listed in paragraph 4 on pages

10  one and two of your report?

11      A.   They didn't affect my opinion in this report

12  but your expert reports and the deposition of the ME I

13  reviewed since.  They are in this stack of documents

14  that are not listed in this report because I didn't

15  rely on them.

16      Q.   Those events hadn't occurred or you -- in

17  fact, those events had not occurred at the time that

18  you gave your opinions in this report, correct?

19      A.   Exactly.

20      Q.   So you have since seen them and reviewed

21  them?

22      A.   I looked through them.

23      Q.   Did they impact your opinions in any way?

24      A.   No, they really didn't.

25      Q.   How about the testimony of Sheriff Bob



 1  Gualtieri?

 2      A.   The only thing I noticed was his deposition,

 3  and I list that in my report.

 4      Q.   I don't see that.  Would you point it out to

 5  me?

 6      A.   On page 1, sub F, his deposition in the

 7  matter of the Tompkins-Holmes matter, I reviewed that.

 8           I have not -- I do not list his deposition in

 9  this report so -- I know I have it in this stack of

10  materials so I must have reviewed thereafter.

11      Q.   Let's break that down.

12           The deposition testimony that Sheriff Bob

13  Gualtieri gave as you describe it in the matter of

14  Tompkins-Holmes against Gualtieri taken October 19,

15  2017, item 4 F at the bottom of page 1?

16      A.   Correct.

17      Q.   You did review that in connection with your

18  engagement in this matter?

19      A.   Yes.

20      Q.   That's not this case, right?

21      A.   That's not this case.

22      Q.   What happened in Tompkins-Holmes?  What was

23  that case about?

24      A.   I don't remember what the whole case was

25  about.  The only thing I was interested in is that he



1   indicated that he doubted that tasers caused death,

2   and that is in my report.

3       Q.   Why is that significant to you in any way?

4       A.   Because he is the chief policymaker of the

5   department and he sets the standard for how the

6   deputies are going to perform and if he believes that

7   tasers don't cause death it's unlikely that he will

8   supervise their usage as it should be.

9       Q.   Any other reason?

10      A.   No.

11      Q.   Did anybody use a taser in the Tompkins-

12  Holmes case?

13      A.   I don't recall.

14      Q.   Do you know what the mechanism of injury was

15  in the Tompkins-Holmes case?

16      A.   I don't recall.

17      Q.   Do you know what happened to the individual

18  deputy in the Tompkins-Holmes case after the use of

19  force that was an issue?

20      A.   No.

21      Q.   Are you aware he was criminally prosecuted?

22      A.   No.

23      Q.   Pleaded guilty?

24      A.   No.

25      Q.   Fired?



1      A.    No.

2      Q.    Are you aware of whether he used a taser?

3      A.    No.

4      Q.    Why did you review anything in connection

5  with the Tompkins-Holmes matter?

6      A.    Because plaintiff's counsel told me that the

7  sheriff indicated that he didn't believe tasers caused

8  death and therefore I wanted to see that portion of

9  the deposition.

10      Q.    4B, Defendant's Motion For Summary Judgment.

11  What is that?  I will represent to you that none of

12  the defendants have moved for summary judgment in this

13  case.

14      A.    It must be in this stack of materials.  It's

15  a motion of Bob Gualtieri in his capacity as sheriff

16  of Pinellas County, Florida for summary judgment.

17      Q.    That's in the Dylan Tompkins-Holmes case,

18  correct?

19      A.    Yes.

20      Q.    Why did you review that?

21      A.    Because it was sent to me.

22      Q.    What was significant to you about the Dylan

23  Tompkins-Holmes case?

24      A.    The only thing significant about it, the only

25  notes I have on it is it indicated the described



1  ratification, which I already knew anyway, but that's

2  the only note.  It said the sheriff did not ratify

3  Gertkin's (phonetic) misconduct.  He had him arrested

4  and fired him.

5      Q.   Is there a ratification claim in the DeGraw

6  matter?

7      A.   I don't know.

8      Q.   I will represent to you that there is not.

9  It's not a cause of action that you have identified in

10  4A, the first amended complaint.

11          I will also represent to you that we are on

12  the second amended complaint.  Take a look at the

13  first one, which should be toward the top of your

14  stack, just to satisfy yourself of that.  I don't see

15  a ratification claim in there.

16      A.   There is not.

17      Q.   The deposition that Sheriff Gualtieri gave in

18  this case, the DeGraw case, my understanding from your

19  testimony a moment ago is that you did review it after

20  you rendered the opinions contained in this report, is

21  that correct?

22      A.   I had it -- it was taken on November 7, so I

23  probably didn't have it in time to include it in this

24  report.

25      Q.   Have you since reviewed it?



1     A.    I have reviewed it, yes.  It has my notes on

2  it.

3     Q.    What, if anything, was significant to you

4  about Sheriff Gualtieri's testimony in this case?

5     A.    He says that it was not the cause of death.

6  He does not track taser applications.  He investigated

7  the matter and ratified the conduct.

8     Q.    Your understanding is Sheriff Gualtieri said

9  he did not track taser applications?

10    A.    It's on page 60 -- page 80, excuse me.  It

11  says "but we do not look at the numbers of total

12  deployments."

13    Q.    That's not what it says at all.  Let's follow

14  along.  Look at line 12.  Let me know when you are

15  there.

16    A.    I'm there.

17    Q.    The question from counsel:  "So the taser use

18  tracking per deputy, how is that done?  Is it just by

19  number?  Like how many days, how many days he used

20  it?" And then the answer on line 15, "No.  "So to be

21  clear, we look at the total number of taser

22  deployments and we are looking at all use of force

23  categories, so we do keep a list, you know, a separate

24  list, you know, of deputy -- I'm sorry -- so do we

25  keep a list, a separate list of Deputy Smith, Deputy



1  Jones, Brown, whatever, the answer to that is no.  How

2  many tasers they use, no.  But we do look at the

3  number of total deployments and there is a record in

4  our use of force system about the use of force each

5  individual deputy used, but we don't have a separate

6  sheet that says okay, during this period of time these

7  are the deputies that, quote, and what we do we

8  isolate it to ECW deployment." The answer to that is

9  "We don't do that."

10        Did I read that correctly?

11     A.   You read it correctly.

12     Q.   So your understanding of his testimony is

13  that the Pinellas County Sheriff's Office does track

14  total number of taser deployments?

15     A.   The total number, but not by per deputy.

16     Q.   Let me just ask this:  The records that you

17  reviewed -- let's go over what you didn't see.  You

18  didn't see any documents concerning any use of force

19  data from the Pinellas County Sheriff's Office,

20  correct?

21     A.   No, just the taser deployments.

22     Q.   The taser deployments from the tasers that

23  were issued to Deputies Goepfert and Martinez and

24  Sergeant Street that were issued to them on September

25  20, 2017, those are the only use of force records,



1   other than the investigation of Mr. DeGraw's death,

2   that you saw in connection with your work on this

3   matter?

4        A.   You are correct.

5        Q.   You did not see any data aggregate, by deputy

6   or otherwise, concerning any uses of force by deputies

7   at Pinellas County Sheriff's Office, correct?

8        A.   Correct.

9        Q.   You did not see any data concerning total

10  number of taser deployments over any period of time

11  from the Pinellas County Sheriff's Office?

12       A.   Correct.

13       Q.   Are you aware of whether those documents have

14  been produced in this case?

15       A.   I do not know.

16       Q.   If they were you have not seen them?

17       A.   I haven't seen them.

18       Q.   How many taser deployments did Deputy

19  Goepfert have?  Let's go to that.

20       A.   What was the question again?

21       Q.   The number of taser deployments that Deputy

22  Goepfert had?

23       A.   The total they list as 533, but those aren't

24  all deployments.

25       Q.   What's your understanding of what that number



 1  is?

 2      A.    That's the total number of times that he has

 3  armor-triggered his taser.

 4      Q.    May I see the document?  I will identify it

 5  so when we are reading this later we will understand.

