# D.P. VAN BLARICOM, Inc.
#### MPA, FBI-NA, CLS, CHIEF of POLICE (Ret)
### *POLICE PRACTICES EXPERT*
835 – 91ST Lane N.E.
Bellevue, Washington 98004-4811
(425) 453-0082 FAX 453-3263 E-Mail dvbinc@aol.com

## Federal Rule 26 (a) (2) (B)
## REPORT OF PLAINTIFF'S POLICE PRACTICES EXPERT
## November 21, 2019

1.  My name is D.P. Van Blaricom and I make this report on behalf of plaintiff in the United States Middle District of Florida 8:18-cv-02116-T-02SPF filing of *DeGraw v. Gualtieri, et al.* under my file 19-1985.

2.  My law enforcement career, training and experience have made me a senior police practices expert in the United States – the 9th Circuit's decision in *Glenn v. Washington County, Oregon* describes me as *"… an expert witness, a former Bellevue, Washington Chief of Police with a law enforcement career spanning over 50 years"*.

3.  A detailed statement of my qualifications, experience, training and a list of all of my publications are attached hereto as Exhibit "A". Both my fee schedule for services and a list of my deposition and trial testimony for the preceding four years are attached hereto as Exhibits "B" and "C" respectively. My areas of expertise in the police arts and sciences include but are not limited to: police administration, policies, practices, procedures and standards of care; police use of force; internal investigation and discipline. As a police practices expert, I have testified in state and federal courts for both plaintiffs and defendants throughout the United States.

4.  Attorneys Michael and Inguna Callahan retained my services on February 6. 2019 to review the facts and circumstances of the death of Donald DeGraw (decedent), while in the custody of Pinellas County Sheriff's Office (PCSO) Deputy Gregory Goepfert (defendant deputy) on September 7, 2016 (Wednesday) at approximately 1558 hours (3:38 PM). I have discussed the matter with plaintiff's counsel and this report was prepared in reliance upon the facts and data obtained from my review of the following documents:

    a.  First Amended Complaint
    b.  Defendants' Motion for Summary Judgment;
    c.  Court's Order
    d.  PCSO reports:
        1)  SO16-362943,
        2)  SO16-363788;
    e.  TASER downloads:
        1)  Defendant deputy,
        2)  Deputy Eduardo Martinez;
    f.  Sheriff Robert Gualtieri's deposition in the matter of *Tompkins-Holmes v. Gualtieri* taken on October 19, 2017.

    g.  PCSO TASER policy and procedure;

    h.  Comparable Tampa Police Department Standard Operating Procedure on Electronic Control Devices (TASERs) – September 1, 2016.

    i.  Florida Department of Law Enforcement:
1) TASER Student Guide,
2) TASER Instructor Guide

    j.  Florida Statute § 943.1717;

    k.  Affidavits:
1) Sergeant Gregory Danzig,
2) Lieutenant Deanna Carey;

    l.  Decedent's autopsy report 16-06622;

    m. Depositions:
1) Julie DeGraw (decedent's wife and plaintiff),
2) Nicole DeGraw (decedent's daughter),
3) Defendant Deputy Gregory Goepfert,
4) Deputy Eduardo Martinez,
5) Deputy Robert Baldwain,
6) Sergeant Charles Street,
7) Sergeant Jonathan Tobek,
8) Detective James Upton,
9) Lieutenant Deanna Carey,
10) Lieutenant Gregory Danzig
11) Deputy Michael Segura (1st call),
12) Deputy Peter Lamborghini (1st call),
13) Paramedic Noel Castro,
14) Paramedic Paul Grenier;

5. Relevant national standards of care and best practices have been published by the International Association of Chiefs of Police (IACP) in the following model policies:

    a.  001 – Use of Force;

    b.  007 – Investigation of Employee Misconduct;

    c.  064 – Electronic Control Weapons;

    d.  070 – Responding to Persons Affected by Mental Illness or In-Crisis;

    e.  076 – In-Custody Deaths.

6. It is my customary practice to evaluate the objective Reasonableness of police conduct on a case-by-case basis from the perspective of a former Chief of Police, career law enforcement officer and nationally recognized police practices expert (see Exhibit "A"). In conducting that evaluation I apply:

    a.  My training and experience as a police officer, who was required to respond to persons affected by mental illness in the performance of my law enforcement duties;

    b.  My training and experience as a police supervisor, who was assigned to conduct internal investigations;

    c.  My training and experience as a police supervisor and commander, who was assigned to train police officers on responding to the mentally ill;

  d. My training and experience as a police supervisor and commander, who had to evaluate the performance of my subordinate police officers;

  e. My training and experience as a chief of police, who had to hire, train, assign, administer and, as may be necessary, discipline and/or terminate police officers;

