UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

CASE NO.:  8:18-CV-2116-WFJ-SPF


JULIE V. DEGRAW, AS PERSONAL REPRESENTATIVE OF THE

ESTATE OF DONALD C. DEGRAW, DECEASED,

       PLAINTIFF,

   VS.

BOB GUALTIERI, IN HIS INDIVIDUAL AND SUPERVISORY

CAPACITY AS PINELLAS COUNTY SHERIFF, AND GREGORY

GOEPFERT, IN HIS INDIVIDUAL CAPACITY AS A

PINELLAS COUNTY DEPUTY SHERIFF,

       DEFENDANTS.

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

DEPONENT:   NOEL CASTRO

DATE:      JULY 16TH, 2019

TIME:      10:00 A.M. TO 11:15 A.M.

LOCATION:   COMPASS REPORTING GROUP

           3000 GULF-TO-BAY BOULEVARD, #500

           CLEARWATER, FL  33759

REPORTER:  KIMBERLY HAMMOCK

           NOTARY PUBLIC

           STATE OF FLORIDA AT LARGE

         COMPASS REPORTING GROUP

1  A P P E A R A N C E S:

2  For the Plaintff:       INGUNA VARSLAVANE-CALLAHAN, ESQ.

3                          CALLAHAN LAW FIRM, LLC

4                          449 CENTRAL AVENUE, #203

5                          ST. PETERSBURG, FL  33701

6

7  For the Defendant:      PAUL G. ROZELLE, ESQ.

8                          PINELLAS COUNTY SHERIFF'S OFFICE

9                          10750 ULMERTON ROAD

10                          LARGO, FL  33778

11

12                  I N D E X

13  Direct Examination by Ms. Callahan .......... 3

14  Cross-Examination by Mr. Rozelle   ..........44

15

16                  E X H I B I T S

17  Plaintiffs'                       Marked for

18  Exhibit No.      Description      Identification

19     30             Interview            18

20

21

22

23

24

25

Thereupon,

NOEL CASTRO,

was called upon and after being duly sworn,

was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CALLAHAN

Q.   Good morning, sir.  My name is Inguna
Callahan.  I represent the plaintiffs, the DeGraw
family, in this matter.  I'm the one that is going to
be asking you questions today.  So let's start by, what
is your full name?

A.   Noel Edward Castro.

Q.   Have you given a deposition before?

A.   Yes.

Q.   So you know the rules.  You are under oath,
so you have to tell the truth.  Also, I ask that you
answer my questions verbally by using words instead
uh-huh or huh-uh, because the court reporter is writing
it down and she will lose both of us pretty quickly if
we do that.

A.   Understood.

Q.   Also, I ask that you wait for me to finish my
question before you start answering for the same reason
that she has to write everything down, and if the two
of us are talking over each other, it makes her job

1   difficult.

2       A.    Got it.

3       Q.    Also, if you need a break for any reason,

4   please let me know.  I don't think we are going to be

5   here that long, but let us know.  You are entitled to

6   have a break, okay?

7       A.    Sounds good.

8       Q.    Okay.  You mentioned that you have given a

9   deposition before.  In what capacity?

10      A.    Working in the capacity as a fire

11  rescue/paramedic.

12      Q.    How many times?

13      A.    I think this is my fourth or fifth.  I worked

14  for two different departments before where I'm at now,

15  so --

16      Q.    Okay.  And what kind of cases were those?

17  Criminal or civil?  Do you know?

18      A.    I don't want to tell you anything I don't

19  remember a hundred percent correctly.  I think the

20  first one was criminal.  It involved a fire where four

21  children died, and it was -- I think someone had set

22  the fire.  That was the first one I remember.

23      Q.    And other ones?  Are they related to the fire

24  part of your job, or are they EMT?

25      A.    They're both the same.  It's fire rescue, so

1   it's firefighter and paramedics.  So when you call 911,

2   they're either going to call us for a fire, or

3   paramedics for a medical emergency.

4       Q.   Okay.  And the other depositions that you --

5   that you were involved in, did they involve deaths?

6       A.   Well, the first one did.  Four children died.

7       Q.   And others?

8       A.   The other ones, not that I recall, no.

9       Q.   Did any of those involve the use of a Taser?

10      A.   Not that I recall.

11      Q.   Were any of them -- the cases that you took

12  and you were involved in depositions, did any of them

13  involve a seizure of the patient?

14      A.   Seizure?  Not to my knowledge.  I think my

15  last one was some gentleman, I think he kicked his

16  mother or something like that through a glass table or

17  something like that and -- I can't remember all the

18  details, honestly.  Sorry.

19      Q.   Okay.  And did you have a chance to go to

20  trial on any of those?

21      A.   No.

22      Q.   Where are you currently employed?

23      A.   Hillsborough County.

24      Q.   And what do you do?

25      A.   Fire rescue.  Firefighter/paramedic.

1      Q.   And is that your position,

2    firefighter/paramedic?

3      A.   Yes, it is.

4      Q.   And where do you work out of?

5      A.   Currently in Town & Country.

6      Q.   And for how long have you been there?

7      A.   We're in July?  So it's been two years and

8    three months.

9      Q.   July of 2017?

10     A.   April of 2017.

11     Q.   And what did you do before that?  Or where

12   were you before that?

13     A.   Oldsmar.  City of Oldsmar.

14     Q.   Fire Department?

15     A.   Yes.

16     Q.   And what did you do there?  Same thing?

17     A.   Firefighter/paramedic.

18     Q.   And you left that position in April of 2017?

19     A.   Yes.  It was April.

20     Q.   And when did you start there?  How long were

21   you there?

22     A.   Two years and -- it was January 2015.

23     Q.   And what did you do before January 2015?

24     A.   I worked for Marion County Fire Rescue from

25   August 2008, until January 2015.

1      Q.    Doing the same --

2      A.    Same.  Well, yes.

3      Q.    So in September of 2016, you were working for

4  Oldsmar Fire Department, correct?

5      A.    Yes.

6      Q.    And did you have -- was that a full-time

7  position?

8      A.    Yes.

9      Q.    Did you have any part-time positions?

10     A.    I did.

11     Q.    What did you do?

12     A.    For Sunstar.  Well, Paramedics Plus is the

13  parent company.  I worked as a paramedic.

14     Q.    So what was your schedule back then, if you

15  remember?  Like, you know, you would be, like, 24 hours

16  in one place and 12 hours for Sunstar or --

17     A.    Yes, typically.  It was 24 hours.  You know,

18  we all worked 24-hour shifts.  Then typically 12 hours.

19  Sometimes it was eight hours or 10 hours.  Whatever.  I

20  was part-time there, so whatever they needed.

21     Q.    And Sunstar, what was your position?

22     A.    EMT/paramedic.

23     Q.    And I don't know a lot about fire

24  departments.  Is there a rank?  Do you guys have ranks?

25     A.    Yes.

1      Q.    Okay.  And what is your rank?

2      A.    Firefighter/paramedic.  That's the rank --

3  it's different, for the most part, department to

4  department.  Let's say for example, in Hillsborough

5  County, the chief is, you know, the top-ranking

6  official of the department.  Then you have your deputy

7  chief.  Then personnel chief.  Operations chief.  Then

8  going down you have a shift commander.  The shift

9  commander is the shift commander for 24 hours for that

10  shift, A, B, C shifts, so there's three shift

11  commanders.  Every shift commander has eight battalion

12  chiefs under him.  Each battalion chief has about five

13  or six or seven stations he's responsible for.  Each

14  station has a station captain.  Then under every

15  captain there's a rescue lieutenant, which is the big

16  ambulance.  Then the rescue lieutenant has a junior

17  medic or junior firefighter.  That's basically my

18  position right now.  Then the captain has his own fire

19  engine crew.  So there's the captain.  Then he has the

20  driver.  Then he has his two fire fighters.  Those are

21  the ones that ride in the back.

22      Q.    Okay.

23      A.    That's the best example I can give you right

24  now.  It's based on department to department.  Oldsmar

25  and Pinellas County all have a different kind of

1    system.  They have lieutenants as opposed to captains,

2    so it's just --

3        Q.   Okay.  So in September of 2016, what was your

4    position?

5        A.   Firefighter/paramedic.  I wasn't an officer

6    or anything.

7        Q.   And what were your job duties?  Were you in

8    the ambulance?

9        A.   I was riding the fire engine that day just as

10   a firefighter/paramedic.  Mainly, I'm basically --

11   anything that the captain or the driver asks for, I'm

12   basically there to do the work that they ask for.

13   Whether it's -- I mean, it's a long list of things.

14   But as a paramedic, you know, we treat the patients for

15   911 calls.  For fires we are the ones pulling hoses.

16   Getting into buildings.  Things like that.

17       Q.   Okay.  So my understanding is on the day at

18   issue, September 7th, 2016, you worked the A shift and

19   also the C shift?

20       A.   Yes.  I was doing a -- basically a double.  I

21   was -- yes.  It was a 48-hour shift I was working.  I

22   worked the day before.

23       Q.   Okay.  So the A shift was from what time to

24   what time?

25       A.   All shifts were from 8:00 -- actually, I

1   think Oldsmar is 7:00 a.m. to 7:00 a.m. the next day.

2   I think they're different than where I am at now.  So I

3   had worked the 24 hours before, 7:00 a.m. to 7:00 a.m.

4   Then stayed on duty for another 24 hours, which is 7:00

5   a.m. to 7:00 a.m.  I'm not sure if it was A, B or C

6   shift.

7        Q.   Okay.  But you had been on from 7:00 a.m.

8   7:00 p.m. the day before, and you continued to be on

9   for another 24 hours on September 7th, 2016?

10       A.   Yes.

11       Q.   And that day were you on the firetruck or --

12       A.   Yes.  I was on the fire engine.

13       Q.   And how many people are there on the

14  engine -- or were there?

15       A.   It just depends on manpower.  I think there

16  were three or four.  I don't remember, honestly.  I

17  would have to look back at the roster from three years

18  ago.

19       Q.   And who would -- normally who would be these

20  three or four people?  Driver?

21       A.   The officer, which for Oldsmar is the

22  lieutenant.  Then the driver.  Then there's either one

23  or two firefighter/paramedics riding in the back.  Just

24  to give you a little bit more information, anyone on

25  that firetruck would be a paramedic, as well.  So I'm

1  not sure what the roster was that day.  Sometimes the

2  firetruck has one paramedic.  Sometimes they have two,

3  three or four.  Or all four of them are paramedics.

4       Q.   Okay.  So it just depends --

5       A.   I'm not sure what the roster was that day, or

6  how many paramedics were on the truck, or if there was

7  four of us on there.

8       Q.   Okay.  So there would be at least three of

9  you?

10       A.   Yes.

11       Q.   What's your educational background?

12       A.   Some college.  I didn't even graduate with an

13  AS.  Just a high school diploma.  I went to college for

14  two years.  Didn't finish.  Then I went to vocational

15  school doing technical college to get my firefighter,

16  EMT and paramedic.

17       Q.   And what college did you attend?

18       A.   The first one was Florida Atlantic

19  University.  At the same time, I was also at Palm Beach

20  -- well, now I think it's Palm Beach State College now.

21  I was doing classes at both.

22       Q.   Okay.  And did you have a specialty there?

23  Did you study --

24       A.   I think I majored in psychology, and I want

25  to say sports medicine maybe.

1  Q. And vocational school for firefighter/EMT?

2 Where did you attend that?

3  A. Firefighter/EMT was at Lake Technical Center

4 in Eustis, Florida.  Then paramedic was at a -- I think

5 now it's called College of Central Florida in Ocala.

6  Q. How long are these programs?

7  A. Well, I went to night school for firefighter

8 and EMT, so those were six months each.  That was a

9 year.  Then a year for paramedic school.

10  Q. And do you have, like, continued training

11 that you have to go to?

12  A. Yes.  I mean, every department that I worked

13 for, you know, they're not traditional college courses.

14 Not all of them.  Like the last one I took was a course

15 delivery test, which is part of the fire science AS

16 degree at HCC.  But, yes, I've taken several courses

17 throughout my career related to fire rescue and

18 paramedic.  So, I mean, it's a long list and filled

19 with a bunch of stuff.

20  Q. Okay.  And these continued courses, education

21 courses, involves firefighting and also paramedic or

22 first aid kind of medicine?

23  A. Yes.  Like off the top of my head, there's

24 tactical EMS, which is -- there's truck company

25 operations classes.  Heavy rescue classes.  Hazmat

1  classes.  Things like that.  It just depends on what --

2  every course has its own different length.  Some are a

3  week.  Some are three days.  Some -- the last class I

4  took was a whole semester.  That was on-line mostly,

5  so, you know --

6        Q.   Okay.  And have you had any training on how

7  to deal with patients with seizures?

8        A.   Yes.  All of that is pretty much all covered

9  in paramedic school.

10       Q.   So how do you deal with patients with

11  seizures?

12            MR. ROZELLE:  Object to the form.  You can

13       answer.

14  BY MS. CALLAHAN:

15       Q.   Based on what your training is?

16            MR. ROZELLE:  Same objection.  You can

17       answer.

18            THE WITNESS:  I can answer?

19            MR. ROZELLE:  Yes.

20  BY MS. CALLAHAN:

21       A.   Well, the main objective we try to find out

22  first is if the patient is -- are they breathing or

23  not?  We have -- we call it A, B, C's.  A is airway.

24  Is their airway clear.  Be is breathing.  C is

25  circulation.  We check a pulse.  You know, see what the

1   skin condition looks like.  We want to make sure the
2   skin is warm, pink and dry.  For their airway, we make
3   sure there's nothing in the airway.  Sometimes people
4   that have seizures, there might be something in the
5   airway that might dislodge their breathing.  We have to
6   check if they're breathing to see whether it's fast,
7   slow or shallow or deep.
8           So first we check our A, B, C's.  Then we
9   mitigate, and basically whatever we find has to go
10  along -- you know if it's -- there's something wrong
11  with the airway, we address that first.  That's A.  If
12  there's a problem with breathing, that's B.  If
13  someone's circulation, it's C, and we go to
14  circulation.  It's basically first aid EMT.  We call
15  BLS first, basic life support, before we do our --
16  treat further with more advanced things, which is our
17  ALS, advanced life support.  That's where you have your
18  IV.  Your drugs.  Intubating with a tube, so -- if
19  someone is actively seizing, we can administer some
20  drugs, some medications, that can help to either slow
21  or stop the seizing altogether.  I mean, I can give you
22  a whole protocol rundown if you want, but we basically
23  work off protocols.  It's "If you find this, do this".
24  You know what I mean?  It's that kind of thing.  So the
25  basics are A, B, C's.  If you were able to give

1    medications for a seizure, then you give medications

2    for a seizure.  Establish an IV.  You have to hook them

3    up to a cardiac monitor.

4         Q.   Are you familiar with the postictal state?

5    The post-seizure state of a patient?

6         A.   Yes.

7         Q.   What do you know about that based on your

8    training?

9              MR. ROZELLE:  Object to the form.  You can

10             answer.

11   BY MS. CALLAHAN:

12        A.   Postictal means that -- it's the state of the

13   patient following the seizure.  Usually presents with

14   mental status as -- that can be unconscious to

15   conscious, depending on the severity of the seizure.

16   They may seem like they are kind of lethargic or groggy

17   some might say.  A little slow to respond.  They may

18   seem confused, like they might not know what's going

19   on.  People that just -- their memory is very foggy.

20   They may not be -- they may not be a hundred percent

21   alert and oriented to where they are at and what's

22   going on.

23             They can present many different ways

24   depending on the patient.  Everyone is -- there's no

25   uniform for it.  It's on a case-by-case basis.  Some

1   people might come around in a minute or two, especially

2   for people that have had a history of seizures.  Others

3   may take a long time.

4        Q.   So is confusion a common -- commonly

5   experienced feature of the postictal state?

6             MR. ROZELLE:  Object to the form.  You can

7        answer.

8   BY MS. CALLAHAN:

9        A.   It's within the realm of possibility, but

10  it's not always the case.

11       Q.   Is that one of the things you consider when

12  administering aid to a patient in a post-seizure state,

13  confusion?  Is that one of the things that you sort of

14  pay attention to when dealing with patients in a

15  post-seizure state?

16            MR. ROZELLE:  Object to the form.  You can

17       answer.

18  BY MS. CALLAHAN:

19       A.   I'm trying to think how you're -- do I

20  consider their postictal state when going through my

21  modality of treatment?  Yes.  But --

22       Q.   Do you --

23       A.   We are not treating the seizure at that point

24  in time anymore, because it's already happened.  So now

25  it's --

1      Q.    Okay.  Do you have that in mind when doing

2    your patient assessment?

3      A.    Yes.  Of course.  It goes without saying

4    almost.

5      Q.    Do you recall or do you know if on September

6    7th, 2016, the two shifts that you worked, did you have

7    the same role on both shifts, basically?

8      A.    Not sure if on one shift I was driving, and

9    the other I was riding backwards.  You would have to

10   check the roster or go back to those shifts.  At that

11   time, I'm not sure they do it anymore, but we basically

12   would rotate who would drive and who would ride

13   backwards.  That's how -- the driver position was not a

14   promoted position for the City of Oldsmar.  Some

15   departments -- most departments have a driver where

16   they just drive.  But that day, I'm not sure if that

17   48-hour shift if I was driving one day and the other

18   day I was riding backwards.

19     Q.    Okay.  Do you remember that you were only the

20   driver for 48 hours -- you had the driver position?  Or

21   do you think you had one shift you had the driving

22   position, and the other shift you didn't?

23     A.    I don't recall a hundred percent.  I don't

24   want to lie to you.

25     Q.    I have here a transcript of your interview

1   with the Pinellas County Sheriff's Office after the

2   incident.  Do you remember giving an interview to the

3   sheriff's department in the evening?

4        A.   I remember going there that night and giving

5   an interview.

6        Q.   Okay.

7             MS. CALLAHAN:  So I'll mark that as our next

8        exhibit.  That would be 30.

9             (At this time Plaintiff's Exhibit No. 30

10             was marked for identification.)

