UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

CASE NO.:  8:18-CV-2116-WFJ-SPF

JULIE V. DEGRAW, AS PERSONAL REPRESENTATIVE OF THE

ESTATE OF DONALD C. DEGRAW, DECEASED,

        PLAINTIFF,

    VS.

BOB GUALTIERI, IN HIS INDIVIDUAL AND SUPERVISORY

CAPACITY AS PINELLAS COUNTY SHERIFF, AND GREGORY

GOEPFERT, IN HIS INDIVIDUAL CAPACITY AS A

PINELLAS COUNTY DEPUTY SHERIFF,

        DEFENDANTS.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPONENT:    MICHAEL SEGURA

DATE:       OCTOBER 3RD, 2019

TIME:       9:30 A.M. TO 10:30 A.M.

LOCATION:    COMPASS REPORTING GROUP

           3000 GULF-TO-BAY BOULEVARD, #500

           CLEARWATER, FL  33759

REPORTER:    KIMBERLY HAMMOCK

           NOTARY PUBLIC

           STATE OF FLORIDA AT LARGE

         COMPASS REPORTING GROUP

```
1   A P P E A R A N C E S:

2

3   For the Plaintff:      INGUNA VARSLAVANE-CALLAHAN, ESQ.

4                          CALLAHAN LAW FIRM, LLC

5                          449 CENTRAL AVENUE, #203

6                          ST. PETERSBURG, FL  33701

7

8

9   For the Defendant:     PAUL G. ROZELLE, ESQ.

10                          PINELLAS COUNTY SHERIFF'S OFFICE

11                          10750 ULMERTON ROAD

12                          LARGO, FL  33778

13

14
```

```
15                          I N D E X

16   Direct Examination by Ms. Callahan .......... 3

17   Cross-Examination by Mr. Rozelle   .........
```

```
18
```

```
19                        E X H I B I T S
```

| Plaintiff's Exhibit No. | Description | Marked for Identification |
|---|---|---|
| 35 | Report | 11 |
| 36 | Report | 16 |

```
24

25
```

1    Thereupon,

2                    MICHAEL SEGURA,

3    was called upon and after being duly sworn,

4    was examined and testified as follows:

5                    DIRECT EXAMINATION

6    BY MS. CALLAHAN:

7        Q.    Good morning, sir.

8        A.    Good morning.

9        Q.    As I introduced myself a couple minutes ago,

10   my name is Inguna Callahan.  I represent Mr. DeGraw's

11   family in this matter, and I will be asking you some

12   questions this morning.  As you can hear, I have a bit

13   of a foreign accent.  So if you have any problem

14   understanding what I'm saying, please let me know and

15   I'll try to articulate better or rephrase my question.

16       A.    Yes, ma'am.

17       Q.    Or if you don't understand my question for

18   whatever reason, please let me know and I'll be happy

19   to repeat or rephrase.

20       A.    Yes, ma'am.

21       Q.    If you answer, I will assume that you

22   understood what I asked.  Is that fair?

23       A.    Yes.

24       Q.    Okay.  Please state your full name for the

25   record.

1        A.    Michael Joseph Segura.

2        Q.    We are here because of an event that happened

3    in September of 2016.  Where were you employed in

4    September of 2016?

5        A.    Pinellas County Sheriff's Office.

6        Q.    What was your role or job?

7        A.    I was a patrol deputy sheriff.

8        Q.    Were you assigned to any particular shift?

9        A.    I was assigned to the Oldsmar -- the city of

10   Oldsmar during the evening shift.

11       Q.    When was the evening shift?  What hours?

12       A.    My hours were from 7:00 p.m. until 7:00 a.m.

13       Q.    And to kind of help me understand, as patrol

14   deputy sheriff do you -- do you ride in the car by

15   yourself or is it a team?

16       A.    By myself, ma'am.

17       Q.    Okay.  And as of September 2016, how long

18   have you been a patrol deputy sheriff?

19       A.    Up until that point, ma'am?

20       Q.    Yes.  When did you start working as a deputy

21   sheriff?

22       A.    I've been with the sheriff's office for

23   approximately four years.

24       Q.    So you started in about 2015?

25       A.    I believe so.  No, 2015.

1       Q.   Do you recall which months of the 2015 you
2   started?
3       A.   May of 2015.
4       Q.   So as of September 2016, you had been with
5   the sheriff's office for a year and about three months?
6       A.   Approximately, yes, ma'am.  I believe so.
7       Q.   And from when you were -- when you first
8   became employed with the sheriff's office in 2015, was
9   your job as a patrol deputy sheriff from the beginning?
10      A.   My primary, yes, ma'am.
11      Q.   Was it in Oldsmar the entire time?
12      A.   No, ma'am.  I began in the city of Dunedin.
13  Then I was assigned to south county for a while.  Then
14  ultimately in the city of Oldsmar.
15      Q.   You said your primary job was patrol deputy
16  sheriff.  Did you have a secondary?
17      A.   I'm also a hostage negotiator.  Part of the
18  hostage negotiation team.  At the time while on patrol,
19  I was a field training officer.
20      Q.   Field training officer?
21      A.   Yes, ma'am.
22      Q.   What did you do as a FTO?
23      A.   As a FTO we help mold and teach new deputy
24  recruits how to become deputy sheriffs.
25      Q.   When did you work before your job at the

1  sheriff's office?

2      A.    Prior to becoming a deputy sheriff, I worked

3  for the Tarpon Springs Police Department.

4      Q.    And for how long were you there?

5      A.    Approximately six years.

6      Q.    What was your role there?

7      A.    My primary was as patrol.  Patrol officer.

8      Q.    So similar to what you were doing at the

9  sheriff's office in 2016?

10      A.    Yes, ma'am.

11      Q.    And did you have any secondary roles?

12      A.    Yes, ma'am.  I was a field training officer.

13  Hostage negotiator.  I was on the bike team.  Honor

14  guard.  I believe that's it.

15      Q.    You were doing everything?

16      A.    Yes.  I was trying, ma'am.

17      Q.    And when you say "field training officer",

18  does it mean that you were training the new recruits on

19  the field?  On-the-job training, so to speak?

20      A.    Yes, ma'am.

21      Q.    Do you have any college education?

22      A.    Yes, ma'am.

23      Q.    What college did you attend?

24      A.    St. Petersburg College.

25      Q.    Did you graduate?

1    A.    No, ma'am.

2    Q.    What did you study?

3    A.    Criminal justice.

4    Q.    So during the time you were -- in 2016 when

5    you were working as a patrol deputy sheriff, was your

6    job to respond to 911 calls?  Is that what it was?

7    A.    Part of the job, yes, ma'am.

8    Q.    And what were the other aspects of your job?

9    A.    As a deputy sheriff on patrol we would

10   respond to 911 calls.  We would respond to traffic

11   accidents.  I would proactively look for illegal

12   activity.  Any crimes occurring.  We do community

13   policing making contact with the public and making them

14   aware of any issues in the area and/or having them tell

15   us of any issues.

16   Q.    Okay.  And the 911 calls, did they include

17   medical calls?

18   A.    Yes, ma'am.

19   Q.    Was it infrequent or unusual to be called in

20   on a medical call?

21   A.    No, ma'am.

22   Q.    So you had the chance to respond to many

23   medical calls, I take it, in your role as a patrol

24   deputy sheriff?

25   A.    Yes, ma'am.

1      Q.   In this case, the deputy sheriffs were called

2  on an assist other agency call.  Was that an unusual

3  occurrence for you to participate in assist other

4  agency call?

5      A.   No, ma'am.

6      Q.   So that also was a pretty frequent

7  occurrence?

8      A.   Yes, ma'am.

9      Q.   I'll represent to you that this particular

10  call involved a gentleman having a seizure.  Was that

11  the first time that you responded to a call involving

12  seizure?

13           MR. ROZELLE:  Objection to the form.  And

14       misstates the record and lacks foundation.  You

15       can answer.

16  BY MS. CALLAHAN:

17      A.   If I remember correctly, the call note stated

18  that FD needed assistance.  They referenced a male in

19  the house who was irate, if I'm not mistaken, and that

20  there was weapons in the house.

