UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

CASE NO.:  8:18-CV-2116-WFJ-SPF


JULIE V. DEGRAW, AS PERSONAL REPRESENTATIVE OF THE

ESTATE OF DONALD C. DEGRAW, DECEASED,

        PLAINTIFF,

    VS.

BOB GUALTIERI, IN HIS INDIVIDUAL AND SUPERVISORY

CAPACITY AS PINELLAS COUNTY SHERIFF, AND GREGORY

GOEPFERT, IN HIS INDIVIDUAL CAPACITY AS A

PINELLAS COUNTY DEPUTY SHERIFF,

        DEFENDANTS.

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

DEPONENT:    PAUL GRENIER

DATE:        AUGUST 7TH, 2019

TIME:        2:00 P.M. TO 3:30 P.M.

LOCATION:    COMPASS REPORTING GROUP

            3000 GULF-TO-BAY BOULEVARD, #500

            CLEARWATER, FL  33759

REPORTER:    KIMBERLY HAMMOCK

            NOTARY PUBLIC

            STATE OF FLORIDA AT LARGE

          COMPASS REPORTING GROUP

 1  A P P E A R A N C E S

 2

 3  For the Plaintiff:      INGUNA VARSLAVANE-CALLAHAN, ESQ

 4                          CALLAHAN LAW FIRM, LLC

 5                          449 CENTRAL AVENUE, #203

 6                          ST. PETERSBURG, FL  33701

 7

 8  For the Defendant:      PAUL G. ROZELLE, ESQ.

 9                          PINELLAS COUNTY SHERIFF'S OFFICE

10                          10750 ULMERTON ROAD

11                          LARGO, FL  33778

12

13                  I N D E X

14  Direct Examination by Ms. Callahan .......... 3

15  Cross-Examination by Mr. Rozelle   .........41

16

17                E X H I B I T S

18  Plaintiff's                         Marked for

19  Exhibit No.        Description      Identification

20      33          Patient Care Report      19

21      34          Grenier Report           40

22

23

24

25

Paul Grenier
August 7, 2019

1    Thereupon,

2                          PAUL GRENIER,

3    was called upon and after being duly sworn,

4    was examined and testified as follows:

5                      DIRECT EXAMINATION

6    BY MS. CALLAHAN:

7         Q.    Good afternoon, sir.  Would you please state

8    your full name for the record.

9         A.    My name is Paul Joseph Grenier.

10        Q.    And what do you do for a living, sir?

11        A.    I am a firefighter/paramedic with Oldsmar

12   Fire Rescue.

13        Q.    And for how long have you been there?

14        A.    I've been with Oldsmar for about four years

15   now.

16        Q.    What did you do before that?

17        A.    I was a firefighter/paramedic in Marion

18   County up in Ocala for about five years.

19        Q.    And before that?

20        A.    Before that, I worked on sinkholes, Secure

21   Foundation Systems, in Ocala.

22        Q.    Okay.  And a firefighter/paramedic, is that

23   the rank or is there a rank?

24        A.    It is a rank.

25        Q.    I understand that at the fire department they

1   are paramedics and EMT's, correct?

2      A.   Yes.

3      Q.   And you're a paramedic?

4      A.   Yes.

5      Q.   And what's the difference between a paramedic

6   and EMT?

7      A.   A paramedic has a little more responsibility

8   over the patient.  They have a little more skill set,

9   as far as administering medications.  Dealing with

10  narcotics.  Different procedures that are more in

11  depth.  Then they deal a little more with the hospital.

12  So they have a little bit more of the responsibility

13  overall than the EMT.

14      Q.   Okay.  And we are here because of an

15  accident -- or incident that happened in September

16  2016.  Were you working the same position then as you

17  do now?

18      A.   Yes.

19      Q.   And are you working the same shift?

20      A.   I am not.  I am on a different shift.  I was

21  working A shift then.

22      Q.   7:00 a.m. to --

23      A.   Yes.  7:00 a.m. to 7:00 a.m. the next day.

24  So same 24 hours, but I'm on B shift now.

25      Q.   Okay.  And are you working anywhere else?  Or

1  is the Oldsmar Police Department (sic) your only place

2  of employment?

3      A.   The fire department?

4      Q.   Yes.  I'm sorry.

5      A.   That's my primary.

6      Q.   Do you do, like, part-time work anywhere

7  else?

8      A.   I don't.

9      Q.   And what is your educational background?

10     A.   High school diploma.  I did around three

11 years computer engineering at the community college in

12 Ocala.  No degree.  Then I pretty much jumped in from

13 there into the fire department.  Did the EMT,

14 paramedic, fire department.

15     Q.   Okay.  And your paramedic training or

16 education, where was that?

17     A.   That was in Ocala at College of Central

18 Florida.

19     Q.   I take it you completed it?

20     A.   Yes.

21     Q.   So what training or on-the-job experience do

22 you have with patients with seizures?

23     A.   We see quite a few.  It's a pretty common

24 medical condition.  Pretty much as soon as I cleared

25 and got in the field in Marion County as a paramedic, I

1    saw it right away.  It's a pretty common thing.  So I

2    have a decent amount of the experience with it.

3        Q.   Okay.  And what do you do with a patient when

4    you are called in for a patient with a seizure?

5        A.   First, get a good assessment of them.  Are

6    they done with the seizure?  Are they still seizing?

7    Is it something we need to take care of, which we do

8    with medicine?  If they are not, what kind of state are

9    they in?  Are they breathing well?  Some patients with

10   seizures come right out of it.  Some take a little

11   while longer.  They're a little sluggish.  Some are

12   combative.  Really, it's case to case.  They are not

13   all the same.

14       Q.   Are you familiar with the so-called postictal

15   state?

16       A.   I'm pretty familiar, yes.

17       Q.   What is your familiarity with it?  What do

18   you know about it?

19       A.   Pretty much every patient is different.  Like

20   I said, the way they come out of it.  Some don't come

21   out of it right away.  It takes some time.  They can be

22   confused.  Lethargic.  Not act normal.  That's kind of

23   the signs that we see.

24       Q.   Do you have any independent recollection of

25   the incident of September 7th, 2016?

1        A.    Yes, I do.

2        Q.    What do you remember?

3        A.    I remember it being pretty early in the

4    morning.  On the way to the call, Noel Castro, he used

5    to work for us, he works for Hillsborough County now,

6    he had been on the shift before.  He was working a

7    double shift, so he was going to work about 48 hours.

8    He had just run prior that morning on the patient.

9            On the way to the call, we have headsets.

10   He's kind of explaining what had happened that morning,

11   that the patient, from what I understand, just kind of

12   woke up out of his sleep screaming.  He was having some

13   sort of PTSD episode.  After a little time, he was

14   calm.  What they did was, they checked his vitals and

15   they cleared that he was okay to make his own

16   decisions.  He refused to go to the hospital.  So it

17   started off with that in the morning.

18           We have pre-run notes that kind of warn us

19   sometimes.  A patient might be combative or have

20   weapons, et cetera, which kind of give us caution.  So

21   there was a note that came up that the patient did have

22   weapons.  So my lieutenant at that time decided to wait

23   for the sheriff's office to go in and clear the scene

24   for us before we went in.

25       Q.    Okay.  Let's back up.  You were telling us

1    about what Mr. Castro told you.  Was he telling these

2    things during the ride from the fire department to the

3    location?

4        A.   I don't know the exact time.  It was either

5    at the point where we were riding to the call or when

6    we were sitting -- we call it staging where we wait for

7    the sheriff's office to go in to clear us to come in.

8    So it was at one of those points that he was briefing

9    us on what happened that morning.

10       Q.   Okay.  Do you remember Mr. Castro saying

11   anything else?  You mentioned that the patient had

12   had -- what he described as a PTSD episode.  That he

13   was calm and that he refused to go to the hospital.  Do

14   you remember Mr. Castro saying anything else?

15       A.   I do not.

16       Q.   Did he say anything about the patient being

17   aggressive?  Bad attitude?

18            MR. ROZELLE:  Object to the form.  You can

19       answer.

20   BY MS. CALLAHAN:

21       A.   No.

22       Q.   Did he say anything about weapons?  Mr.

23   Castro?

24       A.   I don't remember.

25       Q.   Okay.  Then you mentioned the pre-run notes.

1    What are those?

2          A.    It's something that we can have in our

3    system.  So if we run on the same house and it's a

4    person that might be combative or even if it's just

5    something that has to do with a fire response, if the

6    structure is unstable, we get these pre-arrival notes

7    that kind of give us a heads up before we go in.  That

8    way we can relay it to the rest of the crew.

9          Q.    How are they generated?  I mean, where do

10   they come from?

11         A.    We actually -- I believe that we -- for the

12   fire side for structures, we can put our own in.  We

13   run it through the county and they set it up through

14   the program.  I also believe that 911 dispatch puts

15   their own notes in.

16         Q.    And so in this case there were notes

17   associated with that address?

18         A.    Yes.

19         Q.    Do you think those notes still exist?

20         A.    I'm not sure.

21         Q.    And do you know on this occasion the pre-run

22   notes, were they generated by 911 dispatch or someone

23   else?  Do you know?

24         A.    I believe it would come through 911 dispatch.

25         Q.    Okay.  Then during your shift, you received a

1    call.  Did it come in as a -- obviously, it came in as
2    a medical call and not fire call, correct?
3         A.   Right.
4         Q.   And do you know why you were called versus
5    some other agency or fire department?
6         A.   Well, we respond -- Sunstar responds if it's
7    medical.  I'm sure we got called for medical reasons.
8         Q.   Okay.  And do you know or remember or saw in
9    any of your paperwork what type of medical issue was
10   it?
11        A.   I would think it would be on here, but I
12   don't see it.  I can't say for certain what it came in
13   as.  I don't have anything on this, actually.
14        Q.   Okay.  And on this shift, what was your role?
15        A.   Firefighter/paramedic.
16        Q.   And how many people were in the vehicle
17   engine?
18        A.   We had four.
19        Q.   And then how did your role compare to the
20   others?  What were the others doing?
21        A.   On some calls, I'm hands-on.  We had another
22   paramedic, so we both would be hands-on.  But at the
23   end, I would handle the reporting side.  That's just
24   kind of designated day to day who is going to report.
25        Q.   Okay.  So there were two paramedics, correct?

Paul Grenier
August 7, 2019

1       A.    Yes.

2       Q.    And then both of you were hands-on?

3       A.    Yes.

4       Q.    And then what is the reporting side?  What --

5       A.    The reporting side is me.  Usually in that

6   instance when I'm hands-on, my lieutenant or another

7   EMT that's standing back that might not be involved is

8   getting the patient information usually from family.

9   So they will start that reporting for me.  Name.

10  Address.  Past medical history.  Medications.

11  Allergies.  That's a lot of stuff that I need.  That's

12  pretty much the basic stuff that I need to bring in to

13  the hospital to report over to the hospital.  Once

14  that's done and we transfer the patient over to the

15  hospital, I'll take the report and usually write the

16  rest in as far as the vitals and all the interventions

17  that we did.

18      Q.    Okay.

19      A.    I'll fill all those in.

20      Q.    So by reporting you mean preparing the

21  paperwork, basically?

22      A.    Correct.

23      Q.    Okay.  Do you actually remember the events or

24  do you have a mind's eye of what it looked like?

25      A.    I do.

1      Q.    So do you recall who arrived at the house

2  first -- or on the street first?  You or the sheriff's

3  department?

4      A.    That, I don't remember.

5      Q.    And the decision to stage and wait for the

6  sheriffs, that was made by your lieutenant, correct?

7      A.    Correct.

8      Q.    And it was while you guys were riding over?

9      A.    Correct.

10     Q.    And do you recall if you were riding with the

11  lights and sirens blaring or not?

12     A.    I don't recall.

13     Q.    And do you recall how -- first, do you recall

14  where you staged in relation to the house?

15     A.    We stayed on the street that the house was

16  but further back.  So we were on the street of the

17  house.

18     Q.    Okay.  And did you stay staged in that one

19  spot the entire stage time or did you move closer?

20     A.    No.  We stayed in one spot.

21     Q.    Do you recall how long the stage period was?

22     A.    I don't know the exact time, but we were

23  there for a little longer than usual on these calls.

24     Q.    And what would -- how would you describe what

25  would be the usual time?  Fifteen to 20 minutes?

1          MR. ROZELLE:  Object to the form.  You can

2      answer.

3  BY MS. CALLAHAN:

4      A.    It varies, because sometimes we have a

5  disconnect on the radio with PCSO.  It just has to do

6  with the radio system.  Sometimes it doesn't get

7  relayed over, so it varies.  I knew that we were there

8  a little longer than usual.  But sometimes -- like I

9  said, sometimes it's a radio issue.  It just doesn't

10  get related, so sometimes we have to ask for an update.

11      Q.    Okay.  And you're saying longer than usual

12  based your experience in similar cases?

13      A.    Yes.

14      Q.    Okay.  So what do you remember next?  You

15  guys got there and staged and then what?

16      A.    We were staged for quite a bit of time.

17      Q.    By the way, do you get the communication,

18  like, while you're sitting there staged?  I presume

19  you're just sitting in the vehicle, right?

20      A.    Yes.

21      Q.    Are you getting any kind of traffic from the

22  sheriff's department?

23      A.    Not that I remember.  We knew that something

24  had gone wrong.  We saw a lot of officers coming down

25  the street.  More than usual.  So we knew that

1    something was going on.

2        Q.    Okay.  So then what happened next?

3        A.    We eventually got called in, so we pulled up

4    to the house.

5        Q.    Do you remember who called you or how you got

6    that call?

7        A.    Dispatch calls us in.

8        Q.    Okay.

9        A.    And says that we are clear to go in.

10       Q.    Did dispatch say anything else?  Like are you

11   still going in on the original problem, or is there a

12   new medical problem?

13            MR. ROZELLE:  Object to the form.  You can

14       answer.

15   BY MS. CALLAHAN:

16       A.    No.  They just say, "PCSO has cleared you,"

17   is pretty much what they do.

18       Q.    Okay.  So what happened next?

19       A.    We walked in with our medical equipment.  We

20   were directed upstairs.  From there we could see

21   multiple officers upstairs, so we knew what room we

22   needed to go to.  At some point during -- getting our

23   equipment off and coming up into the house and going up

24   into the room, we were told the patient was

25   unresponsive.

1    Q.   Okay.  But as you are entering the house, you

2  didn't know what condition the patient had, is that

3  correct?

4    A.   Honestly, I don't remember at that time if

5  the story was relayed of what happened walking in or

6  when we got upstairs.  I don't know at what point.  But

7  at some point we were told what had happened, that the

8  patient had been Tased.  Then shortly after they went

9  unresponsive.

10    Q.   Do you remember who told -- first -- do you

11  remember whether you were the first person into the

12  house, you know, or someone else was ahead of you among

13  the responders?

14    A.   I do not, and I can't say who told me.

15    Q.   Okay.  But it was one of the deputies that

16  told you that the patient had been Tased?

17    A.   I believe so.

18    Q.   Do you remember anything else about what you

19  were told about the patient's condition?

20    A.   No.

21    Q.   Were you told how many times the patient was

22  Tased?

23    A.   No.  Not that I recall.

24    Q.   Do you remember were you told anything else

25  about the patient's condition?

1    A.    No.  Not that I recall.

2    Q.    Okay.  So what do you remember next?

3    A.    Can we go back to that last question?

4    Q.    Sure.

5    A.    You mean the context of how the patient was

6    behaving, or as far as how their medical condition was

7    now at this point?

8    Q.    Everything.

9    A.    The only other thing I can remember is that

10   they did decide that he was combative with them.

11   Q.    The sheriff's deputy said that?

12   A.    Yes.  One of the deputies.

13   Q.    Did he describe it in any manner?  How

14   combative?  Doing what?

15   A.    Not that I recall.

16   Q.    I think you testified earlier that you did

17   not know what the original medical problem the patient

18   had as you were going in?

19   A.    I don't remember, no.

20   Q.    So then what happens next?  You walk in the

21   house?  You walk upstairs?

22   A.    They direct us to the patient.  He's on the

23   floor.

24   Q.    Do you remember if you were the first one to

25   approach the patient?

Paul Grenier
August 7, 2019

1      A.    I don't remember.  Then I did a quick
2  assessment and saw that he wasn't breathing.
3      Q.    First, can you describe what the patient
4  looked like, which side of the body he was laying on?
5      A.    According to the report, it says on his right
6  side.
7      Q.    And this report was prepared by you?  The one
8  you are looking at?
9      A.    Yes.
10      Q.    So let's compare notes, because I have a
11  document here that's called "incomplete".
12      A.    That says incomplete on it?
13      Q.    Yes.  Does it look like this one?
14      A.    I can already see that I have -- my name here
15  is not documented here.
16      Q.    So it looks like you have a slightly
17  different version.
18          MR. ROZELLE:  Just for the record, I don't --
19      this was not produced by the sheriff's office.
20      This wasn't produced to us in discovery.  I don't
21      know what this is or where you got it from.
22          THE WITNESS:  This is missing a lot.
23          MR. ROZELLE:  So I'll follow up with you
24      definitely later.
25          MS. CALLAHAN:  Okay.

1  BY MS. CALLAHAN:

2      Q.   So let's look at the -- then we are not going

3  to attach this one.  Let's look at one more report

4  which says "complete" -- or "final", actually.

5      A.   So this is a different format.  I'm not sure

6  where this came from.

7          MR. ROZELLE:  Likewise.  Same -- just -- this

8          is not a document that's been produced in

9          discovery in this case either from the plaintiff

10         to the defense or from the defense, whatever it

11         is.

12         MS. CALLAHAN:  Let's talk about it then after

13         the depo.