 6  It's Bate's numbered PCSO001151 through PCSO001169.  I

 7  will represent to you and hand it back so you can

 8  satisfy yourself of this, that it's a 19-page document

 9  for the taser model X26P that would appear to be

10  issued to Deputy Goepfert, is that correct?

11      A.    That's correct.

12      Q.    The 533 that you just mentioned is coming off

13  of page 19 and it's the number at the bottom of the

14  far left-hand column, correct?

15      A.    Correct.

16      Q.    That's just a sequence number, correct?

17      A.    That's correct.

18      Q.    That's each event of any kind, right, not

19  just arming it or triggering it?

20      A.    Any event that the taser recorded.

21      Q.    Turning it on, turning it off, making it

22  safe, arming, these are all different functions,

23  correct?

24      A.    Correct.

25      Q.    Each one of those functions results in a



1   sequence number on the download?

2       A.    Correct.

3       Q.    He did not deploy his taser 533 times?

4       A.    No.

5       Q.    How many times did he deploy his taser?

6       A.    As best I can tell, nine.

7       Q.    How did you come up with that number?

8       A.    Because it would indicate the number of how

9   many times it was discharged and for how many seconds.

10  Many of these are just a one second discharge, which

11  when he first goes on shift he is trained to take his

12  taser out, remove the probes, spark it to make sure

13  it's charged and put it back together.

14          The only times where he has used it multiple

15  times are the ones that I list here on this sheet of

16  paper and I also listed them in my report.

17      Q.    How do you know what the circumstances are

18  under which he used it multiple times?

19      A.    I don't.

20      Q.    Do you know whether they were used on a live

21  subject in the field?

22      A.    I have no way of knowing.

23      Q.    Do you know whether they were ever used in

24  training?

25      A.    No way of knowing.



1      Q.   Do you know whether he was asked that

2  question in his deposition, how many times have you

3  ever used a taser as a law enforcement officer?

4      A.   I don't recall.

5      Q.   I will tell to you that his answer was two,

6  only one which was at Pinellas County Sheriff's

7  Office, and that was in this case with Mr. DeGraw.

8  Were you aware of that?

9      A.   No.

10      Q.   The only documents concerning Deputy

11  Goepfert's use of force at the Pinellas County

12  Sheriff's Office that you have reviewed in connection

13  with this matter are the investigative report of

14  Mr. DeGraw's death and the taser download that we have

15  been describing, correct?

16      A.   Correct.

17      Q.   No other use of force reports?

18      A.   No.

19      Q.   No internal affairs history?  I will

20  represent to you at our agency we call it

21  administrative investigations divisions.  You have not

22  seen any documents or internal affairs concerning

23  Deputy Goepfert, correct?

24      A.   Correct.

25      Q.   Have you seen any of Deputy Goepfert's



1  training records of any kind?

2      A.   No.

3      Q.   Do you know whether that material was

4  produced in this case?

5      A.   I don't know.

6      Q.   You mentioned that you also reviewed the

7  taser downloads for Deputy Martinez and Sergeant

8  Street.

9      A.   Correct.

10     Q.   You came to some conclusions I see there in

11 your report and the handwritten notes as far as the

12 number of times that they used their tasers, is that

13 right?

14     A.   That's correct as well.

15     Q.   You arrived at those numbers, if I understand

16 your testimony, by adding up the number of occasions

17 on which there was more than one activation of the

18 taser on any given day, is that right?

19     A.   Correct.

20     Q.   So you threw out the ones where there was

21 either just a single activation for any reason?

22     A.   Unless it was for multiple seconds.

23     Q.   You kept anything that was for multiple

24 seconds or occasions on which there was more than one

25 activation and threw the rest out?



1    A.    Correct.

2    Q.    From that you concluded that those were

3  occasions on which the deputy used the taser?

4    A.    More probably than not.

5    Q.    Do you even know whether any of these three

6  deputies were working on the days in which those

7  events occurred?

8    A.    I have no way of knowing that.

9    Q.    You didn't review any use of force reports or

10  reports of any kind in connection with Deputy Martinez

11  and Sergeant Street?

12    A.    You are correct.  I made the conclusion

13  strictly off the taser download reports.

14    Q.    You can't tell, you would agree from those

15  reports, whether the deputy used the taser in training

16  or whether he or she used the taser on a subject in

17  connection with undertaking law enforcement action?

18    A.    I cannot.

19    Q.    You can't tell whether the armor pulled the

20  trigger on the taser because it was in for service,

21  can you?

22    A.    I cannot.

23    Q.    You can't tell whether the deputy sheriff

24  spark tested it, that you mentioned, to make sure it

25  was functioning correctly before his or her shift?



1      A.    I can conclude that because it would be a one

2  second discharge at one time.

3      Q.    How many one second discharges were there on

4  Mr. DeGraw?

5      A.    Mr. DeGraw?

6      Q.    Correct.

7      A.    There were four discharges, one for three

8  seconds, one for five seconds, and if I remember

9  correctly there were two -- let me look at it

10  specifically.

11            Three seconds, one second, five seconds and

12  one second, a total of 10.

13      Q.    So 10 seconds, four activations of three,

14  one, five and one seconds?

15      A.    Three, one, five, and one.

16      Q.    Two of those were for one second, right?

17      A.    Correct.

18      Q.    You would agree you can't tell from looking

19  at taser -- the log of the taser download shows it was

20  active for one second as far as whether it was

21  actually used on somebody, can you, just based on this

22  very case?

23      A.    Yes, because it was in the sequence of

24  events.

25      Q.    How did you arrive at the conclusion that the



1  taser was used only four times in this case?

2     A.   Because it was listed on that date as being

3  used four times.

4     Q.   Where did you derive that information from?

5  Show me, if you would.

6     A.   In the sequence from 517 to 527, discharged

7  sequentially.

8     Q.   May I take a look at those?

9     A.   It's those that are listed there.

10    Q.   It looks like you missed one.  Look at 514.

11    A.   There would be two additional seconds.  It's

12 in the same time sequence.

13    Q.   What happened that that was missed, do you

14 know?

15    A.   I'm sorry?

16    Q.   What happened that caused that to be missed,

17 do you know?

18    A.   I don't.  Because I was looking at the dates

19 and times, and I don't know why I started with 1601

20 instead of 1558, but I apparently did.  You can add

21 two more seconds and one more sequence.

22    Q.   We may come back to that.

23         Let me take you through some other stuff that

24 you either did or did not review.  Did you review any

25 documents regarding mechanisms in place at the



 1  Pinellas County Sheriff's Office on use of force

 2  monitoring?

 3      A.   No.

 4      Q.   And that would be anywhere from the

 5  individual deputy sheriff level all the way through

 6  control operations bureau.  Agency-wide you didn't

 7  review any of those documents, correct?

 8      A.   You are correct.

 9      Q.   Did you review any documents concerning the

10  complaints of uses of force or excessive force for

11  Pinellas County Sheriff's Office?

12      A.   No.

13      Q.   Did you review any documents concerning the

14  sheriff's internal affairs investigations, policies

15  and procedures of any kind?

16      A.   No.

17      Q.   Did you review any documents concerning the

18  sheriff's discipline of his deputies concerning uses

19  of force?

20      A.   No.

21      Q.   I gather from that you do not have any

22  criticism that the sheriff's discipline of his

23  deputies was the moving force behind Deputy Goepfert's

24  actions in this case?

25      A.   Ask that again.



 1      Q.   Concerning the sheriff's internal affairs
 2  policies, procedures, discipline, therefore you have
 3  no criticisms that the sheriff's discipline of his
 4  deputies was the moving force behind Deputy Goepfert's
 5  actions in this case?
 6      A.   No, that would be a custom and practice issue
 7  and it doesn't.  I simply don't have that information.
 8      Q.   And therefore you do not have any opinions on
 9  that matter, correct?
10      A.   You are correct.  That it was the moving
11  force behind this particular incident, is what you are
12  asking?
13      Q.   That's correct.
14      A.   Then I answered correctly.
15      Q.   You are not critical of the sheriff's
16  discipline, right, of his deputies?
17      A.   Only in this case where he ratified the
18  conduct of Deputy Goepfert.
19      Q.   You have been critical of the sheriff's
20  operation of his agency when it comes to investigating
21  complaints of uses of force, investigating occasions
22  of excessive force, the results of those
23  investigations, and I'm talking agency-wide here,
24  because among other reasons you haven't reviewed any
25  of that material?