  f. My training and experience as a chief of police, who had to develop and administer policies and procedures for directing police officers under my command;

  g. My training and experience as a chief of police, who had to review internal investigations and make the final administrative decision on whether to sustain or not sustain allegations of misconduct;

  h. My service as an elected city council member, after my retirement as chief of police;

  i. My continuing training, as is supplemented by an ongoing review of professional publications, that addresses contemporary developments in my areas of expertise (see Exhibit "A" Continuing Training);

  j. Additionally, I have served as a police practices expert in over 2,000 matters of police-related litigation (see Exhibit "A"), wherein I have testified at deposition or trial in hundreds of cases (see Exhibit "C") on whether or not a particular fact pattern was objectively reasonable under the totality of circumstances.

 7. My method of forensic analysis is to compare the specific facts of each case that I review to my training, experience (see Exhibit "A") and recognized professional standards of care:

  a. State and federal appellate court decisions such as *Graham v. Connor* and similar citations,

  b. IACP model policies and similar publications.

 8. My use of certain terms (i.e. – *"negligent"*, *"reasonable suspicion"*, *"probable cause"*, *"objectively reasonable"*, *"reckless disregard"*, *"deliberately indifferent"*, *"duty"*, *"ratified"*, *"unconstitutional"*, etc.) merely reflects my training and experience, in applying reasonable standards of care to police officers' conduct, and does not presume or imply a statement of any legal opinion.

 9. Similarly, my use of certain other terms merely reflects my training and experience in reviewing psychological evaluations, triage and/or autopsy reports and does not presume or imply a statement of any medical opinion.

 10. This incident involved use of force, which I have hereafter briefly discussed for the fact finder's enhanced understanding of actual police practice.

  a. Police officers, police trainers and police practice experts may not express legal opinions on use of force:

   1) But, they are trained to know and understand how much force may be used in the lawful performance of a police duty,

   2) And, *"The law dictates officer training, not the other way around"*, per *Weigel v. WY Hwy Ptl*, 544 F.3d 1143 (10th Cir. 2008) – one of my cases;

b. Both justification for and limitation on police use of force have been clearly established by the United States Supreme Court, which supercedes any contradictory state statutes or local police policies:
    1) *Tennessee v. Garner*, 471 U.S. 1, 105 S. Ct. (1985),
    2) *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. (1989);

c. These seminal use of force decisions are further interpreted by the United States Circuit Courts (District of Columbia and 1st through 11th), thereby clarifying legal standards that will be individually applied within each Circuit;

d. American police officers must comply with these legal standards;

e. From a police practices perspective, the fundamental issues in any use of force are:
    1) Was force reasonably necessary under the totality of circumstances?
    2) If force was reasonably necessary, was the amount or degree of force used objectively reasonable under the totality of circumstances?

f. Specific factors that police officers are trained to evaluate, in determining the amount or degree of force to be used, are:
    1) All uses of force:
        a) What is the severity of the crime at issue?
        b) Does the suspect pose an *"immediate"* threat to the safety of the officers or others?
        c) Is the suspect actively resisting arrest or attempting to flee?
    2) Situational factors also affect decision making:
        a) *"The use of force must be judged from the perspective of a reasonable officer on the scene and not from the 20/20 vision of hindsight"*,
        b) *"Allowance must be made for the fact that officers are often forced to make split-second judgments, about the amount of force that is necessary in a particular situation, in circumstances that are tense, uncertain and rapidly evolving"*,
        c) The officer's underlying intent or motivation is irrelevant;
    3) Again, In all cases *"the type and amount of force used must be "objectively reasonable under the totality of circumstances"*;

g. There are varying methods of applying force that may be justifiably used by an officer in response to a reasonably perceived threat and are, in ascending order, as follows:
    1) Officer presence,
    2) Voice command,
    3) Escort or soft hand hold,
    4) Intermediate pain compliance – all less-lethal *"pain-inflicting compliance techniques"* must comply with the *Graham v. Connor "objective reasonableness"* standard:

        a) Hands on (including strikes),

        b) Oleoresin capsicum (OC pepper) aerosol spray,

        c) TASER (electronic control weapon),

        d) Baton,

        e) Impact projectiles,

    5) K-9 bite,

    6) Firearm;

h. An officer is not required to progress sequentially through the afore described *"steps"*, however, and may immediately respond with the appropriate level of force to overcome whatever level of resistance is being encountered on a case by case basis;

i. As previously explained herein, the only constitutional standard for use of force is *"objective reasonableness under the totality of circumstances"*:

    1) Department policy and/or procedure may require a more restrictive use of force but does not create a constitutional standard,