11   BY MS. CALLAHAN:

12        Q.   Have you seen this transcript?

13        A.   It was recently given to me.  I didn't have a

14   chance to go through it.

15        Q.   Who gave it to you?

16        A.   It was my current employer.  I think it was

17   actually left for me at the station.  I'm not sure who

18   dropped it off, but -- this was forwarded to me from --

19   I believe Oldsmar Fire Rescue had it sent to my current

20   employer, Hillsborough County.  Then they had to -- I

21   was on -- I was off duty.  I was on parental leave,

22   essentially.  I had a newborn, so I was off for six

23   weeks.  I think they were trying to get ahold of me at

24   my station.  I think through communication through the

25   battalion chief, it was given to him from headquarters

1    because I wasn't at work for six to eight weeks.  When

2    I came back to work, it was at the station waiting for

3    me.

4         Q.   Did you request it?

5         A.   No.  I didn't request it.

6         Q.   Do you know who requested it or how it came

7    about that it was sent to you?

8         A.   I don't know.

9         Q.   But you didn't have a chance to read it?

10        A.   No.

11        Q.   So if you turn to Page 3 of this printout,

12   there it talks about the first shift that you were on

13   and that you were dispatched to this location.  Just

14   for orientation, "NC" means Noel Castro.  Then "JU" and

15   "JT" are the two detectives who are interviewing you.

16        A.   Okay.

17        Q.   Here in the middle of it you say, "And see, I

18   didn't get to read the call notes because I was

19   driving."  So would that indicate that you were

20   driving?

21        A.   Yes.  There you go.

22        Q.   Okay.

23             MR. ROZELLE:  I'm sorry.  Are you talking

24        about first shift?

25             MS. CALLAHAN:  Yes.

1          MR. ROZELLE:  Thank you.

2     BY MS. CALLAHAN:

3          Q.   So do you remember anything about the call to

4     this location at 1739 Split Fork Drive?

5          MR. ROZELLE:  Just to be clear, you mean the

6          first one or the second one?

7          MS. CALLAHAN:  Anything about either one.

8     BY MS. CALLAHAN:

9          A.   I recall some things.  Not everything a

10    hundred percent.

11         Q.   Okay.

12         A.   It depends on what you want to know.  If you

13    ask me then -- you know.

14         Q.   Okay.  So I will represent to you that you

15    guys were called the first time around 5:15 in the

16    morning on September 7th, 2016, to this location at

17    1739 Split Fork Drive.  What, if anything, do you

18    remember from that call?

19         A.   The main thing that I remember is that we got

20    the call for a patient.  An emergency call.  911

21    medical emergency.  We obtained a refusal.  A -- an

22    against medical advice.  It's kind of refusal to go to

23    the hospital or -- that's mainly it, honestly.

24         Q.   Okay.

25         A.   I wish I could tell you more.  You might have

1  to jog my memory.  We went for a medical call and we

2  got a refusal kind of thing.

3      Q.   Okay.  Do you remember if the police or

4  deputies were involved during that call?

5      A.   I don't remember.

6      Q.   So if I represent to you that you staged and

7  waited for the deputies first to clear the site, would

8  that jog your memory that that's what happened?

9          MR. ROZELLE:  Object to the form.  Leading.

10     You can answer.

11 BY MS. CALLAHAN:

12     A.   What you're talking about looks like JU says

13 here, "Well, we staged, so we didn't go responding to

14 the emergency.  We staged almost a half-mile down the

15 street.  Sunstar is right behind us."  This is talking

16 about the 5:15 in the morning on the 7th, correct?

17     Q.   Correct?

18     A.   So based off of that, it sounds like we did

19 stage.

20     Q.   Okay.  But do you have any recollection about

21 it?

22     A.   No.  Not a hundred percent, no.  I'm not

23 confident enough as to give you a hundred percent

24 answer.

25     Q.   Okay.

1      A.    You can look all this up if you want to.  You
2  can go through dispatch notes and it shows everything.
3      Q.    I'm just asking what you remember.
4      A.    Okay.  If you want the hundred percent
5  answer, that would be the way to go.  But if you ask
6  me, I don't want to -- I don't recall a hundred
7  percent.
8      Q.    So then if you look at, sort of, like,
9  halfway down where you said, NC says, "I didn't get to
10  read call notes because I was driving."  Then below
11  that you say, NC says, "Our lieutenant reads that kind
12  of stuff."
13      A.    Yes.  So --
14      Q.    And then the next remark by NC is, "Uh, so --
15  but he did give us heads-up that there were weapons in
16  the house for the call notes."  You see that?
17      A.    Yes.  I do see that.
18      Q.    Okay.  Do you have any recollection about
19  this issue of there being weapons in the house?
20      A.    When we went to this call this morning, I
21  don't remember a hundred percent seeing any weapons in
22  the house or -- because when we are going through the
23  call, the lieutenant gets information on the laptop
24  given to him by dispatch telling us to stage.  So for
25  this particular incident and this call, I don't

1  remember seeing -- you know, anything myself seeing
2  weapons.
3      Q.   And do you remember the reason why you guys
4  were staged being that the call notes indicated there
5  were weapons in the house.  Do you remember that?
6      A.   Do I remember why we staged is because we
7  were advised that there was weapons in the house?
8      Q.   Yes.
9      A.   I'm not going to give you a hundred percent
10 answer yes or no.  I mean, like I said, I'm not the
11 officer on the truck that day, so I don't have to say
12 whether or not we are staging or not.
13     Q.   Okay.  And you don't remember the reason why
14 you staged sitting here today?
15     A.   I don't want to say a hundred percent that's
16 why we staged.  There are many different reasons why we
17 stage.  It could be a certain person is acting a
18 certain way or whatever.  You know, it could be a
19 hazmat incident.  There could be explosives involved.
20 If this was the one reason why we staged, it wasn't up
21 to me.  I have no recollection of why we did it.
22     Q.   Okay.  Do you have a recollection that that's
23 what the lieutenant said?
24     A.   No.  It was 5:00 in the morning.  We work
25 24-hours shifts.  I don't specifically remember him

1  telling me, "Hey, Noel, stage."  I would be making that

2  up if I said that.

3      Q.   Okay.  So if the transcript indicates that's

4  what you said at the time of this interview in

5  September of 2016, you don't have any reason to dispute

6  it, do you?

7      A.   Not at this time.  But, again, I don't a

8  hundred percent recollect everything, so --

9      Q.   Okay.  Sitting here, do you remember anything

10  about interacting with the patient at this location?

11      A.   No.  You wouldn't happen to have a medical

12  report, do you, that we type up?  If you brought that,

13  then that might be --

14      Q.   I do not have the medical report.  Just the

15  interviews.

16      A.   Okay.

17      Q.   If you go to Page 5 and you look about

18  one-third down, JU says, "And tell me about what type

19  of treatment he received."  He being the patient.  Then

20  NC, you, states, "We didn't treat him at all.  We just

21  assessed him.  We took his blood.  I asked him some

22  simple questions.  I asked him what year it is.  What

23  city he is in.  Who is the president.  So we were just

24  trying to assess how alert he is."  Then the next

25  answer continues, "So he answered all those

1   appropriately?"  Do you see that?

2        A.    Yes.

3        Q.    So that was your testimony at the time of

4   your interview, correct?

5        A.    Yes.

6        Q.    Do you have any recollection sitting here

7   today to the contrary?

8        A.    To the contrary?

9        Q.    Yes.

10       A.    Not to my knowledge.  Not that I can -- not

11  to my knowledge, no.

12       Q.    Okay.

13       A.    I'm sorry.  I've probably run into millions

14  of patients now.

15       Q.    I'm just asking you if you remember.

16       A.    Anything other than what it says here, you

17  know, I have no other -- further recollection.

18       Q.    Okay.  So from this excerpt that we just

19  read, it sounds like you did not have to administer

20  those A, B, C's or the seizure treatment protocol that

21  you mentioned before?  It was the next stage where you

22  do the assessment?

23       A.    Right.  The A, B, C's are not much -- they're

24  not administered.  We're assessing.  They're

25  assessment tools.  That goes with every patient,

1    though.  The A, B, C's is every patient.  I mean, you

2    see what it says here.  This is what I said we did.

3    I'm sure the medical report will probably show

4    something along the lines, but there's nothing more I

5    can add.

6        Q.   Okay.  Then look at the bottom third or so,

7    JU asks, "How about his speech and everything?  Appear

8    normal?"  You say, "I mean, he just woke up.  He just

9    woke up.  So as far as my knowledge, it didn't sound

10   like he -- he -- you know -- it was anything slurred."

11   Then you continue, "Or anything like that.  It sounded

12   normal."  You see that?

13       A.   Yes.  I do see that.

14       Q.   And that was your testimony at the time?

15            MR. ROZELLE:  Object to the form.  You can

16       answer.

17   BY MS. CALLAHAN:

18       A.   According to this, yes.

19       Q.   Okay.  Do you remember anything to the

20   contrary sitting here today?

21       A.   Contrary to what?

22       Q.   To what this says.

23       A.   No.

24       Q.   Then on top of Page 6 you say on the top line

25   there, "Basically, we tell him to go to the hospital.

1    We did -- actually, we also did a full cognitive exam.

2    It's a series of 24 questions."  Do you see that?

3         A.    Yes.

4         Q.    And what is it?  A mental exam?

5         A.    Yes.  Every department is different with the

6    medical protocols.  If I recall correctly, I want to

7    say Pinellas County EMS has a certain way they assess a

8    patient.  I guess they have -- at that time, they had

9    24 questions, but I can't shed any light as to what the

10   specific questions are or -- but that's -- for the most

11   part, that's how most of the medical calls to go.  We

12   have to assess the patient.  Make sure to the best of

13   our knowledge, the test that we give, the assessment

14   tools, we have to go through all the process, the

15   steps, to determine whether or not they're alert and go

16   from there, basically.

17        Q.    Okay.  So the purpose of 24 questions is to

18   determine how alert and oriented they are?

19        A.    Yes and no.  It just depends on the patient.

20   Some people have dementia.  That patient could be

21   intoxicated or whatever.  It can go so many ways, so --

22   it's just a test that we are trained on to use as an

23   assessment tool in the field.

24        Q.    But what's the purpose of it?  Why do you

25   administer this test?

1      A.   Well, like I said, to determine whether they

2   are alert and oriented and able to make their own

3   decisions.  If someone is intoxicated, they don't know

4   that they're intoxicated, so to speak.  It depends on

5   what happened before.  If somebody falls and hits their

6   head or whatever.  It's basically just a tool to see --

7   according to this test, that they're able to make their

8   own decisions as they would if they were -- if nothing

9   had -- without any other kind of preceding incidents.

10      Q.   And there's a mini mental test which has,

11   like, 10 basic questions?

12           MR. ROZELLE:  Object to the form.

13   BY MS. CALLAHAN:

14      A.   I don't know the test you're talking about,

15   so I don't want to speak to it if it's more advanced or

16   less advanced or -- what was it called?

17      Q.   Mini mental test where you just ask 10

18   questions.  What year is it?  What is the date?  Who is

19   the president?

20      A.   Yes.  We ask those questions.

21           MS. CALLAHAN:  Object to the form.  You can

22      answer.

23   BY MS. CALLAHAN:

24      Q.   Then on line three you say, "And everything

25   was answered appropriately."  Then you say, "That's a

1 really detailed, like, basic exam, correct." Is that

2 what you said?

3     A. According to this, yes.

4     Q. Then some lines lower down, JU asks you, "Did

5 you notice anything abnormal, injuries or anything, on

6 this person?" You say, "No." Is that correct?

7     A. Are you asking me if this is what I said?

8     Q. Yes.

9     A. According to this, yes.

10     Q. Then about, like, a third down you say, "Like

11 I said, we did full mental assessment with vital signs

12 and everything. We did the full cognitive exam. All

13 those questions. And he -- we -- we -- we had him sign

14 the computer with the report saying that he didn't want

15 to go to the hospital with us or with Sunstar, and that

16 you accept risk of liability if anything may happen

17 afterwards." Is that what -- that was the memory that

18 you have of this incident, correct?

19     MR. ROZELLE: Object to the form. You can

20     answer.

21 BY MS. CALLAHAN:

22     Q. That he refused to go to the hospital?

23     A. Yes. For this particular incident he refused

24 to go to the hospital.

25     Q. Okay. And this entry is consistent with what

1    your memory was earlier?

2         MR. ROZELLE:  Object to the form.  You can

3    answer.

4    BY MS. CALLAHAN:

5         A.   Yes.

6         Q.   Okay.  Do you remember anything else about

7    that morning incident.

8         A.   I don't.  Sorry.

9         Q.   Okay.  Do you remember talking to the wife?

10        A.   I don't remember if I did or did not.

11        Q.   Do you remember talking to the deputies at

12   all?

13        A.   I don't remember.

14        Q.   Do you remember any conversation you guys

15   might have had at the firetruck about it?

16        A.   No, I don't.

17        Q.   Do you recall if you had been to that address

18   before?

19        A.   I don't recall.

20        Q.   Do you remember what the patient looked like?

21        A.   No.

22        Q.   Do you remember the patient having any bad

23   attitude, being rude or impolite or aggressive or --

24        MR. ROZELLE:  Object to the form.  You can

25   answer.

1    BY MS. CALLAHAN:

2        A.    I don't remember whether he did or didn't.

3        Q.    Okay.  Later in the day your fire department

4    was dispatched again to the same address.  Do you have

5    any independent recollection of the second dispatch?

6        A.    The dispatch?  Mainly that we were called to

7    that address again at whatever time of the day that

8    was, and that I advised the officer that we had been to

9    that house earlier.  That's about it.  I think it was a

10   12-hour span or something like that.  Is that correct?

11       Q.    Yes.

12       A.    Okay.  About 5:00 in the morning.  Then this

13   was, like, 5:00 in the afternoon.  Something like that

14   would have -- for me, at least, I would remember that

15   we went back to the address there.

16       Q.    Okay.  Do you remember what you told the

17   officer about the earlier call that you had been part

18   of?

19       A.    No.  I don't remember what I specifically

20   told him.  Just that we had been to this house before.

21       Q.    Do you remember anything else about that

22   second call?

23       A.    Again, tell me what you want to know and I

24   can see if I can answer that question.  That's kind of

25   a broad question.  Do I remember anything else?  Yes

1    and no.  I'm not trying to be difficult.

2        Q.   Before we go look at the transcript of what

3    you said at the time, I'm just asking what do you

4    remember about it sitting here before we refresh your

5    recollection?

6        A.   It ended up being we took the patient to a

7    hospital.  On the way to one hospital, they told us to

8    turn around because they weren't accepting any more

9    patients, so we went to another hospital.  Then that

10   hospital told us to go to a different hospital because

11   they weren't accepting any more patients.  I remember

12   that that caused a lot of delay in his care because

13   he -- I'm not sure how long -- dispatch knows how to

14   say how long he's back in the ambulance for.  I know it

15   was a lot longer than he should have been in the

16   ambulance for, at least when we got to him, because of

17   the hospitals being closed.  It happens a lot around

18   here, just so you know.

19       Q.   It's good to know.

20       A.   It's a problem.  But, yes, that's -- mainly

21   that we took the patient to the hospital.

22       Q.   And do you remember the patient's outcome?

23       A.   No.  I didn't follow up on him.

24       Q.   Okay.

25       A.   I don't recall what I --

1      Q.   Do you recall what condition caused you guys
2  to transfer him to the hospital?
3      A.   What condition caused us to take him to the
4  hospital -- like take him to the hospital?
5      Q.   Yes.  Why did you take him to the hospital?
6      A.   I don't know, because we are not the doctor.
7  We are not legally allowed to diagnose, like, give a
8  prognosis.  We just treat what we find and go to the
9  hospital.  We let the ER doctor deal with it.  You
10  would have to look at the medical report.  He wasn't my
11  patient either, I don't think, so --
12      Q.   Well, I mean, it's a theoretical point.  But
13  do you recall if you had to transport him because of a
14  breathing problem?  A cardiac problem?  Do you remember
15  anything at all?
16           MR. ROZELLE:  Object to the form.  You can
17      answer.
18  BY MS. CALLAHAN:
19      A.   It's kind of like that what came first, the
20  chicken or the egg?  It could have been a number of
21  things.  I didn't follow up with him.
22      Q.   I'm just asking if you remember.  If you
23  don't, just tell me.
24      A.   I don't.  Sorry.
25      Q.   Do you remember if there was any deputy

1    involvement on the scene?

2         MR. ROZELLE:  Object to the form.  You can

3    answer.

4    BY MS. CALLAHAN:

5         Q.    Sheriff deputy?

6         A.    Yes.  There were sheriff deputies there, yes.

7         Q.    What do you remember about that?

8         A.    Not very much, if anything, at all.

9         Q.    Other than the fact that you remember them

10   there, do you remember anything else?

11        A.    I remember them there.  We staged -- again,

12   waited for some time.  I'm not sure how much time.  We

13   waited for an all clear or clear answer before we can

14   go in and do our job, so -- I don't specifically

15   remember seeing any one deputy do any specific thing

16   while we were there, speaking to any of them or

17   anything.

18        Q.    Okay.  Well, let's look at this transcript

19   and see what you said here.  So they started asking you

20   questions about the second call on Page 7.  The bottom

21   of Page 7.

22        A.    Okay.

23        Q.    On the top of Page 8, line two, you say,

24   "That came -- that one came in as a seizure."  Do you

25   see that?

1     A.    I do.

2     Q.    Then JU -- do you need to look at that?

3     A.    No.

4     Q.    Okay.  Then JU asks, "And I know the first

5  time you said you guys staged for safety reasons.  Did

6  that occur again?"  Then you say, "Yes.  It happened

7  again.  I told the LT."  Is that the lieutenant?

8     A.    Yes.

9     Q.    "That we were going to this house earlier

10  today and that there were weapons -- reports of weapons

11  in the house.  And that, you know, he had PTSD and took

12  psych meds.  So I was, like, all right, you know, based

13  on what you're telling me, they are going to make the

14  response downgrade to."  What is downgrade to?