21      Q.   I'm asking about the seizure.  Have you had

22  an opportunity to respond to medical calls involving

23  seizures?

24      A.   I have, but in this case not being medically

25  trained in that, I wouldn't be able to say yes or no if

1   there was a seizure, no.

2       Q.   Okay.  That was not my question.  My question

3   was, have you had opportunities or reasons to

4   respond -- let me start over.  Have you been involved

5   medical calls that involved patients having seizure

6   activity?

7       A.   Yes, ma'am.

8       Q.   More than once?

9       A.   I believe so.

10      Q.   How about medical calls involving patients

11  with post-traumatic stress disorder?

12      A.   Yes, ma'am.

13      Q.   Have you had opportunity to respond to those

14  calls, as well?

15      A.   Yes, ma'am.

16      Q.   More than once?

17      A.   Yes, ma'am.

18      Q.   Have you reviewed any documents in

19  preparation for this deposition?

20      A.   I read my report, and I also read Deputy

21  Lamborghini's report.

22      Q.   Okay.  Prior to reading these reports, did

23  you have any independent recollection of the events of

24  that day?

25      A.   No, ma'am.

1    Q.    How come you and Deputy Lamborghini both

2  responded to the scene?

3    A.    The city of Oldsmar, it's a smaller city.

4  There's -- I believe at that time of the morning

5  there's two of us working the city.  For officer safety

6  purposes, we respond to calls together.  This one in

7  particular, like I said, the call notes stated that

8  there was firearms within the residence.  So for

9  officer safety reasons, Deputy Lamborghini and I

10  responded together.

11    Q.    Okay.  And you arrived in separate vehicles,

12  correct?

13    A.    Yes, ma'am.

14    Q.    Was the procedure to -- for one of you to

15  wait until the other one arrives and so you walk in

16  together?  Is that how it was?

17    A.    That's ideal.  Again, every situation is

18  different, ma'am.  We have to -- upon arriving we'll

19  make that determination.  But, again, for officer

20  safety purposes we try do it at the same time.

21    Q.    Okay.  From your review of these reports, can

22  you tell how it happened in this case?  Did you walk in

23  the residence together or one of you arrived first

24  before the other?

25    A.    I believe we approached together, at which

1  point we made contact with the female half of the

2  residence.

3       Q.   Okay.  Both of you together?

4       A.   Yes, ma'am.

5            MS. CALLAHAN:  I forgot my exhibit binder, so

6       I don't know what our next exhibit is.  Do you

7       have exhibit binder, Mr. Rozelle, please?

8            MR. ROZELLE:  It looks like you're on 35.

9            MS. CALLAHAN:  So we will mark the next

10      Exhibit 35.

11           (At this time Plaintiff's Exhibit No. 35

12            was marked for identification.)

13  BY MS. CALLAHAN:

14      Q.   Sir, I believe this your report, correct?

15      A.   Yes, ma'am.

16           MS. CALLAHAN:  Mr. Rozelle, for the life of

17      me, I couldn't find a copy from the documents you

18      produced.  So this is from your investigation?

19           MR. ROZELLE:  It's in there, PCSO Bates

20      Number 985 going forward.  It was produced six

21      months ago.

22           MS. CALLAHAN:  Okay.  So 985 is Deputy

23      Lamborghini.  I'm looking for --

24           MR. ROZELLE:  Deputy Segura's?  I'm sure it's

25      in there.

1       MS. CALLAHAN:  I couldn't find it.  That's

2   why I'm saying it.

3       MR. ROZELLE:  Well, we'll followup on that

4   after.  It's either in there or it's not.

5       MS. CALLAHAN:  Okay.

6  BY MS. CALLAHAN:

7     Q.  So, sir, is this the report that you

8  reviewed?

9     A.  I'm sorry?

10     Q.  Is this the report that you reviewed in

11  preparation for this deposition?

12     A.  It's a copy of it, yes, ma'am.

13     Q.  And how was it prepared?  Did you type it

14  yourself?

15     A.  Yes, ma'am.

16     Q.  It's stated it's a supplement.  Can you tell

17  me from reviewing it which day that you prepared it?

18     A.  I don't know if it shows the date that it was

19  authored.

20     Q.  In the first box at the top it says,

21  "Approved date."  That would be when it was approved by

22  the supervisor?

23     A.  That's correct.

24     Q.  And then on the second page there's some

25  dates, "Record origination date."  Do you know what

1  that is?

2      A.   Honestly, I don't know.

3      Q.   There's -- this one states it's a supplement

4  to Deputy Lamborghini's report.  Why were you -- why

5  did you prepare a supplement?  Do you know?

6      A.   I'm sorry?

7      Q.   Why did you prepare a report?

8      A.   For deputy involvement.

9      Q.   Can you explain that?

10     A.   Well, the supplement was done.  Deputy

11 Lamborghini took the primary report, and I documented

12 my involvement in the case under a supplement number.

13     Q.   Okay.  Is that how it's usually done when two

14 deputies respond?

15     A.   Yes, ma'am.

16     Q.   And why did he take the primary role versus

17 you?

18     A.   It was determined that morning at the

19 original call.

20     Q.   Okay.  And who determined that?

21     A.   It was conversation between him and I.  I

22 don't remember, to be honest with you, how he ended up

23 taking primary on that call.

24     Q.   Okay.  It would be between you two?  Not

25 from, like, between you and your boss?

Michael Segura
October 3, 2019

1    A.    No, ma'am.  It would be between Deputy

2  Lamborghini and myself.

3    Q.    Okay.  And when you prepare a supplement

4  report, do you usually prepare it the same day?

5    A.    Not necessarily, no.

6    Q.    It depends?

7    A.    Yes, ma'am.

8    Q.    And when you respond to a call like this one,

9  do you keep any contemporaneous notes?

10    A.    No, ma'am.  Not necessarily.

11    Q.    So this report would be prepared from your

12  memory, correct?

13        MR. ROZELLE:  Object to the form.  You can

14    answer.

15  BY MS. CALLAHAN:

16    A.    Again, every call is different, ma'am, so I'm

17  not sure.

18    Q.    So if you didn't keep notes and you repaired

19  the report some time later, you would have to rely on

20  your memory?

21        MR. ROZELLE:  Object to the form.  You can

22    answer.

23  BY MS. CALLAHAN:

24    A.    Yes, ma'am.

25    Q.    When did you review this report?

Michael Segura
October 3, 2019

1      A.    Prior to this, ma'am?

2      Q.    Yes.

3      A.    I believe it was two weeks ago, the first

4  time I reviewed it.

5      Q.    Okay.  Did you look at it yesterday or day

6  before more recently?

7      A.    What's today?  I believe it was over the

8  weekend.

9      Q.    And as you were reviewing it, did it cause

10  you to remember anything about the actual event?

11      A.    I remember the date, ma'am.

12      Q.    So what do you remember?

13      A.    We were called out on an assist other agency

14  for a medical call --

15      Q.    What you're telling me -- sorry for

16  interrupting you.  Is it based on your actual memory,

17  or just based on your review of the report?

18      A.    Me reviewing the report.  It was a call for

19  service to assist Oldsmar FD, at which point they were

20  staging due to some type of medical issue in which they

21  felt the scene was not safe at the time, so they

22  requested law enforcement to arrive prior to render the

23  scene safe so they can come in and treat whatever

24  medical ailment there possibly was.

25      Q.    Okay.  Do you recall or is there anyway to

1    tell if you talked to the first responders who called

2    in the assist agency call?

3         A.    Talked to them prior to or after?

4         Q.    Prior.

5         A.    No.

6         Q.    You did not talk to them prior?

7         A.    No, ma'am.

8         Q.    So am I correct to assume that your

9    information about the nature of the call or the reasons

10   why you were being summoned came from the dispatch?

11        A.    Yes, ma'am.

12        Q.    Can you tell from your report how long you

13   were at the residence?

14        A.    No, ma'am.

15        Q.    Let me ask you to take a look at Mr.

16   Lamborghini's report.

17             MS. CALLAHAN:  We will mark this as the next

18        exhibit.