14         MR. ROZELLE:  Yes, let's.  I keep running

15         into this issue with you guys, so let's definitely

16         talk about it.

17         MS. CALLAHAN:  Okay.

18  BY MS. CALLAHAN:

19      Q.   Mr. Grenier, if you could take a couple

20  minutes to look at it.  Look it over.

21      A.   Sure.

22         MS. CALLAHAN:  We are going to attach it as

23         the next exhibit, Exhibit 33.  For the record,

24         it's, "Pinellas County Emergency Medical Services

25         Patient Care Report," dated September 7th, 2016.

1              (At this time Plaintiff's Exhibit No. 33

2              was marked for identification.)

3    BY MS. CALLAHAN:

4        A.    It would take some time to match these up,

5    just because they're different formats.  I do know it's

6    missing some of the crew members.  My lieutenant, he's

7    labeled up here in the crew.  So I would have to really

8    sit down and dissect this thing.  It's a lot of the

9    same information, but it's all put in in different ways

10   in here.

11       Q.    Okay.

12       A.    So this probably came from Sunstar, I'm

13   guessing.

14       Q.    I think so, too.  I think it was a request

15   per --

16       A.    So it might print off a different way

17   compared to how my captain prints it off at the

18   station.  I'm not sure how he --

19            MS. CALLAHAN:  Ms. Court Reporter, can we

20       take a little break and make a copy of what he

21       has?

22            (At this time a brief recess was taken.)

23   BY MS. CALLAHAN:

24       A.    Can I go back over to the questions that you

25   asked?

1    Q.   Sure.

2    A.   The first question was what we were called

3 for.  According to the report, we were called for a

4 seizure.  The second question of who arrived on scene

5 first, according to my report, I have PCSO.

6         MR. ROZELLE:  Where are you looking?

7         THE WITNESS:  For the first on scene, "PCSO".

8    It's the fourth line down on the end.  "PCSO were

9    first on scene to the current call."

10         MR. ROZELLE:  This is for the first one or

11    the second one?

12         THE WITNESS:  This is for the second one.

13 BY MS. CALLAHAN:

14    Q.   And you know that because of the dispatch

15 times on the first page?

16    A.   No.  Because of how I worded it.  I might not

17 have worded it the right way, but I understand how I

18 worded to myself as far as not the prior call, but the

19 current call.  Because I was kind of distinguishing at

20 the beginning of this narrative with the last call that

21 happened that morning.  And then transferring from that

22 to the current call.

23    Q.   And you were not part of the first call?

24    A.   No.

25    Q.   It looks like we left it off you were telling

1  me what -- how you found the patient.  You said he was
2  on the right side?
3       A.   Yes.  Right side on the floor next to his
4  bed.  He was still in handcuffs.  At that time, PCSO
5  took the handcuffs off and we began CPR on him.
6       Q.   Did you request that the handcuffs be taken
7  off?
8       A.   I don't remember asking to take them off.
9       Q.   And I think I asked you.  You said patient
10 was on the right side.  Was he sort of leaning to the
11 right side?  Was he on the right hip?  Was there any
12 way better to describe what being on the right side
13 means to you?
14      A.   He was just like it sounds, just on the hip.
15 Perfectly on his side.  Almost if you were like in the
16 fetal position on your side.  It would be similar to
17 that with his hands behind his back.
18      Q.   Okay.  Meaning that his shoulder, upper arm,
19 hip and side were kind of on the floor?
20      A.   Yes.
21      Q.   Do you remember what he was wearing?
22      A.   I do not.
23      Q.   And do you remember there being any Taser
24 wire marks or anything on his body?
25      A.   I do not remember.

Paul Grenier
August 7, 2019

1      Q.   Okay.  And then what did you do next?

2      A.   We pretty much go through our CPR.  Go

3  through the airway breathing.  We go through the

4  whole -- what's the word I'm looking for?  We kind of

5  know how to work with each other in there, so we

6  automatically -- we do a lot of cardiac arrest, so we

7  address the airway.  We end up doing a tube so we can

8  breathe for him.  We put him on a heart monitor.

9      Q.   Let me back up.  Was this respiratory arrest

10  or cardiac arrest?

11      A.   It was cardiac arrest.  His heart rhythm, he

12  had no heart rhythm, what we call asystole.

13      Q.   What is asystole?

14      A.   It's just flat.  No rhythm at all.  It's just

15  flat.  No electric activity.  Just flat.

16      Q.   Okay.  So you hooked up him up to equipment.

17      A.   On equipment which shows rhythm.  So we

18  immediately start doing compressions on his chest and

19  addressing the airway and helping him to breathe.  We

20  also start an IO, which is -- we give a needle in

21  through the bone, as opposed to the IV.  It goes right

22  into the bone.  We're able to give our medications, our

23  fluids, all that way.  It's fairly easy to do.  It's

24  our first go-to as far as starting a line on a patient.

25      Q.   So when do you do IO versus IV?

1       A.   IV is putting the needle in the vein and you

2   leave a catheter in and you're able to give fluids that

3   way.  Sometimes when a patient doesn't have a blood

4   pressure, when a person goes to cardiac arrest and the

5   blood pressure drops, their veins collapse and it's

6   sometimes hard to get IVs.  So our doctor likes us to

7   go in, do the IO first.  It's pretty easy to do for us

8   in the field.  It's almost a guarantee to get a direct

9   line so we can get medications.

10      Q.   Okay.  Which bone do you put it in?

11      A.   The upper tibia.

12      Q.   Okay.  And so what did you do with this

13  patient, as far as medications go?

14      A.   So with this patient, their rhythm went to --

15  from that flatline asystole into PA.

16      Q.   What is that?

17      A.   PA is where -- on our monitor we have a

18  rhythm, but it's just the electrical activity reading

19  of the heart.  The heart is not actually contracting.

20      Q.   So it's electrical activity generated by --

21      A.   It's just naturally in the heart.  Sometimes

22  it can come from the epinephrin that we push.

23  Sometimes it can generate that, but it really doesn't

24  change our treatment.  The CPR continues.  We push

25  epinephrin.  I think we did a couple rounds of that

1     during the whole CPR.  We did about four doses.  We do

2     these every three to five minutes.  We pushed 2

3     milligrams of Narcan.

4          Q.    Why do you do that?

5          A.    It's just on suspicion of overdose.  So it

6     was probably at some point agreed upon between the crew

7     to push it.

8          Q.    Do you have any evidence --

9          A.    Just that he was -- no.  Just based off

10    behavioral issues would probably be the main thing.

11         Q.    Behavioral issues as reported by who?

12         A.    As in history.

13         Q.    So at that point you would have obtained his

14    history from his wife or who?

15         A.    Correct.

16         Q.    Okay.  And what else do you do?

17         A.    We check the patient's blood glucose level to

18    make sure that's not a reason that he went into cardiac

19    arrest or a reason he was not acting right.  If it's

20    low, he could have became combative in the first place.

21         Q.    Okay.  Was it?

22         A.    I believe it was within normal limits.

23         Q.    It says 137?

24         A.    Yes.

25         Q.    Is that normal?

1    A.    Yes.

2    Q.    And when did you administer the epi?

3    A.    Epi is part of our protocol for advanced life

4  cardiac support.

5    Q.    What does it do?

6    A.    It helps to push the electrical activity to

7  try to get the heart to contract.  It's a pretty normal

8  medication that we push in cardiac arrests.

9    Q.    And did you -- did the patient develop any

10 heart rhythm at any time during these efforts?

11   A.    He did not.

12   Q.    So his heart didn't restart?

13   A.    No.  I mean, PA is a rhythm, but his heart

14 wasn't contracting, so he was still in cardiac arrest.

15   Q.    And then obviously he was not breathing on

16 his own either, right?

17   A.    No.

18   Q.    For how long did you continue these efforts?

19   A.    We did it for approximately 25 minutes.

20   Q.    Is that standard, how you usually do it?

21   A.    20 minutes is usually our number.  I can't

22 say why we went 25.  If there was maybe some more

23 interventions that we did that might have took more

24 time, but that's usually around the average.  Around 20

25 minutes, so -- that's not anything out of the ordinary

1  to go longer.

2      Q.    Okay.  So then what did you do next?

3      A.    At that point in time, we are to call our

4  on-line medical control, which is a medical doctor that

5  we contact that's on for the day.  We pretty much give

6  them the rundown of what happened.

7      Q.    Do you contact them by phone?

8      A.    By radio.  It's a detailed, but quick report

9  of why the patient went into arrest.  What the

10  condition is now.  What we've done.  How long we've

11  been doing it.  We usually look for recommendations, as

12  far as is this something we should cease and stop?

13  They're not going to come out of this.  Or is this

14  something that should be transported?  Or is this

15  something we should give other medications and try and

16  see if there's something else -- if there's a different

17  outcome.  So that was done at that time.

18      Q.    Okay.  What were you told to do?

19      A.    They advised us to give sodium bicarb.

20      Q.    Okay.

21      A.    And that's typically to treat if there is

22  some sort of PH imbalance.  Patient is more acidic.

23  You know, something that might have led to the cardiac

24  arrest.  That's usually a normal medication that the

25  doctors have us push after we call in.  That's

 1    something that we need orders for.  So he gave orders
 2    to give that and for the patient to be transported.
 3         Q.   Okay.  And did you try to shock the patient's
 4    heart at any time?
 5         A.   No.
 6         Q.   Why not?
 7         A.   PA and asystole aren't rhythms that we shock.
 8         Q.   So he never had a rhythm that would be
 9    shocked?
10         A.   No.
11         Q.   So he was essentially dead?
12              MR. ROZELLE:  Object to the form.
13    BY MS. CALLAHAN:
14         A.   Not at that time.  Nothing was declared.
15         Q.   And did you accompany him to the hospital?
16         A.   Yes.
17         Q.   And can you tell how long it took to get from
18    the scene to the hospital?
19         A.   It doesn't have the destination time on here.
20    It does have the transport.  So that's probably
21    additional information that's going to have to be
22    obtained.  I don't know why it's not in here.  It might
23    not be in mine, because on my report I don't record the
24    destination time.  Usually Sunstar does on their
25    report.

Paul Grenier
August 7, 2019

1    Q.   Okay.  So it might be -- or it should be on
2    Sunstar's report, correct?
3    A.   It might be.  I don't know if they have it
4    either.
5    Q.   It would be on the front page there in the
6    right-hand corner under times.  It says, "Transport".
7    That would be when you left the house and started
8    transport?
9    A.   Yes.  So the at destination time would be the
10   at hospital time, which it's not on here either.
11   Q.   Okay.  And then does it -- according to your
12   report, the one that you brought today, when you look
13   at the front page with times, it says, "Received."
14   Does that mean the call was received at 15:42?
15   A.   Yes.  Correct.
16   Q.   And then "dispatch" means when you guys were
17   sent out?
18   A.   Correct.
19   Q.   And then "en route"?  Is that the time when
20   you are getting in the vehicle and start driving?
21   A.   Correct.
22   Q.   And "at scene" would be when you arrived to
23   stage?
24   A.   Correct.
25   Q.   And "at patient", is it when you open the

1  door or when you reach the patient?

2       A.   When we reach the patient.

3       Q.   And then "transport" was when you leave the

4  scene?

5       A.   Leave the scene in the ambulance, correct.

6       Q.   And these times that we just discussed, how

7  are they generated?  Are they generated by the computer

8  or someone types them in?

9       A.   Computer and radio.  We hit our computer

10  button when we are en route.  At scene we hit a button.

11  At patient we do on the radio.  I'm not sure how

12  transport is done, because Sunstar does it.  They could

13  do over the radio or -- they have the same touch

14  screens.

15       Q.   Okay.  And you said the transport was done in

16  the Sunstar's vehicle?  Not your vehicle, correct?

17       A.   Correct.

18       Q.   And then on pages 3, 4, 5 and 6, there's

19  times generated in the left-hand column.  It looks like

20  at 16:11, for example, it says, "NIBP machine."  Do you

21  see that?

22       A.   Yes.

23       Q.   Are those times also generated by the

24  computer?

25       A.   No.  Those are generated by me in the report,

Paul Grenier
August 7, 2019

```
 1    but they are timestamped.  So I would go under

 2    interventions and you would hit the button and you will

 3    pull up -- pretty much it will pull up the vitals.

 4    Then you fill them in from there.  Other interventions

 5    is --

 6         Q.   For example, on the bottom of page 3 there's

 7    "16:10 CPR" performed by you?

 8         A.   Correct.

 9         Q.   How would that time be generated?

10         A.   This should be in intervention.  So you would

11    just hit a button.  It doesn't necessarily have to be

12    filled in at that time, but it will capture the time

13    for you.

14         Q.   Okay.

15         A.   As far as the vitals, we transfer our vitals

16    from our monitor.  It connects to our laptop and

17    transfers all the times and the vitals over for us.

18         Q.   Okay.  Then on page 6 of the document there's

19    an assessment section?

20         A.   Yes.

21         Q.   And it looks like the assessment time was at

22    16:09, correct?

23         A.   Correct.

24         Q.   And it says by you, so I'm assuming you did

25    the assessment?
```

1     A.   Yes.

2     Q.   And -- so your assessment of the airway, if

3 I'm reading correctly, "Patent"?

4     A.   Correct.

5     Q.   What does that mean?

6     A.   It just means it's a good airway.  There's

7 nothing obstructing it.  There's nothing in his mouth.

8 There's not blood or vomit coming out.

9     Q.   Okay.  And then your -- you assessed his

10 breathing and it states, "Absent"?

11     A.   Correct.

12     Q.   And then the next line is, "Circulation"?

13     A.   Yes.

14     Q.   And it looks like you checked both femoral

15 and radial pulses?

16     A.   Yes.

17     Q.   And both were absent?

18     A.   Yes.

19     Q.   And then it says, "Central nervous system.

20 No neuro activity?"

21     A.   Correct.

22     Q.   How do you assess that?

23     A.   Any movement.  Any movement by the patient.

24     Q.   Okay.  Then, "Blood/fluid loss."  You said,

25 "None noted", correct?

Paul Grenier
August 7, 2019

1      A.    Correct.

2      Q.    And then it says, "Left upper quadrant.

3    Penetration."  What's that?

4      A.    If I had to -- I would think that's the --

5    that might have been the Taser.

6      Q.    Okay.  How would you describe the left upper

7    quadrant of the person?  What --

8      A.    You pretty much split your chest and abdomen

9    into four quadrants, so your left upper quadrant would

10   be here.

11     Q.    So it would be, what, from the ribs up?

12     A.    Yes.  Generally in that area.

13     Q.    Chest area?

14     A.    Yes.  I would say like your sternum area.

15   Kind of center it there and kind of generalize it as

16   your left upper chest.

17     Q.    And then for, "LOC behavior", you have,

18   "Unresponsive"?

19     A.    Correct.

20     Q.    Meaning he was not exhibiting any behavior at

21   all, correct?

22     A.    Yes.

23     Q.    Then you have, "Lung sounds."  All four

24   quadrants were absent?

25     A.    Correct.  Because he was not the breathing.

1       Q.    Okay.  And then you note that moisture was

2    normal?

3       A.    Correct.

4       Q.    What are the other options?  What else could

5    the moisture be?

6       A.    Dry or moist.

7       Q.    Then the next category is, "Pupils"?

8       A.    Yes.

9       Q.    You have, "Left, non-reactive.  Right,

10   non-reactive?"

11      A.    Right.

12      Q.    And it means that you checked both?

13      A.    Yes.  You close open the eyes and you see if

14   the pupils react at all, and they didn't.

15      Q.    Okay.  And then his respiratory distress

16   level is ten.  What's the scale?

17      A.    Zero to ten.  Or one to ten.  I'm sorry.

18      Q.    Okay.  And ten being the highest?

19      A.    Yes.  Ten being the highest.

20      Q.    And then for skin color it says, "Normal"?

21      A.    Correct.

22      Q.    And what are the other options there?

23      A.    White.  Flush.  That should be it.

24      Q.    And then the skin temperature is normal?

25      A.    Correct.

1      Q.    And did you measure just by touch?

2      A.    Yes.  We don't have thermometers.

3      Q.    Okay.  And then the next section lower down

4    is, "Cardiac arrest?"

5      A.    Yes.

6      Q.    There on the cardiac arrest subcategory it

7    says, "Yes.  Prior to EMS arrival?"

8      A.    Yes.

9      Q.    And is that also a category you pick out of

10   categories or --

11     A.    Yes.

12     Q.    Meaning, that you did not evidence the

13   cardiac arrest?  Is that what that means?

14     A.    Correct.  Prior to us coming on the scene.

15     Q.    Okay.  And then under, "Arrest etiology", I'm

16   assuming that's cardiac arrest?  Etiology?

17     A.    Yes.

18     Q.    You said, "Presume cardiac."  What are the

19   other options there?

20     A.    I can't say.  I don't remember.

21     Q.    Then under, "First monitored," you have,

22   "Asystole," correct?

23     A.    Correct.

24     Q.    Meaning no rhythm, correct?  Does it mean

25   there's no rhythm?

1       A.   Correct.

2       Q.   And then under, "Estimated time of arrest,"

3  it's zero to two minutes?

4       A.   Correct.

5       Q.   What does that mean?

6       A.   That's based on when the last time he was

7  seen alert, was seen acting normal, at the time of

8  arrest.  And that was based on us being on scene and

9  the report from PCSO to us.

10      Q.   Okay.  Then somewhere in the report I saw a

11 notation of, "OLMC contact made."  Does that mean the

12 contact was the doctor?

13      A.   Yes.  Online medical control.

14      Q.   Okay.  Then on page 2 of your report there's

15 a history section?