1      A.    I simply don't have the information.

2      Q.    Instead your criticism -- and we will talk

3   about it -- is you are critical of his reaction to

4   Deputy Goepfert's use of force on Donald DeGraw,

5   right?

6      A.    Exactly.

7      Q.    Are you critical of his discipline of Deputy

8   Goepfert as an individual deputy sheriff other than

9   concerning Deputy Goepfert's actions in this case?

10     A.    No, I have no such information.

11     Q.    You don't have any information at all

12  concerning Deputy Goepfert's past history with use of

13  force or anything else, right?

14     A.    That's correct.

15     Q.    What training data did you review from the

16  Pinellas County Sheriff's Office?

17     A.    None.

18     Q.    I gather from that therefore you are not

19  critical of Sheriff Gualtieri's training of his deputy

20  sheriffs in any respect?

21     A.    I don't know that I can say that because his

22  policy on use of the taser says avoid the chest area

23  rather than prohibits using the chest area.

24           I had one other item that I have since

25  forgotten.  Yeah, that's the only area.



1     Q.    And that's what I have heard referred to as
2  the wedding policy, the use of force policy itself,
3  13-3, it says "avoid the chest area"?
4     A.    Yes.
5     Q.    And your criticism is what?  Are you critical
6  of the sheriff's policy?
7     A.    "Prohibit using the chest area," is what it
8  should say.
9     Q.    So you have a criticism of the policy itself,
10 the sheriff's use of force policies concerning
11 electronic control weapons?
12    A.    Correct.
13    Q.    And that criticism is that it says "avoid
14 targeting the chest area" and it should say "prohibit
15 targeting the chest area"?
16    A.    Correct.
17    Q.    Do you have any other criticisms of general
18 order 13-3, which is the sheriff's use of force
19 policy?
20    A.    I think his statement that he doesn't believe
21 it caused the death or that tasers can cause death
22 indicates a policy of being more tolerant of the use
23 of tasers which is consistent with the amount of taser
24 use as shown on the downloads.
25          I must be coming down with something.  My



1  eyes are watering.

2      Q.   Do you need a break?

3      A.   I don't think a break is going to make any

4  difference.

5          MS. YARSLAVANE-CALLAHAN:  Can I help you with

6  anything?

7          THE WITNESS:  I will be fine.  I just can't

8  see very well.  As you know, I haven't been well

9  lately.

10         MS. YARSLAVANE-CALLAHAN:  We know that.

11 Opposing counsel knows that too.

12     Q.   If you need a break at any time for any

13 reason just let us know.

14     A.   I'm fine.  I'll take a break if I need one,

15 but I don't even like to get up because I'm not steady

16 on my feet.

17     Q.   Let me back this up a little bit and let's

18 break it down.

19         So this line of questioning started off with

20 my asking whether you were critical of the sheriff's

21 training of his deputies agency-wide in any way.  What

22 is your testimony in that regard?

23     A.   The only thing I'm critical of in training is

24 that the download of the three deputies' tasers

25 indicates that they have been using them multiple



1  times which far exceeds the average of one use per

2  taser per year.

3      Q.   You don't know how they were using them,

4  right?

5      A.   All I know is there were multiple uses at the

6  same time for periods of several seconds.

7      Q.   Do you have any idea whether a single one of

8  those instances that you have in your notes here and

9  that are reflected in your report -- and we will go

10 ahead and turn to that -- on page 17, right?  16C, one

11 and two.

12     A.   Just a second.

13     Q.   You are listing a number of dates and

14 activations and what appears to be the sum total of

15 time of those activations?

16     A.   Correct.

17     Q.   Do you know whether a single one of those

18 instances actually involved the deployment of a taser

19 on a human being?

20     A.   I don't have that information.

21     Q.   How can you therefore be critical in any way

22 or have any opinion whatsoever concerning the

23 sheriff's taser training based on this information if

24 you don't even know whether the taser was used on a

25 human being?



1      A.   All I know is they were used multiple times

2   in the sequence, and it's consistent with use with

3   deployment in the field.

4      Q.   It's also consistent with use in training,

5   correct?

6      A.   That's conceivable.

7      Q.   It's also consistent with armor checking the

8   weapon to make sure it's functioning properly, is that

9   correct?

10      A.   It's conceivable.

11      Q.   You are just guessing that they were used in

12   the field, right?

13      A.   I think that's what the information would

14   indicate to me or anybody that would look at it based

15   on that information alone.

16      Q.   Have you seen any use of force reports

17   concerning any of these dates that you list on page

18   17?

19      A.   I have not.

20      Q.   Have you seen any information of any kind

21   that supports your conclusion that any of these taser

22   activations, let alone the sum total of them, was a

23   use of force?

24      A.   No.

25      Q.   Other than this testimony you have given



1   about the number of times a taser was activated from

2   these event logs, is there any other basis for your

3   criticism of the sheriff's taser training program?

4        A.   No.

5        Q.   In fairness to you we will come back.  I know

6   this isn't your first rodeo.  We will come back and

7   talk about the policy.  We will talk about 13-3 and

8   your criticisms of use of force in ECWs.

9             I want to make sure we have covered

10  criticisms concerning agency-wide training.  Have we?

11       A.   I think so.

12       Q.   Believe it or not we got on this line of

13  questions from a question that was originally designed

14  to elicit from you things that you found significant

15  in the sheriff's deposition testimony in the DeGraw

16  case, and to reorient you, you had mentioned -- you

17  pointed out that he -- your understanding was that he

18  did not track taser use.  Do you remember that

19  testimony?

20       A.   Yes.

21       Q.   Was there anything else significant to you or

22  the opinions that you have reached in this case from

23  the sheriff's deposition testimony in the DeGraw

24  matter?

25       A.   He says that he doesn't believe it was the



1  cause of the plaintiff's death when the ME has said
2  that it was contributory.  That he reviewed all the
3  facts.  He is clearly the chief policymaker for the
4  department.  He doesn't believe you would have to
5  repeat taser training once you give the original
6  training, and that he didn't prohibit using the taser,
7  to deploy it into the chest.
8      Q.   Anything else?
9      A.   No.
10     Q.   Do you know how often deputies receive
11 training involving tasers or ECWs at the Pinellas
12 County Sheriff's Office?
13     A.   I believe they are required to have
14 retraining once a year.
15     Q.   Are you critical of that in any way?
16     A.   Simply that I don't know what training they
17 are giving them once a year.
18     Q.   Do you know whether those documents have been
19 produced in this case?
20     A.   I don't.
21     Q.   Therefore it is fair to assume, I imagine,
22 that you don't have any criticisms of the sheriff's
23 taser training as it's delivered to his deputies?
24     A.   Just that he says you don't really need to
25 retrain them after you have trained them the first



1  time.

2       Q.   He can say whatever he wants if he does

3  something different.  Isn't that what matters here is

4  the content of the training, that's what I'm trying

5  ferret out.

6            Is there any criticism that you have of the

7  content of the training that's delivered at Pinellas

8  County Sheriff's Office as it regards taser?

9            MS. YARSLAVANE-CALLAHAN:  Objection, form.

10           THE WITNESS: He is the chief policymaker.  If

11 he doesn't believe they need to be retrained after the

12 initial lesson plan, that's setting an inadequate

13 policy.

14      Q.   Do you know what the sheriff's policy is on

15 how often a deputy receives taser training?

16      A.   I believe they are supposed to receive it

17 once a year, but that's a state standard.