    2) *"Negligence"* in any degree does not create a constitutional standard;

11. A 2014 series of highly controversial officer-involved deaths (Ferguson, et al.) have resulted in the publication of additional standards of care by recognized professional authorities (quoted hereafter), which reflect cumulative past administrative and line experience:

a. The President's Task Force on 21st Century Policing enumerated the following principles:

    1) *"Law enforcement culture should embrace a 'guardian', rather than a 'warrior' mindset"* and *"adopt 'procedural justice' as a guiding principle"* that includes *"transparency and accountability"*;

    2) *"Policies must reflect community values"*:

        a) *"Have clear and comprehensive policies on the use of force, including training on the importance of de-escalation"*,

        b) *"Law enforcement agencies should adopt model policies and best practices"*,

    3) *eed for expanded and more training has become critical"*:

        a) *"Capable to address a wide variety of challenges, including a growing mental health crisis"*,

        b) *"Mandatory Crisis Intervention Training (CIT), which equips officers to deal with individuals in crisis or living with mental disabilities"*;

b. Since the foregoing recommendations were made, the International Association of Directors of Law Enforcement Standards and Training (IADLEST) conducted a nationwide survey of basic and in-service law enforcement training:

    1) Basic training:

       a) 60% had increased training hours,
       b) 87% included de-escalation training,
       c) 94% included Crisis Intervention Team (CIT) mental health training,

  2) In-Service training:
       a) 39% had increased training hours,
       b) 71% included de-escalation training,
       c) 82% included Crisis Intervention Team (CIT) mental health training;

c. The Police Executive Research Forum (PERF) published Guiding Principles on Use of Force, which included the following:

  1) *"Training in most departments is inadequate"*:
       a) *"Importance of de-escalation and crisis intervention strategies for dealing with mentally ill persons"*,
       b) *"Need more 'scenario-based' training about how to respond to the types of incidents they may face, such as a mentally ill person"*,

  2) *"Minimizing use of force is also a question of police 'culture' and seems to reflect training that has officers think solely about their own safety, rather than a broader approach designed to protect everyone's lives"*:
       a) *"Try to 'slow the situation down' when responding to an incident involving an individual experiencing a mental health crisis"* – the ***"SLOW IT DOWN"*** and ***"DE-ESCALATE"*** themes are repeatedly cautioned throughout the report!
       b) *"Tactical disengagement may be a better outcome than forcing confrontation over a minor conflict"*,

  3) *"Officers should be held accountable if they failed to de-escalate the situation in order to prevent it from ever reaching the point where the use of force was necessary"*:
       a) *"Tactics are a key component"*,
       b) *"But for bad tactics, we would not have been in that situation to begin with"*,

  4) *Make a distinction between 'could' and 'should' when evaluating use of force"* and *"just because an officer 'could' use force does not necessarily mean he or she 'should' do so"*,

  5) *"Unnecessary use of force is often tied to an officer's adrenalin or anger"*,

d. PERF additionally published Integrating Communications, Assessment and Tactics, which included the further following principles:

  1) The focus is on responding to *"persons in crisis"*, primarily the mentally ill – typically, no crime is involved,

  2) The theme throughout this publication is, ***"SLOW THE SITUATION DOWN!"*** (emphasis supplied) and, if police training

could only encompass 1 concept, that would be what should be stressed most,

3) The formula of *"distance + cover = time"* includes *"backing away"* and *"repositioning"*,

4) First *"assess"* the situation and, if *"immediate action"* is not necessary, take a *"tactical pause"* to:
   a) *"Isolate, contain and hold"*,
   b) Obtain all possible information about the person from any available source,
   c) Ask yourself, *"What am I trying to achieve?"*
   d) *"Call for additional resources"* ,
   e) *"Use tactical communications"*:
      (1) Only one officer *"does the talking"* and develops *"rapport"*,
      (2) Do not *"shout"* or give *"threatening ultimatums"*,
      (3) Give only one command at a time and repeat as necessary,
      (4) *"Identify options and develop a plan"*,

5) Arrest and/or use of force should be *"a last resort"*,

6) Police responses to calls of persons in crisis can be time consuming:
   a) *"Take as much time as needed, perhaps many hours in some cases"*,
   b) The correct and only answer to, *"How long are we supposed to let this situation go on?"* is, *"As long as it takes!"*

7) Always remember, if possible, to take a *"tactical pause"* and ***"SLOW THE SITUATION DOWN!"*** (emphasis supplied);

e. United States Department of Justice (DOJ) Civil Rights Division has published *"Use of Force Principles"* that they use to assess police *"pattern and practice"* established from *"best practices"*:

1) *"Proportionality and De-Escalation"*:
   a) *"Use only the force that is proportional to the threat faced and rely upon de-escalation"*,
   b) Officers have a duty to *"intervene"* when *"unreasonable force is used by other officers"*,

2) *"Clear Policies on Specific Weapons, Including Firearms and Less-Lethal"*, such as *"electronic control weapons (ECW)"*,

3) *"Systems for Handling Encounters of People with Disabilities or in Mental Health Crisis"*:
   a) *"One in four people shot and killed by police showed signs of mental illness"*,
   b) *"Promote the creation of Crisis Intervention Teams (CIT)"*,

4) *"Documenting and Reviewing Uses of Force"*;

f. PERF has also published Suicide by Cop: Protocol and Training Guide:
    1) That publication incorporates much of what PERF has already advocated,
    2) Most notably, PERF advises:
        a) *"The difference between making a request and yelling an order can determine whether the subject complies"*,
        b) *"Distance + cover = time"*,
        c) ***"SLOW IT DOWN"***;

g. National Consensus Policy on Use of Force was developed *"to reflect the best thinking from line officers to executives"* by 11 consensus organizations (IACP, CALEA, IADLEST NTOA, etc.), which included the following principles:
    1) *"Officers shall use force only when no reasonably effective alternative appears to exist"*,
    2) *"An officer has a duty to intervene to prevent or stop the use of excessive force"*,
    3) *"An officer shall use **DE-ESCALATION** (emphasis supplied) techniques"*:
        a) *"Whenever possible and appropriate before resorting to force"*,
        b) *"An officer shall allow an individual time and opportunity to submit to verbal commands before force is used"*;

h. Additionally and as specifically regards mental illness,
    1) The Treatment Advocacy Center has reported:
        a) Approximately *"3% of adults in the United States suffer from a 'severe' mental illness"*,
        b) And, that *"3% accounts for at least 25% of all officer-involved shootings"*;
    2) The United Stated Department of Justice (DOJ) Bureau of Justice Assistance has reported:
        a) Approximately *"1 in 5 Americans (20%) are affected by mental illness in a given year"*,
        b) However, *"only 41% of adults in the United States with a mental illness received services in the past year"* – that leaves **59% UNTREATED** (emphasis supplied),
        c) *"Up to 10% of* (police) *calls for service involve someone with a **SEVERE** (emphasis supplied) mental illness"*,
        d) Approximately *"1 in 3 individuals in a mental health crisis are transported to treatment by police"*;
    3) The International Association of Chiefs of Police (IACP) established the *"One Mind Campaign"* , wherein it was advocated that all police organizations adopt 4 criteria for successfully facilitating inevitable police contacts with the mentally ill:

       a) *"Establish a clearly defined and sustainable relationship with at least one community mental health organization"*,

       b) *"Develop and implement a written* **POLICY** *(emphasis supplied) addressing law enforcement response to persons affected by mental illness"*,

       c) *"Demonstrate that* **100%** *of sworn officers (and selected non-sworn staff, such as dispatchers) are* **TRAINED** *and* **CERTIFIED** (emphases supplied) *in Mental Health First Aid (MHFA)"*,

       d) *"Demonstrate that* (at least) **20%** *of sworn officers (and selected non-sworn staff, such as dispatchers) are* **TRAINED** *and* **CERTIFIED** (emphasis supplied) *on Crisis Intervention Team (CIT) training"*,

    4) The International Association of Directors of Law Enforcement Standards and Training (IADLEST) has recommended "How to Handle the Mentally Ill":

       a) Move slowly and resist the impulse to act hastily – this is contrary to fundamental police training and requires the officers to *"shift gears"*,

       b) Reassurance is important,

       c) Solicit help from friends, relatives and others known to the emotionally disturbed individual, as a means of developing background information,

       d) Do not lie or try to deceive,

       e) **DO NOT RELY ON YOUR WEAPONS** (emphasis supplied),

       f) Do not meet hostility with hostility and react by being calm, objective and accepting,

       g) Neither argue nor agree with delusions and steer the conversation to neutral or useful questions,

       h) Know what community facilities are available to provide both short and long term assistance,

       i) Remember that most emotionally disturbed persons are **AFRAID** (emphasis supplied);

  i. As correctly explained in the January 2015 edition of LAW and ORDER, there is *"no 'officer safety' exception to the United States Constitution"*.

12. My further analysis of this incident will be within the context of the foregoing explanation of police practice for use of force in the United States.