15     A.    I'm going to -- I don't want to speculate,

16  but it sounds like it's an analogy to, like, something

17  where -- whether or not you're going to respond lights

18  and sirens call or not.  So downgrade is kind of a

19  universal term for turn off your lights.  Turn off your

20  sirens.  Don't go through red lights.  Just go there

21  without any of that going on.

22     Q.    Okay.  Then it looks like the lieutenant made

23  the decision?

24     A.    He makes all the decisions.

25     Q.    Okay.

1      A.    Ninety-nine percent of the time he makes all

2    the decisions.  We just kind of -- you know, we tell

3    him what we know and he makes the decisions based off

4    of that.  Kind of rank-and-file kind of thing.  It's

5    military.  We base it off what military and law

6    enforcement does.

7      Q.    So based on this statement here I just read,

8    it says that what you told the lieutenant was that

9    there was reports of weapons in the house, and that the

10   patient had PTSD and took psych meds, correct?

11     A.    Are you asking me if that's what it says

12   here?

13     Q.    Yes.

14     A.    Yes.

15     Q.    And do you remember telling the lieutenant

16   anything different than what it says here?

17     A.    I don't recall.

18     Q.    Then if you look a third of the way down, you

19   say, "Deputies arrived on the scene."  Then JU says,

20   "And at what point are you told that?"  Then you

21   interject, "I know.  Come on."  So it looks like the

22   question was, "And at what point were you told to come

23   on?"  Then you answer, "And see -- and I want to say

24   maybe 10, 15 minutes go by from the time we got there

25   before they tell us to come in."  Do you see that?

1     A.   Yes.

2     Q.   Do you have any recollection as to the

3 timeframe of this occurrence?

4     A.   Do I have any recollection different from the

5 timeframe?  I don't know either way if this is --

6     Q.   Okay.  Then if you look on Page 9 about a

7 quarter from the bottom, it says, NC, "We basically

8 walk upstairs.  I remember being directed to walk

9 upstairs to where the patient is at.  We get to him.

10 See him.  He's facedown.  He's cuffed.  We start

11 assessing him."  Do you see that?

12     A.   Yes.

13     Q.   Do you remember anything about the patient

14 now?  Does this jog your memory at all?

15     A.   I don't recall.

16     Q.   So you don't have any recollection different

17 from what this says?  You have no recollection?

18     A.   This doesn't help me recollect, is what I

19 mean.  Unless you can go back in time with my memory,

20 this doesn't help.  But we can keep going.

21     Q.   Okay.  On the top of Page 10, JT asks you,

22 "So he was facedown when you got there?"  You say,

23 "Yes."  And JT says, "In handcuffs?"  You say, "Yes.

24 Yes, sir."  Do you see that?

25     A.   I see that.

1   Q.   Do you remember anything different about it?

2   A.   I don't remember anything about it, so --

3   Q.   Okay.

4   A.   Sorry.  I just don't.

5   Q.   Okay.

6   A.   If that's what happened, I don't remember if

7   that's what it was or it wasn't.

8   Q.   And this doesn't jog your memory one way or

9   the other?

10  A.   No.

11  Q.   So you start talking about what you were

12  doing with the patient on the bottom of Page 10.

13  A.   Okay.

14  Q.   So basically asking if he's breathing and

15  what's going on.  Then it continues on Page 11.  It

16  says, "From what he", your partner, "Was telling me, it

17  sounded like he", the patient, "Wasn't breathing.  But

18  if he was breathing, it was very agonal.  Very slow.

19  Very shallow.  At that point, I'm already thinking,

20  hey, it's probably going to be a cardiac arrest, so we

21  start getting our stuff out.  Oxygen monitor and that

22  kind of stuff."  Do you see that?

23  A.   I see that.

24  Q.   Does that jog your memory in any way that --

25  how you were treating the patient?

1          A.    No.

2          Q.    Then about the third middle of the page, you

3    say, "No.  Just -- he wasn't responding to us.  Like,

4    hey, hey, what's going on.  I give him a sternal rub

5    here just to see if he was awake or not and he's not

6    responding to that."  You see that?

7          A.    I see that.

8          Q.    Do you remember giving him sternal rub?

9          A.    I don't recall.

10         Q.    What is the reason would you give sternal

11   rub?

12         A.    A sternal rub, if protocol is deemed

13   necessary, is -- it's just a tapping stimuli.  You

14   touch the patient in the sternum to see if they respond

15   to that at all.  This is to see if they -- if someone

16   is asleep, that could wake them up.  If they had too

17   much to drink, that might make them up.  It's just a

18   tool in the toolbox for assessing the patient's level

19   of consciousness.

20         Q.    Okay.  Then on Page 12, they ask about the

21   pulse and breathing.  You answer, "He," meaning your

22   partner, "And I were just kind of back and forth with

23   the dialogue.  I mean, a lot is going on there right

24   now, you know.  We say, 'Hey', and trying to -- is he

25   breathing?  And we were -- yes, we both were kind of

1    going back and forth like, you know, real quick.  It

2    was in 10 seconds we determined that he was not

3    breathing."  Do you see that?

4         A.    I see that.

5         Q.    Then a couple lines down you say, "And we

6    checked the pulse."  And you say, "No pulse there.

7    Approach cardiac arrest.  We started working him as a

8    cardiac arrest."  Do you see that?

9         A.    I see it.

10        Q.    Does that jog your recollection in any way?

11        A.    I don't recall.  I don't recall.

12        Q.    And then a couple lines below that, you say,

13   "I started off with putting him on the cardiac monitor

14   checking to see what kind of activity he's got."  Do

15   you see that?

16        A.    I see that.

17        Q.    Then the last line on the bottom, the

18   question before that, they ask you, "What happens with

19   the monitor?  What does that tell you?"  Your answer

20   is, "It's -- there is no pulse, which means -- means

21   there is no electrical activity.  So it means that he's

22   in cardiac arrest."  Do you see that?

23        A.    Yes.  I see that.

24        Q.    So earlier in this interview you said that

25   your partner, Paul, was first to the patient and

1   that -- like if you look on Page 10.

2           MR. ROZELLE:  Object to the form.

3   BY MS. CALLAHAN:

4       Q.   Back to Page 10.  The question was, "Did you

5   roll him over?"  They are asking you how you treat the

6   patient.

7       A.   JU?

8       Q.   Yes.  JU says, "Did you roll him over to do

9   that or you just --

10      A.   Where?  Oh, I see.

11      Q.   You said, "I wasn't the first on to him.  It

12  was my partner, Paul.  I was right behind Paul."  Do

13  you see that?

14      A.   Yes.

15      Q.   Okay.  So that would indicate that there were

16  at least two people with fire medical skills present,

17  right?

18          MR. ROZELLE:  Object to the form.  You can

19      answer.

20  BY MS. CALLAHAN:

21      Q.   You and Paul?

22      A.   On every patient that we get, there's always

23  going to be two or three.  It could be four.  It could

24  be five.

25      Q.   Okay.  And how was it decided who goes to the

1  patient first, you versus Paul?

2      A.    I don't recall how we decided that day.  If

3  it's -- it could be for the whole shift one is in

4  charge of -- when we say "in charge", I mean we are the

5  one that signs the medical chart saying the patient is

6  yours.  It's -- I don't recall how we decided who it

7  was.

8      Q.    Okay.  And do you remember if you transported

9  him to the hospital, or was it Sunstar?

10     A.    I don't recall if it was us or Sunstar.

11     Q.    Okay.

12     A.    Ninety-nine percent of the time, Sunstar is

13  transporting in Pinellas County.  It's not out of the

14  realm of possibility that we took him.  But 99 percent

15  of the time it's Sunstar.

16     Q.    Okay.  So us reading portions of this

17  transcript, did it jog any more memory of --

18     A.    Not much, if anything.

19     Q.    Okay.  Nothing else you remember that you

20  could add to what we talked about?

21     A.    Did we go through the whole thing?

22     Q.    Yes.  Those are the questions I had out of

23  the transcript.

24     A.    Okay.  So you don't want to go through the

25  rest of this?  I see at the bottom that I say, "There

1   was a pistol on the bed not two feet from him."  You
2   don't want to talk about that?
3       Q.   Do you remember anything about that?
4       A.   There are so many calls -- a lot of times we
5   go there and there's something with a gun or a knife or
6   people, so --
7       Q.   How do you know that you talk about the
8   pistol?
9       A.   Because I read ahead.  I'm trying to help you
10  and jog my memory, so I'm kind of reading ahead a
11  little bit.  But if you're done with it, it's fine, we
12  can be done with it.  If you want to talk about the
13  rest of the stuff, we can.
14      Q.   I'm just asking if you remember or --
15      A.   Unfortunately, reading this isn't going to --
16  you know, as far as what you're asking so far.  It
17  sounds like you wanted to ask more about his medical
18  treatment on our side, so that's -- like I said, I've
19  treated millions of patients at this point.
20      Q.   Okay.  Well, I appreciate you telling me.
21      A.   Trying to do my best here.  I'm not trying to
22  be difficult here.
23      Q.   Okay.  Sir, did you do anything to prepare
24  for the deposition today?  Did you talk to anybody?
25  Meet with anyone?

1     A.   No.  Like I said, I got this a few days ago.

2  I actually recently moved, too.  So if they did bring

3  it to my address, it wouldn't have gotten to my rental,

4  because my house flooded with water, so -- I don't know

5  if you tried to go that route, but I just got this like

6  maybe a week ago or something like that.  I haven't

7  really had time with the newborn, so -- anyways.  You

8  don't need to hear my problems.

9     Q.  Did you work last night?

10     A.  I did, yes.  I worked a 24-hour shift

11  yesterday.

12     Q.  So when did you finish?

13     A.  End of the shift is 8:00 in the morning, but

14  I didn't get relief until about 9:00.

15     Q.  Today?

16     A.  Yes.

17     MS. CALLAHAN:  Well, then I'm done asking you

18     questions.

19     THE WITNESS:  Okay.

20     MR. ROZELLE:  I've got a couple for you.  Why

21     don't we take a short break.  I've probably got

22     five or 10 minutes with you.

23     (At this time a brief recess was taken.)

24               CROSS-EXAMINATION

25  BY MR. ROZELLE:

1      Q.   Mr. Castro, I'm Paul Rozelle.  I represent
2   the Pinellas County Sheriff's Office -- or work for the
3   Pinellas County Sheriff's Office in this case.  Just so
4   you know who I am and what I do, I represent Deputy
5   Greg Goepfert, who is a defendant in this case, and
6   Sheriff Bob Gualtieri, who is also a defendant in this
7   case.  I've got just a couple of follow-up questions
8   for you.
9      A.   Okay.
10      Q.   First of all, you were shown some of this --
11   Exhibit 30, which is in front of you.  There was some
12   stuff you were directed to.  Let's get reoriented here.
13   On Page 9 about the -- toward the bottom of Page 9
14   about the patient being facedown and handcuffed.  Do
15   you remember being walked that through here a few
16   minutes and --
17      A.   I do remember us going over this, yes.
18      Q.   If you would, sir, please take a look at Page
19   13 of 17 in Exhibit 30, and let me know when you are
20   there.
21      A.   I'm there.
22      Q.   Let's take a look toward the top.  There's
23   JT.  It says, "Okay.  When you got up there you said he
24   was facedown."  Do you see that?
25      A.   I do.

1    Q.   It goes on and you say, "He's facedown."

2  What I want you to do is read to yourself, if you would

3  like, start with that, all the way down toward the

4  bottom where it says, "NC".  That's you, right?

5    A.   Yes.

6    Q.   "He was able to breathe, yes -- yes -- he --

7  he -- it was clear on that as far as that goes."  So,

8  if you would, just take a minute and read kind of

9  between those lines for me.  Let me know when you're

10  ready.

11    A.   Okay.

12    Q.   First of all, do you remember giving this

13  interview that night of September 7th, 2016, to the

14  detectives?

15    A.   I do.

16    Q.   This was the same day, just later the same

17  day as far as when these events happened?

18    A.   Right.

19    Q.   You answered these questions accurately and

20  truthfully to the best of your ability?

21    A.   I did.

22    Q.   As far as what's here in this section I just

23  asked you to read, I want to make sure I understand

24  what you told the detectives.  Let me put it to you

25  this way.  First of all, were you clarifying what you

1  meant by facedown in response to the questions asked of
2  you?
3      A.    To that, I want to say that there was a
4  recording of this, right?  So there's a video of me
5  showing what I meant by this.  Because there's parts
6  here where it says -- it was, like -- it kind of, like,
7  cuts off.  So there was parts of me explaining what I
8  was trying to say visually, if I recall correctly.
9      Q.    I'll represent to you that there is an audio
10 recording of this, but no video.
11     A.    Okay.  That kind of doesn't help me, because
12 what I'm reading here, it sounds like I'm trying to
13 show them what I mean with my body, but I'm trying to
14 tell them what I saw.
15     Q.    Okay.  So you see where it says, "You know,
16 like facedown.  It was like."  And then JT says, "Was
17 his head turned to the side?"  You're like, "No.  He
18 was."  Then JT says -- this is you, it says, "His body
19 was prone."  Let's pause there.  What does prone mean?
20     A.    Prone means with your back up towards the
21 ceiling, if we're trying to get oriented, and your
22 belly down.
23     Q.    Then it says, "But it was, like -- you know,
24 what I mean?  Like if he's sleeping like -- you know,
25 if he's sleeping on your side like this a little bit."

1    Let me pause there.  Is this what you mean by -- your
2    recollection, to the extent you have one, is that you
3    were trying to demonstrate to the detectives exactly
4    how the patient was positioned?
5         A.   Right.  Almost like he was sleeping facedown.
6         Q.   And --
7         A.   But with his head to the side.
8         Q.   And that's where we are heading down here?
9    "Do you remember which side of his face was turned?"
10   Was it his right or," and then what's your answer to
11   that?
12        A.   It says, "I want to say it was his -- I want
13   to it was left.  I want to say the left side of his
14   head was facing, like, to the."  JU says, "Was it away
15   from the floor?"  I say, "Yes.  It was, like -- you
16   know what I mean?"
17        Q.   "Like if you sleep on a pillow facedown,
18   like, that kind of -- but, like I said, the position is
19   prone.  It's called prone."  Then it goes on, "You know
20   where you end up with -- if he was able to breathe,
21   yes."  Let me pause there.  My understanding from this,
22   and it sounds like as we sat here today while you're
23   being questioned by Counsel, and we read through a
24   good bit of this, is that when you got up there to
25   assess the patient, at least this is what you told the

1  detectives that night, he wasn't breathing, is that
2  right?
3      A.   As far as what our assessment could tell us,
4  right.
5      Q.   And then fair to say what's being fleshed out
6  here is, "He wasn't breathing.  The patient wasn't
7  breathing, but his face or mouth wasn't positioned in a
8  manner that would impede his breathing?"
9      A.   Right.  The airway was not being impeded from
10 our --
11     Q.   Okay.  So the A, B, C assessments that you
12 gave some testimony about, I mean, I'm a lay person, so
13 I apologize.
14     A.   I'm a lay person when it comes to --
15     Q.   A is airway, which could be an obstruction
16 that's in the windpipe?  Something --
17     A.   Anywhere from behind your lips to your actual
18 lungs.  So if anything is in the way there --
19     Q.   You got to clear the airway?
20     A.   Exactly.
21     Q.   The patient ain't breathing with a blocked
22 airway?
23     A.   Right.
24     Q.   Would part of that assessment be, you know,
25 if the -- I don't know.  If somebody has their hand

1   over your mouth and asphyxiating you, in other words,

2   you are being pressed down into a soft surface where

3   you can't draw a breath, is that an airway obstruction,

4   or what would you call that?

5       A.   Technically, it's an airway obstruction.  But

6   we were more here to treat the medical sense where if

7   there's something blocking his airway, we can fix it

8   and we're going to do that.

9       Q.   Okay.  As far as the A for your A, B, C's

10  here and what was recorded from this interview, was

11  there anything that was a problem as far as A goes?

12  Was the subject or the patient's airway obstructed?

13          MS. CALLAHAN:  Object to the form.

14          MR. ROZELLE:  What's wrong with the form so I

15      can fix it?

16          MS. CALLAHAN:  It implies that he assessed

17      the A, B, C's at that point.  If that's what the

18      assessment was.

19  BY MR. ROZELLE:

20      Q.   Did you assess the patient's airway when you

21  came upon the scene?  If you know.

22      A.   It's kind of a question where it's -- he's

23  not my patient technically, so I don't want to say that

24  it was my assessment or hold me a hundred percent true

25  and accountable if my assessment was the one that was

1  going on, so -- but from what I recall and from what

2  I'm reading here, nothing is indicating to me that

3  anything was obstructing his airway.

4      Q.   Go back to Page 10 toward the bottom.  Let me

5  get you reoriented here.  I'm at the bottom of 10.

6      A.   Okay.

7      Q.   It says -- JU says, "All right.  So tell me

8  about what -- what do you do from that point?"  And

9  it's talking about when you came on scene.  Do you see

10 that?

11     A.   Yes.

12     Q.   And below that it says -- NC says, "You check

13 his A, B, C.  His airway.  If he's breathing."  Do you

14 see that?

15     A.   Yes.

16     Q.   As far as that being the statement you gave

17 on the night of September 7th, 2016, was that accurate

18 at the time that you gave it?

19     A.   Yes.

20     Q.   Do you have any reason to think as you sit

21 here today that that's not accurate?

22     A.   No.

23     Q.   Do you have any memory or testimony to the

24 contrary?