19             (At this time Plaintiff's Exhibit No. 36

20              was marked for identification.)

21   BY MS. CALLAHAN:

22        Q.    It seems to me that the second box, "Response

23   information," it says, "Time call received.  Time

24   dispatched.  Time arrived.  Time completed."  Would

25   that accurately reflect the time you spent at the

1   residence?

2        A.   I do not recall the times we were there,

3   ma'am.

4        Q.   But is that what this information means in

5   the response information box?

6             MR. ROZELLE:  Object to the form.  You can

7        answer.

8   BY MS. CALLAHAN:

9        A.   The response information box should be

10  accurate to when the call was received, when it was

11  dispatched to deputies, the time we arrived on scene

12  and then the time we closed out the call.

13       Q.   Okay.  And how is the time arrived recorded?

14  Do you know?

15       A.   As far as how was it documented on here?

16       Q.   Yes.

17       A.   How does that information go through?

18       Q.   Yes.

19       A.   We either have a button on our computer on

20  our computer which timestamps it, or we advise dispatch

21  via the radio, and they place it in the call and it

22  timestamps it that way.

23       Q.   Okay.  And then time completed, is it done

24  the same way?

25       A.   Time completed, this one is primarily done on

1  our laptop so that we can choose the closing code.

2  Which at that point, it timestamps the time that we

3  closed the call.

4      Q.   Okay.  So the time arrived and time completed

5  should be accurate to reflect your and Deputy

6  Lamborghini's presence that day, correct?

7      A.   My timing might be a little different,

8  because this would be based off of Deputy Lamborghini's

9  actual arrival time and departure time.  But,

10  generally, yes, ma'am.

11      Q.   Okay.  It's somewhere in the vicinity?

12      A.   Yes, ma'am.

13      Q.   Okay.  Summarize to me what your involvement

14  was with Mr. DeGraw on this morning.

15      A.   Can I refer back to this?

16      Q.   Absolutely.

17      A.   Okay.  On said date of September 7th of 2016,

18  we arrived on scene.  I made contact with the

19  complainant, Ms. Julie Degraw.  She advised me that her

20  husband, Donald DeGraw, suffered from post-traumatic

21  stress disorder from his time in the military.  She

22  went on to explain that he seemed to be having as what

23  she called an "episode".  She advised that earlier in

24  the morning she heard Donald screaming from the other

25  room.  She went in to check on him, at which point she

1 says she saw him lying on his back with his eyes open

2 making gurgling sounds.  She also went on to state that

3 she believed Donald urinated on himself.

4       Julie stated that Donald seemed to be

5 confused and dazed, and he was screaming and reaching

6 towards her.  At one point, he actually made contact

7 and grabbed her by the back of the neck.  I did see

8 that Julie had a redness and minor scratches on the

9 back of her neck that were conducive to the information

10 that she provided.  I asked Julie if she felt Donald

11 placed his hands on her in trying to hurt her, at which

12 time she stated she did not feel he was trying to

13 injure her.  She believed it was just due to the

14 episode that he was having.

15     Q.   Okay.

16     A.   After making contact with Julie, Deputy

17 Lamborghini and I went into the residence.  At which

18 point, there were dogs barking.  How many dogs, I do

19 not know, but there was barking of at least one dog.

20 Donald was standing at the top of the stairs.  He was

21 yelling at the dogs to shut up.  At some point, the dog

22 subsequently stopped barking.  At which point, I was

23 able to start dialogue with Donald.  Subsequently I had

24 him come downstairs to speak with me on the first

25 level.  Once Donald was downstairs and the situation

1    was calmed down, I went ahead and I advised that FD was

2    clear to come in for the medical portion.

3        Q.   Okay.  And were you present while the fire

4    department was treating him?

5        A.   Yes, ma'am.

6        Q.   You stayed the entire time?

7        A.   Yes, ma'am.

8        Q.   Is that standard procedure?

9        A.   For myself, yes, ma'am.  Because any

10   situation, although it's calm at the moment, when law

11   enforcement is present, there's a chance for it to

12   escalate once again once our presence is no longer

13   there.  I can only speak upon myself with my personal

14   experience.  Yes, ma'am, I make sure that I stay until

15   FD leaves.

16       Q.   Okay.  That seems to be reflected in your

17   report, too, because you describe what the FD did as

18   well, correct?

19       A.   Yes, ma'am.

20            MR. ROZELLE:  Object to the form.  You can

21       answer.

22   BY MS. CALLAHAN:

23       A.   Yes, ma'am.

24       Q.   And then subsequently everybody left,

25   correct?

1    A.    As far as medical and law enforcement, yes,
2  ma'am.
3    Q.    And did you also write that Julie stated that
4  Donald didn't have history of violence?
5    A.    I'm referring back to the report, ma'am.
6    Q.    It's the last paragraph.
7    A.    Okay.  That's correct.  Julie stated that
8  Donald did not have a history of violence.
9    Q.    And then it's written here also that Julie
10  asked if she felt in fear at all remaining in the
11  residence with Donald.  Julie advised that she did not.
12  Did you ask that question or did -- Deputy Lamborghini
13  did?  Do you know?
14    A.    I asked it.  Whether Deputy Lamborghini did
15  or did not, I do not recall.
16    Q.    And her answer was that she did not fear,
17  correct?
18    A.    That's correct.
19    Q.    Then in the preceding paragraph you have
20  written, "Based on our evaluation and FD's evaluation,
21  Donald did not need Baker Acted criteria?"
22    A.    That is correct.
23    Q.    So you were assessing him for Baker Act, as
24  well?
25    A.    Yes, ma'am.

1      Q.   And how did you do that?

2      A.   On this occasion based on, again, totality of

3   the circumstances, based off of the information given

4   to us firsthand by Ms. DeGraw, my observations and my

5   conversation with Donald, the conversation Donald had

6   with the medical staff and the way that answers were

7   answered that medical was asking, at that point, it was

8   deemed that Donald did not need Baker Act criteria at

9   the moment.

10     Q.   Okay.  So obviously you were able to have

11  dialogues on Donald at this point, correct?

12     A.   Yes, ma'am.

13     Q.   And you mentioned that when you entered the

14  entered residence, Donald was upstairs.  Do you recall

15  or can you tell from the report if you and Deputy

16  Lamborghini went -- if you went upstairs to talk to

17  Donald or you stayed downstairs?

18          MR. ROZELLE:  Object to the form.  You can

19      answer.

20  BY MS. CALLAHAN:

21     A.   I stayed downstairs, ma'am.

22     Q.   Okay.  In the second paragraph you reference

23  an episode, quote, unquote, that Julie explained that

24  Donald was having an episode.  Can you explain what you

25  meant by an episode?

1    MR. ROZELLE:  Object to the form.  You can

2        answer.

3  BY MS. CALLAHAN:

4    A.    I added it in quotes, so that was a direct

5  quote from Julie.

6    Q.    Do you have -- did you get an understanding

7  of what this episode was?

8    A.    Based off the call notes and the information

9  that Julie subsequently provided and her advising that

10  Donald did suffer from post-traumatic stress disorder,

11  I came to my own conclusion as to it possibly being

12  post-traumatic stress disorder and him having some type

13  of lucid dream if -- based off of what she told me.

14    Q.    But that's something that you deducted (sic)

15  based on what she was telling you, correct?  That you

16  thought it was a PTSD-related episode?

17    A.    Again, yes, ma'am.  Based off the information

18  she gave and the call notes.

19    Q.    Did you note that the call notes referenced a

20  possible seizure?

21        MR. ROZELLE:  Objection to form.  Where are

22        you looking?

23        MS. CALLAHAN:  I'm going from my memory now.

24        It's not in the report.

25        MR. ROZELLE:  For the record, the call notes,

1      or PCSO1271 and 1272, they don't say anything

2      about a seizure.

3           MS. CALLAHAN:  Let's strike that question.

4    BY MS. CALLAHAN:

5      Q.    At the Pinellas County Sheriff's Office, you

6    know, when you are called to an address, do you have an

7    ability to assess any information about that address?