16      A.   Yes.

17      Q.   And do you know or do you remember, how was

18 the history obtained from the wife or how --

19      A.   I assume.  I do not remember.  As far as I

20 understand, she was the only other person at the house.

21      Q.   Okay.  And on page 1, there's a second

22 section called, "Scene information".  It has a 10 in

23 it.  What does that mean?

24      A.   I do not know.

25      Q.   And does Sunstar prepare their own report, or

1  do you guys kind of share a report?

2      A.   That's weird how it works.  We do share

3  reports as far as the interventions, what was done and

4  what time.  As far as the narrative here, they do their

5  own.  They add some other stuff for the transport to

6  it.

7      Q.   I saw in the Sunstar report section for

8  "cause of injury" was the Taser.  Does your report have

9  such a section?

10         MR. ROZELLE:  Object to the form.  You can

11     answer.

12 BY MS. CALLAHAN:

13     A.   Where in their form do they have that?

14     Q.   On page 5.

15     A.   I've got to look to see here.  I have

16 something similar.  I have trauma.

17     Q.   Where is your trauma section?

18     A.   Page 6 towards the middle.

19     Q.   Okay.  I see it.  Sorry I missed it.

20     A.   I assume it's pretty close to the same thing.

21     Q.   Yes.  It says the same thing.  You're right.

22 Do you recall anything else from the events that we

23 didn't discuss?

24     A.   I do not.

25     Q.   Do you recall if you talked to any of the

1  deputies more than what you told me already?

2      A.   Not that I recall.

3      Q.   Do you recall talking to anyone while you

4  were performing the resuscitation efforts?

5      A.   Not that I recall.  It's pretty busy when we

6  are there.  A lot is going on.

7      Q.   I understand.

8      A.   I don't remember any other information on the

9  call.

10     Q.   Or anyone you might have talked to on the way

11 out the door?

12     A.   Not that I recall.

13     Q.   Okay.  Did you see -- did you personally see

14 any guns in the house?

15     A.   I did.

16     Q.   What did you see?

17     A.   I believe it was a handgun on the bed.

18     Q.   One handgun?

19     A.   Correct.

20     Q.   Do you recall or did you note any description

21 of it?

22     A.   I do not.

23     Q.   Do you recall where it was located?

24     A.   Patient was on the floor.  The bed was there.

25 It was probably three to four feet from him to the bed

1    on top of the bed.

2        Q.   How big a bed is it?  Do you know?  Queen

3    size?  Twin?

4            MR. ROZELLE:  Object to the form.  You can

5        answer.

6    BY MS. CALLAHAN:

7        A.   I don't recall.

8        Q.   And do you recall where on the bed the weapon

9    was?

10       A.   It was next to him.

11       Q.   Kind of like on the edge of it?  The middle

12   of it?

13           MR. ROZELLE:  Object to the form.  You can

14       answer.

15   BY MS. CALLAHAN:

16       A.   I don't know at what part of the bed we were.

17   I just know it was three to four feet from him.

18       Q.   Okay.  That's according to your notes, or do

19   you have a recollection of it?

20       A.   That's recollection.  That's not in here.

21       Q.   Okay.  Anything else you know about that gun?

22       A.   No.

23       Q.   Okay.  Did you see any other weapons in the

24   house?

25       A.   I did not.

1    Q.   I forgot if I asked you, during the transport

2   to the hospital, the patient didn't regain

3   consciousness or didn't start breathing with cardiac

4   activity, right?

5    A.   No.

6    Q.   In these pre-run notes, did you read them

7   with your eyes, or was it something that someone in the

8   vehicle was reading out loud or --

9    A.   Most likely it was my lieutenant, because I

10  can't see it from where I'm sitting at.  He has the

11  laptop in front of him.  We sit backwards, and there's

12  a lot of storage in between.

13   Q.   So he would be the one who would actually

14  have his eyes on the report?

15   A.   Correct.

16   Q.   And it shows up on the computer screen?

17   A.   Yes.

18   Q.   Do you recall if any deputy told you that

19  they had Tased Mr. DeGraw?  Did he mention how many

20  times?

21        MR. ROZELLE:  Objection to form.  You can

22        answer.

23  BY MS. CALLAHAN:

24   A.   I do not recall.

25   Q.   Okay.  You told us that you reviewed your

Paul Grenier
August 7, 2019

1   report, the one that we were looking at, and we are

2   going to mark it as the next exhibit, Exhibit 34, I

3   believe.

4           (At this time Plaintiff's Exhibit No. 34

5            was marked for identification.)

6   BY MS. CALLAHAN:

7       Q.   Did you do anything else to prepare for the

8   deposition?

9       A.   I did not.

10      Q.   Did you talk to anybody?

11      A.   I did not.

12      Q.   Okay.  Thank you, sir.

13      A.   I talked to my EMS captain to have him pull

14  the report for me.

15      Q.   Okay.  Is that Mr. Brennan?

16      A.   No.  Captain David Young.

17      Q.   Okay.  And did you discuss the substance of

18  the report?

19      A.   I did.  Just in general where it was at.

20      Q.   Okay.  I mean, as to the location or what?

21      A.   Yes.  That it happened a couple years ago.

22  This was pretty much prior, because I don't -- it's --

23  without a report, a lot of stuff I don't remember.

24      Q.   I understand.

25      A.   When I had heard about the date, this was one

1    of the incidents that I do remember from years back.

2    That was the only thing I really brought up.

3        Q.   Okay.  Did he give you any advice or

4    anything?

5        A.   No.  I just asked for -- just the process.

6    What I needed to do.  What I needed to bring in.  That

7    was it.

8        Q.   Okay.

9             MS. CALLAHAN:  Thank, sir.  That's all the

10           questions I have.

11            MR. ROZELLE:  I've got some for you.

12                     CROSS-EXAMINATION

13   BY MR. ROZELLE:

14       Q.   This was coming up on three years ago, is

15   that right?

16       A.   Yes, sir.

17       Q.   Do you remember being interviewed by Pinellas

18   County sheriff's deputies the very day after this

19   happened on September 8th, 2016?

20       A.   I do, yes.

21       Q.   Would you agree that your memory of what

22   happened is probably clearer the day it happened than

23   it is today, three years ago, three years later?

24       A.   That's correct.

25            MR. ROZELLE:  Ms. Callahan, would you hand me

 1          the exhibits, please?

 2               MS. CALLAHAN:  Sure.

 3     BY MR. ROZELLE:

 4          Q.   Okay.  This is Number 25, it's Exhibit 1,

 5     PCSO Report Number SO16-36378-25, which was previously

 6     marked in this case.  I will hand that to you and ask

 7     you if you've ever seen that document before?

 8          A.   I don't remember.

 9          Q.   It's not something you reviewed in

10     preparation for the testimony you gave here this

11     afternoon?

12          A.   This, no.

13          Q.   Take a look, if you would, at --

14               MS. CALLAHAN:  I have a printout if you need

15          it.

16               MR. ROZELLE:  It's okay.  Thank you.  I

17          appreciate the offer, though.  Well, you've got a

18          printout of the exact same one he has here?

19               MS. CALLAHAN:  I think so.

20               MR. ROZELLE:  Then I will take that, if you

21          don't mind.  Same issue -- no.  These are

22          different.

23               MS. CALLAHAN:  It's not the same?

24               MR. ROZELLE:  No.  This is the one you just

25          handed me, and this is the one that was produced

1          in this case.  It doesn't match what you guys

2          marked as Exhibit 1, unfortunately.  I'm going to

3          work with the witness with this one.

4     BY MR. ROZELLE:

5          Q.   With respect to the testimony you gave here

6     this afternoon about who got there first on this

7     call -- let me back all the way up.  I think that you

8     said this call was maybe in the morning?  Do you

9     remember saying that?

10         A.   I believe so.

11         Q.   Taking a look at the documents that were

12    marked as Exhibit 33 and 34 today here, the Sunstar

13    notes, and then the notes that you brought with you,

14    does that refresh your memory at all about the time of

15    day that this call for service took place that you were

16    on?  Take a look at page 1 of either of those.  The

17    time is in the upper right-hand side.

18         A.   I, honestly, believed it to be more in the

19    morning.

20         Q.   These reports in Exhibit 33 and 34 reflect

21    the call coming in 15:42, dispatch at 15:43, with the

22    patient at 16:09, is that correct?

23         A.   That's correct.

24         Q.   That's all afternoon, p.m., right?  Military

25    time?

1      A.   Yes.

2      Q.   Do you have any reason to believe that these

3 aren't accurate, at least as far as if it was before or

4 after noon?

5      A.   I have no reason to believe they're not

6 accurate.  I just -- my understanding was that was in

7 the morning.  I just might have forgot.

8      Q.   It's just one of these things it's three

9 years later, right?

10      A.   Yes.

11      Q.   As far as on this -- I'm going to go ahead

12 and refer to it as the afternoon call or the second

13 call for service to differentiate from the one that

14 your colleague, Mr. Castro, was out on earlier on an

15 earlier shift, okay?

16      A.   Yes.

17      Q.   So on the second call for service with

18 respect to the who got there first, do you remember

19 there was some testimony and the way it was written in

20 your report about whether FD got there first or whether

21 PCSO got there first?

22      A.   Yes.

23      Q.   Take a look with me, if you would, at Exhibit

24 1, your interview.  Just to help get you oriented to

25 this document, you will see on -- it's page 1 of 6,

1    "Interview of Paul Grenier."  Do you see that?

2       A.   Yes.

3       Q.   That's you, and then you've got these

4    initials here.  "JT" is one of our detectives,

5    Detective Jonathan Tobeck.  "JU" is Detective John

6    Upton.  Then "PG" is going to be you, Paul Grenier,

7    okay?

8       A.   Yes.

9       Q.   If we go to page 2 of that document, you're

10   free to read through as much of this as you want to,

11   but there are a few things that I want to direct you to

12   here.  You will see you're asked toward the bottom of

13   the page about being dispatched out to the location

14   that we've been talking about.  You see that?  Split

15   Fork Drive?

16      A.   Yes.

17      Q.   Then if you flip over to 3.  Again, you're

18   welcome to kind of read around what I'm going to direct

19   you to make sure you have the context correct.  But

20   what I'm looking at is about the top third of the page

21   down.  You see where you're describing what you

22   testified to here today, as far as the staging process

23   that occurred.  "JT.  'Okay.  When you guys got in that

24   area, did you stage?"  Did you go right to the house?"

25   Then you answer, "We did stage, because he did also

1    tell us -- Castro that the -- um -- the man owned
2    guns."  Do you see that?
3         A.   Yes.
4         Q.   Is that accurate?
5         A.   Yes.
6         Q.   So you had had a report before you got to the
7    scene on the second call that the subject who you were
8    being called on had firearms?
9         A.   Yes.
10        Q.   And your lieutenant made the decision to
11   stage prior to going into the residence, is that right?
12        A.   Yes.
13        Q.   Okay.  So the lieutenant made the decision to
14   stage based off of that.  "How long did you guys stage
15   before the deputies got there?"  Do you see that
16   question?
17        A.   Yes.
18        Q.   And what was your answer?
19        A.   Five minutes.
20        Q.   Does that refresh your recollection about who
21   arrived there first?
22        A.   It doesn't.
23        Q.   Do you have any reason to believe that this
24   was inaccurate at the time you gave this statement to
25   detectives that day?

1        A.    Can you rephrase that?

2        Q.    Do you have any reason to believe that when

3    you were interviewed by detectives at --

4        A.    That this was inaccurate?

5        Q.    Right.  Any reason to think this wasn't

6    accurate and truthful when you told detectives at 23:03

7    hours on the date of the occurrence?

8        A.    No.

9        Q.    As far as who got there first?

10       A.    Correct.

11       Q.    As far as -- in total fairness to you, I'm

12   just trying to put this all together and make it make

13   sense here.  Let me just ask you, is it possible in

14   your report, and you can look at either 33 or 34,

15   because I think they are the same narrative description

16   is present in this respect, is it possible that what

17   you're referring to is who got up to the patient first,

18   as opposed to who got to the residence first?

19            MS. CALLAHAN:  Object to the form.

20   BY MR. ROZELLE:

21       A.    In reference to both of these, in here I'm

22   referring to -- it looks like we were the first on the

23   street, but they were the first to go in.

24       Q.    And that's what I was driving at.  Again, in

25   total fairness to you, I'm just trying to harmonize

Paul Grenier
August 7, 2019

1    both of these things.  That's how I read it, but you're
2    the one giving testimony.  I just want to make sure
3    that's accurate reflection as much as you're able to
4    give it here today about the order of which things
5    happened?
6        A.   Right.  Okay.
7        Q.   So your testimony is you guys, FD, got there
8    and decided to stage?  And they got there before
9    deputies did, is that right?
10       A.   Correct.
11       Q.   But the deputies when they got there next,
12   they went into the house and they made contact with the
13   patient, with Mr. DeGraw before you guys did because
14   you-all were staged outside, correct?
15       A.   Yes.
16       Q.   You were asked some questions about the
17   handcuffs and whether they were on or whether you were
18   asked that they be removed.  Do you remember that
19   testimony?
20       A.   Yes.
21       Q.   Let me direct you to page 4 of 6 of
22   Supplement 25, which is part of the Exhibit 1.  Again,
23   for context, you can go ahead and orient yourself here.
24   I'm at the top third of the page.  You're describing
25   assessing the situation.  The question is, "Did you

1      guys start rendering aid?"  Your answer was, "Yes."

2      The deputy -- I really didn't have to say anything.

3      Deputy came and took the handcuffs off.  We put him

4      onto his back and started CPR."  Do you see that?

5           A.   Yes.

6           Q.   Is that accurate?

7           A.   Yes.

8           Q.   Okay.  You were also asked some questions

9      about the observations you made, if any, about the

10     presence of firearms on the scene.  Do you remember

11     those questions?

12          A.   Yes.

13          Q.   And whether there was a firearm in the room?

14          A.   I don't recall, no.

15          Q.   Let me just --

16          A.   As far as --

17          Q.   Just a few moments ago?

18          A.   Yes.  I'm sorry.

19          Q.   The testimony about the location of firearms

20     with respect to the location of the patient?

21          A.   Yes.

22          Q.   Take a look at page 5 of 6 of your interview

23     in Exhibit 1.  I'm in the middle of the page, "JT.

24     'Okay.  Did you see any weapons in that room?'"  Your

25     answer was, "Yes," correct?

1       A.   Yes.

2       Q.   Next question, "What did you see?"  Answer,

3  "A handgun on the bed next to him probably two feet

4  away."  Do you see that?

5       A.   Yes.

6       Q.   And then in fairness to you if we go further

7  down here, you said, "It looks like maybe a 1911, 45."

8  That's the model?  1911 is a type of semiautomatic

9  firearm?

10      A.   Yes.

11      Q.   The 45 is the caliber of that weapon?

12      A.   Yes.

13      Q.   You're familiar with those weapons before you

14 saw one that day?

15      A.   Yes.

16      Q.   And you recognized what it was that day just

17 on sight?

18      A.   Yes.

19      Q.   I mean, you didn't handle the gun or anything

20 like, right?

21      A.   No.

22      Q.   "It wasn't covered or anything.  It was

23 pretty out in the open."  Do you see that?

24      A.   Yes.

25      Q.   That's how it was situated?

1      A.   Yes.

2      Q.   And the question, "All right.  Where at on

3  the bed?"  Answer, "Probably two, three feet away from

4  him.  Closer to his side of the bed -- um."  Then the

5  question is, "At the head of the bed?"  Answer, "Up

6  near the head, yeah."  You see that statement that you

7  gave?

8      A.   Yes.

9      Q.   Is that accurate?

10     A.   Yes.

11     Q.   Do you know who Deputy Greg Goepfert is?

12     A.   I do not recognize the name.

13     Q.   I'll just represent to you that he is the

14  deputy that's being sued in this case for having used

15  his Taser on Mr. DeGraw.  Do you remember speaking with

16  Deputy Goepfert on September 7th, 2016?

17     A.   I do not recall.  I really don't remember a

18  lot of officers that were there, to be honest.

19     Q.   Do you remember -- let me make sure I got

20  this testimony correct.  Your testimony is that someone

21  told you that Mr. DeGraw had been Tased, is that right?

22     A.   Correct.

23     Q.   And that individual was a deputy sheriff, is

24  that correct?

25     A.   I believe so, yes.

1     Q.   But you don't know who it was that said that?

2     A.   No.

3     Q.   Do you recall anything else that any

4  individual who is a sheriff's deputy, police officer,

5  law enforcement of any kind said to you when you were

6  on the scene on the afternoon of September 7th, 2016?

7     A.   I do not.

8     Q.   Did you say anything to any PCSO deputy --

9  obviously, this interview would be responsive, but

10 while you were on the scene, before you cleared the

11 scene and went to the hospital, did you say anything to

12 any PCSO deputy, other than what you testified here

13 about today?

14    A.   Not that I recall, no.

15    Q.   Did you speak with Mrs. Degraw?  Julie

16 DeGraw?

17    A.   I just remember her being there.  I don't

18 know if I conversed with her.  I don't remember.

19    Q.   Do you remember words that she said to you at

20 all?

21    A.   No.

22    Q.   Do you remember words that she said to

23 anybody else?  Like maybe she wasn't addressing you,

24 but you heard her saying something?  Maybe talking to

25 somebody else?