18      Q.   Do you know whether the Pinellas County

19 Sheriff's Office follows that state standard?

20      A.   I don't know for certain.  I can't say that.

21      Q.   You mentioned here a couple times that you

22 are critical of the sheriff in this case because he

23 has testified -- at least you understand his testimony

24 to be -- that he doesn't believe that a taser can

25 cause death.  Is that correct?



1      A.    That's correct.

2      Q.    Is he alone in that view?

3      A.    Well, PACER would have you believe that it

4  doesn't cause death even though they warn you not to

5  use it -- not to deploy it into the chest.  No, there

6  are people out there that believe that the taser

7  doesn't cause death.  The fact of the matter is that

8  it has, many times.

9      Q.    Let's break this down.  First of all, you

10  have not offered here in the 19 pages of this report

11  the opinion that a taser caused Mr. DeGraw's death.  I

12  didn't see that anywhere, is that correct?

13      A.    That's a medical opinion.  It's not an

14  opinion that I can have.

15      Q.    It's not in your report, right?

16      A.    That's right.

17      Q.    You are not going to be offering that opinion

18  in this case, correct?

19      A.    What opinion?

20      Q.    That the taser caused Mr. DeGraw's death.

21      A.    That's not proper testimony from me.

22      Q.    So therefore you are not going to be offering

23  it, correct?

24      A.    I doubt I would be asked, but if I asked and

25  the judge rules I can answer, I will answer.



1     Q.   Do you intend to offer an opinion in this
2  case on the cause of Mr. DeGraw's death?
3     A.   No.
4     Q.   You have no medical education or training of
5  any kind, correct?
6     A.   I wouldn't say.  I have been through the
7  coroner's death investigation school.  I was a deputy
8  coroner at one time.  I attended a lot of autopsies,
9  but I'm certainly not a medical doctor.
10    Q.   Have you ever been permitted to opine on a
11 cause of death in a court of law?
12    A.   Sure.  Shootings.
13    Q.   Is this a shooting case?
14    A.   No, it's not.
15    Q.   Have you ever opined on the cause of death in
16 a taser case?
17    A.   No.
18    Q.   Regarding the frequency of these two
19 deputies' taser activations on page 17 that we spent
20 some time talking about, what did you compare those
21 to?
22    A.   I compared them to each other and Sergeant
23 Street as well, although I didn't include him in the
24 report.
25    Q.   I don't see him in the report.



1      A.   He is not.

2      Q.   So you looked at three deputies' taser

3  downloads?

4      A.   Correct.

5      Q.   And came to some conclusions about the

6  frequency of their taser use from the event downloads,

7  correct?

8      A.   Correct.

9      Q.   You did not look at the event downloads for

10  anybody else, correct?

11      A.   Correct.

12      Q.   You compared these three deputies to each

13  other?

14      A.   To the extent that I could.

15      Q.   Did you compare them to anything else?

16      A.   No.

17      Q.   Do you have any information, or did you

18  review any documents, concerning the number of citizen

19  contacts that the Pinellas County Sheriff's Office has

20  in any given year?

21      A.   No.

22      Q.   Did you review any documents for the number

23  of calls for service of the Pinellas County Sheriff's

24  Office?

25      A.   No.



1      Q.    The number of arrests?

2      A.    No.

3      Q.    The number of uses of force?

4      A.    No.

5      Q.    Or the nature of any of uses of force by the

6   Pinellas County Sheriff's Office?  Hands, batons, OC,

7   taser, firearms, canines, you didn't see any of those

8   documents, is that correct?

9      A.    That's correct.

10     Q.    Do you know whether those documents have been

11  produced in this case?

12     A.    I don't.

13     Q.    Did you review any documents concerning the

14  tracking of subject injuries caused during a use of

15  force from the Pinellas County Sheriff's Office?

16     A.    No.

17     Q.    Do you know whether those documents have been

18  produced in this case?

19     A.    I have no idea.

20     Q.    From going through your materials here it

21  appeared that the only policy that you reviewed of the

22  sheriff's is 13-3, the use of force policy, is that

23  correct?

24     A.    I believe that's correct.

25     Q.    I saw a reference in your report, and I will



1  go ahead and apologize for the nature of that last

2  question, it may be in your materials, I didn't see it

3  though, that you made a reference to general order

4  13-10.

5      A.   I have all the policies together in one

6  place.  All that I have is this.

7      Q.   You've handed me what's been marked in this

8  case as Exhibit 31.  That's not a policy of the

9  Pinellas County Sheriff's Office, is it?

10     A.   I don't believe it is.  I have the one from

11 the criminal justice specialized course on stun gun,

12 and I have the Florida statute.

13     Q.   You have handed -- let me identify this

14 stuff.  CJKTC, FDLE's training component.  Do you

15 understand that's what that is?

16     A.   Yes.

17     Q.   You have handed me an instructor guide.

18 That's not a policy of the Pinellas County Sheriff's

19 Office, is it?

20     A.   No, it's not.

21     Q.   There is also a student guide here clipped to

22 the same set of materials?

23     A.   Instructor guide and student guide.

24     Q.   You mentioned a Florida statute, it's

25 9431717.  That's not a policy of the Pinellas County



 1  Sheriff's Office, is it?

 2      A.    No, but they would be required to follow it.

 3      Q.    Let me ask it this way:  Do you have any

 4  criticisms of any of the sheriff's policies other than

 5  his use of force policy, 13-3?

 6      A.    No, sir.

 7      Q.    Do you believe any aspect of 13-3, the

 8  sheriff's use of force policy, is unconstitutional?

 9      A.    No.

10      Q.    To put it another way, it would be your --

11  help me with the right word -- preference or

12  suggestion that instead of that policy permitting but

13  suggesting a deputy avoid the chest area, that instead

14  a sheriff flat out prohibit deployments in the chest

15  area?

16      A.    That's a fair statement.

17      Q.    You would rather it said something different

18  than it did, that would be best practices?

19      A.    That's correct.

20      Q.    But as that policy lays there you are not

21  testifying it's illegal, it's not unconstitutional?

22            MS. YARSLAVANE-CALLAHAN:  Objection as to the

23  form.

24            THE WITNESS:  I can't give such opinions

25  anyway, but no.



 1      Q.   Have you reviewed any documents concerning

 2 Sheriff Gualtieri's supervision or oversight of his

 3 deputies, in particular concerning their use of force?

 4      A.   I don't know what documents those would be.

 5      Q.   You haven't seen any such documents?

 6      A.   No, sir.

 7      Q.   You don't have any knowledge of the sheriff's

 8 review and supervision of the performance of his

 9 deputies in any regard, do you?

10      A.   No.

11      Q.   From the materials you've seen in this case.

12      A.   That's right, except that he ratified the

13 conduct in this case.

14      Q.   You have said that a couple times, that he

15 ratified the conduct.

16      A.   He has approved it, reviewed the facts of the

17 case, and took no disciplinary or corrective action

18 against the deputy.

19      Q.   Whatever the sheriff did in connection with

20 your claim that he ratified Deputy Goepfert's conduct,

21 all of that occurred after the use of force in this

22 case, correct?

23      A.   That would be correct.

24      Q.   You are aware, or are you aware that the

25 plaintiff has sued Sheriff Gualtieri in his personal



 1  individual capacity in this case?

 2      A.   It's probably in the complaint, but it's not

 3  something that I would pay any attention to.

 4      Q.   I will represent to you that he is sued not

 5  only in official capacity but individually as well.

 6  We can find that in the complaint if you would like.

 7      A.   I will take your word for it.  It's not

 8  unusual.

 9      Q.   Do you have any criticisms of Sheriff

10  Gualtieri's actions or omissions in his individual

11  capacity?

12      A.   I would have no idea.

13      Q.   Back to your report on page 2, some of these

14  materials that you have reviewed here.  H, you

15  describe it as comparable to Tampa Police Department's

16  standard operating procedure on electronic control

17  devices, tasers, from September 1 of 2016.  Do you see

18  that?