13. This incident involved the use of a TASER, which I have hereafter briefly described for the fact finder's better understanding:

  a. The device is an electro-muscular disruption (EMD) and/or electronic control weapon (ECW) system that affects both the sensory and motor nervous systems;

  b. TASER has produced successive models, with varying power outputs expressed in *"microcoulombs per pulse"*:

1) 1995 – Air TASER delivering 70 microcoulombs,
2) 1999 – M26 Advanced TASER delivering 85 microcoulombs,
3) 2003 – X26 delivering 100 (up to 135) microcoulombs at 19 pulses per second:
    a) This was the most popular model and is still in regular use by many/most law enforcement agencies today,
    b) This model has been involved in the most TASER-related deaths,
    c) Sales were discontinued in 2014 but the weapon has never been recalled,
4) 2009 – X3 delivering 63 microcoulombs,
5) 2011 – X2 delivering 63 microcoulombs,
6) 2013 – X26P delivering 63 microcoulombs

c. Although 50,000 volts of electricity are generated, only a low amperage of .0021 (X26) is delivered;

d. Incapacitation is measured in muscular disruption units (MDUs) of 105 (X26);

e. The TASER may be deployed in any of three authorized configurations:
1) Removal of the cartridge and cycling of the weapon to display a *"spark demo"*, whereby the targeted recipient can observe five seconds of audio-electrical arcing between the two contact points and be intimidated into compliance, without actual application,
2) Firing a cartridge will discharge two barbed probes at 160+ feet per second (fps) into the recipient's body and create an electrical circuit that will override the central nervous system, to cause uncontrollable contractions of the muscle tissue, and enable handcuffing *"under power"*, while the recipient is rendered temporarily incapable of resistance:
    a) The upper probe is laser sighted to point of impact and the lower probe's trajectory is 8° downward,
    b) Accordingly, the probes spread approximately 1 foot for every 7 feet of distance and the optimum firing range is from 7 to 15 feet away, with the preferable target being the recipient's back,
    c) Should there be insufficient probe spread and/or one of the probes misses or becomes dislodged, a *"drive stun"* (see below) with the cartridge still attached may be used for *"3 point deployment"* (sometimes called *"stapling"*) to complete a wider circuit,
3) Alternatively but far less effectively, the device may be applied directly to the recipient's body and fired as a *"drive stun"* for pain compliance only:
    a) Such an application leaves a distinctive signature on the recipient's skin,

       b) That signature consists of 2 *"burn"* marks spaced 1 ½ inches apart,

       c) Many agencies have discontinued use of the *"drive stun"*, because it does not render the recipient incapacitated and may exacerbate further resistance;

f. TASER Training Bulletins (since 2009) advise users to *"avoid targeting the chest"* and that lower point of aim will further prevent probes striking the head, especially *"the eyes"*;

g. A pull of the trigger will cycle a five second electric shock, unless the safety is applied during the firing sequence, and subsequent trigger pulls will release successive five second cycles;

h. If the trigger is pulled and held, however, an uninterrupted electrical impulse will occur (in excess of 5 seconds) until the trigger is released;

i. The electric shock that results from either actual application configuration is very painful to the recipient;

j. The device records the date, time and duration of each cycle;

k. If the device is equipped with a TASER Cam, it will also preserve a video/audio recording of the deployment sequence;

l. Properly used, the TASER is a welcome and useful addition to options on the continuum of force, however a 2015 Los Angeles Police Department (LAPD) study found that the devices produced *"the desired outcome – causing someone to submit to arrest - only 53% of the time"*;

m. Improperly used, the TASER can also be an application of unreasonable force, just as any other weapon in the police arsenal (i.e. pepper spray, firearm, etc.) can be individually abused by a particular officer under circumstances that do not justify such use;

n. It has been judicially determined in *Bryan v. McPherson* (9th. Cir 2009):
    1) Non-lethal is not synonymous with non-excessive,
    2) The TASER is an *"intermediate"* but *"significant"* use of force that *"must be justified by a strong government interest that compels use of such force"*,
    3) Unusual behavior alone does not justify such force,
    4) Merely taking a step in an officer's direction is an insufficient threat,
    5) Officers must *"normally provide a warning where feasible"* and are *"required to consider less intrusive alternatives"*, both of which are *"significant factors"* for determining reasonableness;

o. TASER, International has prepared, published and distributed an Operating Manual to end-users that cautions, *"Make sure your agency has a use-of-force policy that addresses TASER device use and that the policy is clearly addressed during end-user training"*;

p. TASER, International supplements their Operations Manual with mutually consistent training bulletins that are continuously updated:

    1) *"The important thing to remember is to look at the totality of circumstances, including applicable laws and department policy, and **BALANCE** (emphasis supplied) injury vs. threat"*,

    2) *"The risk of exposure should be **BALANCED** with threat to the officer (s), subject, and the public, as well as, the availability of other force options and the **LIKELY OUTCOME** (emphases supplied) of their use"*,