25     A.   Not that I recall.

1    Q.   So this -- would it have been your usual
2  practice when you make first contact with a patient who
3  is unresponsive to perform the -- assesses his airway
4  for breathing and circulation?
5    A.   That' every patient.
6    Q.   Do you have any reason to think you didn't do
7  that in this case?
8    A.   No.  But, like I said -- well, at least
9  according to this, it says I wasn't up there touching
10  him.  Obviously, if someone is facedown, I can't assess
11  their airway without rolling them over obviously.  That
12  goes without saying, but -- I wasn't the first one to
13  him.  My partner, Paul -- I was behind Paul.  I don't
14  want to speak as to -- if I was right behind him, I
15  don't want to speak to what he did before I got to him
16  but --
17    Q.   As far as whatever assessment that you
18  performed on the patient with respect to his airway,
19  did you find anything impeding his airway?
20    A.   Not that I recall.
21    Q.   What did you mean by, "He was able to
22  breathe, yes.  It was clear of that and -- as far as
23  that goes."  What did you mean by that?
24    A.   Based off of this, that there's nothing
25  impeding his airway.

1    Q.    All right.  You gave some testimony about
2  staging.  Do you remember that?
3    A.    I do recall giving that testimony.
4    Q.    What is staging?
5    A.    Staging means basically park your unit in an
6  area, it could be quarter of a mile, half a mile, a
7  mile, 10 miles, depending on the severity of the
8  incident, you park your unit away from the actual
9  location of the incident until -- for this call, it
10  would be for deputies or law enforcement officers to
11  give us the okay that it's safe and that there is no
12  weapons or any kind of subjects involved that might
13  pose a danger to us that we are not prepared to handle.
14    Q.    Who makes the decision for fire rescue to
15  stage?
16    A.    Well, it's the officers.  So the lieutenant
17  of the engine.  The truck.  The captain.
18    Q.    And by officers, you mean FD officers?
19    A.    Yes.
20    Q.    Not police officers.
21    A.    Right.  Sorry.
22    Q.    Okay.  So officers meaning commanding
23  officers?  Some supervisor --
24    A.    Right.  Whoever was in charge of that unit
25  going to that call.  It could be two people on.  It

1    could be four people on.  Whoever is in charge of that

2    unit.

3         Q.   So fire rescue, fire department, paramedics,

4    it's your call to stage or not to stage based on the

5    circumstances of whatever that call for service is and

6    the information you have at the time, is that fair?

7         A.   Yes.  Sometimes it comes as a discretion.

8    Sometimes they will tell us to stage at our discretion,

9    so -- you know, depending on -- it could be the area

10   you're going to.  Whether or not it's -- I don't want

11   to go into that whole thing, but, you know, what I

12   mean?  If dispatch tells us, hey, this person may have

13   a weapon, but now it's reported that they are gone, you

14   know -- but it's one of those decisions that's kind of

15   like a -- it's not a split decision, but you're on a

16   call now, so you have to make a decision whether or not

17   you're going to put your crew in danger or not.

18        Q.   It depends on the circumstances --

19        A.   Right.

20        Q.   But ultimately it would be FD's decision?

21        A.   Yes.  It's our decision.

22        Q.   You're following FD policy and protocols on

23   whether to stage in certain circumstances and when to

24   stage, is that right?

25        A.   Yes.

1    Q.   Not necessarily exactly where to stage or how

2  far?

3    A.   No.

4    Q.   As far as a block or mile or 10 miles?

5    A.   That's at our own discretion.

6    Q.   In this case on September 7th, 2016, the two

7  calls for service that you were out there on, you

8  staged both times, right?

9    A.   Yes.

10    Q.   The second call in the afternoon, how many

11  engines were out there, if you remember?

12    A.   Definitely at least one.  Us.

13    Q.   Because you were out there?

14    A.   Yes.  I'm not sure if any other ones -- you

15  said the second call in the afternoon?

16    Q.   Correct.

17    A.   There was a name Stovall mentioned earlier.

18  That's a Palm Harbor unit.  That's a different -- so

19  that means there was at least two.  If you want to

20  count -- I'm not sure if you lump Sunstar with fire EMS

21  or -- if you lump them, then there was three with

22  Sunstar there, too.

23    Q.   Okay.  They would have been riding in the

24  ambulance?  Sunstar?

25    A.   Yes.

1      Q.    Do you remember what Palm Harbor had out

2   there?  Did they have a fire engine?

3      A.    I'm not sure if it was a supression engine,

4   meaning they carry hose and water, or if it was a

5   squad, which means they are basically for car accidents

6   and other kinds of rescue calls.  Not just fires kind

7   of thing.  Medical calls.  You would have to look at

8   talking about that.

9      Q.    You gave some testimony about downgrade to.

10  So downgrading the nature of the call for service, is

11  that -- explain to me more about what that means.

12     A.    I don't want to say the nature of the call

13  for service.  Meaning -- because if we're going to

14  stage -- this is for Oldsmar.  There's a lot of

15  difference between Hillsborough County and where I work

16  now, so I have all these things in my head.  Oldsmar is

17  different where -- if I'm not wrong, Oldsmar -- if you

18  know you're going to stage, you respond to the call.

19  Downgrading to means downgrade lights and sirens.  No

20  lights or sirens if you respond.

21     Q.    So you no longer respond on an emergent

22  basis, is that right?

23     A.    It's still an emergency, but you're not going

24  lights and sirens type of thing.  Now you don't run

25  through red lights.  You're putting other people at

1  risk, so --

2      Q.   As far as whether this patient was -- had had

3  a seizure, was having a seizure or was in a

4  post-seizure state, is that something as a paramedic

5  that you are able to say?

6      A.   Like I said earlier, because we are not the

7  doctor, we don't prognose or diagnose.  We treat off

8  what our protocols tell us to do.  Standing orders that

9  a doctor prescribes for us, so -- it's theoretical.  We

10 go based off what we see.  If it quacks like a duck,

11 looks like a duck, it's probably a duck, right?  If it

12 looks like it's a postictal state, there's no

13 indication of alcohol, as far as we know, we can't

14 smell it, we don't have -- taking certain medications

15 that make -- like a painkiller, you know, oxycodone,

16 like that, if we know for a fact they didn't take

17 anything like that, then -- we know they had a history

18 of seizures and symptoms are present, we are going to

19 assume it's postictal state.  It's kind of like that

20 thing like you err on the side of caution.  You err on

21 what you think -- is this going on?  What's going on?

22 We all kind of talk about it.  We agree, okay, this is

23 what it looks like.  In this case, I'm assuming it was

24 a postictal state where he's in a postictal state, or

25 we are talking about a postictal state.

1      Q.   Why are you assuming that?

2      A.   Because we're talking about it.  I've been

3 asked several questions about it.

4      Q.   Other than the questions that some lawyer

5 asked you --

6      A.   Then, no.

7      Q.   What I want to know is, you know, your

8 testimony based on the factual information and

9 knowledge that you have.  Do you have any information

10 if this patient was in a postictal state?

11      A.   No.  Not to my knowledge.

12      Q.   Was that a conclusion that you reached on

13 September 7th, 2016, that the patient was in a

14 postictal state?

15      A.   Not that I recall.

16      Q.   Do you know whether this patient had ever had

17 a seizure that day or at any time previously?

18      A.   Not to my recollection.

19      Q.   So some dispatcher said you guys are going

20 out there for a seizure, we went through that in the

21 testimony this morning, you remember that if that's

22 what the nature of the call was?

23      A.   That's what I said this morning was -- but

24 what the actual call was, you would have to look at the

25 dispatch notes and that kind of thing.

1     Q.   But diagnosing a seizure, that's not
2  something that you're able to or licensed to do, is it?
3     A.   We don't diagnose.  We are not doctors, no.
4     Q.   Same with whether somebody is in a postictal
5  seizure state?  That's not a medical decision that
6  you're competent to testify to, is it?
7     A.   No paramedic is.  The doctors are.
8     Q.   Okay.  I would like to show you what has
9  previously been marked as Exhibit 22 in this case.  I
10 will --
11         MR. ROZELLE:  This is the show-and-tell
12     portion of our time together.  Ms. Callahan, I
13     invite you to come over here and take a look at
14     what I'm going to do.  This is Exhibit 22.  It's a
15     video.  I cued it up for us.  What I'm going to do
16     is back this up.  I'll wait until Counsel gets
17     over here.
18         MS. CALLAHAN:  Thank you.
19 BY MR. ROZELLE:
20     Q.   Exhibit 22, I'll represent to you is a video.
21 I have it cued up here in front of us to get us
22 oriented.  You see in the bottom right-hand corner
23 where it says September 7th, 2016?
24     A.   Yes.
25     Q.   And the below that 04:08:17 p.m.  Do you see

1   that?

2        A.   Yes.

3        Q.   Okay.  I'm going to push play.  Then I'm

4   going to pause it, and then I'm going to have some

5   questions for you.  If you want me to pause it sooner

6   than I intend to pause it, let me know.  If you have

7   comments or questions about anything that you're seeing

8   here or want to see it a second time or anything of

9   that nature, please let me know.

10       A.   I'm just curious, whose is this?

11       Q.   I'll represent to you that this is the COBAN

12  facing -- front-facing video camera on Deputy Keith

13  Baldwin's patrol vehicle.

14       A.   Okay.

15       Q.   I will -- so it's not one of your guys.

16       A.   I didn't assume that.  I was just curious.

17       Q.   I will push play at 04:08:27.

18            (At this time the video was played.)

19  BY MR. ROZELLE:

20       Q.   I've paused it at 04:08:50.  Do you see that

21  on the screen?

22       A.   Yes.

23       Q.   It looks to me like it's a fire engine in the

24  center of the screen.  Do you see that?

25       A.   Yes.

1      Q.   Can you tell me whose that is?

2      A.   Without any -- without being able to discern,

3  it looks like Oldsmar Fire Engine 54.

4      Q.   As far as you can tell with looking at this

5  paused frame from Exhibit 22?

6      A.   Correct.

7      Q.   Was that the engine you were on?

8      A.   Yes.  If that's Oldsmar Engine 54, I was on

9  that engine.

10     Q.   If that's Oldsmar 54, that's you?

11     A.   Yes.

12     Q.   Do you remember -- having watched the last

13  few seconds of this that we saw here, does that refresh

14  in any way your recollection about where you staged on

15  the second call for service in the afternoon?

16     A.   I mean, it reminds me that basically we were

17  there staging.  That's about it.  I'm not sure if at

18  that point we were inside there or -- you know what I

19  mean?  I'm not sure if deputies showed up afterwards

20  and we were already inside, or if we were still in the

21  engine or --

22     Q.   Absolutely.  And in fairness to you, what we

23  just looked at here doesn't answer any of those

24  questions, right?  You don't see any human beings?

25     A.   No.  I see trees.  Trucks.  Driveways.

1      Q.   Police vehicles.  Other cars parked on the
2  street.  White mailbox.
3      A.   Yes.
4      Q.   But we don't see any humans, right?
5      A.   Right.
6           MR. ROZELLE:  Sir, that's all -- well, let me
7      just ask you two more things to make sure I
8      understand.
9  BY MR. ROZELLE:
10      Q.   Your testimony today is you don't recall
11  speaking with any deputy sheriffs on scene in the
12  morning, is that correct?
13      A.   Correct.
14      Q.   So as far as what you said to them or they
15  said to you or you heard them say to each other or
16  anybody else, you don't have any memory of that as you
17  sit here today?
18      A.   I do not.
19      Q.   Same thing in the afternoon.  As far as
20  conversations that you had with any deputy sheriffs or
21  that you had with anybody else, you don't have any
22  memory of that from the afternoon call for service,
23  correct?
24      A.   No, I don't.
25           MR. ROZELLE:  No further questions.  Thank

1      you for your time.

2          MS. CALLAHAN:  I have nothing more, so thank

3      you, sir.  The court reporter is going to write

4      this up.  She is writing down every word that we

5      say.  Then when she's done, you have the right to

6      either read it and make sure that she transcribed

7      it correctly, or can waive your right to read.

8      But you need to tell us today whether you want to

9      read it or you waive your right to read.

10         THE WITNESS:  Waive my right to read.

11         (At this time the proceedings ended at

12          approximately 11:15 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3

4    STATE OF FLORIDA      )

5    COUNTY OF PINELLAS    )

6

7            I, KIMBERLY HAMMOCK, stenographer, certify

8    that I was authorized to, and did stenographically,

9    report to the best of my ability the foregoing

10   deposition and that the transcript is a true record of

11   the testimony given by the witness.

12           I further certify that I am not a relative,

13   employee, attorney or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorneys or counsel connected with the action, nor am

16   I financially interested in the action.

17           Dated this 23rd day of July, 2019.

18

19                    KIMBERLY HAMMOCK

20                    Notary Public State of Florida

21                    My Commission EE 155298

22                    Expires 12-26-2021

23

24

25

## A

**a.m** 1:18,18 10:1
10:1,3,3,5,5,7
63:12
**ability** 46:20
64:9
**able** 14:25 28:2
28:7 46:6
48:20 52:21
57:5 59:2 61:2
**abnormal** 29:5
**Absolutely**
61:22
**accept** 29:16
**accepting** 32:8
32:11
**accidents** 56:5
**accountable**
50:25
**accurate** 51:17
51:21
**accurately** 46:19
**acting** 23:17
**action** 64:15,16
**actively** 14:19
**activity** 40:14,21
**actual** 49:17
53:8 58:24
**add** 26:5 42:20
**address** 14:11
30:17 31:4,7
31:15 44:3
**administer**
14:19 25:19
27:25
**administered**
25:24
**administering**
16:12
**advanced** 14:16
14:17 28:15,16
**advice** 20:22
**advised** 23:7
31:8

**afternoon** 31:13
55:10,15 61:15
62:19,22
**aggressive** 30:23
**ago** 10:18 44:1,6
**agonal** 38:18
**agree** 57:22
**ahead** 43:9,10
**ahold** 18:23
**aid** 12:22 14:14
16:12
**ain't** 49:21
**airway** 13:23,24
14:2,3,5,11
49:9,15,19,22
50:3,5,7,12,20
51:3,13 52:3
52:11,18,19,25
**alcohol** 57:13
**alert** 15:21
24:24 27:15,18
28:2
**allowed** 33:7
**ALS** 14:17
**altogether** 14:21
**ambulance** 8:16
9:8 32:14,16
55:24
**analogy** 35:16
**answer** 3:17
13:13,17,18
15:10 16:7,17
21:10,24 22:5
23:10 24:25
26:16 28:22
29:20 30:3,25
31:24 33:17
34:3,13 36:23
39:21 40:19
41:19 48:10
61:23
**answered** 24:25
28:25 46:19
**answering** 3:23

**anybody** 43:24
62:16,21
**anymore** 16:24
17:11
**anyways** 44:7
**apologize** 49:13
**Appear** 26:7
**appreciate**
43:20
**Approach** 40:7
**appropriately**
25:1 28:25
**approximately**
63:12
**April** 6:10,18,19
**area** 53:6 54:9
**arrest** 38:20
40:7,8,22
**arrived** 36:19
**asked** 24:21,22
46:23 47:1
58:3,5
**asking** 3:10 22:3
25:15 29:7
32:3 33:22
34:19 36:11
38:14 41:5
43:14,16 44:17
**asks** 9:11 26:7
29:4 35:4
37:21
**asleep** 39:16
**asphyxiating**
50:1
**assess** 24:24
27:7,12 48:25
50:20 52:10
**assessed** 24:21
50:16
**assesses** 52:3
**assessing** 25:24
37:11 39:18
**assessment** 17:2
25:22,25 27:13

27:23 29:11
49:3,24 50:18
50:24,25 52:17
**assessments**
49:11
**assume** 57:19
60:16
**assuming** 57:23
58:1
**Atlantic** 11:18
**attend** 11:17
12:2
**attention** 16:14
**attitude** 30:23
**attorney** 64:13
**attorneys** 64:15
**audio** 47:9
**August** 6:25
**authorized** 64:8
**AVENUE** 2:4
**awake** 39:5

## B

**B** 2:16 8:10 10:5
13:23 14:8,12
14:25 25:20,23
26:1 49:11
50:9,17 51:13
**back** 7:14 8:21
10:17,23 17:10
19:2 31:15
32:14 37:19
39:22 40:1
41:4 47:20
51:4 59:16
**background**
11:11
**backwards** 17:9
17:13,18
**bad** 30:22
**Baldwin's** 60:13
**base** 36:5
**based** 8:24
13:15 15:7

21:18 35:12
36:3,7 52:24
54:4 57:10
58:8
**basic** 14:15
28:11 29:1
**basically** 8:17
9:10,12,20
14:9,14,22
17:7,11 26:25
27:16 28:6
37:7 38:14
53:5 56:5
61:16
**basics** 14:25
**basis** 15:25
56:22
**battalion** 8:11
8:12 18:25
**Beach** 11:19,20
**bed** 43:1
**beings** 61:24
**believe** 18:19
**belly** 47:22
**best** 8:23 27:12
43:21 46:20
64:9
**big** 8:15
**bit** 10:24 43:11
47:25 48:24
**block** 55:4
**blocked** 49:21
**blocking** 50:7
**blood** 24:21
**BLS** 14:15
**Bob** 1:10 45:6
**body** 47:13,18
**bottom** 26:6
34:20 37:7
38:12 40:17
42:25 45:13
46:4 51:4,5
59:22
**BOULEVARD**

1:20
**break** 4:3,6
44:21
**breath** 50:3
**breathe** 46:6
48:20 52:22
**breathing** 13:22
13:24 14:5,6
14:12 33:14
38:14,17,18
39:21,25 40:3
49:1,6,7,8,21
51:13 52:4
**brief** 44:23
**bring** 44:2
**broad** 31:25
**brought** 24:12
**buildings** 9:16
**bunch** 12:19

**C**

**C** 1:7 2:1 8:10
9:19 10:5
13:24 14:13
49:11 51:13
**C's** 13:23 14:8
14:25 25:20,23
26:1 50:9,17
**call** 5:1,2 13:23
14:14 19:18
20:3,18,20,20
21:1,4 22:10
22:16,20,23,25
23:4 31:17,22
34:20 35:18
50:4 53:9,25
54:4,5,16
55:10,15 56:10
56:12,18 58:22
58:24 61:15
62:22
**Callahan** 2:3,13
3:6,8 13:14,20
15:11 16:8,18