8    For example, if there had been prior calls to the same

9    address?

10     A.    Yes, ma'am.  We do have the ability.

11     Q.    Okay.  And how is it done?  On the laptop or

12   how?

13     A.    Yes, ma'am.

14     Q.    And the laptop is in the vehicle?

15     A.    Yes, ma'am.

16     Q.    And is that what you have been trained to do

17   to access the residence address before you go in to see

18   if there are any prior calls?

19     A.    Every situation is different, ma'am.  Whether

20   we've been trained?  I believe it's good practice.  But

21   it's not something that's -- that you're able to do on

22   every call.

23     Q.    Why not?  Why wouldn't you be able to do it?

24     A.    The totality the circumstances.  I'm driving.

25   There's traffic.  Pedestrians.  I can't be staring at

1    my computer screen.  Possible weapons.  Things of that

2    nature.  So we have to take all that into account when

3    we are heading to a call.

4         Q.   Okay.  But physically it is possible, you

5    know, to do it on your laptop right there in the

6    vehicle, correct?

7           MR. ROZELLE:  Objection to form.  You can

8        answer.

9    BY MS. CALLAHAN:

10         A.   It is possible, yes, ma'am.

11         Q.   To your knowledge and experience as a deputy

12    sheriff, your database does keep records of calls

13    received to a certain -- to each residence, correct?

14    By residence address?

15         A.   Can you repeat the question?

16         Q.   Sure.  It was a terrible question.  So, for

17    example, if you get called to my house, you know, for

18    whatever reason and you arrive and you do your thing

19    and you prepare your report, and then let's say a week

20    later you get called to my house again, is the record

21    of your first visit to my house kept by the address of

22    my house?

23           MR. ROZELLE:  Objection to form.  You can

24        answer.

25    BY MS. CALLAHAN:

1      A.   There will be a record of us being there.

2  How that record is prepared, I'm not sure, to be honest

3  with you.  But there would be a record that we were

4  there for whatever reason the call was closed out as.

5      Q.   Okay.  And that's scheduled by the address?

6      A.   I don't know how it's kept in the system.

7      Q.   Okay.  But you said that it was physically

8  possible for you to access, for example, Mr. DeGraw's

9  address from your laptop before you arrived at the

10  scene?  So, therefore, it would kept -- such

11  information would be kept by address in the sheriff's

12  office database?  Am I understanding correctly?

13          MR. ROZELLE:  Objection to form.  You can

14      answer.

15  BY MS. CALLAHAN:

16      A.   I guess I kind of misunderstood what you were

17  saying.  You can see it by address.  But, again, as far

18  as what the call was, you can see what it was closed

19  out as, and, I guess, the date that we were out there

20  just based off of what the laptop shows.

21      Q.   Okay.  And what are the possible -- you said

22  you can see what it's closed out as.  So what are the

23  options to close it out as?

24      A.   There's several.  Just depending on what type

25  of call it was.  I mean, I don't know how many there

1    are.

2         Q.   Can you recite at least some of them?

3         A.   Anything from assist other agency to

4    batteries, assaults, homicides, rapes, Baker Acts.  So

5    just a plethora of different things that a call could

6    be categorized as, if you will.

7         Q.   Okay.

8              MS. CALLAHAN:  I believe that's all the

9         questions I have.  Thank you very much.

10             MR. ROZELLE:  That's a wrap.  He will read if

11        it's ordered.

12             MS. CALLAHAN:  We will order it.

13             MR. ROZELLE:  And he will read.

14             (At this time the proceedings ended at

15              approximately 10:30 a.m.)

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF REPORTER

2

3

4    STATE OF FLORIDA      )

5    COUNTY OF PINELLAS    )

6

7          I, KIMBERLY HAMMOCK, stenographer, certify

8    that I was authorized to, and did stenographically,

9    report to the best of my ability the foregoing

10   deposition and that the transcript is a true record of

11   the testimony given by the witness.

12          I further certify that I am not a relative,

13   employee, attorney or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorneys or counsel connected with the action, nor am

16   I financially interested in the action.

17          Dated this 26th day of October, 2019.

18

19                    KIMBERLY HAMMOCK

20                    Notary Public State of Florida

21                    My Commission EE 155298

22                    Expires 12-26-2021

23

24

25

Michael Segura
October 3, 2019

**A**

**a.m** 1:18,18 4:12
27:15
**ability** 24:7,10
28:9
**able** 8:25 19:23
22:10 24:21,23
**Absolutely**
18:16
**accent** 3:13
**access** 24:17
26:8
**accidents** 7:11
**account** 25:2
**accurate** 17:10
18:5
**accurately** 16:25
**Act** 21:23 22:8
**Acted** 21:21
**action** 28:15,16
**activity** 7:12 9:6
**Acts** 27:4
**actual** 15:10,16
18:9
**added** 23:4
**address** 24:6,7,9
24:17 25:14,21
26:5,9,11,17
**advise** 17:20
**advised** 18:19
18:23 20:1
21:11
**advising** 23:9
**agency** 8:2,4
15:13 16:2
27:3
**ago** 3:9 11:21
15:3
**ahead** 20:1
**ailment** 15:24
**and/or** 7:14
**answer** 3:21
8:15 14:14,22
17:7 20:21

21:16 22:19
23:2 25:8,24
26:14
**answered** 22:7
**answers** 22:6
**anyway** 15:25
**approached**
10:25
**approved** 12:21
12:21
**approximately**
4:23 5:6 6:5
27:15
**area** 7:14
**arrival** 18:9
**arrive** 15:22
25:18
**arrived** 10:11,23
16:24 17:11,13
18:4,18 26:9
**arrives** 10:15
**arriving** 10:18
**articulate** 3:15
**asked** 3:22
19:10 21:10,14
**asking** 3:11 8:21
22:7
**aspects** 7:8
**assaults** 27:4
**assess** 24:7
**assessing** 21:23
**assigned** 4:8,9
5:13
**assist** 8:2,3
15:13,19 16:2
27:3
**assistance** 8:18
**assume** 3:21
16:8
**attend** 6:23
**attorney** 28:13
**attorneys** 28:15
**authored** 12:19
**authorized** 28:8

**AVENUE** 2:5
**aware** 7:14

**B**

**B** 2:19
**back** 18:15 19:1
19:7,9 21:5
**Baker** 21:21,23
22:8 27:4
**barking** 19:18
19:19,22
**based** 15:16,17
18:8 21:20
22:2,3 23:8,13
23:15,17 26:20
**Bates** 11:19
**batteries** 27:4
**becoming** 6:2
**began** 5:12
**beginning** 5:9
**believe** 4:25 5:6
6:14 9:9 10:4
10:25 11:14
15:3,7 24:20
27:8
**believed** 19:3,13
**best** 28:9
**better** 3:15
**bike** 6:13
**binder** 11:5,7
**bit** 3:12
**BOB** 1:10
**boss** 13:25
**BOULEVARD**
1:20
**box** 12:20 16:22
17:5,9
**button** 17:19

**C**

**C** 1:7 2:1
**call** 7:20 8:2,4
8:10,11,17
10:7 13:19,23

14:8,16 15:14
15:18 16:2,9
16:23 17:10,12
17:21 18:3
23:8,18,19,25
24:22 25:3
26:4,18,25
27:5
**Callahan** 2:4,16
3:6,10 8:16
11:5,9,13,16
11:22 12:1,5,6
14:15,23 16:17
16:21 17:8
20:22 22:20
23:3,23 24:3,4
25:9,25 26:15
27:8,12
**called** 3:3 7:19
8:1 15:13 16:1
18:23 24:6
25:17,20
**calls** 7:6,10,16
7:17,23 8:22
9:5,10,14 10:6
24:8,18 25:12
**calm** 20:10
**calmed** 20:1
**CAPACITY**
1:11,12
**car** 4:14
**case** 1:4 8:1,24
10:22 13:12
**categorized** 27:6
**cause** 15:9
**CENTRAL** 2:5
**certain** 25:13
**CERTIFICA...**
28:1
**certify** 28:7,12
**chance** 7:22
20:11
**check** 18:25
**choose** 18:1