Paul Grenier
August 7, 2019

1     A.   I believe she was talking to my lieutenant to
2  give the history.  The medical history.  I don't
3  remember many other interactions with her.
4     Q.   Do you remember anything -- hearing anything
5  that she said to your lieutenant?
6     A.   I do not.
7     Q.   Do you remember anything that he said to her?
8     A.   I do not.
9     Q.   Do you remember -- other than the
10 conversation that she had with your lieutenant about
11 the medical history, do you remember anything else that
12 she said on the scene to anybody?
13    A.   I do not.
14    Q.   The same question with my deputies.  I asked
15 you about conversations that you had with them, or
16 things they said to you, or things you said to them.
17 But do you remember deputies saying anything on that
18 scene, whether it was to you or anybody else that you
19 haven't already testified to?
20    A.   I do not.
21    Q.   For example, talking amongst themselves?
22    A.   I do not.
23    Q.   As far as what caused Mr. DeGraw's death,
24 that's not something that you have any opinion on, is
25 that correct?

1      A.    We have presumptions of what it could be, so

2   I think it would be an opinion.

3      Q.    As far as your medical education and

4   training, you're a paramedic, is that right?

5      A.    Yes.

6      Q.    No medical degree, right?

7      A.    No.

8      Q.    Did you ever render an opinion on medical

9   causation in any testimony or courtroom before?

10     A.    No.

11          MR. ROZELLE:   That's all I have for you.

12     Thank you for your time.

13          MS. CALLAHAN:   Thank you.   Nothing else.   You

14     have -- as a witness, you have the right to read

15     the transcript to make sure the court reporter

16     wrote everything down correctly, or you can assume

17     that she wrote it down and waive that right.

18          THE WITNESS:   Is there a way I can get a copy

19     of that?

20          MS. CALLAHAN:   I can give you a copy.   I have

21     an extra copy.   But you will need to tell the

22     court reporter if you want to read it and see if

23     you have any corrections, or you just waive it and

24     assume she wrote it down correctly.   You have to

25     tell us now.

1       THE WITNESS:  It just seems like this was

2   bringing more than what I could bring now being

3   this far out as you forget so many things, so this

4   was a good review.  I would like to look over it.

5       MS. CALLAHAN:  Okay.  So the court reporter

6   is going to write down every word that we said.

7   She's going to transcribe it and print it out.

8   But before we get it, you have the right to review

9   it to make sure that she wrote down correctly what

10  you said.  Or as a witness you can waive it and

11  assume that she wrote it down correctly.  But you

12  have to tell us today.

13      THE WITNESS:  I'll waive it.

14      (At this time the proceedings ended at

15       approximately 3:30 p.m.)

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3

4    STATE OF FLORIDA        )

5    COUNTY OF PINELLAS      )

6

7             I, KIMBERLY HAMMOCK, stenographer, certify

8    that I was authorized to, and did stenographically,

9    report to the best of my ability the foregoing

10   deposition and that the transcript is a true record of

11   the testimony given by the witness.

12            I further certify that I am not a relative,

13   employee, attorney or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorneys or counsel connected with the action, nor am

16   I financially interested in the action.

17            Dated this 22nd day of August, 2019.

18

19                      KIMBERLY HAMMOCK

20                      Notary Public State of Florida

21                      My Commission EE 155298

22                      Expires 12-26-2021

23

24

25

Paul Grenier
August 7, 2019

## A

**a.m** 4:22,23,23
**abdomen** 32:8
**ability** 56:9
**able** 22:22 23:2
    48:3
**absent** 31:10,17
    32:24
**accident** 4:15
**accompany**
    27:15
**accurate** 44:3,6
    46:4 47:6 48:3
    49:6 51:9
**acidic** 26:22
**act** 6:22
**acting** 24:19
    35:7
**action** 56:15,16
**activity** 22:15
    23:18,20 25:6
    31:20 39:4
**add** 36:5
**additional** 27:21
**address** 9:17
    11:10 22:7
**addressing**
    22:19 52:23
**administer** 25:2
**administering**
    4:9
**advanced** 25:3
**advice** 41:3
**advised** 26:19
**afternoon** 3:7
    42:11 43:6,24
    44:12 52:6
**agency** 10:5
**aggressive** 8:17
**ago** 40:21 41:14
    41:23 49:17
**agree** 41:21
**agreed** 24:6
**ahead** 15:12

44:11 48:23
**aid** 49:1
**airway** 22:3,7,19
    31:2,6
**alert** 35:7
**Allergies** 11:11
**ambulance** 29:5
**amount** 6:2
**answer** 8:19
    13:2 14:14
    36:11 38:5,14
    39:22 45:25
    46:18 49:1,25
    50:2 51:3,5
**anybody** 40:10
    52:23 53:12,18
**appreciate**
    42:17
**approach** 16:25
**approximately**
    25:19 55:15
**area** 32:12,13,14
    45:24
**arm** 21:18
**arrest** 22:6,9,10
    22:11 23:4
    24:19 25:14
    26:9,24 34:4,6
    34:13,15,16
    35:2,8
**arrests** 25:8
**arrival** 34:7
**arrived** 12:1
    20:4 28:22
    46:21
**asked** 19:25
    21:9 39:1 41:5
    45:12 48:16,18
    49:8 53:14
**asking** 21:8
**assess** 31:22
**assessed** 31:9
**assessing** 48:25
**assessment** 6:5

17:2 30:19,21
    30:25 31:2
**associated** 9:17
**assume** 35:19
    36:20 54:16,24
    55:11
**assuming** 30:24
    34:16
**asystole** 22:12
    22:13 23:15
    27:7 34:22
**attach** 18:3,22
**attitude** 8:17
**attorney** 56:13
**attorneys** 56:15
**August** 1:17
    56:17
**authorized** 56:8
**automatically**
    22:6
**AVENUE** 2:5
**average** 25:24

## B

**B** 2:17 4:24
**back** 7:25 11:7
    12:16 16:3
    19:24 21:17
    22:9 41:1 43:7
    49:4
**background** 5:9
**backwards**
    39:11
**Bad** 8:17
**based** 13:12
    24:9 35:6,8
    46:14
**basic** 11:12
**basically** 11:21
**bed** 21:4 37:17
    37:24,25 38:1
    38:2,8,16 50:3
    51:3,4,5
**began** 21:5

**beginning** 20:20
**behaving** 16:6
**behavior** 32:17
    32:20
**behavioral**
    24:10,11
**believe** 9:11,14
    9:24 15:17
    24:22 37:17
    40:3 43:10
    44:2,5 46:23
    47:2 51:25
    53:1
**believed** 43:18
**best** 56:9
**better** 21:12
**bicarb** 26:19
**big** 38:2
**bit** 4:12 13:16
**blaring** 12:11
**blood** 23:3,5
    24:17 31:8
**Blood/fluid**
    31:24
**BOB** 1:10
**body** 17:4 21:24
**bone** 22:21,22
    23:10
**bottom** 30:6
    45:12
**BOULEVARD**
    1:20
**break** 19:20
**breathe** 22:8,19
**breathing** 6:9
    17:2 22:3
    25:15 31:10
    32:25 39:3
**Brennan** 40:15
**brief** 19:22
**briefing** 8:8
**bring** 11:12 41:6
    55:2
**bringing** 55:2

**brought** 28:12
    41:2 43:13
**busy** 37:5
**button** 29:10,10
    30:2,11

## C

**C** 1:7 2:1
**caliber** 50:11
**call** 7:4,9 8:5,6
    10:1,2,2 14:6
    20:9,18,19,20
    20:22,23 22:12
    26:3,25 28:14
    37:9 43:7,8,15
    43:21 44:12,13
    44:17 46:7
**Callahan** 2:4,14
    3:6 8:20 13:3
    14:15 17:25
    18:1,12,17,18
    18:22 19:3,19
    19:23 20:13
    27:13 36:12
    38:6,15 39:23
    40:6 41:9,25
    42:2,14,19,23
    47:19 54:13,20
    55:5
**called** 3:3 6:4
    10:4,7 14:3,5
    17:11 20:2,3
    35:22 46:8
**calls** 10:21 12:23
    14:7
**calm** 7:14 8:13
**CAPACITY**
    1:11,12
**captain** 19:17
    40:13,16
**capture** 30:12
**cardiac** 22:6,10
    22:11 23:4
    24:18 25:4,8

25:14 26:23
34:4,6,13,16
34:18 39:3
**care** 2:20 6:7
18:25
**case** 1:4 6:12,12
9:16 18:9 42:6
43:1 51:14
**cases** 13:12
**Castro** 7:4 8:1
8:10,14,23
44:14 46:1
**categories** 34:10
**category** 33:7
34:9
**catheter** 23:2
**causation** 54:9
**cause** 36:8
**caused** 53:23
**caution** 7:20
**cease** 26:12
**center** 32:15
**Central** 2:5 5:17
31:19
**certain** 10:12
**CERTIFICA...**
56:1
**certify** 56:7,12
**cetera** 7:20
**change** 23:24
**check** 24:17
**checked** 7:14
31:14 33:12
**chest** 22:18 32:8
32:13,16
**Circulation**
31:12
**clear** 7:23 8:7
14:9
**cleared** 5:24
7:15 14:16
52:10
**clearer** 41:22
**CLEARWAT...**

1:21
**close** 33:13
36:20
**closer** 12:19
51:4
**collapse** 23:5
**colleague** 44:14
**college** 5:11,17
**color** 33:20
**column** 29:19
**combative** 6:12
7:19 9:4 16:10
16:14 24:20
**come** 6:10,20,20
8:7 9:10,24
10:1 23:22
26:13
**coming** 13:24
14:23 31:8
34:14 41:14
43:21
**Commission**
56:21
**common** 5:23
6:1
**communication**
13:17
**community** 5:11
**compare** 10:19
17:10
**compared** 19:17
**COMPASS** 1:19
1:25
**complete** 18:4
**completed** 5:19
**compressions**
22:18
**computer** 5:11
29:7,9,9,24
39:16
**condition** 5:24
15:2,19,25
16:6 26:10
**confused** 6:22

**connected** 56:15
**connects** 30:16
**consciousness**
39:3
**contact** 26:5,7
35:11,12 48:12
**context** 16:5
45:19 48:23
**continue** 25:18
**continues** 23:24
**contract** 25:7
**contracting**
23:19 25:14
**control** 26:4
35:13
**conversation**
53:10
**conversations**
53:15
**conversed** 52:18
**copy** 19:20
54:18,20,21
**corner** 28:6
**correct** 4:1 10:2
10:25 11:22
12:6,7,9 15:3
24:15 28:2,15
28:18,21,24
29:5,16,17
30:8,22,23
31:4,11,21,25
32:1,19,21,25
33:3,21,25
34:14,22,23,24
35:1,4 37:19
39:15 41:24
43:22,23 45:19
47:10 48:10,14
49:25 51:20,22
51:24 53:25
**corrections**
54:23
**correctly** 31:3
54:16,24 55:9

55:11
**counsel** 56:13,15
**county** 1:11,13
2:9 3:18 5:25
7:5 9:13 18:24
41:18 56:5
**couple** 18:19
23:25 40:21
**court** 1:1 19:19
54:15,22 55:5
**courtroom** 54:9
**covered** 50:22
**CPR** 21:5 22:2
23:24 24:1
30:7 49:4
**crew** 8:9 19:6,7
24:6
**Cross-Examin...**
2:15 41:12
**current** 20:9,19
20:22

———————
**D**
**D** 2:13
**date** 1:17 40:25
47:7
**dated** 18:25
56:17
**David** 40:16
**day** 4:23 10:24
10:24 26:5
41:18,22 43:15
46:25 50:14,16
56:17
**dead** 27:11
**deal** 4:11
**Dealing** 4:9
**death** 53:23
**DECEASED** 1:7
**decent** 6:2
**decide** 16:10
**decided** 7:22
48:8
**decision** 12:5

46:10,13
**decisions** 7:16
**declared** 27:14
**Defendant** 2:8
**DEFENDANTS**
1:14
**defense** 18:10,10
**definitely** 17:24
18:15
**DeGraw** 1:6,7
39:19 48:13
51:15,21 52:15
52:16
**DeGraw's** 53:23
**degree** 5:12 54:6
**department**
3:25 5:1,3,13
5:14 8:2 10:5
12:3 13:22
**depo** 18:13
**DEPONENT**
1:16
**deposition** 40:8
56:10
**depth** 4:11
**deputies** 15:15
16:12 37:1
41:18 46:15
48:9,11 53:14
53:17
**deputy** 1:13
16:11 39:18
49:2,3 51:11
51:14,16,23
52:4,8,12
**describe** 12:24
16:13 17:3
21:12 32:6
**described** 8:12
**describing** 45:21
48:24
**description** 2:19
37:20 47:15
**designated**

10:24
**destination** 27:19,24 28:9
**detailed** 26:8
**Detective** 45:5,5
**detectives** 45:4 46:25 47:3,6
**develop** 25:9
**difference** 4:5
**different** 4:10 4:20 6:19 17:17 18:5 19:5,9,16 26:16 42:22
**differentiate** 44:13
**diploma** 5:10
**direct** 2:14 3:5 16:22 23:8 45:11,18 48:21
**directed** 14:20
**disconnect** 13:5
**discovery** 17:20 18:9
**discuss** 36:23 40:17
**discussed** 29:6
**dispatch** 9:14,22 9:24 14:7,10 20:14 28:16 43:21
**dispatched** 45:13
**dissect** 19:8
**distinguishing** 20:19
**distress** 33:15
**DISTRICT** 1:1 1:2
**DIVISION** 1:3
**doctor** 23:6 26:4 35:12
**doctors** 26:25
**document** 17:11

18:8 30:18 42:7 44:25 45:9
**documented** 17:15
**documents** 43:11
**doing** 10:20 16:14 22:7,18 26:11
**DONALD** 1:7
**door** 29:1 37:11
**doses** 24:1
**double** 7:7
**Drive** 45:15
**driving** 28:20 47:24
**drops** 23:5
**Dry** 33:6
**duly** 3:3

**E**
**E** 2:1,1,13,17
**earlier** 16:16 44:14,15
**early** 7:3
**easy** 22:23 23:7
**edge** 38:11
**education** 5:16 54:3
**educational** 5:9
**EE** 56:21
**efforts** 25:10,18 37:4
**either** 8:4 18:9 25:16 28:4,10 43:16 47:14
**electric** 22:15
**electrical** 23:18 23:20 25:6
**Emergency** 18:24
**employee** 56:13 56:14

**employment** 5:2
**EMS** 34:7 40:13
**EMT** 4:6,13 5:13 11:7
**EMT's** 4:1
**en** 28:19 29:10
**ended** 55:14
**enforcement** 52:5
**engine** 10:17
**engineering** 5:11
**entering** 15:1
**entire** 12:19
**epi** 25:2,3
**epinephrin** 23:22,25
**episode** 7:13 8:12
**equipment** 14:19,23 22:16 22:17
**ESQ** 2:3,8
**essentially** 27:11
**ESTATE** 1:7
**Estimated** 35:2
**et** 7:20
**etiology** 34:15 34:16
**events** 11:23 36:22
**eventually** 14:3
**evidence** 24:8 34:12
**exact** 8:4 12:22 42:18
**Examination** 2:14 3:5
**examined** 3:4
**example** 29:20 30:6 53:21
**exhibit** 2:19 18:23,23 19:1 40:2,2,4 42:4

43:2,12,20 44:23 48:22 49:23
**exhibiting** 32:20
**exhibits** 42:1
**exist** 9:19
**experience** 5:21 6:2 13:12
**Expires** 56:22
**explaining** 7:10
**extra** 54:21
**eye** 11:24
**eyes** 33:13 39:7 39:14

**F**
**fairly** 22:23
**fairness** 47:11 47:25 50:6
**familiar** 6:14,16 50:13
**familiarity** 6:17
**family** 11:8
**far** 4:9 11:16 16:6 20:18 22:24 23:13 26:12 30:15 35:19 36:3,4 44:3,11 45:22 47:9,11 49:16 53:23 54:3 55:3
**FD** 44:20 48:7
**feet** 37:25 38:17 50:3 51:3
**femoral** 31:14
**fetal** 21:16
**field** 5:25 23:8
**Fifteen** 12:25
**fill** 11:19 30:4
**filled** 30:12
**final** 18:4
**financially** 56:16

**fire** 3:12,25 5:3 5:13,14 8:2 9:5 9:12 10:2,5
**firearm** 49:13 50:9
**firearms** 46:8 49:10,19
**firefighter/pa...** 3:11,17,22 10:15
**FIRM** 2:4
**first** 6:5 12:2,2 12:13 15:10,11 16:24 17:3 20:2,5,7,9,10 20:15,23 22:24 23:7 24:20 34:21 43:6 44:18,20,21 46:21 47:9,17 47:18,22,23
**five** 3:18 24:2 46:19
**FL** 1:21 2:6,11
**flat** 22:14,15,15
**flatline** 23:15
**flip** 45:17
**floor** 16:23 21:3 21:19 37:24
**Florida** 1:2,24 5:18 56:4,20
**fluids** 22:23 23:2
**Flush** 33:23
**follow** 17:23
**follows** 3:4
**foregoing** 56:9
**forget** 55:3
**forgot** 39:1 44:7
**Fork** 45:15
**form** 8:18 13:1 14:13 27:12 36:10,13 38:4 38:13 39:21 47:19

formats 19:5
found 21:1
Foundation 3:21
four 3:14 10:18
  24:1 32:9,23
  37:25 38:17
fourth 20:8
free 45:10
front 28:5,13
  39:11
full 3:8
further 12:16
  50:6 56:12

_____ G _____

G 2:8
general 40:19
generalize 32:15
Generally 32:12
generate 23:23
generated 9:9
  9:22 23:20
  29:7,7,19,23
  29:25 30:9
getting 11:8
  13:21 14:22
  28:20
give 7:20 9:7
  22:20,22 23:2
  26:5,15,19
  27:2 41:3 48:4
  53:2 54:20
given 56:11
giving 48:2
glucose 24:17
go 7:16,23 8:7
  8:13 9:7 14:9
  14:22 16:3
  19:24 22:2,2,3
  23:7,13 26:1
  30:1 44:11
  45:9,24 47:23
  48:23 50:6
go-to 22:24