19      A.   Yes.

20      Q.   What was significant to you about that?

21      A.   They prohibit chest shots.

22      Q.   Let's take a look at that, if you would find

23  it for me.  Show me what it is that you are looking

24  at.

25           You have highlighted a couple things here.



1    Page 1 of 9 of this document that is part of the

2    materials here, it says "The ECD shall not be

3    intentionally aimed at a person's head, neck, upper

4    chest or groin." Is that what you are referring to?

5        A.    Yes, sir.

6        Q.    Is there anything else in this policy that

7    you are referring to?

8        A.    I think they limit the use of force to 15

9    seconds, but that wouldn't be -- they prohibit use for

10   more than 15 seconds total.

11       Q.    They prohibit it for more than 15 seconds, is

12   that what it says?

13       A.    It says it must be justified by the

14   circumstances and fully documented reports.

15       Q.    Does it prohibit the use of a taser for more

16   than 15 seconds?

17       A.    "Prohibit" is the wrong word.  It does not

18   permit it without being fully documented.  They also

19   shall not use force solely to force a passive subject

20   into compliance.

21       Q.    I didn't understand that last part.

22       A.    The taser shall not be deployed by sworn

23   personnel solely to force a passive subject into

24   compliance.

25       Q.    You can't use an electronic control weapon



1  for passive resistance only, correct?

2       A.   Correct.

3       Q.   Why is that significant to you in this case?

4       A.   Because the decedent was not actively

5  resistant.

6       Q.   Let's back up and talk about the sheriff's

7  use of force policy.  Are you critical of the

8  sheriff's use of force policy in this case, 13-3, as

9  it concerns the circumstances in which an electronic

10 control weapon or taser can be used?

11      A.   No.

12      Q.   The Tampa policy, first of all nobody here

13 used a taser for 15 seconds on DeGraw, correct?

14      A.   Right.

15      Q.   Your understanding of the 15 seconds is that

16 that is a single activation of 15 seconds, is that

17 right?

18      A.   No, multiple applications.

19      Q.   Sum total of energy of 15 seconds?

20      A.   Right.

21      Q.   You would agree that every single use of

22 force, whether one second or 15 seconds or more than

23 15 seconds has to be justified, correct?

24      A.   I agree with that.

25      Q.   This document that we have been talking about



1   from the Tampa Police Department, I know you are

2   familiar with these, the header has information from

3   PACER, the electronic case management software for the

4   federal court system.

5            (Discussion off the record.)

6            (Recess.)

7            MR. ROZELLE:  We have been off the record for

8   awhile.  During the time off the record

9   Mr. VanBlaricom has indicated that he is unable to

10  continue the deposition today.

11       Q.   Is that correct, sir?

12       A.   I don't think -- I'm a lot better than this.

13  Giving depositions is something I've done hundreds of

14  times and I'm just not doing worth a damn today.

15       Q.   So you are unable to continue your deposition

16  today?

17       A.   If you want to continue, having come as far

18  as you have, I will try my best.

19            MS. YARSLAVANE-CALLAHAN:  As the lawyer who

20  retained you I would recommend that we continue the

21  deposition.

22            THE WITNESS:  If it's okay with you guys it's

23  fine with me.

24       Q.   To be clear, I think counsel are collectively

25  here ready, willing, and able to continue.  Only you



1  know what is in your heart and mind and how you are

2  feeling.  If you are, then we will continue.  My

3  understanding from the time that we were off the

4  record is that you weren't.  I want to be clear about

5  that.

6      A.    You're clear.

7      Q.    It is your decision that you are not able to

8  give testimony?

9      A.    Yes.  I will not charge anything for the next

10  time.

11          MR. ROZELLE: What we will do then by the

12  agreement of counsel is we are going to continue this

13  deposition to a mutually agreeable time and other

14  issues that flow from that we will take up amongst

15  ourselves.  We don't need to put any of that on the

16  record.  Is that agreeable?

17          THE WITNESS: Yes.

18          MS. YARSLAVANE-CALLAHAN:  Fine.

19          MR. ROZELLE:  I will order.

20          (Deposition adjourned at 1:15 p.m.)

21

22

23

24

25



1                 C E R T I F I C A T E

2    STATE OF WASHINGTON

3    COUNTY OF KING

4          I, the undersigned Certified Shorthand

5    Reporter and Washington Certified Court Reporter,

6    hereby certify that the foregoing deposition upon oral

7    examination DP VanBlaricom, taken stenographically

8    before me on January 30, 2020 transcribed under my

9    direction;

10   That the witness was duly sworn by me to testify

11   truthfully; that the transcript of the deposition is a

12   full, true and correct transcript to the best of my

13   ability; that I am neither attorney for nor a relative

14   or employee of any of the parties to the action or any

15   attorney or counsel employed by the parties hereto nor

16   financially interested in its outcome.

17          WHEREOF, I have hereunto set my hand this 6th

18   day of February, 2020.

19

20

21   *Julie C. Oswald*

22

23   JULIE C. OSWALD

24   Washington Certified Court Reporter No. 2709

25   License expires July 10, 2020



**(**

**(2)** 5:9

**(a)** 5:8

**(B)** 5:9

**1**

**1** 8:6,15 39:17 40:1

**10** 20:12,13

**100** 5:25

**12** 12:14

**13-10** 36:4

**13-3** 25:3,18 29:7 35:22 37:5,7
    41:8

**15** 12:20 40:8,10,11,16 41:13,15,
    16,19,22,23

**1558** 21:20

**1601** 21:19

**16C** 27:10

**17** 27:10 28:18 33:19

**18-page** 4:7

**19** 8:14 15:13 32:10

**19-page** 15:8

**2**

**2** 39:13

**20** 13:25

**2016** 39:17

**2017** 8:15 13:25

**2019** 4:15,18 7:4

**21** 4:15,18

**26** 5:8

**3**

**31** 36:8

**4**

**4** 6:24 7:9 8:15

**42** 3:2,24 4:3,19 5:18 6:23

**4A** 11:10

**4B** 10:10

**5**

**514** 21:10

**517** 21:6

**527** 21:6

**533** 14:23 15:12 16:3

**6**

**60** 12:10

**7**

**7** 11:22

**8**

**80** 12:10

**9**

**9** 40:1

**9431717** 36:25

**A**

**accurate** 5:23

**action** 11:9 19:17 38:17

**actions** 22:24 23:5 24:9 39:10

**activated** 29:1

**activation** 18:17,21,25 41:16

**activations** 20:13 27:14,15
    28:22 33:19

**active** 20:20

**actively** 41:4

**add** 21:20

**adding** 18:16

**additional** 21:11

**administrative** 17:21

**affairs** 17:19,22 22:14 23:1

**affect** 7:11

**agency** 17:20 23:20

**agency-wide** 22:6 23:23 26:21
    29:10

**aggregate** 14:5

**agree** 19:14 20:18 41:21,24

**ahead** 27:10 36:1

**aimed** 40:3

**amended** 11:10,12

**amount** 25:23

**apologize** 36:1

**apparently** 21:20

**appeared** 5:21 35:21

**appears** 5:17 6:25 27:14

**applications** 12:6,9 41:18

**approved** 38:16

**approximately** 5:20

**area** 24:22,23,25 25:3,7,14,15
    37:13,15

**arming** 15:19,22

**armor** 19:19 28:7

**armor-triggered** 15:3

**arrested** 11:3

**arrests** 35:1

**arrive** 20:25

**arrived** 18:15

**aspect** 37:7

**assume** 30:21

**attended** 33:8

**attention** 39:3

**autopsies** 33:8



**average** 27:1

**avoid** 24:22 25:3,13 37:13

**aware** 9:21 10:2 14:13 17:8 38:24

**awhile** 42:8

**B**

**back** 15:7 16:13 21:22 26:17 29:5,6 39:13 41:6

**based** 20:21 27:23 28:14

**basis** 29:2

**Bate's** 15:6

**batons** 35:6

**believes** 9:6

**Bellevue** 3:1

**bit** 26:17

**Bob** 7:25 8:12 10:15

**bottom** 8:15 15:13

**break** 8:11 26:2,3,12,14,18 32:9

**brought** 3:11 5:13

**Brown** 13:1

**bureau** 22:6

**C**

**call** 17:20

**calls** 34:23

**canines** 35:7

**capacity** 10:15 39:1,5,11

**case** 3:11,15 8:20,21,23,24 9:12, 15,18 10:13,17,23 11:18 12:4 14:14 17:7 18:4 20:22 21:1 22:24 23:5,17 24:9 29:16,22 30:19 31:22 32:18 33:2,13,16 35:11,18 36:8 38:11,13,17,22 39:1 41:3,8 42:3