    3) *"Avoid TASER over-dependence"* and *"address any* (such) *concerns early"* by *"reviewing TASER use reports"*;

q. TASER, International has also warned users (since 2006), ***"AVOID EXTENDED or REPEATED APPLICATIONS"*** (emphasis supplied):

    1) *"The application of a TASER device is a physically stressful event"*,

    2) *"Especially when dealing with persons in a health crisis such as **EXCITED DELIRIUM** (emphasis supplied), it is advisable to minimize the physical and psychological stress to the subject to the greatest degree possible"*,

    3) *"Officers should only apply the number of cycles reasonably necessary to allow them to safely restrain the subject"*,

    4) *"TASER applications directly across the chest may cause sufficient muscle contractions to impair normal breathing patterns"* and *"while this is not a significant concern for short (5 seconds) exposure, it may be a more relevant concern for extended duration or repeated applications"*,

    5) *"If circumstances require extended duration or repeated discharges, the operator should take care to observe the breathing patterns of the subject and provide breaks in the TASER stimulation when practicable"*;

r. TASER model policies have been established and distributed by recognized law enforcement policy and training authorities:

    1) International Association of Chiefs of Police (IACP) and National Law Enforcement Policy Center (NLEPC) 1998, 2004, 2005 and 2010, which explains:

        a) As previously explained herein (i.e. – *"spark demo"*), *"the cartridge can be quickly removed from the device and a visible electric arc displayed in hope of coercing suspect compliance"* because *"these actions have successfully convinced suspects that they should submit to officer directions and commands rather than resist"*,

        b) If confronted by a person suspected of being under the influence of *"mind-altering drugs, abuse of alcoholic beverages, or "affected by mental illness"*, it is recommended that *"the subject be secured (handcuffed) as soon as practical while affected"* by a

continued application of EMD power to *"minimize the number of cycles needed to overcome resistance"*,

   c) Finally, there are the cases that are called *"lawful but awful"*, such as are identified in Department of Justice (DOJ) consent decrees as being essentially *"unnecessary and unreasonable"*,

2) U.S. Department of Justice Office of Community Oriented Policing Services (COPS) and the Police Executive Research Forum (PERF) 2005 and 2011, which explains:

   a) TASER *"should not be seen as an all-purpose weapon that takes the place of de-escalation techniques and other options"*,

   b) Like any weapon, *"they are not harmless, and the potential for injury can be exacerbated by inappropriate use and deployment"*,

   c) Risk of death is increased by *"cycling that exceeds 15 seconds in duration"* and *"any subsequent applications should be independently justifiable"*,

   d) Users *"should not rely solely on manufacturers (TASER International) for information"*,

   e) The *"drive stun mode is of questionable value"*, such use *"may even exacerbate the situation by inducing rage"* and policies *"should discourage its use as a pain compliance tactic"*,

   f) From recent experience, *"it appears that, in some instances, officers are using the device inappropriately or too frequently"*,

   g) A *"warning should be given"* before using and can include *"verbalization, display, laser painting, 'arcing', or a combination"* thereof,

   h) A *"medical evaluation"* should be received by *"all subjects who have been exposed"*,

   i) Overall and individual usage *"should be tracked in an early intervention* (use of force warning) *system"* to identify *"trends"* and *"whether some officers are using more frequently or in a different manner"* than others,

   j) Experience has shown the *"average use"* to have been *"less than once per year"* for each device issued,

   k) Officers should receive *"scenario and judgment based training"* but *"exposure to application during training is not recommended"*, because of the potential for *"injury"* to the officer trainees,

3) International Association of Directors of Law Enforcement Standards and Training (IADLEST) and Public Agency Training Council (PATC),

4) National Institute of Justice:

a) Police Use of Force, TASERS and Other Less-Lethal Weapons (2011),
b) Study of Deaths Following Electro Muscular Disruption (2011),

5) The National Institute of Justice (NIJ) recently concluded:

a) *"There is no conclusive medical evidence of a high risk of serious injury or death from direct or indirect CED* (conducted energy device) *exposure in healthy, normal, nonstressed, nonintoxicated persons"* but, unfortunately, that is not the population of persons who the police must most often restrain,
b) *"Also recommended caution in using multiple or prolonged application of a CED"*,

6) The Institute for the Prevention of In-Custody Deaths (IPICD) has reported (2012):

a) Dr. Douglas P. Zipes conducted research to reach the conclusion, *"TASER X26 electronic control device (ECD) probe contact stimulation can cause cardiac electrical capture of the human heart when the ECD probes are shot into the chest area"*, thereby *"disputing the long held theory that a TASER X26 was safe in the deployment mode on humans"*,
b) IPICD further cautioned, *"Indiscriminate use of ECDs by officers is both an ethical and a practical challenge"*;

s. TASER published their Training Bulletin on March 1, 2013 that *"supersedes all prior revisions"* and was to be **"immediately distributed to all TASER CEW users"** (emphasis in original) – applies to all TASER models:

1) *"Minimize the number and duration of CEW exposures"* – *"15 seconds"* is suggested,
2) If TASER is *"ineffective, consider alternative control measures"*,
3) *"Control and restrain immediately"* by *"cuffing under power"*,
4) There is a *"low probability"* of *"cardiac capture"* but *"avoid targeting the frontal chest area"*,
5) **"Always have a back-up plan"** (emphasis in original),
6) **"Drive stun is for pain compliance only"** (emphasis in original) and *"may not be effective"* – first such warning published in 2011;

t. Reuters News conducted a survey of TASER-related deaths and reported:

1) They *"documented 1,081 incidents in the United States in which people died after police stunned them with TASERS"*:

a) *"A quarter of the people who died were suffering from a mental health breakdown or neurological disorder"*,
b) *"Of 442 TASER-related wrongful death lawsuits, 34% suffered from mental illness"*,

    c) *"The deceased was unarmed in 9 of every 10 incidents"*,

    d) *"More than 100 began with a 911 call for help during a medical emergency"* and *"nearly half of those 911 calls came from a family member"*,

  2) To the contrary, Axon Enterprise, Inc. (formerly TASER International, Inc.) *"asserts that only 24 people have ever died from TASERS"* and *"not a single person died from the direct (electrical) effects"*;

u. I am very familiar with litigation issues, involving the TASER as a use of force, and have reviewed 82 such cases to date, starting with my consultation to the federal prosecution in the 1993 Rodney King matter;

14. Based upon my knowledge, skill, experience, training or education and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that the following facts appear to be supported by the record:

a. Decedent was known to defendant deputy to suffer Post-Traumatic Stress Disorder (PTSD) from military service;

b. PCSO had responded to a similar call for assistance earlier that same day, which was appropriately deescalated and resolved without use of force;

c. Decedent's wife (plaintiff) had made defendant deputy aware that he kept a gun under his pillow but that weapon was never accessed or displayed during this incident;

d. Defendant deputy contacted decedent lying on his bed dressed only in his underwear:

  1) He ordered decedent, *"Come toward him"* and he complied,

  2) He next ordered decedent, *"Stay on the bed"* and he complied,

  3) Decedent next stood and allegedly took 2 steps forward, as he had just been previously ordered to do, whereupon defendant deputy fired his TASER into decedent's chest:

    a) First cycle was applied for 3 seconds and caused decedent to fall to the floor,

    b) Second cycle was applied for 1 more second,

    c) Third cycle was applied for 5 more seconds,

    d) Fourth and last cycle was applied for 1 more second,

  4) There were a total of 4 TASER applications over a duration of 1 minute 29 seconds;

e. **NOTE:** Contrary to the foregoing, a comparable Tampa Police Department policy and procedure specifically limits TASER applications:

  1) *"The ECD shall* (mandatory) *not be intentionally aimed at a person's chest"*,

  2) *"The ECD shall not* (mandatory) *be deployed solely to force a passive subject into compliance"*,

    3) *"Use of the ECD on a subject for more than three five-second activations of fifteen (15) seconds total must be justified by the circumstances and fully documented in reports"*;

f. Decedent was unresponsive after defendant deputy's TASER applications;

g. The Hillsborough County Medical Examiner ruled:
    1) Decedent's cause of death was excited delirium syndrome: ,
    2) And, police application of an electro-muscular disruption device was contributory to cause of death.

15. Based upon my knowledge, skill, experience, training or education and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that defendant deputy's use of his TASER on decedent was an objectively unreasonable use of force. In reaching that conclusion I was especially mindful of the following information from the record:

a. All of the information previously described herein;

b. Decedent was not suspected of any crime;

c. Decedent had been compliant with defendant deputy's orders;

d. Defendant deputy stated, *"I wanted to try to get him out of the bedroom at first, because I knew there were guns in there"*;

e. Nevertheless, when decedent tried to leave the room by taking 2 steps forward, he used his TASER to prevent him from going further:
    1) Decedent was clearly moving away from the gun under his pillow,
    2) It is uncontroverted that the gun was never displayed or accessed by decedent;

f. Defendant deputy violated the standard of care for use of a TASER:
    1) He failed to attempt de-escalation of the supposed confrontation with decedent;
    2) He fired his TASER probes into decedent's chest,
    3) He used multiple TASER applications against decedent until he became unresponsive;