18:7,11 19:25
20:2,7,8 21:11
26:17 28:13,21
28:23 29:21
30:4 31:1
33:18 34:4
41:3,20 44:17
50:13,16 59:12
59:18 63:2
**called** 3:3 12:5
20:15 28:16
31:6 48:19
**calls** 9:15 27:11
43:4 55:7 56:6
56:7
**camera** 60:12
**capacity** 1:11,12
4:9,10
**captain** 8:14,15
8:18,19 9:11
53:17
**captains** 9:1
**car** 56:5
**cardiac** 15:3
33:14 38:20
40:7,8,13,22
**care** 32:12
**career** 12:17
**carry** 56:4
**cars** 62:1
**case** 1:4 16:10
45:3,5,7 52:7
55:6 57:23
59:9
**case-by-case**
15:25
**cases** 4:16 5:11
**Castro** 1:16 3:2
3:12 19:14
45:1
**caused** 32:12
33:1,3
**caution** 57:20
**ceiling** 47:21

**center** 12:3
60:24
**Central** 2:4 12:5
**certain** 23:17,18
27:7 54:23
57:14
**CERTIFICA...**
64:1
**certify** 64:7,12
**chance** 5:19
18:14 19:9
**charge** 42:4,4
53:24 54:1
**chart** 42:5
**check** 13:25
14:6,8 17:10
51:12
**checked** 40:6
**checking** 40:14
**chief** 8:5,7,7,7
8:12 18:25
**chiefs** 8:12
**children** 4:21
5:6
**circulation**
13:25 14:13,14
52:4
**circumstances**
54:5,18,23
**city** 6:13 17:14
24:23
**civil** 4:17
**clarifying** 46:25
**class** 13:3
**classes** 11:21
12:25,25 13:1
**clear** 13:24 20:5
21:7 34:13,13
46:7 49:19
52:22
**CLEARWAT...**
1:21
**closed** 32:17

**COBAN** 60:11
**cognitive** 27:1
29:12
**college** 11:12,13
11:15,17,20
12:5,13
**come** 16:1 36:21
36:22,25 59:13
**comes** 49:14
54:7
**commander** 8:8
8:9,9,11
**commanders**
8:11
**commanding**
53:22
**comments** 60:7
**Commission**
64:21
**common** 16:4
**commonly** 16:4
**communication**
18:24
**company** 7:13
12:24
**COMPASS** 1:19
1:25
**competent** 59:6
**computer** 29:14
**conclusion**
58:12
**condition** 14:1
33:1,3
**confident** 21:23
**confused** 15:18
**confusion** 16:4
16:13
**connected** 64:15
**conscious** 15:15
**consciousness**
39:19
**consider** 16:11
16:20
**consistent** 29:25

**contact** 52:2
**continue** 26:11
**continued** 10:8
12:10,20
**continues** 24:25
38:15
**contrary** 25:7,8
26:20,21 51:24
**conversation**
30:14
**conversations**
62:20
**corner** 59:22
**correct** 7:4
21:16,17 25:4
29:1,6,18
31:10 36:10
55:16 61:6
62:12,13,23
**correctly** 4:19
27:6 47:8 63:7
**counsel** 48:23
59:16 64:13,15
**count** 55:20
**Country** 6:5
**County** 1:11,13
2:8 5:23 6:24
8:5,25 18:1,20
27:7 42:13
45:2,3 56:15
64:5
**couple** 40:5,12
44:20 45:7
**course** 12:14
13:2 17:3
**courses** 12:13,16
12:20,21
**court** 1:1 3:18
63:3
**covered** 13:8
**crew** 8:19 54:17
**criminal** 4:17,20
**Cross-Examin...**
2:14 44:24

cuffed 37:10
curious 60:10,16
current 18:16
  18:19
currently 5:22
  6:5
cuts 47:7

**D**

D 2:12
danger 53:13
  54:17
date 1:17 28:18
Dated 64:17
day 9:9,17,22
  10:1,8,11 11:1
  11:5 17:16,17
  17:18 23:11
  31:3,7 42:2
  46:16,17 58:17
  64:17
days 13:3 44:1
deal 13:7,10
  33:9
dealing 16:14
deaths 5:5
DECEASED 1:7
decided 41:25
  42:2,6
decision 35:23
  53:14 54:15,16
  54:20,21 59:5
decisions 28:3,8
  35:24 36:2,3
  54:14
deemed 39:12
deep 14:7
defendant 2:7
  45:5,6
DEFENDANTS
  1:14
Definitely 55:12
DeGraw 1:6,7
  3:8

degree 12:16
delay 32:12
delivery 12:15
dementia 27:20
demonstrate
  48:3
department
  6:14 7:4 8:3,4
  8:6,24,24
  12:12 18:3
  27:5 31:3 54:3
departments
  4:14 7:24
  17:15,15
depending
  15:15,24 53:7
  54:9
depends 10:15
  11:4 13:1
  20:12 27:19
  28:4 54:18
DEPONENT
  1:16
deposition 3:13
  4:9 43:24
  64:10
depositions 5:4
  5:12
deputies 21:4,7
  30:11 34:6
  36:19 53:10
  61:19
deputy 1:13 8:6
  33:25 34:5,15
  45:4 60:12
  62:11,20
Description 2:18
detailed 29:1
details 5:18
detectives 19:15
  46:14,24 48:3
  49:1
determine 27:15
  27:18 28:1

determined 40:2
diagnose 33:7
  57:7 59:3
diagnosing 59:1
dialogue 39:23
died 4:21 5:6
difference 56:15
different 4:14
  8:3,25 10:2
  13:2 15:23
  23:16 27:5
  32:10 36:16
  37:4,16 38:1
  55:18 56:17
difficult 4:1 32:1
  43:22
diploma 11:13
Direct 2:13 3:5
directed 37:8
  45:12
discern 61:2
discretion 54:7
  54:8 55:5
dislodge 14:5
dispatch 22:2,24
  31:5,6 32:13
  54:12 58:25
dispatched
  19:13 31:4
dispatcher
  58:19
dispute 24:5
DISTRICT 1:1
  1:2
DIVISION 1:3
doctor 33:6,9
  57:7,9
doctors 59:3,7
doing 7:1 9:20
  11:15,21 17:1
  38:12
DONALD 1:7
double 9:20
downgrade

  35:14,14,18
  56:9,19
downgrading
  56:10,19
draw 50:3
drink 39:17
drive 17:12,16
  20:4,17
driver 8:20 9:11
  10:20,22 17:13
  17:15,20,20
Driveways
  61:25
driving 17:8,17
  17:21 19:19,20
  22:10
dropped 18:18
drugs 14:18,20
dry 14:2
duck 57:10,11
  57:11
duly 3:3
duties 9:7
duty 10:4 18:21

**E**

E 2:1,1,12,16
earlier 30:1 31:9
  31:17 35:9
  40:24 55:17
  57:6
education 12:20
educational
  11:11
Edward 3:12
EE 64:21
egg 33:20
eight 7:19 8:11
  19:1
either 5:2 10:22
  14:20 20:7
  33:11 37:5
  63:6
electrical 40:21

emergency 5:3
  20:20,21 21:14
  56:23
emergent 56:21
employed 5:22
employee 64:13
  64:14
employer 18:16
  18:20
EMS 12:24 27:7
  55:20
EMT 4:24 11:16
  12:8 14:14
EMT/parame...
  7:22
ended 32:6
  63:11
enforcement
  36:6 53:10
engine 8:19 9:9
  10:12,14 53:17
  56:2,3 60:23
  61:3,7,8,9,21
engines 55:11
entitled 4:5
entry 29:25
ER 33:9
err 57:20,20
especially 16:1
ESQ 2:2,7
essentially 18:22
Establish 15:2
ESTATE 1:7
Eustis 12:4
evening 18:3
events 46:17
exactly 48:3
  49:20 55:1
exam 27:1,4
  29:1,12
Examination
  2:13 3:5
examined 3:4
example 8:4,23

excerpt 25:18
exhibit 2:18
  18:8,9 45:11
  45:19 59:9,14
  59:20 61:5
experienced
  16:5
Expires 64:22
explain 56:11
explaining 47:7
explosives 23:19
extent 48:2

**F**

face 48:9 49:7
facedown 37:10
  37:22 45:14,24
  46:1 47:1,16
  48:5,17 52:10
facing 48:14
  60:12
fact 34:9 57:16
factual 58:8
fair 49:5 54:6
fairness 61:22
falls 28:5
familiar 15:4
family 3:9
far 26:9 43:16
  43:16 46:7,17
  46:22 49:3
  50:9,11 51:16
  52:17,22 55:2
  55:4 57:2,13
  61:4 62:14,19
fast 14:6
FD 53:18 54:22
FD's 54:20
feature 16:5
feet 43:1
field 27:23
fifth 4:13
fighters 8:20
filled 12:18

financially
  64:16
find 13:21 14:9
  14:23 33:8
  52:19
fine 43:11
finish 3:22 11:14
  44:12
fire 4:10,20,22
  4:23,25 5:2,25
  6:14,24 7:4,23
  8:18,20 9:9
  10:12 12:15,17
  18:19 31:3
  41:16 53:14
  54:3,3 55:20
  56:2 60:23
  61:3
firefighter 5:1
  8:17 11:15
  12:7
firefighter/E...
  12:1,3
firefighter/pa...
  5:25 6:2,17 8:2
  9:5,10
firefighter/pa...
  10:23
firefighting
  12:21
fires 9:15 56:6
firetruck 10:11
  10:25 11:2
  30:15
FIRM 2:3
first 4:20,22 5:6
  11:18 12:22
  13:22 14:8,11
  14:14,15 19:12
  19:24 20:6,15
  21:7 33:19
  35:4 40:25
  41:11 42:1
  45:10 46:12,25

52:2,12
five 8:12 41:24
  44:22
fix 50:7,15
FL 1:21 2:5,10
fleshed 49:5
flooded 44:4
floor 48:15
Florida 1:2,24
  11:18 12:4,5
  64:4,20
foggy 15:19
follow 32:23
  33:21
follow-up 45:7
following 15:13
  54:22
follows 3:4
foregoing 64:9
Fork 20:4,17
form 13:12 15:9
  16:6,16 21:9
  26:15 28:12,21
  29:19 30:2,24
  33:16 34:2
  41:2,18 50:13
  50:14
forth 39:22 40:1
forwarded
  18:18
four 4:20 5:6
  10:16,20 11:3
  11:3,7 41:23
  54:1
fourth 4:13
frame 61:5
front 45:11
  59:21
front-facing
  60:12
full 3:11 27:1
  29:11,12
full-time 7:6
further 14:16

25:17 62:25
64:12

**G**

G 2:7
gentleman 5:15
getting 9:16
  38:21
give 8:23 10:24
  14:21,25 15:1
  21:23 22:15
  23:9 27:13
  33:7 39:4,10
  53:11
given 3:13 4:8
  18:13,25 22:24
  64:11
giving 18:2,4
  39:8 46:12
  53:3
glass 5:16
go 5:19 12:11
  14:9,13 17:10
  18:14 19:21
  20:22 21:13
  22:2,5 24:17
  26:25 27:11,14
  27:15,21 29:15
  29:22,24 32:2
  32:10 33:8
  34:14 35:20,20
  36:24 37:19
  42:21,24 43:5
  44:5 51:4
  54:11 57:10
Goepfert 1:12
  45:5
goes 17:3 25:25
  41:25 46:1,7
  48:19 50:11
  52:12,23
going 3:9 4:4 5:2
  8:8 15:18,22
  16:20 18:4

22:22 23:9
  35:9,13,15,17
  35:21 37:20
  38:15,20 39:4
  39:23 40:1
  41:23 43:15
  45:17 50:8
  51:1 53:25
  54:10,17 56:13
  56:18,23 57:18
  57:21,21 58:19
  59:14,15 60:3
  60:4,4 63:3
good 3:7 4:7
  32:19 48:24
gotten 44:3
graduate 11:12
Greg 45:5
GREGORY
  1:11
groggy 15:16
GROUP 1:19,25
Gualtieri 1:10
  45:6
guess 27:8
GULF-TO-B...
  1:20
gun 43:5
guys 7:24 20:15
  23:3 30:14
  33:1 35:5
  58:19 60:15

**H**

H 2:16
half 53:6
half-mile 21:14
halfway 22:9
HAMMOCK
  1:22 64:7,19
hand 49:25
handcuffed
  45:14
handcuffs 37:23

handle 53:13
happen 24:11
    29:16
happened 16:24
    21:8 28:5 35:6
    38:6 46:17
happens 32:17
    40:18
Harbor 55:18
    56:1
hazmat 12:25
    23:19
HCC 12:16
head 12:23 28:6
    47:17 48:7,14
    56:16
heading 48:8
headquarters
    18:25
heads-up 22:15
hear 44:8
heard 62:15
Heavy 12:25
help 14:20 37:18
    37:20 43:9
    47:11
hey 24:1 38:20
    39:4,4 54:12
Hey' 39:24
high 11:13
Hillsborough
    5:23 8:4 18:20
    56:15
history 16:2
    57:17
hits 28:5
hold 50:24
honestly 5:18
    10:16 20:23
hook 15:2
hose 56:4
hoses 9:15
hospital 20:23
    26:25 29:15,22

29:24 32:7,7,9
    32:10,10,21
    33:2,4,4,5,9
    42:9
hospitals 32:17
hours 7:15,16,17
    7:18,19,19 8:9
    10:3,4,9 17:20
house 22:16,19
    22:22 23:5,7
    31:9,20 35:9
    35:11 36:9
    44:4
huh-uh 3:18
human 61:24
humans 62:4
hundred 4:19
    15:20 17:23
    20:10 21:22,23
    22:4,6,21 23:9
    23:15 24:8
    50:24

I
identification
    2:18 18:10
impede 49:8
impeded 49:9
impeding 52:19
    52:25
implies 50:16
impolite 30:23
incident 18:2
    22:25 23:19
    29:18,23 30:7
    53:8,9
incidents 28:9
independent
    31:5
indicate 19:19
    41:15
indicated 23:4
indicates 24:3
indicating 51:2

indication 57:13
INDIVIDUAL
    1:10,12
information
    10:24 22:23
    54:6 58:8,9
Inguna 2:2 3:7
injuries 29:5
inside 61:18,20
intend 60:6
interacting
    24:10
interested 64:16
interject 36:21
interview 2:19
    17:25 18:2,5
    24:4 25:4
    40:24 46:13
    50:10
interviewing
    19:15
interviews 24:15
intoxicated
    27:21 28:3,4
Intubating
    14:18
invite 59:13
involve 5:5,9,13
involved 4:20
    5:5,12 21:4
    23:19 53:12
involvement
    34:1
involves 12:21
issue 9:18 22:19
IV 14:18 15:2

J
January 6:22,23
    6:25
job 3:25 4:24 9:7
    34:14
jog 21:1,8 37:14
    38:8,24 40:10

42:17 43:10
JT 19:15 37:21
    37:23 45:23
    47:16,18
JU 19:14 21:12
    24:18 26:7
    29:4 35:2,4
    36:19 41:7,8
    48:14 51:7
JULIE 1:6
July 1:17 6:7,9
    64:17
junior 8:16,17

K
keep 37:20
Keith 60:12
kicked 5:15
KIMBERLY
    1:22 64:7,19
kind 4:16 8:25
    12:22 14:24
    15:16 20:22
    21:2 22:11
    28:9 31:24
    33:19 35:18
    36:2,4,4 38:22
    39:22,25 40:14
    43:10 46:8
    47:6,11 48:18
    50:22 53:12
    54:14 56:6
    57:19,22 58:25
kinds 56:6
knife 43:5
know 3:15 4:4,5
    4:17 7:15,17
    7:23 8:5 9:14
    12:13 13:5,25
    14:10,24 15:7
    15:18 17:5
    19:6,8 20:12
    20:13 23:1,18
    25:17 26:10

28:3,14 31:23
    32:14,18,19
    33:6 35:4,11
    35:12 36:2,3
    36:21 37:5
    39:24 40:1
    43:7,16 44:4
    45:4,9 46:9
    47:15,23,24
    48:16,19 49:24
    49:25 50:21
    54:9,11,14
    56:18 57:13,15
    57:16,17 58:7
    58:7,16 60:6,9
    61:18
knowledge 5:14
    25:10,11 26:9
    27:13 58:9,11
knows 32:13

L
Lake 12:3
laptop 22:23
LARGE 1:24
LARGO 2:10
law 2:3 36:5
    53:10
lawyer 58:4
lay 49:12,14
Leading 21:9
leave 18:21
left 6:18 18:17
    48:13,13
legally 33:7
length 13:2
let's 3:10 8:4
    34:18 45:12,22
    47:19
lethargic 15:16
level 39:18
liability 29:16
licensed 59:2
lie 17:24

lieutenant 8:15
8:16 10:22
22:11,23 23:23
35:7,22 36:8
36:15 53:16
lieutenants 9:1
life 14:15,17
light 27:9
lights 35:17,19
35:20 56:19,20
56:24,25
line 26:24 28:24
34:23 40:17
lines 26:4 29:4
40:5,12 46:9
lips 49:17
list 9:13 12:18
little 10:24
15:17 43:11
47:25
LLC 2:3
location 1:19
19:13 20:4,16
24:10 53:9
long 4:5 6:6,20
9:13 12:6,18
16:3 32:13,14
longer 32:15
56:21
look 10:17 22:1
22:8 24:17
26:6 32:2
33:10 34:18
35:2 36:18
37:6 41:1
45:18,22 56:7
58:24 59:13
looked 30:20
61:23
looking 61:4
looks 14:1 21:12
35:22 36:21
57:11,12,23
60:23 61:3

lose 3:19
lot 7:23 32:12,15
32:17 39:23
43:4 56:14
lower 29:4
LT 35:7
lump 55:20,21
lungs 49:18