**circumstances**
22:3 24:24
**city** 4:9 5:12,14
10:3,3,5
**clear** 20:2
**CLEARWAT...**
1:21
**close** 26:23
**closed** 17:12
18:3 26:4,18
26:22
**closing** 18:1
**code** 18:1
**college** 6:21,23
6:24
**come** 10:1 15:23
19:24 20:2
**Commission**
28:21
**community** 7:12
**COMPASS** 1:19
1:25
**complainant**
18:19
**completed** 16:24
17:23,25 18:4
**computer** 17:19
17:20 25:1
**conclusion**
23:11
**conducive** 19:9
**confused** 19:5
**connected** 28:15
**contact** 7:13
11:1 18:18
19:6,16
**contemporane...**
14:9
**conversation**
13:21 22:5,5
**copy** 11:17
12:12
**correct** 10:12
11:14 12:23

14:12 16:8 18:6 20:18,25 21:7,17,18,22 22:11 23:15 25:6,13
**correctly** 8:17 26:12
**counsel** 28:13,15
**county** 1:11,13 2:10 4:5 5:13 24:5 28:5
**couple** 3:9
**COURT** 1:1
**crimes** 7:12
**Criminal** 7:3
**criteria** 21:21 22:8
**Cross-Examin...** 2:17

_____
**D**

**D** 2:15
**database** 25:12 26:12
**date** 1:17 12:18 12:21,25 15:11 18:17 26:19
**Dated** 28:17
**dates** 12:25
**day** 9:24 12:17 14:4 15:5 18:6 28:17
**dazed** 19:5
**DECEASED** 1:7
**deducted** 23:14
**deemed** 22:8
**Defendant** 2:9
**DEFENDANTS** 1:14
**DeGraw** 1:6,7 18:14,19,20 22:4
**DeGraw's** 3:10 26:8

**department** 6:3 20:4
**departure** 18:9
**depending** 26:24
**depends** 14:6
**DEPONENT** 1:16
**deposition** 9:19 12:11 28:10
**deputies** 13:14 17:11
**deputy** 1:13 4:7 4:14,18,20 5:9 5:15,23,24 6:2 7:5,9,24 8:1 9:20 10:1,9 11:22,24 13:4 13:8,10 14:1 18:5,8 19:16 21:12,14 22:15 25:11
**describe** 20:17
**Description** 2:21
**determination** 10:19
**determined** 13:18,20
**dialogue** 19:23
**dialogues** 22:11
**different** 10:18 14:16 18:7 24:19 27:5
**direct** 2:16 3:5 23:4
**disorder** 9:11 18:21 23:10,12
**dispatch** 16:10 17:20
**dispatched** 16:24 17:11
**DISTRICT** 1:1 1:2
**DIVISION** 1:3

**documented** 13:11 17:15
**documents** 9:18 11:17
**dog** 19:19,21
**dogs** 19:18,18,21
**doing** 6:8,15
**Donald** 1:7 18:20,24 19:3 19:4,10,20,23 19:25 21:4,8 21:11,21 22:5 22:5,8,11,14 22:17,24 23:10
**downstairs** 19:24,25 22:17 22:21
**dream** 23:13
**driving** 24:24
**due** 15:20 19:13
**duly** 3:3
**Dunedin** 5:12

_____
**E**

**E** 2:1,1,15,19
**earlier** 18:23
**education** 6:21
**EE** 28:21
**either** 12:4 17:19
**employed** 4:3 5:8
**employee** 28:13 28:14
**ended** 13:22 27:14
**enforcement** 15:22 20:11 21:1
**entered** 22:13 22:14
**entire** 5:11 20:6
**episode** 18:23 19:14 22:23,24

22:25 23:7,16
**escalate** 20:12
**ESQ** 2:3,9
**ESTATE** 1:7
**evaluation** 21:20 21:20
**evening** 4:10,11
**event** 4:2 15:10
**events** 9:23
**everybody** 20:24
**Examination** 2:16 3:5
**examined** 3:4
**example** 24:8 25:17 26:8
**exhibit** 2:21 11:5,6,7,10,11 16:18,19
**experience** 20:14 25:11
**Expires** 28:22
**explain** 13:9 18:22 22:24
**explained** 22:23
**eyes** 19:1

_____
**F**

**fair** 3:22
**family** 3:11
**far** 17:15 21:1 26:17
**FD** 8:18 15:19 20:1,15,17
**FD's** 21:20
**fear** 21:10,16
**feel** 19:12
**felt** 15:21 19:10 21:10
**female** 11:1
**field** 5:19,20 6:12,17,19
**financially** 28:16
**find** 11:17 12:1

**fire** 20:3
**firearms** 10:8
**FIRM** 2:4
**first** 5:7 8:11 10:23 12:20 15:3 16:1 19:24 25:21
**firsthand** 22:4
**FL** 1:21 2:6,12
**Florida** 1:2,24 28:4,20
**follows** 3:4
**followup** 12:3
**foregoing** 28:9
**foreign** 3:13
**forgot** 11:5
**form** 8:13 14:13 14:21 17:6 20:20 22:18 23:1,21 25:7 25:23 26:13
**forward** 11:20
**foundation** 8:14
**four** 4:23
**frequent** 8:6
**FTO** 5:22,23
**full** 3:24
**further** 28:12

_____
**G**

**G** 2:9
**generally** 18:10
**gentleman** 8:10
**given** 22:3 28:11
**go** 17:17 24:17
**GOEPFERT** 1:12
**going** 11:20 23:23
**good** 3:7,8 24:20
**grabbed** 19:7
**graduate** 6:25
**GREGORY** 1:11

GROUP 1:19,25
GUALTIERI
1:10
guard 6:14
guess 26:16,19
GULF-TO-B...
1:20
gurgling 19:2

**H**

H 2:19
half 11:1
HAMMOCK
1:22 28:7,19
hands 19:11
happened 4:2
10:22
happy 3:18
heading 25:3
hear 3:12
heard 18:24
help 4:13 5:23
history 21:4,8
homicides 27:4
honest 13:22
26:2
Honestly 13:2
Honor 6:13
hostage 5:17,18
6:13
hours 4:11,12
house 8:19,20
25:17,20,21,22
hurt 19:11
husband 18:20

**I**

ideal 10:17
identification
2:21 11:12
16:20
illegal 7:11
include 7:16
independent

9:23
INDIVIDUAL
1:10,12
information
16:9,23 17:4,5
17:9,17 19:9
22:3 23:8,17
24:7 26:11
infrequent 7:19
Inguna 2:3 3:10
injure 19:13
interested 28:16
interrupting
15:16
introduced 3:9
investigation
11:18
involved 8:10
9:4,5
involvement
13:8,12 18:13
involving 8:11
8:22 9:10
irate 8:19
issue 15:20
issues 7:14,15

**J**

job 4:6 5:9,15,25
7:6,7,8
Joseph 4:1
Julie 1:6 18:19
19:4,8,10,16
21:3,7,9,11
22:23 23:5,9
justice 7:3

**K**

keep 14:9,18
25:12
kept 25:21 26:6
26:10,11
KIMBERLY
1:22 28:7,19

kind 4:13 26:16
know 3:14,18
11:6 12:18,25
13:2,5 17:14
19:19 21:13
24:6 25:5,17
26:6,25
knowledge
25:11