Goepfert 1:12
  51:11,16
goes 22:21 23:4
going 7:7 10:24
  14:1,11,23
  16:18 18:2,22
  26:13 27:21
  37:6 40:2 43:2
  44:11 45:6,18
  46:11 55:6,7
good 3:7 6:5
  31:6 55:4
Greg 51:11
GREGORY
  1:11
Grenier 1:16
  2:21 3:2,9
  18:19 45:1,6
GROUP 1:19,25
GUALTIERI
  1:10
guarantee 23:8
guessing 19:13
GULF-TO-B...
  1:20
gun 38:21 50:19
guns 37:14 46:2
guys 12:8 13:15
  18:15 28:16
  36:1 43:1
  45:23 46:14
  48:7,13 49:1

_____ H _____

H 2:17
HAMMOCK
  1:22 56:7,19
hand 41:25 42:6
handcuffs 21:4
  21:5,6 48:17
  49:3
handed 42:25
handgun 37:17
  37:18 50:3

handle 10:23
  50:19
hands 21:17
hands-on 10:21
  10:22 11:2,6
happened 4:15
  7:10 8:9 14:2
  14:18 15:5,7
  20:21 26:6
  40:21 41:19,22
  41:22 48:5
happens 16:20
hard 23:6
harmonize
  47:25
head 51:5,6
heads 9:7
headsets 7:9
heard 40:25
  52:24
hearing 53:4
heart 22:8,11,12
  23:19,19,21
  25:7,10,12,13
  27:4
help 44:24
helping 22:19
helps 25:6
High 5:10
highest 33:18,19
Hillsborough
  7:5
hip 21:11,14,19
history 11:10
  24:12,14 35:15
  35:18 53:2,2
  53:11
hit 29:9,10 30:2
  30:11
honest 51:18
honestly 15:4
  43:18
hooked 22:16
hospital 4:11

7:16 8:13
  11:13,13,15
  27:15,18 28:10
  39:2 52:11
hours 4:24 7:7
  47:7
house 9:3 12:1
  12:14,15,17
  14:4,23 15:1
  15:12 16:21
  28:7 35:20
  37:14 38:24
  45:24 48:12

_____ I _____

identification
  2:19 19:2 40:5
imbalance 26:22
immediately
  22:18
inaccurate
  46:24 47:4
incident 4:15
  6:25
incidents 41:1
incomplete
  17:11,12
independent
  6:24
individual 1:10
  1:12 51:23
  52:4
information
  11:8 19:9
  27:21 35:22
  37:8
INGUNA 2:3
initials 45:4
injury 36:8
instance 11:6
interactions
  53:3
interested 56:16
intervention

30:10
interventions
  11:16 25:23
  30:2,4 36:3
interview 44:24
  45:1 49:22
  52:9
interviewed
  41:17 47:3
involved 11:7
IO 22:20,25 23:7
issue 10:9 13:9
  18:15 42:21
issues 24:10,11
IV 22:21,25 23:1
IVs 23:6

_____ J _____

John 45:5
Jonathan 45:5
Joseph 3:9
JT 45:4,23 49:23
JU 45:5
Julie 1:6 52:15
jumped 5:12

_____ K _____

keep 18:14
KIMBERLY
  1:22 56:7,19
kind 6:8,22 7:10
  7:11,18,20 9:7
  10:24 13:21
  20:19 21:19
  22:4 32:15,15
  36:1 38:11
  45:18 52:5
knew 13:7,23,25
  14:21
know 6:18 8:4
  9:21,23 10:4,8
  12:22 15:2,6
  15:12 16:17
  17:21 19:5

20:14 22:5
26:23 27:22
28:3 35:17,24
38:2,16,17,21
51:11 52:1,18

**L**

labeled 19:7
laptop 30:16
39:11
LARGE 1:24
LARGO 2:11
law 2:4 52:5
laying 17:4
leaning 21:10
leave 23:2 29:3,5
led 26:23
left 20:25 28:7
32:2,6,9,16
33:9
left-hand 29:19
let's 7:25 17:10
18:2,3,12,14
18:15
Lethargic 6:22
level 24:17
33:16
lieutenant 7:22
11:6 12:6 19:6
39:9 46:10,13
53:1,5,10
life 25:3
lights 12:11
likes 23:6
Likewise 18:7
limits 24:22
line 20:8 22:24
23:9 31:12
little 4:7,8,11,12
6:10,11 7:13
12:23 13:8
19:20
living 3:10
LLC 2:4

LOC 32:17
located 37:23
location 1:19 8:3
40:20 45:13
49:19,20
long 3:13 12:21
25:18 26:10
27:17 46:14
longer 6:11
12:23 13:8,11
26:1
look 17:13 18:2
18:3,20,20
26:11 28:12
36:15 42:13
43:11,16 44:23
47:14 49:22
55:4
looked 11:24
17:4
looking 17:8
20:6 22:4 40:1
45:20
looks 17:16
20:25 29:19
30:21 31:14
47:22 50:7
loss 31:24
lot 11:11 13:24
17:22 19:8
22:6 37:6
39:12 40:23
51:18
loud 39:8
low 24:20
lower 34:3
Lung 32:23

**M**

machine 29:20
main 24:10
man 46:1
manner 16:13
Marion 3:17

5:25
mark 40:2
marked 2:18
19:2 40:5 42:6
43:2,12
marks 21:24
match 19:4 43:1
mean 9:9 11:20
16:5 25:13
28:14 31:5
34:24 35:5,11
35:23 40:20
50:19
Meaning 21:18
32:20 34:12,24
means 21:13
28:16 31:6
33:12 34:13
measure 34:1
medical 5:24
10:2,7,7,9
11:10 14:12,19
16:6,17 18:24
26:4,4 35:13
53:2,11 54:3,6
54:8
medication 25:8
26:24
medications 4:9
11:10 22:22
23:9,13 26:15
medicine 6:8
members 19:6
memory 41:21
43:14
mention 39:19
mentioned 8:11
8:25
middle 1:2
36:18 38:11
49:23
Military 43:24
milligrams 24:3
mind 42:21

mind's 11:24
mine 27:23
minutes 12:25
18:20 24:2
25:19,21,25
35:3 46:19
missed 36:19
missing 17:22
19:6
model 50:8
moist 33:6
moisture 33:1,5
moments 49:17
monitor 22:8
23:17 30:16
monitored 34:21
morning 7:4,8
7:10,17 8:9
20:21 43:8,19
44:7
mouth 31:7
move 12:19
movement 31:23
31:23
multiple 14:21

**N**

N 2:1,13
name 3:8,9 11:9
17:14 51:12
Narcan 24:3
narcotics 4:10
narrative 20:20
36:4 47:15
naturally 23:21
near 51:6
necessarily
30:11
need 6:7 11:11
11:12 27:1
42:14 54:21
needed 14:22
41:6,6
needle 22:20

23:1
nervous 31:19
neuro 31:20
never 27:8
new 14:12
NIBP 29:20
Noel 7:4
non-reactive
33:9,10
noon 44:4
normal 6:22
24:22,25 25:7
26:24 33:2,20
33:24 35:7
Notary 1:23
56:20
notation 35:11
note 7:21 33:1
37:20
noted 31:25
notes 7:18 8:25
9:6,15,16,19
9:22 17:10
38:18 39:6
43:13,13
number 25:21
42:4,5

**O**

Object 8:18 13:1
14:13 27:12
36:10 38:4,13
47:19
Objection 39:21
observations
49:9
obstructing 31:7
obtained 24:13
27:22 35:18
obviously 10:1
25:15 52:9
Ocala 3:18,21
5:12,17
occasion 9:21

occurred 45:23
occurrence 47:7
offer 42:17
office 2:9 7:23
  8:7 17:19
officer 52:4
officers 13:24
  14:21 51:18
okay 3:22 4:14
  4:25 5:15 6:3
  7:15,25 8:10
  8:25 9:25 10:8
  10:14,25 11:18
  11:23 12:18
  13:11,14 14:2
  14:8,18 15:1
  15:15 16:2
  17:25 18:17
  19:11 21:18
  22:1,16 23:10
  23:12 24:16,21
  26:2,18,20
  27:3 28:1,11
  29:15 30:14,18
  31:9,24 32:6
  33:1,15,18
  34:3,15 35:10
  35:14,21 36:19
  37:13 38:18,21
  38:23 39:25
  40:12,15,17,20
  41:3,8 42:4,16
  44:15 45:7,23
  46:13 48:6
  49:8,24 55:5
Oldsmar 3:11
  3:14 5:1
OLMC 35:11
on-line 26:4
on-the-job 5:21
Once 11:13
Online 35:13
open 28:25
  33:13 50:23

opinion 53:24
  54:2,8
opposed 22:21
  47:18
options 33:4,22
  34:19
order 48:4
orders 27:1,1
ordinary 25:25
orient 48:23
oriented 44:24
original 14:11
  16:17
outcome 26:17
outside 48:14
overall 4:13
overdose 24:5
owned 46:1

          P

P 2:1,1
p.m 1:18,18
  43:24 55:15
PA 23:15,17
  25:13 27:7
page 20:15 28:5
  28:13 30:6,18
  35:14,21 36:14
  36:18 43:16
  44:25 45:9,13
  45:20 48:21,24
  49:22,23
pages 29:18
paperwork 10:9
  11:21
paramedic 4:3,5
  4:7 5:14,15,25
  10:22 54:4
paramedics 4:1
  10:25
part 20:23 25:3
  38:16 48:22
part-time 5:6
parties 56:13

parties' 56:14
Patent 31:3
patient 2:20 4:8
  6:3,4,19 7:8,11
  7:19,21 8:11
  8:16 11:8,14
  14:24 15:2,8
  15:16,21 16:5
  16:17,22,25
  17:3 18:25
  21:1,9 22:24
  23:3,13,14
  25:9 26:9,22
  27:2 28:25
  29:1,2,11
  31:23 37:24
  39:2 43:22
  47:17 48:13
  49:20
patient's 15:19
  15:25 24:17
  27:3
patients 5:22 6:9
Paul 1:16 2:8
  3:2,9 45:1,6
PCSO 13:5
  14:16 20:5,7,8
  21:4 35:9 42:5
  44:21 52:8,12
Penetration
  32:3
people 10:16
Perfectly 21:15
performed 30:7
performing 37:4
period 12:21
person 9:4 15:11
  23:4 32:7
  35:20
PERSONAL 1:6
personally 37:13
PETERSBURG
  2:6
PG 45:6

PH 26:22
phone 26:7
pick 34:9
Pinellas 1:11,13
  2:9 18:24
  41:17 56:5
place 5:1 24:20
  43:15
plaintiff 1:8 2:3
  18:9
Plaintiff's 2:18
  19:1 40:4
please 3:7 42:1
point 8:5 14:22
  15:6,7 16:7
  24:6,13 26:3
points 8:8
police 5:1 52:4
position 4:16
  21:16
possible 47:13
  47:16
postical 6:14
pre-arrival 9:6
pre-run 7:18
  8:25 9:21 39:6
preparation
  42:10
prepare 35:25
  40:7
prepared 17:7
preparing 11:20
presence 49:10
present 47:16
pressure 23:4,5
presume 13:18
  34:18
presumptions
  54:1
pretty 5:12,23
  5:24 6:1,16,19
  7:3 11:12
  14:17 22:2
  23:7 25:7 26:5

30:3 32:8
  36:20 37:5
  40:22 50:23
previously 42:5
primary 5:5
print 19:16 55:7
printout 42:14
  42:18
prints 19:17
prior 7:8 20:18
  34:7,14 40:22
  46:11
probably 19:12
  24:6,10 27:20
  37:25 41:22
  50:3 51:3
problem 14:11
  14:12 16:17
procedures 4:10
proceedings
  55:14
process 41:5
  45:22
produced 17:19
  17:20 18:8
  42:25
program 9:14
protocol 25:3
PTSD 7:13 8:12
Public 1:23
  56:20
pull 30:3,3
  40:13
pulled 14:3
pulses 31:15
pupils 33:7,14
push 23:22,24
  24:7 25:6,8
  26:25
pushed 24:2
put 9:12 19:9
  22:8 23:10
  47:12 49:3
puts 9:14

putting 23:1

**Q**

quadrant 32:2,7
  32:9
quadrants 32:9
  32:24
Queen 38:2
question 16:3
  20:2,4 46:16
  48:25 50:2
  51:2,5 53:14
questions 19:24
  41:10 48:16
  49:8,11
quick 17:1 26:8
quite 5:23 13:16

**R**

R 2:1
radial 31:15
radio 13:5,6,9
  26:8 29:9,11
  29:13
rank 3:23,23,24
reach 29:1,2
react 33:14
read 39:6 45:10
  45:18 48:1
  54:14,22
reading 23:18
  31:3 39:8
really 6:12 19:7
  23:23 41:2
  49:2 51:17
reason 24:18,19
  44:2,5 46:23
  47:2,5
reasons 10:7
recall 12:1,10,12
  12:13,13,21
  15:23 16:1,15
  36:22,25 37:2
  37:3,5,12,20

37:23 38:7,8
  39:18,24 49:14
  51:17 52:3,14
received 9:25
  28:13,14
recess 19:22
recognize 51:12
recognized
  50:16
recollection 6:24
  38:19,20 46:20
recommendati...
  26:11
record 3:8 17:18
  18:23 27:23
refer 44:12
reference 47:21
referring 47:17
  47:22
reflect 43:20
reflection 48:3
refresh 43:14
  46:20
refused 7:16
  8:13
regain 39:2
related 13:10
relation 12:14
relative 56:12
  56:14
relay 9:8
relayed 13:7
  15:5
remember 7:2,3
  8:10,14,24
  10:8 11:23
  12:4 13:14,23
  14:5 15:4,10
  15:11,18,24
  16:2,9,19,24
  17:1 21:8,21
  21:23,25 34:20
  35:17,19 37:8

40:23 41:1,17
  42:8 43:9
  44:18 48:18
  49:10 51:15,17
  51:19 52:17,18
  52:19,22 53:3
  53:4,7,9,11,17
removed 48:18
render 54:8
rendering 49:1
rephrase 47:1
report 2:20,21
  10:24 11:13,15
  17:5,7 18:3,25
  20:3,5 26:8
  27:23,25 28:2
  28:12 29:25
  35:9,10,14,25
  36:1,7,8 39:14
  40:1,14,18,23
  42:5 44:20
  46:6 47:14
  56:9
reported 24:11
reporter 1:22
  19:19 54:15,22
  55:5 56:1
reporting 1:19
  1:25 10:23
  11:4,5,9,20
reports 36:3
  43:20
represent 51:13
REPRESENT...
  1:6
request 19:14
  21:6
Rescue 3:12
residence 46:11
  47:18
respect 43:5
  44:18 47:16
  49:20
respiratory 22:9

33:15
respond 10:6
responders
  15:13
responds 10:6
response 9:5
responsibility
  4:7,12
responsive 52:9
rest 9:8 11:16
restart 25:12
resuscitation
  37:4
review 55:4,8
reviewed 39:25
  42:9
rhythm 22:11
  22:12,14,17
  23:14,18 25:10
  25:13 27:8
  34:24,25
rhythms 27:7
ribs 32:11
ride 8:2
riding 8:5 12:8
  12:10
right 6:1,10,21
  10:3 13:19
  17:5 20:17
  21:2,3,10,11
  21:11,12 22:21
  24:19 25:16
  33:9,11 36:21
  39:4 41:15
  43:24 44:9
  45:24 46:11
  47:5 48:6,9
  50:20 51:2,21
  54:4,6,14,17
  55:8
right-hand 28:6
  43:17
ROAD 2:10
role 10:14,19

room 14:21,24
  49:13
room?' 49:24
rounds 23:25
route 28:19
  29:10
Rozelle 2:8,15
  8:18 13:1
  14:13 17:18,23
  18:7,14 20:6
  20:10 27:12
  36:10 38:4,13
  39:21 41:11,13
  41:25 42:3,16
  42:20,24 43:4
  47:20 54:11
run 7:8 9:3,13
rundown 26:6
running 18:14

**S**

S 2:1,17
saw 6:1 10:8
  13:24 17:2
  35:10 36:7
  50:14
saying 8:10,14
  13:11 43:9
  52:24 53:17
says 14:9 17:5
  17:12 18:4
  24:23 28:6,13
  29:20 30:24
  31:19 32:2
  33:20 34:7
  36:21
scale 33:16
scene 7:23 20:4
  20:7,9 27:18
  28:22 29:4,5
  29:10 34:14
  35:8,22 46:7
  49:10 52:6,10
  52:11 53:12,18

**school** 5:10
**screaming** 7:12
**screen** 39:16
**screens** 29:14
**second** 20:4,11
  20:12 35:21
  44:12,17 46:7
**section** 30:19
  34:3 35:15,22
  36:7,9,17
**Secure** 3:20
**see** 5:23 6:23
  10:12 14:20
  17:14 26:16
  29:21 33:13
  36:15,19 37:13
  37:13,16 38:23
  39:10 44:25
  45:1,12,14,21
  46:2,15 49:4
  49:24 50:2,4
  50:23 51:6
  54:22
**seen** 35:7,7 42:7
**seizing** 6:6
**seizure** 6:4,6
  20:4
**seizures** 5:22
  6:10
**semiautomatic**
  50:8
**sense** 47:13
**sent** 28:17
**September** 4:15
  6:25 18:25
  41:19 51:16
  52:6
**service** 43:15
  44:13,17
**Services** 18:24
**set** 4:8 9:13
**share** 36:1,2
**sheriff** 1:11,13
  51:23