**categories** 12:23

**caused** 9:1 10:7 21:16 25:21 32:11,20 35:14

**charged** 16:13

**checking** 28:7

**chest** 24:22,23 25:3,7,14,15 30:7 32:5 37:13,14 39:21 40:4

**chief** 9:4 30:3 31:10

**circumstances** 16:17 40:14 41:9

**citizen** 34:18

**CJKTC** 36:14

**claim** 11:5,15 38:20

**clear** 12:21 42:24

**clipped** 36:21

**collectively** 42:24

**column** 15:14

**comparable** 39:15

**compare** 33:20 34:15

**compared** 33:22 34:12

**complaint** 11:10,12 39:2,6

**complaints** 22:10 23:21

**compliance** 40:20,24

**component** 36:14

**composite** 3:24

**conceivable** 28:6,10

**concerns** 41:9

**conclude** 20:1

**concluded** 19:2

**conclusion** 19:12 20:25 28:21

**conclusions** 18:10 34:5

**conduct** 12:7 23:18 38:13,15,20

**conference** 5:14 6:19

**connection** 3:12 4:11 5:22 6:16, 20 7:2 8:17 10:4 14:2 17:12 19:10,17 38:19

**consistent** 25:23 28:2,4,7

**contacts** 34:19

**contained** 11:20

**content** 31:4,7

**continue** 42:10,15,17,20,25

**contributory** 30:2

**control** 22:6 25:11 39:16 40:25 41:10

**coroner** 33:8

**coroner's** 33:7

**correct** 4:8,9,20 5:5,10,11,18,24 7:5,18 8:16 10:18 11:21 13:20 14:4,7,8,12 15:10,11,14,15,16,17, 23,24 16:2 17:15,16,23,24 18:9, 14,19 19:1,12 20:6,17 22:7,8 23:9,10,13 24:14 25:12,16 27:16 28:5,9 31:25 32:1,12,18,23 33:5 34:4,7,8,10,11 35:8,9,23,24 37:19 38:22,23 41:1,2,13,23 42:11

**corrective** 38:17

**correctly** 13:10,11 19:25 20:9 23:14

**counsel** 10:6 12:17 26:11 42:24

**County** 3:9 10:16 13:13,19 14:7, 11 17:6,11 22:1,11 24:16 30:12 31:8,18 34:19,23 35:6,15 36:9,18, 25

**couple** 31:21 38:14 39:25

**court** 33:11 42:4

**covered** 29:9

**criminal** 36:11

**criminally** 9:21

**critical** 23:15,19 24:3,7,19 25:5 26:20,23 27:21 30:15 31:22 41:7

**criticism** 22:22 24:2 25:5,9,13 29:3 31:6

**criticisms** 23:3 25:17 29:8,10 30:22 37:4 39:9

**current** 5:6

**custom** 23:6

**CV** 4:25

**D**

**damn** 42:14

**data** 13:19 14:5,9 24:15

**date** 21:2

**dated** 4:14



**dates** 21:18 27:13 28:17

**day** 18:18

**days** 12:19 19:6

**death** 9:1,7 10:8 12:5 14:1 17:14 25:21 30:1 31:25 32:4,7,11,20 33:2,7,11,15

**decedent** 41:4

**Defendant's** 10:10

**defendants** 10:12

**Degraw** 11:5,18 17:7 20:4,5 24:4 29:15,23 41:13

**Degraw's** 14:1 17:14 32:11,20 33:2

**delivered** 30:23 31:7

**department** 9:5 30:4 42:1

**Department's** 39:15

**deploy** 16:3,5 30:7 32:5

**deployed** 40:22

**deployment** 13:8 27:18 28:3

**deployments** 12:12,22 13:3,14, 21,22 14:10,18,21,24 37:14

**deposition** 3:2,14,25 5:9,13 7:12 8:2,6,8,12 10:9 11:17 17:2 29:15, 23 42:10,15,21

**depositions** 42:13

**deputies** 3:10 6:11 9:6 13:7,23 14:6 19:6 22:18,23 23:4,16 26:21 30:10,23 34:12 38:3,9

**deputies'** 26:24 33:19 34:2

**deputy** 3:13 9:18 12:18,24,25 13:5,15 14:5,18,21 15:10 17:10, 23,25 18:7 19:3,10,15,23 22:5,23 23:4,18 24:4,7,8,9,12,19 31:15 33:7 37:13 38:18,20

**derive** 21:4

**describe** 8:13 39:15

**describing** 17:15

**designed** 29:13

**devices** 39:17

**difference** 26:4

**discharge** 16:10 20:2

**discharged** 16:9 21:6

**discharges** 20:3,7

**disciplinary** 38:17

**discipline** 22:18,22 23:2,3,16 24:7

**discussion** 42:5

**divisions** 17:21

**doctor** 33:9

**document** 4:21 15:4,8 40:1 41:25

**documented** 40:14,18

**documents** 6:8,11,18,20 7:13 13:18 14:13 17:10,22 21:25 22:7, 9,13,17 30:18 34:18,22 35:8,10, 13,17 38:1,4,5

**Donald** 3:21 24:4

**doubt** 32:24

**doubted** 9:1

**download** 16:1 17:14 19:13 20:19 26:24

**downloads** 6:11 18:7 25:24 34:3,6,9

**Dylan** 10:17,22

**E**

**ECD** 40:2

**ECW** 13:8

**ECWS** 29:8 30:11

**education** 33:4

**eighth** 5:16

**electronic** 25:11 39:16 40:25 41:9 42:3

**elicit** 29:14

**energy** 41:19

**enforcement** 17:3 19:17

**engagement** 8:18

**event** 15:18,20 29:2 34:6,9

**events** 7:16,17 19:7 20:24

**evidently** 5:17

**EXAMINATION** 3:4

**exceeds** 27:1

**excessive** 22:10 23:22

**excuse** 12:10

**exhibit** 3:2,24 4:3,18,22 5:3,8,18 6:23 36:8

**expert** 3:14 7:12

**extent** 34:14

**eyes** 26:1

**F**

**fact** 7:17 32:7

**facts** 30:3 38:16

**fair** 30:21 37:16

**fairness** 29:5

**familiar** 4:2 42:2

**FDLE's** 36:14

**federal** 42:4

**fees** 5:3

**feet** 26:16

**ferret** 31:5

**field** 16:21 28:3,12

**find** 39:6,22

**fine** 26:7,14 42:23

**firearms** 35:7

**fired** 9:25 11:4

**flat** 37:14

**flip** 4:21

**Florida** 10:16 36:12,24

**folders** 5:15,20

**follow** 12:13 37:2

**force** 3:12 9:19 12:22 13:4,18,25 14:6 17:11,17 19:9 22:1,10,19,23 23:4,11,21,22 24:4,13 25:2,10,18 28:16,23 29:8 35:3,5,15,22 37:5,8 38:3,21 40:8,19,23 41:7,8,22