g. Lieutenant Danzig testified in his deposition:
    1) He commands PCSO TASER training,
    2) *"The preferred target zone on the front of a subject's body is the lower torso and below"* (page 59 lines 21-22),
    3) PCSO deputies are trained to exercise *"patience"* and *"allow them that time to calm themselves"* (page 71 lines 5-8);

h. Additionally:
    1) Decedent's alleged threatening behavior toward defendant deputy is at best only vaguely described – *"He put his hands kind of like, uh, out in front of him, like almost like going to grab me"*,
    2) He had the immediate assistance of 2 other deputies (3 total) to physically restrain decedent, if that had been necessary,
    3) Decedent was of small size and 58 years of age:
        a) Height of only 5 feet 5 inches,

b) Weight of 176 pounds;
i. Decedent was not displaying any hostile intent toward the deputies;
j. Accordingly, defendant deputy's use of his TASER under the totality of these circumstances was objectively unreasonable.

16. Based upon my knowledge, skill, experience, training or education and a careful evaluation of the totality of circumstances in this matter, it is considered professional opinion that PCSO failed to adequately train and supervise defendant deputy. In reaching that conclusion I was specifically mindful of the following information from the record:

a. All of the information previously described herein;
b. As determined by both Cops (2005) and PERF (2011), *"average use"* of the TASER has been *"less than once per year"* by those to whom it has been issued;
c. Nevertheless:

    1) Defendant deputy's use of his TASER from June of 2014 until his use on decedent was:
        a) June 3, 2014 – 13 activations for 65 seconds,
        b) October 27, 2014 – 11 activations for 31 seconds,
        c) January 21, 2015 – 3 activations for 7 seconds,
        d) March 6, 2015 – 2 activations for 11 seconds,
        e) August 11, 2015 – 1 activation for 5 seconds,
        f) September 5, 2015 – 3 activations for 9 seconds,
        g) February 1, 2016 – 1 activation for 5 seconds,
        h) July 13, 2016 – 1 activation for 5 seconds.

    2) And, Deputy Martinez' similar use of his TASER was;
        a) June 10, 2010 – 3 activations for 15 seconds,
        b) March 8, 2011 – 2 activations for 10 seconds,
        c) March 28, 2011 – 1 activation for 5 seconds,
        d) May 23, 2012 – 1 activation for 5 seconds,
        e) April 1, 2013 - - 2 applications for 10 seconds,
        f) June 8, 2013 – 4 applications for 10 seconds,
        g) June 17, 2013 – 8 applications for 27 seconds,
        h) July 9, 2013 – 5 applications for 25 seconds,
                    15 applications for 55 seconds,
        i) July 13, 2013 – 2 applications for 7 seconds,
        j) July 19, 2013 – 1 application for 5 seconds,
        k) October 21, 2013 – 1 application for 5 seconds,
        l) November 20, 2013 – 1 application for 5 seconds,
        m) February 7, 2014 – 1 application for 5 seconds,
        n) April 26, 2014 – 1 application for 5 seconds,
        o) August 28, 2014 – 1 application for 5 seconds,
        p) August 29, 2014 – 1 application for 5 seconds,
        q) July 17, 2015 – 1 application for 5 seconds.

    3) Clearly, these PCSO deputies' use of their TASERs far exceeded the *"average"* of *"less than once a year"* but the

record is devoid of any corrective action to change that behavior;

d. Furthermore and in spite of official studies to the contrary, Sheriff Gualtieri has testified in a prior deposition that he doubts a TASER can cause the death of the recipient;

e. Accordingly, PCSO does not track TASER deaths.

17. Based upon my knowledge, skill, experience, training or education and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that the chief policy maker has ratified defendant deputy's conduct as being within the custom, policy and practice of PCSO. In reaching that conclusion, I was specifically mindful of the following information from the record:

a. All of the information previously described herein;

b. Sheriff Gualtieri is the chief policy maker of PCSO;

c. PCSO investigated this in-custody death and that investigation was available to the chief policy maker;

d. PLSO's policy and procedure on use of a TASER directs deputies:
   1) *"Avoid chest shots when possible"*,
   2) *"Minimize the number of ECD exposures"*;

e. Defendant deputy clearly violated both of those policy and procedural mandates;

f. Nevertheless, the chief policy maker has taken no disciplinary or other corrective action against defendant deputy;

g. Accordingly, the chief policy maker has ratified defendant deputy's lethal use of his TASER against decedent as being within the custom, policy and practice of PLSO.

18. I am prepared to testify to these opinions at deposition or trial, if called upon to do so.

19. If I am provided with further documentation for my review, I may have additional opinions.

20. I declare under penalty of United States State perjury law that the information contained in this document is true and correct to the best of my knowledge.

D.P. VAN BLARICOM