**M**

mailbox 62:2
main 13:21
20:19
majored 11:24
making 24:1
manner 49:8
manpower
10:15
Marion 6:24
mark 18:7
marked 2:17
18:10 59:9
matter 3:9
mean 9:13 12:12
12:18 14:21,24
20:5 23:10
26:1,8 33:12
37:19 39:23
42:4 47:13,19
47:24 48:1,16
49:12 52:21,23
53:18 54:12
61:16,19
meaning 39:21
53:22 56:4,13
means 15:12
19:14 40:20,20
40:21 47:20
53:5 55:19
56:5,11,19
meant 47:1,5
medic 8:17
medical 5:3
20:21,22 21:1

24:11,14 26:3
27:6,11 33:10
41:16 42:5
43:17 50:6
56:7 59:5
medications
14:20 15:1,1
57:14
medicine 11:25
12:22
meds 35:12
36:10
Meet 43:25
memory 15:19
21:1,8 29:17
30:1 37:14,19
38:8,24 42:17
43:10 51:23
62:16,22
mental 15:14
27:4 28:10,17
29:11
mentioned 4:8
25:21 55:17
middle 1:2
19:17 39:2
mile 53:6,6,7
55:4
miles 53:7 55:4
military 36:5,5
millions 25:13
43:19
mind 17:1
mini 28:10,17
minute 16:1
46:8
minutes 36:24
44:22 45:16
mitigate 14:9
modality 16:21
monitor 15:3
38:21 40:13,19
months 6:8 12:8
morning 3:7

20:16 21:16
22:20 23:24
30:7 31:12
44:13 58:21,23
62:12
mother 5:16
mouth 49:7 50:1
moved 44:2

**N**

N 2:1,12
name 3:7,11
55:17
nature 56:10,12
58:22 60:9
NC 19:14 22:9
22:11,14 24:20
37:7 46:4
51:12
necessarily 55:1
necessary 39:13
need 4:3 35:2
44:8 63:8
needed 7:20
newborn 18:22
44:7
night 12:7 18:4
44:9 46:13
49:1 51:17
Ninety-nine
36:1 42:12
Noel 1:16 3:2,12
19:14 24:1
normal 26:8,12
normally 10:19
Notary 1:23
64:20
notes 19:18 22:2
22:10,16 23:4
58:25
notice 29:5
number 33:20

**O**

oath 3:15
Object 13:12
15:9 16:6,16
21:9 26:15
28:12,21 29:19
30:2,24 33:16
34:2 41:2,18
50:13
objection 13:16
objective 13:21
obstructed
50:12
obstructing 51:3
obstruction
49:15 50:3,5
obtained 20:21
obviously 52:10
52:11
Ocala 12:5
occur 35:6
occurrence 37:3
Office 2:8 18:1
45:2,3
officer 9:5 10:21
23:11 31:8,17
officers 53:10,16
53:18,18,20,22
53:23
official 8:6
Oh 41:10
okay 4:6,8,16
5:4,19 8:1,22
9:3,17,23 10:7
11:4,8,22
12:20 13:6
17:1,19 18:6
19:16,22 20:11
20:14,24 21:3
21:20,25 22:4
22:18 23:13,22
24:3,9,16
25:12,18 26:6
26:19 27:17
29:25 30:6,9

31:3,12,16
32:24 34:18,22
35:4,22,25
37:6,21 38:3,5
38:13 39:20
41:15,25 42:8
42:11,16,19,24
43:20,23 44:19
45:9,23 46:11
47:11,15 49:11
50:9 51:6
53:11,22 55:23
57:22 59:8
60:3,14
**Oldsmar** 6:13
6:13 7:4 8:24
10:1,21 17:14
18:19 56:14,16
56:17 61:3,8
61:10
**on-line** 13:4
**one-third** 24:18
**ones** 4:23 5:8
8:21 9:15
55:14
**operations** 8:7
12:25
**opposed** 9:1
**orders** 57:8
**orientation**
19:14
**oriented** 15:21
27:18 28:2
47:21 59:22
**outcome** 32:22
**oxycodone**
57:15
**Oxygen** 38:21

― P ―
**P** 2:1,1
**p.m** 10:8 59:25
**page** 19:11
24:17 26:24

34:20,21,23
37:6,21 38:12
38:15 39:2,20
41:1,4 45:13
45:13,18 51:4
**painkiller** 57:15
**Palm** 11:19,20
55:18 56:1
**paramedic** 7:13
9:14 10:25
11:2,16 12:4,9
12:18,21 13:9
57:4 59:7
**paramedics** 5:1
5:3 7:12 11:3,6
54:3
**parent** 7:13
**parental** 18:21
**park** 53:5,8
**parked** 62:1
**part** 4:24 8:3
12:15 27:11
31:17 49:24
**part-time** 7:9,20
**particular** 22:25
29:23
**parties** 64:13
**parties'** 64:14
**partner** 38:16
39:22 40:25
41:12 52:13
**parts** 47:5,7
**patient** 5:13
13:22 15:5,13
15:24 16:12
17:2 20:20
24:10,19 25:25
26:1 27:8,12
27:19,20 30:20
30:22 32:6,21
33:11 36:10
37:9,13 38:12
38:17,25 39:14
40:25 41:6,22

42:1,5 45:14
48:4,25 49:6
49:21 50:23
52:2,5,18 57:2
58:10,13,16
**patient's** 32:22
39:18 50:12,20
**patients** 9:14
13:7,10 16:14
25:14 32:9,11
43:19
**patrol** 60:13
**Paul** 2:7 40:25
41:12,12,21
42:1 45:1
52:13,13
**pause** 47:19
48:1,21 60:4,5
60:6
**paused** 60:20
61:5
**pay** 16:14
**people** 10:13,20
14:3 15:19
16:1,2 27:20
41:16 43:6
53:25 54:1
56:25
**percent** 4:19
15:20 17:23
20:10 21:22,23
22:4,7,21 23:9
23:15 24:8
36:1 42:12,14
50:24
**perform** 52:3
**performed**
52:18
**person** 23:17
29:6 49:12,14
54:12
**PERSONAL** 1:6
**personnel** 8:7
**PETERSBURG**

2:5
**pillow** 48:17
**Pinellas** 1:11,13
2:8 8:25 18:1
27:7 42:13
45:2,3 64:5
**pink** 14:2
**pistol** 43:1,8
**place** 7:16
**Plaintff** 2:2
**PLAINTIFF** 1:8
**Plaintff's** 18:9
**plaintiffs** 3:8
**Plaintiffs'** 2:17
**play** 60:3,17
**played** 60:18
**please** 4:4 45:18
60:9
**Plus** 7:12
**point** 16:23
33:12 36:20,22
38:19 43:19
50:17 51:8
61:18
**police** 21:3
53:20 62:1
**policy** 54:22
**portion** 59:12
**portions** 42:16
**pose** 53:13
**position** 6:1,18
7:7,21 8:18 9:4
17:13,14,20,22
48:18
**positioned** 48:4
49:7
**positions** 7:9
**possibility** 16:9
42:14
**post-seizure**
15:5 16:12,15
57:4
**postictal** 15:4,12
16:5,20 57:12

57:19,24,24,25
58:10,14 59:4
**practice** 52:2
**preceding** 28:9
**prepare** 43:23
**prepared** 53:13
**prescribes** 57:9
**present** 15:23
41:16 57:18
**presents** 15:13
**president** 24:23
28:19
**pressed** 50:2
**pretty** 3:19 13:8
**previously** 58:17
59:9
**printout** 19:11
**probably** 25:13
26:3 38:20
44:21 57:11
**problem** 14:12
32:20 33:14,14
50:11
**problems** 44:8
**proceedings**
63:11
**process** 27:14
**prognose** 57:7
**prognosis** 33:8
**programs** 12:6
**promoted** 17:14
**prone** 47:19,19
47:20 48:19,19
**protocol** 14:22
25:20 39:12
**protocols** 14:23
27:6 54:22
57:8
**psych** 35:12
36:10
**psychology**
11:24
**PTSD** 35:11
36:10

Public 1:23
  64:20
pulling 9:15
pulse 13:25
  39:21 40:6,6
  40:20
purpose 27:17
  27:24
push 60:3,17
put 46:24 54:17
putting 40:13
  56:25

**Q**

quacks 57:10
quarter 37:7
  53:6
question 3:23
  31:24,25 36:22
  40:18 41:4
  50:22
questioned
  48:23
questions 3:10
  3:17 24:22
  27:2,9,10,17
  28:11,18,20
  29:13 34:20
  42:22 44:18
  45:7 46:19
  47:1 58:3,4
  60:5,7 61:24
  62:25
quick 40:1
quickly 3:19

**R**

R 2:1
rank 7:24 8:1,2
rank-and-file
  36:4
ranks 7:24
reached 58:12
read 19:9,18

22:10 25:19
  36:7 43:9 46:2
  46:8,23 48:23
  63:6,7,9,9,10
reading 42:16
  43:10,15 47:12
  51:2
reads 22:11
ready 46:10
real 40:1
really 29:1 44:7
realm 16:9
  42:14
reason 3:23 4:3
  23:3,13,20
  24:5 39:10
  51:20 52:6
reasons 23:16
  35:5
recall 5:8,10
  17:5,23 20:9
  22:6 27:6
  30:17,19 32:25
  33:1,13 36:17
  37:15 39:9
  40:11,11 42:2
  42:6,10 47:8
  51:1,25 52:20
  53:3 58:15
  62:10
received 24:19
recess 44:23
recollect 24:8
  37:18
recollection
  21:20 22:18
  23:21,22 25:6
  25:17 31:5
  32:5 37:2,4,16
  37:17 40:10
  48:2 58:18
  61:14
record 64:10
recorded 50:10

recording 47:4
  47:10
red 35:20 56:25
refresh 32:4
  61:13
refusal 20:21,22
  21:2
refused 29:22,23
related 4:23
  12:17
relative 64:12
  64:14
relief 44:14
remark 22:14
remember 4:19
  4:22 5:17 7:15
  10:16 17:19
  18:2,4 20:3,18
  20:19 21:3,5
  22:3,21 23:1,3
  23:5,6,13,25
  24:9 25:15
  26:19 30:6,9
  30:10,11,13,14
  30:20,22 31:2
  31:14,16,19,21
  31:25 32:4,11
  32:22 33:14,22
  33:25 34:7,9
  34:10,11,15
  36:15 37:8,13
  38:1,2,6 39:8
  42:8,19 43:3
  43:14 45:15,17
  46:12 48:9
  53:2 55:11
  56:1 58:21
  61:12
reminds 61:16
rental 44:3
reoriented 45:12
  51:5
report 24:12,14
  26:3 29:14

33:10 64:9
reported 54:13
reporter 1:22
  3:18 63:3 64:1
REPORTING
  1:19,25
reports 35:10
  36:9
represent 3:8
  20:14 21:6
  45:1,4 47:9
  59:20 60:11
REPRESENT...
  1:6
request 19:4,5
requested 19:6
rescue 4:25 5:25
  6:24 8:15,16
  12:17,25 18:19
  53:14 54:3
  56:6
rescue/param...
  4:11
respect 52:18
respond 15:17
  35:17 39:14
  56:18,20,21
responding
  21:13 39:3,6
response 35:14
  47:1
responsible 8:13
rest 42:25 43:13
ride 8:21 17:12
riding 9:9 10:23
  17:9,18 55:23
right 8:18,23
  21:15 25:23
  35:12 39:23
  41:12,17 46:4
  46:18 47:4
  48:5,10 49:2,4
  49:9,23 51:7
  52:14 53:1,21

53:24 54:19,24
  55:8 56:22
  57:11 61:24
  62:4,5 63:5,7,9
  63:10
right-hand
  59:22
risk 29:16 57:1
ROAD 2:9
role 17:7
roll 41:5,8
rolling 52:11
roster 10:17
  11:1,5 17:10
rotate 17:12
route 44:5
Rozelle 2:7,14
  13:12,16,19
  15:9 16:6,16
  19:23 20:1,5
  21:9 26:15
  28:12 29:19
  30:2,24 33:16
  34:2 41:2,18
  44:20,25 45:1
  50:14,19 59:11
  59:19 60:19
  62:6,9,25
rub 39:4,8,11,12
rude 30:23
rules 3:15
run 25:13 56:24
rundown 14:22

**S**

S 2:1,16
safe 53:11
safety 35:5
sat 48:22
saw 47:14 61:13
saying 17:3
  29:14 42:5
  52:12
says 21:12 22:9

22:11 24:18 25:16 26:2,22 36:8,11,16,19 37:7,17,23 38:16 41:8 45:23 46:4 47:6,15,16,18 47:18,23 48:12 48:14 51:7,7 51:12,12 52:9 59:23
**scene** 34:1 36:19 50:21 51:9 62:11
**schedule** 7:14
**school** 11:13,15 12:1,7,9 13:9
**science** 12:15
**screen** 60:21,24
**second** 20:6 31:5 31:22 34:20 55:10,15 60:8 61:15
**seconds** 40:2 61:13
**section** 46:22
**see** 13:25 14:6 19:17 22:16,17 25:1 26:2,12 26:13 27:2 28:6 31:24 34:19,25 36:23 36:25 37:10,11 37:24,25 38:22 38:23 39:5,6,7 39:14,15 40:3 40:4,8,9,14,15 40:16,22,23 41:10,13 42:25 45:24 47:15 51:9,14 57:10 59:22,25 60:8 60:20,24 61:24 61:25 62:4

**seeing** 22:21 23:1,1 34:15 60:7
**seen** 18:12
**seizing** 14:19,21
**seizure** 5:13,14 15:1,2,13,15 16:23 25:20 34:24 57:3,3 58:17,20 59:1 59:5
**seizures** 13:7,11 14:4 16:2 57:18
**semester** 13:4
**sense** 50:6
**sent** 18:19 19:7
**September** 7:3 9:3,18 10:9 17:5 20:16 24:5 46:13 51:17 55:6 58:13 59:23
**series** 27:2
**service** 54:5 55:7 56:10,13 61:15 62:22
**set** 4:21
**seven** 8:13
**severity** 15:15 53:7
**shallow** 14:7 38:19
**shed** 27:9
**sheriff** 1:11,13 34:5,6 45:6
**sheriff's** 2:8 18:1,3 45:2,3
**sheriffs** 62:11,20
**shift** 8:8,8,9,10 8:10,11 9:18 9:19,21,23 10:6 17:8,17 17:21,22 19:12

19:24 42:3 44:10,13
**shifts** 7:18 8:10 9:25 17:6,7,10 23:25
**short** 44:21
**show** 26:3 47:13 59:8
**show-and-tell** 59:11
**showed** 61:19
**showing** 47:5
**shown** 45:10
**shows** 22:2
**side** 43:18 47:17 47:25 48:7,9 48:13 57:20
**sign** 29:13
**signs** 29:11 42:5
**simple** 24:22
**sir** 3:7 37:24 43:23 45:18 62:6 63:3
**sirens** 35:18,20 56:19,20,24
**sit** 51:20 62:17
**site** 21:7
**sitting** 23:14 24:9 25:6 26:20 32:4
**six** 8:13 12:8 18:22 19:1
**skills** 41:16
**skin** 14:1,2
**sleep** 48:17
**sleeping** 47:24 47:25 48:5
**slow** 14:7,20 15:17 38:18
**slurred** 26:10
**smell** 57:14
**soft** 50:2
**somebody** 28:5 49:25 59:4

**someone's** 14:13
**sooner** 60:5
**sorry** 5:18 19:23 25:13 30:8 33:24 38:4 53:21
**sort** 16:13 22:8
**sound** 26:9
**sounded** 26:11 38:17
**sounds** 4:7 21:18 25:19 35:16 43:17 47:12 48:22
**span** 31:10
**speak** 28:4,15 52:14,15
**speaking** 34:16 62:11
**specialty** 11:22
**specific** 27:10 34:15
**specifically** 23:25 31:19 34:14
**speculate** 35:15
**speech** 26:7
**split** 20:4,17 54:15
**sports** 11:25
**squad** 56:5
**ST** 2:5
**stage** 21:19 22:24 23:17 24:1 25:21 53:15 54:4,4,8 54:23,24 55:1 56:14,18
**staged** 21:6,13 21:14 23:4,6 23:14,16,20 34:11 35:5 55:8 61:14
**staging** 23:12

53:2,4,5 61:17
**Standing** 57:8
**start** 3:10,23 6:20 37:10 38:11,21 46:3
**started** 34:19 40:7,13
**state** 1:24 11:20 15:4,5,12 16:5 16:12,15,20 57:4,12,19,24 57:24,25 58:10 58:14 59:5 64:4,20
**statement** 36:7 51:16
**states** 1:1 24:20
**station** 8:14,14 18:17,24 19:2
**stations** 8:13
**status** 15:14
**stayed** 10:4
**stenographer** 64:7
**stenographica...** 64:8
**steps** 27:15
**sternal** 39:4,8,10 39:12
**sternum** 39:14
**stimuli** 39:13
**stop** 14:21
**Stovall** 55:17
**street** 21:15 62:2
**study** 11:23
**stuff** 12:19 22:12 38:21,22 43:13 45:12
**subject** 50:12
**subjects** 53:12
**Sunstar** 7:12,16 7:21 21:15 29:15 42:9,10 42:12,15 55:20

55:22,24
**supervisor**
53:23
**SUPERVISO...**
1:10
**support** 14:15
14:17
**supression** 56:3
**sure** 10:5 11:1,5
14:1,3 17:8,11
17:16 18:17
26:3 27:12
32:13 34:12
46:23 55:14,20
56:3 61:17,19
62:7 63:6
**surface** 50:2
**sworn** 3:3
**symptoms** 57:18
**system** 9:1

**T**

**T** 2:16
**table** 5:16
**tactical** 12:24
**take** 16:3 33:3,4
33:5 44:21
45:18,22 46:8
57:16 59:13
**taken** 12:16
44:23
**talk** 43:2,7,12,24
57:22
**talked** 42:20
**talking** 3:25
19:23 21:12,15
28:14 30:9,11
38:11 51:9
56:8 57:25
58:2
**talks** 19:12
**TAMPA** 1:3
**tapping** 39:13
**Taser** 5:9