**L**

lacks 8:14
Lamborghini
10:1,9 11:23
13:11 14:2
19:17 21:12,14
22:16
Lamborghini's
9:21 13:4
16:16 18:6,8
laptop 18:1
24:11,14 25:5
26:9,20
LARGE 1:24
LARGO 2:12
law 2:4 15:22
20:10 21:1
leaves 20:15
left 20:24
let's 24:3 25:19
level 19:25
life 11:16
little 18:7
LLC 2:4
LOCATION
1:19
long 4:17 6:4
16:12
longer 20:12
look 7:11 15:5
16:15
looking 11:23
23:22
looks 11:8

lucid 23:13
lying 19:1

**M**

ma'am 3:16,20
4:16,19 5:6,10
5:12,21 6:10
6:12,16,20,22
7:1,7,18,21,25
8:5,8 9:7,12,15
9:17,25 10:13
10:18 11:4,15
12:12,15 13:15
14:1,7,10,16
14:24 15:1,11
16:7,11,14
17:3 18:10,12
20:5,7,9,14,19
20:23 21:2,5
21:25 22:12,21
23:17 24:10,13
24:15,19 25:10
making 7:13,13
19:2,16
male 8:18
mark 11:9 16:17
marked 2:20
11:12 16:20
matter 3:11
mean 6:18 26:25
means 17:4
meant 22:25
medical 7:17,20
7:23 8:22 9:5
9:10 15:14,20
15:24 20:2
21:1 22:6,7
medically 8:24
memory 14:12
14:20 15:16
23:23
mentioned
22:13
Michael 1:16

3:2 4:1
MIDDLE 1:2
military 18:21
minor 19:8
minutes 3:9
misstates 8:14
mistaken 8:19
misunderstood
26:16
mold 5:23
moment 20:10
22:9
months 5:1,5
11:21
morning 3:7,8
3:12 10:4
13:18 18:14,24

**N**

N 2:1,15
name 3:10,24
nature 16:9 25:2
necessarily 14:5
14:10
neck 19:7,9
need 21:21 22:8
needed 8:18
negotiation 5:18
negotiator 5:17
6:13
new 5:23 6:18
Notary 1:23
28:20
note 8:17 23:19
notes 10:7 14:9
14:18 23:8,18
23:19,25
number 11:20
13:12

**O**

Object 14:13,21
17:6 20:20
22:18 23:1

**Objection** 8:13 23:21 25:7,23 26:13
**observations** 22:4
**obviously** 22:10
**occasion** 22:2
**occurrence** 8:3,7
**occurring** 7:12
**October** 1:17 28:17
**office** 2:10 4:5 4:22 5:5,8 6:1 6:9 24:5 26:12
**officer** 5:19,20 6:7,12,17 10:5 10:9,19
**Okay** 3:24 4:17 7:16 9:2,22 10:11,21 11:3 11:22 12:5 13:13,20,24 14:3 15:5,25 17:13,23 18:4 18:11,13,17 19:15 20:3,16 21:7 22:10,22 24:11 25:4 26:5,7,21 27:7
**Oldsmar** 4:9,10 5:11,14 10:3 15:19
**On-the-job** 6:19
**once** 9:8,16 19:25 20:12,12
**open** 19:1
**opportunities** 9:3
**opportunity** 8:22 9:13
**options** 26:23
**order** 27:12
**ordered** 27:11
**original** 13:19

**P**

**origination** 12:25

**P** 2:1,1
**p.m** 4:12
**page** 12:24
**paragraph** 21:6 21:19 22:22
**Part** 5:17 7:7
**participate** 8:3
**particular** 4:8 8:9 10:7
**parties** 28:13
**parties'** 28:14
**patients** 9:5,10
**patrol** 4:7,13,18 5:9,15,18 6:7,7 7:5,9,23
**PAUL** 2:9
**PCSO** 11:19
**PCSO1271** 24:1
**Pedestrians** 24:25
**personal** 1:6 20:13
**Petersburg** 2:6 6:24
**physically** 25:4 26:7
**Pinellas** 1:11,13 2:10 4:5 24:5 28:5
**place** 17:21
**placed** 19:11
**Plaintff** 2:3
**PLAINTIFF** 1:8
**Plaintiff's** 2:20 11:11 16:19
**please** 3:14,18 3:24 11:7
**plethora** 27:5
**point** 4:19 11:1 15:19 18:2,25

19:6,18,21,22 22:7,11
**Police** 6:3
**policing** 7:13
**portion** 20:2
**possible** 23:20 25:1,4,10 26:8 26:21
**possibly** 15:24 23:11
**post-traumatic** 9:11 18:20 23:10,12
**practice** 24:20
**preceding** 21:19
**preparation** 9:19 12:11
**prepare** 13:5,7 14:3,4 25:19
**prepared** 12:13 12:17 14:11 26:2
**presence** 18:6 20:12
**present** 20:3,11
**pretty** 8:6
**primarily** 17:25
**primary** 5:10,15 6:7 13:11,16 13:23
**prior** 6:2 9:22 15:1,22 16:3,4 16:6 24:8,18
**proactively** 7:11
**problem** 3:13
**procedure** 10:14 20:8
**proceedings** 27:14
**produced** 11:18 11:20
**provided** 19:10 23:9
**PTSD-related**

23:16
**public** 1:23 7:13 28:20
**purposes** 10:6 10:20

**Q**

**question** 3:15,17 9:2,2 21:12 24:3 25:15,16
**questions** 3:12 27:9
**quote** 22:23 23:5
**quotes** 23:4

**R**

**R** 2:1
**radio** 17:21
**rapes** 27:4
**reaching** 19:5
**read** 9:20,20 27:10,13
**reading** 9:22
**reason** 3:18 25:18 26:4
**reasons** 9:3 10:9 16:9
**recall** 5:1 15:25 17:2 21:15 22:14
**received** 16:23 17:10 25:13
**recite** 27:2
**recollection** 9:23
**record** 3:25 8:14 12:25 23:25 25:20 26:1,2,3 28:10
**recorded** 17:13
**records** 25:12
**recruits** 5:24 6:18
**redness** 19:8
**refer** 18:15

**reference** 22:22
**referenced** 8:18 23:19
**referring** 21:5
**reflect** 16:25 18:5
**reflected** 20:16
**relative** 28:12 28:14
**rely** 14:19
**remaining** 21:10
**remember** 8:17 13:22 15:10,11 15:12
**render** 15:22
**repaired** 14:18
**repeat** 3:19 25:15
**rephrase** 3:15 3:19
**report** 2:22,23 9:20,21 11:14 12:7,10 13:4,7 13:11 14:4,11 14:19,25 15:17 15:18 16:12,16 20:17 21:5 22:15 23:24 25:19 28:9
**REPORTER** 1:22 28:1
**REPORTING** 1:19,25
**reports** 9:22 10:21
**represent** 3:10 8:9
**REPRESENT...** 1:6
**requested** 15:22
**residence** 10:8 10:23 11:2 16:13 17:1 19:17 21:11

22:14 24:17 25:13,14
**respond** 7:6,10 7:10,22 8:22 9:4,13 10:6 13:14 14:8
**responded** 8:11 10:2,10
**responders** 16:1
**response** 16:22 17:5,9
**review** 10:21 14:25 15:17
**reviewed** 9:18 12:8,10 15:4
**reviewing** 12:17 15:9,18
**ride** 4:14
**right** 25:5
**ROAD** 2:11
**role** 4:6 6:6 7:23 13:16
**roles** 6:11
**room** 18:25
**Rozelle** 2:9,17 8:13 11:7,8,16 11:19,24 12:3 14:13,21 17:6 20:20 22:18 23:1,21,25 25:7,23 26:13 27:10,13

**S**

**S** 2:1,19
**safe** 15:21,23
**safety** 10:5,9,20
**saw** 19:1
**saying** 3:14 12:2 26:17
**says** 12:20 16:23 19:1
**scene** 10:2 15:21 15:23 17:11

18:18 26:10
**scheduled** 26:5
**scratches** 19:8
**screaming** 18:24 19:5
**screen** 25:1
**second** 12:24 16:22 22:22
**secondary** 5:16 6:11
**see** 19:7 24:17 26:17,18,22
**Segura** 1:16 3:2 4:1
**Segura's** 11:24
**seizure** 8:10,12 8:21 9:1,5 23:20 24:2
**seizures** 8:23
**separate** 10:11
**September** 4:3,4 4:17 5:4 18:17
**service** 15:19
**sheriff** 1:11,13 4:7,14,18,21 5:9,16 6:2 7:5 7:9,24 25:12
**sheriff's** 2:10 4:5,22 5:5,8 6:1,9 24:5 26:11
**sheriffs** 5:24 8:1
**shift** 4:8,10,11
**shows** 12:18 26:20
**shut** 19:21
**sic** 23:14
**similar** 6:8
**sir** 3:7 11:14 12:7
**situation** 10:17 19:25 20:10 24:19
**six** 6:5 11:20