**sheriff's** 2:9
  7:23 8:7 12:2
  13:22 16:11
  17:19 41:18
  52:4
**sheriffs** 12:6
**shift** 4:19,20,21
  4:24 7:6,7 9:25
  10:14 44:15
**shock** 27:3,7
**shocked** 27:9
**shortly** 15:8
**shoulder** 21:18
**shows** 22:17
  39:16
**sic** 5:1
**side** 9:12 10:23
  11:4,5 17:4,6
  21:2,3,10,11
  21:12,15,16,19
  43:17 51:4
**sight** 50:17
**signs** 6:23
**similar** 13:12
  21:16 36:16
**sinkholes** 3:20
**sir** 3:7,10 40:12
  41:9,16
**sirens** 12:11
**sit** 19:8 39:11
**sitting** 8:6 13:18
  13:19 39:10
**situated** 50:25
**situation** 48:25
**size** 38:3
**skill** 4:8
**skin** 33:20,24
**sleep** 7:12
**slightly** 17:16
**sluggish** 6:11
**so-called** 6:14
**SO16-36378-25**
  42:5
**sodium** 26:19

**somebody** 52:25
**soon** 5:24
**sorry** 5:4 33:17
  36:19 49:18
**sort** 7:13 21:10
  26:22
**sounds** 21:14
  32:23
**speak** 52:15
**speaking** 51:15
**split** 32:8 45:14
**spot** 12:19,20
**ST** 2:6
**stage** 12:5,19,21
  28:23 45:24,25
  46:11,14,14
  48:8
**staged** 12:14,18
  13:15,16,18
  48:14
**staging** 8:6
  45:22
**standard** 25:20
**standing** 11:7
**start** 11:9 22:18
  22:20 28:20
  39:3 49:1
**started** 7:17
  28:7 49:4
**starting** 22:24
**state** 1:24 3:7
  6:8,15 56:4,20
**statement** 46:24
  51:6
**states** 1:1 31:10
**station** 19:18
**stay** 12:18
**stayed** 12:15,20
**stenographer**
  56:7
**stenographica...**
  56:8
**sternum** 32:14
**stop** 26:12

**storage** 39:12
**story** 15:5
**street** 12:2,15,16
  13:25 47:23
**structure** 9:6
**structures** 9:12
**stuff** 11:11,12
  36:5 40:23
**subcategory**
  34:6
**subject** 46:7
**substance** 40:17
**sued** 51:14
**Sunstar** 10:6
  19:12 27:24
  29:12 35:25
  36:7 43:12
**Sunstar's** 28:2
  29:16
**SUPERVISO...**
  1:10
**Supplement**
  48:22
**support** 25:4
**sure** 9:20 10:7
  16:4 18:5,21
  19:18 20:1
  24:18 29:11
  42:2 45:19
  48:2 51:19
  54:15 55:9
**suspicion** 24:5
**sworn** 3:3
**system** 9:3 13:6
  31:19
**Systems** 3:21

      **T**

**T** 2:17
**take** 5:19 6:7,10
  11:15 18:19
  19:4,20 21:8
  42:13,20 43:16
  44:23 49:22

**taken** 19:22 21:6
**takes** 6:21
**talk** 18:12,16
  40:10
**talked** 36:25
  37:10 40:13
**talking** 37:3
  45:14 52:24
  53:1,21
**TAMPA** 1:3
**Tased** 15:8,16
  15:22 39:19
  51:21
**Taser** 21:23
  32:5 36:8
  51:15
**tell** 27:17 46:1
  54:21,25 55:12
**telling** 7:25 8:1
  20:25
**temperature**
  33:24
**ten** 33:16,17,17
  33:18,19
**testified** 3:4
  16:16 45:22
  52:12 53:19
**testimony** 42:10
  43:5 44:19
  48:2,7,19
  49:19 51:20,20
  54:9 56:11
**Thank** 40:12
  41:9 42:16
  54:12,13
**thermometers**
  34:2
**thing** 6:1 16:9
  19:8 24:10
  36:20,21 41:2
**things** 8:2 44:8
  45:11 48:1,4
  53:16,16 55:3
**think** 9:19 10:11

Paul Grenier
August 7, 2019

16:16 19:14,14
21:9 23:25
32:4 42:19
43:7 47:5,15
54:2
**third** 45:20
48:24
**three** 5:10 24:2
37:25 38:17
41:14,23,23
44:8 51:3
**tibia** 23:11
**time** 1:18 6:21
7:13,22 8:4
12:19,22,25
13:16 15:4
19:1,4,22 21:4
25:10,24 26:3
26:17 27:4,14
27:19,24 28:9
28:10,19 30:9
30:12,12,21
35:2,6,7 36:4
40:4 43:14,17
43:25 46:24
54:12 55:14
**times** 15:21
20:15 28:6,13
29:6,19,23
30:17 39:20
**timestamped**
30:1
**Tobeck** 45:5
**today** 28:12
41:23 43:12
45:22 48:4
52:13 55:12
**told** 8:1 14:24
15:7,10,14,16
15:19,21,24
26:18 37:1
39:18,25 47:6
51:21
**top** 38:1 45:20

48:24
**total** 47:11,25
**touch** 29:13 34:1
**traffic** 13:21
**training** 5:15,21
54:4
**transcribe** 55:7
**transcript** 54:15
56:10
**transfer** 11:14
30:15
**transferring**
20:21
**transfers** 30:17
**transport** 27:20
28:6,8 29:3,12
29:15 36:5
39:1
**transported**
26:14 27:2
**trauma** 36:16,17
**treat** 26:21
**treatment** 23:24
**true** 56:10
**truthful** 47:6
**try** 25:7 26:15
27:3
**trying** 47:12,25
**tube** 22:7
**Twin** 38:3
**two** 10:25 35:3
50:3 51:3
**type** 10:9 50:8
**types** 29:8
**typically** 26:21

__U__

**ULMERTON**
2:10
**um** 46:1 51:4
**understand** 3:25
7:11 20:17
35:20 37:7
40:24

**understanding**
44:6
**unfortunately**
43:2
**UNITED** 1:1
**unresponsive**
14:25 15:9
32:18
**unstable** 9:6
**update** 13:10
**upper** 21:18
23:11 32:2,6,9
32:16 43:17
**upstairs** 14:20
14:21 15:6
16:21
**Upton** 45:6
**usual** 12:23,25
13:8,11,25
**usually** 11:5,8
11:15 25:20,21
25:24 26:11,24
27:24

__V__

**V** 1:6
**varies** 13:4,7
**VARSLAVA...**
2:3
**vehicle** 10:16
13:19 28:20
29:16,16 39:8
**vein** 23:1
**veins** 23:5
**version** 17:17
**versus** 10:4
22:25
**vitals** 7:14 11:16
30:3,15,15,17
**vomit** 31:8
**VS** 1:9

__W__

**wait** 7:22 8:6

12:5
**waive** 54:17,23
55:10,13
**walk** 16:20,21
**walked** 14:19
**walking** 15:5
**want** 45:10,11
48:2 54:22
**warn** 7:18
**wasn't** 17:2,20
25:14 47:5
50:22 52:23
**way** 6:20 7:4,9
9:8 13:17
19:16 20:17
21:12 22:23
23:3 37:10
43:7 44:19
54:18
**ways** 19:9
**We're** 22:22
**we've** 26:10,10
45:14
**weapon** 38:8
50:11
**weapons** 7:20,22
8:22 38:23
49:24 50:13
**wearing** 21:21
**weird** 36:2
**welcome** 45:18
**went** 7:24 15:8
23:14 24:18
25:22 26:9
48:12 52:11
**White** 33:23
**wife** 24:14 35:18
**wire** 21:24
**witness** 17:22
20:7,12 43:3
54:14,18 55:1
55:10,13 56:11
**woke** 7:12
**word** 22:4 55:6

**worded** 20:16
20:17,18
**words** 52:19,22
**work** 5:6 7:5,7
22:5 43:3
**worked** 3:20
**working** 4:16,19
4:21,25 7:6
**works** 7:5 36:2
**write** 11:15 55:6
**written** 44:19
**wrong** 13:24
**wrote** 54:16,17
54:24 55:9,11

__X__

**X** 2:13,17

__Y__

**yeah** 51:6
**years** 3:14,18
5:11 40:21
41:1,14,23,23
44:9
**you-all** 48:14
**Young** 40:16

__Z__

**zero** 33:17 35:3

__0__

__1__

**1** 35:21 42:4
43:2,16 44:24
44:25 48:22
49:23
**10** 35:22
**10750** 2:10
**12-26-2021**
56:22
**137** 24:23
**15:42** 28:14
43:21
**15:43** 43:21

Paul Grenier
August 7, 2019

**155298** 56:21
**16:09** 30:22
 43:22
**16:10** 30:7
**16:11** 29:20
**19** 2:20
**1911** 50:7,8

---
**2**
**2** 24:2 35:14
 45:9
**2:00** 1:18
**20** 12:25 25:21
 25:24
**2016** 4:16 6:25
 18:25 41:19
 51:16 52:6
**2019** 1:17 56:17
**203** 2:5
**22nd** 56:17
**23:03** 47:6
**24** 4:24
**25** 25:19,22 42:4
 48:22

---
**3**
**3** 2:14 29:18
 30:6 45:17
**3:30** 1:18 55:15
**3000** 1:20
**33** 2:20 18:23
 19:1 43:12,20
 47:14
**33701** 2:6
**33759** 1:21
**33778** 2:11
**34** 2:21 40:2,4
 43:12,20 47:14

---
**4**
**4** 29:18 48:21
**40** 2:21
**41** 2:15
**449** 2:5
**45** 50:7,11

**48** 7:7

---
**5**
**5** 29:18 36:14
 49:22
**500** 1:20

---
**6**
**6** 29:18 30:18
 36:18 44:25
 48:21 49:22

---
**7**
**7:00** 4:22,23,23
**7th** 1:17 6:25
 18:25 51:16
 52:6

---
**8**
**8:18-CV-2116...**
 1:4
**8th** 41:19

---
**9**
**911** 9:14,22,24



# Pinellas County Emergency Medical Services
## Patient Care Report

**Patient Name: DONALD DEGRAW**                    EMS Run#: 6136595          **FINAL**

**DOS: 09/07/2016    Job: 0845-A    Vehicle:E54**        FD Incident#: 6136595

**Agency: OLDSMAR FIRE DEPARTMENT**

ACH Incident #:

### CREW INFO    Doc'd By: GRENIER (OL), PAUL, Paramedic

| Crew1: CASTRO (OL), NOEL, Paramedic | Crew2: GRENIER (OL), PAUL, Paramedic | Crew3: WEBER (OL), NICHOLAS, EMT |

### RESPONSE INFO | DESTINATION | TIMES

| Call Type: | Dest. Reason: Closest Facility | Call Received: 15:42 09-07-2016 |
| Nature of Call: | Tx Priority: | Dispatch: 15:43 09-07-2016 |
| Response Priority: 1 - Emergency | Destination: | Enroute: 15:43 09-07-2016 |
| FD Agnt: | | At Scene: 15:47 09-07-2016 |
| FD Unit:   E54, OLOPP, 492, oL2A, s80A, | | At Patient: 16:09 09-07-2016 |
| Location:  1739 SPLIT FORK DR | | Transport: 16:52 09-07-2016 |
| Oldsmar, FL 34677 | | At Destination: |
| | At Scene Mileage: | In Service: |
| | At Dest. Mileage: | |

### PATIENT INFORMATION

Name : Donald Degraw                          Phone : 7277761315

SSN :                          DOB : 06/25/████    58Years Old          Weight : 90.91 Kg      200.00 Lb

Sex : Male                     Home Addr. : 1739 SPLIT FORK DR          Mailing Addr. : 1739 SPLIT FORK DR
                               OLDSMAR, FL 34677                        OLDSMAR, FL 34677
Race : White

Advanced Directives: Not Known

Medical Rec No.:                                              Trauma Alias:

### INSURANCE

no insurance information entered

### SCENE INFORMATION

| Distress Level (1-10): 10 | Patient Found: | Position Found: | To Stretcher Via: |
| | Can Patient Get Up w/o Asst? | Can PT Ambulate? | Can PT sit in a chair or wheelchair? |

### CHIEF COMPLAINT                                                      PT. SEVERITY: RED

Cardiac Arrest

### NARRATIVE

E54 RESPONDED FOR A 58 Y/O MALE, CHIEF COMPLAINT OF SEIZURE. E54 STAGED NEAR THE SCENE DUE TO PT POSSIBLY BEING COMBATIVE AND HAVE FIREARMS. E54 CREW MEMBER SAYS HE RAN ON THE PT THIS MORNING. THIS MORNING THE PT WOKE UP SCREAMING AND YELLING WHICH PROMPTED THE PT'S WIFE TO CALL 911. PT HAS HISTORY OF PTSD. COGNITIVE TEST WAS PERFORMED ON THE PT WHICH HE PASSED. PT REFUSAL WAS OBTAINED AT THAT TIME. PCSO WERE FIRST ON SCENE TO THE CURRENT CALL FOR SEIZURE. E54 CREW WERE EVENTUALLY CALLED IN BY PCSO. PCSO SAYS THAT THE PT HAD TO BE TASED DUE TO HIS BEHAVIOR. PCSO SAY THAT SHORTLY AFTER THE PT WAS TASED, HE WENT UNRESPONSIVE. PT WAS IN HANDCUFFS AT THIS TIME AND ON HIS RIGHT SIDE. ONE HANDGUN WAS NOTED ON A BED NEXT TO THE PT. PT'S WIFE ON SCENE SAYS SHE WITNESSED THE PT HAVE A SEIZURE PRIOR TO CALLING 911; UNKNOWN HOW LONG THE SEIZURE LASTED OR THE PT'S CONDITION AFTER THE SEIZURE. PT WAS LOCATED IN A ROOM ON THE SECOND FLOOR LYING ON THE FLOOR (CARPET). UPON ASSESSMENT, PT WAS FOUND TO BE IN CARDIAC ARREST. HANDCUFFS WERE TAKEN OFF THE PT AND CPR WAS STARTED. PT WAS INITIALLY IN ASYSTOLE ON THE MONITOR. KING TUBE WAS INSERTED WITH END TIDAL CAPNOGRAPHY AND OXYGEN. VENTILATION WAS CONFIRMED WITH CAPNOGRAPHY WAVEFORM, POSITIVE BREATH SOUNDS AND VISUAL CHEST RISE AND FALL. I/O WAS ESTABLISHED AND FLUIDS WERE ADMINISTERED. PT RECEIVED 4 DOSES OF EPI 1/10000 AND 2 MG OF NARCAN WHILE CPR WAS ADMINISTERED IN THE PT'S HOME. IN THIS TIME, PT'S HEART RHYTHM WENT FROM ASYSTOLE TO PEA. BGL WAS ALSO OBTAINED. AT THIS TIME, CPR HAD BEEN ADMINISTERED AT APPROXIMATELY 25 MINUTES. MD-1 WAS CONTACTED FOR POSSIBLE DISCONTINUATION OF EFFORTS. MD-1 ADVISED THAT SODIUM BICARB BE ADMINISTERED AND FOR THE PT TO BE TRANSPORTED DUE TO CAPNOGRAPHY READINGS. PT WAS PLACED ON A LONG BOARD, STRAPPED AND LOADED ONTO STRETCHER AND INTO AMBULANCE. DURING TRANSPORT, PT OG TUBE WAS REPLACED DUE TO SUCTION ISSUES. KING TUBE WAS REASSESSED FOR CORRECT PLACEMENT. PT WAS GIVEN TWO DOSES OF EPI 1/10000 DURING TRANSPORT. PT'S HEART RATE WAS FOUND TO HAVE RETURNED TO ASYSTOLE. NO OTHER CHANGES WERE NOTED DURING TRANSPORT. UPON ARRIVAL, PT WAS STILL IN ASYSTOLE. PT CARE REPORT WAS GIVEN TO ER DOCTOR. PT CARE WAS TRANSFERRED TO ER DOCTOR.