**forgotten** 24:25



**form** 31:9 37:23

**found** 29:14

**frequency** 33:18 34:6

**front** 6:10

**full** 3:19

**fully** 40:14,18

**functioning** 19:25 28:8

**functions** 15:22,25

---

**G**

**gather** 22:21 24:18

**gave** 7:18 8:13 11:17

**general** 25:17 36:3

**Gertkin's** 11:3

**give** 3:17 30:5 37:24

**giving** 30:17 42:13

**Goepfert** 3:10,13 6:12 13:23 14:19,22 15:10 17:23 23:18 24:8

**Goepfert's** 17:11,25 22:23 23:4 24:4,9,12 38:20

**Good** 3:6,7

**groin** 40:4

**Gualtieri** 3:10 8:1,13,14 10:15 11:17 12:8 38:25

**Gualtieri's** 12:4 24:19 38:2 39:10

**guessing** 28:11

**guide** 36:17,21,23

**guilty** 9:23

**gun** 36:11

**guys** 42:22

---

**H**

**hand** 15:7

**handed** 36:7,13,17

**Hands** 35:6

**handwriting** 6:3,5

**handwritten** 6:9 18:11

**happened** 8:22 9:17 21:13,16

**head** 40:3

**header** 42:2

**heard** 25:1

**highlighted** 39:25

**history** 17:19 24:12

**Holmes** 9:12

**human** 27:19,25

**hundreds** 42:13

---

**I**

**idea** 27:7 35:19 39:12

**identified** 7:1 11:9

**identify** 15:4 36:13

**illegal** 37:21

**imagine** 30:21

**impact** 7:23

**inadequate** 31:12

**inch** 5:16

**inches** 5:21

**incident** 23:11

**include** 11:23 33:23

**individual** 9:17 13:5 22:5 24:8 39:1,10

**individually** 39:5

**information** 21:4 23:7 24:1,10, 11 27:20,23 28:13,15,20 34:17 42:2

**initial** 31:12

**injuries** 35:14

**injury** 9:14

**instances** 27:8,18

**instructor** 36:17,23

**intend** 33:1

**intentionally** 40:3

**interested** 8:25

---

**internal** 17:19,22 22:14 23:1

**investigated** 12:6

**investigating** 23:20,21

**investigation** 14:1 33:7

**investigations** 17:21 22:14 23:23

**investigative** 17:13

**involved** 27:18

**involving** 30:11

**isolate** 13:8

**issue** 9:19 23:6

**issued** 13:23,24 15:10

**item** 8:15 24:24

---

**J**

**Jones** 13:1

**judge** 32:25

**judgment** 10:10,12,16

**justice** 36:11

**justified** 40:13 41:23

---

**K**

**kind** 4:17 15:18 18:1 19:10 22:15 28:20 33:5

**knew** 11:1

**knowing** 16:22,25 19:8

**knowledge** 38:7

---

**L**

**law** 17:3 19:17 33:11

**lawyer** 3:8 42:19

**lays** 37:20

**left-hand** 15:14

**lesson** 31:12

**let alone** 28:22

**level** 22:5



**limit** 40:8

**list** 8:3,8 12:23,24,25 14:23 16:15 28:17

**listed** 7:9,14 16:16 21:2,9

**listing** 27:13

**live** 16:20

**log** 20:19

**logs** 29:2

**looked** 7:22 34:2

**lot** 33:8 42:12

### M

**made** 6:16 19:12 36:3

**make** 16:12 19:24 26:3 28:8 29:9

**making** 15:21

**management** 42:3

**manilla** 5:15

**marked** 3:2,24 36:7

**Martinez** 3:10 6:12 13:23 18:7 19:10

**material** 18:3 23:25

**materials** 4:6 5:13,22 6:1,6,20 7:1,3 8:10 10:14 35:20 36:2,22 38:11 39:14 40:2

**matter** 4:4,11 5:23 6:16,21 7:2 8:7,13,18 10:5 11:6 12:7 14:3 17:13 23:9 29:24 32:7

**matters** 31:3

**mechanism** 9:14

**mechanisms** 21:25

**medical** 32:13 33:4,9

**mentioned** 15:12 18:6 19:24 29:16 31:21 36:24

**misconduct** 11:3

**missed** 21:10,13,16

**model** 15:9

**moment** 11:19

**monitoring** 22:2

**morning** 3:6,7,13

**motion** 10:10,15

**moved** 10:12

**moving** 22:23 23:4,10

**multiple** 16:14,18 18:22,23 26:25 27:5 28:1 41:18

### N

**nature** 35:5 36:1

**neck** 40:3

**note** 11:2

**notes** 6:1,9,12,15 10:25 12:1 18:11 27:8

**noticed** 8:2

**November** 4:15,18 7:4 11:22

**number** 6:24 12:19,21 13:3,14, 15 14:10,21,25 15:2,13,16 16:1,7, 8 18:12,16 27:13 29:1 34:18,22 35:1,3

**numbered** 15:6

**numbers** 12:11 18:15

### O

**Objection** 31:9 37:22

**OC** 35:6

**occasions** 18:16,24 19:3 23:21

**occurred** 7:16,17 19:7 38:21

**October** 8:14

**offer** 33:1

**offered** 32:10

**offering** 32:17,22

**Office** 3:9 13:13,19 14:7,11 17:7, 12 22:1,11 24:16 30:12 31:8,19 34:19,24 35:6,15 36:9,19 37:1

**officer** 17:3

**official** 39:5

**omissions** 39:10

**operating** 39:16

**operation** 23:20

**operations** 22:6

**opine** 33:10

**opined** 33:15

**opinion** 7:11 27:22 32:11,13,14, 17,19 33:1

**opinions** 7:8,18,23 11:20 23:8 29:22 37:24

**opportunity** 5:12

**Opposing** 26:11

**order** 25:18 36:3

**oriented** 4:5

**original** 30:5

**originally** 29:13

**oversight** 38:2

### P

**PACER** 32:3 42:3

**pages** 5:1,8 6:24 7:9 32:10

**paper** 6:9,14 16:16

**paragraph** 6:24 7:9

**paragraphs** 6:25

**part** 4:18 40:1,21

**passive** 40:19,23 41:1

**past** 24:12

**Paul** 3:8

**pay** 39:3

**PCSO001151** 15:6

**PCSO001169** 15:6

**people** 32:6

**perform** 9:6

**performance** 38:8

**period** 13:6 14:10

**periods** 27:6

**permit** 40:18

**permitted** 33:10

**permitting** 37:12



**Perry** 3:21

**person's** 40:3

**personal** 38:25

**personnel** 40:23

**phonetic** 11:3

**Pinellas** 3:9 10:16 13:13,19 14:7, 11 17:6,11 22:1,11 24:16 30:11 31:7,18 34:19,23 35:6,15 36:9,18, 25

**place** 21:25 36:6

**plaintiff** 3:15 38:25

**plaintiff's** 10:6 30:1

**plan** 31:12

**Pleaded** 9:23

**point** 8:4

**pointed** 29:17

**Police** 39:15 42:1

**policies** 22:14 23:2 25:10 36:5 37:4

**policy** 24:22 25:2,6,9,19,22 29:7 31:13,14 35:21,22 36:8,18,25 37:5,8,12,20 40:6 41:7,8,12

**policymaker** 9:4 30:3 31:10

**portion** 10:8

**practice** 23:6

**practices** 37:18

**preference** 37:11

**prepared** 4:11

**present** 5:14 7:8

**pretty** 5:16

**probes** 16:12

**procedure** 39:16

**procedures** 22:15 23:2

**proceeding** 5:10

**produced** 14:14 18:4 30:19 35:11,18

**program** 29:3

**prohibit** 25:7,14 30:6 37:14 39:21 40:9,11,15,17

**prohibits** 24:23

**proper** 32:21

**properly** 28:8

**prosecuted** 9:21

**pulled** 19:19

**put** 16:13 37:10

---

## Q

**question** 12:17 14:20 17:2 29:13 36:2

**questioning** 26:19

**questions** 4:7 29:13

**quote** 13:7

---

## R

**ratification** 11:1,5,15

**ratified** 12:7 23:17 38:12,15,20

**ratify** 11:2

**reached** 29:22

**reaction** 24:3

**read** 13:10,11

**reading** 15:5

**ready** 4:1 42:25

**reason** 9:9 18:21 26:13

**reasons** 23:24

**recall** 9:13,16 17:4

**receive** 30:10 31:16

**receives** 31:15

**Recess** 42:6

**recommend** 42:20

**record** 3:20,23 13:3 42:5,7,8

**recorded** 15:20

**records** 13:16,25 18:1

**reference** 35:25 36:3

**referred** 25:1

**referring** 40:4,7

**reflected** 27:9

**regard** 26:22 38:9

**rely** 7:15

**remember** 8:24 20:8 29:18

**remove** 16:12

**rendered** 7:4 11:20

**rendering** 7:7

**reorient** 29:16

**repeat** 30:5

**report** 4:4,8,10,14,18 6:23 7:4,8, 10,11,14,18 8:3,9 9:2 11:20,24 16:16 17:13 18:11 27:9 32:10,15 33:24,25 35:25 39:13