**technical** 11:15
12:3
**technically** 50:5
50:23
**tell** 3:16 4:18
20:25 24:18
26:25 31:23
33:23 36:2,25
40:19 47:14
49:3 51:7 54:8
57:8 61:1,4
63:8
**telling** 22:24
24:1 35:13
36:15 38:16
43:20
**tells** 54:12
**term** 35:19
**test** 12:15 27:13
27:22,25 28:7
28:10,14,17
**testified** 3:4
**testify** 59:6
**testimony** 25:3
26:14 49:12
51:23 53:1,3
56:9 58:8,21
62:10 64:11
**thank** 20:1
59:18 62:25
63:2
**That'** 52:5
**theoretical**
33:12 57:9
**thing** 6:16 14:24
20:19 21:2
34:15 36:4
42:21 54:11
56:7,24 57:20
58:25 62:19
**things** 9:13,16
13:1 14:16
16:11,13 20:9
33:21 56:16

62:7
**think** 4:4,13,19
4:21 5:14,15
10:1,2,15
11:20,24 12:4
16:19 17:21
18:16,23,24
31:9 33:11
51:20 52:6
57:21
**thinking** 38:19
**third** 26:6 29:10
36:18 39:2
**three** 6:8 8:10
10:16,17,20
11:3,8 13:3
28:24 41:23
55:21
**time** 1:18 9:23
9:24 11:19
16:3,24 17:11
18:9 20:15
24:4,7 25:3
26:14 27:8
31:7 32:3
34:12,12 35:5
36:1,24 37:19
42:12,15 44:7
44:23 51:18
54:6 58:17
59:12 60:8,18
63:1,11
**timeframe** 37:3
37:5
**times** 4:12 43:4
55:8
**today** 3:10 23:14
25:7 26:20
35:10 43:24
44:15 48:22
51:21 62:10,17
63:8
**told** 31:16,20
32:7,10 35:7

36:8,20,22
46:24 48:25
**tool** 27:23 28:6
39:18
**toolbox** 39:18
**tools** 25:25
27:14
**top** 12:23 26:24
26:24 34:23
37:21 45:22
**top-ranking** 8:5
**touch** 39:14
**touching** 52:9
**Town** 6:5
**traditional**
12:13
**trained** 27:22
**training** 12:10
13:6,15 15:8
**transcribed** 63:6
**transcript** 17:25
18:12 24:3
32:2 34:18
42:17,23 64:10
**transfer** 33:2
**transport** 33:13
**transported**
42:8
**transporting**
42:13
**treat** 9:14 14:16
24:20 33:8
41:5 50:6 57:7
**treated** 43:19
**treating** 16:23
38:25
**treatment** 16:21
24:19 25:20
43:18
**trees** 61:25
**trial** 5:20
**tried** 44:5
**truck** 11:6 12:24
23:11 53:17

**Trucks** 61:25
**true** 50:24 64:10
**truth** 3:16
**truthfully** 46:20
**try** 13:21
**trying** 16:19
18:23 24:24
32:1 39:24
43:9,21,21
47:8,12,13,21
48:3
**tube** 14:18
**turn** 19:11 32:8
35:19,19
**turned** 47:17
48:9
**two** 3:24 4:14
6:7,22 8:20
10:23 11:2,14
16:1 17:6
19:15 34:23
41:16,23 43:1
53:25 55:6,19
62:7
**type** 24:12,18
56:24
**typically** 7:17,18

**U**

**Uh** 22:14
**uh-huh** 3:18
**ULMERTON**
2:9
**ultimately** 54:20
**unconscious**
15:14
**understand**
46:23 62:8
**understanding**
9:17 48:21
**Understood**
3:21
**Unfortunately**
43:15

uniform 15:25
unit 53:5,8,24
  54:2 55:18
UNITED 1:1
universal 35:19
University 11:19
unresponsive
  52:3
upstairs 37:8,9
use 5:9 27:22
usual 52:1
Usually 15:13

**V**

V 1:6
VARSLAVA...
  2:2
vehicle 60:13
vehicles 62:1
verbally 3:17
versus 42:1
video 47:4,10
  59:15,20 60:12
  60:18
visually 47:8
vital 29:11
vocational 11:14
  12:1
VS 1:9

**W**

wait 3:22 59:16
waited 21:7
  34:12,13
waiting 19:2
waive 63:7,9,10
wake 39:16
walk 37:8,8
walked 45:15
want 4:18 11:24
  14:1,22 17:24
  20:12 22:1,4,6
  23:15 27:6
  28:15 29:14

31:23 35:15
36:23 42:24
43:2,12 46:2
46:23 47:3
48:12,12,13
50:23 52:14,15
54:10 55:19
56:12 58:7
60:5,8 63:8
wanted 43:17
warm 14:2
wasn't 9:5 19:1
  23:20 33:10
  38:7,17 39:3
  41:11 49:1,6,6
  49:7 52:9,12
watched 61:12
water 44:4 56:4
way 22:5 23:18
  27:7 32:7
  36:18 37:5
  38:8,24 40:10
  46:3,25 49:18
  61:14
ways 15:23
  27:21
we're 6:7 25:24
  47:21 50:8
  56:13 58:2
weapon 54:13
weapons 22:15
  22:19,21 23:2
  23:5,7 35:10
  35:10 36:9
  53:12
week 13:3 44:6
weeks 18:23
  19:1
went 11:13,14
  12:7 21:1
  22:20 31:15
  32:9 58:20
weren't 32:8,11
White 62:2

wife 30:9
windpipe 49:16
wish 20:25
witness 13:18
  44:19 63:10
  64:11
woke 26:8,9
word 63:4
words 3:17 50:1
work 6:4 9:12
  14:23 19:1,2
  23:24 44:9
  45:2 56:15
worked 4:13
  6:24 7:13,18
  9:18,22 10:3
  12:12 17:6
  44:10
working 4:10
  7:3 9:21 40:7
wouldn't 24:11
  44:3
write 3:24 63:3
writing 3:18
  63:4
wrong 14:10
  50:14 56:17

**X**

X 2:12,16

**Y**

year 12:9,9
  24:22 28:18
years 6:7,22
  10:17 11:14
yesterday 44:11

**Z**

**0**

04:08:17 59:25
04:08:27 60:17
04:08:50 60:20

**1**

10 7:19 28:11,17
  36:24 37:21
  38:12 40:2
  41:1,4 44:22
  51:4,5 53:7
  55:4
10:00 1:18
10750 2:9
11 38:15
11:15 1:18 63:12
12 7:16,18 39:20
12-26-2021
  64:22
12-hour 31:10
13 45:19
15 36:24
155298 64:21
16TH 1:17
17 45:19
1739 20:4,17
18 2:19

**2**

2008 6:25
2015 6:22,23,25
2016 7:3 9:3,18
  10:9 17:6
  20:16 24:5
  46:13 51:17
  55:6 58:13
  59:23
2017 6:9,10,18
2019 1:17 64:17
203 2:4
22 59:9,14,20
  61:5
23rd 64:17
24 7:15,17 8:9
  10:3,4,9 27:2,9
  27:17
24-hour 7:18
  44:10
24-hours 23:25

**3**

3 2:13 19:11
30 2:19 18:8,9
  45:11,19
3000 1:20
33701 2:5
33759 1:21
33778 2:10

**4**

44 2:14
449 2:4
48 17:20
48-hour 9:21
  17:17

**5**

5 24:17
5:00 23:24 31:12
  31:13
5:15 20:15 21:16
500 1:20
54 61:3,8,10

**6**

6 26:24

**7**

7 34:20,21
7:00 10:1,1,3,3,4
  10:5,7,8
7th 9:18 10:9
  17:6 20:16
  21:16 46:13
  51:17 55:6
  58:13 59:23

**8**

8 34:23
8:00 9:25 44:13
8:18-CV-2116...
  1:4

**9**

9 37:6 45:13,13

| Warning |
| --- |
| Contains entities exempt from disclosure |

### Primary Information

| | |
| --- | --- |
| Description: | TRANSCRIBED INTERVIEW NOEL CASTRO "UPTON" |
| Occurrence.From: | 09/08/2016 22:30 |
| Occurrence To: | 09/08/2016 22:30 |
| Dissemination Code: | RESTRICTED |
| Reporting LEO: | UPTON, J. A. DET (56961 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Approval Status: | Approved |
| Approved Date: | 09/20/2016 |
| Approved By: | GREENE, TODD A SGT (56670 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |

### Addresses

| Relationship | Address |
| --- | --- |
| RELATED | 737 LOUDEN AVE PCSO NORTH DISTRICT STATION, DUNEDIN, Florida 34698 , UNITED STATES |

### Subjects

| Relationship | Name | Bio | DOB |
| --- | --- | --- | --- |
| FIREFIGHTER - EXEMPT | CASTRO, NOEL E (PERSON) | 29 yr. old, HISPANIC, MALE | 07/03/ ▮ |
| OTH AGY - NON LAW ENFORCE | OLDSMAR FIRE DEPARTMENT 54 (AGENCY) | | --- |

### Narrative

(INTERVIEW OF NOEL CASTRO, #16-363788-7, 9/7/ ▮

(The following may contain unintelligible or misunderstood words due to the recording quality.)

JU = Detective James Upton
JT = Detective Jonathan Tobeck
NC = Noel Castro

JU: I am Detective Upton. Today's date is September 7th, 2016. The time is 2236 hours. Present with me are Detective Tobeck and Noel Castro from the Oldsmar Fire Rescue Station 54. This is in reference to SO16-363788. We are currently at the Sheriff's north district station building, located at 737 Louden Avenue. The occurred for this incident is listed at 1739 Split Fork Drive in Oldsmar.

All right. Noel, how long have you worked for, uh, Oldsmar Fire Rescue?

NC: A year and nine months, now.

JU: Have you worked anywhere be -- before that as -- in your capacity?

NC: Marion County Fire Rescue.

JU: How long did you work there?

NC: Six years.

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

EXHIBIT
30
PENGAD 800-631-6989

---

**Narrative - Continued**

JU:   Six years for Marion County?  Anywhere before that?

NC:   Uh, not for a fire department or anything related to fire or EMS.

JU:   Okay.  And what's your title?

NC:   Firefighter paramedic.

JU:   Firefighter paramedic?  And what shift do you work?

NC:   C-shift, normally.

JU:   And those hours are --

NC:   Uh, 7 a.m. to 7 a.m. the next day.

JC:   So 07 to 7 -- 24-hour shift?

NC:   Yes, sir.

JU:   And today you worked --

NC:   I'm doing, uh, A-shift.  A trade, 24 hours.

JU:   Okay.

NC:   So I just stayed on -- didn't go home.

JU:   So you went from a 07 yesterday to 07 today and --

NC:   To 07 tomorrow morning.

JU:   Then you started a new shift today?  07 to 07?

NC:   Yes, yes, yes.

JU:   Okay.  So you got 48 hours.  You're gonna go.

NC:   Uh-huh.

JU:   Okay.

JT:   Only get one day off then, huh?

NC:   Uh, I'm back here Saturday.

JT:   Oh, wow.

NC:   And I'm working Sunstar tomorrow.

JU:   You also work for Sunstar?

NC:   Part-time.

JU:   Okay.  How long have you worked for them?

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

| Narrative - Continued |
| --- |

NC:  Uh, a year now.  I guess that counts, right?  Yeah.  Sorry.

JU:  All right.  And, uh, your day today -- it's my understanding that you were, uh -- you were sent to this address, 1739 Split Fork Drive.  Can you tell me what time that occurred, about?

NC:  Five -- I think the note said 5:15, the dispatch.  Around 5:15.

JT:  This morning?

NC:  Yes.  Yes, sir.

JU:  And what did you get dispatched there for?  In regards to what?

NC:  I want to say it's a sick person.

JU:  Sick person?

NC:  Yeah.

JU:  Okay.

NC:  Could be wrong.  I don't want to speculate.

JU:  Do you -- do you recall what the, uh, call notes stated that you were going to?  Sick person for what type of -- what type of illness, or --

NC:  No.

JU:  No?

NC:  I didn't get to read the call notes 'cause I was driving.

JU:  Okay.

NC:  Our lieutenant reads that kind of stuff.

JU:  Okay.

NC:  Uh, so -- but he did give us a heads up that there was weapons in the house for the call notes, so --

JU:  And who -- who -- how was he advised of weapons in the house?  Do you know if the person that called 9-1-1 said that, or --

NC:  I don't know how he knew that, but it shows up in our computer call notes, so --

JU:  Okay.

NC:  -- I don't know for sure if he said anything or not.  The party calling, or --

JU:  All right.  So some -- sometime early this morning, uh, a little after five, uh, you were dispatched to a sick person at this address, 1739 Split Fork Drive:  When you get there, uh, tell me what happens.

JU:  Well, we staged, so we -- we don't go responding to the emergency, so we staged, almost half a mile down the street.  Um, Sunstar's right behind us.

JU:  And -- uh, let me -- let me just stop you there, briefly.  You were staged for what reason?

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

**Narrative - Continued**

NC:   'Cause we heard there was weapons in the house.

JU:   You just -- because you knew there was weapons in the house?

NC:   Right. That's pretty much our policy if we heard there was --

JU:   Okay.

NC:   -- weapons, and -- we don't, uh --

JU:   Okay. So go ahead. I'm sorry for interrupting you.

NC:   No, it's fine. We staged, and then we see a deputy pass us. A few minutes later, uh, he clears us. We go in, and -- I don't know what the deputy's name was, but he comes out and meets us in the yard, and, uh, basically tells, uh, you know, here's our patient. Um, kid walks down the stairs as we walk into the house. He walks down the stairs.

JU:   Who walked down the stairs?

NC:   The patient.

JU:   The patient walked down the stairs?

NC:   Yeah.

JU:   And did you, uh, learn of his name or anything? Was it --

NC:   I asked him what his name was. Said, "Hey, what's your name, Bud?" You know?

JU:   Okay.

NC:   It was Ronald. So then I call him Ron. "Hey, Ron, how you feeling?" And he was basically telling me he was fine.

JU:   Okay.

NC:   He was --

JU:   When the deputy said that the scene was clear, you're free to come in, did he notify you via radio, or how -- how did he do that one on that --

NC:   Uh --

JU:   -- particular time?

NC:   Dispatch told us.

JU:   Okay.

NC:   Dispatch told us, and then when we park, he comes out and meets us.

JU:   So you -- you get there. You go inside the house. Who else is inside the house at that time?

NC:   Uh, I think it was the wife and the deputy and the patient. That's it. Just the wife and --

JU:   Oh, only one deputy?

NC:   Another deputy was already --

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

| Narrative - Continued |
| --- |

JU:  Okay. Okay. --

NC:  So --

JU:  So one was outside, and one's inside?

NC:  Yeah.

JU:  And the patient's coming down the stairs? You introduce yourself to him?

NC:  Uh-huh.

JU:  And tell me about what type of treatment he received.

NC:  Um, we didn't treat him at all. We just assessed him. We took his blood -- I -- I asked him some simple questions. I asked him, uh, what year is it? Uh, what city is he in? Who's the president? So we're just trying to assess how alert he is.

JU:  Uh-huh.

NC:  So we -- he answers all those appropriately. Tells me 2016, Oldsmar, and the president's Obama. Uh, took his blood pressure, his pulse. We, uh, put him on a cardiac monitor. And we took his blood -- his blood glucose level.

JU:  Uh-huh.

NC:  And, um, that's basically it. We assessed him. We did -- um, we tried -- we tried to convince him to go to the hospital, um, .ecause of what we heard. One of my partners talked to the wife.

JU:  Uh-huh.

NC:  He said that he woke up -- sounded like it was a nightmare, maybe. Screaming, yelling. Um, she called 911. She was scared. Um, so we basically convinced them, hey, you know, you should probably go to the hospital, you know. And nothing's changed lately with your health. We asked him if his health has been okay. If he's taking any new meds, any extracurricular meds, alcohol, anything like that. He's denied all that. Said he feels fine. Want me to slow down? Sorry.

JU:  No. You're okay.

NC:  So he -- basically doesn't want to.go to the hospital. We --

JU:  So you -- you -- you take his vitals and everything. You do his blood sugar [sic] and everything checks out fine?

NC:  Yeah.

JU:  How about his, uh, his speech and everything. Appeared normal?

NC:  I mean, he just woke up. I just woke up, so -- as far as my knowledge, it didn't sound like he, you know -- it was anything slurred --

JU:  Uh-huh.

NC:  -- or anything like that. It sounded normal, yeah.

JU:  And the, uh -- the color of his skin, the eye -- the pupils of the eyes, everything -- that was all normal, as well?

NC:  Yeah. I mean, it -- it -- it's -- it's nothing like that carried in the back of my mind that, hey, you know --

JU:  Uh-huh.

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

**Narrative - Continued**

NC:   -- we should assess further. And, um, you know -- basically tell him to go to the hospital. We did a -- actually, we also did a full cognitive exam. It's a series of 24 questions. And we asked him simple questions.

JU:   Uh-huh.

NC:   And everything was answered appropriately, so that -- and that's a really detailed, like, basic exam.

JU:   Okay.

NC:   So after doing that, it's kind of like, we -- we really can't force him. It's --

JU:   Right.

NC:   If he wants to refuse, he can refuse. And that's what he did. So --

JU:   Did you notice anything, uh, abnormal? Any injuries or anything or on his person?

NC:   No.

JU:   Nothing at all? No cuts on the lip? No --

NC:   Trying to think back. I'm gonna say no, because I don't want to -- like I say, I was just waking up, so if I didn't notice anything --

JU:   Okay. Nothing that stands out to you?

NC:   Yeah, that -- yeah.

JU:   Okay. All right. Um, uh, and then after -- after you spoke with him, he didn't want to go to the hospital?

NC:   Uh-huh.

JU:   Is that pretty much the end of is your involvement on that trip?

NC:   Yeah.

JU:   Uh-huh.

NC:   Like I said, we did the full assessment with vital signs and everything. We did the full cognitive exam, all those questions. Um, and he -- we -- we had him sign the computer. It's a report saying that, hey, you don't want to go to the hospital with us or with Sunstar, and then you accept the risk of liability if anything may happen afterwards. And that's basically it. We talked -- we made sure that the -- one of the deputies that was -- that was there first -- said, "Hey, you -- you good? You know, do you need us for anything else?" You know. That's --

JU:   Did you -- did you speak to the wife at all?