**smaller** 10:3
**sorry** 12:9 13:6 15:15
**sounds** 19:2
**south** 5:13
**speak** 6:19 19:24 20:13
**spent** 16:25
**Springs** 6:3
**St** 2:6 6:24
**staff** 22:6
**staging** 15:20
**stairs** 19:20
**standard** 20:8
**standing** 19:20
**staring** 24:25
**start** 4:20 9:4 19:23
**started** 4:24 5:2 19:2 28:4,20
**stated** 8:17 10:7 12:16 19:4,12 21:3,7
**states** 1:1 13:3
**stay** 20:14
**stayed** 20:6 22:17,21
**stenographer** 28:7
**stenographica...** 28:8
**stopped** 19:22
**stress** 9:11 18:21 23:10,12
**strike** 24:3
**study** 7:2
**subsequently** 19:22,23 20:24 23:9
**suffer** 23:10
**suffered** 18:20
**Summarize** 18:13

**summoned** 16:10
**supervisor** 12:22
**SUPERVISO...** 1:10
**supplement** 12:16 13:3,5 13:10,12 14:3
**sure** 11:24 14:17 20:14 25:16 26:2
**sworn** 3:3
**system** 26:6

**T**

**T** 2:19
**take** 7:23 13:16 16:15 25:2
**talk** 16:6 22:16
**talked** 16:1,3
**TAMPA** 1:3
**Tarpon** 6:3
**teach** 5:23
**team** 4:15 5:18 6:13
**tell** 7:14 10:22 12:16 16:1,12 22:15
**telling** 15:15 23:15
**terrible** 25:16
**testified** 3:4
**testimony** 28:11
**Thank** 27:9
**thing** 25:18
**things** 25:1 27:5
**thought** 23:16
**three** 5:5
**time** 1:18 5:11 5:18 7:4 8:11 10:4,20 11:11 14:19 15:4,21 16:19,23,23,24

16:24,25 17:11 17:12,13,23,25 18:2,4,4,9,9,21 19:12 20:6 27:14
**times** 17:2
**timestamps** 17:20,22 18:2
**timing** 18:7
**today** 15:7
**told** 23:13
**top** 12:20 19:20
**totality** 22:2 24:24
**traffic** 7:10 24:25
**trained** 8:25 24:16,20
**training** 5:19,20 6:12,17,18,19
**transcript** 28:10
**treat** 15:23
**treating** 20:4
**true** 28:10
**try** 3:15 10:20
**trying** 6:16 19:11,12
**two** 10:5 13:13 13:24 15:3
**type** 12:13 15:20 23:12 26:24

**U**

**ULMERTON** 2:11
**ultimately** 5:14
**understand** 3:17 4:13
**understanding** 3:14 23:6 26:12
**understood** 3:22
**UNITED** 1:1
**unquote** 22:23

unusual 7:19 8:2
upstairs 22:14
   22:16
urinated 19:3
usually 13:13
   14:4

**V**

V 1:6
VARSLAVA...
   2:3
vehicle 24:14
   25:6
vehicles 10:11
versus 13:16
vicinity 18:11
violence 21:4,8
visit 25:21
VS 1:9

**W**

wait 10:15
walk 10:15,22
way 17:22,24
   22:6
we'll 10:18 12:3
we've 24:20
weapons 8:20
   25:1
week 25:19
weekend 15:8
weeks 15:3
went 18:22,25
   19:2,17 20:1
   22:16,16
witness 28:11
work 5:25
worked 6:2
working 4:20
   7:5 10:5
wouldn't 8:25
   24:23
wrap 27:10
write 21:3

written 21:9,20

**X**

X 2:15,19

**Y**

year 5:5
years 4:23 6:5
yelling 19:21
yesterday 15:5

**Z**

**0**

**1**

10:30 1:18 27:15
10750 2:11
11 2:22
12-26-2021
   28:22
1272 24:1
155298 28:21
16 2:23

**2**

2015 4:24,25 5:1
   5:3,8
2016 4:3,4,17
   5:4 6:9 7:4
   18:17
2019 1:17 28:17
203 2:5
26th 28:17

**3**

3 2:16
3000 1:20
33701 2:6
33759 1:21
33778 2:12
35 2:22 11:8,10
   11:11
36 2:23 16:19
3RD 1:17

**4**

449 2:5

**5**

500 1:20

**6**

**7**

7:00 4:12,12
7th 18:17

**8**

8:18-CV-2116...
   1:4

**9**

9:30 1:18
911 7:6,10,16
985 11:20,22



EXHIBIT
35
SEGURA

## Primary Information

| | |
|---|---|
| Description: | DEPUTY INVOVLEMENT |
| Dissemination Code: | UNCLASSIFIED |
| Reporting LEO: | SEGURA, MICHAEL (59065 / SQUAD 8 - B-NIGHTS / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Approval Status: | Approved |
| Approved Date: | 10/19/2016 |
| Approved By: | BINGHAM, BRYAN A. SGT (54878 / SQUAD 8 - B-NIGHTS / PINELLAS COUNTY SHERIFF'S OFFICE) |

## Narrative

This is a supplement to Deputy Lamborghini's original report # SO16-362943. On 09/07/16, at approximately 0521 hours, Deputies were dispatched to 1739 Split Fork Dr., in reference to an Assist other Agency medical call.

Upon arrival, I knocked on the door and was greeted by the complainant, Julie Degraw. Julie advised her husband, Donald Degraw, suffered from Post-Traumatic Stress Disorder (PTSD) from his time in the military. Julie advised that Donald was having an "episode". Julie further explained that Donald was having an episode earlier in the morning, she heard Donald screaming and went to check on him. Upon entering his room, she observed Donald lying on his back with his eyes open and "gurgling". Julie went on to explain that it appeared that Donald urinated himself.

Julie advised that Donald appeared to be dazed and confused. Julie stated that Donald was screaming and reached out towards her and grabbed the back of her neck. I asked Julie if she felt that Donald was trying to hurt her. Julie advised she did not. Julie stated that she did not think that Donald knew what he was doing. (Note: Julie had some redness and minor scratches on the rear of her neck that appeared to be from someone scratching it. Julie refused medical attention.)

Upon entering the residence, there were dogs barking due to Deputy's presence. Donald was standing at the top of the stairs and began to yell at the dogs to "shut up". We announced our presence and ask Donald to come down stairs and speak with us. Donald did so without incident. Donald was asked what occurred prior to our arrival. Donald advised that he must have had a bad dream, but was better now. Donald went on to explain that he suffered from PTSD was being treated with medication. Donald explained that he was a medic in the Navy for eighteen (18) years and served in combat through his career.

At this point, Donald was calm but still seemed a bit dazed. Donald was asked if he wanted to hurt himself. Donald stated he did not. Donald was asked if he wanted to hurt anyone else. Donald stated he did not and again stated he just had a bad dream. Deputy Lamborghini asked Donald what his dream was about. Donald advised he could not remember.

Oldsmar Fire Department arrived on scene and began to triage Donald. When FD began their questionnaire on Donald, he was unable to answer what year we were currently in. Donald was able to answer the rest of the questions without any issue. Donald was asked if he would voluntarily go to the hospital to be checked out. Donald refused to go. Donald was then advised by FD that they were going to ask his a series of questions to better evaluate him. Donald was able to answer all the questions without issues. Donald signed the refusal and stated he was going to go back to bed. Based on our evaluation and FD's evaluation, Donald did not meet Baker Act criteria.

Contact was again made with Julie. Julie was asked if she felt in fear at all remaining in the residence with Donald. Julie advised that she did not. Julie was again asked if she felt that Donald was trying to hurt her when he reached out and grabbed the back of her neck. Julie advised that Donald was not trying to hurt her. Julie stated that Donald did not have a history of violence. Julie stated that Donald had a similar episode approximately three and a half (3 ½ ) years ago but did not feel that he was a danger to her.