### IMPRESSIONS

Primary Impression:    Cardio-Cardiac Arrest

### TREATMENT SUMMARY

| Time | PTA | Treatment | Completed By | Comments |
|------|-----|-----------|--------------|----------|
| | | | | |

# Pinellas County Emergency Medical Services
## Patient Care Report

| | | | | |
|---|---|---|---|---|
| **Patient Name:** DONALD DEGRAW | | | EMS Run#: 6136595 | **FINAL** |
| **DOS:** 09/07/2016 | **Job:** 0845-A | **Vehicle:** E54 | FD Incident#: 6136595 | |
| **Agency:** OLDSMAR FIRE DEPARTMENT | | | | |
| | | | ACH Incident #: | |

**CREW INFO**  Doc'd By: GRENIER (OL), PAUL, Paramedic

| Crew1: CASTRO (OL), NOEL, Paramedic | Crew2: GRENIER (OL), PAUL, Paramedic | Crew3: WEBER (OL), NICHOLAS, EMT |
|---|---|---|

## TREATMENT SUMMARY CONTINUED

| Time | PTA | Treatment | Completed By | Comments |
|---|---|---|---|---|

**16:10  CPR**  —  GRENIER (OL), PAUL

Complication — Complication Narrative

**None**

| Indication=Adult Arrest | Method=Circle Chest | Number of Attempts=1 |
|---|---|---|
| Procedure Result=Successful | Q-CPR Usage=Yes | Response=Unchanged |

| Time | BP | Pulse | Respiratory | SPO2 | EtCO2 | Glucose | GCS |
|---|---|---|---|---|---|---|---|
| 16:11 | 0/0 NIBP Machine | 0, <None> | 0, <None> | 78%, Source: Supplemental | | | E1 + V1 + M1 = 3 |

Skin Temp=Normal
Level of Consciousness: Unresponsive; Pain Scale=10; ECG/Ectopics=Asystole, Artifact

WEBER (OL), NICHOLAS

**16:13  I.O. Adult**  —  GRENIER (OL), PAUL

Complication — Complication Narrative

**None**

| Length=25 mm (1 inch) | Number of Attempts=1 | Procedure Result=Unsuccessful |
|---|---|---|
| Rate=Not Applicable | Response=Not Applicable | Size=15 G |
| Solution=0.9% NSS | Successful IO Site=Proximal Tibia - Left | Tubing=Macro drip |
| Type=IO | Volume=10 ML | |

**16:13  Cardiac Monitor**  —  GRENIER (OL), PAUL

Complication — Complication Narrative

**None**

| Ectopy=None | Indication=Monitoring | Interpretation=Asystole |
|---|---|---|
| Number of Attempts=1 | Procedure Result=Successful | Response=Not Applicable |

**16:14  I.O. Adult**  —  GRENIER (OL), PAUL

Complication — Complication Narrative

**None**

| Length=25 mm (1 inch) | Number of Attempts=1 | Procedure Result=Successful |
|---|---|---|
| Rate=Bolus | Response=Unchanged | Size=15 G |
| Solution=0.9% NSS | Successful IO Site=Proximal Tibia - Right | Tubing=Macro drip |
| Type=IO | Volume=10 ML | |

**16:15  Fluid Infused**  —  Sunstar

Complication — Complication Narrative

**None**

| Dose / Amount Infused (ml)=1000 | Number of Attempts=1 | Procedure Result=Successful |
|---|---|---|
| Rate=Bolus | Response=Unchanged | Solution=0.9% NSS |

**16:16  End Tidal CO2**  —  CASTRO (OL), NOEL

Complication — Complication Narrative

**None**

| EtCO2 value (mmHg)=41 | Indication=Cardiac or Respiratory Arrest | Number of Attempts=1 |
|---|---|---|
| Procedure Result=Successful | Response=Not Applicable | |

Form Rev Date: 11/16/2016

| Patient Name: DONALD DEGRAW | EMS Run#: 6136595 | FINAL |
|---|---|---|
| DOS: 09/07/2016   Job: 0845-A   Vehicle:E54 | FD Incident#: 6136595 | |
| Agency: OLDSMAR FIRE DEPARTMENT | | |

| | ACH Incident #: |
|---|---|

**CREW INFO** Doc'd By: GRENIER (OL), PAUL, Paramedic

Crew1: CASTRO (OL), NOEL, Paramedic    Crew2: GRENIER (OL), PAUL, Paramedic    Crew3: WEBER (OL), NICHOLAS, EMT

## TREATMENT SUMMARY CONTINUED

| Time | PTA | Treatment | Completed By | Comments |
|---|---|---|---|---|
| 16:16 | | **Extraglottic Airway** | CASTRO (OL), NOEL | |
| | | Complication | Complication Narrative | |
| | | **None** | | |

Add'l Confirm (Dest)=EtCO2 Confirmation (Waveform)
Add'l Confirm2 (Scene)=Visualization of the Chest Rising with Ventilation
Initial ETCO2 Post-Tube (mmHg)=41

Printed Waveform @ transfer of=Yes
Secured=Tape

Add'l Confirm (Scene)=Bilateral Breath Sounds without Epigastric Sounds
EtCO2 @ transfer of care=80

Number of Attempts=1

Procedure Result=Successful
Size=4

Add'l Confirm2 (Dest)=Visualization of the Chest Rising with Ventilation
Indication=Cardiac Arrest

Principle Confirm (Dest)=EtCO2 Confirmation (Waveform)
Response=Unchanged
Tube Confirm (Scene)=EtCO2 Confirmation (Waveform)

| Time | BP | Pulse | Respiratory | SPO2 | EtCO2 | Glucose | GCS |
|---|---|---|---|---|---|---|---|
| 16:16 | 0/0 NIBP Machine | 0, <None> | 0, <None> | 68%, Source: Supplemental | 41mm Hg | | E1 + V1 + M1 = 3 |

Skin Temp=Normal
Level of Consciousness:
Unresponsive; Pain Scale=10;
ECG/Ectopics=Asystole,  None

WEBER (OL), NICHOLAS

| 16:17 | | **OG Insertion** | CASTRO (OL), NOEL | |
|---|---|---|---|---|
| | | Complication | Complication Narrative | |
| | | **None** | | |

Number of Attempts=1                     Procedure Result=Successful

| 16:17 | | **Oxygen** | WEBER (OL), NICHOLAS | |
|---|---|---|---|---|
| | | Complication | Complication Narrative | |
| | | **None** | | |

Device=BVM

Number of Attempts=1
Response=Unchanged

Device Applied (Procedure Resu=Successful

Rate (LPM)=15

FiO2 if Venturi Mask=N.A. (not a venturi mask)
Rate Unit=LPM

| Time | BP | Pulse | Respiratory | SPO2 | EtCO2 | Glucose | GCS |
|---|---|---|---|---|---|---|---|
| 16:20 | 0/0 NIBP Machine | 0, <None> | 0, <None> | 0%, Source: Supplemental | 40mm Hg | | E1 + V1 + M1 = 3 |

Skin Temp=Normal
Level of Consciousness:
Unresponsive; Pain Scale=10;
ECG/Ectopics=PEA (Pulseless Electrical Activity),  None

WEBER (OL), NICHOLAS

| 16:21 | | **EPI 1:10,000** | Sunstar | |
|---|---|---|---|---|
| | | Complication | Complication Narrative | |
| | | **None** | | |

Dosage=1
Response=Unchanged

Dosage Units=mg
Route=Intraosseous

Indication=Asystole

| 16:21 | | **Accu-Check** | CASTRO (OL), NOEL | |
|---|---|---|---|---|
| | | Complication | Complication Narrative | |
| | | **None** | | |

Blood Glucose (mg/dl)=137
Response=Not Applicable

Number of Attempts=1
Source=Capillary

Procedure Result=Successful

| | |
|---|---|
| Patient Name: DONALD DEGRAW | EMS Run#: 6136595 |
| DOS: 09/07/2016   Job: 0845-A   Vehicle:E54 | FD Incident#: 6136595 |
| Agency: OLDSMAR FIRE DEPARTMENT | |

ACH Incident #:

**CREW INFO**   Doc'd By: GRENIER (OL), PAUL, Paramedic

Crew1: CASTRO (OL), NOEL, Paramedic   Crew2: GRENIER (OL), PAUL, Paramedic   Crew3: WEBER (OL), NICHOLAS, EMT

## TREATMENT SUMMARY CONTINUED

| Time | PTA | Treatment | | Completed By | Comments | |
|---|---|---|---|---|---|---|
| 16:23 | | EPI 1:10,000 | | Sunstar | | |
| | | Complication | | Complication Narrative | | |
| | | None | | | | |
| | Dosage=1 | | | Dosage Units=mg | Indication=Asystole | |
| | Response=Unchanged | | | Route=Intraosseous | | |

| Time | BP | Pulse | Respiratory | SPO2 | EtCO2 | Glucose | GCS |
|---|---|---|---|---|---|---|---|
| 16:25 | 0/0 NIBP Machine<br>Skin Temp=Normal<br>Level of Consciousness: Unresponsive; Pain Scale=10; ECG/Ectopics=PEA (Pulseless Electrical Activity), None | 0, <None> | 0, <None> | 77%, Source: Supplemental | 51mm Hg | | E1 + V1 + M1 = 3 |

CASTRO (OL), NOEL

| Time | PTA | Treatment | | Completed By | Comments | |
|---|---|---|---|---|---|---|
| 16:26 | | Narcan | | Sunstar | | |
| | | Complication | | Complication Narrative | | |
| | | None | | | | |
| | Dosage=2 | | | Dosage Unit=mg | Indication=Narcotic Overdose | |
| | Response=Unchanged | | | Route=Intraosseous | | |
| 16:26 | | EPI 1:10,000 | | Sunstar | | |
| | | Complication | | Complication Narrative | | |
| | | None | | | | |
| | Dosage=1 | | | Dosage Units=mg | Indication=Asystole | |
| | Response=Unchanged | | | Route=Intraosseous | | |
| 16:30 | | EPI 1:10,000 | | Sunstar | | |
| | | Complication | | Complication Narrative | | |
| | | None | | | | |
| | Dosage=1 | | | Dosage Units=mg | Indication=PEA | |
| | Response=Unchanged | | | Route=Intraosseous | | |

| Time | BP | Pulse | Respiratory | SPO2 | EtCO2 | Glucose | GCS |
|---|---|---|---|---|---|---|---|
| 16:30 | 0/0 NIBP Machine<br>Skin Temp=Normal<br>Level of Consciousness: Unresponsive; Pain Scale=10; ECG/Ectopics=PEA (Pulseless Electrical Activity), None | 0, <None> | 0, <None> | 0%, Source: Supplemental | 13mm Hg | | E1 + V1 + M1 = 3 |

WEBER (OL), NICHOLAS

| Time | BP | Pulse | Respiratory | SPO2 | EtCO2 | Glucose | GCS |
|---|---|---|---|---|---|---|---|
| 16:35 | 0/0 NIBP Machine<br>Skin Temp=Normal<br>Level of Consciousness: Unresponsive; Pain Scale=10; ECG/Ectopics=Asystole, None | 0, <None> | 0, <None> | 40%, Source: Supplemental | 53mm Hg | | E1 + V1 + M1 = 3 |

Sunstar

| Time | PTA | Treatment | | Completed By | Comments | |
|---|---|---|---|---|---|---|
| 16:38 | | OLMC Contact Made | | Sunstar | | |
| | | Complication | | Complication Narrative | | |
| | | None | | | | |
| | Number of Attempts=1 | | | OLMC Consult ID=MD-1 OLMC Consult | Procedure Result=Successful | |
| | Response=Not Applicable | | | | | |

**FINAL**

Patient Name: DONALD DEGRAW

EMS Run#: 6136595

DOS: 09/07/2016    Job: 0845-A    Vehicle: E54

FD Incident#: 6136595

Agency: OLDSMAR FIRE DEPARTMENT

ACH Incident #:

**CREW INFO**  Doc'd By: GRENIER (OL), PAUL, Paramedic

Crew1: CASTRO (OL), NOEL, Paramedic    Crew2: GRENIER (OL), PAUL, Paramedic    Crew3: WEBER (OL), NICHOLAS, EMT

## TREATMENT SUMMARY CONTINUED

| Time | PTA | Treatment | | Completed By | Comments | | |
|------|-----|-----------|--|--------------|----------|--|--|
| Time | | Pulse | Respiratory | SPO2 | EtCO2 | Glucose | GCS |
| 16:40 | 0/0 NIBP Machine | 0, <None> | 0, <None> | 52%, Source: Supplemental | 80mm Hg | | E1 + V1 + M1 = 3 |
| | Skin Temp=Normal | | | | | | |
| | Level of Consciousness: Unresponsive; Pain Scale=10; ECG/Ectopics=Asystole, Artifact | | | | | | |
| | | | | Sunstar | | | |

| Time | | Treatment | Completed By | | |
|------|--|-----------|--------------|--|--|
| 16:44 | | **Sodium Bicarbonate** | Sunstar | | |
| | | Complication | Complication Narrative | | |
| | | None | | | |
| | Dosage=50 | | Dosage Unit=mEq | Indication=Cardiac Arrest | |
| | Response=Unchanged | | Route=Intravenous | | |
| 16:46 | | **Intub Re-Confirm** | CASTRO (OL), NOEL | | |
| | | Complication | Complication Narrative | | |
| | | None | | | |
| | 1st Add'l Method=Bilateral Breath Sounds without Epigastric Sounds EtCO2 value (mmHg)=52 | | 2nd Add'l Method=Visualization of the Chest Rising with Ventilation Number of Attempts=1 | 3rd Add'l Method=N.A. Principle Method=EtCO2 Confirmation (Waveform) | |
| | Printed Waveform=No | | Procedure Result=Successful | Response=Not Applicable | |
| 16:50 | | **EPI 1:10,000** | GRENIER (OL), PAUL | | |
| | | Complication | Complication Narrative | | |
| | | None | | | |
| | Dosage=1 | | Dosage Units=mg | Indication=PEA | |
| | Response=Unchanged | | Route=Intraosseous | | |
| 16:54 | | **EPI 1:10,000** | GRENIER (OL), PAUL | | |
| | | Complication | Complication Narrative | | |
| | | None | | | |
| | Dosage=1 | | Dosage Units=mg | Indication=Asystole | |
| | Response=Unchanged | | Route=Intraosseous | | |

## HISTORY

## Allergies

None Known

## Cause of Injury

Other (see comment)

TASER

## Medications

Other - Not Listed                     Cyanocobalamin (vitamin B-12)

BUPROPION

Venlafaxine (EFFEXOR)

## Past Medical History

Behavioral Disorders

# Pinellas County Emergency Medical Services
## Patient Care Report

**FINAL**

Patient Name: DONALD DEGRAW

DOS: 09/07/2016    Job: 0845-A    Vehicle:E54

Agency: OLDSMAR FIRE DEPARTMENT

EMS Run#: 6136595

FD Incident#: 6136595

ACH Incident #:

### CREW INFO   Doc'd By: GRENIER (OL), PAUL, Paramedic

| Crew1: CASTRO (OL), NOEL, Paramedic | Crew2: GRENIER (OL), PAUL, Paramedic | Crew3: WEBER (OL), NICHOLAS, EMT |
|---|---|---|

### ASSESSMENTS

09/07/2016 16:09:00   By: GRENIER (OL), PAUL

| Body Area | Assessment | Body Area | Assessment |
|---|---|---|---|
| Airway | Patent | Breathing | Absent |
| Circulation | Pulses - Femoral - Absent :<br>Pulses - Radial - Absent | Central Nervous System | No Neuro Activity |
| Blood/Fluid Loss | None Noted | Left Upper Quadrant | Penetration |
| LOC / Behavior | Unresponsive | Lung Sounds | Left Lower - Absent :<br>Left Upper - Absent :<br>Right Lower - Absent :<br>Right Upper - Absent |
| Moisture | Normal | Pupils | Left - Non-Reactive :<br>Right - Non-Reactive |
| Respiratory Distress Level | 10 | Skin Color | Normal |
| Skin Temperature | Normal | | |

### TRAUMA

Trauma Description

Taser

### SCORES

no scores entered

### CARDIAC ARREST

| | | |
|---|---|---|
| Resp. Delay: <None><br><None><br><None> | Arrest Witnessed by | Not Applicable |
| | Estimated Time of Arrest | 0-2 Minutes |
| | Discontinued Reason | CPR NOT Discontinued |
| | Rhythm at Destination | Asystole |

Last Known Pt Status

Continued Resuscitation or Pt Care In Progress

Trans. Delay: <None><br><None><br><None>

### DISPOSITION

Outcome:   FD Ride In with Sunstar to Hospital

Condition at Dest.:

Recv Doctor:

Pt. Transported:

Barriers to Care:

Delay Reason:

Transporting Agency:

6/13/2017   4:34:05PM

Form Rev Date: 11/16/2016

Patient Name: DONALD DEGRAW

EMS Run#: 6136595

**FINAL**

DOS: 09/07/2016     Job: 0845-A     Vehicle:E54

FD Incident#: 6136595

Agency: OLDSMAR FIRE DEPARTMENT

ACH Incident #:

**CREW INFO**    Doc'd By: GRENIER (OL), PAUL, Paramedic

| Crew1: CASTRO (OL), NOEL, Paramedic | Crew2: GRENIER (OL), PAUL, Paramedic | Crew3: WEBER (OL), NICHOLAS, EMT |
|---|---|---|

**SIGNATURES**

no signatures entered

# Pinellas County Emergency Medical Services
## Patient Care Report

Patient Name: DONALD DEGRAW

DOS: 09/07/2016     Job: 0845-A     Vehicle:E54

Agency: OLDSMAR FIRE DEPARTMENT

EMS Run#: 6136595

FD Incident#: 6136595

ACH Incident #:

**FINAL**

**CREW INFO**  Doc'd By: GRENIER (OL), PAUL, Paramedic

Crew1: CASTRO (OL), NOEL, Paramedic     Crew2: GRENIER (OL), PAUL, Paramedic     Crew3: WEBER (OL), NICHOLAS, EMT

---

## CREW INFORMATION

Start Date/Time: 09/03/2016 07:21

| Crew # | Name | Crew # | Name | Crew # | Name |
|--------|------|--------|------|--------|------|
| 183154 | CASTRO (OL), NOEL | 183158 | GRENIER (OL), PAUL | 183151 | WEBER (OL), NICHOLAS |

X _____     X _____     X _____

| Crew # | Name |
|--------|------|
| 183150 | BRENNAN (OL), TOM |

X _____

---

## CHANGE TRACKING

| Caption | Date/Time | Change | Who Changed |
|---------|-----------|--------|-------------|

---

## PERSONAL BELONGINGS

Items:                                                                    Left With:

---

# Pinellas County Emergency Medical Services
## Patient Care Report

### OLDSMAR FIRE DEPARTMENT

Date of Service: 09/07/2016
Patient Name: Donald Degraw
Location: 1739 SPLIT FORK DR

Run Number: 6136595
ACH Incident:
Transported to:

Revised:
2014-08-15

| CREW INFO | RESPONSE INFO | DISPOSITION | TIMES |
|---|---|---|---|
| | Med/Trauma: | Outcome: FD Ride In with Sunstar to Hospital | Received: 15:42 09-07-16 |
| Vehicle: E54 | Call Type: | Dest. Reason: Closest Facility | Dispatched: 15:43 09-07-16 |
| Crew #1: CASTRO (OL), NOEL | Response Priority: 1 – Emergency | Transport Priority: | En Route: 15:43 09-07-16 |
| Crew #2: GRENIER (OL), PAUL | | | |
| Crew #3: WEBER (OL), NICHOLAS | Nature Of Call: | At Scene Mileage: | At Scene: 15:47 09-07-16 |
| Crew #4: BRENNAN (OL), TOM | | At Dest. Mileage: | At Patient: 16:09 09-07-16 |
| Doc'd By: GRENIER (OL), PAUL | | Transport Mileage: | |
| Assisted By: | | Distress Level at Time of Transfer: | Transport: 16:52 09-07-16 |
| | | Pt Severity: RED | At Destination: |
| | | Barriers to Care: | In Service: |
| | 1st ALS on Scene: Yes | | At Station: |
| | Asst Agency: PCSO | | |
| | Assisting Unit E54, OLOPP, 492, oL2A | Pt. Transported: | |
| | FD Incident #: 6136595 | | |
| | Incident Location: 1739 SPLIT FORK DR Oldsmar, FL 34677 | Scene Delay : | |
| | | Personal Effects: | |
| | | Turned Over To: | |
| | | Destination: | |
| | Referring Phys: | Recv | |

### SCENE INFORMATION

10

### PATIENT INFORMATION

Name : Donald Degraw
SSN : 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
Sex : Male
Race : White
Doctor:

Phone : 7277761315
DOB : 06/25/

Home Addr. : 1739 SPLIT FORK DR
OLDSMAR, FL 34677

DL Info :
Weight : 90.72 Kg
Medical Record No:
Mailing Addr. :1739 SPLIT FORK DR
OLDSMAR, FL 34677

### PATIENT COMPLAINTS

**Chief Complaint**
Cardiac Arrest(Primary)

**Anatomic Location**
General/Global

**Organ System**
Cardiovascular

**Primary Symptom**
Change in responsiveness

# Pinellas County Emergency Medical Services
## Patient Care Report

### OLDSMAR FIRE DEPARTMENT

Date of Service: 09/07/2016
Patient Name: Donald Degraw
Location: 1739 SPLIT FORK DR

Run Number: 6136595
ACH Incident:
Transported to:

Revised:
2014-08-15

## HISTORY

Past Medical History
  Behavioral Disorders

Medications
  Cyanocobalamin (vitamin B12, COBAL 1000) -

  Venlafaxine (EFFEXOR) -

Other - Not Listed -

Note: BUPROPION

Allergies
  None Known

## NARRATIVE

E54 RESPONDED FOR A 58 Y/O MALE, CHIEF COMPLAINT OF SEIZURE. E54 STAGED NEAR THE SCENE DUE TO PT POSSIBLY BEING COMBATIVE AND HAVE FIREARMS. E54 CREW MEMBER SAYS HE RAN ON THE PT THIS MORNING. THIS MORNING THE PT WOKE UP SCREAMING AND YELLING WHICH PROMPTED THE PT'S WIFE TO CALL 911. PT HAS HISTORY OF PTSD. COGNITIVE TEST WAS PERFORMED ON THE PT WHICH HE PASSED. PT REFUSAL WAS OBTAINED AT THAT TIME. PCSO WERE FIRST ON SCENE TO THE CURRENT CALL FOR SEIZURE. E54 CREW WERE EVENTUALLY CALLED IN BY PCSO. PCSO SAYS THAT THE PT HAD TO BE TASED DUE TO HIS BEHAVIOR. PCSO SAY THAT SHORTLY AFTER THE PT WAS TASED, HE WENT UNRESPONSIVE. PT WAS IN HANDCUFFS AT THIS TIME AND ON HIS RIGHT SIDE. ONE HANDGUN WAS NOTED ON A BED NEXT TO THE PT. PT'S WIFE ON SCENE SAYS SHE WITNESSED THE PT HAVE A SEIZURE PRIOR TO CALLING 911; UNKNOWN HOW LONG THE SEIZURE LASTED OR THE PT'S CONDITION AFTER THE SEIZURE. PT WAS LOCATED IN A ROOM ON THE SECOND FLOOR LYING ON THE FLOOR (CARPET). UPON ASSESSMENT, PT WAS FOUND TO BE IN CARDIAC ARREST. HANDCUFFS WERE TAKEN OFF THE PT AND CPR WAS STARTED. PT WAS INITIALLY IN ASYSTOLE ON THE MONITOR. KING TUBE WAS INSERTED WITH END TIDAL CAPNOGRAPHY AND OXYGEN. VENTILATION WAS CONFIRMED WITH CAPNOGRAPHY WAVEFORM, POSITIVE BREATH SOUNDS AND VISUAL CHEST RISE AND FALL. I/O WAS ESTABLISHED AND FLUIDS WERE ADMINISTERED. PT RECEIVED 4 DOSES OF EPI 1/10000 AND 2 MG OF NARCAN WHILE CPR WAS ADMINISTERED IN THE PT'S HOME. IN THIS TIME, PT'S HEART RHYTHM WENT FROM ASYSTOLE TO PEA. BGL WAS ALSO OBTAINED. AT THIS TIME, CPR HAD BEEN ADMINISTERED AT APPROXIMATELY 25 MINUTES. MD-1 WAS CONTACTED FOR POSSIBLE DISCONTINUATION OF EFFORTS. MD-1 ADVISED THAT SODIUM BICARB BE ADMINISTERED AND FOR THE PT TO BE TRANSPORTED DUE TO CAPNOGRAPHY READINGS. PT WAS PLACED ON A LONG BOARD, STRAPPED AND LOADED ONTO STRETCHER AND INTO AMBULANCE. DURING TRANSPORT, PT OG TUBE WAS REPLACED DUE TO SUCTION ISSUES. KING TUBE WAS REASSESSED FOR CORRECT PLACEMENT. PT WAS GIVEN TWO DOSES OF EPI 1/10000 DURING TRANSPORT. PT'S HEART RATE WAS FOUND TO HAVE RETURNED TO ASYSTOLE. NO OTHER CHANGES WERE NOTED DURING TRANSPORT. UPON ARRIVAL, PT WAS STILL IN ASYSTOLE. PT CARE REPORT WAS GIVEN TO ER DOCTOR. PT CARE WAS TRANSFERRED TO ER DOCTOR.

## IMPRESSIONS

Primary Impression:    Cardio-Cardiac Arrest

# Pinellas County Emergency Medical Services
## Patient Care Report

### OLDSMAR FIRE DEPARTMENT

Date of Service: 09/07/2016
Patient Name: Donald Degraw
Location: 1739 SPLIT FORK DR

Run Number: 6136595
ACH Incident:
Transported to:

Revised:
2014-08-15

## VITAL SIGNS

| Time | BP | Pulse | Respiratory | SPO2 | EtCO2 | Glucose | GCS |
|------|-----|-------|-------------|------|-------|---------|-----|
| 16:11 | 0/0 NIBP Machine | 0 | 0 | 78%, Source: Supplemental | | | E1 + V1 + M1 = 3 |
| | Skin Temp=Normal | | | | | | |
| | Level of Consciousness: Unresponsive; Pain Scale=10; | | | | | | |
| | ECG/Ectopics=Asystole, Artifact | | | | | | |
| Taken by: | WEBER (OL), NICHOLAS | | | | | | |
| 16:16 | 0/0 NIBP Machine | 0 | 0 | 68%, Source: Supplemental | 41 mmHg | | E1 + V1 + M1 = 3 |
| | Skin Temp=Normal | | | | | | |
| | Level of Consciousness: Unresponsive; Pain Scale=10; | | | | | | |
| | ECG/Ectopics=Asystole, None | | | | | | |
| Taken by: | WEBER (OL), NICHOLAS | | | | | | |
| 16:20 | 0/0 NIBP Machine | 0 | 0 | 0%, Source: Supplemental | 40 mmHg | | E1 + V1 + M1 = 3 |
| | Skin Temp=Normal | | | | | | |
| | Level of Consciousness: Unresponsive; Pain Scale=10; | | | | | | |
| | ECG/Ectopics=PEA (Pulseless Electrical Activity), None | | | | | | |
| Taken by: | WEBER (OL), NICHOLAS | | | | | | |
| 16:25 | 0/0 NIBP Machine | 0 | 0 | 77%, Source: Supplemental | 51 mmHg | | E1 + V1 + M1 = 3 |
| | Skin Temp=Normal | | | | | | |
| | Level of Consciousness: Unresponsive; Pain Scale=10; | | | | | | |
| | ECG/Ectopics=PEA (Pulseless Electrical Activity), None | | | | | | |
| Taken by: | CASTRO (OL), NOEL | | | | | | |
| 16:30 | 0/0 NIBP Machine | 0 | 0 | 0%, Source: Supplemental | 13 mmHg | | E1 + V1 + M1 = 3 |
| | Skin Temp=Normal | | | | | | |
| | Level of Consciousness: Unresponsive; Pain Scale=10; | | | | | | |
| | ECG/Ectopics=PEA (Pulseless Electrical Activity), None | | | | | | |
| Taken by: | WEBER (OL), NICHOLAS | | | | | | |
| 16:35 | 0/0 NIBP Machine | 0 | 0 | 40%, Source: Supplemental | 53 mmHg | | E1 + V1 + M1 = 3 |
| | Skin Temp=Normal | | | | | | |
| | Level of Consciousness: Unresponsive; Pain Scale=10; | | | | | | |
| | ECG/Ectopics=Asystole, None | | | | | | |
| Taken by: | Sunstar | | | | | | |
| 16:40 | 0/0 NIBP Machine | 0 | 0 | 52%, Source: Supplemental | 80 mmHg | | E1 + V1 + M1 = 3 |
| | Skin Temp=Normal | | | | | | |
| | Level of Consciousness: Unresponsive; Pain Scale=10; | | | | | | |
| | ECG/Ectopics=Asystole, Artifact | | | | | | |
| Taken by: | Sunstar | | | | | | |

## TREATMENT SUMMARY

| Time | PTA | Treatment | Who Performed | Comments |
|------|-----|-----------|---------------|----------|
| 16:10 | | CPR | GRENIER (OL), PAUL | |
| | | Number of Attempts=1 | Procedure Result=Successful | Response=Unchanged |

# Pinellas County Emergency Medical Services
## Patient Care Report

### OLDSMAR FIRE DEPARTMENT

| | | |
|---|---|---|
| **Date of Service:** 09/07/2016 | **Run Number:** 6136595 | Revised: |
| **Patient Name:** Donald Degraw | **ACH Incident:** | 2014-08-15 |
| **Location:** 1739 SPLIT FORK DR | Transported to: | |

### TREATMENT SUMMARY CONTINUED

| Time | PTA | Treatment | Who Performed | Comments |
|---|---|---|---|---|
| 16:10 | | .CPR | GRENIER (OL), PAUL | |
| | | Indication=Adult Arrest | Method=Circle Chest | Q-CPR Usage=Yes |
| 16:13 | | I.O. Adult | GRENIER (OL), PAUL | |
| | | Number of Attempts=1 | Procedure Result=Unsuccessful | Response=Not Applicable |
| | | Type=IO | Successful IO Site=Proximal Tibia - Left | Rate=Not Applicable |
| | | Solution=0.9% NSS | Tubing=Macro drip | Volume=10 ML |
| | | Size=15 G | Length=25 mm (1 inch) | |
| 16:13 | | Cardiac Monitor | GRENIER (OL), PAUL | |
| | | Number of Attempts=1 | Procedure Result=Successful | Response=Not Applicable |
| | | Interpretation=Asystole | Ectopy=None | |
| 16:14 | | I.O. Adult | GRENIER (OL), PAUL | |
| | | Number of Attempts=1 | Procedure Result=Successful | Response=Unchanged |
| | | Type=IO | Successful IO Site=Proximal Tibia - Right | Rate=Bolus |
| | | Solution=0.9% NSS | Tubing=Macro drip | Volume=10 ML |
| | | Size=15 G | Length=25 mm (1 inch) | |
| 16:15 | | Fluid Infused | Sunstar | |
| | | Number of Attempts=1 | Procedure Result=Successful | Response=Unchanged |
| | | Solution=0.9% NSS | Dose / Amount Infused (ml)=1000 | Rate=Bolus |
| 16:16 | | End Tidal CO2 | CASTRO (OL), NOEL | |
| | | Number of Attempts=1 | Procedure Result=Successful | Response=Not Applicable |
| | | Indication=Cardiac or Respiratory Arrest | EtCO2 value (mmHg)=41 | |
| 16:16 | | Extraglottic Airway | CASTRO (OL), NOEL | |
| | | Number of Attempts=1 | Procedure Result=Successful | Response=Unchanged |
| | | Indication=Cardiac Arrest | Tube Confirm (Scene)=EtCO2 Confirmation (Waveform) | Add'l Confirm (Scene)=Bilateral Breath Sounds without Epigastric Sounds |
| | | Add'l Confirm2 (Scene)=Visualization of the Chest Rising with Ventilation | Printed Waveform @ transfer of=Yes | Principle Confirm (Dest)=EtCO2 Confirmation (Waveform) |
| | | Add'l Confirm (Dest)=EtCO2 Confirmation (Waveform) | Add'l Confirm2 (Dest)=Visualization of the Chest Rising with Ventilation | Size=4 |
| | | Secured=Tape | Initial ETCO2 Post-Tube (mmHg)=41 | EtCO2 @ transfer of care=80 |
| 16:17 | | OG Insertion | CASTRO (OL), NOEL | |
| | | Number of Attempts=1 | Procedure Result=Successful | |

# Pinellas County Emergency Medical Services
## Patient Care Report

### OLDSMAR FIRE DEPARTMENT

| Date of Service: 09/07/2016 | Run Number: 6136595 | Revised: |
|---|---|---|
| Patient Name: Donald Degraw | ACH Incident: | 2014-08-15 |
| Location: 1739 SPLIT FORK DR | Transported to: | |

| Time | PTA Treatment | TREATMENT SUMMARY CONTINUED Who Performed | Comments |
|---|---|---|---|
| 16:17 | Oxygen | WEBER (OL), NICHOLAS | |
| | Number of Attempts=1 | Device Applied (Procedure Resu=Successful | Response=Unchanged |
| | Device=BVM | Rate (LPM)=15 | Rate Unit=LPM |
| | FiO2 if Venturi Mask=N.A. (not a venturi mask) | | |
| 16:21 | EPI 1:10,000 | Sunstar | |
| | Dosage=1 | Dosage Units=mg | Route=Intraosseous |
| | Response=Unchanged | Indication=Asystole | |
| 16:21 | Accu-Check | CASTRO (OL), NOEL | |
| | Number of Attempts=1 | Procedure Result=Successful | Response=Not Applicable |
| | Source=Capillary | Blood Glucose (mg/dl)=137 | |
| 16:23 | EPI 1:10,000 | Sunstar | |
| | Dosage=1 | Dosage Units=mg | Route=Intraosseous |
| | Response=Unchanged | Indication=Asystole | |
| 16:26 | Narcan | Sunstar | |
| | Dosage=2 | Dosage Unit=mg | Route=Intraosseous |
| | Response=Unchanged | Indication=Narcotic Overdose | |
| 16:26 | EPI 1:10,000 | Sunstar | |
| | Dosage=1 | Dosage Units=mg | Route=Intraosseous |
| | Response=Unchanged | Indication=Asystole | |
| 16:30 | EPI 1:10,000 | Sunstar | |
| | Dosage=1 | Dosage Units=mg | Route=Intraosseous |
| | Response=Unchanged | Indication=PEA | |
| 16:38 | OLMC Contact Made | Sunstar | |
| | Number of Attempts=1 | Procedure Result=Successful | Response=Not Applicable |
| | OLMC Consult ID=MD-1 OLMC Consult | | |
| 16:44 | Sodium Bicarbonate | Sunstar | |
| | Dosage=50 | Dosage Unit=mEq | Route=Intravenous |
| | Response=Unchanged | Indication=Cardiac Arrest | |
| 16:46 | Intub Re-Confirm | CASTRO (OL), NOEL | |
| | Number of Attempts=1 | Procedure Result=Successful | Response=Not Applicable |
| | Printed Waveform=No | Principle Method=EtCO2 Confirmation (Waveform) | 1st Add'l Method=Bilateral Breath Sounds without Epigastric Sounds |
| | 2nd Add'l Method=Visualization of the Chest Rising with Ventilation | 3rd Add'l Method=N.A. | EtCO2 value (mmHg)=52 |

# Pinellas County Emergency Medical Services
## Patient Care Report

### OLDSMAR FIRE DEPARTMENT

| | | |
|---|---|---|
| Date of Service: 09/07/2016 | Run Number: 6136595 | Revised: |
| Patient Name: Donald Degraw | ACH Incident: | 2014-08-15 |
| Location: 1739 SPLIT FORK DR | Transported to: | |

## SCORES

*no trauma scores entered*

## NEXT OF KIN

| | |
|---|---|
| Name : | Phone : |
| SSN : | DOB : |
| Sex : | Home Addr. : |

## INSURANCE

*no insurance information entered*

## HIPAA

Date:        Ack. Method:        Relationship:        Ack. By:

*see hipaa verbiage in acceptance signatures*

## SIGNATURES

*no signatures entered*

Start Date/Time :        09/03/2016 07:21

| Crew # | Name | Crew # | Name | Crew # | Name |
|---|---|---|---|---|---|
| 183154 | CASTRO (OL), NOEL | 183158 | GRENIER (OL), PAUL | 183151 | WEBER (OL), NICHOLAS |

x _____        x _____        x _____

| Crew # | Name |
|---|---|
| 183150 | BRENNAN (OL), TOM |

x _____