**reports** 7:12 17:17 19:9,10,13,15 28:16 40:14

**represent** 3:9 10:11 11:8,11 15:7 17:20 39:4

**required** 30:13 37:2

**resistance** 41:1

**resistant** 41:5

**respect** 24:20

**rest** 18:25

**results** 15:25 23:22

**retained** 3:15 42:20

**retrain** 30:25

**retrained** 31:11

**retraining** 30:14

**review** 8:17 10:4,20 11:19 19:9 21:24 22:7,9,13,17 24:15 34:18, 22 35:13 38:8

**reviewed** 5:22 6:20 7:1,3,9,13,20 8:7,10 11:25 12:1 13:17 17:12 18:6 23:24 30:2 35:21 38:1,16 39:14

**rodeo** 29:6

**room** 6:19

**Rozelle** 3:5,8 42:7

**Rule** 5:8

**rules** 32:25

---



## S

**safe** 15:22

**satisfy** 11:14 15:8

**schedule** 5:3

**school** 33:7

**seconds** 16:9 18:22,24 20:8,11, 13,14 21:11,21 27:6 40:9,10,11, 16 41:13,15,16,19,22,23

**separate** 12:23,25 13:5

**September** 13:24 39:17

**sequence** 15:16 16:1 20:23 21:6, 12,21 28:2

**sequentially** 21:7

**Sergeant** 3:11 13:24 18:7 19:11 33:22

**service** 19:20 34:23

**services** 5:4

**set** 36:22

**sets** 9:5

**setting** 31:12

**sheet** 6:9 13:6 16:15

**sheets** 6:14

**sheriff** 3:10 7:25 8:12 10:7,15 11:2,17 12:4,8 19:23 22:5 24:8,19 31:22 37:14 38:2,19,25 39:9

**sheriff's** 3:9 13:13,19 14:7,11 17:6,12 22:1,11,14,18,22 23:1,3, 15,19 24:16 25:6,10,18 26:20 27:23 29:3,15,23 30:12,22 31:8, 14,19 34:19,23 35:6,15,22 36:9, 18 37:1,4,8 38:7 41:6,8

**sheriffs** 24:20

**shift** 16:11 19:25

**shooting** 33:13

**Shootings** 33:12

**shots** 39:21

**Show** 21:5 39:23

**shown** 25:24

**shows** 20:19

**significant** 9:3 10:22,24 12:3 29:14,21 39:20 41:3

**simply** 23:7 24:1 30:16

**single** 18:21 27:7,17 41:16,21

**sir** 3:7,18 4:12 5:7,19 6:7,13,22 7:6 37:6 38:6 40:5 42:11

**small** 6:9

**Smith** 12:25

**software** 42:3

**solely** 40:19,23

**spark** 16:12 19:24

**specialized** 36:11

**specifically** 20:10

**spent** 33:19

**stack** 7:13 8:9 10:14 11:14

**standard** 9:5 31:17,19 39:16

**stapled** 6:10

**started** 3:23 21:19 26:19

**state** 3:19 31:17,19

**statement** 25:20 37:16

**statute** 36:12,24

**steady** 26:15

**sticky** 5:25 6:15

**Street** 3:11 13:24 18:8 19:11 33:23

**strictly** 19:13

**student** 36:21,23

**stuff** 21:23 36:14

**stun** 36:11

**subject** 16:21 19:16 35:14 40:19, 23

**sued** 38:25 39:4

**suggesting** 37:13

**suggestion** 37:12

**sum** 27:14 28:22 41:19

**summary** 10:10,12,16

**supervise** 9:8

**supervision** 38:2,8

**supplements** 4:13,17

**supports** 28:21

**supposed** 31:16

**sworn** 40:22

**system** 13:4 42:4

## T

**table** 5:15 6:19

**talk** 24:2 29:7 41:6

**talking** 23:23 33:20 41:25

**Tampa** 39:15 41:12 42:1

**targeting** 25:14,15

**taser** 6:11 9:11 10:2 12:6,9,17,21 13:14,21,22 14:10,18,21 15:3,9, 20 16:3,5,12 17:3,14 18:7,18 19:3,13,15,16,20 20:19 21:1 24:22 25:23 27:2,18,23,24 28:21 29:1,3,18 30:5,6,23 31:8,15,24 32:6,11,20 33:16,19 34:2,6 35:7 40:15,22 41:10,13

**tasers** 9:1,7 10:7 13:2,22 18:12 25:21,23 26:24 30:11 39:17

**tested** 19:24

**testified** 31:23

**testifying** 37:21

**testimony** 3:17 5:9 7:25 8:12 11:19 12:4 13:12 18:16 26:22 28:25 29:15,19,23 31:23 32:21

**thick** 5:21

**thin** 5:16

**thing** 5:17 8:2,25 10:24 26:23

**things** 29:14 39:25

**threw** 18:20,25

**time** 7:3,17 11:23 13:6 14:10 20:2 21:12 26:12 27:6,15 31:1 33:8,20 42:8

**times** 15:2 16:3,5,9,14,15,18 17:2 18:12 21:1,3,19 27:1 28:1 29:1 31:21 32:8 38:14 42:14

**today** 3:17,24 5:14 42:10,14,16



**told** 10:6

**tolerant** 25:22

**Tompkins-** 9:11

**Tompkins-holmes** 8:7,14,22 9:15,18 10:5,17,23

**top** 11:13

**total** 12:11,21 13:3,14,15 14:9,23 15:2 20:12 27:14 28:22 40:10 41:19

**track** 12:6,9 13:13 29:18

**tracking** 12:18 35:14

**trained** 16:11 30:25

**training** 16:24 18:1 19:15 24:15, 19 26:21,23 27:23 28:4 29:3,10 30:5,6,11,16,23 31:4,7,15 33:4 36:14

**trial** 5:9

**trigger** 19:20

**triggering** 15:19

**turn** 27:10

**turning** 15:21

---
                         **U**
---

**unable** 42:9,15

**unconstitutional** 37:8,21

**understand** 3:16 15:5 18:15 31:23 36:15 40:21

**understanding** 11:18 12:8 13:12 14:25 29:17 41:15

**undertaking** 19:17

**unusual** 39:8

**upper** 40:3

**usage** 9:8

---
                         **V**
---

**V-A-N-B-L-A-R-I-C-O-M** 3:22

**Vanblaricom** 3:6,21 42:9

**view** 32:2

---
                         **W**
---

**wanted** 10:8

**warn** 32:4

**Washington** 3:1

**watering** 26:1

**weapon** 28:8 40:25 41:10

**weapons** 25:11

**wedding** 25:2

**whatsoever** 27:22

**word** 37:11 39:7 40:17

**work** 4:11 5:23 6:16,21 7:2 14:2

**working** 19:6

**worth** 42:14

**wrong** 40:17

---
                         **X**
---

**X26p** 15:9

---
                         **Y**
---

**YARSLAVANE-CALLAHAN** 26:5,10 31:9 37:22 42:19

**year** 27:2 30:14,17 31:17 34:20