NC:   No, I did not.

JU:   You did not? Did you treat her, or look at any injuries she may have had, or anything like that while you were there?

NC:   No. No. Not at all. No, I didn't. My partner went to go talk to her, um, so I just saw her  kind of just we went in, and -- and then she came out after we were done assessing him.

JU:   Uh-huh.

NC:   So by -- I -- I -- no. I didn't -- I didn't check or anything like that, so --

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

| Narrative - Continued |
|---|

JU: Okay. Have you ever been dispatched to this place before?

NC: No.

JU: Before today?

NC: No. Not that I recall.

JU: Have you ever heard of any of your, uh -- your teammates or people on your crew --

NC: No.

JU: -- being dispatched or have any issues with this guy?

NC: No.

JU: Um, you didn't make it upstairs --

NC: The --

JU: -- when you went inside the house?

NC: The first time, no.

JU: The first time.

NC: Not the first time.

JU: All right.

NC: We all stayed downstairs.

JU: Okay. So did you see any weapons or anything in the house at that time?

NC: No.

JU: You -- downstairs?

NC: Not the first time.

JU: Okay. All right. So then everybody departs. He says he's fine. He passes all your tests and everything.

NC: Uh-huh.

JU: And then sometime later on, uh, do you recall being dispatched there again?

NC: Uh-huh. Yeah.

JU: At approximately what time was that?

NC: I'd say around four o'clock, give or take half an hour or fifteen minutes.

JU: Okay.

NC: So --

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

| Narrative - Continued |
|---|

JU:     And what was the nature of that, uh call?  Do you -- do you remember?

NC:     That one came in as seizures.

JU:     That one came in as seizures?

NC:     Yeah.

JU:     And -- and -- I know the first time, you said you guys staged, uh, for safety reasons.  Did that occur again?

NC:     Yeah.  It happened again.  I told, uh, the L.T. that, hey, we were going to this house earlier today and that there was weapons reports -- reports of weapons in the house.  And that, you know, he had PTSD and took psych meds and -- so I was like, all right, you know, based on what you're telling me, we're gonna make a respond downgrade 2.

JU:     Uh-huh.

NC:     So we basically didn't go non -- we go non-emergency, stage like we did last time, and wait for the deputy to get there and clear everything.

JU:     The -- the earlier -- let's revert back to earlier in the morning, when you talked to the guy.  Did he give you a hard time at all at any time, or was he polite, or was he rude , or did he seem aggressive, anything like that?

NC:     No.  I mean, he stayed in his chair with his legs crossed.  And he just kept saying, "No, no, no.  I don't want to go to the hospital.  I feel fine."  Um, and he never, like, cussed, or --

'U:     Okay.

NC:     The body language.  Just didn't seem like he wanted, you know --

JU:     All right.

NC:     Just didn't want to go.

JU:     So the second call, you're dispatched out there, uh, for seizures.  You stage again.

NC:     Uh-huh.

JU:     Uh, once the -- what happens when the deputies arrive on scene?

JU:     Uh-huh, deputies arrive on scene --

JU:     And -- and at what point are you told that --

NC:     I know four show up

JU:     -- come on?

NC:     All together.  And I want to say maybe ten, fifteen minutes go by from the time we got there before they tell us to come in.

JU:     Were you the first ones on scene -- medical personnel?

NC:     Yes.  Uh, yes, sir.  Yeah.

JU:     Okay.

NC:     We, um -- Sunstar was right -- they -- they got there right behind us when we staged, so we kind of all went in together.

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

**Narrative - Continued**

JU: Uh-huh.

NC: Uh, we were both -- me and my partner were, like, the first ones, like, actually to him.

JU: Okay. So how did you get the, uh, notification from the deputies that the scene was clear and free to go in?

NC: The L.T. told you.

JU: L.T. told you? Okay.

NC: I'm not sure if he got a wave, or if he got on the radio, but --

JU: Okay.

NC: -- I told him hey, we're clear. We're going on. So (unintelligible).

JU: All right. So you -- you enter the house and, uh, downstairs, did you see anybody in the, uh, downstairs portion of the home?

NC: The wife.

JU: The wife is downstairs?

NC: As soon as we walk in, she's to the left.

'U: Okay.

NC: She's there.

JU: Nobody else?

NC: I want to say -- not -- downstairs?

JU: Yeah.

NC: Not --

JU: Upon entry at the front door.

NC: Not that I can remember, beside the deputy walking us in.

JU: Okay. All right. And then tell me about, uh, what happens after that.

NC: Um, we basically walk upstairs. I remember being directed to walk upstairs to where the patient's at. And we get to him, see him. He's face down. He's cuffed, and we start assessing him.

JU: Were you briefed downstairs before you went upstairs by the deputy that was telling you that -- well, you know what -- come on in? Were you briefed about anything, about his condition, or what had occurred before you get there, or anything?

NC: Um, I don't want to tell you any false information. Um --

JT: If you don't remember, say "I don't remember."

NC: Yeah. I don't -- I'll say I don't remember it, honestly.

JU: Okay.

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

| Narrative - Continued |
| --- |

**JT:** So he was face down when you got there?

**NC:** Yeah.

**JT:** In handcuffs?

**NC:** Yes, sir.

**JU:** How many people were in the room?

**NC:** It was the deputy, the patient, and that was it. And then me and all the crew got there. So it was just two --

**JU:** Okay.

**NC:** -- in the room. The hallway does -- the deputy to my right.

**JU:** Right. Now, was anybody touching the patient at that time?

**NC:** I --

**JU:** When you -- when you -- when you first enter the room, uh -- where is the room in proximity to the, uh, stairwell when you go up to it, first of all?

**NC:** As soon as you -- it's right in front of the stairwell.

**U:** Right in front of the stairwell?

**NC:** Yeah. As soon as you get up the stairwell, there's the little patch of hallway, and then there's the -- the room that he's in.

**JU:** Okay. So you enter the room. There's two deputies in there and a patient?

**NC:** Uh, in the room there's one deputy --

**JU:** Okay.

**NC:** -- the patient -- and then outside -- just outside the room to the right in the -- in the hallway is another deputy.

**JU:** Okay. Is anybody touching the patient at that time, or is he just on his stomach in handcuffs, uh, with -- by himself?

**NC:** I honestly don't remember.

**JU:** Okay.

**NC:** I don't -- I don't want to -- I don't want to say.

**JU:** All right. So tell me about what -- what -- what do you do from that point?

**NC:** Uh, check his ABCs. His airway -- uh, if he's breathing.

**JU:** Did you roll him over to do that, or you just did it where he was?

**NC:** Uh, I wasn't up there right, like, touching him. I wasn't the first one to him. It was my partner, Paul. I was right behind Paul.

**JU:** Uh-huh.

**NC:** So we're -- and I'm asking him, "Hey, what's going on? Is he breathing? What you got?" You know? So I didn't -- I didn't -- I

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

Narrative - Continued

didn't touch him or anything, so -- uh, from what he was telling me, it sounded like he wasn't breathing. Or if he was breathing it was very agonal, very slow, very -- you know, shallow. Um, so at that point I'm already thinking, hey, it's probably gonna be a cardiac arrest. So we start getting our stuff out -- oxygen, monitor, and all that kind of stuff.

JU: Uh-huh.

NC: So like I said, I wasn't the one that got to him first.

JU: Did your partner roll him over?

NC: Um, it was him and the deputy, I want to say.

JU: Okay.

NC: After he uncuffed him.

JU: Did you notice any, uh -- what's -- any type of abnormalities, any injuries or anything at that time on the, uh -- the patient?

NC: No. Just that he wasn't responding to us. Like, hey, hey. What's going on? I gave him a sternal rub, here, just to see if he's awake or not, and he's not responding to that. So --

JU: Have you ever seen, uh, Taser probes or leads -- the wires that come off of the, uh -- the probes before?

NC: No.

JU: You're never seen them before?

NC: Not in real life.

JU: Did -- did you notice any type of, uh --

NC: Sorry.

JU: -- little metal dart-looking things, or electrical wires, or anything coming off the, uh --

NC: I noticed a wire. Uh -- there was a wire. It was, like, maybe copper -- like, brown looking.

JU: Okay.

NC: But I didn't see where it was coming from.

JU: Okay.

NC: So --

JU: And you didn't notice any type of, uh, discoloration or blood or anything on the patient's face or arms, or anything?

NC: Um, he wasn't as -- I guess you could say, like his -- wasn't as white. Like you know he's a white male, so --

JU: Uh-huh.

NC: -- he wasn't like -- it looked -- looked like a little more color, like a little more maybe pink, reddish. Like, flushed almost, maybe.

JU: Okay.

NC: Um -- so that -- that's about it. After they turn him over, that's when I noticed, so --

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

---

### Narrative - Continued

JU:    So you -- your partner tells you that, uh -- what -- what did he say to you, exactly?  He didn't have a pulse?  He's in the breathing?  What --

NC:    No -- well, he and I were just kind of back and forth with the dialogue, I mean, a lot's going on right there, you know?  Saying hey, and -- um, trying to -- is he breathing, and we were -- we were both kind of going back and forth, like, you know -- real quick, like within ten seconds, we just determined that he's not breathing

JU:    Okay.

NC:    And we checked for a pulse, carotid pulses --

JU:    All right.

NC:    No pulse there.  Approach cardiac arrest, and we started working him as cardiac arrest.

JU:    Okay.  And what was your -- what was your role in -- at -- at that point --

NC:    Um --

JU:    Were you doing chest compressions, or --

NC:    I started off with putting him on the cardiac monitor, checking to see what kind of activity he's got.  Um --

JU:    Not the A -- AED, or --

IC:    Yeah.  The AED.

JU:    The AED?  Okay.

NC:    Yeah.  It's the -- pretty much the AED, but it's got -- yeah.  A little more than that, but yeah.  It's the AED -- I -- I started putting that on him, and -- want to say Sunstar EMT started doing something.  I -- I started off with the monitor --

JU:    Okay.

NC:    -- but in cardiac arrest, you all switch off --

JU:    Sure.

NC:    -- 'cause it's compressions, and you get -- so I started off with the monitor -- putting him on the monitor.

JU:    And when you were doing that, was he still handcuffed, or --

NC:    No.  He was uncuffed.

JU:    Somebody uncuffed him?

NC:    He -- yeah.  Yeah, he was -- he was uncuffed already.

JU:    Okay.  All right.  So when you hook up the monitor --

NC:    Uh-huh...

JU:    -- uh, what happens with the -- with the monitor?  What does that tell you?

NC:    It's -- there's no pulse.  Asistoly [phonetic, which means, means there's -- there's no electrical activity.  So that he -- means it's in cardiac arrest.

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

| Narrative - Continued |
|---|

JU: Okay. Um, Detective Tobeck?

JT: How long did you guys work on him?

NC: I want to say it was almost an hour.

JT: That's with transport too, or --

NC: With transport. From the time we basically -- our monitor, from the moment we turn it on, has a timer on it. So I didn't look at the exact time on it, but it was -- it was near an hour.

JT: Okay. Um, when you got up there, and you said he was face down --

NC: Yeah, he was face down.

JT: Like, face down --

NC: No. It was like --

JT: Was his head turned to the side --

NC: No, he was --

JT: -- where he can breathe?

IC: His body was prone, but it was like, you know what I mean? Like if he's sleeping, like -- you know, if you sleep on your side like this a little bit.

JT: You remember which side of his face was turned? Was it his right, or --

NC: I want to say it was left -- I want to say the left side of his face was facing -- like to the --

JU: Was it away from the floor?

JT: So the --

NC: Yeah. It was like -- you know what I mean? Like, if you sleep on a pillow, face down, like that kind of -- but like I said, the position is prone. It's called -- called prone --

JT: Yeah.

NC: Which you guys probably know it. So it -- but his body position was prone, but his face was --

JT: So he could have been breathing through if -- if he was able to --

NC: If he was able to breathe, yeah. He -- he -- it was clear on that -- and -- as far as that goes.

JT: Okay. All right. Um --

JU: Did you notice anything, uh -- anything in the room? Did you see any weapons or anything in the room?

NC: Yeah. There was a pistol on the bed, not two feet from him. And --

JU: What -- and can you describe the pistol to me?

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

### Narrative - Continued

NC: Looked like a 1911. I don't know if it was a Kimber or what kind of 1911 it was, but it liked like a 1911 to me.

JU: Do you have, uh, training and experience in firearms?

NC: Um, very minimal. Uh --

JU: Very minimal?

NC: (Unintelligible) --

JU: What would make you -- make you believe or lead you to believe that it was a 1911?

NC: I mean, I've got a bunch of friends that have them.

JU: Okay.

NC: I want to get one.

JU: You've seen 'em, you've handled 'em, you've looked at them.

NC: I've shot them. I've shot them.

JU: Okay.

NC: My fiancée's dad shoots -- he's a gunsmith, so I've shot his a lot, you know, so --

JU: Okay.

NC: And there was also a rifle case, um -- like not behind the bed, but in -- you know. Here's the bed, little space probably to walk through in -- in and out of the room --

JU: Uh-huh.

NC: And there was a -- like a dresser, or whatever.

JU: Uh-huh.

NC: And a little -- it was like -- looks like it was a rifle case. A hard rifle case that had tape on it, like duct tape or something like that.

JU: Where was the gun on the bed?

NC: In the pretty much right in the middle, towards like -- middle towards the head, kind of. But it was in plain sight. I -- I'm not sure if someone --

JU: It wasn't hidden by anything? It was just right in plain sight?

NC: No. It wasn't under the pillow or -- I -- I don't know if it was loaded or anything kind of thing, um --

JU: All right. Did you see any other weapons in there besides the, uh -- you said a rifle, and you saw or case or something?

NC: It was a rifle case.

JU: Okay.

NC: I -- it wasn't open. I didn't -- obviously, I didn't check and touch anything. But there was just a pistol and then a rifle case.

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

## Narrative - Continued

JU: Anything else on the floor?

NC: I'm trying to think back. Um, I don't --

JU: If you don't remember, it's okay.

NC: Yeah, I don't remember. It's just -- just him.

JU: We're just trying to get as much detail as we can.

NC: Yeah, yeah.

JU: So if you don't remember, then --

JT: Did -- did you speak to the family, or --

NC: Nope. Only -- only family I know who was there was the wife, and she was -- she was off in the corner.

JU: Any -- any deputies making statements to you, other than saying you can come in and --

NC: You can come in.

JU: Based on your training and experience, um, the patient -- no pulse, no breathing. Is he considered deceased at that time, up there?

IC: At the time we got to him, or how far into the -- the assessment do you --

JU: While you were still up in the bedroom.

NC: Um, he's apneic and pulseless, but it's -- it's -- we didn't call it. We didn't call him a signal 7, which means he's dead --

JU: Right.

NC: -- and we are gonna stop, you know? We get calls all the time, we get to someone, they're cold, stiff, they're dead. We're not gonna work it. But, so -- if they're apneic and pulseless, if you want to go from that, that means they're in cardiac arrest. You know, so if they're in cardiac arrest, maybe we still work them, to get them out of cardiac arrest. But we didn't pronounce him dead.

JU: And is there somebody that's, uh -- say a higher pay grade or different rank than you that tells you when and if you can --

NC: Um --

JU: -- stop treatment?

NC: Um, we -- yeah. The -- the medical director. Um, but like I said, based on our, uh, initial assessment --

JU: Uh-huh.

NC: Um, we still had -- we still had to do our job, which is a -- you know, try to get him back, um, but not -- at that point, yeah, he was -- he was still a work -- what was called a workable cardiac arrest.

JU: Okay.

NC: So -- but yeah. The -- if -- if -- if -- that's why we called the doctor later on at the call. You know, we got (unintelligible), but twenty minutes into a call, like that, cardiac arrest, you call the medical director and based on what we tell him, um, he can tell us where they to stop or keep going. Obviously, he told us keep going, 'cause of what we-told him. So you know this is -- we had a call earlier in the day when the lady was cold, stiff. We don't have to call the doctor on that kind of person.

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

---

### Narrative - Continued

JU: Right.

JT: Uh-huh.

NC: Cold, stiff. It's been a last -- it's been an hour since we last saw the patient. We're not gonna work it. There's no point. As far as that goes, it's gonna -- this is -- no effort's gonna be, uh, given.

JU: Okay. Um is -- is there anything that we haven't asked you that you feel that we should know or would be important for us to know?

NC: Um, I mean, we had to change the hospital destination so that delayed his care to a -- a -- an ER by, um, maybe ten, fifteen minutes.

JU: That delayed his care to the ER for --

NC: Right. It delayed by about ten, fifteen minutes.

JU: That was due to, uh, overcrowding or the emergency room at Countryside was --

NC: Yeah, (unintelligible) divert.

JU: Okay.

NC: Some reason we're not taking patients.

U: Okay.

NC: So I don't -- that happened. I mean I -- honestly, I don't know how much more a -- a -- the hospital's gonna do --

JU: Uh-huh.

NC: -- but it was a -- a while longer to get there, um, so --

JU: Okay. All right. Detective Tobeck, you have anything else to add?

JT: That's it, man. We'll let you go and get some sleep. We know you've had a long day.

NC: Okay.

JT: I appreciate it.

NC: All right.

JT: Thanks for coming back here.

NC: Oh, no problem.

JU: Time is 2259 hours. We'll end this, uh, interview.

(CONCLUSION OF INTERVIEW)

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

### Narrative - Continued

Transcribed by: jiz/ms

### Record Status Information

| | |
|---|---|
| Record Origination Operator: | UPTON, J. A. DET (56961 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Record Origination Date: | 09/08/2016 11:01 |
| Last Update Operator: | GREENE, TODD A SGT (56670 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Last Update Date: | 09/20/2016 15:17 |

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| UPTON, J. A. DET (56961 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 | GREENE, TODD A SGT (56670 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 |
| | | | |

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*