For more information, see original report.

No further action taken.

Disposition: Case Closed, Solved Non Criminal

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

| Record Status Information | |
|---|---|
| Record Origination Operator: | PIPER, CHERYLE ARMS (52326 / A.R.M.S / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Record Origination Date: | 10/18/2016 06:09 |
| Last Update Operator: | BINGHAM, BRYAN A. SGT (54878 / SQUAD 3 - B-NIGHTS / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Last Update Date: | 10/19/2016 21:25 |

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| SEGURA, MICHAEL (59065 / SQUAD 8 - B-NIGHTS / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 | BINGHAM, BRYAN A. SGT (54878 / SQUAD 8 - B-NIGHTS / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 |
| | | | |

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.



EXHIBIT
36
SEGURA

## Primary Information

| | |
|---|---|
| Incident Type: | ASSIST OTH AGY |
| Occurrence From: | 09/07/2016 05:14 |
| Occurrence To: | 09/07/2016 05:14 |
| Source Of Call: | DISPATCHED |
| Dissemination Code: | UNCLASSIFIED |
| Shift: | CHARLIE - EARLY |
| Reporting LEO: | LAMBORGHINI, PETER DEP (58476 / SQUAD 8 - B-NIGHTS / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Backup LEO: | SEGURA, MICHAEL DEP (59065 / ND - SQUAD C / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Approval Status: | Approved |
| Approved Date: | 09/08/2016 |
| Approved By: | BINGHAM, BRYAN A. SGT (54878 / SQUAD 8 - B-NIGHTS / PINELLAS COUNTY SHERIFF'S OFFICE) |

## Response Information

| | |
|---|---|
| Time Call Received: | 09/07/2016 05:14 |
| Time Dispatched: | 09/07/2016 05:18 |
| Time Arrived: | 09/07/2016 05:22 |
| Time Completed: | 09/07/2016 05:54 |

## Address #1 - OCCURRED/DISPATCHED #1 - 1739 SPLIT FORK DR

### Primary Information

| | |
|---|---|
| Address: | 1739 SPLIT FORK DR, OLDSMAR, Florida 34677, UNITED STATES |
| District (PCSO ONLY): | North |
| UCR Municipality (Formerly: Contract City): | OLDSMAR |
| Grid: | 180 |
| Occurred Squad (PCSO ONLY): | SQ8 |
| Sector (PCSO ONLY): | 84 |

## Subject #1 - COMPLAINANT #1 - DEGRAW, JULIE

### Primary Information

| | |
|---|---|
| Subject Name: | DEGRAW, JULIE |
| Record Type: | PERSON |
| Bio: | 56 yr. old, ORIENTAL/ASIAN, FEMALE |
| Birth Date: | 07/04/ |
| Juvenile: | NO |
| Residence Status: | PERMANENT |
| Residence Type: | CITY |

### Relationship Information

| | |
|---|---|
| Homicide Victim: | NO |
| Hate Crime Victim: | NO |

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

## Subject #1 - COMPLAINANT #1 - DEGRAW, JULIE - Continued

### Relationship Information - Continued
Domestic Violence:     NO
Use Of Force:          NO

### Addresses
Relationship
HOME ADDRESS

Address
1739 SPLIT FORK DR, OLDSMAR, Florida 34677, UNITED STATES

### Telephones / E-Addresses
Relationship
CELLULAR PHONE

Number/E-Address
(727) 776-1315 (CELLULAR)

## Subject #2 - OTHER #1 - OLDSMAR FIRE RESCUE #54C

### Primary Information
Subject Name:      OLDSMAR FIRE RESCUE #54C
Record Type:       ORGANIZATION
Juvenile:          NO

### Relationship Information
Contact Info:        PARAMEDIC YOUNG
Homicide Victim:     NO
Hate Crime Victim:   NO
Domestic Violence:   NO
Use Of Force:        NO

### Addresses
Relationship
PERMANENT

Address
225 PINE AVE N OLDSMAR FIRE DEPARTMENT, OLDSMAR, Florida 34677, UNITED STATES

### Telephones / E-Addresses
Relationship
PERMANENT

Number/E-Address
(813) 855-1059 (BUSINESS)

## Subject #3 - OTHER #2 - DEGRAW, DONALD CHRISTOPHER

### Primary Information
Subject Name:       DEGRAW, DONALD CHRISTOPHER
Record Type:        PERSON
Bio:                58 yr. old, WHITE, MALE
Birth Date:         06/25/█████
Juvenile:           NO
Residence Status:   PERMANENT
Residence Type:     CITY

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

| Subject #3 - OTHER #2 - DEGRAW, DONALD CHRISTOPHER - Continued | |
|---|---|

### Relationship Information

| | |
|---|---|
| Homicide Victim: | NO |
| Hate Crime Victim: | NO |
| Domestic Violence: | NO |
| Use Of Force: | NO |

### Personal Information

| | |
|---|---|
| Height: | 504 |
| Weight: | 130 |
| Eye Color: | BROWN |
| Hair Color: | BROWN |

### Employment Information

| | |
|---|---|
| Occupation: | STUDENT |

### Addresses

| Relationship | Address |
|---|---|
| HOME ADDRESS | 1739 SPLIT FORK DR, OLDSMAR, Florida 34677, UNITED STATES |

### Telephones / E-Addresses

| Relationship | Number/E-Address |
|---|---|
| HOME | (813) 854-3097 (RESIDENTIAL) |

### Analysis Information

| | |
|---|---|
| Sick Or Injured: | NO |
| Suspicious P/V: | NO |
| Marchman Act: | NO |
| Disturbance: | NO |
| Alarm: | NO |
| Baker Act: | NO |

### Narrative

On 9/7/2016 at approximately 0521 hours, I responded to 1739 Split Fork Drive in reference to a medical call. (Assist other Agency).

Upon our arrival, Deputy Segura made contact with the complainant, Julie Degraw, who advised him that her husband, Donald Degraw, has PTSD and was acting abnormally. Julie stated that she heard Donald scream out this morning and went to investigate. She then went into his room and observed him lying on the bed making a gurgling sound with his eyes open. She then stated that he appeared dazed and confused and reached out toward her as she was getting off of the bed, grabbing the back of her neck. See Deputy Segura's supplemental report.

When we entered the residence, Donald was at the top of the stairs yelling at the dogs to shut up. We asked Donald to come down the stairs, and he complied. I asked him about this evening; and he stated that he had a bad dream and was fine now. He did advise that he has PTSD and is on medication for it. I asked Donald about his military career, and he advised me he was a medic in the Navy for 18 years. I asked him if he was in the war, and he did state that he was. I asked him if he wanted to hurt himself, his wife or their two dogs; and he advised me that he did not, he was just having a bad dream. I asked him what was the dream about, and he stated that he did not recall anything about it.

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

### Narrative - Continued

Oldsmar Fire Rescue responded to the scene and triaged Donald. At first Donald did not know what year it was, but had answered all of the other questions Fire Fighter/Paramedic Young asked of him. Paramedic Young asked Donald to voluntarily go to the hospital, but he refused. Paramedic Young then stated to Donald that he was going to ask him a series of questions to evaluate him, and Donald answered all the questions correctly. Paramedic Young had Donald and his wife sign the refusal form on the computer for not wanting to go to the hospital. Donald advised that he was going back to bed and headed upstairs. Paramedic Young did ask Donald for his psychiatrist's number so he can speak with him, but Donald advised that he will contact him later.

We made contact with Julie again and asked her if she was in fear of being with Donald, and she advised us that she was not. She advised us that he did not have a history of violent behavior, but had an episode about three and a half years ago.

Disposition: Case closed, solved non-criminal.

### Record Status Information

| | |
|---|---|
| Record Origination Operator: | ACISS System (PINELLAS COUNTY SHERIFF'S OFFICE) |
| Record Origination Date: | 09/07/2016 06:30 |
| Last Update Operator: | BINGHAM, BRYAN A. SGT (54878 / SQUAD 3 - A-NIGHTS / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Last Update Date: | 09/08/2016 13:50 |

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*