UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

CASE NO.:  8:18-CV-2116-WFJ-SPF


JULIE V. DEGRAW, AS PERSONAL REPRESENTATIVE OF THE

ESTATE OF DONALD C. DEGRAW, DECEASED,

       PLAINTIFFS,

   VS.

BOB GUALTIERI, IN HIS INDIVIDUAL AND SUPERVISORY

CAPACITY AS PINELLAS COUNTY SHERIFF, AND GREGORY

GOEPFERT, IN HIS INDIVIDUAL CAPACITY AS A

PINELLAS COUNTY DEPUTY SHERIFF,

       DEFENDANTS.

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

DEPONENT:    GREGORY GOEPFERT

DATE:       JULY 18TH, 2019

TIME:       9:00 A.M. TO 3:00 P.M.

LOCATION:    COMPASS REPORTING GROUP

             3000 GULF-TO-BAY BOULEVARD, #500

             CLEARWATER, FL  33759

REPORTER:    KIMBERLY HAMMOCK

             NOTARY PUBLIC

             STATE OF FLORIDA AT LARGE

             COMPASS REPORTING GROUP

```
 1   A P P E A R A N C E S:
 2   For the Plaintiff:     MICHAEL T. CALLAHAN, ESQ.
 3                          CALLAHAN LAW FIRM, LLC
 4                          449 CENTRAL AVENUE, #203
 5                          ST. PETERSBURG, FL  33701
 6
 7   For the Defendants:    PAUL G. ROZELLE, ESQ.
 8                          PINELLAS COUNTY SHERIFF'S OFFICE
 9                          10750 ULMERTON ROAD
10                          LARGO, FL  33778
11
12                      I N D E X
13   Direct Examination by Mr. Callahan .......... 3
14   Cross-Examination by Mr. Rozelle   .........116
15   Redirect-Examination by Mr. Callahan ........139
16
17                     E X H I B I T S
18   Plaintiffs'                          Marked for
19   Exhibit No.        Description        Identification
20      31              Composite              91
21      32    Doc - Criminal Justice Standards  98
22
23
24
25
```

1   Thereupon,

2                    GREGORY GOEPFERT,

3   was called upon and after being duly sworn,

4   was examined and testified as follows:

5                    DIRECT EXAMINATION

6   BY MR. CALLAHAN:

7       Q.   Good morning.  I'm Mick Callahan.  I'm here

8   today to take your deposition.  How do you prefer to be

9   called?  Deputy Goepfert?

10      A.   Deputy is fine.  Greg is fine.  No

11  preference.

12      Q.   I'll call you Deputy Goepfert.

13      A.   Sure.

14      Q.   If you need a break today at any time,

15  bathroom break or anything else, just let me know and

16  I'll be happy to accommodate you right then and there.

17      A.   Okay.

18      Q.   If you don't understand anything I say to you

19  this morning, feel free to just stop me right then and

20  there and say, "I'm sorry.  I don't understand."  I'll

21  be happy to re-clarify it or ask in a way that you do

22  understand.  Anything else that would make you feel

23  comfortable, just let me know.  I'll be happy to

24  accommodate you.

25      A.   Okay.

1      Q.    Would you give me your full name, please?

2      A.    Gregory Hunter Goepfert.

3      Q.    Deputy Goepfert, how long have you worked for

4  the Pinellas County Sheriff's Office?

5      A.    It will be five years September 22nd.

6      Q.    What rank did you have when you began to work

7  for the sheriff's office?

8      A.    Deputy.

9      Q.    You still have the same rank?

10     A.    Yes.

11     Q.    What have your duties been while you worked

12 for the sheriff's office?

13     A.    Basically, roll patrol.  I did the courthouse

14 for almost two years.  Then I came back to the road in

15 the last year or so.

16     Q.    When did you do the courthouse?  From when to

17 when?

18     A.    I can't be exact on the dates, but it was

19 approximately a two-year time period that ended about

20 nine months ago.

21     Q.    Let's take a look at the -- the incident in

22 this case that we are here on occurred in September of

23 '16?

24     A.    Yes.

25     Q.    So when did you go to the courthouse?  After

 1   that?

 2        A.   A few months after that.  I couldn't tell you

 3   exact dates.  I'm sure it's in my file somewhere.

 4        Q.   Why did you do that?

 5        A.   Why did I do that?

 6        Q.   Yes, sir.

 7        A.   I needed the time for the schedule to help

 8   run my martial arts school.

 9        Q.   And where was your martial arts school?

10        A.   Nebraska and 19.

11        Q.   And when did you start that?

12        A.   I'm trying to think of the dates.  I didn't

13   put them to memory.  Probably 2015-ish.

14        Q.   And that was in which county, in Hillsborough

15   County?

16        A.   Pinellas County.

17        Q.   US 19, okay.

18        A.   Yes.

19        Q.   And did you have -- did you start that school

20   here in Pinellas County when you moved here?

21        A.   Shortly after.  Once I got off the awkward

22   shift I was on, I was able to open up the gym, yes.

23        Q.   So the first shift you were on was what?

24        A.   I was working 3:00 to 11:00 with only

25   Wednesdays, Thursdays off, which makes it impossible to

1  run the gym.

2      Q.   And do you still have that school?

3      A.   I do not.

4      Q.   When did that end?

5      A.   I would say sometime in 2017.  It was only

6  open for approximately a year.  Exact dates, I couldn't

7  give you right now.

8      Q.   And tell me about that school.  What did you

9  do there?

10     A.   Taught men, woman and children martial arts.

11  Krav Maga, Jujitsu.

12     Q.   What else?  Any other disciplines?

13     A.   Taekwondo.  Kickboxing.

14     Q.   And how long have you been a practitioner of

15  those arts?

16     A.   Forty-five years.  Not all of those arts, but

17  I've been in the arts since I was four years old.

18     Q.   Tell me about each one of those and what

19  level of skill you have.

20     A.   You want to know about the martial arts

21  themselves?

22     Q.   Yes.  In other words, generally what each one

23  of them involves and what your level of skill is in

24  each one and to what level you can teach it.

25     A.   Okay.  Taekwondo, Korean martial art.  It's

1    more a -- Taekwondo is basically a foot and fist art,

2    so it's more kicking and striking.  I've been in that

3    for over 20 years.  I hold an A3 black belt in

4    Taekwondo.  Jujitsu --

5        Q.   Let me stop you right there, because I'm a

6    layman with these.  What is an A3 black belt?

7        A.   In the ranking system you have white through

8    black with multiple colors in between, black being the

9    high rank.  Then after that you get degrees of black

10   belt.  Usually first year, second, third, fourth and

11   then eighth is the highest.

12       Q.   So you're still third of eighth in the

13   highest ranking you can have, which is black?

14       A.   I'm the highest ranking in Taekwondo you can

15   have, yes.  I mean there are some ninth degrees, tenth

16   degrees in their own systems.  Things like that, but --

17       Q.   Now let's go to the next one you mentioned.

18       A.   Jujitsu.  It's a grappling art.  I've been

19   doing that since 1991.  I have a black belt in that.

20   Jujitsu is more -- it's a grappling art.  More like

21   wrestling.  It's like UFC if you've ever seen that.

22   You typically do a lot of ground fighting.

23       Q.   Does that involve defensive tactics to

24   protect yourself?

25       A.   It does, absolutely.

1    Q.    And what was the other one you mentioned?

2    A.    Krav Maga.

3    Q.    Spell that.

4    A.    It's K-R-A-V M-A-G-A.

5    Q.    What is that?

6    A.    It's an Israeli martial art developed by the

7    Israeli military special forces.  It's a combat special

8    art.  Lots of knife defense.  Gun defense.  No-nonsense

9    fighting.

10   Q.    What level of skill do you have in that to be

11   able to teach that?

12   A.    I'm a second.  It's a little different.  I'm

13   a second-level instructor.

14   Q.    How many levels are there?

15   A.    I believe there are four.  But there are many

16   different systems out there, so everything could be

17   different in there some.

18   Q.    And do you have skills in any other martial

19   arts?

20   A.    I do.  I mean, we would be here quite a while

21   if you want me to list them all.

22   Q.    Really?

23   A.    Yes.  I've been doing it since I was four

24   years old.  I can take you from when I was four to all

25   the way through, but you're going to go through that

1  paper.

2      Q.   Well, rather than spending an hour telling me

3  all your skills, just summarize them for me.

4      A.   I started in Kar Do Ryu (phon), was my first.

5  Did that for about four years.  Did Isshin-ryu after

6  that.  My parents moved around a lot, so I would go to

7  different schools based on where we were living at the

8  time.  I did Tangsado after that.  T-A-N-G-S-A-D-O,

9  which is a Korean martial art.  Did black belt in that.

10  That's when I basically started in Taekwondo.

11           Then when I went to Okinawa, Japan, in the

12  military.  I studied Aikido, A-I-K-I-D-O, which is a

13  very -- more of a self-defense type art.  Steven Seagal

14  does it in his movies.  I also studied Uechi-ryu, which

15  I'm not even sure I can spell that for you.  U-E-C-H-I

16  R-Y-U.  Something like that.  I studied Kendo, which is

17  a sword -- Japanese sword art.  Bamboo Shinai sticks.

18  That probably rounds them all up.

19      Q.   And you've maintained your proficiency in all

20  these years with these different martial arts?

21      A.   I have.  I mean, like I don't do certain ones

22  like the Aikido as much or the Kendo as much.  It's

23  sometimes impractical to do, but the Jui Jitsu and the

24  Krav Maga are kind of my things I do now.

25      Q.   And how old are you today?

1      A.    Forty-nine.  I'll be 50 September 12th, so

2   close.

3      Q.    I'll tell you, it's a lot better than 73.

4   Any other physical skills, as if that isn't enough,

5   that you have?

6      A.    I'm assuming -- knife defense.  Knife

7   fighting.  That kind of thing.  If that's what you're

8   looking for, yes.

9           MR. ROZELLE:  I'm sorry, Mick.  Just to be

10          clear, you're talking about like extracurricular

11          that is outside of his law enforcement training or

12          military training or anything else --

13          MR. CALLAHAN:  Yes.

14   BY MR. ROZELLE:

15     Q.    Obviously I realize you're trained as a

16   police officer, as well.

17     A.    I am.  I taught military special forces, as

18   well.

19     Q.    And what did you do in the military special

20   forces?

21     A.    I was in the Air Force.  I did many things in

22   the Air Force, but one of my duties was to train the

23   special forces.

24     Q.    And what sort of physical skills did that

25   involve?

1    A.    Hand-to-hand combat.  That would involve the

2   knife fighting defense.  Obviously gun takeaways.

3    Q.    In other words, the ability to disarm your

4   opponent?

5    A.    Yes.

6    Q.    And to overcome them and kill them if

7   necessary?

8    A.    Yes.  The military training was much

9   different than the martial art training obviously.

10  There's different levels of force to be used.  I mean,

11  I've trained everybody from a four-year-old kid to

12  military special forces.  Obviously, you can't teach

13  the four-year-old kid what you taught the special

14  forces.  You teach adults differently than you teach

15  kids and you teach women differently than you do men,

16  so it's all a little different.  You have to be well

17  rounded.

18   Q.    I understand.  I was asking you about your

19  background history when we got on the martial arts

20  aspect of this.  You came to Pinellas County Sheriff's

21  Office in 2015, what did you do prior to 2015?

22   A.    Prior to coming here, I had a martial art

23  school in the Franklin, Massachusetts area.

24   Q.    Is that a suburb of Boston?

25   A.    It is.

1      Q.   How long did you have that?

2      A.   Almost four years.

3      Q.   And prior to that, where did you work?

4      A.   I did a short stint for the DOD as a law

5 enforcement office at Tyndall Air Force Base.

6      Q.   What did you do there?

7      A.   Basically, base security.  I was also base

8 security and an FTO and a trainer with them.

9      Q.   What's an FTO?

10     A.   Field training officer.

11     Q.   So base security means MP-type duties?

12     A.   Not quite.  We were the law enforcement

13 portion of it.  The airmen were more of the base

14 security type of thing.  So, I mean, we would do

15 traffic stops.  Domestics.  You know, everything that

16 you would do as a normal police officer.

17     Q.   On the base?

18     A.   Yes.

19     Q.   And where is that located?

20     A.   Panama City Beach area.

21     Q.   How long did you work at Tyndall?

22     A.   Just about a year.

23     Q.   And prior to that?

24     A.   Palm Beach County Sheriff's Office.

25     Q.   And how long did you work there?

1      A.    Approximately, six years.

2      Q.    What were your duties in Palm Beach?

3      A.    I did road patrol.  Then I became a full-time

4  trainer, and I did that for about two years.  Then I

5  went to the dignitary detention -- what is it?

6  Dignitary detail team squad, basically out of the

7  airport.  So when like the president came in or other

8  leaders came in, we would be there for that.  Kind of

9  patrol the airport.  Keep things safe.

10     Q.    Any other duties in Palm Beach?

11     A.    That was about it.  I mean, I was -- I taught

12  at the academy during the same period of time.  The

13  police academy, basically, as an instructor.

14     Q.    In Palm Beach County?

15     A.    Yes.

16     Q.    And what areas did you teach the academy in

17  Palm Beach County?

18     A.    All high liability areas, which is your

19  firearms.  Defensive tactics.  Driving.  Are you

20  talking about at the academy or at the sheriff's

21  office?

22     Q.    At the Palm Beach County academy.

23     A.    Okay.  So those three.  Then basically, you

24  know, all the different classes which range from drug

25  detection to searches.  Stuff like that.  Whatever the

1  FDLE curriculum is.

2       Q.   Prior to that, where did you work?

3       A.   Prior to that, I worked for Home Depot.

4       Q.   What did you do at Home Depot?

5       A.   Store manager.

6       Q.   Which store?

7       A.   Lake Worth.

8       Q.   Was the Palm Beach County job your first law

9  enforcement job?

10      A.   It was.

11      Q.   And prior to the Palm Beach County job -- I'm

12  sorry.  From the Home Depot job back, you didn't have

13  any jobs in law enforcement, I take it?

14      A.   Right.

15      Q.   How long did you work in the civilian world

16  doing jobs like Home Depot?

17      A.   So from probably '98 to 2004.

18      Q.   Let me ask you just a few questions about

19  your past employment here.  By the way, what happened

20  to the martial arts school here in town?  Did you say

21  you closed it?

22      A.   I did.

23      Q.   And that was for what reason?

24      A.   Burnt out.  6:00 a.m. to 6:00 p.m here.  Then

25  go to the gym until 10:00 p.m. and do that every day.

1    I think I worked -- I think I figured I worked 160

2    hours straight before I had a day off.  Then that day

3    was basically to catch up for the two weeks that I

4    didn't have my day off, then I would just go again.  We

5    were successful, but I had to make a choice.  Being

6    older now, you know, do I just do that again, or do I

7    stay with the sheriff's office?  It has good benefits,

8    pension, et cetera, et cetera, so I decided to do one

9    thing.

10        Q.    I'm sorry if I asked you before, but when did

11   you close the school?

12        A.    I think it was 2017.  I don't know exact

13   dates.  I really don't.

14        Q.    And how long did you keep it open?

15        A.    It was about a year.

16        Q.    In looking over your history here with the

17   Palm Beach County Sheriff's Department, I note that you

18   had applied for jobs at Rivera Beach Police Department

19   in '03, Rural Palm Beach in '04, Jupiter in '04, Palm

20   Beach Gardens in '04, Lantana in '04, and were not

21   employed by any of those places.  Do you have a

22   recollection of why you were not employed in '03 and

23   '04?

24        A.    Well, all that was going on when I was

25   self-sponsored in the academy.  A couple of them had

1    actually made offers, but the sheriff's office came in

2    and snatched me up out of the academy.  Came in and

3    hired I think four of us or maybe ten of us on the

4    spot.

5         Q.    You also had applications in Boca Raton,

6    Margate, Boynton Beach and Broward County, again not

7    employed by any of those.  Did you just tell me that of

8    those nine, you did get offers from some of them?

9         A.    I did.

10        Q.    Who gave you an offer?

11        A.    I don't remember.  I know -- I remember

12   Lantana for sure, because they actually -- the chief of

13   police from Lantana kind of got upset with the sheriff

14   from Palm Beach for, kind of, snatching me away.  It

15   was kind of like when I came here, I was actually

16   moving into my apartment and West Palm Beach called and

17   Ft. Lauderdale called and they said they wanted to give

18   me the job.  Agencies take a long time to process your

19   stuff and get the hiring process going, so --

20        Q.    How long did you own a martial arts school in

21   the past prior to your venture up here with the martial

22   arts school?

23        A.    Well, the four years or so in Boston.  I had

24   five schools in the Rockford, Illinois, Chicago area

25   for about another five years.  I mean, I had a gym in

1  Okinawa at the rec center I taught, so --

2      Q.  Ten years altogether?

3      A.  At least, yes.

4      Q.  And did you end up closing all of those that

5  you owned?

6      A.  I ended up selling them.  I usually sell

7  them.  I don't just close them.  I sell them so my

8  students, you know, make some money.

9      Q.  Did you ever file a bankruptcy petition?

10     A.  I have.

11     Q.  When was that?

12     A.  When was that?  March I believe of -- I think

13  it's four years ago.  That had to be before I came

14  here, so it was probably five years ago.  Maybe six.

15  I'm bad with dates.  Exact dates.

16     Q.  And did that bankruptcy petition involve any

17  of the martial arts schools?

18     A.  It did.  It was mostly because of the

19  business.  I sold the gym.  I moved to South Florida to

20  open another gym.  I had all the plans.  Had all the

21  plans and financing.  Put a lot of money into this new

22  gym.  It was going to be Cross Fit, kickboxing, martial

23  arts.  The day before the lease was signed, the deal

24  fell through.  One of my partners backed out.  That

25  left me with a huge amount of debt and stuff out there,

1 so that's why we did that.

2     Q. So your plans were to open the school where?

3     A. West Palm Beach.

4     Q. And when that fell through and left you

5 financially distressed, is that the time you came up

6 here?

7     A. It is. I -- well, not exactly. I still was

8 doing some consulting for a couple martial arts schools

9 down there trying to get something back in the works.

10 It just wasn't getting done the way I wanted it to. I

11 have a friend that works for Kenneth City. A

12 lieutenant there. His wife is a sergeant at the jail.

13 They said that Pinellas County was hiring a lot of

14 deputies. I should maybe apply, so I did, and I ended

15 up here.

16     Q. Also in reviewing the records from Palm Beach

17 County, I noticed that either there were some

18 discrepancies that they noted in your application

19 process there, including a denial on your application

20 as to drug use. Then an admission on the same to a

21 psychologist interviewing you. Do you recall that

22 incident?

23     MR. ROZELLE: Object to the form. You can

24     answer.

25 BY MR. CALLAHAN:

1      A.   Do I remember that?

2      Q.   Yes.

3      A.   No.  I do not.

4      Q.   Let me read to you exactly what I see here.

5  "Applicant admitted to a 1994 marijuana use on a PBSO

6  application."  This is at the Palm Beach Sheriff's

7  Office.

8      A.   Okay.

9      Q.   "And to a psychologist.  However, applicant

10 marked no to the question on the CBSA pretest

11 questionnaire."  What's CBSA?

12     A.   I couldn't tell you.

13     Q.   Were you confronted by that by the -- during

14 the application process?

15          MR. ROZELLE:  Form.  You can answer.

16 BY MR. CALLAHAN:

17     A.   No.  That's the first I've ever heard of any

18 discrepancy.  Apparently they hired me, though.  So it

19 must not have been that big of a deal.

20     Q.   Obviously they did hire you, right.  Have you

21 ever had any discrepancies after a polygraph

22 examination?

23     A.   Not that I'm aware of.

24     Q.   I note that you had listed the Impact School

25 of Martial Arts, LLC, from 2010 until the time you

1   applied in 2014 at Palm Beach.  Is that one of the
2   schools you had mentioned to me earlier?
3        A.   Yes.
4        Q.   And where was that located?
5        A.   I believe you're probably talking about the
6   one in Rockford, Illinois.
7        Q.   It doesn't say where the location was on the
8   application here, so that's why I'm asking.
9        A.   I'm assuming that's where it was.
10        Q.   There's a question on your application that
11   says, "Have you ever used, sold or possessed any
12   illegal drugs."  And you said, "Yes."  Would you
13   explain that answer to me?
14             MR. ROZELLE:  Object to the form.  You can
15        answer.  What application are you talking about?
16             MR. CALLAHAN:  At the Pinellas County
17        Sheriff's Office.
18   BY MR. CALLAHAN:
19        A.   What was the question?
20        Q.   "Have you ever used, sold or possessed any
21   illegal drugs?"  The answer is, "Yes."
22        A.   Yes.  Used.
23        Q.   What drugs are you referring to?
24        A.   Marijuana.
25        Q.   The question regarding civil history says,

1  "Have you ever declared bankruptcy?  How many times?"

2  You said, "Yes.  Filed Chapter 7 in March 2014 due to

3  business setbacks.  $300,000 in debt discharged."  What

4  was the 2014 bankruptcy regarding?  Is the one you just

5  testified to?

6       A.    That's the one we just talked about, yes.

7       Q.    Okay.  It also says, "Chapter 7 Bankruptcy

8  1999 failed business.  Case closed."  What did that

9  involve?

10      A.    That was after my chain of martial arts

11 schools, when we sold those, there was a -- kind of a

12 shady dealing.  I actually went to court for it and,

13 again, I kind of got stuck with debt that I shouldn't

14 have had.  Leases that they were supposed to take over.

15 We're talking lots and lots of money.  So to get out of

16 that, I did the bankruptcy on that, as well.

17      Q.    So that -- that doesn't relate to the one you

18 just testified to a few minutes ago?  That was another

19 one?

20      A.    It was.

21      Q.    All right.  And that involved martial arts

22 schools and the failed financing relating to them, as

23 well?

24      A.    Yes.

25      Q.    Did either of them involve any other

1  financial failings?

2      A.    No.

3      Q.    The bankruptcy in 1999 occurred where?  Which

4  county?

5      A.    I think that one would have been out of

6  Miami.  That's where we did it, I believe.

7      Q.    The explanation you gave in your description

8  of different applications to different police

9  departments, again in your July 17th, 2014, application

10  to the Pinellas County Sheriff's Office, states that

11  for the Palm Beach County application you were

12  disqualified due to arrest.

13         MR. ROZELLE:  Object to the form.

14  BY MR. CALLAHAN:

15      Q.    Do you have a recollection of that?

16         MR. ROZELLE:  Object to the form.  You can

17      answer.

18  BY MR. CALLAHAN:

19      A.    I don't understand the question if you want

20  to clarify it for me.

21      Q.    Sure.  A minute ago I asked you about the

22  different applications and why you didn't get the job,

23  if you did or if you were offered the job.  Now the

24  same question appears in your application of the

25  Pinellas County Sheriff's Office.  Going through your

1  background it states about other agencies which you

2  applied for and been investigated for.  And your answer

3  to question 29 relating to that is, "2003 Palm Beach

4  County Sheriff's Office, 2014 Davie Police Department

5  disqualified due to arrest."

6       A.   Okay.

7            MR. CALLAHAN:

8            MR. ROZELLE:  Object to the form.  You can

9       answer.

10  BY MR. CALLAHAN:

11       Q.   Could you explain your answer to me?

12       A.   Yes.  I had an arrest at one point, and

13  they -- at that point, you couldn't have an arrest to

14  become a police officer with that agency.  I assume

15  that's what that is.

16       Q.   What was the arrest for?

17       A.   It was -- the charge -- initial charge was

18  telephone harassment.

19       Q.   Telephone harassment?

20       A.   Yes.

21       Q.   The initial charges?

22       A.   Yes.

23       Q.   Were there other charges?

24       A.   Yes.

25       Q.   Why do you say initial charges?

1    A.    It was dismissed.  It was my wife's
2  ex-husband trying to cause problems for us.  It was
3  dismissed, expunged and no longer on my record.
4  Technically I could say I never did it and no one would
5  ever know.  But I'm an honest person, so that's why I
6  put it on the paper.
7    Q.    Okay.  The 2014 Plantation Police Department
8  says, "Delayed due to filing bankruptcy."
9    A.    I believe they didn't allow bankruptcy within
10  so much time back then.  Back then it was a lot harder
11  to get a job as a police officer.
12    Q.    So that was the reason you didn't get that
13  job in 2014?
14    A.    Yes.
15    Q.    Okay.  In 2013, Cape Coral, it says,
16  "Applied, but certification expired."  Do you have a
17  recollection of that?
18    A.    No.  I could have -- I mean at one point my
19  certification expired and maybe it had to be intact to
20  get a job there.  I don't recall why -- what that was
21  for.
22    Q.    The 2013 application to the Gainesville
23  Police Department says you withdrew it.  Do you have a
24  recollection of that or why you withdrew it?
25    A.    I have no idea.

1      Q.   Your profile sheet in your application talks

2 about different instructor certifications.  The defense

3 tactics, firearms and general instructor says inactive.

4 Are they inactive or do you still have them?

5         MR. ROZELLE:  Object to the form.  You can

6    answer.

7 BY MR. CALLAHAN:

8      A.   I still have some of them.

9         MR. ROZELLE:  Hang on.  Object to the form.

10    You can still answer.

11 BY MR. CALLAHAN:

12      A.   I still have some of them.

13      Q.   Okay.  Can you tell me which ones you had

14 back in September of 2016, and which ones you have now?

15      A.   I couldn't tell you what I had in 2016.  I

16 can tell you what I have now.  Now I have my general,

17 and I have my defensive tactics.

18      Q.   And how long have you had them active?

19      A.   Pretty much since I got to this agency.  So I

20 would say at least four, four and a half years.

21      Q.   Okay.  Looking at your educational history, I

22 note in your application a reference to attending

23 Barrington University.

24      A.   Barrington?

25      Q.   B-A-R-R-I-N-G-T-O-N.

1     A.   Yes.

2     Q.   Where is that?

3     A.   I have no idea.  I can't remember.  That was

4 a long time ago.  It was an online school, so I'm not

5 sure where they are located.

6     Q.   The same for University of College Park?

7     A.   I went to the University of Maryland while I

8 was in the Air Force.

9     Q.   And that -- how long did you attend that?

10 It's unclear from the handwriting here.

11     A.   Just a few classes.

12     Q.   Okay.  The degree that you got, was that

13 online, as well?  Or was that in person?

14     MR. ROZELLE:  Object to the form.  What's

15     degrade (sic)?

16     MR. CALLAHAN:  He knows what I'm taking

17     about.

18 BY MR. CALLAHAN:

19     Q.   Did you get a degree from anywhere?

20     A.   I have.

21     MR. ROZELLE:  I thought you said degrade.

22 BY MR. CALLAHAN:

23     Q.   Where?

24     A.   California Coast University.

25     Q.   Was that online or attending?

1        A.    Online.

2        Q.    And you did get an online degree in what

3   year?

4        A.    I'm terrible with years.  I don't know the

5   years.  I don't want to guess and say something wrong.

6        Q.    Okay.  There's a note to the file discussing

7   the arrest you talked about a while ago.  I'm sorry.

8   The discrepancies in the application.  It says,

9   "Initially he," referring to you, "Denied having sexual

10  contact with someone under the age of 18 after he

11  turned 18.  Later he admitted to having sexual

12  relations with a 17-year-old girlfriend."  Do you

13  recall that discrepancy in your application, or did you

14  know anything about it?

15            MR. ROZELLE:  Object to the form.  You can

16        answer.

17  BY MR. CALLAHAN:

18        A.    No.  I absolutely remember that.

19        Q.    Do you recall denying it and then later being

20  confronted about it?

21            MR. ROZELLE:  Object to the form.  You can

22        answer.

23  BY MR. CALLAHAN:

24        A.    That's not really how it happened.  Again,

25  because I was honest, I could have said no and nobody

1    would ever be the wiser.  When I was thinking about it,

2    when I was in high school I dated a girl that was 17

3    and I was 17.  Then I turned 18, and I still was

4    technically dating her when she was 17 and when I was

5    18 and I left for the Air Force.

6        Q.   The question is, do you recall having a

7    denial and then being confronted about it?

8        A.   I said no.  Then after I thought about the

9    question, I re -- I changed my answer.

10       Q.   Okay.  Your start date here is listed as

11   September 22nd, 2014, with the Pinellas County

12   Sheriff's Office.  Does that consort with your

13   recollection?

14       A.   Yes.

15       Q.   Looking through your training records, I note

16   that you had M26 Taser and X26 Taser training

17   certification on October 23rd, 2009.  Where was that

18   done?

19            MR. ROZELLE:  Object to the form.  You can

20       answer.

21   BY MR. CALLAHAN:

22       A.   In 2009?  I imagine Palm Beach County

23   Sheriff's Office.

24       Q.   Have you had Taser training since you've been

25   with the Pinellas County Sheriff's Office?

1      A.    I have.

2      Q.    And what training was that?  Where and when,

3  if you recall?

4      A.    I had the training again when I was with the

5  DOD.  I was a -- then I've had it here.

6      Q.    So on three separate occasions you've gone

7  through Taser training?

8      A.    I probably did -- I mean, I've been through

9  instructor training.  I was an instructor for Taser.  I

10  probably -- I get Tasered in training every year, so

11  probably at least five times, six times, in Palm Beach.

12  Probably at least four to five times here.  Then one

13  time in the DOD.

14      Q.    And how often do you have your refresher

15  course in Tasers here at the Pinellas County Sheriff's

16  Department?

17      A.    Once a year.

18      Q.    Do you recall when you had it in 2016?

19      A.    I do not.

20      Q.    Let me ask you a little bit about your use of

21  a Taser.  Did you ever in your law enforcement

22  experience, have you ever used one before the day of

23  the incident?

24      A.    Yes.

25      Q.    Tell me about your past experiences using a

1   Taser.

2       A.   I believe I've deployed it one time.

3   Actually, it was a drive-stun.  The year?  I would say

4   probably 2005-ish some time.  Got a call to a house

5   at -- from the mom of a son who was throwing stuff.

6   Smashing the house up.  We come in.  We try to talk to

7   him.  He's combative.  We tried to physically control

8   him.  Get him to the ground.  He's still fighting.  I

9   pull my Taser.  Take out the cartridge because I'm on

10  top of him.  We can't get his hands, so I ask for his

11  hands.  He's still not complying.  I use a drive-stun,

12  which actually makes him comply.  His hands go behind

13  his back and we handcuff him.

14      Q.   So this was a circumstance of an

15  out-of-control kid in a house?

16      A.   Yes.

17      Q.   What county was that in?

18      A.   Palm Beach.

19      Q.   Do you remember what month it was in '05?

20      A.   No.

21      Q.   Have you ever deployed your Taser since that

22  date until you did on Mr. DeGraw?

23      A.   Deployed it in, like, on duty?

24      Q.   Yes.

25      A.   No.

1      Q.    Obviously I'm not referring to training.

2      A.    Okay.

3      Q.    Was it ever deployed by any officer

4  accompanying you during that period of time?

5      A.    No.

6      Q.    At the time of this incident with Mr. DeGraw,

7  who was your supervisor?

8      A.    Sergeant Street.

9      Q.    How long had he been your supervisor?

10     A.    Maybe a year.

11     Q.    Get along with him okay?

12     A.    Yes.

13     Q.    Was he ever critical of your performances as

14 a police officer?

15     A.    No.

16     Q.    Tell me a little bit about what materials you

17 use in your training and teaching of Tasers.

18          MR. ROZELLE:  Object to the form.  You can

19     answer.

20 BY MR. CALLAHAN:

21     A.    Can you repeat the question?

22     Q.    Yes.  Tell me a little bit about the

23 materials you use in your training on Tasers.

24     A.    When I'm training or when I'm being trained?

25     Q.    When you're training.

Gregory Goepfert
July 18, 2019

1       A.    I haven't taught Taser in quite some time,

2   but you use video, manuals, tests, and typically some

3   sort of practical.

4       Q.    Were there any differences between the

5   training that you employed and what you received here

6   at the Pinellas County Sheriff's Office?

7            MR. ROZELLE:   Object to the form.   You can

8        answer.

9   BY MR. CALLAHAN:

10      A.    The only difference that we have between the

11  two is that at Palm Beach we actually had a suit the

12  instructor got on -- got into, and we had dummy rounds

13  or dummy probes, and we would do role playing and the

14  officer would either Tase or not Tase.

15      Q.    And that was here or there?

16      A.    That was at Palm Beach.

17      Q.    And were there any practical use of the

18  Tasers here in your training at the Pinellas County

19  Sheriff's Office in that?

20      A.    There is.

21      Q.    Tell me about that.

22      A.    There's been different types.   We've had

23  where we are at the range and we do some running

24  movements, some shooting and then go to an area where

25  there's a target set up that's meant to Tase them, so

1   we Tase that.  We also have a simulator that we go in

2   and we basically deal with somebody on the screen.

3   It's kind of like an interactive-type of thing.  Then

4   we have training Tasers that we deploy on the screen.

5       Q.   And what limitations on the use of a Taser

6   have you been taught during your tenure here at the

7   Pinellas County Sheriff's Office?

8           MR. ROZELLE:  Object to the form.  You can

9       answer.

10  BY MR. CALLAHAN:

11      A.   I don't understand the question.

12      Q.   During your course and use of the training

13  materials, are there any circumstances or limitations

14  on circumstances that you were taught not to use it or

15  limitations on it that you were taught?

16          MR. ROZELLE:  Object to the form.  You can

17      answer.

18  BY MR. CALLAHAN:

19      A.   Yes.  Obviously if somebody is standing on a

20  ladder you don't want to Tase them.  If they're in the

21  pool or water you don't want to Tase them.  Not because

22  of the electricity, but because you don't want them to

23  drown.  You don't want to Tase a pregnant woman.  You

24  don't want to Tase them in the face, neck, groin.  If

25  possible, you want to stay below the chest.  If

1  possible, you want to Tase them in the back.  You want

2  to reduce the amount of times you want to Tase them.

3  That probably covers all of them.  Most of them.

4       Q.   Is that standard for all the training

5  courses?

6       A.   Well, it's changed over the years, to be

7  honest with you.  Over the last couple years, it's

8  changed.

9       Q.   How so?

10      A.   I think just with Taser and developing new

11  programs, they have -- and more research, they've

12  changed things, how they want it done, so -- as they

13  recommend things and they put it in the manual, we go

14  along with that.

15      Q.   For your training prior to the incident with

16  Mr. DeGraw, would the limitations you mentioned have

17  been in effect?

18      A.   I would say most of them.  I can't be sure if

19  they all were there.  I can't recall that far back, to

20  be honest with you.  Even teaching -- being a Taser

21  instructor, some of those things -- I mean, obviously

22  the ladder and somebody up high and the water, pregnant

23  female, throat, neck, I think the multiple Taserings

24  and the chest area has changed somewhat, I think.

25      Q.   How so?

1        A.   I think there's more emphasis on that now
2    than there was before.
3        Q.   You were taught to avoid the chest in 2016 at
4    the time of Mr. DeGraw's incident, were you not?
5             MR. ROZELLE:  Object to the form.  You can
6        answer.
7             MR. CALLAHAN:  What's your objection?
8             MR. ROZELLE:  Form.  Foundation.
9             MR. CALLAHAN:  This gentleman is a party.
10       I'm entitled to lead him.
11            MR. ROZELLE:  I'm not objecting to leading.
12       You just said something that's -- I'm not
13       instructing him not to answer.  He can answer if
14       he can.
15   BY MR. CALLAHAN:
16       A.   I don't recall, to be honest with you.
17       Q.   Are you familiar with POB18 from the Pinellas
18   County Sheriff's Office?
19       A.   Number-wise, no.  I might be familiar if I
20   knew what it was about.
21       Q.   We have the exhibits here.  Let me have you
22   look at -- they are numbered with an index.  Let me
23   have you look at Exhibit Number 2.  Have you had a
24   chance to look at it?
25       A.   Yes.  I previously looked at it.

1       Q.    Have you had a chance to look at it?

2       A.    Yes.  I looked over it briefly.

3       Q.    Are you familiar with that bulletin?

4       A.    Yes.

5       Q.    Look at Page 2, if you don't mind, at the

6  top.  Would you read Number 1 to me?

7       A.    "Upon arrival to any scene involving injury

8  or illness, immediate determination should be made

9  whether medical assistance is required."

10      Q.    All right.  Did you do that with Mr. DeGraw?

11      A.    Attempted to.  Several times.

12      Q.    Tell me how you attempted to determine

13 whether medical assistance we required for him.

14      A.    By speaking to him.  By asking if he was okay

15 to try to create a dialogue with him.  Obviously

16 looking at his body seeing if there's any wounds.  Only

17 thing we noticed at that time was the dry blood in his

18 mouth, but -- then obviously there was something wrong

19 because he's screaming, and not really communicating

20 much but that scream.  He was hearing some of the

21 things I was saying because he did listen to some of

22 the commands, but not fully.

23      Q.    So you weren't able to determine from talking

24 to him if he required medical assistance?

25           MR. ROZELLE:  Object to the form.  You can

1    answer.

2  BY MR. CALLAHAN:

3    A.   No, because he wasn't talking.  He was only

4  screaming.

5    Q.   Did you talk to his wife and ask her if he

6  had a medical condition?

7    A.   When I arrived on scene, I spoke to her

8  briefly about what was going on to determine what I was

9  there for.  I believe she said he may have had a

10 seizure earlier.  That he had PTSD.  I believe she said

11 he was military.  I think that's about all I got from

12 her and -- because my focus was getting up to the room

13 before he comes out shooting, or whatever could happen

14 if he's acting that crazy.  So I go upstairs, and as

15 I'm going upstairs, she said, yes, he had a gun under

16 the pillow and there are several guns around the house

17 and possibly in that room.

18   Q.   Back to the medical condition.  When you saw

19 him, he was initially where?

20   A.   When I first walked in the room he was

21 laying on his bed.  You want more detail?

22   Q.   Yes.

23   A.   So he was laying on his bed.  His head, I

24 guess, was facing -- I believe that would be south.

25 He's in his underwear.  Hands are above his head.  The

1  pillow is right here where the gun was under.  That's

2  where I was really worrying about him grabbing it,

3  assuming how many times he's practiced pointing the gun

4  at the door or doing something like that.  That was it.

5  That's how we -- that's how he was when I saw him.

6      Q.   Was he moving or just laying there?

7      A.   He was kind of moving around.  Kind of --

8  hands were kind of moving towards the pillow.  Feet

9  were kind of moving, kind of restless.

10     Q.   So his hands, you're indicating, were near

11 the ear beside him?

12     A.   Yes.  Right here.  Right by the pillow.

13     Q.   Did he ever say anything to you?

14     A.   No.

15     Q.   And did you examine him for post-seizure

16 symptoms -- or let me ask you first, are you aware of

17 what post-seizure symptoms are?

18     A.   I'm aware that they can potentially happen.

19 I'm more aware of it after the fact, after I researched

20 it.  I've seen probably 20 seizures in my life on the

21 job.  I've never seen anybody come out of it and act

22 like that.  So based on my training and experience, no.

23     Q.   So what symptoms were you looking for based

24 on your experience?

25     A.   Well, first of all, if he had a seizure -- in

1 my experience, that's not a seizure.  That post-seizure

2 experience, I've never experienced that before, so I

3 would have no idea, I'm not a doctor, that that's what

4 he's doing.  It could have been from a post-seizure or

5 whatever the terminology is, but what I'm looking

6 for -- first of all, I'm trying to communicate to him

7 telling him, "We are here for you.  We are here to make

8 sure you're okay."  I'm looking at his body making sure

9 there's no holes in him or he hasn't hit his head.

10 There's no bleeding.  The only bleeding was obviously

11 from quite a bit earlier, which could have been from a

12 seizure.  A lot of times when you have a seizure you

13 bite your lip, bite your tongue.  But it was very dry,

14 so to me, that would make it seem like it was from

15 quite some time ago.

16  Q. Were you aware that mental confusion and

17 fogginess are typical symptoms of post-seizure?

18   MR. ROZELLE:  Object to the form.  You can

19  answer.

20 BY MR. CALLAHAN:

21  A. That, yes.

22  Q. Okay.  Are you aware that speech impairment

23 is a typical symptom of a post-seizure?

24   MR. ROZELLE:  Object to the form.  You can

25  answer.

1   BY MR. CALLAHAN:

2        A.   Yes.

3        Q.   Confusion?

4        A.   Yes.

5        Q.   Some cases even delirium or psychosis?

6        A.   That I did not know.

7        Q.   So you do agree that he wasn't communicating

8   with you?

9            MR. ROZELLE:  Object to the form.  You can

10       answer.

11  BY MR. CALLAHAN:

12       Q.   Verbally?

13       A.   Yes.

14       Q.   And at no time when you were dealing with him

15  was the gun ever exposed, was it?

16       A.   No.

17       Q.   And at no time did he ever touch the gun or

18  reach under the pillow for the gun or in any way

19  indicate to you that he was attempting to use the gun?

20           MR. ROZELLE:  Object to the form.  You can

21       answer.

22  BY MR. CALLAHAN:

23       A.   His hands went towards the pillow, and

24  actually under the pillow several times.  He

25  actually -- when he was laying there, he reached up,

1  over and down between the bed and the wall more than

2  once.  I told him not to do that.  "Let me see your

3  hands."  So he was -- you don't just sit up and reach

4  for nothing.  As I'm seeing all these gun boxes, I

5  don't know what he's going to do.

6      Q.  But you would agree at no time did he ever

7  get the gun or touch the gun, to your knowledge?

8          MR. ROZELLE:  Object to the form.  You can

9      answer.

10 BY MR. CALLAHAN:

11     A.  He never got the opportunity to do that, no.

12     Q.  Okay.  Tell me about being in the room.  You

13 mentioned when you went in the room.  Did you actually

14 go into the room initially?

15     A.  I did not go in the room.  I was at the door

16 frame.

17     Q.  Okay.  So you were standing in the doorway?

18     A.  Yes.

19     Q.  Did you ever go into the room at any time you

20 were giving him instructions or dealing with him before

21 you actually deployed the Taser?

22     A.  I probably stepped in a little bit when he

23 stood up towards the end of the bed.  I probably

24 entered just a little bit further in.

25     Q.  By just a little bit --

1          A.    Maybe a foot.

2          Q.    And the other officers with you, they

3    remained outside of the room, as well, did they not,

4    prior to the deployment of the Taser?

5              MR. ROZELLE:  Object to the form.  You can

6          answer.

7    BY MR. CALLAHAN:

8          A.    They did.

9          Q.    Let's talk a little bit about your training

10   again.  Are you familiar with General Order 13-10?

11         A.    Somewhat.

12         Q.    It's Exhibit 3.  Could you take a look at it

13   there?

14         A.    Okay.

15         Q.    Are you familiar with this Pinellas County

16   Sheriff's Office order?

17         A.    Somewhat, yes.  I mean, we've -- we always

18   read them over, but we don't read them every day before

19   we start the job.

20         Q.    I understand.  What's the purpose of this

21   order?

22         A.    You want me to read that?

23         Q.    Yes.

24         A.    "Purpose of general order to establish

25   guidelines for the recognition and appropriate handling

1   of individuals with mental and/or physical disabilities

2   and injuries and to provide the quality service,

3   protect their rights and comply with the provisions of

4   the Disabilities Act of 1990."  You want me to read the

5   next line?

6        Q.   If you want.

7        A.   "No single policy or procedure can address

8   police response to all people with all disabilities or

9   illnesses."  That's a pretty --

10       Q.   Keep reading.

11       A.   "This general order addresses common law

12  enforcement interaction with people with physical

13  and/or mental disability and illness, including those

14  who are complainants, victims, witnesses, suspects,

15  arrestees, people seeking information and uninvolved

16  bystanders."

17       Q.   And the next section has to do with

18  discussion.  The second paragraph states what?

19       A.   The second paragraph under, "Discussion"?

20       Q.   Yes.

21       A.   "When coming into contact with anyone having

22  a disability for whatever reason or circumstance,

23  agency members must take extra caution to ensure the

24  person's rights are not violated, and that he/she

25  understands what is occurring.  Some individuals may

1    not have education or communication comprehensive

2    levels to fully understand the basic Miranda rights.

3    Simply reading the rights to someone with these types

4    of disabilities and having the individual acknowledge

5    they are understood may not be sufficient."

6        Q.  Did you develop any understanding when you

7    were dealing with Mr. DeGraw that he knew what was

8    occurring?

9        A.  He seemed to understand some of my commands,

10    because he did -- what's a good word?  Obey them at

11    some point.  Like when he was reaching under the pillow

12    or starting to go and I said, "Don't do it.  Let me see

13    your hands," he pulled his hands back.  When he reached

14    up, reached under or between the bed and the wall like

15    he was going to get something and I said, "Don't do

16    that.  Let me see your hands.  Stop," he came back.  He

17    would do it again.  But, again, I would say it, and he

18    would come back.  To me, it seemed like he was

19    understanding.

20          When he -- when I asked him to sit up,

21    because I wanted him to sit up and get away from the

22    gun, he sat up at the -- finally at one point, he sat

23    up on the edge of the bed.  That's kind of where I

24    wanted him to stay, and then he stood up.

25        Q.  Did he have any difficulty doing --

1  responding to you?

2           MR. ROZELLE:  Object to the form.  You can

3      answer.

4  BY MR. CALLAHAN:

5      Q.   In other words, did you have to give repeated

6  commands to get him to obey?

7      A.   Yes.  Yes, I did.

8      Q.   Do you think he knew who you were?

9           MR. ROZELLE:  Object to the form.  You can

10     answer.

11 BY MR. CALLAHAN:

12     A.   I'm imagining that he sees my uniform.  That

13 he knows that I'm a police officer.  Deputy sheriff.

14 Do I know what his state of mind was?  No.  I'm not a

15 doctor and I can't read his mind.

16     Q.   Did he ever say anything to you at all?

17     A.   No.

18     Q.   So verbally he didn't indicate to you that he

19 knew you were a police officer?

20     A.   Well, no.  He was just screaming.  But

21 obviously as I'm talking to him and asking him

22 questions, his answers were screams back, I don't know

23 if he was attempting to communicate and he just could

24 not.  So, again, I'm not a doctor.  I don't know what

25 he's thinking.

1    Q.   But specifically I'm asking, he didn't say
2  anything or do anything to indicate --
3    A.   He did not verbalize any English language,
4  no.
5    Q.   And he didn't do or say anything to you to
6  let you know that he knew you might be a police
7  officer?
8    A.   Well, he was obeying some of my commands, so
9  that -- maybe that could be part of it.
10    Q.   Other than that, no?
11    A.   No.
12    Q.   Okay.  Did anybody from the crisis
13  intervention team ever show up or be summoned by you on
14  the date you were there with Mr. DeGraw?
15    A.   I believe Deputy Martinez was on the CIT
16  team.
17    Q.   Do you know that?
18    A.   I'm not a hundred percent sure.  I know he is
19  now.  I think he was at the time, though.  I remember
20  him telling me that he had the class, and I did it
21  exactly the way that they would have taught me to do
22  it, so --
23    Q.   Did he -- did you and he discuss at any time
24  he arrived there any dealings with Mr. DeGraw?  In
25  other words, the appropriate way to deal with him?

1    A.    It was happening pretty fast, so we were, I

2  think, handling it the best way we thought.  I was --

3    Q.    My question was, did you discuss it with him?

4    A.    No, because I'm involved in concentrating on

5  Mr. DeGraw's hands, whether they're going towards the

6  gun or whatever he's going to do.  I can't sit there

7  and have a conversation with Deputy Martinez at the

8  same time.

9    Q.    Okay.  You would agree with me that Mr.

10  DeGraw exhibited erratic behavior, wouldn't you?

11    A.    Yes.

12    Q.    You would agree with me to some extent he was

13  delusional?

14    A.    That, I don't know.

15    Q.    When you first saw him, he wasn't creating

16  any disturbance or doing anything illegal, was he?

17        MR. ROZELLE:  Object to the form.  You can

18      answer.

19  BY MR. CALLAHAN:

20    A.    No.

21    Q.    He was laying in bed?

22    A.    Yes.

23    Q.    What was the reason why Mrs. DeGraw summoned

24  help with him, to your knowledge?

25    A.    To my knowledge, I believe that he attacked

1 her earlier in the day and he was chasing her around

2 the house and doing all that stuff. He was doing it

3 again, so she called fire rescue. Fire rescue said,

4 "No. We don't go in when somebody is being combative

5 and going to fight," so that's what we do. That's why

6 we went in.

7 Q. So your understanding that day was that he

8 was chasing her and threatening her in the afternoon?

9 A. I believe that was communicated to me at some

10 point, yes.

11 Q. Who told you that?

12 A. I think it was either the fireman when we got

13 there. They said something about it. Or maybe it was

14 Martinez from talking to the wife. I can't recall.

15 But I remember having some sort of knowledge that an

16 event happened earlier that day.

17 Q. You can't be specific about what you knew

18 then?

19 MR. ROZELLE: Object to the form.

20 BY MR. CALLAHAN:

21 A. It was three years ago. I can't be specific

22 on who exactly it was.

23 MR. ROZELLE: Would this be a good time for a

24 short bathroom break?

25 MR. CALLAHAN: Sure.

1          (At this time a brief recess was taken.)

2     BY MR. CALLAHAN:

3          Q.    Deputy Goepfert, I was asking you a few

4     questions about General Order 13-10, which deals with

5     response to individuals with mental or physical

6     disabilities, illness or injuries, and I would like to

7     refer you to Page 6.  Subsection, "Encountering a

8     subject who may have a mental illness."  Got that?

9          A.    Yes, sir.

10         Q.    Section 3 of that subsection deals with what?

11    Would you read it for me?

12         A.    "Take steps to calm the situation.  When

13    possible, eliminate emergency lights and sirens,

14    disperse crowds and assume a quiet, non-threatening

15    manner when approaching or conversing with the subject.

16    Give the subject some space, do not corner them.  Where

17    violence or destructive acts have not occurred, avoid

18    physical contact and take time to assess the

19    situation."

20         Q.    And would you read Section 4 for me?

21         A.    "The subject should be handled calmly and

22    spoken to in a reassuring voice.  Try to establish a

23    comfort zone by showing respect and dignity for the

24    subject.  Explain to the subject you are there to help

25    them.  Listen to them, but neither endorse nor argue

1  with their delusions/hallucinations, et cetera."

2      Q.    And Number 6?

3      A.    "Communicate with the subject in an attempt

4  to determine what is bothering them.  Speak slowly.

5  Ask short, direct questions.  Repeat yourself as

6  needed.  Relate your concern and respect for their

7  feelings, and allow them to vent their feelings.  Be

8  patient with the subject."

9      Q.    Number 7?

10     A.    "Do not threaten the individual with arrest

11  or in any manner as this will create additional fright,

12  stress and potential aggression."

13     Q.    When you got to the doorway with Mr. DeGraw,

14  what was your goal?

15     A.    I was there to help.  I was there for a

16  medical call.  We weren't there to -- by any means

17  thinking that it's going to turn bad.  We go to them

18  every day, but -- so I just answered your question.

19     Q.    Did you consider getting him out of the room?

20     A.    At first, yes.  I mean, that was our initial

21  goal.  I believe that's definitely what we were trying

22  to do.

23     Q.    Did you ever ask him to leave the room?

24     A.    Initially I did, yes.

25     Q.    When?

1      A.    I guess I'm going to -- if you want me to
2  tell the story, basically I'm trying to communicate
3  with him what's wrong?  What can we do for you?  We are
4  here to help you.  We have paramedics outside that need
5  to help you.  Would like to help you."  I'm trying to
6  communicate what's wrong.  What's happened.

7      Q.    Was there any response to any of that?
8      A.    Again, he would look me in the eye.  I mean,
9  he was definitely looking at me, staring into my eyes.
10  He was focused on me.  I even went to the point of -- I
11  knew he was a vet, saying, "Hey, look, I was in the Air
12  Force.  I was in Desert Storm, as well.  Can we talk
13  about that?  What's bothering you?"  I'm trying to find
14  something that he would relate to and maybe help him
15  come out of that funk that he was in.  That rage he was
16  in.

17          So, definitely -- I mean, reading this, I did
18  all this.  I spoke softly.  I spoke compassionately.  I
19  brought up things like the military thing and tried to
20  see if that would help, so I absolutely followed this
21  pretty well, I think.

22      Q.    Did you ever ask him to leave the room?
23          MR. ROZELLE:  Object to the form.  Asked and
24      answered.
25  BY MR. CALLAHAN:

1      A.   At one point I told him that I wanted to get
2  him out of the room.  At that point, it was -- because
3  he was laying on the bed close to the gun, it was,
4  "Hey, let's get you up and out of here."  Did I go back
5  to that?  Probably not.  Because things moved pretty
6  fast and went kind of sideways.
7      Q.   So he's in this room and you and the other
8  deputies are in the doorway?
9          MR. ROZELLE:  Objection.  You keep saying
10         "other deputies".  That's not anything we've had
11         testimony from this witness or anybody else about.
12         MR. CALLAHAN:  I'll rephrase it.
13  BY MR. CALLAHAN:
14     Q.   Who was in the doorway with you?
15     A.   Nobody was in the doorway with me.  It's a
16  small door.  Martinez, I believe, was off to the left,
17  as I can remember.
18     Q.   Anybody else arrive and stand in the vicinity
19  of the doorway?
20     A.   Not at this time, no.
21     Q.   So initially it was just you and Martinez in
22  the vicinity of the doorway?
23     A.   I was in the doorway.  He was in the vicinity
24  of the doorway.
25     Q.   A third person arrived eventually?

1      A.   Yes.

2      Q.   Who was that?

3      A.   Sergeant Street.

4      Q.   And he was initially also in the vicinity of

5    the doorway, was he not?

6           MR. ROZELLE:  Object to the form.  You can

7      answer.

8    BY MR. CALLAHAN:

9      A.   At some point after everything happened, he

10   was there.  And when he got there, we went in to

11   attempt to handcuff the person.

12     Q.   But there was a point in which you, Martinez

13   and Street were in the vicinity of the doorway, but not

14   in the room?

15          MR. ROZELLE:  Object to the form.  You can

16     answer.

17   BY MR. CALLAHAN:

18     A.   Yes.

19     Q.   Now, did Mr. DeGraw give you any indication

20   at all that he understood your suggestion that you

21   wanted to get him out of the room?

22     A.   Well, again, actually I would say yes,

23   because I said -- again, I mentioned that to him once,

24   and then I kind of went away from that and I asked him

25   if he could sit up so I could get him away from the gun

1   under the pillow, and potentially the gun that he was

2   reaching for on the other side of the wall.  Which is

3   great.  That's what I wanted.

4       Q.   The one he was reaching for on the other side

5   of the wall?

6       A.   Or whatever he was reaching for.  It could

7   have been a gun.  I'm not sure.  Somebody doesn't reach

8   over and do that if their intention isn't to get

9   something.  He's not doing sit-ups.  He's reaching for

10  something.

11      Q.   Did you ever determine if there was anything

12  down there on the other side of the wall?

13      A.   That, I don't know.  That would be the

14  detectives' crime scene and whoever went in and got all

15  that stuff.

16      Q.   What did Mrs. DeGraw tell you when you first

17  got there?

18      A.   You want me to tell you what I said before?

19      Q.   Just tell me your recollection of what she

20  told you.

21      A.   The recollection of what I told you earlier?

22      Q.   No.  Tell me --

23      A.   You already asked me this question.

24      Q.   I did.  I want you to tell me what your

25  current recollection is of what she said to you when

1  you first arrived.

2      A.  I believe when I got there, the door was

3  open.  I think she was sitting on the couch.  Or

4  standing.  I believe it might have been on the couch.

5  She said, "My husband may have had a seizure earlier.

6  He has PTSD."  Again, I can't remember if she told me

7  that he attacked her earlier.  I remember somehow

8  knowing that this happened earlier in the day because

9  we were out there before.

10      Q.  Were you personally out there before?

11      A.  No.  This was the shift before us.

12      Q.  Prior to talking to her that day, did you

13  talk to anyone who had been out there before?

14      A.  I did not.  I did not -- usually we try to do

15  that, but they did not relay that information to us.

16      Q.  Did she tell you when you first talked to her

17  that her husband was irrational or erratic?

18      A.  I don't recall that.

19      Q.  In the first -- let me just read you on Page

20  5 of your statement in the middle of the page.

21          MR. ROZELLE:  I'm sorry.  Where are we?

22          MR. CALLAHAN:  Twenty-one.  His statement in

23      the investigation.

24          MR. ROZELLE:  Do you have a copy for him, or

25      do --

1    MR. CALLAHAN:  It's Exhibit 8A.

2    MR. ROZELLE:  Maybe you can give it to him,

3    because I'm not familiar with that.  Exhibit 8 is

4    a photograph.  I'm referring to my own exhibits.

5    Just a minute.

6    MR. CALLAHAN:  Do you have it there?  It's 21

7    of the Pinellas County supplement.  If you -- it's

8    part of Exhibit 1.  If you look at the flagged

9    part of Exhibit 1.  Turn to Page 5 of his

10    interview.

11    MR. ROZELLE:  So Supplement 21 to the report?

12    MR. CALLAHAN:  Correct.

13    MR. ROZELLE:  Okay.  We've got it here.

14  BY MR. CALLAHAN:

15    Q.   My question to you was, did she tell you that

16  he was being irrational or erratic?

17    A.   She did according to this.

18    Q.   If you look at Page 6 of Exhibit 1, again, we

19  are on Supplement 21, which is your interview, at the

20  top of the page, there's a description of what you

21  initially did.  Then in the middle of that, you refer

22  to the blood in his mouth.  It states, "Uh, blood in

23  his mouth.  His mouth was all bloody.  He was just

24  laying there.  He wasn't doing anything."  Got it?

25    A.   Yes.

1    Q.   So when you initially got there before you
2    started to speak to him, was his mouth all bloody?  Did
3    you notice that?
4    A.   Yes.  I noticed his mouth was bloody.  He had
5    dry blood.
6    Q.   And in his mouth and around his mouth, or
7    just in it?
8    A.   Kind of in it.  Teeth looked bloody, his
9    mouth, but not dripping down his face or anything.
10   Q.   Okay.  And you said he was just laying there,
11   he wasn't doing anything?
12   A.   When I first saw him, yes.
13   Q.   Okay.  And then in referring to the sounds he
14   was making, you say, "He was -- just basically yelled
15   'ya' or 'ha'.  He was just making a 'ha' noise."  Then
16   you said, "I don't know.  I put it down as 'ya'."  So
17   you referred earlier to his communications as
18   screaming.  Is that what you were referring to?
19   A.   Yes.
20   Q.   Was the noise he was making consistent
21   throughout your dealing with him?
22   A.   Yes.
23   Q.   So what you're describing here doesn't strike
24   me as what we described as a scream.  Can you describe
25   it in any way?

1           MR. ROZELLE:  Object to the form.  You can
2      answer.
3  BY MR. CALLAHAN:
4      A.    You want me to communicate the sound?
5      Q.    Yes.
6      A.    "Ahh".  (Witness indicated a scream.)
7      Q.    So the loud sound you made, I interpreted it
8  to be fear or anger.  Could you interpret it, please?
9           MR. ROZELLE:  Object to the form.  You can
10     answer.
11 BY MR. CALLAHAN:
12     Q.    Could you interpret what he was trying to
13 communicate at all?
14     A.    To me it seemed very angry.
15     Q.    Could it have been fearful, as well?
16          MR. ROZELLE:  Object to the form.  You can
17     answer.
18 BY MR. CALLAHAN:
19     A.    What I saw was somebody very angry and
20 hostile.
21     Q.    Was he delusional?
22          MR. ROZELLE:  Object to the form.  You can
23     answer, but it's been asked and answered.
24 BY MR. CALLAHAN:
25     A.    I do not know.  I'm not a doctor.

1    Q.   You were aware that he had -- that he was a

2  combat veteran?

3    A.   I was.

4    Q.   And you were aware that he had -- you were

5  told that he had symptoms of PTSD before you went up

6  there, yes?

7    A.   Yes.

8    Q.   And you were also aware that he was in a

9  post-seizure state possibly when you went up there?

10        MR. ROZELLE:   Object to the form.  You can

11     answer.

12  BY MR. CALLAHAN:

13    A.   The last question, I did not know.

14    Q.   His wife didn't tell you that he possibly had

15  a seizure?

16    A.   She mentioned he -- possibly.  She said he

17  possibly had a seizure earlier.  Not like ten minutes

18  ago, but earlier in the day.

19    Q.   Did she say earlier in the day, or did she

20  put a timeframe on it at all?

21    A.   She said earlier.

22    Q.   Did you consider that he might be in a

23  post-seizure state?

24    A.   I did not.

25    Q.   So whatever he was doing, he wasn't acting in

1   a way that he understood the circumstances, was he?

2          MR. ROZELLE:  Objection to form.  You can

3      answer.

4   BY MR. CALLAHAN:

5      A.   As I stated before, he did seem at times that

6   he understood what was going on because he was

7   listening to my commands and obeying some of them.

8   Whether he could communicate back to me or not is a

9   different story.

10     Q.   So you had testified earlier that you got him

11  to sit up?

12     A.   Yes.

13     Q.   And he was sitting on the bed?

14     A.   Yes.

15     Q.   Did you ask him thereafter to stand up?

16     A.   I did at one point, I believe, because I was

17  going to try to get him out of the room again.  I

18  believe that was our thought process.

19     Q.   Okay.  And did he thereafter sit back down on

20  the bed?

21     A.   That, I don't recall.  He may have.  I don't

22  recall if he sat back down.

23     Q.   And then at another point he did stand up

24  again, though?

25     A.   Yes.

1      Q.   Okay.  And did you ask him to stand there?

2      A.   I believe -- I believe at two different times

3  there was a time where I wanted to get him out, and

4  then there was a time where I just wanted him to stay

5  where he was.  At the latter end it was, okay, we

6  probably need him to stay there because there's a lot

7  of things going through my head as he's getting closer

8  to the gun.  You know, if he charges at me, I have two

9  steps that I'm downstairs.  If he falls down the stairs

10  and breaks his neck, it could be bad.  So all these

11  things are going through your head pretty rapidly, and

12  what's the next best thing to do here?

13      Q.   So describe his steps.  Were they shuffling,

14  walking normally or somewhere in between?

15      A.   When he was standing, he didn't really move

16  at all.

17      Q.   When he did move, did he take a

18  shuffling-type movement or a full step?

19      A.   When he did move, he took a full step.

20      Q.   Was it a normal step?

21      A.   Yes.

22      Q.   Okay.  You described him as almost like a

23  zombie on Page 7.  You said, "It was kind of weird."

24          MR. ROZELLE:  Where are we?

25          MR. CALLAHAN:  Middle of the page.

1          MR. ROZELLE:  Got it.

2     BY MR. CALLAHAN:

3          Q.   You say, "It was kind of weird."  What did

4     you mean by, "Almost like a zombie?"

5               MR. ROZELLE:  Hang on.  Just so we are --

6          object to the form.  This is after the Taser has

7          been deployed, correct?

8               MR. CALLAHAN:  No.

9               MR. ROZELLE:  Look up further.  Or is it

10         before?

11              MR. CALLAHAN:  It's before, I think.

12              MR. ROZELLE:  "What happened when you

13         deployed the Taser?"

14              MR. CALLAHAN:  I know.  But if you read the

15         whole context, I think it skips around a little

16         bit.

17              MR. ROZELLE:  Okay.

18    BY MR. CALLAHAN:

19         Q.   My question is, can you describe what you

20    meant by that?

21         A.   Describing it is harder than showing it.  But

22    I know we are on record, so I have to describe it.

23    Hands out kind of, you know, fists are down.  Then he's

24    got that look of just -- I've seen that look.  It's

25    usually not a good look to get from somebody as they

1    are coming at you.

2         Q.   Were they kind of jerky movements?

3         A.   No.  He wasn't shaking or jerky or anything.

4         Q.   Okay.  So how far away was he from you --

5         A.   At what point?

6         Q.   I'm about to ask.  When he finally took a

7    step towards you and you deployed the Taser?

8         A.   I would say three to four feet.  Probably

9    four to -- yes, three to four feet.

10        Q.   Just above where I asked you about the

11   zombie, you state -- or you were asked, "He got within

12   three feet of you before you deployed the Taser," and

13   you said, "Yes."  So is three feet a good estimate?

14        A.   I think I just said three to four, so, yes.

15        Q.   Okay.  And then you deployed the Taser probes

16   where?  Where in relation to his body?

17        A.   I believe one was just below center of the

18   chest, and one was over to the lower left side.

19        Q.   And what was his reaction when you deployed

20   the Taser?

21        A.   He tensed up.  It didn't -- you know, we

22   didn't get full NMI, but he felt it.  He took a couple

23   of shuffle steps towards me still, like he was still

24   coming at me.  Then he ultimately fell onto his butt

25   against the ladder that was in the room.

1      Q.    In a seated position?

2      A.    Yes.

3      Q.    In the interview here you don't mention

4   shuffling a couple steps more.  Is that something you

5   just recalled?

6           MR. ROZELLE:  Object to the form.  You can

7           answer.

8   BY MR. CALLAHAN:

9      A.    No.  I knew that that was absolutely what

10  happened.  I don't know if maybe they didn't ask that

11  or I just didn't say it, but it absolutely happened.

12     Q.    And so you described him as on his butt

13  against the east wall?

14     A.    Yes.

15     Q.    All right.  And if you look at the bottom

16  there, you state, "I didn't give him the full, you

17  know, five-second ride."  It was like two seconds.

18  Maybe three."  And then you say, "The blood coming out

19  of his mouth," in that paragraph.  So was he bleeding

20  out of his mouth at that point?

21     A.    I think maybe at that point, because he was

22  kind of -- there was a little bit of saliva coming out

23  of his mouth.  Spit or whatever.  But it wasn't like

24  gushing down his face or anything.  It was --

25     Q.    So he's seated up against the wall.  You say,

1    "I Tased him again just so we get more control of him

2    and again for probably two-or three-second rides or

3    whatever you want to call it."  Okay?

4        A.    Uh-huh.

5        Q.    "And when he was on his butt there was blood

6    coming out of his mouth up against the wall."  What was

7    he doing?

8            MR. ROZELLE:  Object to the form.  You can

9        answer.

10   BY MR. CALLAHAN:

11       Q.    Anything else you can describe?

12       A.    Yes.  So the first Tase, he goes down.  He's

13   sitting there.  I turned it off so I can evaluate him.

14   Talk to him some more.  "Sir, stay where you're at.

15   Are you okay?  We need to get through this.  We just

16   need to get you some help."  He starts to get up again.

17   He does that yell.  Starts to get up.  So I Taser him

18   again, I believe, for another short period of time just

19   to keep him down.  Because at this point, I'm just

20   waiting for somebody else to get there so that we can

21   go hands-on and get him secured.

22       Q.    So after the first one, but before the second

23   one, in your statement here, I don't see where you

24   describe any activity on his part.  Then down below you

25   say again, "Ya.  He yelled.  Not listening to my verbal

1  communications or verbal commands.  I believe I did it

2  one more time.  It could have two, to be honest at that

3  point.  I'm not counting how many times I Tased him."

4          MR. ROZELLE:  Hang on a second.  Is that the

5      question?

6          MR. CALLAHAN:  I'm about to ask the question.

7  BY MR. CALLAHAN:

8      Q.   So was his reaction between each of the

9  Tasers that you described, his reaction yelling "ya" or

10  "ha"?

11          MR. ROZELLE:  I'll object to the form.  You

12      can answer.

13  BY MR. CALLAHAN:

14      A.   Again, I don't know if somehow we missed the

15  other question that was skipped over, but he says, "You

16  stated he was going aggressive before you Tased him the

17  second time?"  And again I say, "Yes."  So, yes, he was

18  going aggressive again and I Tased him.  And each time

19  we -- I stopped, evaluate, try to see if he's going to

20  comply.  He doesn't.  He gets aggressive.  Starts to

21  try to stand up.  That's when he gets it again.

22      Q.   So by aggressive you meant yelling "ya" or

23  "ha" and trying to stand up?

24      A.   Yes.

25      Q.   Anything --

1      A.   Not obeying my lawful commands to stay on the

2 ground and stop resisting.

3      Q.   Do you have any idea if he understands at

4 that stage what you were telling him to do?

5      A.   I have no idea if he was understanding at

6 that time.  I mean, it was working, because he would

7 stop for a minute after the Tase.  Think about it, I

8 guess.  Then he would all of a sudden start getting up.

9 It wasn't like I turned it off and he jumped right back

10 up.  There was time in between the Tasing.  It wasn't

11 just bam, bam, bam.

12      Q.   I understand, but what you've described as

13 him trying to stand up and yelling "ya", I think you

14 said that was the extent of his conduct?

15           MR. ROZELLE:  Object to the form.  You can

16      answer.

17 BY MR. CALLAHAN:

18      Q.   So what were you trying to get him to do?

19      A.   To comply with my lawful commands.

20      Q.   What was your lawful commands?

21      A.   Stay on the ground.  Stop resisting.

22      Q.   So you didn't want him to yell or try to

23 stand up?

24      A.   I don't want him to stand up.  He can yell

25 all he wants.

1    Q.   And your command was to sit there?

2    A.   Yes.  Stay on the ground.

3    Q.   So regardless of the number of times you

4  deployed your Taser, after you completed deployment,

5  was a determination made that you-all would try to get

6  physical control of him?

7         MR. ROZELLE:  Object to the form.  You can

8      answer.

9  BY MR. CALLAHAN:

10    A.   Yes.  Once Sergeant Street arrived on the

11  scene, that's when we now have the numbers to go in and

12  try to secure him and handcuff him, and that's exactly

13  what we did.

14    Q.   So it wasn't to keep him seated anymore at

15  that point?  It was to restrain him by handcuffing him?

16         MR. ROZELLE:  Object to the form.  You can

17      answer.

18  BY MR. CALLAHAN:

19    A.   Yes.

20    Q.   When did you make the determination that you

21  should handcuff him?

22    A.   Well, that determination was from the start.

23  But we don't operate in an environment where we put

24  ourselves at risk.  That's not how we do things.  We

25  wait for somebody.  Because, typically, on a scene,

1    they are pretty fast.  So as soon as we got there and

2    we have the number that we need, we know we are going

3    in to put him in handcuffs.

4         Q.   Was he still up against the wall whenever the

5    three of you decided to handcuff him?

6         A.   I believe he was.

7         Q.   Who grabbed him first?

8              MR. ROZELLE:  Object to the form.  You can

9         answer.

10   BY MR. CALLAHAN:

11        A.   I believe Sergeant Street did.

12        Q.   And then who also joined in attempting --

13        A.   Martinez.

14        Q.   And were you involved in that?

15        A.   Yes.

16        Q.   And in what way?

17        A.   Well, I -- his feet were -- so after the

18   Tasing is done, we go in to handcuff -- or they go in

19   to handcuff.  They're fighting with him.  His feet are,

20   you know, thrashing around moving, so I go down and get

21   control of his feet and legs.

22        Q.   How -- what was his reaction to each of the

23   Taser hits that you gave him?

24             MR. ROZELLE:  Object to the form.  Asked and

25        answered.  You can answer it again.

1  BY MR. CALLAHAN:

2      A.    Can you repeat the question?

3      Q.    What was his reaction to each of the Taser

4  hits that you gave him when you deployed it?

5      A.    He tensed up.

6      Q.    Did he have any other reaction?

7      A.    No.  Pretty much just that.

8      Q.    So how long did it take the three of you to

9  get him handcuffed on the floor?

10     A.    I can't say how long it took, but probably a

11 matter of 45 seconds to a minute.  I mean, we are not

12 timing it.

13     Q.    And when you were done, he ended up prone on

14 his stomach?

15     A.    Yes.  That's how we handcuff people to get

16 their arms behind their back.

17     Q.    Okay.  And at that point, did you-all stand

18 up?

19     A.    We did.

20     Q.    And when was it that you realized that he had

21 a problem medically?

22     A.    I looked down.  I saw that he just didn't

23 look quite right.  I believe I said, "Are you all

24 right?"  That's when someone said, "I don't know.

25 Let's check him."  I said, "Let's put him in a recovery

1  position," because that's what we do if somebody is
2  asphyxiated.  We turned him on his side.  I believe
3  Sergeant Street checked his pulse.  His mouth was
4  moving.  His eyes were moving.  We kind of thought,
5  yes, he's fine.  Then we kind of looked at him again.
6  Something wasn't right about the way he looked, so
7  we -- I thought -- I think I said -- I told Baldwin --
8  because Deputy Baldwin was there at that point, "We
9  need EMS.  Get them up here."  I think he tried on the
10 radio.  There was so much traffic.  I said, "Just run
11 down there and get them," because they were right
12 there.  He brought them up.  I believe Sergeant Street
13 did a sternum rub.  Maybe a nipple twist.  I think
14 Deputy Martinez was patting him trying to say, "Buddy,
15 are you okay?"  Are you okay?"  Trying to get a
16 response.
17        Q.   And was there any response?
18        A.   There was movement.  His eyes moved.  His
19 mouth moved a little bit.  No responses in any type of
20 verbal communication, but we hadn't had any verbal
21 communication with him the whole time we were there.
22        Q.   Do you know when it was that he quit
23 breathing?
24        A.   I do not.  I know the paramedics came in and
25 started working on him, and at some point at that time,

1  I believe that happened.

2      Q.   Do you know if he was breathing when you-all

3  were checking him?

4      A.   He seemed to be.  His mouth was moving.  His

5  eyes were moving.  When they were -- when we were

6  handcuffing him, I mean, he was definitely alive

7  because he was fighting us.  He was screaming.  He was

8  thrashing.  If he's screaming and thrashing, he's got

9  to be alive.  So he was definitely alive the whole time

10  we were doing that.

11      Q.   After he was handcuffed and before the EMTs

12  tried to revive him, can you state any point at which

13  he may have expired where his heart quit?

14      A.   I cannot.  All I know is when they came in, I

15  remember -- he was still -- his mouth was moving and

16  his eyes were kind of moving, so I'm assuming he was

17  alive.  Whether he was dead at that point, I don't

18  know.  I'm not a doctor and I couldn't tell you.  I

19  didn't work on him.

20      Q.   And you don't know whether that eye movement

21  or mouth movement related in any way to his heart still

22  functioning?

23      A.   I do not know.

24      Q.   When did you learn that he had died?

25      A.   I was out in the hallway.  I believe I heard

1  one of the paramedics say he coded.

2      Q.   They weren't able to revive him in the room?

3      A.   I don't believe so.  I think they worked him

4  all the way to the hospital, but knowing he's done I

5  think.

6      Q.   Did you have a conversation with Mrs. DeGraw

7  about the fact that her husband had expired?

8      A.   I did not.

9      Q.   Do you know who did, if anyone?

10     A.   I think Baldwin.  Deputy Baldwin might have,

11  but I'm not positive myself.

12     Q.   It was there in the house wherever she was?

13     A.   Yes.

14     Q.   Did you talk to her after the incident?

15     A.   I did not.

16     Q.   Let me talk to you a little bit about Tasers.

17     A.   Sure.

18     Q.   What's the purpose of using a Taser like the

19  one that was used on Mr. DeGraw?

20     A.   The purpose is to gain control of the subject

21  through NMI, neuromuscular incapacitation.

22     Q.   From your training, what's the most effective

23  place to deploy the Taser to do that?

24     A.   Large muscle groups.  I mean, the best place

25  is the back and the back of the thigh.  However, it's

1    kind of hard to say, "Sir, can you please turn around

2    so I can Tase you in the best spot."  Other than that,

3    lower chest.  Thigh.

4         Q.   Have you ever read that the best, most

5    effective place from the front is in the belt buckle

6    area?

7         A.   No.  That would be pretty close to the groin.

8    I don't think I would want to try to shoot somebody in

9    the belt buckle area.

10        Q.   When you-all attempted to handcuff Mr.

11   DeGraw, you never had any physical contact with him,

12   did you?

13        A.   No.

14        Q.   The entire distance from where he stood up

15   from the bed, on the edge of the bed, to where you

16   first deployed the Taser, how far would you estimate

17   that to be when he took a step or two?

18        A.   I don't understand the question.

19        Q.   You had described him sitting on the bed once

20   or twice, and then standing up and ultimately taking a

21   step or two towards you.  Towards the doorway, I take

22   it, where you were?

23        A.   Yes.

24        Q.   How far did he move in distance?  Was it

25   literally a step or two?

1    A.    So how far did he step before I Tased him?

2    Q.    Yes.

3    A.    Probably a step or two, yes.  I imagine it

4    was -- I'm pretty sure it was two.

5    Q.    Okay.  I'm sorry if I asked you this earlier.

6    I don't think I did.  But did you learn of any of the

7    details of the interaction with Mr. DeGraw that morning

8    from any of the deputies or medical personnel who were

9    at his house?

10    A.    I believe you did ask that.  No to the people

11    that you mentioned.

12    Q.    So were you aware at the time that you went

13    in the evening -- or afternoon to -- on this call, that

14    he had come downstairs in the morning in response to

15    the request from the deputy?

16    A.    Yes.

17    Q.    And how were you made aware of that?  Can you

18    tell me?

19    A.    The more I think about it, I think somebody

20    on the fire rescue, or whatever, because when I pulled

21    up, I'm like, "Why are we here?  What's going on?"  I'm

22    trying to get some information from him.  I believe

23    that's when they said, "Hey, we were out here earlier

24    and he went after his wife," or whatever.  Something

25    like that.  I would be willing to -- that's really

1   accurate, now that I think about it more.  Because we

2   do that.  I mean, it's like, "Guys, why are we here?

3   Why don't you want to go in?"  Then just, you know,

4   when I went in, what she told me.

5       Q.   Okay.  In General Order 13.3, which we

6   discussed earlier, there's a section that's relevant to

7   what I just asked you.

8           MR. ROZELLE:  I'm sorry.  13-3 or 13-10?

9           MR. CALLAHAN:  13-3.

10          MR. ROZELLE:  I don't think we were in 13-3.

11          MR. CALLAHAN:  Its's Exhibit 4 in the

12      exhibits in front of you.

13          MR. ROZELLE:  Just one second.  Here you go.

14  BY MR. CALLAHAN:

15      A.   Did you want me to read this?

16      Q.   First, are you familiar with it?

17      A.   Yes.

18      Q.   You were familiar with this prior to the

19  incident with Mr. DeGraw?

20      A.   What was the question?

21      Q.   You were familiar with this general order

22  prior to your involvement with Mr. DeGraw?

23      A.   Yes.

24      Q.   The discussion on the bulletin on the first

25  page describes the most important purpose of law

1   enforcement.  Would you read that to me?

2      A.   Under, "Discussion.  The most important

3   purpose?"

4      Q.   Yes.

5      A.   "The most important purpose of law

6   enforcement is the protection of human life.  In order

7   to be consistent with that purpose, the use of force

8   must be limited to situations involving resistance to

9   arrest, defense against physial assault or force

10  necessary to perform official duties."

11     Q.   If we look at Page 6, there's a section on

12  electronic control weapons.

13     A.   Okay.

14     Q.   Under guideline E in the last sentence, it

15  says, "Subject, age and physical ability should be

16  considered prior to the deployment of electronic

17  control weapons."  Would you agree with that?

18     A.   Yes.

19     Q.   And then below that you have a section on the

20  uses of the electronic control weapon.  If you will go

21  to subsection H for me.  Read that to me.

22     A.   "The electronic control weapon should not be

23  intentionally be aimed at the head, neck, groin or

24  female breast.  The preferred target zone on the front

25  of the subject's body is the lower torso and below.

1  The preferred target zone in the rear of the subject's
2  body is below the neck and down."

3       Q.   So you testified a few minutes ago in
4  response to my question about use of the belt area.
5  You said you weren't familiar with that in the belt
6  buckle area.

7       A.   You said belt buckle.  Belt buckle is here.
8  If I aim for that, I'm going to hit the groin possibly.
9  Then your second probe is going to go through their
10 legs.  So, no, that does not make sense.

11      Q.   So how do you describe the lower torso and
12 below in relation to the person's body?

13      A.   Lower torso is here and below.  So you would
14 have to place it here, because that other probe is
15 going -- has to hit something.  If you go middle, it
16 goes between the legs.  Unless the guy is facing
17 towards you.

18      Q.   So describe for me where on the body the
19 lower torso and below is that they are referring to, to
20 your understanding.

21      A.   This is my lower torso.  So here, which you
22 would probably have to be in this area or this area so
23 that you can have the other probe go into the leg.

24      Q.   In the stomach area between the ribs?
25 Abdominal area?

1      A.    Yes.  Or, like if I said, if you're going to

2  aim for the lower torso, it has somewhere to go.  Here

3  or here.

4      Q.    It says, "And below."  Where does that mean?

5      A.    That would be the legs.

6      Q.    Okay.  Would you read subsection I to me?

7      A.    "Minus exigent circumstances, multiple

8  electronic control weapon applications or the prolonged

9  duration of an application should be minimized or

10  avoided."

11      Q.    "Absent exigent circumstances".  What were

12  the exigent circumstances for multiple applications to

13  Mr. DeGraw?

14          MR. ROZELLE:  Object to the form.  You can

15      answer.

16  BY MR. CALLAHAN:

17      A.    Well, again, being combative.  Not obeying

18  the commands.  That would be those circumstances.

19      Q.    You described for me two things between

20  Tasering, and that is his attempt to stand up and his

21  continuing yelling "ya" or "ha".  Is that what you mean

22  by combative?

23      A.    Yes.  Can I expound on that?

24      Q.    You can say anything you like.

25      A.    With experiences of law enforcement officers,

1  there's a difference between just getting up leisurely
2  or getting up like you're going to go to combat.
3  There's definitely a difference in that.  If you're
4  getting off the couch or you're getting off the floor
5  ready to fight, anybody that has any experience knows
6  the difference.
7      Q.   And are you telling me that's what you
8  interpreted his standing up to be?
9      A.   Yes.  Like I said, as the initial -- it goes
10  back to initially why I Tased him, is because he balled
11  his fists, he put his arms out and he started towards
12  me yelling and had that look like it's on.  That's why
13  he got Tasered.  He had the same yell.  The same
14  balled-up hands.  Getting up aggressively.  That's why
15  he got Tased.
16      Q.   Was he ever able to stand up during any of
17  the times you Tased him?
18      A.   No, because we're not going to let him stand
19  up.
20      Q.   How far up did he go?  Did he ever get up on
21  one knee?
22      A.   I don't believe so.
23      Q.   Did you guys remove the Taser probes from him
24  at any time?
25      A.   I did not.

1     Q.   Do you know if any of the law enforcement

2  officers did?

3     A.   I do not know.

4     Q.   Do you know if he was ever entangled with the

5  wires?

6     A.   I do not recall.

7     Q.   Would you look at Exhibit 5?  Are you

8  familiar with the bulletin that's Exhibit Number 5?

9     A.   I am.

10     Q.   It's entitled, "Taser Handheld CEW Warnings."

11  What does CEW stand for?

12     A.   Conducted electrical weapon.

13     Q.   It's another way of saying a Taser?

14     A.   Okay.

15     Q.   The warning at the bottom of Page 1 on the

16  right states, "In rare circumstances cardiac capture

17  could lead to cardiac arrest.  When possible avoid

18  targeting the frontal chest area near the heart to

19  reduce risk of potential serious injury or death."

20  Were you aware of that on the date that you were

21  dealing with Mr. DeGraw?

22     A.   Yes.

23     Q.   Did you ever attempt to deploy the Tasers

24  into his stomach or abdomen?

25     A.   I did.

1      Q.   And why didn't you?

2      A.   I believe when he started coming at me, I

3  turned sideways to move back.  If you see how the

4  probes are -- typically, probes are like this.  Top

5  one.  Bottom one.  They were like this.  So what in my

6  mind happened is, I'm stepping back to get away from

7  him.  When I'm deploying it, my hand cantered a little

8  bit, which will probably make the target -- make it go

9  off from where I originally was.

10     Q.   Where did you attempt to aim it?

11     A.   Here and here.  Torso.  Leg.  And the probe

12  spread didn't make it very far, because it's not a lot

13  of distance.  I need seven feet to get 12 inches of

14  spread.  I think I got six inches of spread maybe,

15  which means I was at three feet.  That's pretty close.

16     Q.   Were you aiming at him when he took the step

17  toward you?

18     A.   I was.  Well, yes, my Taser was up.  "Don't

19  move.  Stay there."  And as I said, I'm moving back.

20  And as we know, it's very close.  I mean, it happened

21  that quick, so anything can happen.

22     Q.   Anything can what?

23     A.   Anything -- in that distance, anything can

24  happen.  There's weapons in the room.  There's a knife

25  on the ground.  There's all this stuff that he can get

1  to very quickly.  He can get to me and grab me very

2  quickly.

3      Q.  He was walking towards you and away from the

4  only gun, is that correct?

5      A.  He was walking towards the gun.  He was

6  walking in the direction of the gun.

7      Q.  Of what gun?

8      A.  Of the gun I knew about.

9      Q.  Under the pillow?

10     A.  Yes.

11     Q.  How so?

12     A.  Okay.  So I'm in the doorway.  The bed is

13 right here.  The pillow is right here.  You're where he

14 is.  He's coming this way.  That's the gun.  That's

15 towards the gun.

16     Q.  He was making no motion toward his pillow or

17 the bed in any way, was he?

18     A.   But he was coming in the direction of that,

19 yes.  Absolutely.

20     Q.  He was coming towards you and the doorway?

21     A.  Yes.  I'm in the doorway.  The bed is right

22 there.  I can probably touch it with my foot.  It's a

23 very small bedroom.

24     Q.  He made no motion, did he, to reach for any

25 gun?

1        A.    No.   I didn't say he did.   I just said he was

2   walking towards the direction of the weapon that was in

3   the room.

4        Q.    He was walking towards you.   The bed was to

5   his left?

6             MR. ROZELLE:   Object to the form.   You can

7        answer.

8   BY MR. CALLAHAN:

9        A.    The bed was to his right.

10       Q.    To his right?   How far away was the pillow?

11  It was against the wall, right?

12       A.    Yes.

13       Q.    And he was walking towards the doorway?

14       A.    Yes.

15       Q.    And he made no motion toward the pillow?

16       A.    No.

17       Q.    So look at Page 2 of the bulletin.   There's a

18  diagram there on the upper left part of the page.

19  There are areas shaded in white beside the description.

20  You see that?

21       A.    Yes.

22       Q.    And it says, "To reduce the risk of injury;

23  use preferred target areas."   You see that?

24       A.    Yes.

25       Q.    Are the areas to avoid shaded in white?   The

1    two figures?

2          A.    Yes.

3          Q.    You see that?

4          A.    Yes.

5                MR. ROZELLE:   Object to the form.   You can

6          answer.

7    BY MR. CALLAHAN:

8          Q.    What areas are shaded in white on the

9    figures?

10          A.    It's kind of hard to see, but it looks like

11    the chest area.   The neck.   The head.   Back of the

12    head.   It should be the groin.   That's not -- I'm not

13    sure why that's not shaded.

14          Q.    And you were aware of that anyway, were you

15    not?

16          A.    Yes.

17          Q.    If you look at Page 1 of 2, "To reduce the

18    risk from CEW exposure."   You see that?

19          A.    I see that, yes.

20          Q.    On the right-hand column there is a section

21    that says, "Minimize the number and duration of CEW

22    exposures."

23          A.    Okay.

24          Q.    Would you read that for me?

25          A.    "Most human CEW lab tests have not exceeded

1  15 seconds of CEW application, and none has exceeded 45

2   seconds.  Use the shortest duration of a CEW exposure

3  objectively reasonable to accomplish lawful objectives

4  and reassess the subject's behavior, reaction and

5  resistence before initiating or continuing exposure.

6  If a CEW deployment is ineffective in incapacitating a

7  subject or achieving compliance, consider alternative

8  control measures in conjunction with or separate from

9  of CEW."

10      Q.   Once he was on the ground on his butt, did

11  you ever consider any alternative other than continuing

12  to Taser him?

13          MR. ROZELLE:  Object to the form.  You can

14      answer.

15  BY MR. CALLAHAN:

16      A.   At that point in time, we were just -- in my

17  mind, I'm trying to keep him on the ground until

18  somebody else can some and we can go in and take care

19  of business.

20      Q.   So that's a no, you didn't consider a

21  different alternative?

22          MR. ROZELLE:  Object to the form.

23  BY MR. CALLAHAN:

24      A.   It's not a no.  It's an I am.  As a deputy,

25  we have 20 million things going through our head all

1  the time.  What we can do?  What else is going on?

2  It's always in your brain.  But at that point, what's

3  in my mind is that he's going to be combative.  He's

4  going to be strong.  I mean, you know, we need somebody

5  else to be there.  Somebody needs to maintain the

6  Taser, so that if he does get up, we can have him back

7  down on the ground.

8      Q.  How did you know he was going to be strong?

9      A.  He looked like a strong guy.  When you're in

10  that state, you can be very strong.  The kid that I

11  mentioned the first time, he was just a kid.  He was

12  having some sort of episode and it took two of us, two

13  strong deputies, to hold that kid down, so.  It's

14  experience and training.  You just know.

15      Q.  In this case, you didn't really know how

16  strong he was or not?

17      A.  I don't know for sure until we went hands-on.

18  Then when we went hands-on, he was really strong and we

19  struggled to get his hands behind his back.  I

20  struggled to hold his legs, so he was very strong.

21  Good thing we didn't go with just two of us, because we

22  probably couldn't have handled him with just two of us.

23      Q.  Do you know if he had any understanding why

24  you were physically --

25      A.  Again, he listened to some commands.  He

1    didn't listen to others.  So I'm assuming he had some

2    sort of understanding of what was going on.  A hundred

3    percent, probably not.

4         Q.    My question was understanding why you were

5    physically accosting him and attempting to put his

6    hands behind his back.  I didn't finish my question.

7              MR. ROZELLE:  Object -- go ahead and finish.

8         Is that the question?  Object to the form.  You

9         can answer.

10   BY MR. CALLAHAN:

11        A.    I didn't get the whole thing.  I just heard

12   you say I accosted him or something like that.

13        Q.    You may have understood what I meant, though.

14             MR. ROZELLE:  Object to the form.

15   BY MR. CALLAHAN:

16        A.    So could you ask the question again?

17        Q.    Do you have any idea if he understood why you

18   were physically accosting him and trying to get his

19   hands behind his back?  You meaning the three of you.

20             MR. ROZELLE:  Object to the form.  You can

21        answer.

22   BY MR. CALLAHAN:

23        A.    I'm not sure if he understood.  But our job

24   is to get control of the subject, and that's how we do

25   it, so --

1      Q.   When he was sitting there on his butt, you

2   knew where the probes had entered his body, didn't you?

3           MR. ROZELLE:  Object to the form.  You can

4       answer.

5   BY MR. CALLAHAN:

6      A.   Yes.  I could see where they were.

7      Q.   There is a document I just wanted to show you

8   and ask you if you're familiar with this one.  It's

9   entitled, "Taser Protect Life Instructor Certificate

10  course for the X26."

11          MR. ROZELLE:  Do you have a copy of it for

12      Counsel?

13  BY MR. CALLAHAN:

14     Q.   Have you --

15          MR. ROZELLE:  Sir, you're handing the witness

16      a document.  Do you have a copy of it for me?

17          MR. CALLAHAN:  I don't have an extra for you,

18      but you can look at it with him.

19          MR. ROZELLE:  Hand that thing over, please.

20      This is -- do you want to identify this thing for

21      the record or you want me to do it, just as far as

22      it being selective pages in some sort of random

23      order?

24          MR. CALLAHAN:  The question pending is if he

25      is familiar with the document.

1        MR. ROZELLE:  The document you've handed

2    him -- you want to take a look at the Bates

3    numbers here?

4        MR. CALLAHAN:  Yes.  It's Pinellas County

5    Sheriff's Office 2158.

6        MR. ROZELLE:  What's the next one?

7        MR. CALLAHAN:  2202 -- I mean, 0222.

8        MR. ROZELLE:  And it says Page 30 at the

9    bottom?  The second page?

10        MR. CALLAHAN:  They are all identified as

11    documents produced by the Pinellas County

12    Sheriff's Office.

13        MR. ROZELLE:  Let's go ahead and do this, are

14    you going to mark this?  Because that will save

15    some time.

16        MR. CALLAHAN:  Yes.  I will.

17        THE COURT REPORTER:  May I take a quick break

18    while you are getting that together?

19        MR. ROZELLE:  Sure.  Let's take a break.

20        (At this time a brief recess was taken.)

21  BY MR. CALLAHAN:

22    Q.   Your counsel has had an opportunity to look

23  at the document I provided you.  Let's mark them as

24  Composite Exhibit Number 31.

25        MR. CALLAHAN:  Is that correct?  Is that the

1    next exhibit?

2            MR. ROZELLE:  Yes, 31.

3            MR. CALLAHAN:  Let's mark them as 31.

4            (At this time Plaintiff's Exhibit No. 31

5             was marked for identification.)

6    BY MR. CALLAHAN:

7        Q.   My initial question to you was, are you

8    familiar with these documents in connection with the

9    Taser portion training you've had at the Pinellas

10   County Sheriff's Office?

11           MR. ROZELLE:  I'll just object here and say

12       for the record that Composite Exhibit 31 appears

13       to be at least three separate discrete documents,

14       and there are parts and pieces of them and not

15       necessarily in the correct order.  So with that,

16       the witness can look through hem and answer the

17       question.

18           MR. CALLAHAN:  Okay.  Thank you.

19   BY MR. CALLAHAN:

20       A.   Yes.  They look familiar.  It looks like old.

21   I mean, it looks like it's from 2011, but I don't know.

22       Q.   The version 18 on this phase says it was

23   released July 2011.

24       A.   Okay.  So eight years ago.

25       Q.   Okay.  Let me refer you to what's marked as

1　Page 9 in the documents.　The heading is, "Cardiac."

2　　　A.　Page 9?

3　　　Q.　Yes.

4　　　A.　Okay.

5　　　　MR. ROZELLE:　Again, just for the record,

6　PCSO 002226?

7　　　　MR. CALLAHAN:　Correct.

8　　　　MR. ROZELLE:　There are several Page 9's in

9　here, so --

10　　　　MR. CALLAHAN:　I'll identify each one by the

11　Bates number of the document produced.

12　　　　MR. ROZELLE:　That's appreciated.

13　BY MR. CALLAHAN:

14　　　Q.　So this appears to be an instructional

15　material in which there's a heading on the top and a

16　discussion below?

17　　　A.　Uh-huh.

18　　　Q.　Is that what it is to you?

19　　　A.　Yes.

20　　　Q.　Instruction materials?

21　　　A.　Yes.

22　　　Q.　Okay.　The heading at the top says, "When

23　possible avoiding chest shots with ECD's reduces the

24　risk of affecting the heart.　Avoids the controversy

25　about whether ECD's do or do not affect the human

1    heart."  See that on Page 9?

2         A.   Yes.

3         Q.   Then below in the discussion area it says,

4    "We have issued a new Taser targeting guide.  Note we

5    have lowered the recommended point of aim from center

6    of mass to lower center of mass for front shots."  You

7    see that?

8         A.   Uh-huh.

9         Q.   Did you teach that or were you instructed

10   about that?

11            MR. ROZELLE:  Object to the form.  You can

12        answer.

13   BY MR. CALLAHAN:

14        A.   Yes.

15        Q.   Okay.  And -- so you were aware the lower

16   center of the mass is the appropriate target area?

17        A.   Yes.

18        Q.   By the way, did you -- when you were

19   interviewed by Tobeck after the investigation was done

20   on Mr. DeGraw's death, did you tell him about the

21   probes entering where they did because you were turning

22   away from Mr. DeGraw?

23        A.   I don't recall.

24        Q.   Let me read you from Page 7 of your

25   statement.  It's the very top line.  That's Exhibit 1.

1          MR. ROZELLE:  Hang on a second.  So you're

2      going to Exhibit 1?

3          MR. CALLAHAN:  Yes.  Page 7.

4    BY MR. CALLAHAN:

5      Q.    This is Exhibit 1.  Take a look at the

6    section with the yellow tab, which is your interview.

7    Go to Page 7 of your interview.

8      A.    Okay.

9      Q.    At the top line in the last part of the

10   sentence you say, "And he started coming toward me.

11   That's when I deployed the Taser."

12     A.    Uh-huh.

13     Q.    Did you say anything to him about turning

14   away from Mr. DeGraw before deploying the Taser as you

15   did?

16     A.    Apparently not.

17     Q.    Okay.  Let me take you back to Exhibit 31.

18   On Page 20, which is 002237, bottom of the page.  The

19   teaching box at the top it says, "The ECD can produce

20   physiologic or metabolic effects."  Were you aware of

21   that?

22     A.    Yes.

23     Q.    "A reasonable effort should be made to

24   minimize the number of ECD exposures in resulting

25   physiologic and metabolic affects."  Are you aware of

1   that?

2       A.   Yes.

3       Q.   Did you make any effort with Mr. DeGraw to

4   minimize the number of his exposures?

5       A.   I did.

6       Q.   In what way?

7       A.   Well, I believe there were multiple Tasings,

8   but they were all -- most of them were a second, two

9   seconds, three seconds.  So I'm limiting those.  I

10  didn't do five second rides and then hold on, look at

11  him and then do another five seconds and then wait and

12  see.  I just basically was being as thoughtful as I

13  could be by limiting the time of exposure.

14      Q.   What's the number of exposures that you gave

15  to Mr. DeGraw?

16      A.   I believe it was five.

17      Q.   So we're discussing the number of exposures

18  here.

19      A.   Okay.

20      Q.   Did you attempt to do less than five?

21          MR. ROZELLE:  Object to the form.  You can

22      answer.

23  BY MR. CALLAHAN:

24      A.   I wasn't counting, to be honest with you.  I

25  didn't know I did five.  I thought I literally did

1    three.  Possibly four.  I know the last one or the

2    second one, I have no idea how that would have even

3    been done, but -- so --

4         Q.   You now know that you did five?

5         A.   Yes.  After the fact, I did, yes.

6         Q.   Let's look at Page 13, which is 002254 of the

7    teaching materials in Exhibit 31.

8         A.   Okay.

9         Q.   In the discussion below says -- would you

10   read that to me?  "Multiple ECD applications."

11        A.   "Multiple ECD applications cannot be

12   justified solely on grounds that a subject fails to

13   comply with a command.  Absent other indications that

14   the suspect is an immediate threat or about to flee.

15   This is particularly true when more than one officer is

16   present to assist and control a situation.

17        Q.   Did you have any indication that Mr. DeGraw

18   ever attempted to flee the room?

19        A.   He was trying to get up.  I don't know if he

20   was trying to get up and flee the area or just trying

21   to get up and fight.  I'm not sure.

22        Q.   In fact, you don't know why he was trying to

23   get up, do you?

24        A.   I can only assume.

25        Q.   Okay.  Lastly, I would like to ask you about

1    Page 14, which is 002255.  See the teaching tool at the

2    top?

3         A.   Yes.

4         Q.   Would you read it to me?

5         A.   "Any decision to deploy ECD applications must

6    take into consideration whether a suspect is capable of

7    complying with officer's commands."

8         Q.   Do you know if Mr. DeGraw was capable of

9    complying with your commands?

10        A.   After the initial Tasing or the next one

11   after an application was given, he did calm down.  He

12   did stop.  He was -- so there was a little bit of time

13   where it seemed like it was working, yes, and he was

14   able to comply.

15        Q.   He was calmed down for a time after you

16   Tasered him, correct?

17        A.   Yes.

18             MR. ROZELLE:  Object to the form.  You can

19        answer.

20   BY MR. CALLAHAN:

21        Q.   Did you give him --

22        A.   After the Tasing, he would kind of take a

23   breath.  Then there was -- it wasn't like he just -- I

24   turned the Taser off, and he went "ha" and started to

25   get back up.  It was -- there was time in between to

1   assess and say, "Hey, look.  Stay down.  We are here to

2   help you."  Then, boom, he does the yelling and he's

3   trying to get up aggressively again.

4        Q.   Again, but you had no understanding of his

5   mental capabilities at that point in time, did you?

6        A.   No.

7        Q.   Let me ask you about one other document here.

8             MR. CALLAHAN:  Let's mark this as Exhibit 32.

9             (At this time Plaintiff's Exhibit No. 32

10              was marked for identification.)

11            MR. ROZELLE:  Do you have a copy for counsel?

12            MR. CALLAHAN:  I have one.

13            MR. ROZELLE:  You've just got an original?

14            MR. CALLAHAN:  I've got an original and one.

15            MR. ROZELLE:  That means you don't have one

16      for me?

17            MR. CALLAHAN:  Right.

18            MR. ROZELLE:  This wasn't produced in this

19      case, was it?

20            MR. CALLAHAN:  No.

21            MR. ROZELLE:  Is this the first time I'm

22      seeing this in this case?

23            MR. CALLAHAN:  It wasn't produced by the

24      sheriff's office, no.

25            MR. ROZELLE:  To wasn't produced by the

1      plaintiff to the sheriff in response to --

2           MR. CALLAHAN:  It wasn't produced --

3           MR. ROZELLE:  I just want to make sure I

4      understand what I'm looking at here.

5           MR. CALLAHAN:  I don't know.  I got it from

6      my materials.  If you don't have it, I'll be happy

7      to give it to you, Paul.  You know that.

8           MR. ROZELLE:  Well, I'll follow up with you

9      on that.  Just before you ask, just for our

10     record, same objection to Exhibit 32 as 31.  This

11     is multiple documents that are stuck together and

12     it's parts and pieces of them out of order.  With

13     that, ask away.

14  BY MR. CALLAHAN:

15     Q.   My question to you, sir, was simply whether

16  you were familiar with the Criminal Justice Standards &

17  Training Commission Standards from the FDE on the use

18  of dart-firing stun guns?

19          MR. ROZELLE:  Object to the form.  You can

20     answer.

21  BY MR. CALLAHAN:

22     A.   That's the heading on the document.  I'm

23  familiar.

24     Q.   Okay.  And how are you familiar?  Have you

25  ever read them before?

1      A.    This particular one?  I don't know.  But I've

2  taught this curriculum and been taught the curriculum

3  in the academy.

4      Q.    This is labeled as an instructor guide.  So

5  have you used this yourself as an instructor?

6           MR. ROZELLE:  Objection.  Exhibit 32 is

7       several different documents, so if you want to

8       identify which one you are asking him about, maybe

9       that would be helpful.

10 BY MR. CALLAHAN:

11     Q.    Why don't you tell me which of these

12 documents you've used?

13          MR. ROZELLE:  Object to the form.  He's

14      testified he doesn't know if he used it.

15 BY MR. CALLAHAN:

16     Q.    Go ahead and look through them and tell me.

17     A.    You want me to look through every page?

18     Q.    Yes, I do.

19          MR. ROZELLE:  Take whatever time you need.

20 BY MR. CALLAHAN:

21     A.    I mean just on the basis of -- I don't think

22 I've ever used this.  I believe this is an instructor

23 guide for the academy, and I didn't teach this at the

24 academy.  So, no, I've never seen this or taught this.

25     Q.    Okay.

1      A.   I might have seen it as a student in a

2  different form, but this is an instructor guide for the

3  academy and I didn't teach it.

4      Q.   Okay.

5      A.   There's a student guide in there.  I wouldn't

6  have been a student in 2008 or after, so --

7           MR. ROZELLE:  Just for the record, what I

8      just did is I separated these documents here that

9      are part of Exhibit 32.  It appears that there is

10     a student guide that's part of this, also.

11  BY MR. CALLAHAN:

12     A.   Again, I wasn't a student.  I went to the

13  academy in 2004, so this is after that date.  I didn't

14  instruct at the academy, so I don't see that I would

15  have had this.  I didn't instruct this part.

16     Q.   Thank you.  Let me have you look at

17  Exhibit -- what we previously marked as Exhibit Number

18  14.

19     A.   Okay.

20     Q.   Got it?

21     A.   Yes.

22     Q.   Have you seen this before?

23     A.   I have not.

24     Q.   Take a minute and look at this.  I will

25  identify it as the sheriff's department Supplement 15

 1    to their investigation.  The serial number of the Taser

 2    you used and the download information is depicted on

 3    the document.

 4         A.    Okay.

 5         Q.    So let me go through that with you.  If you

 6    look at the bottom of Exhibit Number 14, it's got your

 7    name, Deputy Goepfert, and it says on September 7th,

 8    2016, at 15:58:05 the Taser was armed.  You see that?

 9         A.    Yes.

10         Q.    So at 15:58:05, or 3:58:05 in the afternoon,

11    the Taser was armed.  Describe for me what that means.

12    How you do that?

13         A.    I'm sorry.  Which one are you talking about?

14         Q.    The very first line on the bottom of the

15    page.

16         A.    I think I'm looking at the other side.

17         Q.    Page 1.

18         A.    Okay.  I see it now.

19         Q.    Got it?

20         A.    Yes.

21         Q.    Okay.  So at 3:58:05 in the afternoon the

22    Taser was armed.  What do you do to arm a Taser?

23         A.    You turn on the switch.  Flip up the switch.

24         Q.    Okay.  At that time, were you holding the

25    Taser and pointing it at Mr. DeGraw?

1           MR. ROZELLE:  Object to the form.  You can

2      answer.

3  BY MR. CALLAHAN:

4      A.    I don't remember if I was pointing it at him

5  at the time.  Most likely I was, but I don't recall.  I

6  might have had it down by my side.

7      Q.    Then it says at 16:01:04 the trigger was

8  pulled for two seconds.

9      A.    Okay.

10     Q.    So this is a minute and four seconds after

11 4:00.  Then the time prior to 4:00 is a minute and 55

12 seconds.  For those two combined times, what was going

13 on after it was armed and before you pulled it the

14 first time?

15     A.    Obviously, I armed it at the 15:58 in between

16 that it would be --

17     Q.    So you've got a minute and --

18     A.    So I'm obviously talking to him trying to get

19 him not to do what he's doing.

20     Q.    So there's two minutes and change between

21 those two times.  So can you tell me at what point you

22 armed it, where he was, and before --

23     A.    According to this, at 15:58:05 I armed my

24 Taser.  And I didn't pull it until 16:04, which means

25 we were communicating with each other for a while, a

1 few minutes, before I Tased him.

2     Q.   That's my question to you. Do you have a

3 recollection --

4     A.   Yes. Of what I said?

5     Q.   Of what, if anything, you said and what was

6 going on in those two minutes and change?

7     A.   Yes. I believe that's when he stood up --

8 got up off the bed, stood up and started staring at me

9 not listening to me. At that time, I'm telling him to,

10 "Stay there. Don't move. Calm down. We are just here

11 to help you." I would imagine at the 16:01:04 is when

12 he took the steps towards me.

13     Q.   It says the trigger was pulled for two

14 seconds. What happens when you pull it for two

15 seconds?

16     A.   What happens? That's where the Taser is

17 trying to be effective. Get the NMI. It's giving them

18 a -- he's being Tased at that time.

19     Q.   And for how long a period is he Tased?

20     A.   According to this, two seconds.

21     Q.   At 16:01:06, it says the Taser was put on

22 safe. Does that mean that it wasn't discharging

23 electricity from that point forward?

24     A.   That means I actually clicked it all the way

25 down off.

1    Q.   Okay.  So that's only a two-second interval
2    that you clicked it off after you Tased him the first
3    time?
4    A.   Yes.
5    Q.   Now we have three minutes where it's on safe,
6    is that correct?
7         MR. ROZELLE:  Object to the form.  You can
8         answer.
9    BY MR. CALLAHAN:
10   Q.   181 seconds?
11   A.   If that's what 181 seconds is, yes.  It was
12   on safe for 181 seconds, according to this.
13   Q.   What was going on for those three minutes and
14   one second?
15        MR. ROZELLE:  Object to the form.  That
16        totally mischaracterizes what this says.  You've
17        taken this testimony from other witnesses.  You
18        know exactly what happened.  You can answer.
19        MR. CALLAHAN:  What is your objection again?
20        MR. ROZELLE:  You're just completely being
21        misleading in your question.  It's totally --
22        MR. CALLAHAN:  I am doing no such thing.
23        MR. ROZELLE:  You're representing that there
24        is a three-minute break in the action, and you
25        know that's not the case.  There's been no

1      testimony to that.

2           MR. CALLAHAN:  I'm asking him what occurred

3      while that Taser was on safe for 181 seconds.

4           MR. ROZELLE:  And what I'm saying is what you

5      know is that isn't what that information means.

6      I've noted my objection.  The witness can answer.

7  BY MR. CALLAHAN:

8      A.   I'm just looking at it here.  It doesn't make

9  any sense.  Because at 16:01:06, it was put on safe.

10 Then at 16:01:17, taser was armed.  So there wasn't 181

11 seconds between those two times.

12     Q.   Okay.  So what happened at 16:01:07?

13     A.   Taser was armed.  That doesn't mean it was

14 deployed or pulled the trigger.  It just means I

15 flipped the switch back up ready to deploy again.

16     Q.   So at 16:01:08, the trigger was pulled for

17 three seconds?

18     A.   Yes.

19     Q.   And at 16:01:07, it was rearmed, right?

20     A.   Yes.

21     Q.   So it was only -- if you look back at this at

22 16:01:04, that's the first time you pulled it?

23     A.   Yes.

24     Q.   The second time you pulled the trigger was at

25 16:01:08, four seconds later?

1      A.   Okay.

2      Q.   That was for three seconds, correct?

3      A.   Yes.  According to this.

4      Q.   What was Mr. DeGraw doing for that four

5  seconds between Tasering?

6      A.   Trying to stand up.

7      Q.   Was it only for four seconds?

8      A.   It doesn't take long to stand up.

9      Q.   Well, you testified he didn't stand up.

10      A.   Because I activated the Taser.

11      Q.   At -- so whatever he was doing, he was only

12  doing it for four seconds between Tasering?

13      A.   Yes.

14      Q.   All right.  Then it says at 16:01:16, the

15  Taser was armed.  And 16:01:16, it was pulled for one

16  second.

17           MR. ROZELLE:  Again, just an objection.

18      You're skipping the 16:01:11 put on safe.

19  BY MR. CALLAHAN:

20      A.   For four seconds.

21      Q.   Does that mean anything to you, that it was

22  put on safe for four seconds?

23      A.   It means that I turned it off and I was

24  speaking to him and trying to get him to stay on the

25  ground and obey my lawful commands.

1      Q.   But the third time you deployed it the
2   16:01:16, correct?
3      A.   Yes.  For one second.
4      Q.   Okay.  So you pulled it for three seconds at
5   16:01:08.  Then at 01:11 it stopped?
6      A.   Yes.
7      Q.   Five seconds later you pulled the trigger
8   again for one second?
9      A.   Yes.
10     Q.   That was the third time you deployed it?
11     A.   Yes.
12     Q.   Okay.  So that would have -- the deployment
13  would have been at 16:01:17, correct?  16:01:16 plus a
14  second?
15     A.   Yes.
16     Q.   And then at 16:01:34, which is 17 seconds
17  later, it was pulled for five seconds again?
18         MR. ROZELLE:  Object to the form.
19  BY MR. CALLAHAN:
20     Q.   It was pulled again for the duration of five
21  seconds?
22     A.   According to this, yes.
23     Q.   Okay.  That would have been the fourth
24  deployment of the Taser?
25     A.   Yes.

1    Q.   Can you tell me why you deployed it for five
2  seconds that time as opposed to a lesser amount?
3    A.   That, I don't know.  I believe in the first
4  interview I had no recollection of pulling it for five
5  seconds.  Still to this day, I don't understand how it
6  was five seconds.
7    Q.   And at 16:02:37, the trigger was pulled
8  again?
9    A.   Yes.  According to this.
10    Q.   So you had deployed it for five seconds at
11  16:01:34, and would have ended at 16:01:39.  Then it
12  would have been deployed again 58 seconds later at
13  2:37?
14    A.   According to this, yes.
15    Q.   Do you know what went on in that 58 seconds?
16  Do have any recollection of it?
17    A.    I do not.  Again, like I said, I don't recall
18  that Tase at all, so --
19    Q.   Okay.  So it was after the last deployment at
20  16:02:37 that a decision was made for you-all to
21  physically accost him and attempt to handcuff him?
22         MR. ROZELLE:  Object to the form.  You can
23         answer.
24  BY MR. CALLAHAN:
25    A.   That's when we decided that we needed to

1  place him in custody.  Then we went in to handcuff him,

2  as he fought us for another few minutes screaming and

3  yelling.

4      Q.   What did he do at the end of the fifth

5  Tasering?  Did he say anything?

6      A.   He was just yelling, as he was the whole

7  time.

8      Q.   I thought you had testified earlier that

9  after the Tasings, he had quieted down for a while.

10  Than he began yelling again?  Did I misconstrue what

11  you said?

12          MR. ROZELLE:  Object to the form.  You can

13      answer.

14  BY MR. CALLAHAN:

15      A.   I believe the only time he got quiet is after

16  we were done handcuffing him.

17      Q.   So did he react to each of the Taserings that

18  you applied by -- well, how did he react?

19      A.   Tense up.  Basically we got some NMI on him,

20  which is the effect we wanted on him so that he

21  wouldn't stand up and fight us.

22      Q.   What does that mean?

23      A.   Neuromuscular incapacitation.  That's what

24  the Taser does.

25      Q.   How long did that last at the end of the

1  first Taser?

2      A.   How long did what last?

3      Q.   The incapacitation.

4      A.   Once the trigger goes off, that's done.  It's

5  not a long-lasting thing.  That's the good thing about

6  a Taser versus hitting somebody with a baton or

7  something, is the pain is over when it's over.

8      Q.   Why -- can you describe for me what his

9  reaction was after each of the Taserings?  Was it after

10  the neuromuscular incapacitations ended and he was on

11  his butt on the ground up against the wall?  How long a

12  period was it that he -- before he tried to stand up

13  after the first Taser?

14          MR. ROZELLE:  Object to the form.  You can

15      answer.

16  BY MR. CALLAHAN:

17      A.   Well, I would assume -- I would say if these

18  are my Taserings and this is the timeframe between each

19  one where he would decide to get back up, so if you did

20  the math, I guess you could do it that way.

21      Q.   All right.  That clarifies it for me.  So you

22  applied to when he tried to get back up?

23      A.   Exactly.

24      Q.   Okay.  In each case?

25      A.   Yes.

1      Q.   Thank you.  Can you tell me when it was that
2  you first pulled your Taser out of the holster?
3      A.   I believe I pulled it out when I first went
4  up the stairs.
5      Q.   At the top of the stairs?
6      A.   Yes.  Or as I was getting to the bedroom.
7      Q.   Would you take a look at Exhibit 21?  This is
8  a picture of Mr. DeGraw at the hospital after he was
9  taken over there.  Do you recognize him from this
10 photo?
11     A.   No.
12     Q.   Recognize his shorts he was wearing?
13     A.   Yes.  I believe so.
14     Q.   Take a look at the picture and tell me if the
15 two -- if the round dark area in the center between his
16 nipples and the one lower down in the left part of his
17 chest are the places where the Taser probes were
18 deployed by you?
19          MR. ROZELLE:  Object to the form.  You can
20     answer.
21 BY MR. CALLAHAN:
22     A.   I believe they are.
23     Q.   You recognize them from that photo?
24     A.   Yes.
25     Q.   Okay.  Thank you.

1          MR. CALLAHAN:  Let's take a little break.

2          (At this time a brief recess was taken.)

3          MR. CALLAHAN:  Just a few more questions.

4     BY MR. CALLAHAN:

5          Q.    Officer Goepfert, I looked at some of the

6     corporations you were associated with.  One is called

7     Creative Body, Inc.  Is that you?

8          A.    Yes.

9          Q.    What was that?

10         A.    A gym.

11         Q.    And that's listed in Ft. Walton Beach?

12         A.    Yes.

13         Q.    Is that still active?

14         A.    No.

15         Q.    When did you have that company?

16         A.    1990, maybe.

17         Q.    And was that --

18         A.    1991.

19         Q.    Was that part of the bankruptcy?  Either one?

20         A.    No.

21         Q.    And you said it's closed down?

22         A.    Yes.

23         Q.    Another was Defensive Tactics International,

24    LLC, Delray Beach?

25         A.    Yes.

1    Q.    You were listed as manager and member of the
2    LLC?
3    A.    Yes.
4    Q.    And is that active?
5    A.    No.
6    Q.    When was that closed?
7    A.    Probably -- I couldn't tell you.  2011,
8    maybe.
9    Q.    And what was that company?
10    A.    It was a police training company.
11    Q.    Was it ever actively used?
12    A.    Yes.
13    Q.    And why did you close that one?
14    A.    The police department at a certain time -- or
15    around that time were very low funded.  They were not
16    doing a lot of training and things like that, so it was
17    just not worth keeping the LLC.
18    Q.    Was that a matter of either of the
19    bankruptcies?
20    A.    No.
21    Q.    The other one was Impact School of Martial
22    Arts, LLC?
23    A.    Yes.
24    Q.    That was another one of your corporations?
25    A.    Yes.

Gregory Goepfert
July 18, 2019

1    Q.   And that was in Dunedin, according to the

2  records here in this county?

3    A.   Yes.  That was the one on Alternate 19 and

4  Nebraska.  My house was in Dunedin, so I probably had

5  it through the address there.

6    Q.   And that was part of the bankruptcy?

7    A.   No.

8    Q.   No?

9    A.   No.

10    Q.   There's another Impact School of Martial

11  Arts, LLC in Bellingham, Massachusetts?

12    A.   Yes.

13    Q.   That was your company, as well?

14    A.   Yes.

15    Q.   And was that part of the bankruptcy?

16    A.   That was.

17    Q.   Which one?

18    A.   Since it was after the -- well after the

19  first one, it had to have been the second one.

20    Q.   And that, again, was martial arts training?

21    A.   Yes.

22    Q.   And then ISOMA, Inc.?  You were listed as

23  president.  Can you tell me what that was?

24    A.   Impact School of Martial Arts.

25    Q.   And that corporation was where?

1       A.   That might have been the Illinois one.

2       Q.   And you're through with that one, too?

3       A.   Yes.

4       Q.   Was that part of either bankruptcy?

5       A.   I believe that -- if that's the one, it was

6  through the first bankruptcy.

7       Q.   Okay.  There were associates in that one

8  there who were listed from Illinois.  So that would

9  have been identified as the Illinois one?

10      A.   Yes.

11           MR. CALLAHAN:  That's all I have.  Thank you.

12           MR. ROZELLE:  All right.  It's 12:37.  I

13      think we've been told we have some chow here.

14      Let's take a short break if every is agreeable.  I

15      will have a couple questions.

16           MR. CALLAHAN:  Sure.  And thank you for your

17      patience.

18           (At this time a brief recess was taken.)

19                 CROSS-EXAMINATION

20  BY MR. ROZELLE:

21      Q.   Deputy Goepfert, Paul Rozelle here for the

22  sheriff and you in this case.  I have just a handful of

23  follow-up questions for you.  You were asked some

24  questions about Exhibit 2, which is POB Standard

25  Operating Procedure for the Patrol Bureau, Number 18.

1    Do you remember those questions?

2         A.    I don't recall all the questions.

3         Q.    Remember that area of testimony?

4         A.    I do.

5         Q.    About POB 18 and --

6         A.    Yes.

7         Q.    When you arrived on the scene at the DeGraw

8    residence, were medical personnel already on the scene?

9         A.    They were.  They were staging outside of the

10   residence.

11        Q.    How is it that you came to be on this call?

12   What was the nature of the call for service?

13        A.    It was assist other agency, which was the

14   fire rescue.  They did not want to go into the house

15   because they felt it wasn't safe.  We go in and make

16   sure the scene is safe before they come in.

17        Q.    Is that a decision that fire rescue makes, or

18   a decision that the deputy makes as far as whether to

19   stage?

20        A.    The fire rescue makes that.

21        Q.    You remember giving some testimony this

22   morning about when you first observed Mr. DeGraw and

23   how he was on the bed?

24        A.    I do.

25        Q.    And I believe you testified he had his hands

Gregory Goepfert
July 18, 2019

1    in the air.  Do you remember giving that testimony?

2         A.    I do.

3         Q.    Can you maybe describe for me what you meant

4    by that?

5         A.    When I first walked in, he's lying on the

6    bed.  Head on the pillow.  His arms were above his

7    head, but on the bed, so not, like, up in the air.

8    They were laying on the bed itself, but above his head

9    touching the pillow.

10        Q.    And he didn't have them like, you know, put

11   your hands up reaching toward the ceiling, did he?

12        A.    No.

13        Q.    Where were they in relationship to the

14   pillow?

15        A.    They were touching the pillow and they -- so

16   the back of his hands would have been on the bed

17   itself.  Then the other his part of the hands would

18   have been on the pillow.

19        Q.    When you first made contact with him, was Mr.

20   DeGraw screaming?

21        A.    Not at first.

22        Q.    When did he start screaming?

23        A.    When I started the dialogue with him shortly

24   after that.

25        Q.    When you deployed the Taser for the first

1    time, let's break that down a little bit.  When you

2    pulled the trigger on the Taser for the first time,

3    describe what happened physically with the Taser.  What

4    does it do?

5         A.    What does the Taser do?

6         Q.    Yes.

7         A.    Do you want me to describe the function of

8    the Taser?

9         Q.    I understand there was some testimony about

10   darts hitting Mr. DeGraw?

11        A.    Yes.

12        Q.    What causes the darts to come out?

13        A.    So as I pull the trigger, it deploys two

14   darts on -- basically they are like fishing wire --

15   called probes.  They -- now I believe the probes are 1

16   1/4 to 1 3/4 inches long.  They change here and there.

17   The wires, I believe, on that one were probably 21

18   feet.  They exit -- the blast doors in the front of the

19   cartridge come off.  They exit the cartridge.

20   Typically, your above dart is the one that -- that's

21   your aiming point, and the other dart is aimed at a

22   downward angle.

23        Q.    So the first time you pull the trigger, is

24   that when the darts come out?

25        A.    Yes.

1    Q.    If you pull the trigger a second time or any

2  subsequent time, do any more darts come out?

3    A.    No more darts come out.

4    Q.    Is it fair to say you're -- pulling the

5  trigger a second or subsequent time is just

6  reenergizing that electrical connection that's

7  established on the initial deployment?

8    A.    Yes.  It's basically sending out the current.

9  The amps, whatever you want to call it, the watts,

10  energy to those same probes.

11    Q.    When you initially deployed the Taser on Mr.

12  DeGraw, when you pulled the trigger for the first time,

13  was he advancing on you?

14    A.    He was.

15    Q.    Describe that for me.

16    A.    He -- basically, when I saw it coming is --

17  he clenched his fists, put his hands up and he took, I

18  believe, two steps towards me.

19    Q.    And then you pulled the trigger?

20    A.    And then I pulled the trigger myself because

21  he's already close enough.  I needed to make a little

22  more distance.  Especially to get any type of NMI, I

23  had to get some distance.  So as I'm going backwards

24  and he's coming at me, I pulled the trigger.

25    Q.    Did you retreat before you pulled the trigger

1    the first time?

2         A.   I was retreating, yes.  I was -- I don't know

3    if you call it retreating, but I was making -- getting

4    away from him, making distance from him as I'm pulling

5    the trigger.

6         Q.   Moving backward and away from him?

7         A.   Yes.

8              MR. CALLAHAN:  Excuse me just a minute.  You

9         are leading him every time.  Would you please ask

10        direct questions?

11   BY MR. CALLAHAN:

12        Q.   You gave some testimony about the placement,

13   I guess both where you intended to aim and then where

14   the darts ended up on Mr. DeGraw.  Do you remember that

15   testimony?

16        A.   Yes.

17        Q.   Let's take a look at Exhibit -- I think it

18   was 21, but let's see.  Take a look at Exhibit 21,

19   which was shown to you earlier today, if you would.

20   First of all, do you see the anything in Exhibit 21

21   that would indicate to you where the probes landed?

22        A.   On this picture there's two arrows, but the

23   burn marks that a Taser probe usually gives off is here

24   and here.

25        Q.   So just for our record, you didn't draw those

1    arrows on there?

2        A.    I did not.

3        Q.    Is where those arrows are drawn, what they

4    are pointing to, does that indicate to you what you

5    believe where the probes landed on Mr. DeGraw?

6        A.    Yes.

7        Q.    Is there anything significant to you as far

8    as what Exhibit 21 indicates with respect to the probe

9    placement that tells you about how you were oriented or

10   the Taser was oriented or how close you were to Mr.

11   DeGraw?

12       A.    Yes.  When -- he still -- when you have your

13   Taser, you hold it straight out, straight up and down.

14   We don't -- just like a firearm, we don't canter

15   firearms.  The only time you canter a Taser, which is

16   turn your Taser, is, like, for an animal like a dog

17   because the probes are going to go this way.  So as

18   I'm -- there's also the laser that would be on him.

19   That's my focus point or my site.  And, obviously, this

20   wasn't straight up and down as I originally had the

21   Taser on him, which to me means that I was -- when I

22   stepped back to retreat, I somewhat cantered my Taser

23   to the right.  Probably also the reason it might be a

24   little higher than I would have liked, it's still below

25   the nipple line, it's a little higher, is because he's

Gregory Goepfert
July 18, 2019

1    coming at me.  So that probably makes him closer to me

2    than he was supposed to be.  Also, we can -- can I add

3    to that?

4        Q.    Absolutely.

5        A.    Also, I believe this ruler is six inches,

6    which is about the spread that -- that would be the

7    marks, which means I was probably three feet away,

8    three and a half feet away, from the Taser to his

9    chest.  His stomach.

10       Q.    After the Taser cycled off following its

11   initial deployment -- actually, let me ask you.  You

12   cut that initial activation short, I understand?

13       A.    I did.

14       Q.    Why did you do that?

15       A.    Just, again, I wasn't there to, you know, sit

16   there and Tase him all day.  I was just trying to gain

17   some compliance and then figure out what the problem

18   was.  So I cut it short so I could evaluate, assess,

19   speak to him a little bit more and hopefully calm him

20   down.  A lot of times when somebody gets Tased, it's

21   done.  They don't want it anymore.

22       Q.    After the Taser cycled off its initial

23   deployment, what did you see Mr. DeGraw do, if

24   anything?

25       A.    When he was sitting on the ground -- the

1  initial one he fell, he was on his butt.  He kind of
2  clenched his fist and started to get up and he was
3  making that yelling noise.
4      Q.  Did you say anything to him?
5      A.  I asked him to, "Stay on the ground.  Don't
6  get up.  We don't want to hurt you."
7      Q.  What happened after you said that?
8      A.  He started to stand up.
9      Q.  What happened next?
10     A.  I deployed my Taser again.
11     Q.  And that's the second -- do you call that an
12  activation of the Taser?
13         MR. CALLAHAN:  Object to the form of the
14     question.
15         MR. ROZELLE:  What's wrong with the form of
16     the question?  I'm asking him --
17  BY MR. ROZELLE:
18     Q.  What should we call that so I make sure we
19  are talking about the right thing?  The deployment is
20  the initial, boom, the darts come out, right?
21     A.  Yes.
22     Q.  What do you call the second --
23     A.  I guess that would be my next activation.
24     Q.  Okay.  When counsel walked you through
25  Exhibit 14, the second activation appears to have been

1    for at least, according to that record, three seconds.

2    Do you remember that testimony?

3         A.    Yes.

4         Q.    Did you cut the second activation short?

5         A.    I did.

6         Q.    Why did you do that?

7         A.    Again, the same reason.  To evaluate to see

8    if he's going to comply.

9         Q.    What did you see Mr. DeGraw do following the

10   second activation, if anything?

11        A.    Basically the same thing as he did the first

12   time or the second time.  Kind of clench his fists.

13   Yell.  Start to get up.

14        Q.    Did you say anything to him following the

15   second activation during the time that the Taser is not

16   energized?

17        A.    I did.  Same thing.  "Stay on the ground.

18   Don't get up.  We just need to evaluate you.  We are

19   not here to hurt you."  I just kind of kept saying the

20   first thing.  That was the main thing.  "Don't get up.

21   Stay on the ground."  I was waiting for Sergeant Street

22   to get there, so we could go in and handcuff him.

23        Q.    The Taser, I understand, at least from

24   Exhibit 14, was activated a third time.  Do you

25   remember giving testimony about that?

Gregory Goepfert
July 18, 2019

1      A.   Yes.

2      Q.   Do you remember it from Exhibit 14, take

3   another look at it if you need to, that it was -- at

4   least that document shows it was for one second?

5      A.   Yes.

6      Q.   Did you cut the third Taser activation short?

7      A.   I did.

8      Q.   Why did you do that?

9      A.   Again, same philosophy.  My objective was to

10   just keep him from getting up.  As soon as I hit the

11   Taser, he went down.  I clicked it off.  Went back to,

12   "Stay down.  Don't move.  Don't get up."

13      Q.   Is he -- is Mr. DeGraw making any

14   verbalizations at this point after the third

15   activation?  Yelling or screaming that you had

16   described earlier?

17      A.   He was doing the yelling.  The "ha".  The

18   loud yell.  Kind of groaning.  Again, he wasn't

19   sweating.  He wasn't like out of breath or anything.

20   He was just seemed very angry and very intense.

21      Q.   You activated the Taser a fourth time,

22   according to Exhibit 14, and that was for five seconds.

23   You remember that testimony?

24      A.   I do.

25      Q.   Between the time that you activated the Taser

1    the third time and the fourth time, you assessed Mr.

2    DeGraw?

3         A.    Yes.  I assessed him every time.

4         Q.    You gave him verbal commands?

5         A.    Yes, I did.

6         Q.    Did he comply with your verbal commands?

7         A.    For a short period of time, and then he would

8    try to get up.

9         Q.    After the Taser cycles off following its

10   fourth activation, that's this 58-second time period

11   that you were asked about, do you remember that?

12        A.    I do.

13        Q.    Before it's going to be, at least according

14   to Exhibit 14, activated for a fifth and final time for

15   one second, just to orient you to your prior testimony

16   here today, do you remember that?

17        A.    I do.

18        Q.    During that time period that the Taser is

19   de-energized between its four and its fifth and final

20   activation, did you assess Mr. DeGraw?

21        A.    I believe so.  I am not sure when that last

22   one -- I mean, exactly where it went off at or how it

23   went off.  I don't know if it was during us trying to

24   handcuff him, because that seems like a long time in

25   between all of a sudden I got another one second, so --

1    Q.    Is Mr. DeGraw still alive after the fourth

2    activation and the five-second one?

3    A.    Yes.

4    Q.    How do you know that?

5    A.    Because he's continuing to try to get up.

6    Fight.

7    Q.    Is he breathing?

8    A.    Yes.

9    Q.    How do you know that?

10   A.    He's yelling.

11   Q.    Are you issuing verbal commands to Mr. DeGraw

12   following the fourth activation?

13   A.    Yes.  Same thing.  "Stay on the ground.

14   Don't get up."

15   Q.    Is he complying with those commands?

16   A.    No.

17   Q.    What is he doing that's not compliant with

18   those commands?

19   A.    Trying to stand up.

20   Q.    Following this fifth one-second activation,

21   let me just ask you about that, the one-second -- fair

22   to say you don't remember doing that, is that --

23   A.    I don't.

24   Q.    Based on your training, your experience, your

25   understanding of how the Taser works, how is it that it

1  cycles for only one second?  How is it that that would

2  happen?

3      A.   I would had to have activated it, pulled the

4  trigger and turned it off like instantly.

5      Q.   To put it another way, you've got to do some

6  intentional act to cause it to cut off in order for it

7  to only run for one second?

8      A.   Yes.  Absolutely.

9      Q.   If you pulled the trigger and didn't do

10  anything further, what would happen?

11      A.   It runs for five seconds.

12      Q.   Following the completion of this fifth

13  activation, is Mr. DeGraw still alive?

14      A.   Yes.

15      Q.   How do you know that?

16      A.   He's still screaming.  Fighting.

17      Q.   You're on his -- the lower portion of Mr.

18  DeGraw?  The feet I think you said?

19      A.   When we entered room, yes.

20      Q.   Tell me what you see and feel and experience

21  when you do go hands-on with Mr. DeGraw?

22      A.   His feet were -- his legs and feet were

23  thrashing around, moving.  I don't know if -- I think

24  maybe Sergeant Street said, "Get his legs," or I just

25  did it.  So at first, I still had the Taser in my hand.

1    I had my knee or leg on his legs to keep them still and

2    pin him down, basically.  While I'm doing this,

3    Sergeant Street and Deputy Martinez are struggling with

4    him to get his arms to get him handcuffed.  I believe

5    at one point Deputy Martinez says, "He grabbed my cuff.

6    He grabbed my hand."  Something like that.  Then

7    Sergeant Street says, "Hey, let's get him away from the

8    wall and pull him down."  So I actually put my Taser

9    down on the ground and pulled his feet back.  Which,

10   actually, I think that's how we got his other arm free

11   and were able to handcuff him.

12        Q.   At some point Deputy Martinez and Sergeant

13   Street are successful in placing both of Mr. DeGraw's

14   wrists in handcuffs, is that right?

15        A.   Yes.

16        Q.   After Mr. DeGraw is placed in handcuffs, is

17   he still alive?

18        A.   Yes.

19        Q.   How do you know that?

20        A.   He's moaning.  Groaning.  He was screaming up

21   until the time they put the cuffs on him.  May I add

22   something to the --

23        Q.   Absolutely.

24        A.   When I was on his feet and I grabbed his

25   legs -- I mean, obviously he was in his underwear or

1  whatever they were.  They weren't moist.  They weren't
2  sweaty.  It was dry.  So, again, no indication that
3  something crazy was going on with him as in -- because
4  I've seen people sweating.  Even sweating out their
5  shins that are having some sort of diabetic thing, but
6  it was nothing like that, so --
7      Q.   So when you went hands-on with him, there was
8  nothing in your tactical experience that -- well, just
9  tell me what significance -- once you touched him, what
10  did you observe and what significance did that have?
11     A.   Again, he felt normal.  He felt -- you know,
12  he wasn't cold.  He wasn't burning up hot.  Wasn't
13  sweating.  Which I've seen on all different kinds of
14  calls indicating, you know, diabetic shock or some
15  other type of issues that he might be going through.
16     Q.   This is the audio/video portion of our time
17  together here.
18         MR. ROZELLE:  Mr. Callahan, just to get you
19         oriented, you've seen this before with a couple
20         other witnesses.  I have loaded up on the laptop
21         here Exhibit 23, which is identified on this index
22         as, "Patrol Radio Traffic Property Report."  It's
23         previously marked as Exhibit 23.  Bates number
24         PCSO001032.  I'm going to play that for him.  I am
25         also going to play what was previously marked as

1          Exhibit 22, PCSO 001031, the COBAN property
2          report, Item Number 54.  So same invitation I
3          extended prior, if you want to come on over here,
4          or we can reorient ourselves so that you can see
5          what it is I'm going to show the witness, you're
6          welcome to do so.
7     BY MR. ROZELLE:
8          Q.   Then, Deputy Goepfert, just to get you
9     oriented.  I'm going to start with Exhibit 23, which is
10    the "Radio Traffic Patrol Four".  I'm going to play
11    this without these headphones initially so that we can
12    demonstrate, once again, that this laptop is not
13    powered enough to drive the speakers here, especially
14    with this air conditioner going and the traffic on
15    State Road 60 to hear this clearly.  I'm going to have
16    a set of headphones if we need to use them.  That's so
17    everybody understands what's happening.
18    BY MR. ROZELLE:
19         Q.   I am going to hit play on Exhibit 23, and the
20    clock is at 000 on our audio here.
21              (At this time the audio/video was played.)
22    BY MR. ROZELLE:
23         Q.   I've pushed pause at nine seconds.  As
24    demonstrated, I'm sure that none of us heard any of
25    that clearly?  Is that fair, Deputy?

1      A.   Yes.

2      Q.   Okay.  Let me ask you try it with the

3  headphones.

4      A.   Okay.  So I handed Deputy Goepfert the

5  headphones, and I will -- I rewound it to 000 and I

6  will push play on Exhibit 23.

7           (At this time the audio/video was played.)

8  BY MR. ROZELLE:

9      Q.   I pushed pause at 11 on the clock.  Tell me

10  what you heard there.

11      A.   Deputy Martinez letting the dispatch know

12  that he's not being compliant.

13      Q.   Okay.  Do you remember when that occurred in

14  the sequence of events that we've all been here talking

15  about today?

16      A.   No.  I was dealing with Mr. DeGraw and --

17  Deputy Martinez should be calling the scene a little

18  bit better.  Or more often, I should say.

19      Q.   Let me skip this forward here to start it at

20  1:18 on the clock.  I'm going to push play.

21           (At this time the audio/video was played.)

22  BY MR. ROZELLE:

23      Q.   I'm going to push pause at 1:30 on the clock.

24  Did you hear anything during the segment that we just

25  played there?

1      A.   I heard Sergeant Street asking for the
2  channel so we have the air, and I heard Mr. DeGraw
3  screaming in the background.
4      Q.   So you hear Sergeant Street come up on the
5  radio?
6      A.   Yes.
7      Q.   That's his voice?
8      A.   Yes.  I'm pretty sure it's his voice.
9      Q.   You recognize it?
10      A.   Yes.
11      Q.   80 Alpha is his call sign?
12      A.   Yes.
13      Q.   Sergeant's call sign for squad A, Alpha
14  shift?
15      A.   Yes.
16      Q.   The background noise you described, do you
17  recognize -- you know, who is that?
18      A.   It sounds like Mr. DeGraw screaming.
19      Q.   All right.  That's what I have for you on
20  Exhibit 23.
21          MR. ROZELLE:  This one we can do without the
22      headphones.
23          MR. CALLAHAN:  Let me listen to what he just
24      heard.
25          MR. ROZELLE:  Absolutely.  Go ahead.  You're

1    gonna want to use these.  This is just a driver

2    problem.  This plays just fine in the office.  We

3    can go off the record.

4              (At this time a brief conversation was

5               held off the record.)

6  BY MR. ROZELLE:

7         Q.   Deputy Goepfert, I have in front of me on the

8  laptop what I brought up as Exhibit 22 in this case,

9  which is a CD that has been previously marked as

10  Exhibit 22 in this case.  I have it paused here on a

11  frame, still shot, of this at -- let me -- just tell

12  me, do you recognize what it is we are looking at here?

13         A.   It's a COBAN video.  It looks like the street

14  it occurred on.

15         Q.   This is the street the DeGraw's residence was

16  on, you believe?

17         A.   It looks like it.

18         Q.   Okay.  You see where it says in the bottom

19  corner 04:08:38 p.m.?  You see that?

20         A.   Yes.

21         Q.   What does that indicate?

22         A.   That's the time of day.

23         Q.   Let me just ask, if you know, do you know

24  what that clock is set to?  You know, why does it think

25  it's 4:08?  Is it internal with COBAN?  Is it synced up

1   with an anatomic clock in Colorado?

2       A.   I think it's just inside of the COBAN.  I

3   don't know.

4       Q.   Do you know if that's the same clock that is

5   the clock time that we were looking at in Exhibit 14 on

6   the Taser?

7       A.   It is.  Well, I don't understand the

8   question.

9       Q.   So if I had -- if I had a COBAN, does COBAN

10   think it's the exact same time that the Taser does?  Or

11   could it be like in my house where the oven thinks it's

12   4:00 and my bedside clock says it's 3:58 and my cell

13   phone thinks it's 3:59?

14         MR. CALLAHAN:  Object to the form of the

15       question.  It's leading.

16   BY MR. ROZELLE:

17       Q.   Do you know if the clocks are the same?

18       A.   I don't know if they are.  I'm assuming they

19   would be, but I'm assuming -- like iPhone and my car

20   clock are all just set somehow.  I don't know how it

21   works.  I just know it says it's the right time.

22       Q.   All right.  Fair enough.  So I'm going to

23   push play on this at 04:08:38 p.m.  Just to orient this

24   to this exhibit, I'm going to start and stop this, but

25   if you have -- if you want me to stop, if you want me

1   to play something again or listen to something again,

2   please just let me know that.  The same invitation goes

3   for counsel here so we can be efficient with our time.

4   So I'm going to push play at 04:08:38.

5          (At this time the audio/video was played.)

6   BY MR. ROZELLE:

7      Q.   Let me pause at 04:08:45.  Deputy Goepfert,

8   do you recognize the vehicle you drove to the scene in

9   this still here at 04:08:45?

10     A.   I'm sorry?  Do I recognize what vehicle?

11     Q.   Yes.  Do you see your vehicle here?

12     A.   I have no idea if that's mine or not.  I

13  don't remember where I parked.

14     Q.   I'll push play at 04:08:45.

15         (At this time the audio/video was played.)

16  BY MR. ROZELLE:

17     A.   I believe that's my vehicle right there.

18  BY MR. ROZELLE:

19     Q.   I pushed pause at 04:08:58.  I'm sorry.  What

20  was that you just said?

21     A.   I'm pretty sure that's my vehicle or it's

22  behind the fire rescue.  I think I was parked there,

23  actually.

24     Q.   So at 04:08:58 the vehicle that we see on the

25  fart right-hand side of the screen you believe to be

1    yours?

2         A.    I do.  The reason -- can I explain?

3         Q.    Yes.  Absolutely.

4         A.    The reason I believe that to be -- because

5    when I got to the scene, I talked to the fire rescue

6    and that car was pretty far away and facing away from

7    us.  Away from the house.  That's near the fire engine.

8    So I believe when I got out, they were there, so I

9    talked to him.  It was three years ago, but I'm pretty

10   sure that's how it went.

11        Q.    I will push play at 04:08:58.

12              (At this time the audio/video was played.)

13   BY MR. ROZELLE:

14        Q.    I pushed pause at 04:09:46.  Let me ask you a

15   couple questions about what we just heard here.  First

16   of all, do you hear yourself on it?

17        A.    I did.

18        Q.    Did or did not?

19        A.    Did not.

20        Q.    Do you hear any other speakers or people

21   making any kind of sound on this?

22        A.    I heard Mr. DeGraw yelling.  Groaning.  I

23   shouldn't say yelling, but groaning.  I believe some

24   breaths.  Gaspy breaths.  I heard, I believe, Sergeant

25   Street on there.

1    Q.    What did you hear Sergeant Street say or --

2    A.    I heard him clear channel.  I believe ask,

3  "Are you okay?"  I don't know if that was Martinez or

4  him, but they were making sure each one of them were

5  okay since they just got done fighting to get this guy

6  under control.

7    Q.    Your testimony is you hear Mr. DeGraw

8  breathing on that?

9    A.    I do.

10         MR. ROZELLE:  Sir, I have no further

11     questions for you.

12                  REDIRECT EXAMINATION

13  BY MR. CALLAHAN:

14    Q.    Deputy, I have a couple more.  As I

15  understand your testimony, you first decided that you

16  wanted Mr. DeGraw to come towards you?  Come out of the

17  room towards you?

18    A.    I did.

19    Q.    And that you told him to do that, to come

20  towards you three or four times?

21         MR. ROZELLE:  Object to the form.  It's also

22     beyond the scope of anything I did here.

23  BY MR. CALLAHAN:

24    Q.    How many times did he you come towards you?

25    A.    I don't recall.

Gregory Goepfert
July 18, 2019

1    Q.   Your statement, question, "How many times did
2    this happen?"  Answer "Three or four times.  And I kept
3    asking him, 'Sir, come towards me.  I wanted to try to
4    get him out of the bedroom first."
5        A.   I did say --
6            MR. ROZELLE:  Object to the form.  You can
7        answer.
8    BY MR. CALLAHAN:
9        A.   Was the last thing you said at first?
10       Q.   Yes.
11           MR. ROZELLE:  I'm sorry.  Where are we?
12           MR. CALLAHAN:  Bottom of Page 6.
13           MR. ROZELLE:  You're in Exhibit 1?
14           MR. CALLAHAN:  Yes.  It's marked with a
15       yellow sticker.
16   BY MR. CALLAHAN:
17       Q.   Then as I understand it what you did then, is
18   you changed your mind and said you decided that you
19   would rather wait for back up?
20           MR. ROZELLE:  Objection.  That's not what
21       this says.
22           MR. CALLAHAN:  Let the witness answer.  You
23       don't suggest what he says.
24           MR. ROZELLE:  I'm not suggesting a single
25       thing to him about what to say.  I'm --

Gregory Goepfert
July 18, 2019

1          MR. CALLAHAN:  You can object.

2          MR. ROZELLE:  The objection is you've

3      mischaracterized what this says.  Now, if we want

4      to go back and --

5          MR. CALLAHAN:  He just agree with me.  I

6      didn't mischaracterize anything.

7          MR. ROZELLE:  He didn't agree with you.

8          MR. CALLAHAN:  If you have an objection, make

9      it.

10          MR. ROZELLE:  It's made.  You're just flatout

11      misrepresenting what this says.  If we want to

12      read from this and have him testify to either what

13      he says or what he remembers, that's fair.  I'll

14      let you do that.

15          MR. CALLAHAN:  I just did that.

16   BY MR. CALLAHAN:

17      Q.   Deputy, you changed your mind about having

18   him come towards you giving him those directions

19   because you decided to wait for backup?

20      A.   No.

21      Q.   Well, let me read what you said.  "I kept

22   asking him, 'Sir, come towards me'."  You agree that's

23   what you said?

24      A.   If you read the whole thing, at first

25   that's -- yes, I agree to that.

1        Q.    Okay.

2        A.    If you put it all -- the whole sentence

3    together, of course.  I agree.

4        Q.    "I wanted to try to get him out of the

5    bedroom at first because I knew there were guns in

6    there.  I didn't want to try to go in there.  And it

7    was, you know -- there was a ladder there and a table.

8    There was not a lot of room to do anything in there.

9    Finally he sat on the edge of the bed.  He stood up

10   towards me again yelling "ya".  He Kind of came towards

11   me and I said, "Stay where you are."  You know, because

12   I wanted to wait for backup.

13            MR. ROZELLE:  Again, objection.  If you want

14        to just read it, that's fair.  But skipping stuff

15        and omitting words isn't fair and it's misleading

16        and it's --

17            MR. CALLAHAN:  He can answer the question.

18        He's got the transcript right in front of him.

19            MR. ROZELLE:  No, sir.  We are not going to

20        have testimony where you are representing on this

21        record that this thing says something that you're

22        not going to read.  So you need to read it and ask

23        him, or --

24            MR. CALLAHAN:  Excuse me.  Your long-speaking

25        objection is inappropriate.  Stop, please.

Gregory Goepfert
July 18, 2019

```
 1            MR. ROZELLE:  We've been over this before,
 2      sir.
 3            MR. CALLAHAN:  Yes, we have.  And your
 4      objections are wrong.  Now, you can object
 5      properly and he can answer the question.
 6            MR. ROZELLE:  What's the question?
 7   BY MR. CALLAHAN:
 8      Q.    Deputy, did you decide that you -- then --
 9   did you then decide that you wanted to wait for backup?
10      A.    I did.
11      Q.    And at that time, you didn't want him to come
12   towards you?
13      A.    Exactly.  Can I explain why?
14            THE COURT REPORTER:  I'm sorry.  Did or did
15      not want him to come towards you?
16            MR. CALLAHAN:  Did not.
17   BY MR. CALLAHAN:
18      Q.    So you did not want him to come towards you,
19   correct.
20      A.    Yes.
21      Q.    At that time, who did you have there with
22   you?
23      A.    Martinez.
24      Q.    Where was he?
25      A.    On the side of the door.
```

Gregory Goepfert
July 18, 2019

1      Q.   Was he armed?

2      A.   I believe so.

3      Q.   And what other backup were you waiting for?

4      A.   The next one on scene, which happened to be

5   Sergeant Street.

6      Q.   Why did you decide you needed a third deputy

7   there before he should come towards you, as you earlier

8   instructed him?

9      A.   Because I did not want to go in a room full

10   of guns and get me or my partner shot and killed.

11      Q.   But regardless of what you thought, he did

12   not have a gun?

13      A.   He did have a gun.

14          MR. ROZELLE:  Objection.

15   BY MR. CALLAHAN:

16      Q.   You already testified that there was no

17   visible gun and he never touched it, right?

18          MR. ROZELLE:  Objection.  Totally

19      mischaracterizes and misstates his testimony.

20   BY MR. CALLAHAN:

21      A.   When I first go in there and I'm trying to

22   get him out of the room is because his hands are right

23   on the pillow next to the gun that was there.  And --

24      Q.   Did you --

25          MR. ROZELLE:  Don't let him interrupt him.

1      Let him testify.

2   BY MR. CALLAHAN:

3      A.   Listen, I'm answering your question.

4      Q.   Was that gun ever visible to you?

5      A.   Yes.

6      Q.   When?

7      A.   At the end when the pillow got knocked off.

8   There was a 1911 sitting there pointing towards door.

9   Absolutely.

10     Q.   But that gun was never visible when you were

11  dealing with him, Mr. DeGraw --

12     A.   So I should assume that the gun was not

13  there?  Would that be a safe thing for me to do?

14     Q.   You're arguing with me.

15     A.   No, I'm not.

16     Q.   The question to was simply, why did you --

17     A.   I trying to answer, but you're not letting me

18  finish my answer.

19     Q.   So you thought you needed a third person

20  there?

21     A.   After that, yes, I did.

22     Q.   Now, do you have any idea if this man

23  understood that he still wasn't to come towards you?

24          MR. ROZELLE:  Objection.  It's been asked and

25      answered three times.  It's also totally beyond

1          the scope --

2               MR. CALLAHAN:  Sir --

3               MR. ROZELLE:  Listen, don't put your hand up

4          at me.  It is beyond the scope of anything the

5          witness was asked by me.  I've extended you a

6          great bit of leeway here, but if you want to

7          replow the same territory and you want to do

8          something beyond what I did, then at some point we

9          are either going to have to go off the record and

10         sort this out, call the judge or I'm going to take

11         him out of here.  You can answer.

12    BY MR. CALLAHAN:

13         A.   So if you let me explain --

14         Q.   My question is simple.  Let me repeat it.

15         A.   Sure.  Go ahead.

16         Q.   Do you have any idea whether he still

17    understood that he wasn't to come towards you if you

18    had asked him --

19         A.   At that point he should have, because I

20    wasn't asking him to not come towards me.

21         Q.   The question is, do you know whether he

22    understood that he was --

23         A.   I don't know what he understood that whole

24    time.

25         Q.   Okay.  And when he then -- he sat back down

1   on the bed, did he not?

2       A.   Yes.

3       Q.   He got up again?

4       A.   Yes.

5       Q.   Sat on the bed a second time?

6       A.   Yes.

7            MR. CALLAHAN:  Objection.  Asked and

8       answered.

9   BY MR. CALLAHAN:

10      Q.   You understand that?

11      A.   Was that a statement or a question?

12      Q.   Question.

13      A.   It sounded like a statement.  Yes.

14      Q.   And then he got up and took two steps, one

15  and then another one, coming towards you?

16      A.   Again, that sounds like a statement.  Not a

17  question.  Are you asking me a question?

18      Q.   Is that what he did?

19      A.   Yes.  That's what he did.

20      Q.   Okay.  You characterize that in response to

21  Mr. Rozelle's questioning as coming at you and you were

22  retreating.  Coming at you, is that any different than

23  coming towards you?

24      A.   Yes.

25      Q.   Did you -- do you know in fact what caused

1    the Taser to canter a little bit?

2        A.    Probably from me moving backwards trying to

3    get distance from him.

4        Q.    Probably?

5        A.    I don't walk back like this when somebody is

6    coming at me.  I turn, lean my body and walk backwards

7    that's tactically how you do that.

8        Q.    You don't really know what caused the Taser

9    to canter, if it did, do you?

10           MR. ROZELLE:  Object to the form.  You can

11       answer.

12   BY MR. CALLAHAN:

13       Q.    Whether it was you turning, or whether it was

14   your arm turning?

15           MR. ROZELLE:  Object to the form.  You can

16       answer.

17   BY MR. CALLAHAN:

18       A.    Well, it was my arm turning.  That's obvious.

19       Q.    But you don't know whether your body turning

20   made you do that?

21       A.    Well, it had to have.

22       Q.    Sir, you can hold the gun straight and turn

23   your body?

24       A.    I certainly could.

25       Q.    Okay.  You mentioned that you thought he was

1    still alive because his legs weren't sweaty?

2         MR. ROZELLE:  Objection.  Misstates his

3    testimony.

4    BY MR. ROZELLE:

5    A.    That's not at all what I said.

6    Q.    Well, what was the point of your response to

7    that question?  The question -- you said, "May I say

8    something?"  Then you said, "He didn't have sweaty

9    legs.  It's a diabetic thing.  Other people have been

10   cold or hot."  And you were relating that in response

11   to whether you knew if he was still alive.

12        MR. ROZELLE:  Object to the form.  You can

13   answer.

14   BY MR. CALLAHAN:

15   A.    Yes.  He felt alive.  He felt like a normal

16   every day person would feel at their legs.

17   Q.    Do you know medically whether a person who is

18   having heart failure or heart fibrillation would have

19   any symptoms at all in their legs?

20   A.    I have no idea.

21   Q.    Do you know whether a person who is having

22   heart fibrillation or heart failure might still move

23   their eyes or lips?

24   A.    I have no idea.  I'm not a doctor.

25        MR. CALLAHAN:  That's it.

Gregory Goepfert
July 18, 2019

1      MR. ROZELLE:  Nothing further.  He will read.

2      THE COURT REPORTER:  Order, Mick?

3      MR. CALLAHAN:  Yes.

4      THE COURT REPORTER:  Copy, Paul?

5      MR. ROZELLE:  Yes, ma'am.

6      (At this time the proceedings ended at

7       approximately 3:00 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   CERTIFICATE OF REPORTER

2

3

4    STATE OF FLORIDA      )

5    COUNTY OF PINELLAS    )

6

7              I, KIMBERLY HAMMOCK, stenographer, certify

8    that I was authorized to, and did stenographically,

9    report to the best of my ability the foregoing

10   deposition and that the transcript is a true record of

11   the testimony given by the witness.

12             I further certify that I am not a relative,

13   employee, attorney or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorneys or counsel connected with the action, nor am

16   I financially interested in the action.

17             Dated this 30th day of July, 2019

18

19                   KIMBERLY HAMMOCK

20                   Notary Public State of Florida

21                   My Commission EE 155298

22                   Expires 12-26-2021

23

24

25

PLEASE ATTACH TO THE DEPOSITION OF: GREGORY GOEPFERT IN THE CASE OF: Julie DeGraw, as Personal Representative of the Estate of Donald C. DeGraw, deceased vs. Bob Gualtieri, in his individual capacity as Pinellas County Sheriff, and Gregory Goepfert, in his individual capacity as a Pinellas County Deputy Sheriff Case No. 8:18-cv-2116-WFJ-SPF

<u>ERRATA SHEET</u>

INSTRUCTIONS:
Please read the transcript of your deposition and make note of errors or amendments in transcription on this page. DO NOT MARK on the original transcript itself. Please sign and date this sheet.

| PAGE/LINE | READS | SHOULD READ |
|-----------|-------|-------------|
| 4/13 | roll | road |
| 7/3, 7/6 | A3 | eighth degree |
| 29/10 | Tasered in training | Taser training |
| 51/3 | what's | "What's |
| 54/2 | on the other side of the wall | between the bed and the wall |
| 75/16 | Yes | No |
| 131/8 | tactical | tactile |
| 137/25 | fart | far |

_____
GREGORY GOEPFERT

DATE: _10/15/19_

Gregory Goepfert
July 18, 2019

**A**

**A-I-K-I-D-O**
9:12
**a.m** 1:18 14:24
**A3** 7:3,6
**abdomen** 81:24
**Abdominal**
78:25
**ability** 11:3
77:15 151:9
**able** 5:22 8:11
36:23 73:2
80:16 97:14
130:11
**Absent** 79:11
96:13
**absolutely** 7:25
27:18 51:20
64:9,11 83:19
123:4 129:8
130:23 134:25
138:3 145:9
**academy** 13:12
13:13,16,20,22
15:25 16:2
100:3,23,24
101:3,13,14
**accommodate**
3:16,24
**accompanying**
31:4
**accomplish** 86:3
**accost** 109:21
**accosted** 88:12
**accosting** 88:5
88:18
**accurate** 76:1
**achieving** 86:7
**acknowledge**
44:4
**act** 38:21 43:4
129:6
**acting** 37:14
59:25

**action** 105:24
151:15,16
**activated** 107:10
125:24 126:21
126:25 127:14
129:3
**activation**
123:12 124:12
124:23,25
125:4,10,15
126:6,15
127:10,20
128:2,12,20
129:13
**active** 25:18
113:13 114:4
**actively** 114:11
**activity** 65:24
**acts** 49:17
**add** 123:2
130:21
**additional** 50:11
**address** 43:7
115:5
**addresses** 43:11
**admission** 18:20
**admitted** 19:5
27:11
**adults** 11:14
**advancing**
120:13
**affect** 92:25
**afternoon** 48:8
75:13 102:10
102:21
**age** 27:10 77:15
**agencies** 16:18
23:1
**agency** 23:14
25:19 43:23
117:13
**aggression**
50:12
**aggressive** 66:16

66:18,20,22
**aggressively**
80:14 98:3
**ago** 4:20 17:13
17:14 21:18
22:21 26:4
27:7 39:15
48:21 59:18
78:3 91:24
138:9
**agree** 40:7 41:6
47:9,12 77:17
141:5,7,22,25
142:3
**agreeable**
116:14
**ahead** 88:7
90:13 100:16
134:25 146:15
**Ahh** 58:6
**Aikido** 9:12,22
82:10 93:5
121:13
**aimed** 77:23
119:21
**aiming** 82:16
119:21
**air** 10:21,22
12:5 26:8 28:5
51:11 118:1,7
132:14 134:2
**airmen** 12:13
**airport** 13:7,9
**alive** 72:6,9,9,17
128:1 129:13
130:17 149:1
149:11,15
**allow** 24:9 50:7
**Alpha** 134:11,13
**Alternate** 115:3
**alternative** 86:7
86:11,21
**altogether** 17:2

**amount** 17:25
34:2 109:2
**amps** 120:9
**anatomic** 136:1
**and/or** 43:1,13
**anger** 58:8
**angle** 119:22
**angry** 58:14,19
126:20
**animal** 122:16
**answer** 18:24
19:15 20:13,15
20:21 22:17
23:2,9,11 25:6
25:10 27:16,22
28:9,20 31:9
32:8 33:9,17
35:6,13,13
37:1 39:19,25
40:10,21 41:9
42:6 45:3,10
47:18 53:7,16
58:2,10,17,23
59:11 60:3
64:7 65:9
66:12 67:16
68:8,17 69:9
69:25 79:15
84:7 85:6
86:14 88:9,21
89:4 91:16
93:12 95:22
97:19 99:20
103:2 105:8,18
106:6 109:23
110:13 111:15
112:20 140:2,7
140:22 142:17
143:5 145:17
145:18 146:11
148:11,16
149:13
**answered** 50:18
51:24 58:23

69:25 145:25
147:8
**answering** 145:3
**answers** 45:22
**anybody** 38:21
46:12 52:11,18
80:5
**anymore** 68:14
123:21
**anyway** 85:14
**apartment**
16:16
**Apparently**
19:18 94:16
**appears** 22:24
91:12 92:14
101:9 124:25
**applicant** 19:5,9
**application**
18:18,19 19:6
19:14 20:8,10
20:15 22:9,11
22:24 24:22
25:1,22 27:8
27:13 79:9
86:1 97:11
**applications**
16:5 22:8,22
79:8,12 96:10
96:11 97:5
**applied** 15:18
20:1 23:2
24:16 110:18
111:22
**apply** 18:14
**appreciated**
92:12
**approaching**
49:15
**appropriate**
42:25 46:25
93:16
**approximately**
4:19 6:6 13:1

150:7
**area** 11:23 12:20
16:24 32:24
34:24 74:6,9
78:4,6,22,22
78:24,25 81:18
85:11 93:3,16
96:20 112:15
117:3
**areas** 13:16,18
84:19,23,25
85:8
**argue** 49:25
**arguing** 145:14
**arm** 102:22
130:10 148:14
148:18
**armed** 102:8,11
102:22 103:13
103:15,22,23
106:10,13
107:15 144:1
**arms** 70:16
80:11 118:6
130:4
**arrest** 22:12
23:5,12,13,16
27:7 50:10
77:9 81:17
**arrestees** 43:15
**arrival** 36:7
**arrive** 52:18
**arrived** 37:7
46:24 52:25
55:1 68:10
117:7
**arrows** 121:22
122:1,3
**art** 6:25 7:1,18
7:20 8:6,8 9:9
9:13,17 11:9
11:22
**arts** 5:8,9 6:10
6:15,16,17,20

8:19 9:20
11:19 14:20
16:20,22 17:17
17:23 18:8
19:25 21:10,21
114:22 115:11
115:20,24
**asked** 15:10
22:21 44:20
51:23 53:24
54:23 58:23
63:10,11 69:24
75:5 76:7
116:23 124:5
127:11 145:24
146:5,18 147:7
**asking** 11:18
20:8 36:14
45:21 46:1
49:3 100:8
106:2 124:16
134:1 140:3
141:22 146:20
147:17
**aspect** 11:20
**asphyxiated**
71:2
**assault** 77:9
**assess** 49:18
98:1 123:18
127:20
**assessed** 127:1,3
**assist** 96:16
117:13
**assistance** 36:9
36:13,24
**associated** 113:6
**associates** 116:7
**assume** 23:14
49:14 96:24
111:17 145:12
**assuming** 10:6
20:9 38:3
72:16 88:1

136:18,19
**attacked** 47:25
55:7
**attempt** 50:3
53:11 79:20
81:23 82:10
95:20 109:21
**attempted** 36:11
36:12 74:10
96:18
**attempting**
40:19 45:23
69:12 88:5
**attend** 26:9
**attending** 25:22
26:25
**attorney** 151:13
**attorneys**
151:15
**audio** 132:20
**audio/video**
131:16 132:21
133:7,21 137:5
137:15 138:12
**authorized**
151:8
**AVENUE** 2:4
**avoid** 35:3 49:17
81:17 84:25
**avoided** 79:10
**avoiding** 92:23
**Avoids** 92:24
**aware** 19:23
38:16,18,19
39:16,22 59:1
59:4,8 75:12
75:17 81:20
85:14 93:15
94:20,25
**awkward** 5:21

**B**

**B** 2:17
**B-A-R-R-I-N-...**

25:25
**back** 4:14 14:12
18:9 24:10,10
25:14 30:13
34:1,19 37:18
44:13,16,18
45:22 52:4
60:8,19,22
67:9 70:16
73:25,25 80:10
82:3,6,19
85:11 87:6,19
88:6,19 94:17
97:25 106:15
106:21 111:19
111:22 118:16
122:22 126:11
130:9 140:19
141:4 146:25
148:5
**backed** 17:24
**background**
11:19 23:1
134:3,16
**backup** 141:19
142:12 143:9
144:3
**backward** 121:6
**backwards**
120:23 148:2,6
**bad** 17:15 50:17
61:10
**Baldwin** 71:7,8
73:10,10
**balled** 80:10
**balled-up** 80:14
**bam** 67:11,11,11
**Bamboo** 9:17
**bankruptcies**
114:19
**bankruptcy**
17:9,16 21:1,4
21:7,16 22:3
24:8,9 113:19

115:6,15 116:4
116:6
**Barrington**
25:23,24
**base** 12:5,7,7,11
12:13,17
**based** 9:7 38:22
38:23 128:24
**basic** 44:2
**basically** 4:13
7:1 9:10 12:7
13:6,13,23
15:3 33:2 51:2
57:14 95:12
110:19 119:14
120:8,16
125:11 130:2
**basis** 100:21
**Bates** 90:2 92:11
131:23
**bathroom** 3:15
48:24
**baton** 111:6
**Beach** 12:20,24
13:2,10,14,17
13:22 14:8,11
15:17,18,19,20
16:6,14,16
18:3,19 19:6
20:1 22:11
23:3 28:22
29:11 30:18
32:11,16
113:11,24
**bed** 37:21,23
41:1,23 44:14
44:23 47:21
52:3 60:13,20
74:15,15,19
83:12,17,21
84:4,9 104:8
117:23 118:6,7
118:8,16 142:9
147:1,5

**bedroom** 83:23
112:6 140:4
142:5
**bedside** 136:12
**began** 4:6
110:10
**behavior** 47:10
86:4
**believe** 8:15
17:12 20:5
22:6 24:9 30:2
37:9,10,24
46:15 47:25
48:9 50:21
52:16 55:2,4
60:16,18 61:2
61:2 63:17
65:18 66:1
69:6,11 70:23
71:2,12 72:1
72:25 73:3
75:10,22 80:22
82:2 95:7,16
100:22 104:7
109:3 110:15
112:3,13,22
116:5 117:25
119:15,17
120:18 122:5
123:5 127:21
130:4 135:16
137:17,25
138:4,8,23,24
139:2 144:2
**Bellingham**
115:11
**belt** 7:3,6,10,19
9:9 74:5,9 78:4
78:5,7,7
**benefits** 15:7
**best** 47:2 61:12
73:24 74:2,4
151:9
**better** 10:3

133:18
**beyond** 139:22
145:25 146:4,8
**big** 19:19
**bit** 29:20 31:16
31:22 39:11
41:22,24,25
42:9 62:16
64:22 71:19
73:16 82:8
97:12 119:1
123:19 133:18
146:6 148:1
**bite** 39:13,13
**black** 7:3,6,8,8,9
7:13,19 9:9
**blast** 119:18
**bleeding** 39:10
39:10 64:19
**blood** 36:17
56:22,22 57:5
64:18 65:5
**bloody** 56:23
57:2,4,8
**BOB** 1:10
**Boca** 16:5
**body** 36:16 39:8
63:16 77:25
78:2,12,18
89:2 113:7
148:6,19,23
**boom** 98:2
124:20
**Boston** 11:24
16:23
**bothering** 50:4
51:13
**bottom** 64:15
81:15 82:5
90:9 94:18
102:6,14
135:18 140:12
**BOULEVARD**
1:20

**box** 94:19
**boxes** 41:4
**Boynton** 16:6
**brain** 87:2
**break** 3:14,15
48:24 90:17,19
105:24 113:1
116:14 119:1
**breaks** 61:10
**breast** 77:24
**breath** 97:23
126:19
**breathing** 71:23
72:2 128:7
139:8
**breaths** 138:24
138:24
**brief** 49:1 90:20
113:2 116:18
135:4
**briefly** 36:2 37:8
**brought** 51:19
71:12 135:8
**Broward** 16:6
**buckle** 74:5,9
78:6,7,7
**Buddy** 71:14
**bulletin** 36:3
76:24 81:8
84:17
**Bureau** 116:25
**burn** 121:23
**burning** 131:12
**Burnt** 14:24
**business** 17:19
21:3,8 86:19
**butt** 63:24 64:12
65:5 86:10
89:1 111:11
124:1
**bystanders**
43:16

———————
**C**
———————

**C** 1:7 2:1
**California** 26:24
**call** 3:12 30:4
50:16 65:3
75:13 117:11
117:12 120:9
121:3 124:11
124:18,22
134:11,13
146:10
**Callahan** 2:2,3
2:13,15 3:6,7
10:13 18:25
19:16 20:16,18
22:14,18 23:7
23:10 25:7,11
26:16,18,22
27:17,23 28:21
31:20 32:9
33:10,18 35:7
35:9,15 37:2
39:20 40:1,11
40:22 41:10
42:7 45:4,11
47:19 48:20,25
49:2 51:25
52:12,13 53:8
53:17 55:22
56:1,6,12,14
58:3,11,18,24
59:12 60:4
61:25 62:2,8
62:11,14,18
64:8 65:10
66:6,7,13
67:17 68:9,18
69:10 70:1
76:9,11,14
79:16 84:8
85:7 86:15,23
88:10,15,22
89:5,13,17,24
90:4,7,10,16
90:21,25 91:3

91:6,18,19
92:7,10,13
93:13 94:3,4
95:23 97:20
98:8,12,14,17
98:20,23 99:2
99:5,14,21
100:10,15,20
101:11 103:3
105:9,19,22
106:2,7 107:19
108:19 109:24
110:14 111:16
112:21 113:1,3
113:4 116:11
116:16 121:8
121:11 124:13
131:18 134:23
136:14 139:13
139:23 140:8
140:12,14,16
140:22 141:1,5
141:8,15,16
142:17,24
143:3,7,16,17
144:15,20
145:2 146:2,12
147:7,9 148:12
148:17 149:14
149:25 150:3
**called** 3:3,9
16:16,17 48:3
113:6 119:15
**calling** 133:17
**calls** 131:14
**calm** 49:12
97:11 104:10
123:19
**calmed** 97:15
**calmly** 49:21
**canter** 122:14
122:15 148:1,9
**cantered** 82:7
122:22

capabilities 98:5
capable 97:6,8
**CAPACITY**
1:11,12
**Cape** 24:15
capture 81:16
car 136:19 138:6
cardiac 81:16,17
92:1
care 86:18
cartridge 30:9
119:19,19
case 1:4 4:22
21:8 87:15
98:19,22
105:25 111:24
116:22 135:8
135:10
cases 40:5
catch 15:3
cause 24:2 129:6
caused 147:25
148:8
causes 119:12
caution 43:23
**CBSA** 19:10,11
**CD** 135:9
ceiling 118:11
cell 136:12
center 17:1
63:17 93:5,6
93:16 112:15
**CENTRAL** 2:4
certain 9:21
114:14
certainly 148:24
**Certificate** 89:9
151:1
certification
24:16,19 28:17
certifications
25:2
certify 151:7,12
cetera 15:8,8

50:1
**CEW** 81:10,11
85:18,21,25
86:1,2,6,9
chain 21:10
chance 35:24
36:1
change 103:20
104:6 119:16
changed 28:9
34:6,8,12,24
140:18 141:17
channel 134:2
139:2
**Chapter** 21:2,7
characterize
147:20
charge 23:17,17
charges 23:21
23:23,25 61:8
chasing 48:1,8
check 70:25
checked 71:3
checking 72:3
chest 33:25
34:24 35:3
63:18 74:3
81:18 85:11
92:23 112:17
123:9
**Chicago** 16:24
chief 16:12
children 6:10
choice 15:5
chow 116:13
circumstance
30:14 43:22
circumstances
33:13,14 60:1
79:7,11,12,18
81:16
**CIT** 46:15
**City** 12:20 18:11
civil 20:25

civilian 14:15
clarifies 111:21
clarify 22:20
class 46:20
classes 13:24
26:11
clear 10:10
139:2
clearly 132:15
132:25
**CLEARWAT...**
1:21
clench 125:12
clenched 120:17
124:2
clicked 104:24
105:2 126:11
clock 132:20
133:9,20,23
135:24 136:1,4
136:5,12,20
clocks 136:17
close 10:2 15:11
17:7 52:3 74:7
82:15,20
114:13 120:21
122:10
closed 14:21
21:8 113:21
114:6
closer 61:7
123:1
closing 17:4
**Coast** 26:24
**COBAN** 132:1
135:13,25
136:2,9,9
coded 73:1
cold 131:12
149:10
**College** 26:6
**Colorado** 136:1
colors 7:8
column 85:20

combat 8:7 11:1
59:2 80:2
combative 30:7
48:4 79:17,22
87:3
combined
103:12
come 30:6 38:21
44:18 51:15
75:14 117:16
119:12,19,24
120:2,3 124:20
132:3 134:4
139:16,16,19
139:24 140:3
141:18,22
143:11,15,18
144:7 145:23
146:17,20
comes 37:13
comfort 49:23
comfortable
3:23
coming 11:22
43:21 63:1,24
64:18,22 65:6
82:2 83:14,18
83:20 94:10
120:16,24
123:1 147:15
147:21,22,23
148:6
command 68:1
96:13
commands
36:22 44:9
45:6 46:8 60:7
66:1 67:1,19
67:20 79:18
87:25 97:7,9
107:25 127:4,6
128:11,15,18
**Commission**
99:17 151:21

common 43:11
communicate
39:6 45:23
50:3 51:2,6
58:4,13 60:8
communicated
48:9
communicating
36:19 40:7
103:25
communication
44:1 71:20,21
communicatio...
57:17 66:1
company 113:15
114:9,10
115:13
**COMPASS** 1:19
1:25
compassionat...
51:18
complainants
43:14
completed 68:4
completely
105:20
completion
129:12
compliance 86:7
123:17
compliant
128:17 133:12
comply 30:12
43:3 66:20
67:19 96:13
97:14 125:8
127:6
complying 30:11
97:7,9 128:15
**Composite** 2:20
90:24 91:12
comprehensive
44:1
concentrating

47:4
**concern** 50:6
**condition** 37:6
37:18
**conditioner**
132:14
**conduct** 67:14
**Conducted**
81:12
**confronted**
19:13 27:20
28:7
**confusion** 39:16
40:3
**conjunction**
86:8
**connected**
151:15
**connection** 91:8
120:6
**consider** 50:19
59:22 86:7,11
86:20
**consideration**
97:6
**considered**
77:16
**consistent** 57:20
77:7
**consort** 28:12
**consulting** 18:8
**contact** 27:10
43:21 49:18
74:11 118:19
**context** 62:15
**continuing**
79:21 86:5,11
128:5
**control** 30:7
65:1 68:6
69:21 73:20
77:12,17,20,22
79:8 86:8
88:24 96:16

139:6
**controversy**
92:24
**conversation**
47:7 73:6
135:4
**conversing**
49:15
**copy** 55:24
89:11,16 98:11
150:4
**Coral** 24:15
**corner** 49:16
135:19
**corporation**
115:25
**corporations**
113:6 114:24
**correct** 56:12
62:7 83:4
90:25 91:15
92:7 97:16
105:6 107:2
108:2,13
143:19
**couch** 55:3,4
80:4
**counsel** 89:12
90:22 98:11
124:24 137:3
151:13,15
**counting** 66:3
95:24
**county** 1:11,13
2:8 4:4 5:14,15
5:16,20 11:20
12:24 13:14,17
13:22 14:8,11
15:17 16:6
18:13,17 20:16
22:4,10,11,25
23:4 28:11,22
28:25 29:15
30:17 32:6,18

33:7 35:18
42:15 56:7
90:4,11 91:10
115:2 151:5
**couple** 15:25
18:8 34:7
63:22 64:4
116:15 131:19
138:15 139:14
**course** 29:15
33:12 89:10
142:3
**courses** 34:5
**court** 1:1 21:12
90:17 143:14
150:2,4
**courthouse** 4:13
4:16,25
**covers** 34:3
**crazy** 37:14
131:3
**create** 36:15
50:11
**creating** 47:15
**Creative** 113:7
**crime** 54:14
**Criminal** 2:21
99:16
**crisis** 46:12
**critical** 31:13
**Cross** 17:22
**Cross-Examin...**
2:14 116:19
**crowds** 49:14
**cuff** 130:5
**cuffs** 130:21
**current** 54:25
120:8
**curriculum** 14:1
100:2,2
**custody** 110:1
**cut** 123:12,18
125:4 126:6
129:6

**cycled** 123:10,22
**cycles** 127:9
129:1

_____

**D**

**D** 2:12
**dark** 112:15
**dart** 119:20,21
**dart-firing**
99:18
**darts** 119:10,12
119:14,24
120:2,3 121:14
124:20
**date** 1:17 28:10
30:22 46:14
81:20 101:13
**dated** 28:2
151:17
**dates** 4:18 5:3
5:12 6:6 15:13
17:15,15
**dating** 28:4
**Davie** 23:4
**day** 14:25 15:2,2
15:4 17:23
29:22 42:18
48:1,7,16
50:18 55:8,12
59:18,19 109:5
123:16 135:22
149:16 151:17
**de-energized**
127:19
**dead** 72:17
**deal** 17:23 19:19
33:2 46:25
**dealing** 21:12
40:14 41:20
44:7 57:21
81:21 133:16
145:11
**dealings** 46:24
**deals** 49:4,10

**death** 81:19
93:20
**debt** 17:25 21:3
21:13
**DECEASED** 1:7
**decide** 111:19
143:8,9 144:6
**decided** 15:8
69:5 109:25
139:15 140:18
141:19
**decision** 97:5
109:20 117:17
117:18
**declared** 21:1
**Defendants** 1:14
2:7
**defense** 8:8,8
10:6 11:2 25:2
77:9
**defensive** 7:23
13:19 25:17
113:23
**definitely** 50:21
51:9,17 72:6,9
80:3
**degrade** 26:15
26:21
**DeGraw** 1:6,7
30:22 31:6
34:16 36:10
44:7 46:14,24
47:10,23 50:13
53:19 54:16
73:6,19 74:11
75:7 76:19,22
79:13 81:21
93:22 94:14
95:3,15 96:17
97:8 102:25
107:4 112:8
117:7,22
118:20 119:10
120:12 121:14

122:5,11
123:23 125:9
126:13 127:2
127:20 128:1
128:11 129:13
129:18,21
130:16 133:16
134:2,18
138:22 139:7
139:16 145:11
**DeGraw's** 35:4
47:5 93:20
130:13 135:15
**degree** 26:12,19
27:2
**degrees** 7:9,15
7:16
**Delayed** 24:8
**delirium** 40:5
**Delray** 113:24
**delusional** 47:13
58:21
**delusions/hall...**
50:1
**demonstrate**
132:12
**demonstrated**
132:24
**denial** 18:19
28:7
**Denied** 27:9
**denying** 27:19
**department**
15:17,18 23:4
24:7,23 29:16
101:25 114:14
**departments**
22:9
**depicted** 102:2
**deploy** 33:4
73:23 81:23
97:5 106:15
**deployed** 30:2
30:21,23 31:3

41:21 62:7,13
63:7,12,15,19
68:4 70:4
74:16 94:11
106:14 108:1
108:10 109:1
109:10,12
112:18 118:25
120:11 124:10
**deploying** 82:7
94:14
**deployment**
42:4 68:4
77:16 86:6
108:12,24
109:19 120:7
123:11,23
124:19
**deploys** 119:13
**DEPONENT**
1:16
**deposition** 3:8
151:10
**Depot** 14:3,4,12
14:16
**deputies** 18:14
52:8,10 75:8
87:13
**deputy** 1:13 3:9
3:10,12 4:3,8
45:13 46:15
47:7 49:3 71:8
71:14 73:10
75:15 86:24
102:7 116:21
117:18 130:3,5
130:12 132:8
132:25 133:4
133:11,17
135:7 137:7
139:14 141:17
143:8 144:6
**describe** 57:24
61:13 62:19,22

65:11,24 78:11
78:18 102:11
111:8 118:3
119:3,7 120:15
**described** 57:24
61:22 64:12
66:9 67:12
74:19 79:19
126:16 134:16
**describes** 76:25
**describing** 57:23
62:21
**description** 2:19
22:7 56:20
84:19
**Desert** 51:12
**destructive**
49:17
**detail** 13:6 37:21
**details** 77:9
**detection** 13:25
**detectives'** 54:14
**detention** 13:5
**determination**
36:8 68:5,20
68:22
**determine** 36:12
36:23 37:8
50:4 54:11
**develop** 44:6
**developed** 8:6
**developing**
34:10
**diabetic** 131:5
131:14 149:9
**diagram** 84:18
**dialogue** 36:15
118:23
**died** 72:24
**difference** 32:10
80:1,3,6
**differences** 32:4
**different** 8:12
8:16,17 9:7,20

11:9,10,16
13:24 22:8,8
22:22 25:2
32:22 60:9
61:2 86:21
100:7 101:2
131:13 147:22
**differently**
11:14,15
**difficulty** 44:25
**dignitary** 13:5,6
**dignity** 49:23
**direct** 2:13 3:5
50:5 121:10
**direction** 83:6
83:18 84:2
**directions**
141:18
**disabilities** 43:1
43:4,8 44:4
49:6
**disability** 43:13
43:22
**disarm** 11:3
**discharged** 21:3
**discharging**
104:22
**disciplines** 6:12
**discrepancies**
18:18 19:21
27:8
**discrepancy**
19:18 27:13
**discrete** 91:13
**discuss** 46:23
47:3
**discussed** 76:6
**discussing** 27:6
95:17
**discussion** 43:18
43:19 76:24
77:2 92:16
93:3 96:9
**dismissed** 24:1,3

**dispatch** 133:11
**disperse** 49:14
**disqualified**
22:12 23:5
**distance** 74:14
74:24 82:13,23
120:22,23
121:4 148:3
**distressed** 18:5
**DISTRICT** 1:1
1:2
**disturbance**
47:16
**DIVISION** 1:3
**Doc** 2:21
**doctor** 39:3
45:15,24 58:25
72:18 149:24
**document** 89:7
89:16,25 90:1
90:23 92:11
98:7 99:22
102:3 126:4
**documents**
90:11 91:8,13
92:1 99:11
100:7,12 101:8
**DOD** 12:4 29:5
29:13
**dog** 122:16
**doing** 7:19 8:23
14:16 18:8
38:4 39:4
44:25 47:16
48:2,2 54:9
56:24 57:11
59:25 65:7
72:10 103:19
105:22 107:4
107:11,12
114:16 126:17
128:17,22
130:2
**Domestics** 12:15

**DONALD** 1:7
**door** 38:4 41:15
  52:16 55:2
  143:25 145:8
**doors** 119:18
**doorway** 41:17
  50:13 52:8,14
  52:15,19,22,23
  52:24 53:5,13
  74:21 83:12,20
  83:21 84:13
**download** 102:2
**downstairs** 61:9
  75:14
**downward**
  119:22
**draw** 121:25
**drawn** 122:3
**dripping** 57:9
**drive** 132:13
**drive-stun** 30:3
  30:11
**driver** 135:1
**Driving** 13:19
**drove** 137:8
**drown** 33:23
**drug** 13:24
  18:20
**drugs** 20:12,21
  20:23
**dry** 36:17 39:13
  57:5 131:2
**due** 21:2 22:12
  23:5 24:8
**duly** 3:3
**dummy** 32:12
  32:13
**Dunedin** 115:1,4
**duration** 79:9
  85:21 86:2
  108:20
**duties** 4:11
  10:22 12:11
  13:2,10 77:10

**duty** 30:23

**E**

**E** 2:1,1,12,17
  77:14
**ear** 38:11
**earlier** 20:2
  37:10 39:11
  48:1,16 54:21
  55:5,7,8 57:17
  59:17,18,19,21
  60:10 75:5,23
  76:6 110:8
  121:19 126:16
  144:7
**east** 64:13
**ECD** 94:19,24
  96:10,11 97:5
**ECD's** 92:23,25
**edge** 44:23
  74:15 142:9
**education** 44:1
**educational**
  25:21
**EE** 151:21
**effect** 34:17
  110:20
**effective** 73:22
  74:5 104:17
**effects** 94:20
**efficient** 137:3
**effort** 94:23 95:3
**eight** 91:24
**eighth** 7:11,12
**either** 18:17
  21:25 32:14
  48:12 113:19
  114:18 116:4
  141:12 146:9
**electrical** 81:12
  120:6
**electricity** 33:22
  104:23
**electronic** 77:12

77:16,20,22
  79:8
**eliminate** 49:13
**emergency**
  49:13
**emphasis** 35:1
**employed** 15:21
  15:22 16:7
  32:5
**employee**
  151:13,14
**employment**
  14:19
**EMS** 71:9
**EMTs** 72:11
**Encountering**
  49:7
**ended** 4:19 17:6
  18:14 70:13
  109:11 111:10
  121:14 150:6
**endorse** 49:25
**energized**
  125:16
**energy** 120:10
**enforcement**
  10:11 12:5,12
  14:9,13 29:21
  43:12 77:1,6
  79:25 81:1
**engine** 138:7
**English** 46:3
**ensure** 43:23
**entangled** 81:4
**entered** 41:24
  89:2 129:19
**entering** 93:21
**entire** 74:14
**entitled** 35:10
  81:10 89:9
**environment**
  68:23
**episode** 87:12
**erratic** 47:10

55:17 56:16
**especially**
  120:22 132:13
**ESQ** 2:2,7
**establish** 42:24
  49:22
**established**
  120:7
**ESTATE** 1:7
**estimate** 63:13
  74:16
**et** 15:8,8 50:1
**evaluate** 65:13
  66:19 123:18
  125:7,18
**evening** 75:13
**event** 48:16
**events** 133:14
**eventually** 52:25
**everybody** 11:11
  132:17
**ex-husband**
  24:2
**exact** 4:18 5:3
  6:6 15:12
  17:15 136:10
**exactly** 18:7
  19:4 46:21
  48:22 68:12
  105:18 111:23
  127:22 143:13
**examination**
  2:13 3:5 19:22
  139:12
**examine** 38:15
**examined** 3:4
**exceeded** 85:25
  86:1
**Excuse** 121:8
  142:24
**exhibit** 2:19
  35:23 42:12
  56:1,3,8,9,18
  76:11 81:7,8

90:24 91:1,4
  91:12 93:25
  94:2,5,17 96:7
  98:8,9 99:10
  100:6 101:9,17
  101:17 102:6
  112:7 116:24
  121:17,18,20
  122:8 124:25
  125:24 126:2
  126:22 127:14
  131:21,23
  132:1,9,19
  133:6 134:20
  135:8,10 136:5
  136:24 140:13
**exhibited** 47:10
**exhibits** 35:21
  56:4 76:12
**exigent** 79:7,11
  79:12
**exit** 119:18,19
**experience**
  29:22 38:22,24
  39:1,2 80:5
  87:14 128:24
  129:20 131:8
**experienced**
  39:2
**experiences**
  29:25 79:25
**expired** 24:16
  24:19 72:13
  73:7
**Expires** 151:22
**explain** 20:13
  23:11 49:24
  138:2 143:13
  146:13
**explanation**
  22:7
**exposed** 40:15
**exposure** 85:18
  86:2,5 95:13

exposures 85:22 94:24 95:4,14 95:17
expound 79:23
expunged 24:3
extended 132:3 146:5
extent 47:12 67:14
extra 43:23 89:17
extracurricular 10:10
eye 51:8 72:20
eyes 51:9 71:4 71:18 72:5,16 149:23

**F**

face 33:24 57:9 64:24
facing 37:24 78:16 138:6
fact 38:19 73:7 96:5,22 147:25
failed 21:8,22
failings 22:1
fails 96:12
failure 149:18 149:22
fair 120:4 128:21 132:25 136:22 141:13 142:14,15
falls 61:9
familiar 35:17 35:19 36:3 42:10,15 56:3 76:16,18,21 78:5 81:8 89:8 89:25 91:8,20 99:16,23,24
far 34:19 63:4 74:16,24 75:1

80:20 82:12 84:10 89:21 117:18 122:7 138:6
fart 137:25
fast 47:1 52:6 69:1
FDE 99:17
FDLE 14:1
fear 58:8
fearful 58:15
feel 3:19,22 129:20 149:16
feelings 50:7,7
feet 38:8 63:8,9 63:12,13 69:17 69:19,21 82:13 82:15 119:18 123:7,8 129:18 129:22,22 130:9,24
fell 17:24 18:4 63:24 124:1
felt 63:22 117:15 131:11,11 149:15,15
female 34:23 77:24
fibrillation 149:18,22
Field 12:10
fifth 110:4 127:14,19 128:20 129:12
fight 48:5 80:5 96:21 110:21 128:6
fighting 7:22 8:9 10:7 11:2 30:8 69:19 72:7 129:16 139:5
figure 123:17
figured 15:1
figures 85:1,9

file 5:3 17:9 27:6
Filed 21:2
filing 24:8
final 127:14,19
finally 44:22 63:6 142:9
financial 22:1
financially 18:5 151:16
financing 17:21 21:22
find 51:13
fine 3:10,10 71:5 135:2
finish 88:6,7 145:18
fire 48:3,3 75:20 117:14,17,20 137:22 138:5,7
firearm 122:14
firearms 13:19 25:3 122:15
fireman 48:12
FIRM 2:3
first 5:23 7:10 9:4 14:8 19:17 37:20 38:16,25 39:6 47:15 50:20 54:16 55:1,16,19 57:12 65:12,22 69:7 74:16 76:16,24 87:11 98:21 102:14 103:14 105:2 106:22 109:3 111:1,13 112:2 112:3 115:19 116:6 117:22 118:5,19,21,25 119:2,23 120:12 121:1 121:20 125:11 125:20 129:25

138:15 139:15 140:4,9 141:24 142:5 144:21
fishing 119:14
fist 7:1 124:2
fists 62:23 80:11 120:17 125:12
Fit 17:22
five 4:5 16:24,25 17:14 29:11,12 95:10,11,16,20 95:25 96:4 108:7,17,20 109:1,4,6,10 126:22 129:11
five-second 64:17 128:2
FL 1:21 2:5,10
flagged 56:8
flatout 141:10
flee 96:14,18,20
Flip 102:23
flipped 106:15
floor 70:9 80:4
Florida 1:2,24 17:19 151:4,20
focus 37:12 122:19
focused 51:10
fogginess 39:17
follow 99:8
follow-up 116:23
followed 51:20
following 123:10 125:9 125:14 127:9 128:12,20 129:12
follows 3:4
foot 7:1 42:1 83:22
force 10:21,22 11:10 12:5

26:8 28:5 51:12 77:7,9
forces 8:7 10:17 10:20,23 11:12 11:14
foregoing 151:9
form 18:23 19:15 20:14 22:13,16 23:8 25:5,9 26:14 27:15,21 28:19 31:18 32:7 33:8,16 35:5,8 36:25 39:18,24 40:9,20 41:8 42:5 45:2,9 47:17 48:19 51:23 53:6,15 58:1,9,16,22 59:10 60:2 62:6 64:6 65:8 66:11 67:15 68:7,16 69:8 69:24 79:14 84:6 85:5 86:13,22 88:8 88:14,20 89:3 93:11 95:21 97:18 99:19 100:13 101:2 103:1 105:7,15 108:18 109:22 110:12 111:14 112:19 124:13 124:15 136:14 139:21 140:6 148:10,15 149:12
Forty-five 6:16
Forty-nine 10:1
forward 104:23 133:19
fought 110:2
Foundation 35:8

**four** 6:17 8:15
8:23,24 9:5
12:2 16:3,23
17:13 25:20,20
29:12 63:8,9,9
63:14 96:1
103:10 106:25
107:4,7,12,20
107:22 127:19
132:10 139:20
140:2
**four-year-old**
11:11,13
**fourth** 7:10
108:23 126:21
127:1,10 128:1
128:12
**frame** 41:16
135:11
**Franklin** 11:23
**free** 3:19 130:10
**friend** 18:11
**fright** 50:11
**front** 74:5 76:12
77:24 93:6
119:18 135:7
142:18
**frontal** 81:18
**Ft** 16:17 113:11
**FTO** 12:8,9
**full** 4:1 61:18,19
63:22 64:16
144:9
**full-time** 13:3
**fully** 36:22 44:2
**function** 119:7
**functioning**
72:22
**funded** 114:15
**funk** 51:15
**further** 41:24
62:9 129:10
139:10 150:1
151:12

| G |
| --- |

**G** 2:7
**gain** 73:20
123:16
**Gainesville**
24:22
**Gardens** 15:20
**Gaspy** 138:24
**general** 25:3,16
42:10,24 43:11
49:4 76:5,21
**generally** 6:22
**gentleman** 35:9
**getting** 18:10
37:12 50:19
61:7 67:8 80:1
80:2,4,4,14
90:18 112:6
121:3 126:10
137:7
**girl** 28:2
**girlfriend** 27:12
**give** 4:1 6:7
16:17 45:5
49:16 53:19
56:2 64:16
97:21 99:7
**given** 97:11
151:11
**gives** 121:23
**giving** 41:20
104:17 117:21
118:1 125:25
141:18
**go** 4:25 7:17
8:25 9:6 14:25
15:4 30:12
32:24 33:1
34:13 37:14
41:14,15,19
44:12 48:4
50:17 52:4
65:21 68:11
69:18,18,20
76:3,13 77:20

78:9,15,23
79:2 80:2,20
82:8 86:18
87:21 88:7
90:13 94:7
100:16 102:5
117:14,15
122:17 125:22
129:21 134:25
135:3 141:4
142:6 144:9,21
146:9,15
**goal** 50:14,21
**Goepfert** 1:12
1:16 3:2,9,12
4:2,3 49:3
102:7 113:5
116:21 132:8
133:4 135:7
137:7
**goes** 65:12 78:16
80:9 111:4
137:2
**going** 8:25 15:24
16:19 17:22
22:25 37:8,15
41:5 44:15
47:5,6 48:5
50:17 51:1
60:6,17 61:7
61:11 66:16,18
66:19 69:2
75:21 78:8,9
78:15 79:1
80:2,18 86:25
87:1,3,4,8 88:2
90:14 94:2
103:12 104:6
105:13 120:23
122:17 125:8
127:13 131:3
131:15,24,25
132:5,9,10,14
132:15,19

133:20,23
136:22,24
137:4 142:19
142:22 146:9
146:10
**gonna** 135:1
**good** 3:7 15:7
44:10 48:23
62:25 63:13
87:21 111:5
**grab** 83:1
**grabbed** 69:7
130:5,6,24
**grabbing** 38:2
**grappling** 7:18
7:20
**great** 54:3 146:6
**Greg** 3:10
**Gregory** 1:11,16
3:2 4:2
**groaning** 126:18
130:20 138:22
138:23
**groin** 33:24 74:7
77:23 78:8
85:12
**ground** 7:22
30:8 67:2,21
68:2 82:25
86:10,17 87:7
107:25 111:11
123:25 124:5
125:17,21
128:13 130:9
**grounds** 96:12
**GROUP** 1:19,25
**groups** 73:24
**GUALTIERI**
1:10
**guess** 27:5 37:24
51:1 67:8
111:20 121:13
124:23
**guide** 93:4 100:4

100:23 101:2,5
101:10
**guideline** 77:14
**guidelines** 42:25
**GULF-TO-B...**
1:20
**gun** 8:8 11:2
37:15 38:1,3
40:15,17,18,19
41:4,7,7 44:22
47:6 52:3
53:25 54:1,7
61:8 83:4,5,6,7
83:8,14,15,25
144:12,13,17
144:23 145:4
145:10,12
148:22
**guns** 37:16
99:18 142:5
144:10
**gushing** 64:24
**guy** 78:16 87:9
139:5
**guys** 76:2 80:23
**gym** 5:22 6:1
14:25 16:25
17:19,20,22
113:10

| H |
| --- |

**H** 2:17 77:21
**ha** 66:10,23
79:21 97:24
126:17
**ha'** 57:15,15
**half** 25:20 123:8
**hallway** 72:25
**HAMMOCK**
1:22 151:7,19
**hand** 82:7 89:19
129:25 130:6
146:3
**Hand-to-hand**

11:1
handcuff 30:13
53:11 68:12,21
69:5,18,19
70:15 74:10
109:21 110:1
125:22 127:24
130:11
handcuffed 70:9
72:11 130:4
handcuffing
68:15 72:6
110:16
handcuffs 69:3
130:14,16
handed 90:1
133:4
handful 116:22
Handheld 81:10
handing 89:15
handled 49:21
87:22
handling 42:25
47:2
hands 30:10,11
30:12 37:25
38:8,10 40:23
41:3 44:13,13
44:16 47:5
62:23 80:14
87:19 88:6,19
117:25 118:11
118:16,17
120:17 144:22
hands-on 65:21
87:17,18
129:21 131:7
handwriting
26:10
Hang 25:9 62:5
66:4 94:1
happen 37:13
38:18 82:21,24
129:2,10 140:2

happened 14:19
27:24 48:16
51:6 53:9 55:8
62:12 64:10,11
72:1 82:6,20
105:18 106:12
119:3 124:7,9
144:4
happening 47:1
132:17
happens 104:14
104:16
happy 3:16,21
3:23 99:6
harassment
23:18,19
hard 74:1 85:10
harder 24:10
62:21
he/she 43:24
head 37:23,25
39:9 61:7,11
77:23 85:11,12
86:25 118:6,7
118:8
heading 92:1,15
92:22 99:22
headphones
132:11,16
133:3,5 134:22
hear 132:15
133:24 134:4
138:16,20
139:1,7
heard 19:17
72:25 88:11
132:24 133:10
134:1,2,24
138:15,22,24
139:2
hearing 36:20
heart 72:13,21
81:18 92:24
93:1 149:18,18

149:22,22
held 135:5
help 5:7 47:24
49:24 50:15
51:4,5,5,14,20
65:16 98:2
104:11
helpful 100:9
hem 91:16
Hey 51:11 52:4
75:23 98:1
130:7
high 7:9 13:18
28:2 34:22
higher 122:24
122:25
highest 7:11,13
7:14
Hillsborough
5:14
hire 19:20
hired 16:3 19:18
hiring 16:19
18:13
history 11:19
15:16 20:25
25:21
hit 39:9 78:8,15
126:10 132:19
hits 69:23 70:4
hitting 111:6
119:10
hold 7:3 87:13
87:20 95:10
122:13 148:22
holding 102:24
holes 39:9
holster 112:2
Home 14:3,4,12
14:16
honest 24:5
27:25 34:7,20
35:16 66:2
95:24

hopefully
123:19
hospital 73:4
112:8
hostile 58:20
hot 131:12
149:10
hour 9:2
hours 15:2
house 30:4,6,15
37:16 48:2
73:12 75:9
115:4 117:14
136:11 138:7
huge 17:25
human 77:6
85:25 92:25
hundred 46:18
88:2
Hunter 4:2
hurt 124:6
125:19
husband 55:5,17
73:7

_____
I
idea 24:25 26:3
39:3 67:3,5
88:17 96:2
137:12 145:22
146:16 149:20
149:24
identification
2:19 91:5
98:10
identified 90:10
116:9 131:21
identify 89:20
92:10 100:8
101:25
illegal 20:12,21
47:16
Illinois 16:24
20:6 116:1,8,9

illness 36:8
43:13 49:6,8
illnesses 43:9
imagine 28:22
75:3 104:11
imagining 45:12
immediate 36:8
96:14
Impact 19:24
114:21 115:10
115:24
impairment
39:22
important 76:25
77:2,5
impossible 5:25
impractical 9:23
inactive 25:3,4
inappropriate
142:25
incapacitating
86:6
incapacitation
73:21 110:23
111:3
incapacitations
111:10
inches 82:13,14
119:16 123:5
incident 4:21
18:22 29:23
31:6 34:15
35:4 73:14
76:19
including 18:19
43:13
index 35:22
131:21
indicate 40:19
45:18 46:2
121:21 122:4
135:21
indicated 58:6
indicates 122:8

131:14
**indication** 53:19
96:17 131:2
**indications**
96:13
**individual** 1:10
1:12 44:4
50:10
**individuals** 43:1
43:25 49:5
**ineffective** 86:6
**information**
43:15 55:15
75:22 102:2
106:5
**initial** 23:17,21
23:25 50:20
80:9 91:7
97:10 120:7
123:11,12,22
124:1,20
**initially** 27:9
37:19 41:14
50:24 52:21
53:4 56:21
57:1 80:10
120:11 132:11
**initiating** 86:5
**injuries** 43:2
49:6
**injury** 36:7
81:19 84:22
**inside** 136:2
**instantly** 129:4
**instruct** 101:14
101:15
**instructed** 93:9
144:8
**instructing**
35:13
**Instruction**
92:20
**instructional**
92:14

**instructions**
41:20
**instructor** 8:13
13:13 25:2,3
29:9,9 32:12
34:21 89:9
100:4,5,22
101:2
**intact** 24:19
**intended** 121:13
**intense** 126:20
**intention** 54:8
**intentional**
129:6
**intentionally**
77:23
**interaction**
43:12 75:7
**interactive-type**
33:3
**interested**
151:16
**internal** 135:25
**International**
113:23
**interpret** 58:8
58:12
**interpreted** 58:7
80:8
**interrupt** 144:25
**interval** 105:1
**intervention**
46:13
**interview** 56:10
56:19 64:3
94:6,7 109:4
**interviewed**
93:19
**interviewing**
18:21
**investigated**
23:2
**investigation**
55:23 93:19

102:1
**invitation** 132:2
137:2
**involve** 7:23
10:25 11:1
17:16 21:9,25
**involved** 21:21
47:4 69:14
**involvement**
76:22
**involves** 6:23
**involving** 36:7
77:8
**iPhone** 136:19
**irrational** 55:17
56:16
**ISOMA** 115:22
**Israeli** 8:6,7
**Isshin-ryu** 9:5
**issued** 93:4
**issues** 131:15
**issuing** 128:11
**Item** 132:2
**Its's** 76:11

**J**

**jail** 18:12
**Japan** 9:11
**Japanese** 9:17
**jerky** 63:2,3
**Jitsu** 9:23
**job** 14:8,9,11,12
16:18 22:22,23
24:11,13,20
38:21 42:19
88:23
**jobs** 14:13,16
15:18
**joined** 69:12
**judge** 146:10
**Jui** 9:23
**Jujitsu** 6:11 7:4
7:18,20
**JULIE** 1:6

**July** 1:17 22:9
91:23 151:17
**jumped** 67:9
**Jupiter** 15:19
**Justice** 2:21
99:16
**justified** 96:12

**K**

**K-R-A-V** 8:4
**Kar** 9:4
**keep** 13:9 15:14
43:10 52:9
65:19 68:14
86:17 126:10
130:1
**keeping** 114:17
**Kendo** 9:16,22
**Kenneth** 18:11
**kept** 125:19
140:2 141:21
**kickboxing** 6:13
17:22
**kicking** 7:2
**kid** 11:11,13
30:15 87:10,11
87:13
**kids** 11:15
**kill** 11:6
**killed** 144:10
**KIMBERLY**
1:22 151:7,19
**kind** 9:24 10:7
13:8 16:13,14
16:15 21:11,13
33:3 38:7,7,8,9
38:9 44:23
52:6 53:24
57:8 61:23
62:3,23 63:2
64:22 71:4,5
72:16 74:1
85:10 97:22
124:1 125:12

125:19 126:18
138:21 142:10
**kinds** 131:13
**knee** 80:21
130:1
**knew** 35:20 44:7
45:8,19 46:6
48:17 51:11
64:9 83:8 89:2
142:5 149:11
**knife** 8:8 10:6,6
11:2 82:24
**knocked** 145:7
**know** 3:15,23
6:20 12:15
13:24 15:6,12
16:11 17:8
24:5 27:4,14
40:6 41:5
45:14,22,24
46:6,17,18
47:14 54:13
57:16 58:25
59:13 61:8
62:14,22,23
63:21 64:10,17
66:14 69:2,20
70:24 71:22,24
72:2,14,18,20
72:23 73:9
76:3 81:1,3,4
82:20 87:4,8
87:14,15,17,23
91:21 95:25
96:1,4,19,22
97:8 99:5,7
100:1,14
105:18,25
106:5 109:3,15
118:10 121:2
123:15 127:23
128:4,9 129:15
129:23 130:19
131:11,14

133:11 134:17
135:23,23,24
136:3,4,17,18
136:20,21
137:2 139:3
142:7,11
146:21,23
147:25 148:8
148:19 149:17
149:21
**knowing** 55:8
73:4
**knowledge** 41:7
47:24,25 48:15
**knows** 26:16
45:13 80:5
**Korean** 6:25 9:9
**Krav** 6:11 8:2
9:24

**— L —**

**lab** 85:25
**labeled** 100:4
**ladder** 33:20
34:22 63:25
142:7
**Lake** 14:7
**landed** 121:21
122:5
**language** 46:3
**Lantana** 15:20
16:12,13
**laptop** 131:20
132:12 135:8
**Large** 1:24
73:24
**LARGO** 2:10
**laser** 122:18
**Lastly** 96:25
**Lauderdale**
16:17
**law** 2:3 10:11
12:4,12 14:8
14:13 29:21

43:11 76:25
77:5 79:25
81:1
**lawful** 67:1,19
67:20 86:3
107:25
**laying** 37:21,23
38:6 40:25
47:21 52:3
56:24 57:10
118:8
**layman** 7:6
**lead** 35:10 81:17
**leaders** 13:8
**leading** 35:11
121:9 136:15
**lean** 148:6
**learn** 72:24 75:6
**lease** 17:23
**Leases** 21:14
**leave** 50:23
51:22
**leeway** 146:6
**left** 17:25 18:4
28:5 52:16
63:18 84:5,18
112:16
**leg** 78:23 82:11
130:1
**legs** 69:21 78:10
78:16 79:5
87:20 129:22
129:24 130:1
130:25 149:1,9
149:16,19
**leisurely** 80:1
**lesser** 109:2
**let's** 4:21 7:17
42:9 52:4
70:25,25 90:13
90:19,23 91:3
96:6 98:8
113:1 116:14
119:1 121:17

121:18 130:7
**letting** 133:11
145:17
**level** 6:19,23,24
8:10
**levels** 8:14 11:10
44:2
**liability** 13:18
**lieutenant** 18:12
**life** 38:20 77:6
89:9
**lights** 49:13
**liked** 122:24
**limitations** 33:5
33:13,15 34:16
**limited** 77:8
**limiting** 95:9,13
**line** 43:5 93:25
94:9 102:14
122:25
**lip** 39:13
**lips** 149:23
**list** 8:21
**listed** 19:24
28:10 113:11
114:1 115:22
116:8
**listen** 36:21
49:25 88:1
134:23 137:1
145:3 146:3
**listened** 87:25
**listening** 60:7
65:25 104:9
**literally** 74:25
95:25
**little** 8:12 11:16
29:20 31:16,22
41:22,24,25
42:9 62:15
64:22 71:19
73:16 82:7
97:12 113:1
119:1 120:21

122:24,25
123:19 133:17
148:1
**living** 9:7
**LLC** 2:3 19:25
113:24 114:2
114:17,22
115:11
**loaded** 131:20
**located** 12:19
20:4 26:5
**location** 1:19
20:7
**long** 4:3 6:14
12:1,21,25
14:15 15:14
16:18,20 25:18
26:4,9 31:9
70:8,10 104:19
107:8 110:25
111:2,11
119:16 127:24
**long-lasting**
111:5
**long-speaking**
142:24
**longer** 24:3
**look** 4:21 35:22
35:23,24 36:1
36:5 42:12
51:8,11 56:8
56:18 62:9,24
62:24,25 64:15
70:23 77:11
80:12 81:7
84:17 85:17
89:18 90:2,22
91:16,20 94:5
95:10 96:6
98:1 100:16,17
101:16,24
102:6 106:21
112:7,14
121:17,18

126:3
**looked** 35:25
36:2 57:8
70:22 71:5,6
87:9 113:5
**looking** 10:8
15:16 25:21
28:15 36:16
38:23 39:5,8
51:9 99:4
102:16 106:8
135:12 136:5
**looks** 85:10
91:20,21
135:13,17
**lot** 7:22 9:6 10:3
17:21 18:13
24:10 39:12
61:6 82:12
114:16 123:20
142:8
**lots** 8:8 21:15,15
126:18
**loud** 58:7 126:18
**low** 114:15
**lower** 63:18 74:3
77:25 78:11,13
78:19,21 79:2
93:6,15 112:16
129:17
**lowered** 93:5
**lying** 118:5

**— M —**

**M-A-G-A** 8:4
**M26** 28:16
**ma'am** 150:5
**Maga** 6:11 8:2
9:24
**main** 125:20
**maintain** 87:5
**maintained** 9:19
**making** 39:8
57:14,15,20
83:16 121:3,4

Gregory Goepfert
July 18, 2019

124:3 126:13
138:21 139:4
**man** 145:22
**manager** 14:5
114:1
**manner** 49:15
50:11
**manual** 34:13
**manuals** 32:2
**March** 17:12
21:2
**Margate** 16:6
**marijuana** 19:5
20:24
**mark** 90:14,23
91:3 98:8
**marked** 2:18
19:10 91:5,25
98:10 101:17
131:23,25
135:9 140:14
**marks** 121:23
123:7
**martial** 5:8,9
6:10,20,25 8:6
8:18 9:9,20
11:9,19,22
14:20 16:20,21
17:17,22 18:8
19:25 21:10,21
114:21 115:10
115:20,24
**Martinez** 46:15
47:7 48:14
52:16,21 53:12
69:13 71:14
130:3,5,12
133:11,17
139:3 143:23
**Maryland** 26:7
**mass** 93:6,6,16
**Massachusetts**
11:23 115:11
**material** 92:15

**materials** 31:16
31:23 33:13
92:20 96:7
99:6
**math** 111:20
**matter** 70:11
114:18
**me'** 141:22
**mean** 7:15 8:20
9:21 11:10
12:14 13:11
16:25 24:18
29:8 34:21
42:17 50:20
51:8,17 62:4
67:6 70:11
72:6 73:24
76:2 79:4,21
82:20 87:4
90:7 91:21
100:21 104:22
106:13 107:21
110:22 127:22
130:25
**meaning** 88:19
**means** 12:11
50:16 82:15
98:15 102:11
103:24 104:24
106:5,14
107:23 122:21
123:7
**meant** 32:25
62:20 66:22
88:13 118:3
**measures** 86:8
**medical** 36:9,13
36:24 37:6,18
50:16 75:8
117:8
**medically** 70:21
149:17
**member** 114:1
**members** 43:23

**memory** 5:13
**men** 6:10 11:15
**mental** 39:16
43:1,13 49:5,8
98:5
**mention** 64:3
**mentioned** 7:17
8:1 20:2 34:16
41:13 53:23
59:16 75:11
87:11 148:25
**metabolic** 94:20
94:25
**Miami** 22:6
**MICHAEL** 2:2
**Mick** 3:7 10:9
150:2
**middle** 1:2
55:20 56:21
61:25 78:15
**military** 8:7
9:12 10:12,17
10:19 11:8,12
37:11 51:19
**million** 86:25
**mind** 36:5 45:14
45:15 82:6
86:17 87:3
140:18 141:17
**mine** 137:12
**minimize** 85:21
94:24 95:4
**minimized** 79:9
**Minus** 79:7
**minute** 22:21
56:5 67:7
70:11 101:24
103:10,11,17
121:8
**minutes** 21:18
59:17 78:3
103:20 104:1,6
105:5,13 110:2
**Miranda** 44:2

**mischaracterize**
141:6
**mischaracteri...**
141:3
**mischaracteri...**
105:16 144:19
**misconstrue**
110:10
**misleading**
105:21 142:15
**misrepresenting**
141:11
**missed** 66:14
**misstates** 144:19
149:2
**moaning** 130:20
**moist** 131:1
**mom** 30:5
**money** 17:8,21
21:15
**month** 30:19
**months** 4:20 5:2
**morning** 3:7,19
75:7,14 117:22
**motion** 83:16,24
84:15
**mouth** 36:18
56:22,23,23
57:2,4,6,6,9
64:19,20,23
65:6 71:3,19
72:4,15,21
**move** 61:15,17
61:19 74:24
82:3,19 104:10
126:12 149:22
**moved** 5:20 9:6
17:19 52:5
71:18,19
**movement** 61:18
71:18 72:20,21
**movements**
32:24 63:2
**movies** 9:14

**moving** 16:16
38:6,7,8,9
69:20 71:4,4
72:4,5,15,16
82:19 121:6
129:23 148:2
**MP-type** 12:11
**multiple** 7:8
34:23 79:7,12
95:7 96:10,11
99:11
**muscle** 73:24

**N**

**N** 2:1,12
**name** 4:1 102:7
**nature** 117:12
**near** 38:10
81:18 138:7
**Nebraska** 5:10
115:4
**necessarily**
91:15
**necessary** 11:7
77:10
**neck** 33:24
34:23 61:10
77:23 78:2
85:11
**need** 3:14 51:4
61:6 65:15,16
69:2 71:9
82:13 87:4
100:19 125:18
126:3 132:16
142:22
**needed** 5:7 50:6
109:25 120:21
144:6 145:19
**needs** 87:5
**neither** 49:25
**neuromuscular**
73:21 110:23
111:10

never 24:4 38:21
39:2 41:11
74:11 100:24
144:17 145:10
new 17:21 34:10
93:4
nine 4:20 16:8
132:23
ninth 7:15
nipple 71:13
122:25
nipples 112:16
NMI 63:22
73:21 104:17
110:19 120:22
No-nonsense 8:8
noise 57:15,20
124:3 134:16
non-threatening
49:14
normal 12:16
61:20 131:11
149:15
normally 61:14
Notary 1:23
151:20
note 15:17 19:24
25:22 27:6
28:15 93:4
noted 18:18
106:6
notice 57:3
noticed 18:17
36:17 57:4
number 35:23
36:6 50:2,9
68:3 69:2 81:8
85:21 90:24
92:11 94:24
95:4,14,17
101:17 102:1,6
116:25 131:23
132:2
Number-wise

35:19
numbered 35:22
numbers 68:11
90:3

**O**

obey 44:10 45:6
107:25
obeying 46:8
60:7 67:1
79:17
object 18:23
20:14 22:13,16
23:8 25:5,9
26:14 27:15,21
28:19 31:18
32:7 33:8,16
35:5 36:25
39:18,24 40:9
40:20 41:8
42:5 45:2,9
47:17 48:19
51:23 53:6,15
58:1,9,16,22
59:10 62:6
64:6 65:8
66:11 67:15
68:7,16 69:8
69:24 79:14
84:6 85:5
86:13,22 88:7
88:8,14,20
89:3 91:11
93:11 95:21
97:18 99:19
100:13 103:1
105:7,15
108:18 109:22
110:12 111:14
112:19 124:13
136:14 139:21
140:6 141:1
143:4 148:10
148:15 149:12

objecting 35:11
objection 35:7
52:9 60:2
99:10 100:6
105:19 106:6
107:17 140:20
141:2,8 142:13
142:25 144:14
144:18 145:24
147:7 149:2
objections 143:4
objective 126:9
objectively 86:3
objectives 86:3
observe 131:10
observed 117:22
obvious 148:18
obviously 10:15
11:2,9,12
19:20 31:1
33:19 34:21
36:15,18 39:10
45:21 103:15
103:18 122:19
130:25
occasions 29:6
occurred 4:22
22:3 49:17
106:2 133:13
135:14
occurring 43:25
44:8
October 28:17
offer 16:10
offered 22:23
offers 16:1,8
office 2:8 4:4,7
4:12 11:21
12:5,24 13:21
15:7 16:1 19:7
20:17 22:10,25
23:4 28:12,23
28:25 32:6,19
33:7 35:18

42:16 90:5,12
91:10 98:24
135:2
officer 10:16
12:10,16 23:14
24:11 31:3,14
32:14 45:13,19
46:7 96:15
113:5
officer's 97:7
officers 42:2
79:25 81:2
official 77:10
okay 3:17,25
5:17 6:25
13:23 19:8
21:7 23:6 24:7
24:15 25:13,21
26:12 27:6
28:10 31:2,11
36:14 39:8,22
41:12,17 42:14
46:12 47:9
56:13 57:10,13
60:19 61:1,5
61:22 62:17
63:4,15 65:3
65:15 70:17
71:15,15 75:5
76:5 77:13
79:6 81:14
83:12 85:23
91:18,24,25
92:4,22 93:15
94:8,17 95:19
96:8,25 99:24
100:25 101:4
101:19 102:4
102:18,21,24
103:9 105:1
106:12 107:1
108:4,12,23
109:19 111:24
112:25 116:7

124:24 133:2,4
133:13 135:18
139:3,5 142:1
146:25 147:20
148:25
Okinawa 9:11
17:1
old 6:17 8:24
9:25 91:20
older 15:6
omitting 142:15
once 5:21 29:17
41:2 53:23
68:10 74:19
86:10 111:4
131:9 132:12
one-second
128:20,21
ones 9:21 25:13
25:14
online 26:4,13
26:25 27:1,2
open 5:22 6:6
15:14 17:20
18:2 55:3
operate 68:23
Operating
116:25
opponent 11:4
opportunity
41:11 90:22
opposed 109:2
order 42:10,16
42:21,24 43:11
49:4 76:5,21
77:6 89:23
91:15 99:12
129:6 150:2
orient 127:15
136:23
oriented 122:9
122:10 131:19
132:9
original 98:13

98:14
**originally** 82:9
122:20
**out-of-control**
30:15
**outside** 10:11
42:3 51:4
117:9
**oven** 136:11
**overcome** 11:6
**owned** 17:5

**P**

**P** 2:1,1
**p.m** 1:18 14:24
14:25 135:19
136:23 150:7
**page** 36:5 49:7
55:19,20 56:9
56:18,20 61:23
61:25 76:25
77:11 81:15
84:17,18 85:17
90:8,9 92:1,2,8
93:1,24 94:3,7
94:18,18 96:6
97:1 100:17
102:15,17
140:12
**pages** 89:22
**pain** 111:7
**Palm** 12:24 13:2
13:10,14,17,22
14:8,11 15:17
15:19,19 16:14
16:16 18:3,16
19:6 20:1
22:11 23:3
28:22 29:11
30:18 32:11,16
**Panama** 12:20
**paper** 9:1 24:6
**paragraph**
43:18,19 64:19

**paramedics** 51:4
71:24 73:1
**parents** 9:6
**Park** 26:6
**parked** 137:13
137:22
**part** 46:9 56:8,9
65:24 84:18
94:9 101:9,10
101:15 112:16
113:19 115:6
115:15 116:4
118:17
**particular** 100:1
**particularly**
96:15
**parties** 151:13
**parties'** 151:14
**partner** 144:10
**partners** 17:24
**parts** 91:14
99:12
**party** 35:9
**patience** 116:17
**patient** 50:8
**patrol** 4:13 13:3
13:9 116:25
131:22 132:10
**patting** 71:14
**Paul** 2:7 99:7
116:21 150:4
**pause** 132:23
133:9,23 137:7
137:19 138:14
**paused** 135:10
**PBSO** 19:5
**PCSO** 92:6
132:1
**PCSO001032**
131:24
**pending** 89:24
**pension** 15:8
**people** 43:8,12
43:15 70:15

75:10 131:4
138:20 149:9
**percent** 46:18
88:3
**perform** 77:10
**performances**
31:13
**period** 4:19
13:12 31:4
65:18 104:19
111:12 127:7
127:10,18
**person** 24:5
26:13 52:25
53:11 145:19
149:16,17,21
**person's** 43:24
78:12
**PERSONAL** 1:6
**personally** 55:10
**personnel** 75:8
117:8
**PETERSBURG**
2:5
**petition** 17:9,16
**phase** 91:22
**philosophy**
126:9
**phon** 9:4
**phone** 136:13
**photo** 112:10,23
**photograph**
56:4
**physial** 77:9
**physical** 10:4,24
43:1,12 49:5
49:18 68:6
74:11 77:15
**physically** 30:7
87:24 88:5,18
109:21 119:3
**physiologic**
94:20,25
**picture** 112:8,14

121:22
**pieces** 91:14
99:12
**pillow** 37:16
38:1,8,12
40:18,23,24
44:11 54:1
83:9,13,16
84:10,15 118:6
118:9,14,15,18
144:23 145:7
**pin** 130:2
**Pinellas** 1:11,13
2:8 4:4 5:16,20
11:20 18:13
20:16 22:10,25
28:11,25 29:15
32:6,18 33:7
35:17 42:15
56:7 90:4,11
91:9 151:5
**place** 73:23,24
74:5 78:14
110:1
**placed** 130:16
**placement**
121:12 122:9
**places** 15:21
112:17
**placing** 130:13
**plaintiff** 2:2
99:1
**Plaintiff's** 91:4
98:9
**PLAINTIFFS**
1:8
**Plaintiffs'** 2:18
**plans** 17:20,21
18:2
**Plantation** 24:7
**play** 131:24,25
132:10,19
133:6,20
136:23 137:1,4

137:14 138:11
**played** 132:21
133:7,21,25
137:5,15
138:12
**playing** 32:13
**plays** 135:2
**please** 4:1 58:8
74:1 89:19
121:9 137:2
142:25
**plus** 108:13
**POB** 116:24
117:5
**POB18** 35:17
**point** 23:12,13
24:18 44:11,22
48:10 51:10
52:1,2 53:9,12
60:16,23 63:5
64:20,21 65:19
66:3 68:15
70:17 71:8,25
72:12,17 86:16
87:2 93:5 98:5
103:21 104:23
119:21 122:19
126:14 130:5
130:12 146:8
146:19 149:6
**pointing** 38:3
102:25 103:4
122:4 145:8
**police** 10:16
12:16 13:13
15:18 16:13
22:8 23:4,14
24:7,11,23
31:14 43:8
45:13,19 46:6
114:10,14
**policy** 43:7
**polygraph** 19:21
**pool** 33:21

portion 12:13
91:9 129:17
131:16
position 64:1
71:1
positive 73:11
possessed 20:11
20:20
possible 33:25
34:1 49:13
81:17 92:23
possibly 37:17
59:9,14,16,17
78:8 96:1
post-seizure
38:15,17 39:1
39:4,17,23
59:9,23
potential 50:12
81:19
potentially
38:18 54:1
powered 132:13
practical 32:3
32:17
practiced 38:3
practitioner
6:14
prefer 3:8
preference 3:11
preferred 77:24
78:1 84:23
pregnant 33:23
34:22
present 96:16
president 13:7
115:23
pretest 19:10
pretty 25:19
43:9 47:1
51:21 52:5
61:11 69:1
70:7 74:7 75:4
82:15 134:8

137:21 138:6,9
previously 35:25
101:17 131:23
131:25 135:9
prior 11:21,22
12:3,23 14:2,3
14:11 16:21
34:15 42:4
55:12 76:18,22
77:16 103:11
127:15 132:3
probably 5:13
9:18 14:17
17:14 20:5
29:8,10,11,12
30:4 34:3
38:20 41:22,23
52:5 61:6 63:8
65:2 70:10
75:3 78:22
82:8 83:22
87:22 88:3
114:7 115:4
119:17 122:23
123:1,7 148:2
148:4
probe 78:9,14
78:23 82:11
121:23 122:8
probes 82:13
63:15 80:23
82:4,4 89:2
93:21 112:17
119:15,15
120:10 121:21
122:5,17
problem 70:21
123:17 135:2
problems 24:2
procedure 43:7
116:25
proceedings
150:6
process 16:18,19

18:19 19:14
60:18
produce 94:19
produced 90:11
92:11 98:18,23
98:25 99:2
proficiency 9:19
profile 25:1
programs 34:11
prolonged 79:8
prone 70:13
properly 143:5
property 131:22
132:1
protect 7:24
43:3 89:9
protection 77:6
provide 43:2
provided 90:23
provisions 43:3
psychologist
18:21 19:9
psychosis 40:5
PTSD 37:10
55:6 59:5
Public 1:23
151:20
pull 30:9 103:24
104:14 119:13
119:23 120:1
130:8
pulled 44:13
75:20 103:8,13
104:13 106:14
106:16,22,24
107:15 108:4,7
108:17,20
109:7 112:2,3
119:2 120:12
120:19,20,24
120:25 129:3,9
130:9
pulling 109:4
120:4 121:4

pulse 71:3
purpose 42:20
42:24 73:18,20
76:25 77:3,5,7
push 133:6,20
133:23 136:23
137:4,14
138:11
pushed 132:23
133:9 137:19
138:14
put 5:13 17:21
24:6 34:13
57:16 59:20
68:23 69:3
70:25 80:11
88:5 104:21
106:9 107:18
107:22 118:10
120:17 129:5
130:8,21 142:2
146:3

**Q**

quality 43:2
question 19:10
20:10,19,25
22:19,24 23:3
28:6,9 31:21
33:11 47:3
50:18 54:23
56:15 59:13
62:19 66:5,6
66:15 70:2
74:18 76:20
78:4 88:4,6,8
88:16 89:24
91:7,17 99:15
104:2 105:21
124:14,16
136:8,15 140:1
142:17 143:5,6
145:3,16
146:14,21

147:11,12,17
147:17 149:7,7
questioning
147:21
questionnaire
19:11
questions 14:18
45:22 49:4
50:5 113:3
116:15,23,24
117:1,2 121:10
138:15 139:11
quick 82:21
90:17
quickly 83:1,2
quiet 49:14
110:15
quieted 110:9
quit 71:22 72:13
quite 8:20 12:12
32:1 39:11,15
70:23

**R**

R 2:1
R-Y-U 9:16
radio 71:10
131:22 132:10
134:5
rage 51:15
random 89:22
range 13:24
32:23
rank 4:6,9 7:9
ranking 7:7,13
7:14
rapidly 61:11
rare 81:16
Raton 16:5
re-clarify 3:21
reach 40:18 41:3
54:7 83:24
reached 40:25
44:13,14

reaching 44:11 54:2,4,6,9 118:11
react 110:17,18
reaction 63:19 66:8,9 69:22 70:3,6 86:4 111:9
read 19:4 36:6 42:18,18,22 43:4 45:15 49:11,20 55:19 62:14 74:4 76:15 77:1,21 79:6 85:24 93:24 96:10 97:4 99:25 141:12,21,24 142:14,22,22 150:1
reading 43:10 44:3 51:17
ready 80:5 106:15
realize 10:15
realized 70:20
really 8:22 15:13 27:24 36:19 38:2 61:15 75:25 87:15,18 148:8
rear 78:1
rearmed 106:19
reason 14:23 24:12 43:22 47:23 122:23 125:7 138:2,4
reasonable 86:3 94:23
reassess 86:4
reassuring 49:22
rec 17:1
recall 18:21

24:20 27:13,19 28:6 29:3,18 34:19 35:16 48:14 55:18 60:21,22 81:6 93:23 103:5 109:17 117:2 139:25
recalled 64:5
received 32:5
recess 49:1 90:20 113:2 116:18
recognition 42:25
recognize 112:9 112:12,23 134:9,17 135:12 137:8 137:10
recollection 15:22 22:15 24:17,24 28:13 54:19,21,25 104:3 109:4,16
recommend 34:13
recommended 93:5
record 24:3 62:22 89:21 91:12 92:5 99:10 101:7 121:25 125:1 135:3,5 142:21 146:9 151:10
records 18:16 28:15 115:2
recovery 70:25
REDIRECT 139:12
Redirect-Exa... 2:15
reduce 34:2

81:19 84:22 85:17
reduces 92:23
reenergizing 120:6
refer 49:7 56:21 91:25
reference 25:22
referred 57:17
referring 20:23 27:9 31:1 56:4 57:13,18 78:19
refresher 29:14
regarding 20:25 21:4
regardless 68:3 144:11
relate 21:17 50:6 51:14
related 72:21
relating 21:22 23:3 149:10
relation 63:16 78:12
relations 27:12
relationship 118:13
relative 151:12 151:14
relay 55:15
released 91:23
relevant 76:6
remained 42:3
remember 16:11 16:11 19:1 26:3 27:18 30:19 46:19 48:15 52:17 55:6,7 72:15 103:4 117:1,3 117:21 118:1 121:14 125:2 125:25 126:2 126:23 127:11

127:16 128:22 133:13 137:13
remembers 141:13
remove 80:23
reorient 132:4
repeat 31:21 50:5 70:2 146:14
repeated 45:5
rephrase 52:12
replow 146:7
report 56:11 131:22 132:2 151:9
REPORTER 1:22 90:17 143:14 150:2,4 151:1
REPORTING 1:19,25
REPRESENT... 1:6
representing 105:23 142:20
request 75:15
required 36:9 36:13,24
rescue 48:3,3 75:20 117:14 117:17,20 137:22 138:5
research 34:11
researched 38:19
residence 117:8 117:10 135:15
resistance 77:8
resistence 86:5
resisting 67:2,21
respect 49:23 50:6 122:8
responding 45:1
response 43:8

49:5 51:7 71:16,17 75:14 78:4 99:1 147:20 149:6 149:10
responses 71:19
restless 38:9
restrain 68:15
resulting 94:24
retreat 120:25 122:22
retreating 121:2 121:3 147:22
reviewing 18:16
revive 72:12 73:2
rewound 133:5
ribs 78:24
ride 64:17
rides 65:2 95:10
right 3:16,19 6:7 7:5 14:14 19:20 21:21 36:10 38:1,12 38:12 64:15 67:9 70:23,24 71:6,11 81:16 83:13,13,21 84:9,10,11 98:17 106:19 107:14 111:21 116:12 122:23 124:19,20 130:14 134:19 136:21,22 137:17 142:18 144:17,22
right-hand 85:20 137:25
rights 43:3,24 44:2,3
risk 68:24 81:19 84:22 85:18 92:24

**Rivera** 15:18
**road** 2:9 4:14
13:3 132:15
**Rockford** 16:24
20:6
**role** 32:13
**roll** 4:13
**room** 37:12,17
37:20 41:12,13
41:14,15,19
42:3 50:19,23
51:22 52:2,7
53:14,21 60:17
63:25 73:2
82:24 84:3
96:18 129:19
139:17 142:8
144:9,22
**round** 112:15
**rounded** 11:17
**rounds** 9:18
32:12
**Rozelle** 2:7,14
10:9,14 18:23
19:15 20:14
22:13,16 23:8
25:5,9 26:14
26:21 27:15,21
28:19 31:18
32:7 33:8,16
35:5,8,11
36:25 39:18,24
40:9,20 41:8
42:5 45:2,9
47:17 48:19,23
51:23 52:9
53:6,15 55:21
55:24 56:2,11
56:13 58:1,9
58:16,22 59:10
60:2 61:24
62:1,5,9,12,17
64:6 65:8 66:4
66:11 67:15

68:7,16 69:8
69:24 76:8,10
76:13 79:14
84:6 85:5
86:13,22 88:7
88:14,20 89:3
89:11,15,19
90:1,6,8,13,19
91:2,11 92:5,8
92:12 93:11
94:1 95:21
97:18 98:11,13
98:15,18,21,25
99:3,8,19
100:6,13,19
101:7 103:1
105:7,15,20,23
106:4 107:17
108:18 109:22
110:12 111:14
112:19 116:12
116:20,21
124:15,17
131:18 132:7
132:18,22
133:8,22
134:21,25
135:6 136:16
137:6,16,18
138:13 139:10
139:21 140:6
140:11,13,20
140:24 141:2,7
141:10 142:13
142:19 143:1,6
144:14,18,25
145:24 146:3
148:10,15
149:2,4,12
150:1,5
**Rozelle's** 147:21
**rub** 71:13
**ruler** 123:5
**run** 5:8 6:1

71:10 129:7
**running** 32:23
**runs** 129:11
**Rural** 15:19
**Ryu** 9:4

---
**S**

**S** 2:1,17
**safe** 13:9 104:22
105:5,12 106:3
106:9 107:18
107:22 117:15
117:16 145:13
**saliva** 64:22
**sat** 44:22,22
60:22 142:9
146:25 147:5
**save** 90:14
**saw** 37:18 38:5
47:15 57:12
58:19 70:22
120:16
**saying** 36:21
51:11 52:9
81:13 106:4
125:19
**says** 20:11,25
21:7 24:8,15
24:23 25:3
27:8 66:15
77:15 79:4
84:22 85:21
90:8 91:22
92:22 93:3
94:19 96:9
102:7 103:7
104:13,21
105:16 107:14
130:5,7 135:18
136:12,21
140:21,23
141:3,11,13
142:21
**scene** 36:7 37:7

54:14 68:11,25
117:7,8,16
133:17 137:8
138:5 144:4
**schedule** 5:7
**school** 5:8,9,19
6:2,8 11:23
14:20 15:11
16:20,22 18:2
19:24 26:4
28:2 114:21
115:10,24
**schools** 9:7
16:24 17:17
18:8 20:2
21:11,22
**scope** 139:22
146:1,4
**scream** 36:20
57:24 58:6
**screaming** 36:19
37:4 45:20
57:18 72:7,8
110:2 118:20
118:22 126:15
129:16 130:20
134:3,18
**screams** 45:22
**screen** 33:2,4
137:25
**Seagal** 9:13
**searches** 13:25
**seated** 64:1,25
68:14
**second** 7:10 8:12
43:18,19 65:22
66:4,17 76:13
78:9 90:9 94:1
95:8,10 96:2
105:14 106:24
107:16 108:3,8
108:14 115:19
120:1,5 124:11
124:22,25

125:4,10,12,15
126:4 127:15
127:25 129:1,7
147:5
**second-level**
8:13
**seconds** 64:17
70:11 86:1,2
95:9,9,11
103:8,10,12
104:14,15,20
105:10,11,12
106:3,11,17,25
107:2,5,7,12
107:20,22
108:4,7,16,17
108:21 109:2,5
109:6,10,12,15
125:1 126:22
127:1 132:23
**section** 43:17
49:10,20 76:6
77:11,19 85:20
94:6
**secure** 68:12
**secured** 65:21
**security** 12:7,8
12:11,14
**see** 19:4 41:2
44:12,16 51:20
65:23 66:19
82:3 84:20,23
85:3,10,18,19
89:6 93:1,7
95:12 97:1
101:14 102:8
102:18 121:18
121:20 123:23
125:7,9 129:20
132:4 135:18
135:19 137:11
137:24
**seeing** 36:16
41:4 98:22

seeking 43:15
seen 7:21 38:20
    38:21 62:24
    100:24 101:1
    101:22 131:4
    131:13,19
sees 45:12
segment 133:24
seizure 37:10
    38:25 39:1,12
    39:12 55:5
    59:15,17
seizures 38:20
selective 89:22
self-defense 9:13
self-sponsored
    15:25
sell 17:6,7
selling 17:6
sending 120:8
sense 78:10
    106:9
sentence 77:14
    94:10 142:2
separate 29:6
    86:8 91:13
separated 101:8
September 4:5
    4:22 10:1
    25:14 28:11
    102:7
sequence 133:14
sergeant 18:12
    31:8 53:3
    68:10 69:11
    71:3,12 125:21
    129:24 130:3,7
    130:12 134:1,4
    138:24 139:1
    144:5
Sergeant's
    134:13
serial 102:1
serious 81:19

service 43:2
    117:12
set 32:25 132:16
    135:24 136:20
setbacks 21:3
seven 82:13
sexual 27:9,11
shaded 84:19,25
    85:8,13
shady 21:12
shaking 63:3
sheet 25:1
sheriff 1:11,13
    16:13 45:13
    99:1 116:22
sheriff's 2:8 4:4
    4:7,12 11:20
    12:24 13:20
    15:7,17 16:1
    19:6 20:17
    22:10,25 23:4
    28:12,23,25
    29:15 32:6,19
    33:7 35:18
    42:16 90:5,12
    91:10 98:24
    101:25
shift 5:22,23
    55:11 134:14
Shinai 9:17
shins 131:5
shock 131:14
shoot 74:8
shooting 32:24
    37:13
short 12:4 48:24
    50:5 65:18
    116:14 123:12
    123:18 125:4
    126:6 127:7
shortest 86:2
shortly 5:21
    118:23
shorts 112:12

shot 135:11
    144:10
shots 92:23 93:6
show 46:13 89:7
    132:5
showing 49:23
    62:21
shown 121:19
shows 126:4
shuffle 63:23
shuffling 61:13
    64:4
shuffling-type
    61:18
sic 26:15
side 54:2,4,12
    63:18 71:2
    102:16 103:6
    137:25 143:25
sideways 52:6
    82:3
sign 134:11,13
signed 17:23
significance
    131:9,10
significant
    122:7
simple 146:14
simply 44:3
    99:15 145:16
simulator 33:1
single 43:7
    140:24
sir 5:6 49:9
    65:14 74:1
    89:15 99:15
    139:10 140:3
    141:22 142:19
    143:2 146:2
    148:22
sirens 49:13
sit 41:3 44:20,21
    47:6 53:25
    60:11,19 68:1

123:15
sit-ups 54:9
site 122:19
sitting 55:3
    60:13 65:13
    74:19 89:1
    123:25 145:8
situation 49:12
    49:19 96:16
situations 77:8
six 13:1 17:14
    29:11 82:14
    123:5
skill 6:19,23
    8:10
skills 8:18 9:3
    10:4,24
skip 133:19
skipped 66:15
skipping 107:18
    142:14
skips 62:15
slowly 50:4
small 52:16
    83:23
Smashing 30:6
snatched 16:2
snatching 16:14
softly 51:18
sold 17:19 20:11
    20:20 21:11
solely 96:12
somebody 33:2
    33:19 34:22
    48:4 54:7
    58:19 62:25
    65:20 68:25
    71:1 74:8
    75:19 86:18
    87:4,5 111:6
    123:20 148:5
somewhat 34:24
    42:11,17
    122:22

son 30:5
soon 69:1
    126:10
sorry 3:20 10:9
    14:12 15:10
    27:7 55:21
    75:5 76:8
    102:13 137:10
    137:19 140:11
    143:14
sort 10:24 32:3
    48:15 87:12
    88:2 89:22
    131:5 146:10
sound 58:4,7
    138:21
sounded 147:13
sounds 57:13
    134:18 147:16
south 17:19
    37:24
space 49:16
speak 50:4 57:2
    123:19
speakers 132:13
    138:20
speaking 36:14
    107:24
special 8:7,7
    10:17,19,23
    11:12,13
specific 48:17,21
specifically 46:1
speech 39:22
spell 8:3 9:15
spending 9:2
Spit 64:23
spoke 37:7
    51:18,18
spoken 49:22
spot 16:4 74:2
spread 82:12,14
    82:14 123:6
squad 13:6

134:13
**ST** 2:5
**stage** 67:4
117:19
**staging** 117:9
**stairs** 61:9 112:4
112:5
**stand** 52:18
60:15,23 61:1
66:21,23 67:13
67:23,24 70:17
79:20 80:16,18
81:11 107:6,8
107:9 110:21
111:12 124:8
128:19
**standard** 34:4
116:24
**Standards** 2:21
99:16,17
**standing** 33:19
41:17 55:4
61:15 74:20
80:8
**staring** 51:9
104:8
**start** 5:11,19
28:10 42:19
67:8 68:22
118:22 125:13
132:9 133:19
136:24
**started** 9:4,10
57:2 71:25
80:11 82:2
94:10 97:24
104:8 118:23
124:2,8
**starting** 44:12
**starts** 65:16,17
66:20
**state** 1:24 45:14
59:9,23 63:11
64:16 72:12

87:10 132:15
151:4,20
**stated** 60:5
66:16
**statement** 55:20
55:22 65:23
93:25 140:1
147:11,13,16
**states** 1:1 22:10
23:1 43:18
56:22 81:16
**stay** 15:7 33:25
44:24 61:4,6
65:14 67:1,21
68:2 82:19
98:1 104:10
107:24 124:5
125:17,21
126:12 128:13
142:11
**stenographer**
151:7
**stenographica...**
151:8
**step** 61:18,19,20
63:7 74:17,21
74:25 75:1,3
82:16
**stepped** 41:22
122:22
**stepping** 82:6
**steps** 49:12 61:9
61:13 63:23
64:4 104:12
120:18 147:14
**sternum** 71:13
**Steven** 9:13
**sticker** 140:15
**sticks** 9:17
**stint** 12:4
**stomach** 70:14
78:24 81:24
123:9
**stood** 41:23

44:24 74:14
104:7,8 142:9
**stop** 3:19 7:5
44:16 67:2,7
67:21 97:12
136:24,25
142:25
**stopped** 66:19
108:5
**stops** 12:15
**store** 14:5,6
**Storm** 51:12
**story** 51:2 60:9
**straight** 15:2
122:13,13,20
148:22
**street** 31:8 53:3
53:13 68:10
69:11 71:3,12
125:21 129:24
130:3,7,13
134:1,4 135:13
135:15 138:25
139:1 144:5
**stress** 50:12
**strike** 57:23
**striking** 7:2
**strong** 87:4,8,9
87:10,13,16,18
87:20
**struggled** 87:19
87:20
**struggling** 130:3
**stuck** 21:13
99:11
**student** 101:1,5
101:6,10,12
**students** 17:8
**studied** 9:12,14
9:16
**stuff** 13:25
16:19 17:25
30:5 48:2
54:15 82:25

142:14
**stun** 99:18
**subject** 49:8,15
49:16,21,24,24
50:3,8 73:20
77:15 86:7
88:24 96:12
**subject's** 77:25
78:1 86:4
**subsection** 49:7
49:10 77:21
79:6
**subsequent**
120:2,5
**suburb** 11:24
**successful** 15:5
130:13
**sudden** 67:8
127:25
**sufficient** 44:5
**suggest** 140:23
**suggesting**
140:24
**suggestion** 53:20
**suit** 32:11
**summarize** 9:3
**summoned**
46:13 47:23
**supervisor** 31:7
31:9
**SUPERVISO...**
1:10
**supplement** 56:7
56:11,19
101:25
**supposed** 21:14
123:2
**sure** 3:13 5:3
9:15 16:12
22:21 26:5
34:18 39:8,8
46:18 48:25
54:7 73:17
75:4 85:13

87:17 88:23
90:19 96:21
99:3 116:16
117:16 124:18
127:21 132:24
134:8 137:21
138:10 139:4
146:15
**suspect** 96:14
97:6
**suspects** 43:14
**sweating** 126:19
131:4,4,13
**sweaty** 131:2
149:1,8
**switch** 102:23
102:23 106:15
**sword** 9:17,17
**sworn** 3:3
**symptom** 39:23
**symptoms** 38:16
38:17,23 39:17
59:5 149:19
**synced** 135:25
**system** 7:7
**systems** 7:16
8:16

---

**T**

**T** 2:2,17
**T-A-N-G-S-A-...**
9:8
**tab** 94:6
**table** 142:7
**tactical** 131:8
**tactically** 148:7
**tactics** 7:23
13:19 25:3,17
113:23
**Taekwondo**
6:13,25 7:1,4
7:14 9:10
**take** 3:8 4:21
8:24 14:13

16:18 21:14
30:9 42:12
43:23 49:12,18
61:17 70:8
74:21 86:18
90:2,17,19
94:5,17 97:6
97:22 100:19
101:24 107:8
112:7,14 113:1
116:14 121:17
121:18 126:2
146:10
**takeaways** 11:2
**taken** 49:1 90:20
105:17 112:9
113:2 116:18
**talk** 30:6 37:5
42:9 51:12
55:13 65:14
73:14,16
**talked** 21:6 27:7
55:16 138:5,9
**talking** 10:10
13:20 20:5,15
21:15 36:23
37:3 45:21
48:14 55:12
102:13 103:18
124:19 133:14
**talks** 25:1
**TAMPA** 1:3
**Tangsado** 9:8
**target** 32:25
77:24 78:1
82:8 84:23
93:16
**targeting** 81:18
93:4
**Tase** 32:14,14
32:25 33:1,20
33:21,23,24
34:1,2 65:12
67:7 74:2

109:18 123:16
**Tased** 65:1 66:3
66:16,18 75:1
80:10,15,17
104:1,18,19
105:2 123:20
**taser** 28:16,16
28:24 29:7,9
29:21 30:1,9
30:21 32:1
33:5 34:10,20
41:21 42:4
62:6,13 63:7
63:12,15,20
65:17 68:4
69:23 70:3
73:18,23 74:16
80:23 81:10,13
82:18 86:12
87:6 89:9 91:9
93:4 94:11,14
97:24 102:1,8
102:11,22,22
102:25 103:24
104:16,21
106:3,10,13
107:10,15
108:24 110:24
111:1,6,13
112:2,17
118:25 119:2,3
119:5,8 120:11
121:23 122:10
122:13,15,16
122:21,22
123:8,10,22
124:10,12
125:15,23
126:6,11,21,25
127:9,18
128:25 129:25
130:8 136:6,10
148:1,8
**Tasered** 29:10

80:13 97:16
**Tasering** 79:20
107:5,12 110:5
**Taserings** 34:23
110:17 111:9
111:18
**Tasers** 29:15
31:17,23 32:18
33:4 66:9
73:16 81:23
**Tasing** 67:10
69:18 97:10,22
**Tasings** 95:7
110:9
**taught** 6:10
10:17 11:13
13:11 17:1
32:1 33:6,14
33:15 35:3
46:21 100:2,2
100:24
**teach** 6:24 8:11
11:12,14,14,15
13:16 93:9
100:23 101:3
**teaching** 31:17
34:20 94:19
96:7 97:1
**team** 13:6 46:13
46:16
**technically** 24:4
28:4
**Teeth** 57:8
**telephone** 23:18
23:19
**tell** 5:2 6:8,18
10:3 16:7
19:12 25:13,15
25:16 29:25
31:16,22 32:21
36:12 41:12
51:2 54:16,18
54:19,22,24
55:16 56:15

59:14 72:18
75:18 93:20
100:11,16
103:21 109:1
112:1,14 114:7
115:23 129:20
131:9 133:9
135:11
**telling** 9:2 39:7
46:20 67:4
80:7 104:9
**tells** 122:9
**ten** 16:3 17:2
59:17
**Tense** 110:19
**tensed** 63:21
70:5
**tenth** 7:15
**tenure** 33:6
**terminology**
39:5
**terrible** 27:4
**territory** 146:7
**testified** 3:4 21:5
21:18 60:10
78:3 100:14
107:9 110:8
117:25 144:16
**testify** 141:12
145:1
**testimony** 52:11
105:17 106:1
117:3,21 118:1
119:9 121:12
121:15 125:2
125:25 126:23
127:15 139:7
139:15 142:20
144:19 149:3
151:11
**tests** 32:2 85:25
**thank** 91:18
101:16 112:1
112:25 116:11

116:16
**thigh** 73:25 74:3
**thing** 10:7 12:14
15:9 33:3
36:17 51:17
61:12 87:21
88:11 89:19,20
105:22 111:5,5
124:19 125:11
125:17,20,20
128:13 131:5
140:9,25
141:24 142:21
145:13 149:9
**things** 7:16 9:24
10:21 13:9
34:12,13,21
36:21 51:19
52:5 61:7,11
68:24 79:19
86:25 114:16
**think** 5:12 15:1
15:1,12 16:3
17:12 22:5
34:10,23,24
35:1 37:11
45:8 46:19
47:2 48:12
51:21 55:3
62:11,15 63:14
64:21 67:7,13
71:7,9,13 73:3
73:5,10 74:8
75:6,19,19
76:1,10 82:14
100:21 102:16
116:13 121:17
129:18,23
130:10 135:24
136:2,10
137:22
**thinking** 28:1
45:25 50:17
**thinks** 136:11,13

**third** 7:10,12
52:25 108:1,10
125:24 126:6
126:14 127:1
144:6 145:19
**thought** 26:21
28:8 47:2
60:18 71:4,7
95:25 110:8
144:11 145:19
148:25
**thoughtful**
95:12
**thrashing** 69:20
72:8,8 129:23
**threat** 96:14
**threaten** 50:10
**threatening** 48:8
**three** 13:23 29:6
48:21 63:8,9
63:12,13,14
64:18 69:5
70:8 82:15
88:19 91:13
95:9 96:1
105:5,13
106:17 107:2
108:4 123:7,8
125:1 138:9
139:20 140:2
145:25
**three-minute**
105:24
**three-second**
65:2
**throat** 34:23
**throwing** 30:5
**Thursdays** 5:25
**time** 1:18 3:14
4:19 5:7 9:8
13:12 16:18
18:5 19:25
24:10 26:4
29:13 30:2,4

31:4,6 32:1
35:4 36:17
39:15 40:14,17
41:6,19 46:19
46:23 47:8
48:23 49:1,18
52:20 61:3,4
65:18 66:2,17
66:18 67:6,10
71:21,25 72:9
75:12 80:24
86:16 87:1,11
90:15,20 91:4
95:13 97:12,15
97:25 98:5,9
98:21 100:19
102:24 103:5
103:11,14
104:9,18 105:3
106:22,24
108:1,10 109:2
110:7,15 113:2
114:14,15
116:18 119:1,2
119:23 120:1,2
120:5,12 121:1
121:9 122:15
125:12,12,15
125:24 126:21
126:25 127:1,1
127:3,7,10,14
127:18,24
130:21 131:16
132:21 133:7
133:21 135:4
135:22 136:5
136:10,21
137:3,5,15
138:12 143:11
143:21 146:24
147:5 150:6
**timeframe** 59:20
111:18
**times** 21:1 29:11

29:11,12 34:2
36:11 38:3
39:12 40:24
60:5 61:2 66:3
68:3 80:17
103:12,21
106:11 123:20
139:20,24
140:1,2 145:25
**timing** 70:12
**Tobeck** 93:19
**today** 3:8,14
9:25 121:19
127:16 133:15
**told** 41:2 48:11
52:1 54:20,21
55:6 59:5 71:7
76:4 116:13
139:19
**tongue** 39:13
**tool** 97:1
**top** 30:10 36:6
56:20 82:4
92:15,22 93:25
94:9,19 97:2
112:5
**torso** 77:25
78:11,13,19,21
79:2 82:11
**totally** 105:16
105:21 144:18
145:25
**touch** 40:17 41:7
83:22
**touched** 131:9
144:17
**touching** 118:9
118:15
**town** 14:20
**traffic** 12:15
71:10 131:22
132:10,14
**train** 10:22
**trained** 10:15

11:11 31:24
**trainer** 12:8
13:4
**training** 10:11
10:12 11:8,9
12:10 28:15,16
28:24 29:2,4,7
29:9,10 31:1
31:17,23,24,25
32:5,18 33:4
33:12 34:4,15
38:22 42:9
73:22 87:14
91:9 99:17
114:10,16
115:20 128:24
**transcript**
142:18 151:10
**tried** 30:7 51:19
71:9 72:12
111:12,22
**trigger** 103:7
104:13 106:14
106:16,24
108:7 109:7
111:4 119:2,13
119:23 120:1,5
120:12,19,20
120:24,25
121:5 129:4,9
**true** 96:15
151:10
**try** 30:6 36:15
49:22 55:14
60:17 66:19,21
67:22 68:5,12
74:8 127:8
128:5 133:2
140:3 142:4,6
**trying** 5:12 18:9
24:2 39:6
50:21 51:2,5
51:13 58:12
66:23 67:13,18

71:14,15 75:22
86:17 88:18
96:19,20,20,22
98:3 103:18
104:17 107:6
107:24 123:16
127:23 128:19
144:21 145:17
148:2
**turn** 50:17 56:9
74:1 102:23
122:16 148:6
148:22
**turned** 27:11
28:3 65:13
67:9 71:2 82:3
97:24 107:23
129:4
**turning** 93:21
94:13 148:13
148:14,18,19
**Twenty-one**
55:22
**twice** 74:20
**twist** 71:13
**two** 4:14 13:4
15:3 32:11
61:2,8 64:17
66:2 74:17,21
74:25 75:3,4
79:19 85:1
87:12,12,21,22
95:8 103:8,12
103:20,21
104:6,13,14,20
106:11 112:15
119:13 120:18
121:22 147:14
**two-or** 65:2
**two-second**
105:1
**two-year** 4:19
**Tyndall** 12:5,21
**type** 9:13 12:14

71:19 120:22
131:15
**types** 32:22 44:3
**typical** 39:17,23
**typically** 7:22
32:2 68:25
82:4 119:20

---

**U**

**U-E-C-H-I** 9:15
**Uechi-ryu** 9:14
**UFC** 7:21
**Uh** 56:22
**Uh-huh** 65:4
92:17 93:8
94:12
**ULMERTON**
2:9
**ultimately** 63:24
74:20
**unclear** 26:10
**understand** 3:18
3:20,22 11:18
22:19 33:11
42:20 44:2,9
67:12 74:18
99:4 109:5
119:9 123:12
125:23 136:7
139:15 140:17
147:10
**understanding**
44:6,19 48:7
67:5 78:20
87:23 88:2,4
98:4 128:25
**understands**
43:25 67:3
132:17
**understood** 44:5
53:20 60:1,6
88:13,17,23
145:23 146:17
146:22,23

**underwear**
37:25 130:25
**uniform** 45:12
**uninvolved**
43:15
**UNITED** 1:1
**University** 25:23
26:6,7,24
**upper** 84:18
**upset** 16:13
**upstairs** 37:14
37:15
**use** 18:20 19:5
29:20 30:11
31:17,23 32:2
32:17 33:5,12
33:14 40:19
77:7 78:4
84:23 86:2
99:17 132:16
135:1
**uses** 77:20
**usually** 7:10
17:6 55:14
62:25 121:23

---

**V**

**V** 1:6
**vehicle** 137:8,10
137:11,17,21
137:24
**vent** 50:7
**venture** 16:21
**verbal** 65:25
66:1 71:20,20
127:4,6 128:11
**verbalizations**
126:14
**verbalize** 46:3
**verbally** 40:12
45:18
**version** 91:22
**versus** 111:6
**vet** 51:11

**veteran** 59:2
**vicinity** 52:18,22
52:23 53:4,13
**victims** 43:14
**video** 32:2
135:13
**violated** 43:24
**violence** 49:17
**visible** 144:17
145:4,10
**voice** 49:22
134:7,8
**VS** 1:9

---

**W**

**wait** 68:25 95:11
140:19 141:19
142:12 143:9
**waiting** 65:20
125:21 144:3
**walk** 148:5,6
**walked** 37:20
118:5 124:24
**walking** 61:14
83:3,5,6 84:2,4
84:13
**wall** 41:1 44:14
54:2,5,12
64:13,25 65:6
69:4 84:11
111:11 130:8
**Walton** 113:11
**want** 6:20 8:21
22:19 27:5
33:20,21,22,23
33:24,25 34:1
34:1,2,12
37:21 42:22
43:4,6 51:1
54:18,24 58:4
65:3 67:22,24
74:8 76:3,15
89:20,21 90:2
99:3 100:7,17

117:14 119:7
120:9 123:21
124:6 132:3
135:1 136:25
136:25 141:3
141:11 142:6
142:13 143:11
143:15,18
144:9 146:6,7
**wanted** 16:17
18:10 44:21,24
52:1 53:21
54:3 61:3,4
89:7 110:20
139:16 140:3
142:4,12 143:9
**wants** 67:25
**warning** 81:15
**Warnings** 81:10
**wasn't** 18:10
37:3 40:7
47:15 56:24
57:11 59:25
63:3 64:23
67:9,10 68:14
71:6 95:24
97:23 98:18,23
98:25 99:2
101:12 104:22
106:10 117:15
122:20 123:15
126:18,19
131:12,12,12
145:23 146:17
146:20
**water** 33:21
34:22
**watts** 120:9
**way** 3:21 8:25
14:19 18:10
40:18 46:21,25
47:2 57:25
60:1 69:16
71:6 72:21

73:4 81:13
83:14,17 93:18
95:6 104:24
111:20 122:17
129:5
**we're** 21:15
80:18 95:17
**we've** 32:22
42:17 52:10
56:13 116:13
133:14 143:1
**weapon** 77:20
77:22 79:8
81:12 84:2
**weapons** 77:12
77:17 82:24
**wearing** 112:12
**Wednesdays**
5:25
**weeks** 15:3
**weird** 61:23
62:3
**welcome** 132:6
**went** 9:11 13:5
21:12 26:7
40:23 41:13
48:6 51:10
52:6 53:10,24
54:14 59:5,9
75:12,24 76:4
87:17,18 97:24
101:12 109:15
110:1 112:3
126:11,11
127:22,23
131:7 138:10
**weren't** 36:23
50:16 73:2
78:5 131:1,1
149:1
**West** 16:16 18:3
**white** 7:7 84:19
84:25 85:8
**wife** 18:12 37:5

48:14 59:14 75:24
wife's 24:1
willing 75:25
wire 119:14
wires 81:5 119:17
wiser 28:1
withdrew 24:23 24:24
witness 52:11 58:6 89:15 91:16 106:6 132:5 140:22 146:5 151:11
witnesses 43:14 105:17 131:20
woman 6:10 33:23
women 11:15
word 44:10
words 6:22 11:3 45:5 46:25 142:15
work 4:6 12:3 12:21,25 14:2 14:15 72:19
worked 4:3,11 14:3 15:1,1 73:3
working 5:24 67:6 71:25 97:13
works 18:9,11 128:25 136:21
world 14:15
worrying 38:2
worth 14:7 114:17
wouldn't 47:10 101:5 110:21
wounds 36:16
wrestling 7:21
wrists 130:14

wrong 27:5 36:18 51:3,6 124:15 143:4

**X**

X 2:12,17
X26 28:16 89:10

**Y**

ya 65:25 66:9,22 67:13 79:21 142:10
ya' 57:15,16
year 4:15 6:6 7:10 12:22 15:15 27:3 29:10,17 30:3 31:10
years 4:5,14 6:16,17 7:3 8:24 9:5,20 12:2 13:1,4 16:23,25 17:2 17:13,14 25:20 27:4,5 34:6,7 48:21 91:24 138:9
yell 65:17 67:22 67:24 80:13 125:13 126:18
yelled 57:14 65:25
yelling 66:9,22 67:13 79:21 80:12 98:2 110:3,6,10 124:3 126:15 126:17 128:10 138:22,23 142:10
yellow 94:6 140:15
you-all 68:5 70:17 72:2

74:10 109:20

**Z**

zombie 61:23 62:4 63:11
zone 49:23 77:24 78:1

**0**

000 132:20 133:5
001031 132:1
002226 92:6
002237 94:18
002254 96:6
002255 97:1
01:11 108:5
0222 90:7
03 15:19,22
04 15:19,19,20 15:20,23
04:08:38 135:19 136:23 137:4
04:08:45 137:7,9 137:14
04:08:58 137:19 137:24 138:11
04:09:46 138:14
05 30:19

**1**

1 36:6 56:8,9,18 81:15 85:17 93:25 94:2,5 102:17 119:15 119:16 140:13
1/4 119:16
1:18 133:20
1:30 133:23
10:00 14:25
10750 2:9
11 133:9
11:00 5:24
116 2:14
12 82:13

12-26-2021 151:22
12:37 116:12
12th 10:1
13 96:6
13-10 42:10 49:4 76:8
13-3 76:8,9,10
13.3 76:5
139 2:15
14 97:1 101:18 102:6 124:25 125:24 126:2 126:22 127:14 136:5
15 86:1 101:25
15:58 103:15
15:58:05 102:8 102:10 103:23
155298 151:21
16 4:23
16:01:04 103:7 104:11 106:22
16:01:06 104:21 106:9
16:01:07 106:12 106:19
16:01:08 106:16 106:25 108:5
16:01:11 107:18
16:01:16 107:14 107:15 108:2 108:13
16:01:17 106:10 108:13
16:01:34 108:16 109:11
16:01:39 109:11
16:02:37 109:7 109:20
16:04 103:24
160 15:1
17 28:2,3,4 108:16

17-year-old 27:12
17th 22:9
18 27:10,11 28:3 28:5 91:22 116:25 117:5
181 105:10,11 105:12 106:3 106:10
18TH 1:17
19 5:10,17 115:3
1911 145:8
1990 43:4 113:16
1991 7:19 113:18
1994 19:5
1999 21:8 22:3

**2**

2 35:23 36:5 84:17 85:17 116:24
2:37 109:13
20 7:3 38:20 86:25 94:18
2003 23:3
2004 14:17 101:13
2005-ish 30:4
2008 101:6
2009 28:17,22
2010 19:25
2011 91:21,23 114:7
2013 24:15,22
2014 20:1 21:2,4 22:9 23:4 24:7 24:13 28:11
2015 11:21,21
2015-ish 5:13
2016 25:14,15 29:18 35:3 102:8

Gregory Goepfert
July 18, 2019

| | | |
|---|---|---|
| **2017** 6:5 15:12 | **4** | **98** 2:21 14:17 |
| **2019** 1:17 | **4** 49:20 76:11 | |
| 151:17 | **4:00** 103:11,11 | |
| **203** 2:4 | 136:12 | |
| **21** 56:6,11,19 | **4:08** 135:25 | |
| 112:7 119:17 | **449** 2:4 | |
| 121:18,18,20 | **45** 70:11 86:1 | |
| 122:8 | | |
| **2158** 90:5 | **5** | |
| **22** 132:1 135:8 | **5** 55:20 56:9 | |
| 135:10 | 81:7,8 | |
| **2202** 90:7 | **50** 10:1 | |
| **22nd** 4:5 28:11 | **500** 1:20 | |
| **23** 131:21,23 | **54** 132:2 | |
| 132:9,19 133:6 | **55** 103:11 | |
| 134:20 | **58** 109:12,15 | |
| **23rd** 28:17 | **58-second** | |
| **29** 23:3 | 127:10 | |
| | | |
| **3** | **6** | |
| **3** 2:13 42:12 | **6** 49:7 50:2 | |
| 49:10 | 56:18 77:11 | |
| **3/4** 119:16 | 140:12 | |
| **3:00** 1:18 5:24 | **6:00** 14:24,24 | |
| 150:7 | **60** 132:15 | |
| **3:58** 136:12 | | |
| **3:58:05** 102:10 | **7** | |
| 102:21 | **7** 21:2,7 50:9 | |
| **3:59** 136:13 | 61:23 93:24 | |
| **30** 90:8 | 94:3,7 | |
| **300,000** 21:3 | **73** 10:3 | |
| **3000** 1:20 | **7th** 102:7 | |
| **30th** 151:17 | | |
| **31** 2:20 90:24 | **8** | |
| 91:2,3,4,12 | **8** 56:3 | |
| 94:17 96:7 | **8:18-CV-2116...** | |
| 99:10 | 1:4 | |
| **32** 2:21 98:8,9 | **80** 134:11 | |
| 99:10 100:6 | **8A** 56:1 | |
| 101:9 | | |
| **33701** 2:5 | **9** | |
| **33759** 1:21 | **9** 92:1,2 93:1 | |
| **33778** 2:10 | **9's** 92:8 | |
| | **9:00** 1:18 | |
| | **91** 2:20 | |

EXHIBIT
3 1
GOGGFERT.
PENGAD 800-631-6989



# TASER

### P r o t e c t  L i f e

Instructor Certification Course * TASER® X26™ Electronic Control Device

Version 18 Released July, 2011

TASER TRAINING ACADEMY

©1999-2011 TASER International Inc.



TASER: The Leader in On-Officer Video
45,000+ TASERCams Fielded

While the individual members of public safety agencies rely on our ECD technology, those agencies have come to rely on our tactical information systems to help ensure that their members are doing the job of protecting the public without abusing their power as well as to protect their members from false claims against them. The dataport that records the date and time of each trigger pull in a TASER ECD and the TASERCam have become invaluable resources to agencies to help them better manage their members to better protect the public. In fact, TASER International has become one of the market leaders in on-officer video with over 45,000 TASERCams in the field today.



# Cardiac

There have been numerous studies specifically studying the cardiac effects of TASER technology.

There have been numerous studies specifically studying the cardiac effects of TASER technology.

# Cardiac

- The TASER X26 did not electrically capture the human heart when used with probe deployment. These data are in agreement with 2 prior studies by these authors but are contrary to animal studies in which capture occurred.

*Dawes DM, Ho JD, Reardon RF, Miner JR. Echocardiographic evaluation of TASER X26 probe deployment into the chests of human volunteers. Am J Emerg Med. Jan 2010;28(1):49-55*

TASER TRAINING ACADEMY

Conclusions: In this study, a training instructor discharged a TASER X26 into the chests of 10 subjects from a distance of 7 ft so that a 5-second discharge could be administered through the probes as in field exposures. Limited echocardiography was performed before, during, and after discharge. In agreement with 2 prior studies by these authors, the TASER X26 did not electrically capture the human myocardium when used with probe deployment. These data are contrary to animal studies in which capture occurred.

PCSO 002223

# Cardiac

- Risk of an ECD application having a negative effect on a person's heart rate and/or rhythm is not zero

- The risk of an ECD causing cardiac arrest in humans from ventricular fibrillation is sufficiently remote that making accurate estimates is very difficult. Current estimates of the risk are on the order of 1 in 100,000 applications

TASER TRAINING ACADEMY

The risk of an ECD causing cardiac arrest in humans from ventricular fibrillation is not zero, but is sufficiently remote that making accurate estimates is very difficult. Current estimates of the risk are on the order of 1 in 100,000 applications.
*Sun H, Haemmerich D, Rahko PS, Webster JG. Estimating the probability that the Taser directly causes human ventricular fibrillation. J Med Eng Technol. Apr 2010;34(3):178-191*
This paper describes the first methodology and results for estimating the order of probability for a TASER ECD directly causing human ventricular fibrillation (VF). The probability of an X26 Taser causing human VF was estimated using: (1) current density near the human heart estimated by using 3D finite-element (FE) models; (2) prior data of the maximum dart-to-heart distances that caused VF in pigs; (3) minimum skin-to-heart distances measured in erect humans by echocardiography; and (4) dart landing distribution estimated from police reports. The estimated mean probability of human VF was 0.000006 for data from a pig with no resection when inserting a blunt probe.

One risk of applying electricity to a human is the direct induction of ventricular fibrillation (VF). In addition to electrically induced direct VF induction, other risks include, but are no limited to: cardiac capture/pacing for sufficiently long duration to deteriorate to VF and through sufficiently significant physiological or metabolic effects to negatively impact the heart.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

This document, and the entirety of its contents, is for discussion and demonstration purposes only. All numbers, references, and values in this document are nominal. Actual measurements on particular products, references, and/or analogies may vary as a result of many factors including, but not limited to, factors outside TASER International, Inc.'s (TASER's) control. Please refer to TASER published product specifications, manuals and product literature for additional information including specified limits, test conditions, and allowed tolerances. For more information please see current TASER Web site (www.taser.com). TASER reserves the right to change or modify this document without notice. TASER is a registered trademark of TASER International, Inc.
2 Stedman's Medical Dictionary, 26th Edition.
3 Ho JD, Dawes DM, Reardon RF, et al. Echocardiographic Evaluation of a TASER-X26 Application in the Ideal Human Cardiac Axis. Acad Emerg Med. Aug 10, 2008. Heart Rhythm 2008, 29th Annual Scientific Sessions, May 14-17, 2008, San Francisco, CA USA. Jeffrey D. Ho, MD, Donald M. Dawes, MD, Robert F. Reardon, MD, Anne L. Lapine, MD, Jeremy D. Olsen, MD, Benjamin J. Dolan, BA and James R. Miner, MD. Hennepin County Medical Center, Minneapolis, MN, Lompoc District Hospital, Lompoc, CA.
4 Sloane CM, Chan TC, Levine SD, Dunford JV, Neuman T, Vilke GM. Serum troponin I measurement of subjects exposed to the TASER X-26. J Emerg Med. 2008 Jul;35(1):29-32. Epub 2008 Mar 4.
5 Ho, JD, Dawes, DM, et al. Absence of Electrocardiographic Change Following Prolonged Application of a Conducted Electrical Weapon in Physically Exhausted Adults. Acad Emerg Med, 2007 (Supplement 1); 14: S128-S129.
6 Vilke G., Sloane, C., et al. Does the TASER Cause Electrical Changes in Twelve Lead ECG Monitoring of Human Subjects? Acad Emerg Med, 2007 (Supplement 1); 14:S104.
7 Levine, S., Sloane, C., Chan, T., et al. Cardiac of human subjects exposed to the TASER. J Emerg Med, 2007.
8 Ho, J., Dawes, D., et al. Ultrasound measurement of cardiac activity during conducted electrical weapon application in exercising adults. Am Emerg Med, 2007; 50 (3): S108.
9 Ho JD, Miner JR, Lakkireddy DR, et al. Cardiovascular and physiologic effects of conducted electrical weapon discharge in resting adults. Acad Emerg Med, 2006;13:589-595.
10 Barnes Jr., D., Winslow, J., et al. Cardiac Effects of the TASER X26 Conducted Energy Weapon. Ann Emerg Med, 2006; 48 (Supplement):102monitoring

PCSO 002224

**Cardiac**

- Experts have identified heart to dart distance as being a key determining factor in whether an ECD can affect the heart.
- The further an ECD dart is away from the heart, the lower the risk of affecting the heart.

Experts have identified heart to dart distance as being a key determining factor in whether an ECD can affect the heart. The VF probability for a given dart location decreased with the dart-to-heart horizontal distance (radius) on the skin surface. The further an ECD dart is away from the heart, the lower the risk of affecting the heart.

*Sun H, Haemmerich D, Rahko PS, Webster JG. Estimating the probability that the Taser directly causes human ventricular fibrillation. J Med Eng Technol. Apr 2010;34(3):178-191*



# Cardiac

- When possible, avoiding chest shots with ECDs reduces the risk of affecting the heart and avoids the controversy about whether ECDs do or do not affect the human heart.

TASER TRAINING ACADEMY

# We have issued a new TASER Targeting Guide.

Note, we have lowered the recommended point of aim from center of mass to lower-center of mass for front shots. There are three reasons:

1. Simplify targeting for all TASER systems to one easy to remember map, avoiding chest shots when possible and the risk of a head/eye shot in a dynamic situation, as is standard for impact munitions

2. When possible, avoiding chest shots with ECDs reduces the risk of affecting the heart and avoids the controversy about whether ECDs do or do not affect the human heart.

3. Close-spread ECD discharges to the front of the body are more effective when at least one probe is in the major muscles of the pelvic triangle or thigh region

**Back shots remain the preferred area when practical.** We believe this recommendation will improve the effective use of TASER ECDs while also further increasing safety margins and enhancing the ability to defend such cases in post event legal proceedings.

PCSO 002226

9



This safety chart is from the Medical Safety testing of the TASER X26. The results were accepted for publication in January 2005 in Pacing and Clinical Electrophysiology (PACE), a prestigious peer-reviewed journal in the field of pacing and implantable cardioversion defibrillation. These results indicate a 15x safety factor for the X26 when applied directly across the chest of a 60 pound test animal using the "worst case" trans-chest electrode placement. In other words, it took 15 times the stimulating output of the X26 to cause the animal to fibrillate in a typical "worst case" scenario. If the electrodes are not directly across the chest area, the safety margin will of course be higher. Note that the safety margin increases with body mass, to a 42x safety factor for a 250 pound animal subject.

Abstract: TASER type devices discharge a pulsed dose of electrical energy to cause muscle contraction and pain. Field data suggest electrical NMI devices present an extremely low risk of injury. One risk of applying electricity to a human is the induction of ventricular fibrillation (VF). We hypothesized that inducing VF would require a significantly greater NMI discharge than a discharge output by fielded devices.

Methods and Results: The cardiac safety of TASER type discharges was studied in a large porcine model (n = 9, 60 ± 28 kg). Minimum fibrillating level was defined as the lowest discharge level that induced VF at least once, maximum safe level was defined as the highest discharge level which could be applied 5 times without VF induction, and VF threshold was defined as their average. A safety index was defined as the ratio of the VF threshold to the standard discharge level output by fielded NMI devices. A VF induction protocol was applied to each porcine model to estimate VF threshold and safety index. The safety index for stored charge ranged from 15X to 42X as weight increased from 30 to 117 kg (p<0.001). Discharge levels above standard discharge and weight were independently significant for predicting VF induction.

Conclusions: The safety index for an NMI discharge was shown to have a significant and positive association to weight. Discharge levels for standard electrical NMI devices have an extremely low probability of inducing VF.

# Physiologic or Metabolic Effects

- The ECD can produce physiologic or metabolic effects (see notes)
- Reasonable effort should be made to minimize the number of ECD exposures and resulting physiologic and metabolic effects

TASER TRAINING ACADEMY

The ECD can produce physiologic or metabolic effects which include, but are not limited to, changes in: acidosis; adrenergic states; blood pressure; calcium, creatine kinase ("CK"); electrolytes (including potassium), heart rate and rhythm; lactic acid; myoglobin; pH; respiration; stress hormones or other biochemical neuromodulators (e.g., catecholamines). Reasonable effort should be made to minimize the number of ECD exposures and resulting physiologic and metabolic effects

This section is not a complete outline of ECD related medical research and information.

Electrical energy delivered to a human has been studied and reported in the peer-reviewed medical, scientific, electrical, and engineering research for three centuries. Thus, there is a large amount of published research on the effects of delivered electrical charge on a human.

See (current) TASER Warning, Product Manual, and other relevant materials.
See (current) TASER Electronic Control Device Research Index and associated literature.
See (current) In-Custody Death Research Index and associated literature.

PCSO 002237

## Higher Risk Populations

- ECD use has not been scientifically tested on:
  - Pregnant women
  - The infirm
  - The elderly
  - Small children
  - Low body-mass index (BMI) persons
- ECD use on these individuals could increase the risk of death or serious injury.

ECD use has not been scientifically tested on:

    Pregnant women

    The infirm

    The elderly

    Small children

    low body-mass index (BMI) persons

ECD use on these individuals could increase the risk of death or serious injury

Although ECDs have been used in the field on members of each of these high risk populations, often without injury, it is unknown if these individuals are at a higher risk of injury or death due to a lack of scientific research.

Electrical energy delivered to a human has been studied and reported in the peer-reviewed medical, scientific, electrical, and engineering research for three centuries. Thus, there is a large amount of published research on the effects of delivered electrical charge on a human.

See (current) TASER Warning, Product Manual, and other relevant materials.
See (current) TASER Electronic Control Device Research Index and associated literature.
See (current) In-Custody Death Research Index and associated literature.

## Physiologically or Metabolically Compromised Persons

- Law enforcement personnel are called upon to deal with individuals in crises that are often physiologically or metabolically compromised and may be susceptible to arrest-related death ("ARD")
- The subject may already be at risk of death or serious injury as a result of pre-existing conditions, individual susceptibility, or other factors
- Any physiologic or metabolic change may cause or contribute to death or serious injury
- Follow your agency's Guidance when dealing with physiologically or metabolically compromised persons.

TASER TRAINING ACADEMY                    ©1999-2011 TASER International Inc.

Law enforcement personnel are called upon to deal with individuals in crises that are often physiologically or metabolically compromised and may be susceptible to arrest-related death ("ARD"). The factors that may increase susceptibility for an ARD have not been fully characterized but may include: a hypersympathetic state, autonomic dysregulation, capture myopathy, hyperthermia, altered electrolytes, severe acidosis, cardiac arrest, drug or alcohol effects (toxic withdrawal, sensitization to arrhythmias, etc), alterations in brain function (agitated or excited delirium), cardiac disease, pulmonary disease, sickle cell disease, and other pathologic conditions. These risks may exist prior to, during, or after law enforcement intervention or ECD Use, and the subject may already be at risk of death or serious injury as a result of pre-existing conditions, individual susceptibility, or other factors. In a physiologically or metabolically compromised person any physiologic or metabolic change may cause or contribute to death or serious injury. Follow your agency's Guidance when dealing with physiologically or metabolically compromised persons.

This section is not a complete outline of ECD related medical research and information. Electrical energy delivered to a human has been studied and reported in the peer-reviewed medical, scientific, electrical, and engineering research for three centuries. Thus, there is a large amount of published research on the effects of delivered electrical charge on a human.

See (current) TASER Warning, Product Manual, and other relevant materials.
See (current) TASER Electronic Control Device Research Index and associated literature.
See (current) In-Custody Death Research Index and associated literature.

# Legal

- Litigation risk
- 4th Amendment risk/benefit standard
- "Quantum of Force"
- Sampling of court decisions
- Minimize ECD excessive force liability

In this module, we will very briefly provide an overview of your risk of litigation as a law enforcement officer, a sampling of court decisions regarding use of force in general and some cases specific to ECD use, and some considerations that can help minimize excessive force liability in the use of ECDs.
*********************************************************************************************
*******************

The standards for Law Enforcement force and ECD usage are:
United States ("U.S.") Constitutional force standards
State law force standards
Department policy standards


TASER International, Inc. ("TASER") cannot address all possible ECD Use circumstances or permutations. TASER training, warnings, and other information are intended to acquaint Users about some of the reasonably foreseeable potential risks of harm. The decision to Use the ECD in a particular manner or circumstance must follow applicable legal standards, regulations, department policy and training. TASER training, warnings, or other information are not intended to create a standard of care.


As with all legal issues and questions seek out local competent legal advice or guidance as appropriate and necessary for your needs.

PCSO 002243

# TASER ECD Litigation Risk

- General rule, the greater the actual injury or effects, or risk of injury or effects, to suspects caused by the force option, the greater the risk of LE liability and litigation

- TASER ECD has one of the lowest liability and litigation risk profiles of any force option due to the reduction of suspect injuries

TASER TRAINING ACADEMY

As a General rule, the greater the actual injury or effects, or risk of injury or effects, to suspects caused by the force option, the greater the risk of liability and litigation to law enforcement.

TASER ECDs have one of the lowest liability and litigation risk profiles of any force option. Law Enforcement agencies across the U.S. and Canada have documented significant reductions in officer and suspect injuries after implementing TASER ECDs. Many have also shown reductions in the use of deadly force, which carries a very high probability of litigation.
*****************************************************************************************

Research has shown suspect injury reductions up to 79%,
estimated 9,000 lives have been saved

In addition to other sources, see:

- (current) TASER ECD Research Index
- (current) TASER ECD Risk Management Injury Reduction PowerPoint® Presentation
- (01/22/11 CDC/CPSC) Haileyesus T, Annest JL, Mercy JA, Non-fatal conductive energy device-related injuries treated in US emergency departments, 2005-2008, Injury Prevention (2010). doi:10.1136/ip.2010.028704.
- (12/09 Strote) Strote J, Walsh M, Angelidis M, Basta A, Hutson HR. Conducted electrical weapon use by law enforcement: an evaluation of safety and injury. J Trauma. May 2010;68(5):1239-1246.
- (09/09 PERF) Taylor B, Woods D, Kubu B, et al. Police Executive Research Forum (PERF); "Comparing safety outcomes in police use-of-force cases for law enforcement agencies that have deployed Conducted Energy Devices and a matched comparison group that have not: A quasi-experimental evaluation."
- (07/10 Smith) Smith M, Kaminski R, Alpert G, Fridell L, MacDonald J, Kubu B. A Multi-Method Evaluation of Police Use of Force Outcomes: Final Report to the National Institute of Justice: US Department of Justice; 2010.
- (01/09 Bozeman) Bozeman, W P. Additional Information on TASER safety. Annals of Emergency Medicine. November 2009. Vol. 54, No. 5.
- (11/09 MacDonald) John M. MacDonald, Robert J. Kaminski, and Michael R. Smith. The Effect of Less-Lethal Weapons on Injuries in Police Use-of-Force Events. Am J Public Health. published 21 October 2009, 10.2105/AJPH.2009.159616.
- W P Bozeman, D G Barnes, Jr, J E Winslow, III, J C Johnson, III, C H Phillips, and R Alson. Immediate cardiovascular effects of the Taser X26 conducted electrical weapon. Emerg. Med. J. 2009; 26(8): p. 567-570.
- (06/08 Eastman) Eastman, A.L., et al., Conductive electrical devices: a prospective, population-based study of the medical safety of law enforcement use. J Trauma, 2008. 64(6): p. 1567-72.

# Risk Benefit Standard

4th Amendment Risk/Benefit Standard:

"[I]n judging whether [officer's] actions were reasonable, we must consider the risk of bodily harm that [officer's] actions posed to [suspect] in light of the threat to the public that [officer] was trying to eliminate."

(*Scott v. Harris*, 550 U.S. 372, 383 (2007))

TASER TRAINING ACADEMY

In Scott v Harris the court stated:

- In determining reasonableness of the manner in which a seizure is effected, we must balance the nature and quality of the intrusion on the individual's 4th Amendment interests against the importance of the governmental interests alleged to justify the intrusion.*

- "we must consider the risk of bodily harm that [officer's] actions posed to [suspect] in light of the threat to the public that [officer] was trying to eliminate." Id.

- *****************************************************************************************************
*********************

- *Scott v. Harris*, 550 U.S. 372, 383 (2007).



# "Quantum of Force"

"Quantum of force" means:
- the reasonably foreseeable (to the officer) effects and injuries of a chosen force option under the totality of the circumstances of the force option use

TASER TRAINING ACADEMY

Quantum of force" means:
- the reasonably foreseeable effects and injuries of a chosen force option under the totality of the circumstances of the force option use

PCSO 002246

# "Quantum of Force"

## To use ECD in probe mode:

Officer must reasonably perceive subject to be:

- An immediate threat of harm/injury or
- Fleeing or flight risk from serious offense
- Officer consider necessity of warning

Be aware of foreseeable risks of secondary injury, especially falls from heights or on hard surfaces

TASER TRAINING ACADEMY

©1999-2011 TASER International, Inc.

---

To use ECD in probe mode:
Officer must reasonably perceive subject to be:
•An immediate threat of harm/injury or
•Fleeing or flight risk from serious offense
•Officer consider necessity of warning
Be aware of foreseeable risks of secondary injury, especially falls from heights or on hard surfaces

********************************************************************************

*Bryan v. MacPherson*, 630 F.3d 805 (C.A.9 (Cal.), November 30, 2010).

# Id., quoting *Cavanaugh v. Woods Cross City*, 625 F.3d 661 (C.A.10 (Utah) 2010).) (Graham factors clearly cautioned against a significant use of force, such as the deployment of a[n ECD]);

See also, numerous court decisions have found that use of ECD in probe mode is at least an intermediate, if nonlethal, level of force. See, e.g.,

-*Cockrell v. City of Cincinnati*, Slip Copy, 2010 WL 4918725 (S.D.Ohio, November 24, 2010)

-*Oliver v. Fiorino*, 586 F.3d 898, 903 (C.A.11 2009) (ECD "designed to cause significant, uncontrollable muscle contractions");

-*Orem v. Rephann*, 523 F.3d 442, 447-48 (C.A.4 2008) (rejecting that ECD constitutes minor or *de minimus* level of force);

-*Hickey v. Reeder*, 12 F.3d 754, 757 (C.A.8 1993) (stun gun inflicts painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless);

-*Crowell v. Kirkpatrick*, 667 F.Supp.2d 391, 408 (D.Vt. 2009) (ECDs have "been described by other courts as 'moderate, non-lethal force" and cause "acute-even severe-physical pain");

-*Orsak v. Metro. Airports Comm'n*, 675 F.Supp.2d 944, 957-59 (D.Minn. 2009);

-*Cyrus v. Town of Mukwonago*, 2009 WL 1110413, at *21 (E.D. Wis. April 24, 2009) ("use of a[n ECD] as an intermediate or medium, though not insignificant, quantum of force...."); See also *Cyrus v. Town of Mukwonago*, 624 F.3d 856 (C.A.7 (Wis.) 2010);

-*Kaady v. City of Sandy*, 2008 WL 5111101, at *16 (D.Or. Nov. 26, 2008) (use of a[n ECD] constitutes an intermediate level of force and a significant intrusion on a victim's 4th Amendment rights.);

-*McDonald v. Pon*, 2007 WL 4420936, at *2 (W.D.Wash. Dec. 14, 2007) ("[ECD] use is considered an intermediate control tactic.");

-*Beaver v. City of Federal Way*, 507 F.Supp.2d 1137, 1144 (W.D.Wash.2007) ("use of a[n ECD] constituted significant force.") (see *Beaver v. City of Federal Way*, 301 Fed.Appx. 704 (C.A.9 (Wash), November 25, 2008);

-*Parker v. City of South Portland*, 2007 WL 1468658, at *22 (D.Me. 2007) ("In the circumstances, the [ECD] fairly can be characterized-as it has been by one court-as a significantly violent level of force."), see also *Parker v. Gerrish*, 547 F.3d 1 (C.A.1 (Me.) 2008);

-*DeSalvo v. City of Collinsville*, 2005 WL 2487829, at *4 (S.D.Ill. 2005);

-*Brown v. City of Golden Valley*, 574 F.3d 491 (C.A.8 (Minn.) 2009).

-*Casey v. City of Federal Heights*, 509 F.3d 1278 (C.A.10 (Colo.) 2007);

-*Mann v. TASER International, Inc.*, 588 F.3d 1291 (C.A.11 (Ga.) 2009).

# 4th Amendment – Dart Mode

ECD in dart mode constitutes an "intermediate, significant level of force that must be justified by the governmental interest involved", *

ECD against a non-violent misdemeanant who appeared to pose no immediate threat and who was given no warning was unconstitutional excessive force #

*In Bryan v McPherson* the court said, " [the] ECD in dart mode constitutes an "intermediate, significant level of force that must be justified by the governmental interest involved."

*In Cavanaugh v Woods Cross City* the court said, ECD against a non-violent misdemeanant who appeared to pose no immediate threat and who was given no warning was unconstitutional excessive force

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\* *Bryan v. MacPherson*, 630 F.3d 805 (C.A.9 (Cal.), November 30, 2010).
# Id., quoting *Cavanaugh v. Woods Cross City*, 625 F.3d 661 (C.A.10 (Utah)
November 3, 2010).

PCSO 002248

7

**Graham Factors as Risk Prioritized Ranked by Chew**

Order of Importance – Potential for Injury Risk Importance

- Immediate threat to safety of officers/others
- Actively resisting
- Circumstances tense, uncertain, rapidly evolving ("*pace*" of events)
- Severity of the crime at issue
- Attempting to evade seizure by flight

The landmark case that sets standards for law enforcement use of force under the Fourth Amendment is Graham v. Conner. In Graham, the Supreme Court established standards for determining if a use of force by an officer was reasonable. In Chew v. Gates, the 9th Circuit Court of Appeals ranked several of the Graham factors that can be used to assess the risk posed by an individuals actions.

The first factor is whether the subject poses an immediate risk to the safety of officers or others? Next, is the subject actively resisting the officers' attempt to perform their lawful duties? The third factor to consider is whether the circumstances of the situation were tense, uncertain and rapidly evolving. In other words, were the circumstances changing quickly and requiring immediate response from officers, or had the pace of the situation slowed and provided officers time to evaluate the situation and consider numerous options? The next factor to consider is the severity of the crime that the subject was suspected of committing or was in the process of committing. Finally, was the subject attempting to flee to evade seizure by officers?

*********************************************************************************************

Graham Factors as Ranked by *Chew*. Order of Importance – Potential for Injury Risk Importance

Graham v. Conner, 490 U.S. 386, 396, 104 L.Ed.2d 443, 109 S.Ct. 1865 (1989)

Chew v. Gates, 27 F.3d 1432 (9th Cir. 1994), cert. denied, 513 U.S. 1148, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995)

Graham Factors as Injury Risk Priority Risk Ranked by *Chew*:

1. Immediate threat to safety of officers/others
2. Actively resisting
3. Circumstances tense, uncertain, rapidly evolving ("*pace*" of events)
4. Severity of the crime at issue
5. Attempting to evade seizure by flight

See also - *Scott v. Harris*, 550 U.S. 372 (2008):

- While these are the most common considerations, they are not "a magical on/off switch that triggers rigid preconditions" to determine whether an officer's conduct constituted excessive force. (at 383)

- "Thus, in judging whether [officer's] actions were reasonable, *we must consider the risk of bodily harm that [officer's] actions posed to [suspect]* in light of the threat to the public that [officer] was trying to eliminate." (at 383).

**Additional Force Factors**

- Court may consider "the availability of [less injurious] alternative methods of capturing or subduing a suspect." (*Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir.2005))
- Court may consider what officers knew about the suspect's health, mental condition, or other relevant frailties.* (*Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001); *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir.1994))
- Officer should give a warning before force when appropriate.

Other factors the court may consider in determining the reasonableness of force include:

•The availability of [less injurious] alternative methods of capturing or subduing a suspect

•What officers knew about the suspect's health, mental condition, or other relevant frailties

•And whether the officers warned the suspect that a certain type of force was about to be used

*************************************************************************

Also, see: *Bryan v. McPherson*, 590 F.3d 767 (C.A.9 2009) - seat belt violation, failed to comply, clenched fists, profanities, acting out.

*See Force consideration in the Training manual or DVD

PCSO 002250

**V18 Legal and Case Law**

# Clarifying the *Graham* Factors:
### (Immediate threat to safety of officers or others)

*Graham's* "*immediate*" vs. "*possible*" threat:

"[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *(Deorle v. Rutherford, 272 F.3d 1272, 1281 (9th Cir. 2001))*

- *Beaver* – "*possibly*" had a weapon under him
- *Brooks* – "*could*" have fled in car
- *Brown* – "*could*" have used beer "tankards" as weapons

ONLY "*immediate*" threats – NOT "*possible*"

TASER TRAINING ACADEMY

---

The courts have distinguished the difference between an immediate threat and a possible threat. An immediate threat is clearly articulable and based on facts known to the officer such as : the suspect was armed, the suspect threatened officers, or the suspect attempted to strike an officer. Possible threats are generally based on unknown, but possible circumstances such as: the suspect could have possibly had a weapon under him, the suspect could have fled at any moment, or the suspect was close to a beer mug that he could have used as a weapon.

**********************************************************************

A small sampling of relevant court cases where law enforcement filed motions for summary judgments and rulings taking plaintiffs' versions of the facts as true, the officers uses of the ECDs was found to be objectively unreasonable:
- *Beaver v. City of Federal Way*, 507 F.Supp.2d 1137 (W.D.Wash. 2007); (qualified immunity upheld by 301 Fed.Appx. 704 (Nov. 25, 2008 C.A.9 (Wash.)). Fleeing residential burglar (5 ECD uses, first 3 ok).
- *Brooks v. City of Seattle*, 2008 WL 2433717 (W.D. Wash. 2008) - Pregnant speeder who refused to sign ticket or get out of the car.
- *Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir.(Minn) Jul 22, 2009). Female car passenger, beer tankards at feet, husband (driver) arrested for OMVWI. Case settled for $200,000.
- *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir.(Colo.) Dec. 10, 2007). Convicted speeder bringing court file back into courthouse (settled for $85,000).
- *Stych v. City of Muscatine, Iowa*, 655 F.Supp.2d 928 (S.D. Iowa Sept. 18, 2009). Fn 12 - "Plaintiff has presented testimony from two witnesses attesting to how important it is for police officers to listen."

# (Usually) Not a Problem ...

If a LEO is justified in using force and:

- the person *"is reasonably perceived as an immediate threat"* to LEOs or others, or

- the person is *"fleeing from a serious crime"* (involving physical injury) (and LEO would be justified in tackling the person),

then reasonable ECD use is *usually* justified. The challenge: to make the best force option decisions coupled with excellent reporting

If a LEO is justified in using force and the person is an immediate threat to LEOs or others or the person is trying to flee (and the LEO would be justified in tackling the person), then reasonable ECD use is usually legally justified.

The challenge facing officers is to make the best force decisions coupled with excellent reporting.

**Beaver v. City of Federal Way,**

1. The use of an ECD involves the application of force.

   (Each use of force on a person that is a seizure is the application of force and must be objectively reasonable.)

2. Each ECD application involves an additional use of force.

   (This is true of any use of force.)

The use of an ECD involves the application of force.

Each use of force on a free person that is a seizure is the application of force and must be objectively reasonable.

Each ECD application involves an additional use of force. This is true of any use of force.

*******************************************************************************

*Beaver v. City of Federal Way*, 507 F.Supp.2d 1137 (W.D.Wash. 2007); (qualified immunity upheld by 301 Fed.Appx. 704 (Nov. 25, 2008 C.A.9 (Wash.)). The Beaver case is an excellent example of where courts are headed in analyzing law enforcement force events.

PCSO 002253

# *Beaver v. City of Federal Way,*

### 3. Multiple ECD applications cannot be justified solely on the grounds that a suspect fails to comply with a command,

absent other indications that the suspect is an *immediate threat or about to flee*.

This is particularly true when more than one officer is present to assist in controlling a situation.

TASER TRAINING ACADEMY

Multiple ECD applications cannot be justified solely on the grounds that a suspect fails to comply with a command absent other indications that the suspect is an immediate threat or about to flee. In the example of an unarmed suspect who threatens an officer and is incapacitated by an ECD, then, after the cycle has ended, refuses to put his hands behind his back but makes no attempt to get up and is not known to be armed, additional ECD cycles might not be justified absent other indications of an immediate threat. This is particularly true when more than one officer is present to assist in controlling a situation. The number of officers and the number of suspects is frequently one factor considered by the courts in determining the level of risk faced by the officer and what would be considered reasonable force.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Beaver v. City of Federal Way*, 507 F.Supp.2d 1137 (W.D.Wash. 2007); (qualified immunity upheld by 301 Fed.Appx. 704 (Nov. 25, 2008 C.A.9 (Wash.)). The Beaver case is an excellent example of where courts are headed in analyzing law enforcement force events.

# Beaver v. City of Federal Way,

4. Any decision to apply multiple ECD applications must take into consideration whether a suspect is capable of complying with officers' commands.

TASER TRAINING ACADEMY ©1994-2011 TASER International Inc.

Any decision to apply multiple ECD applications must take into consideration whether a suspect is capable of complying with officers' commands. This would apply to whether a suspect is capable of complying - physically, emotionally, language barrier, mental condition, etc. Also, in the Beaver case, the officers gave conflicting commands.

**************************************************************************************

*Beaver v. City of Federal Way*, 507 F.Supp.2d 1137 (W.D.Wash. 2007); (qualified immunity upheld by 301 Fed.Appx. 704 (Nov. 25, 2008 C.A.9 (Wash.)). The Beaver case is an excellent example of where courts are headed in analyzing law enforcement force events.

PCSO 002255

*Bryan v. McPherson*

**(as seen through the Court's eyes)**

- Bryan was not an immediate threat
- Bryan was not resisting
- Bryan was not a flight risk
- Bryan was stopped for traffic infraction
- Officer gave no warning prior to ECD use
- Officer did not consider less intrusive (injurious) options (than ECD probes) (waiting for backup)
- See the court opinion and *Bryan* article in the Support Materials/Legal folder on the training DVD

In the *Bryan* case the 9th Circuit Court of Appeals found that the officer had used objectively unreasonable force, but was entitled to qualified immunity. The Court had to view the facts of the case in the light most favorable to the plaintiff. From plaintiff's version of the facts the Court concluded:

- Plaintiff was not an immediate threat.
- His conduct did not constitute resistance at all.
- He was not a flight risk.
- He was not a dangerous felon.
- He was stopped for a seat-belt violation.
- Officer failed to warn that he would be shot (in probe mode) with a TASER ECD if he did not comply.
- Officer did not consider what other (less injurious to Bryan) tactics if any were available to effect the arrest.
- Officer failed to consider less-intrusive (injurious to Bryan) alternatives (*e.g.* waiting for approaching backup).

The *Bryan* Court's opinion is a good reminder that:

- ECDs are not risk free and officers need to consider the "quantum of force," including foreseeable injuries and effects, including the risk of secondary injuries from incapacitation and falls in determining when and how to deploy an ECD.
- ECDs, while non-lethal, are an "'intermediate or medium, though not insignificant' use of force and every trigger pull must be justified as a separate use of force.
- In any Fourth Amendment force analysis, an officer must consider the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."
- When circumstances allow, giving a warning and an opportunity to comply is very important prior to discharging an ECD.
- An officer must consider what other tactics if any were available to effect the arrest, and other less intrusive (less injurious) tactics that would have been available to effect the arrest and be able to articulate them in an arrest or force report.
- An officer must use commands that are clear, are being heard, and the suspect has the opportunity and ability to respond.
- The government has an important interest in providing assistance to a person in need of psychiatric care; thus, the use of force that may be justified by that interest necessarily differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community.
- Understanding the difference between active and passive resistance and the different levels of force that can be applied in those different circumstances is very important for all officers no matter the force involved.
- Officers need to understand what constitutional rights are "clearly established in light of the specific context of the case" in order to avail themselves of the protection of qualified immunity in excessive use of force claims.
- This case highlights the importance that smart use training can play in teaching officers the proper use of a TASER ECD in accordance with judicial mandates.
- Please see the full court opinion and an article from Police Chief Magazine on the *Bryan* case in the Support Materials/Legal folder on the TASER Training DVD.

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

*Bryan v. MacPherson*, 630 F.3d 805 (C.A.9 (Cal.), November 30, 2010). (3rd *Bryan* 9th Circuit Appellate decision)

# Considerations to Avoid ECD Excessive Force Liability

Force decision must consider (as time and circumstances reasonably permit):

- Officer's objective for using force
- Officer's reasonable perceptions of the subject's actions or behaviors the officer is attempting to stop or control
- Foreseeable risks of injuries or harm to subject resulting from force to be used
- Foreseeable secondary risks of injury

TASER TRAINING ACADEMY ©1999-2011 TASER International Inc.

Considerations to Avoid ECD Excessive Force Liability:

Force decision must reasonably consider:

- Officer's objective for using force
- Officer's reasonable perceptions of the subject's actions or behaviors the officer is attempting to stop or control
- Foreseeable risks of injuries or harm to subject resulting from force to be used
- Foreseeable secondary risks of injury

PCSO 002257

Considerations to Avoid ECD Excessive Force Liability

**Considerations to Avoid ECD Excessive Force Liability:**

- Justify and document every use or application of force, including:
  - each ECD trigger pull or 5 second discharge
  - fully document subject's threats or behaviors
- Avoid using an ECD on elevated risk population member, unless necessary and justifiable ***************************************************************************

Numerous use-of-force related litigations, criminal prosecutions and disciplinary actions of officers, and community/media criticism related to allegations of misuse regarding ECD deployment/use emanate from allegations including:

1. ECD deployment(s) where it is alleged that the ECD should not have been deployed/used – allegation that ECD use was not justified.
2. ECD deployment(s) on a person in a suspect (special) population.
3. Multiple ECD deployments in drive (touch) stun mode – where the ECD can only foreseeably be utilized for discomfort compliance.
4. Repeated, prolonged, or continuous ECD deployments where it is alleged that the officer(s) had opportunity(ies) to control and failed to do so.

Thus, it is important for officers to fully understand and appreciate:

1. Whether they can legally deploy an ECD?
2. How many ECD deployments are legally acceptable?
3. Whether the officers have taken reasonable and appropriate steps/actions to appropriately minimize the number of ECD exposures/discharges.

# Considerations to Avoid ECD Excessive Force Liability

Avoid multiple, repeated, prolonged, or continuous ECD exposures unless necessary to counter reasonably perceived threat(s) and is legally justifiable—<u>document your justification</u>

©1999-2011 TASER International Inc.

Considerations to Avoid ECD Excessive Force Liability:
• Justify and document every use or application of force, including:
  • each ECD trigger pull or 5 second discharge
  • fully document subject's threats or behaviors
• Avoid using an ECD on elevated risk population member, unless necessary and justifiable
• Avoid multiple, repeated, prolonged, or continuous ECD exposures unless necessary to counter reasonably perceived threat(s) and justifiable—document your justification
*********************************************************************************

Numerous use-of-force related litigations, criminal prosecutions and disciplinary actions of officers, and community/media criticism related to allegations of misuse regarding ECD deployment/use emanate from allegations including:
1. ECD deployment(s) where it is alleged that the ECD should not have been deployed/used – allegation that ECD use was not justified.
2. ECD deployment(s) on a person in a suspect (special) population.
3. Multiple ECD deployments in drive (touch) stun mode – where the ECD can only foreseeably be utilized for discomfort compliance.
4. Repeated, prolonged, or continuous ECD deployments where it is alleged that the officer(s) had opportunity(ies) to control and failed to do so.

Thus, it is important for officers to fully understand and appreciate:
1. Whether they can legally deploy an ECD?
2. How many ECD deployments are legally acceptable?
3. Whether the officers have taken reasonable and appropriate steps/actions to appropriately minimize the number of ECD exposures/discharges.

# Trigger Operation

- Single trigger pull and release discharges an electrical charge for a 5-second cycle
- Shift the Safety Switch down (SAFE) to stop a discharge (e.g., if accidentally discharged)
- Holding the trigger continuously beyond the 5-second cycle will continue the electrical discharge until the trigger is released. (The discharge will cease once the trigger is released after the initial 5-second cycle.)

TASER TRAINING ACADEMY                    ©1999-2011 TASER International Inc.

Pulling the trigger initiates a 5-second discharge cycle. The cycle may be extended beyond 5 seconds by keeping the trigger depressed. To stop a discharge cycle, for example an accidental discharge, shift the Safety Switch down to the SAFE position. Holding the trigger continuously beyond the 5-second cycle will continue the electrical discharge until the trigger is released. In this instance, the discharge will cease once the trigger is released.

# Post Arrest-Related Death Evidence

- Do not assume the medical examiner is familiar with sudden death, arrest-related death, or excited delirium
- Have core body temperature obtained prior to death (or as soon as possible after death)
- 1 800-UM-BRAIN – University of Miami
  - VERY time sensitive – 24 hours to collect, harvest, prepare, and freeze brain samples (www.exciteddelirium.org)
- Collect samples – for determining acute and chronic drug (especially stimulant) abuse
- Conduct Psychological Autopsy

TASER TRAINING ACADEMY

Medical Examiners often fail to examine the small details such as having the brain microscopically examined, or fail to collect and then analyze hair samples, which may indicate chronic drug abuse. A negative autopsy is common in ARDs, often due to a lack of forensic evidence for identification of a proven mechanism of death. Valuable evidence can be lost forever if not expeditiously collected and properly retained.

It is important to note that often in sudden death cases routine toxicology tests and reports may be negative for certain substances. However, chronic drug (especially stimulant) abuse can result in bizarre behavior and sudden death due to the changes over time in brain chemistry. Thus, the person may suddenly die from the chronic drug abuse, yet the routine toxicology screen may be clear of drugs in the person's system at time of death.

*****************************************************************************

Obtain a core body temperature in cases where agitated (excited) delirium is a consideration. A core body temperature greater than 103°F (41° C) will indicate hyperthermia. Drug levels may be non-existent, and/or very low at the time of the autopsy, especially in those people who were chronic drug abusers.

Obtain an analysis of the person's brain. The brain can be extremely valuable in toxicological analysis, as compounds can be found in the brain that cannot cross the blood-brain barrier. The brain must be properly harvested within **24 hours PER EXPLICIT PROTOCOL** (contact 1.800.UM-BRAIN www.exciteddelirium.org).

Obtain and analyze hair. The hair can provide insights into a person's chronic and recreational drug abuse, especially cocaine. Do not wait for a negative autopsy report about cocaine, meth, and other stimulants. Analyze the hair as part of the customary investigation and analysis. NOTE: The longer the hair, the greater the history. Also, hair can be taken from any portion of the body. Obtain hair sample(s) before they are lost.

Obtain urine levels of cocaine and benzoylecgonine. These levels, however, may not provide a basis for intoxication, so avoid an intoxication decision based solely on these levels.

Conduct a Psychological Autopsy. This is an investigative technique that requires special training. Contact the Institute for the Prevention of in-custody deaths for more information.

PCSO 002347

# Arrest-Related Death Responses

- Recommend PIO/Agency Spokesperson attend TASER training to understand technology/organize crisis plan for an arrest-related death (ARD)
- In the event of an ARD following the use of an ECD, refer to the ARD checklist located in the Support Materials folder
- Obtain as much information as possible regarding the incident
- Prepare media statement and provide media with information about TASER technology

TASER TRAINING ACADEMY

We recommend that your PIO/Agency Spokesperson attend TASER training to understand the technology and terminology, and to organize a crisis plan for an arrest-related death (ARD). It is always better to have this plan in place before an ARD, rather than to be scrambling for information while the press waits.

In the event of an ARD following the use of an ECD, refer to the ARD checklist located in the Support Materials folder and obtain as much information as possible regarding the incident.

Prepare a media statement and provide the media with information about TASER technology.

*******************************************************************************

**Sample of Critical Information on Arrest-Related Death Checklist:**

**Time Between ECD Application and Pronouncement of Death Is Critical**

Circumstances regarding arrest

Distance fired, probe spread, location and duration of cycles

ECD effects (any change in behavior?)

Subject's influence (drugs, alcohol, EDP)

Any other force used?

Medical Examiner's contact info

Don't overreact. Take time to analyze the situation and the potential causes of death prior to drawing any conclusions.

For further reference see: *(03/27/09)* TASER® Electronic Control Devices: Physiology, Pathology, and Law, by Mark W. Kroll (Editor), Jeffrey D. Ho (Editor). Especially see:
- Appendix A: Excited Delirium Checklist
- Appendix B: Electrocution Diagnosis Checklist

Version 18  07/11



EXHIBIT

32

GOPPFERT

**Criminal Justice Standards and Training Commission
Florida Department of Law Enforcement**

# *1160 Dart-Firing Stun Gun*

## *August 7, 2008*
## *(Version 2008.08)*
## *(Updated October 19, 2016)*

# Instructor Guide

# *Criminal Justice Specialized Course*

COPYRIGHT © 2016 by
Florida Department of Law Enforcement

# Copyright Information

COPYRIGHT © 2016 by Florida Department of Law Enforcement. Reproduction or duplication of this courseware in any form, in whole or in part, is prohibited without prior written permission from the Florida Department of Law Enforcement. Training Schools, as defined in Rule 11B-21.001, F.A.C., have permission to duplicate the training materials contained herein for the purpose of Commission-approved training.

Permission can be obtained by contacting:

Florida Department of Law Enforcement
Criminal Justice Professionalism Division
Curriculum Section
PO Box 1489
Tallahassee, FL 32302-1489
(850) 410-8600

# Updates

This course was updated on October 22, 2009, with the following changes:
- Update to lesson material clarifying how to gain compliance and handcuff subject
- Update to lesson material clarifying frontal target areas.

See Curriculum Alert 2008.08 Number 4

This course was updated on October 1, 2011, with the following changes:
- Updated course effective date
- Added to Updates section to include this curriculum alert
- Updated Disclaimer and Foreword
- Revision to Objective DFSG525. Provide a brief history of stun guns in Instructor Guide (p.8) and Student Guide (p.5)

See Curriculum Alert 2011-18

This course was updated on March 6, 2014, with the following changes:
- Updated course effective date
- Added to Updates section to include this curriculum alert
- Revision to lesson material statement summarizing independent medical and scientific expert affirmation of the safety and effectiveness of TASER technology

See Curriculum Alert 2014-07

This course was updated on January 6, 2016, with the following changes:
- Updated course effective date
- Added to Updates section to include this curriculum alert
- Added the Evaluation and Feedback section

- Moved the References section to the front pages
- Revision to lesson material to reflect statute number change (F.S. §790.01) per Legislative updates

See Curriculum Alert 2015-29

This course was updated on October 19, 2016, with the following changes:
- Updated references to F.A.C. in course Foreword

# Disclaimer

FDLE makes a sincere effort to ensure accuracy and quality of its published materials; however, no warranty, expressed or implied, is provided. FDLE disclaims any responsibility or liability for any direct or indirect damages resulting from the use of the information in this course or products described in it.

Mention of any product does not constitute an endorsement by FDLE of that product. All referenced persons, places, or situations are intended to be fictional, unless otherwise stated. Any resemblance to real persons, places, or situations is coincidental.

The training in this course is provided to familiarize students with issues that may involve high liability and/or high stress activities. FDLE urges students to ensure that their practices are correct in accordance with their agencies' policies and procedures. Employing agencies are solely responsible for guiding their employees' actions in actual situations.

# Acknowledgments

We extend our sincere appreciation to the agencies of the Florida Criminal Justice System who allowed their members to assist in the development of this Specialized Course.

Developed with the following assistance:

*Coral Springs Police Department*
*Florida Capitol Police*
*Florida Department of Law Enforcement*
*Leon County Sheriffs Office*
*Palm Bay Police Department*
*Pensacola Police Department*
*Tallahassee Community College*
*Tallahassee Police Department*
*Tarpon Springs Police Department*

# Foreword

This course is part of the Criminal Justice Standards and Training Commission Specialized Training Program pursuant to Rule 11B-35.007, F.A.C.

Courses in the Specialized Training Program are designed for post-basic or in-service training to enhance an officer's knowledge, skills, and abilities in a specific area and may be credited toward an officer's mandatory retraining, pursuant to Rule 11B-27.00212, F.A.C.

Specialized courses are competency-based, meaning the course may be completed in less than the total course hours assigned provided all learning goals and objectives are covered. See Rule 11B-35.001(11)(c), F.A.C. Training schools and instructors have the flexibility to redistribute topic hours in areas where greater emphasis is needed. At the instructor's discretion, additional learning aids may be used to enhance instruction of the learning goals and objectives. To provide further flexibility, a maximum of four hours of electives may be used for each forty hours of course instruction. See Rule 11B-35.007(2)(b)9., F.A.C.

Specialized courses, or portions of specialized courses, delivered in an eLearning format must comply with the requirements of Rules 11B-35.0010, F.A.C.

Some Specialized courses do not require that students pass a written end-of-course examination. However, Specialized courses identified in Rule 11B-35.001(8), F.A.C. do require a written end-of-course examination. Students must pass the examination with a score of at least 80 percent. Specialized Instructor Training courses also require a written end-of-course examination; students must pass the examination with a score of at least 85 percent on the first attempt and demonstrate the required skills. See Rule 11B-35.0024, F.A.C.

The CJSTC requires that a law enforcement, correctional, or correctional probation officer, who is authorized by his or her employing agency to carry a dart-firing stun gun, attend either a Commission-approved dart-firing stun gun training course or an equivalent program provided by the officer's employing agency. The completion of this course meets the statutory retraining requirements for all three disciplines.

# Evaluation and Feedback

We encourage instructors and students to contact the FDLE directly to leave feedback. We constantly improve our curriculum and especially appreciate hearing about areas in which the course could be refined. Please email curriculum@fdle.state.fl.us or call Professionalism directly at 850-410-8600. We always appreciate your feedback.

# Course Outline

Copyright Information ........................................................................................ ii

Updates............................................................................................................ ii

Disclaimer ....................................................................................................... iii

Acknowledgments............................................................................................ iii

Foreword .........................................................................................................iv

Evaluation and Feedback ................................................................................ iv

Course Outline .................................................................................................v

Summary .......................................................................................................... vi

References...................................................................................................... viii

Unit 1  Dart-Firing Stun Gun Use
      Introduction
      Lesson 1      Dart-Firing Stun Gun Use
      Role-play Practicum 1: Bar Fight
      Role-play Practicum 2: Wanted Panhandler

# Summary

**Instructional Goal:** To maintain proficiency in safely using, maintaining, and documenting use of the dart-firing stun gun.

**Structure of Course:** 1 Unit, 1 Lesson

**Total Estimated Time:** 8 hours

**Competency Areas Included:**
Communication skills (verbal and nonverbal)
Community oriented policing
Conflict management
Crisis management
Diversity
Ethics
Human relations
Interpersonal skills
Officer safety
Planning
Problem solving
Stress management
Working with community resources
Professionalism

**Materials and Supplies:**
Florida Statutes
Attachments
    1-1-1: Blank Use of DFSG Force Report or other instructor provided Use of Force Report
    1-1-2: Role-play Practicum 1: Bar Fight
    1-1-3    e-play Practicum 2: Wanted Panhandler
Duty belt with baton ring, handcuff case, and training gun and holster (for student practice)
Dart-firing stun guns with live cartridges (for instructor demonstration)
Dart-firing stun gun inert/non-conductive cartridges for Role-play Scenarios)
Target(s) as required for class size
Student Guide

**Media:**
Video: *Dart-Firing Stun Gun*, Segments 1 – 9
    Segment 1: "Yuma" (2:10 minutes)
    Segment 2: "Stun vs. EMD" (1:58 min.)
    Segment 3: "History Channel" (6:05 min.)
    Segment 4: "Non Block Buster" (ABC News 8/3/02) (2:37 min.)
    Segment 5: "Draper" (Copy from officer's car, counsel for Clinton Reynolds for Stacy Draper, 7/19/01) (3:27 min.)

Segment 6: "Contingencies" (2:08 min.)
Segment 7: "Drug Clip" (4:20 min.)
Segment 8: "Toronto" (City Pulse 24 News, Riverdale Park, Toronto, CA) (2:28 min.)
Segment 9: "Traffic Stops" (Ohio State Patrol, 5/22/02) (6:38 min.)

**Equipment:**
DVD player

**Instructional Strategies:**
Class discussion
Oral briefing
Instructor demonstration
Individual demonstration and practice
Small group role-play scenarios

# References

All Registered TASER® names and products and "Top Probe" diagram and 3 "signatures"—TASER International, Inc. Copyright 1998-2006

All ©Stinger copyrighted names and products registered (including Ultron®, ICE Shield™ and Band-Aid™)

*General FAQ's.* (2008) Retrieved from http://www.taser.com/Pages/TASERSPLASH.aspx

Harris, T. (2000). "Stun Gun Diagram" and "How Stun Guns Work." *How stun guns work.* Retrieved from http://electronics.howstuffworks.com/stun-gun3.htm

Stinger Systems, Inc. *Stinger Systems, Inc. announces initial sales and volume production of the Stinger projectile stun weapon.* Retrieved from http://www.stingersystems.com/press.htm#p14

Video: *Guts and bolts: Tasers.* The History Channel. Retrieved from http://www.history.com/media.do?id=gandb_taser_broadband&action=clip

Video: *Yuma clip.* Taser International Version 13 Training and Information Disc. ©2007 Taser International.

Video: *Stun vs. EMD.* Taser International Version 13 Training and Information Disc. ©2007 Taser International.

Video: *Non-block buster.* (2002, August 3). ABC News. [Television broadcast].

Video: *Clinton Reynolds for Stacy Draper.* Draper clip. Taser International Version 13 Training and Information Disc. ©2007 Taser International.

Video: *Contingencies.* Taser International Version 13 Training and Information Disc. ©2007 Taser International.

Video: *Halstead, Jim. Drug clip.* Chandler, AZ: CA News.

Video: *Toronto clip.* Riverdale Park and Toronto, Canada: City Pulse 24 News.

**Unit 1:** Dart-Firing Stun Gun Use
**Lesson 1:** Dart-Firing Stun Gun Use
**Unit Goal:** To introduce, educate, and train on use of stun guns and dart-firing stun guns.
**Lesson Goal:** To provide students with historical, medical, and physical basics of both the stun gun and the dart-firing stun gun, allow students to practice assessing situations based on statutory requirements of dart-firing stun gun use, and document the use.

| OVERVIEW | INSTRUCTOR NOTES |
|---|---|
| **Introduction** This eight-hour course provides instruction in the history, understanding, familiarization, use, and documentation of the dart-firing stun gun (DFSG). At the end of this course, students should be able to do the following: <ul><li>identify DFSG use per Florida Statute ss. 943.1717 and 790.01(3)(b)</li><li>identify and articulate legislative considerations regarding DFSG and their impact on officers in Florida</li><li>identify and articulate the possible effects that a DFSG has on the human body</li><li>properly and safely operate a DFSG</li><li>articulate verbally and in reports justification for tactical options chosen while participating in DFSG simulated scenarios</li><li>use verbal skills to de-escalate a situation and avoid the use of a DFSG</li></ul> Safety considerations: During actual discharge of live cartridges, students should be outfitted with all safety equipment in case of incidental probe strike. | |

| OVERVIEW | INSTRUCTOR NOTES |
|---|---|

**Suggested Time:** 8 hours

**Instructional Methods**

Class discussion
Oral briefing
Instructor demonstration
Individual demonstration and practice
Small group Role-play Scenarios
Group and individual practice and exercise

**Training Materials and Aids**

DVD player
Video, *Dart-Firing Stun Gun,* Segments 1–9
    Segment 1: "Yuma" (2:10 minutes)
    Segment 2: "Stun vs. EMD" (1:58 min.)
    Segment 3: "History Channel" (6:05 min.)
    Segment 4: "Non Block Buster" (ABC News
    8/3/02) (2:37 min.)
    Segment 5: "Draper" (Copy from officer's
    car, counsel for Clinton Reynolds for Stacy
    Draper, 7/19/01) (3:27 min.)
    Segment 6: "Contingencies" (2:08 min.)
    Segment 7: "Drug Clip" (4:20 min.)
    Segment 8: "Toronto" (City Pulse 24 News,
    Riverdale Park, Toronto, CA) (2:28 min.)
    Segment 9: "Traffic Stops" (Ohio State
    Patrol, 5/22/02) (6:38 min.)
Student Guide
Florida Statutes
Attachments
    1-1-1: Blank Use of DFSG Force Report or
    other instructor provided Use of Force report
    1-1-2: Role-play Scenario 1: Bar Fight
    1-1-3: Role-play Scenario 2: Wanted
    Panhandler
Duty belt with baton ring, handcuff case, and
training gun and holster (for student practice)
Dart-firing stun guns with live cartridges (for
instructor demonstration)
Dart-firing stun gun inert/non-conductive
cartridges (for Role-play Scenarios)
Target(s) as required for class size

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|

**DFSG521. Summarize basic training or equivalency requirements for dart-firing stun gun use.**

In 2006, the Florida legislature created Florida Statute s. 943.1717 as a response to inconsistent stun gun use statewide. The legislation governs the training and use of dart-firing stun guns by law enforcement in Florida. The statute requires that any law enforcement officer authorized by his or her employing agency to operate a DFSG must attend either the Commission-approved DFSG course during basic recruit training or an equivalent training course provided by the officer's employing agency.

**DFSG522. Summarize required annual training for dart-firing stun gun use.**

Not every criminal justice agency authorizes its officers to carry DFSGs. However, if an officer is employed by an agency that does, he or she may be required to go through supplemental agency training before being allowed to operate the weapon. If the officer's agency allows the use of the DFSG and has authorized the officer to carry it, he or she is required to attend annual training of at least one hour on its use.

**DFSG519. Describe statutorily authorized use of a dart-firing stun gun.**

As defined in Florida Statute ss. 943.1717 and 790.01(3)(b), a DFSG is categorized as a nonlethal (force level that is not intended to cause death or great bodily harm) weapon. It is used to control a person during an arrest or a person in custody when resistance escalates from passive physical resistance to active physical resistance. The person must also have the apparent ability to physically threaten the officer or others, or the person prepares or attempts to flee or escape. These statutory guidelines provide the minimum criteria for use of a DFSG. The appropriate and necessary use of a DFSG will be

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|

determined on the basis of the officer's training, experience, and assessment of all pertinent circumstances.

**DFSG523. Explain lawful possession and use of a dart-firing stun gun by a civilian.**

Stun guns and DFSGs are available for purchase and legal use by civilians in Florida. According to Florida Statute s. 790.01(3)(b), it is not a violation of this section for a person to carry, "for purposes of lawful self-defense in a concealed manner," a DFSG." Further, Florida Statute s. 790.053(2)(b) states that a person may openly carry a DFSG for purposes of lawful self-defense.

**DFSG525. Provide a brief history of stun guns.**

Show Video Segment 1.

The stun gun was invented in the 1960s by John Cover. He intended to create an electric, nonlethal weapon to control violent criminal behavior. This new weapon was called a TASER, an acronym for Thomas A. Swift's Electrical Rifle. It was named this in reference to an early 1900s children's novel by Victor Appleton. Electronic control devices (the words "devices" and "tools" will be used synonymously throughout this lesson) are all generally built using the same principle, which is delivering relatively low power (amperage and wattage) coupled with high voltage to a subject. Compliance is gained either through pain or involuntary muscle contractions causing incapacitation that enables the officer to restrain the subject.

Early in its development, a basic stun gun itself had to make physical contact with a subject because the electrodes were fixed to the device. This type of stun gun has been manufactured in various sizes and shapes but is usually small and easy to hold. Currently, the two most common types of stun guns are the basic stun gun and the

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|
| DFSG.<br><br>Additionally, there are several different types of electronic control tools including shields, batons, and restraint devices. The shield is generally used for riot control and in correctional settings. The restraint type devices are not seen as much as the other delivery systems. The first DFSG was developed in 1974 and is the most widely used tool to date for law enforcement officers in Florida.<br><br>One example of a dart-firing stun gun is the TASER® International TASER® device, which is a stun gun with the ability to reach its subject from up to 35 feet. The TASER® device is shaped like a handgun and uses compressed gas to propel two small darts that are connected by wire to the TASER® device.<br><br>The TASER device is primarily used by law enforcement, the military, and security guards. However, civilians are increasingly using TASER devices as self-defense weapons.<br><br>**DFSG524. Describe the basic nomenclature and mechanics of a stun gun.**<br><br>If a person is struck by lightning or sticks a finger in an electrical outlet, the current can maim or even kill, but in smaller doses, electricity is harmless. An amp (ampere) is the measure of electrical current or power. High voltage will not injure a subject if the current (or amps) is low. For example, a harmless carpet static discharge is equal to 30,000 volts. Low voltage can injure if the current is high enough. Stun guns operate at low average currents.<br><br>Electricity follows the path of least resistance. In order for a stun gun to operate, electricity must be able to flow between the probes. The path of least resistance on a DFSG is between the probes. The wider the probes spread on the | Show Video Segment 2. |

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|

TASER® is a registered trademark of TASER International, Inc., 1998-2012
target, the greater the effectiveness of the weapon. Electricity will not pass to others in contact with the subject unless contact is made directly between or on the probes. An officer should remember that electricity can arc through clothing and even some bullet-resistant materials. If the officer were to expose a subject who was submerged or standing in water to a DFSG, it would not cause electrocution or increase the power applied to the subject.



The basic idea of a stun gun is to disrupt the body's communication system by generating a high-voltage, low-amperage electrical charge. In simple terms, the charge has a lot of pressure behind it but not much intensity. When a stun gun is pressed against a subject and the trigger is held, the charge passes into the subject's body.

Because it has a fairly high voltage, the charge will pass through heavy clothing and skin, but the charge is not intense enough to damage the subject's body unless applied for extended periods. It does affect the subject's nervous system.

First, the charge combines with the electrical signals from the subject's brain, making it very difficult to decipher any messages. The subject has a hard time telling his or her muscles to move and may become confused, unbalanced,

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|

and incapacitated. Also, the current may be generated with a pulse frequency that mimics the body's own electrical signals. In this case, the current will tell the subject's muscles to do a great deal of work in a short amount of time. Depending on shot placement, the subject's torso and limbs will either contract or extend.

Conventional stun guns have a simple design. They are about the size of a flashlight and work on nine-volt batteries. The circuitry includes multiple transformers and components that boost the voltage in the circuit, typically between 20,000 and 150,000 volts, and reduce the amperage. The electrodes are simply two plates of conducting metal positioned in the circuit with a gap between them. Because the electrodes are positioned along the circuit, they have a high voltage difference between them. If this gap is filled with a conductor (the subject's body), the electrical pulses will try to move from one electrode to the other, dumping electricity into the subject's nervous system.

**DFSG526. Describe the basic nomenclature and mechanics of a dart-firing stun gun.**



Show Video Segment 3.

TASER stun guns work the same basic way as ordinary stun guns, except the two charge electrodes are not permanently joined to the housing. Instead, they are positioned at the ends

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|

of long conductive wires attached to the gun's electrical circuit. Pulling the trigger breaks open a compressed gas cartridge inside the gun, launching the electrodes through the air; the attached conductive wires trail behind. This is the same basic firing mechanism of a BB gun.



TOP PROBE IS "HORIZONTAL" IN RELATIVITY TO THE WEAPON

BOTTOM PROBE POINTS 8 DEGREES DOWN

The electrodes are fitted with small barbs so that they will grab onto a subject's clothing. When the electrodes are attached, the current travels down the wires into the subject. The main advantage of this design is that it stuns subjects from a greater distance (typically 15 to 25 feet for patrol and 35 feet for SWAT/Special Operations). The disadvantage is that if an officer misses or only one probe hits, he or she must reload to attempt a second shot. A *cycle* is the predetermined amount of time (usually five seconds) that a stun device will discharge automatically when activated.

Some TASER guns have a built-in shooter-identification system. When fired, the gun also releases dozens of confetti-sized identification tags that tell investigators which gun was fired and at what location. Some also have a computer system that records the time and date of shots.

**DFSG540. Explain use as a drive stun device.**

Drive stun, or touch stun, occurs when the front

Display a DFSG, while explaining the similarities and differences between its nomenclature and functioning and that of a basic stun gun.

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|
| of the DFSG is directly touched to the body of the resisting electrical subject, and the electrical charge is passed to the subject's body. In this mode, the DFSG works as a conventional stun gun and is a pain-compliance tool only. The drive stun can be used when the suspect is too close to the DFSG operator or when a probe application would be hard to make (e.g., a suspect and an officer are fighting, and the DFSG operator cannot get a clear shot on the suspect). The drive stun does not incapacitate a subject but may assist an officer in taking him or her into custody.<br><br>To use as a drive stun device (without firing probes), the officer should remove the live cartridge and apply the weapon directly to a subject. Ideal target areas of the body are large muscle mass areas or areas with high nerve concentration such as the side of the neck, inside of the thigh, or abdomen and leg area (excluding the chest area).<br><br>If the first choice of target area is not effective, an officer may consider a different area of application, use of an additional cycle of application, or use an alternative force option. The drive stun generally does not cause incapacitation. Because of this, officers frequently find themselves in prolonged struggles with violent suspects whom they end up drive stunning several times in several different locations on the body. This often results in multiple discharges, causing scratches on the suspect's body and numerous *signature marks*, which are marks left on a subject's body after a drive stun application. | |

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|







**The above are examples of drive stun signatures marks.**

An effective alternative technique is for an officer to use a drive stun with a live cartridge.

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|
| For example, the officer fires a DFSG, and the probes are discharged into the resisting subject. | |

A drive stun is then applied away from the probes to achieve neuromuscular incapacitation. In addition, if only one probe strikes a subject, the drive stun will act as a second probe by completing the cycle.

This tactic also works even if both probes strike the subject. If the probe spread is very minimal due to a close shot or a drive stun with a live cartridge, a drive stun away from the probes will increase the spread and cause incapacitation. Probe hits are almost always more desirable than drive stuns. They are more effective (neuromuscular vs. pain compliance), can be applied from a safe distance, usually require fewer cycles, and cause fewer injuries.

**DFSG527. Describe the proper maintenance, care, and storage of the dart-firing stun gun.**

While most electronic control devices have specific maintenance requirements, there are some considerations that apply to all. An officer should keep the device clean and dry as much as possible. If it gets wet, the officer should make sure it is turned off and put in a clean, dry place until it dries completely. An officer should never test the device while it is still wet. Storage will be based on the manufacturer's recommendation and agency policy. Prolonged storage in extreme temperatures should be avoided.

**DFSG528. Explain that a dart-firing stun gun is intended to prevent injury to the subject involved and other persons present.**

Although use of a DFSG is intended to prevent injury to the subject and other people present, the device itself has a very powerful physical effect.

*Instructor Notes:*

Demonstrate how to use the DFSG as a drive stun device.

Have students demonstrate how to use the DFSG as a drive stun device.

Demonstrate the proper maintenance, care, and storage of a DFSG.

Have students demonstrate the proper maintenance, care, and storage of a DFSG.

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|

**DFSG535. Describe the possible effects that a dart-firing stun gun has on the human body.**

The human body uses electricity to move its muscles. A DFSG essentially overwhelms that electrical system, causing temporary paralysis and/or incapacitation.

A 7 to 15-watt system works as a pain compliance tool and does not interfere with a person's nervous system. A 26-watt system overrides the body's sensory and motor nervous system but has not been shown to interfere with respiration or heartbeat.

When DFSG probes hit a subject, the weapon transmits electric impulses that interfere with the electric impulses used by the human nerve system to communicate with the skeletal muscles, causing physical incapacitation, or electro-muscular disruption (EMD). Therefore, the subject immediately loses control of his or her body and falls to the ground, incapable of any coordinated action Possible effects of use could include the subject immediately falling to the ground, yelling or screaming, having involuntary muscle contractions, freezing in place with legs locked, feeling dazed for several seconds or minutes, experiencing vertigo or a temporary tingling sensation, experiencing critical stress amnesia, not remembering any pain, and/or exhibiting minor signature marks from contact.

The subject may not show any physical effects from the contact but may have sustained injuries from a fall as a result of contact with the DFSG. These injuries are usually minor in nature. However, there are circumstances where more severe injuries could occur. At this time, there is no evidence that age is a contributing factor in injuries. Also, there is no evidence that electrical energy alone causes significant injury to an unborn fetus or an expectant mother.

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|
| Manufacturers and independent studies assert that the use of these devices has no residual medical impact on subjects. There is no basis to establish that stun guns pose unacceptable health risks when used appropriately on healthy subjects. The fall that results from use of a DFSG, if it occurred from elevated heights or other hazardous areas, could cause more significant injuries. | |

**DFSG549. Explain medical considerations involving dart-firing stun gun use.**

Sudden In-custody Death Syndrome (SDS) is a broad classification for unexplained in-custody deaths, usually occurring 20 minutes to 2 hours after the suspect has been taken into custody.

In nearly all cases of unexplained deaths involving in-custody subjects, the victim has exhibited bizarre behavior due to delusional, agitated, or stimulant drug-induced mental states.

SDS is an emerging medical diagnosis for the following well-documented medical maladies: excited delirium and drug-induced psychosis, which is a form of psychosis resulting from drug use. It can cause hallucinations and/or delusions, or positional asphyxia, which is death as a result of body position that interferes with one's ability to breathe.

Researchers have noted this phenomenon for more than a century. Though there are few diagnostic methods to accurately predict an onset of SDS, there are some consistent indicators that alert a trained professional that a subdued person is more susceptible to the onset of SDS.

The most common factors that are relevant to criminal justice officers are the visible signs of distress or indicators that a subject may be suffering from excited delirium. Some indicators of this condition include unusual or psychotic behavior, disorientation, intense sweating, hot,

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|
| feverish skin, delirious and/or delusional behavior, extreme paranoia, continuously racing pulse, and/or a history of drug abuse or use.<br><br>The quickest and safest way for an officer to handle a subject in this state is to notify EMS as soon as possible, use a DFSG to incapacitate, if necessary, and restrain the subject at the earliest possible point using the least restrictive means possible.<br><br>**DFSG550. Explain how to handle an impaired, ill, injured, or pregnant subject.**<br><br>In as safe and practical a manner as possible, an officer should attempt to discern if a subject is impaired.<br><br>Although most subjects who are emotionally or mentally disturbed or under the influence of drugs or alcohol usually comply, some do not. Agency policy should be followed in these situations. An officer must be aware that the typical physiological responses to the DFSG are not always present in impaired subjects. As in any high-risk situation, the officer should be prepared to adapt to the situation and take other tactical action. In general, the best approach to handling subjects suffering from any form of psychosis is to restrain them as quickly as possible to protect them and others from potential injury. Also, an officer should follow agency policy when encountering an obviously pregnant or ill subject.<br><br>**DFSG551. Explain the after-care considerations of dart-firing stun gun use.**<br><br>All persons who have been subjected to DFSG use should be monitored regularly while in custody, even if they are receiving medical care. In accordance with training and agency policy, an officer should consider removing the probes if all signs of resistance are gone. Probes that have been removed from the skin should be treated as | Video Segment 4. This segment offers an example of how officers responded to a case of excited delirium. |

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|
| biohazard sharps. If excessive bleeding is observed, medical attention should be sought immediately. Additionally, an officer should clean and bandage any wounds in accordance with agency policy. An officer should look for and treat any possible secondary injuries and seek medical attention if the condition requires it. Trained medical professionals should remove all deeply embedded probes or probes that penetrate sensitive tissue areas (i.e., neck, face, groin, female breast, etc.). | |

**DFSG520. Explain legal justification of use of a dart-firing stun gun.**

Claims that officers used excessive force in the course of an arrest, investigatory stop, or other seizure, are analyzed under the Fourth Amendment's objective reasonableness standard (*Graham v. Conner*, 490 U.S. 386 1989).

Use of force incidents are judged on whether officers considered that a reasonable person would believe the officer's actions were justifiable based on the totality of circumstances known to officers at the time the force was used. The officer must consider, without regard to underlying intent or motivation, his or her authority to use force and the totality of the circumstances, much of which officers may have no control over. In these instances, the officer must be able to articulate justification verbally for why he or she chose to utilize the DFSG. Florida Statute also requires officers to consider using a DFSG only when a subject is actively, physically resisting.

*Instructor Note: Show Video Segment 5.*

The court has established law on the use of a TASER in the case of *Draper vs. Reynolds*, 369 F3d 1270 (11th Cir. 2004). Video of the traffic stop led the court to conclude that if the officer had attempted handcuffing without the use of the TASER, it would have escalated into a serious physical struggle. The one-time shock of a suspect with a TASER did not constitute

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|
| excessive force and was reasonably proportionate when the subject repeatedly refused verbal commands and became hostile, belligerent, and uncooperative during the stop.<br><br>Many law enforcement officials claim that in some situations, stun guns can be an effective alternative to more harmful methods such as traditional firearms and batons.<br><br>    "Independent medical and scientific expert's studies…have determined TASER devices to be a safer response to resistance option compared to traditional use-of-force tools. Field studies have reaffirmed the life-saving value of TASER devices. Independent studies…including an extensive, multi-million dollar three-year study conducted by the United Kingdom's Association of Chief Police Officers (ACPO) in consultation with the British Police Scientific Development Branch (PSDB), the British Defense Science and Technology Laboratory (DSTL) and the British Defense Scientific Advisory Council Sub-committee on the Medical Implications of Less-lethal Weapons (DOMILL), as well as a U.S. Department of Defense (DOD) study involving approximately 20 medical and research doctors from a dozen academic, government and private institutions…have reaffirmed the overall safety and effectiveness of TASER's life-saving technology." (www.taser.com)<br><br>**DFSG530. Describe how to use proper verbal skills to de-escalate a situation and avoid the use of the dart-firing stun gun when practical.**<br><br>An officer should first attempt to gain control of a situation by using verbal commands. Many physical encounters can be avoided by this process, often referred to as verbal de-escalation. By disengaging or de-escalating, an officer gives the subject another opportunity to comply with lawful commands and avoid the use of the DFSG. If all efforts to verbally de-escalate the | Provide examples of situations when a DFSG was properly used on a subject and articulate justification of use. |

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|
| situation are exhausted or are not feasible, the use of a DFSG may be warranted. | |

**DFSG529. Explain why not every subject displaying an active physical resistance will necessitate the use of a dart-firing stun gun.**

| | |
|---|---|
| Not every subject who displays an active physical resistance will need the use of a DFSG. During these encounters, an officer must continually assess whether to engage or disengage and decide on the appropriate force option. Many times, the most prudent approach may be for the officer to fend off the initial assault then disengage and reassess. From this point, the officer can either escalate to a higher force option or de-escalate to a lower force option as the situation dictates. Whenever possible, this should be done from a position of cover. If an officer decides to use a DFSG, he or she will be expected to articulate that, based on training, experience, and assessment of the circumstances, use of the device was the best force option for the situation. | Show Video Segment 7. |

**DFSG534. Explain why use of a dart-firing stun gun in a punitive manner is prohibited.**

The DFSG is not to be used to coerce a subject to give statements or perform an illegal act. Use of a DFSG in a punitive manner without lawful authority may be violating a citizen's civil rights and subject to the following decision:

> U.S. Code Title 42 Chapter 21 Subchapter 1 Section 1983: Civil action for deprivation of rights states that "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|
| immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." | |

**DFSG537. Identify that a dart-firing stun gun is not a substitute for a firearm.**

The use of a DFSG is not a substitute for the use of a firearm. However, this does not exclude its use in place of a firearm when an officer is afforded the time, reasonable cover, and a backup officer.

**DFSG532. Describe primary and alternative sites on the body to target with a dart-firing stun gun.**

Once the decision to use a DFSG has been made, an officer must consider a number of tactical factors including the following:

- What is the most effective area of the body to target?

- What is the physical environment around the subject?

- Are there officer safety concerns or danger to the subject or nearby public?

- Is there cover or concealment available for an officer?

- Is there a time constraint?

- Is backup present or en route?

- At what point in the encounter might an additional DFSG application be required?     Show Video Segment 6.

The primary target of a subject's body should be

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|
| large muscle groups such as the back, buttocks, and legs. Alternative target sites might be the back near the shoulders or the back of the legs where, if clothed, the clothing fits tighter and the probes will conduct electricity to the subject more effectively. | |

**DFSG531. Describe areas to avoid targeting with a dart-firing stun gun.**

The physical positioning of a subject, the clothing he or she is wearing, and how he or she is wearing it could also play a big role in the effectiveness of a DFSG application. The DFSG may not be as effective when the subject has on loose-fitting or very thick clothing. The intentional targeting of a subject's head, neck, face, female breasts, or groin should be avoided when possible because of a higher likelihood of potential for injury to the subject.

Demonstrate appropriate areas to target on a subject's body.

Have students demonstrate the proper targeting of a subject's body.

**DFSG533. Describe environmental conditions to consider prior to using a dart-firing stun gun.**

Officers must observe the subject and be aware at all times of the methods subjects may use to defeat a DFSG including where a subject's hands are. He must also be prepared to intervene as necessary with an additional application/cycle or other methods of control.

There are a number of environmental safety factors to consider prior to the use of a DFSG. For instance, if a subject is encountered in an elevated position, such as a ledge or stairwell, the officer should consider that if he or she fires a DFSG, the subject may become incapacitated and injure him- or herself upon falling. If a subject is operating a vehicle or machinery and is incapacitated by a DFSG, there is a possibility that the subject could turn the vehicle into an uncontrolled, deadly object. If a subject is in or could fall into water when hit with a DFSG, the subject could drown. If a flammable chemical

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|

spray has been deployed on a subject, the DFSG could ignite the subject. An officer should follow his or her agency's policy and procedures regarding the use of OC sprays and DFSGs. If a subject is in an environment containing hazardous materials or potentially flammable, volatile, or explosive materials that could be ignited as a result of firing the DFSG , the subject could ignite when hit with a DFSG.

**DFSG501. Explain how to properly utilize backup officer(s) to gain compliance and handcuff a subject during use of a dart-firing stun gun.**

An officer should try to have at least one backup officer present to handcuff the subject after the officer with the DFSG has gained compliance. The primary officer will be operating the DFSG and the backup officer(s) will take physical control of the subject. By taking advantage of the time the subject is incapacitated, the backup officer moves in and secures him or her, while the primary officer maintains control through the use of a DFSG.

While the cycle (five seconds) is active, the officer will not be able to manipulate the subject's arms or legs to handcuff. At this point, the subject is usually no longer trying to resist and wants to comply but has little or no muscular control and may appear to be resisting. It is for the officer's (and the subject's) safety that the officer be aware of the subject's potential uncontrollable overreaction in these situations.

*Show Video Segment 8.*

**DFSG502. Explain the use of multiple exposures to gain compliance.**

Experts in the field agree that there is no definitive number of exposures to the electricity that a DFSG produces. The reasonableness standard will help in the decision-making process. For example, an officer who is left alone for several minutes away from the nearest

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|
| backup and is facing a large subject who threatens to do serious bodily harm to the officer may decide to use a DFSG. At the end of the cycle, the subject still refuses to comply. An officer may continue demanding compliance and deliver another cycle. Several cycles may be necessary until another officer arrives on scene to assist or until the subject stops physically resisting. | Demonstrate how to properly utilize backup officer(s) to gain compliance and handcuff a subject during use of a DFSG. |
| **DFSG503. Summarize the need to stay current on dart-firing stun gun policy issues and trends.** | |
| An officer should stay up to date on case law, department policies, and current trends that may impact the officer's use of a dart-firing stun gun. The agency, manufacturers of the dart-firing stun gun, and local States Attorneys may provide these updates. | |
| It has recently been noted that subjects expecting encounters with law enforcement may be putting objects or shields under their clothing to render the DFSG ineffective. They may also "stop, drop, and roll" to pull out darts. If a subject begins to roll, an officer should close the distance, move with the subject, and keep sufficient slack in the wire to maintain electrical contact. Additionally, subjects may wait for the cycle to stop then pull out the darts and may even begin to run away. An officer must be prepared to close in and utilize a drive stun or transition to another force option to stop the suspect from leaving. | Show Video Segment 9. |
| **DFSG504. Demonstrate how to properly document use of force reports involving dart-firing stun gun use.** | |
| Prompt and accurate reporting of this decision and the use of a DFSG is required. An officer's employing agency will have specific policy and training on when and how to document this use. | |

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|

**Summary**

This lesson provides you with fundamental knowledge and use of a DFSG. Not all criminal justice agencies authorize their officers to carry DFSGs. If you are employed by an agency that does, you may be required to complete supplemental agency training before you are authorized to operate a DFSG. Once authorized you will then be required by Florida statute to complete annual retraining requirements.

Provide examples of and explain how to properly document use of force reports with emphasis on complete and accurate narrative sections. These examples may include Attachment1 1-1-1: DFSG Use of Force Reports, local agency Use of Force Reports, PC Affidavits, Offense Reports, Incident Reports, or other instructor-provided Use of Force reports.

Demonstrate each of the following concepts. After you demonstrate have the students practice how to discharging a DFSG with live (conductive)* cartridge by:

1. drawing from the holster

2. deploying and firing a live cartridge onto target

3. reloading (Stress that reloads should be conducted in a safe manner and that students should never cross their hands in front of the cartridge, as a static electrical charge could cause the gun to fire.)

4. transitioning from a DFSG to another force option

Live (conductive)* DFSG cartridges will be used for instructor demonstration and initial student practice only.

Demonstrate and have students perform each of the following:

| LESSON OUTLINE | INSTRUCTOR NOTES |
|---|---|
| | • de-escalation: utilizing verbal commands to control a situation |
| | • contact cover or tactical approaches to a situation utilizing multiple officers |
| | • securing under power: gaining compliance and control of subject so restraints can be applied |
| | • transitioning from one force option to another as the situation dictates |
| | At the conclusion of this lesson, use Attachments 1-1-2 and 1-1-3 to conduct Role-play Practicum #1: Bar Fight and #2: Wanted Pan-Handler. Also distribute copies of Attachment 1-1-1- Blank Use of DFSG Force Reports or provide other blank Use of Force reports for students to fill out at the conclusion of each practicum. DFSG training inert (nonconductive) cartridges will be used for students during the Role-play Practicum. |

# Dart-Firing Stun Gun Use of Force Report Example

Date/Time:_____ Officer's Name and Agency: _____

On Scene Supervisor:_____ Officer(s) Involved: _____

DFSG Model: _____
Battery Type: _____Alkaline _____NiMH
Air Cartridge Type(s): _____21 ft Std _____21 ft _____15 ft _____35 ft

DFSG Serial #:_____ Medical Facility:_____ Doctor: _____

Nature of the Call or Incident:_____ Charges:_____ Booked: Y / N

Type of Subject: ( ) Human ( ) Animal
Location of Incident: ( ) Indoor ( ) Outdoor ( ) Jail ( ) Hospital
Type of Initial Force Used (check all that apply): ( ) Physical ( ) Baton ( ) Impact Munition ( ) Chemical ( ) Firearm

Nature of any Injuries and Medical Treatment Required: _____

Admitted to Hospital for Injuries: Y / N    Admitted to Hospital for Psychiatric: Y / N

Medical Exam: Y / N    Suspect Under the influence: Alcohol / Drugs (specify): _____

Was an officer/law enforcement employee injured other than by DFSG? Y / N

Incident Type (circle appropriate response(s) below):
Civil Disturbance    Suicidal    Suicide by Cop    Violent Suspect    Barricaded    Warrant    Other
Age:_____    Sex:_    Height:_____    Race:_____    Weight: _____

DFSG use (circle one): Success / Failure    Suspect wearing heavy or loose clothes: Y / N

Number of Air Cartridges fired:_____ Number of cycles applied: _____

Usage (check one):    ( ) Arc Display Only    ( ) Laser Display Only    ( ) DFSG Application

DFSG: Is this a dart probe contact: Y / N    Is this a drive stun contact: Y / N

Approximate target distance at the time of the dart launch:_____ feet

Distance between the two probes:_____ inches    Need for an additional shot? Y / N
Did dart contacts penetrate the subject's skin? Y / N    Probes removed on scene: Y / N
Did DFSG application cause injury: Y / N    If yes, was the subject treated for the injury: Y / N

DESCRIPTION OF INJURY: _____

_____

_____

_____

_____

COPYRIGHT © 2015 by
Florida Department of Law Enforcement

# Application Areas

(Place Xs where probes hit suspect and Os where stunned)



SYNOPSIS:

_____

_____

_____

Need for additional applications? Y / N      Did the device respond satisfactorily? Y / N

If the DFSG deployment was unsuccessful, was a DRIVE STUN follow up used? Y / N

Describe the subject's demeanor after the device was used or displayed?

_____

_____

_____

Chemical Spray: Y / N          Baton or Blunt Instrument: Y / N

Authorized control holds: Y / N          If yes, what types: _____

Describe other means attempted to control the subject: _____

Photographs Taken: Y / N          Report Completed by: _____

ADDITIONAL INFORMATION:

_____

_____

_____

**ATTACHMENT 1-1-2**

## Role-play Practicum 1: Bar Fight

Students will participate in instructor-directed simulation scenarios; verbally articulate tactical options used, and then complete appropriate Use of Force Report. DFSG training inert (nonconductive) cartridges will be used for students during the practice scenario.

### Background
The recruit has completed Legal, Communications, and Defensive Tactics. This scenario will enable students to interact with suspects, safely operate a DFSG, and document its use.

### Logistics
This scenario may take place in a classroom or appropriate outside venue.

### Equipment Issued to Officer
Duty belts with handcuffs, baton, OC spray, practice DFSG or other object to simulate a DFSG, and Instructor Material—Blank Use of DFSG Force Report or instructor-provided Use of Force Report

### Facilitator
These are teaching scenarios with uninvolved students acting as observers. You are to function as dispatcher. This scenario may be modified to incorporate a variety of suspect actions and officer responses. Ensure the following occur throughout simulation scenarios as appropriate:

- de-escalation—utilizing verbal commands to control a situation

- contact cover or tactical approaches to a situation utilizing multiple officers

- securing under power—gaining compliance and control of subject so restraints can be applied

- transition drills—moving from one force option to another as the situation dictates

At the end of each simulation scenario, facilitate a guided discussion of possible tactical options, and debrief the role-playing officer.

### Dispatch Information
The recruit will be dispatched to the scene of a fight in progress at a local bar.

### Role Player Props
The props will vary according to scenario modification but may include simulated knives or striking objects.

### Role Player (Victim)
You will start on the ground, straddled by the suspect. No weapon is involved. Upon disengagement by the suspect, either walk away or comply with officer's direction to sit, stay in the area, etc. Minimize your influence on the remaining portion of the scenario.

COPYRIGHT © 2015 by
Florida Department of Law Enforcement

**Role Player (Suspect)**

You are establishing yourself as the aggressor. Start on top of the victim, and deliver simulated strikes to the victim's head area. As the officer arrives on the scene and issues direction comply or elevate resistance as directed by the instructor.

**Officer(s) Behavior**

- Establish presence.

- Give proper verbal commands.

- Announce that you have a DFSG.

- Communicate with other officer(s).

- Recognize nonverbal cues of elevating aggression; respond verbally to de-escalate the situation or, if they escalate to the active physical resistance level, then respond with a baton, OC, or simulated DFSG activation.

- Coordinate with backup officer(s) for proper relative positioning.

- If application misses, reassess and reapply if needed by pulling the trigger again, and wait for results.

- If suspect complies, direct him or her to lay face down on the ground.

- Reposition as needed to allow backup officer(s) to apply handcuffs, remove weapon, and complete the arrest.

- If the suspect escalates his or her agression to the use of deadly force, respond with a simulated use of deadly force.

- Explain the proper procedures for handling the fired cartridge.

- Explain the proper medical follow-up for the subject.

- Verbally articulate tactical options used and then fill out appropriate Use of Force Report.

**ATTACHMENT 1-1-3**

## Role-play Practicum 2: Wanted Panhandler

Students will participate in instructor-directed simulation scenarios, verbally articulate tactical options used, and then complete appropriate Use of Force Report. DFSG training inert (nonconductive) cartridges will be used for students during the practice scenario.

### Background
The recruit has completed Legal, Communications, and Defensive Tactics. This scenario will enable students to interact with suspects, safely operate a DFSG, and document its use. This scenario may be modified to incorporate a variety of suspect actions and officer responses.

### Logistics
This scenario may take place in a classroom or appropriate outside venue.

### Equipment Issued to Officer
Duty belts with handcuffs, practice DFSG or other object to simulate a DFSG, and Instructor Material—Blank Use of DFSG Force Report or instructor-provided Use of Force Report

### Facilitator
These are teaching scenarios with uninvolved students acting as observers. You are to function as dispatcher. This scenario may be modified to incorporate a variety of suspect actions and officer responses. Ensure that the following actions occur throughout the simulation scenarios as appropriate

- de-escalation—utilizing verbal commands to control a situation

- contact cover or tactical approaches to a situation utilizing multiple officers

- securing under power—gaining control of subject so restraints can be applied

- transition drills—moving from one force option to another as the situation dictates

At the end of each simulation scenario, facilitate a guided discussion of possible tactical options, and debrief the role-playing officer.

### Dispatch Information
The recruit will be dispatched to an intoxicated person, pan-handling at the bus station, who is known to have an active misdemeanor warrant for petty theft.

### Role Player Props
None (may vary according to scenario modification)

### Role Player (Suspect)
You are lying on the ground, facing away from the officer, with your hands under you.

COPYRIGHT © 2015 by
Florida Department of Law Enforcement

Path 1—The officer does not announce his or her presence or identify him- or herself and does not give clear directions:

- Do not resist.

- Offer a nonintelligible grumble.

- Lazily move a foot in the direction of the officer, as in a drunken kick.

- Offer no other physical resistance.

Path 2—The officer properly announces his or her presence:

- Provide no verbal resistance.

- Upon the officer's request to remove your hands from under you, do not act until the officer gives the same direction two or three times.

- Offer no other physical resistance.

**Officer(s) Behavior**

- Establish presence.

- Give proper verbal commands.

- Coordinate with backup officer for proper relative positioning.

- Reposition as needed to allow backup officer to complete arrest.

- If the suspect is seriously injured and noncompliant, a DFSG cannot be used to coerce his or her compliance.

- Verbally articulate tactical options used.

# Criminal Justice Standards and Training Commission
## Florida Department of Law Enforcement

# *1160 Dart-Firing Stun Gun*

### *August 7, 2008*
### *Version 2008.08*
### *(Updated January 6, 2016)*

# Student Guide

# *Criminal Justice Specialized Course*

COPYRIGHT © 2016 by
Florida Department of Law Enforcement

# Copyright Information

COPYRIGHT © 2016 by Florida Department of Law Enforcement. Reproduction or duplication of this courseware in any form, in whole or in part, is prohibited without prior written permission from the Florida Department of Law Enforcement. Training Schools, as defined in Rule 11B-21.001, F.A.C., have permission to duplicate the training materials contained herein for the purpose of Commission-approved training.

Permission can be obtained by contacting:
Florida Department of Law Enforcement
Criminal Justice Professionalism Program
Curriculum Section
PO Box 1489
Tallahassee, FL 32302-1489
(850) 410-8600

# Updates

This course was updated on October 22, 2009, with the following changes:
- Update to lesson material clarifying how to gain compliance and handcuff subject
- Update to lesson material clarifying frontal target areas.

See Curriculum Alert 2008.08 Number 4

This course was updated on October 1, 2011, with the following changes:
- Update to course effective date
- Added to Updates section to include this curriculum alert
- Updated Foreword
- Revision to Objective DFSG525. Provide a brief history of stun guns in Instructor Guide (p.8) and Student Guide (p.5)

See Curriculum Alert 2011-18

This course was updated on March 6, 2014, with the following changes:
- Updated course effective date
- Added to Updates section to include this curriculum alert
- Revision to lesson material statement summarizing independent medical and scientific expert affirmation of the safety and effectiveness of TASER technology (p.

See Curriculum Alert 2014-07

This course was updated on January 6, 2016, with the following changes:
- Updated course effective date
- Added to Updates section to include this curriculum alert
- Revision to lesson material to reflect statute number change (F.S. §790.01) per Legislative updates

See Curriculum Alert 2015-29

# Disclaimer

FDLE makes a sincere effort to ensure accuracy and quality of its published materials; however, no warranty, expressed or implied, is provided. FDLE disclaims any responsibility or liability for any direct or indirect damages resulting from the use of the information in this course or products described in it.

Mention of any product does not constitute an endorsement by FDLE of that product. All referenced persons, places, or situations are intended to be fictional, unless otherwise stated. Any resemblance to real persons, places, or situations is coincidental.

The training in this course is provided to familiarize students with issues that may involve high liability and/or high stress activities. FDLE urges students to ensure that their practices are correct in accordance with their agencies' policies and procedures. Employing agencies are solely responsible for guiding their employees' actions in actual situations.

# Acknowledgments

We extend our sincere appreciation to the agencies of the Florida Criminal Justice System that allowed their members to assist in the development of this Specialized Course.

Developed with the following assistance:

*Coral Springs Police Department*
*Florida Capitol Police*
*Florida Department of Law Enforcement*
*Leon County Sheriffs Office*
*Palm Bay Police Department*
*Pensacola Police Department*
*Tallahassee Police Department*
*Tarpon Springs Police Department*

# Foreword

This course is part of the Criminal Justice Standards and Training Commission Specialized Training Program pursuant to Rule 11B-35.007, F.A.C.

Courses in the Specialized Training Program are designed for post-basic or in-service training to enhance an officer's knowledge, skills, and abilities in a specific area and may be credited toward an officer's mandatory retraining, pursuant to Rule 11B-27.00212, F.A.C.

Instruction of a specialized course must meet the total hours assigned to the course. Training schools and instructors have the flexibility to redistribute topic hours in areas where greater emphasis is needed. The hours assigned to each lesson are an estimate of the time needed to thoroughly cover the stated goals and objectives. At the instructor's discretion, additional learning aids may be used to enhance instruction of the learning goals and objectives. To provide further flexibility, a maximum of four hours of electives may be used for each forty hours of course instruction.

Some specialized courses do not require that students pass a written end-of-course examination. However, any specialized course that is designated as a Specified Specialized Training Program Course, pursuant to Rule 11B-35.001(9)(d), F.A.C., or a Specialized Instructor Training Course, pursuant to Rule 11B-35.007(3), F.A.C., do require an end-of course examination. Students enrolled in a Specified Specialized Training Program Course must achieve a passing score of at least 80%. Students enrolled in a Specialized Instructor Training Program Course must achieve a passing score of at least 85%.

The CJSTC requires that a law enforcement, correctional, or correctional probation officer, who is authorized by his or her employing agency to carry a dart-firing stun gun, attend either a Commission-approved dart-firing stun gun training course or an equivalent program provided by the officer's employing agency. The completion of this course meets the statutory retraining requirements for all three disciplines.

# Course Outline

Copyright Information ................................................................................................ ii

Updates.......................................................................................................................... ii

Disclaimer .................................................................................................................... iii

Acknowledgments....................................................................................................... iii

Foreword ......................................................................................................................iv

Course Outline ..............................................................................................................v

Summary ...................................................................................................................... vi

References ................................................................................................................... vii

Unit 1  Dart-Firing Stun Gun Use

      Introduction

      Lesson 1      Dart-Firing Stun Gun Use

# Summary

**Instructional Goal:** To maintain proficiency in safely using, maintaining, and documenting use of the dart-firing stun gun.

**Structure of Course:** 1 Unit, 1 Lesson

**Total Estimated Time:** 8 hours

# References

All ©Stinger copyrighted names and products registered (including Ultron®, ICE Shield™ and Band-Aid™)

Stinger Systems, Inc. *Stinger Systems, Inc. announces initial sales and volume production of the Stinger projectile stun weapon*. Retrieved October 10, 2005, from http://www.stingersystems.com/press.htm#p14

"Stun Gun Diagram" and "How Stun Guns Work" – Harris, Tom. (2000). *How stun guns work*. Retrieved September 1, 2006, from: http://electronics.howstuffworks.com/stun-gun3.htm

All Registered TASER® names and products and "Top Probe" diagram and 3 "signatures"—TASER International, Inc. Copyright 1998-2006

(2008) *General FAQ's*. Retrieved June 26, 2008 : http://www.taser.com/Pages/TASERSPLASH.aspx

Video: *Guts and Bolts: Tasers*. The History Channel. Retrieved May 9, 2006, from: http://www.history.com/media.do?id=gandb_taser_broadband&action=clip

Video: *Yuma clip*. Taser International Version 13 Training and Information Disc. ©2007 Taser International.

Video: *Stun vs. EMD*. Taser International Version 13 Training and Information Disc. ©2007 Taser International.

Video: *Non-block buster*. (2002, August 3). ABC News. [Television broadcast].

Video: *Clinton Reynolds for Stacy Draper*. Draper clip. Taser International Version 13 Training and Information Disc. ©2007 Taser International.

Video: *Contingencies*. Taser International Version 13 Training and Information Disc. ©2007 Taser International.

Video: *Halstead, Jim. Drug clip*. Chandler, AZ: CA News.

Video: *Toronto clip*. Riverdale Park and Toronto, Canada: City Pulse 24 News.

**Unit 1:** Dart-Firing Stun Gun Use
**Lesson 1:** Dart-Firing Stun Gun Use
**Unit Goal:** To introduce, educate, and train on use of stun guns and dart-firing stun guns.
**Lesson Goal:** To provide students with historical, medical, and physical basics of both the stun gun and the dart-firing stun gun, allow students to practice assessing situations based on statutory requirements of dart-firing stun gun use, and document the use.

## OVERVIEW

### Introduction

This eight-hour course provides instruction in the history, understanding, familiarization, use, and documentation of the dart-firing stun gun (DFSG).

At the end of this course, students should be able to do the following:

- identify DFSG use per Florida Statute ss. 943.1717 and 790.01(3)(b)

- identify and articulate Commission DFSG considerations and their impact on officers in Florida

- identify and articulate the possible effects that a DFSG has on the human body

- properly and safely operate a DFSG

- articulate verbally and in reports justification for tactical options chosen while participating in DFSG simulated scenarios

- use verbal skills to de-escalate a situation and avoid the use of a DFSG

Safety considerations: During actual discharge of live cartridges, students should be outfitted with all safety equipment in case of incidental probe strike.

**Suggested Time:** 8 hours

### Instructional Methods

Class discussion
Oral briefing
Instructor demonstration
Individual demonstration and practice
Small group Role-play Practicums
Group and individual practice and exercise

### Training Materials and Aids

DVD player
Video, *Dart-Firing Stun Gun* Segments 1–9
Student Guide
Florida Statutes

**OVERVIEW**

## Objectives

DFSG521. Summarize basic training or equivalency requirements for dart-firing stun gun use.

DFSG522. Summarize required annual training for dart-firing stun gun use.

DFSG519. Describe statutorily authorized use of a dart-firing stun gun.

DFSG523. Explain lawful possession and use of a dart-firing stun gun by a civilian.

DFSG525. Provide a brief history of stun guns.

DFSG524. Describe the basic nomenclature and mechanics of a stun gun.

DFSG526. Describe the basic nomenclature and mechanics of a dart-firing stun gun.

DFSG540. Explain use as a drive stun device.

DFSG527. Describe the proper maintenance, care, and storage of the dart-firing stun gun.

DFSG528. Explain that a dart-firing stun gun is intended to prevent injury to the subject involved and other persons present.

DFSG535. Describe the possible effects that a dart-firing stun gun has on the human body.

DFSG549. Explain medical considerations involving dart-firing stun gun use.

DFSG550. Explain how to handle an impaired, ill, injured, or pregnant subject.

DFSG551. Explain the after-care considerations of dart-firing stun gun use.

DFSG520. Explain legal justification of use of a dart-firing stun gun.

DFSG530. Describe how to use proper verbal skills to de-escalate a situation and avoid the use of the dart-firing stun gun when practical.

DFSG529. Explain why not every subject displaying an active physical resistance will necessitate the use of a dart-firing stun gun.

DFSG534. Explain why use of a dart-firing stun gun in a punitive manner is prohibited.

DFSG537. Identify that a dart-firing stun gun is not a substitute for a firearm.

DFSG532. Describe primary and alternative sites on the body to target with a dart-firing stun gun.

## OVERVIEW

DFSG531. Describe areas to avoid targeting with a dart-firing stun gun.

DFSG533. Describe environmental conditions to consider prior to using a dart-firing stun gun.

DFSG501. Explain how to properly utilize backup officer(s) to gain compliance and handcuff a subject during use of a dart-firing stun gun.

DFSG502. Explain the use of multiple exposures to gain compliance.

DFSG503. Summarize the need to stay current on dart-firing stun gun policy issues and trends.

DFSG504. Demonstrate how to properly document use of force reports involving dart-firing stun gun use.

Performance Objectives

DFSG538. Demonstrate how to discharge a dart-firing stun gun.

DFSG536. Identify tactical options available while participating in dart-firing stun gun simulation scenarios.

DFSG539. Articulate tactical options used while participating in dart firing stun gun simulation scenario exercises

| Dart-Firing Stun Gun | Dart-Firing Stun Gun Use |
|---|---|
| Specialized Course 1160 | Student Guide Unit 1 Lesson 1 |

**LESSON OUTLINE**

**DFSG521. Summarize basic training or equivalency requirements for dart-firing stun gun use.**

The Florida Legislature created Florida Statute s. 943.1717 as a response to inconsistent stun gun use statewide. The legislation governs the training and use of dart-firing stun guns by law enforcement in Florida. The statute requires that any law enforcement officer authorized by his or her employing agency to operate a dart-firing stun gun (DFSG) must attend either the Commission-approved DFSG course during basic recruit training or an equivalent training course provided by the officer's employing agency.

**DFSG522. Summarize required annual training for dart-firing stun gun use.**

Not every criminal justice agency authorizes its officers to carry DFSGs. However, if an officer is employed by an agency that does, he or she may be required to go through supplemental agency training before being allowed to operate the weapon. If the officer's agency allows the use of the DFSG and has authorized the officer to carry it, he or she is required to attend annual training of at least one hour on its use.

**DFSG519. Describe statutorily authorized use of a dart-firing stun gun.**

As defined in Florida Statute ss. 943.1717 and 790.01(3)(b), a DFSG is categorized as a nonlethal (force level that is not intended to cause death or great bodily harm) weapon. It is used to control a person during an arrest or a person in custody when resistance escalates from passive physical resistance to active physical resistance. The person must also have the apparent ability to physically threaten the officer or others, or the person prepares or attempts to flee or escape. These statutory guidelines provide the minimum criteria for use of a DFSG. The appropriate and necessary use of a DFSG will be determined on the basis of the officer's training, experience, and assessment of all pertinent circumstances.

**DFSG523. Explain lawful possession and use of a dart-firing stun gun by a civilian.**

Stun guns and DFSGs are available for purchase and legal use by civilians in Florida. According to Florida Statute s. 790.01(3)(b), it is not a violation of this section for a person to carry, "for purposes of lawful self-defense in a concealed manner, a DFSG." Further, Florida Statute s. 790.053(2)(b) states that a person may openly carry a DFSG for purposes of lawful self-defense.

**DFSG525. Provide a brief history of stun guns.**

The stun gun was invented in the 1960s by John Cover. He intended to create an electric, nonlethal weapon to control violent criminal behavior. This new weapon was called a TASER, an acronym for Thomas A. Swift's Electrical Rifle. It was named this in reference to an early 1900s children's novel by Victor Appleton. Electronic control devices (the words "devices" and "tools" will be used synonymously throughout this lesson) are all generally built using the same principle, which is delivering relatively low power (amperage and wattage) coupled with high voltage to a subject. Compliance is gained either through pain or involuntary muscle contractions causing incapacitation that enables the officer to restrain the subject.

Early in its development, a basic stun gun itself had to make physical contact with a subject because the electrodes were fixed to the device. This type of stun gun has been manufactured in various sizes and shapes but is usually small and easy to hold. Currently, the two most common types of stun guns are the basic stun gun and the DFSG.

Additionally, there are several different types of electronic control tools including shields, batons, and restraint devices. The shield is generally used for riot control and in correctional settings. The restraint type devices are not seen as much as the other delivery systems. The first DFSG was developed in 1974 and is the most widely used tool to date for law enforcement officers in Florida.

One example of a dart-firing stun gun is the TASER® International TASER® device, which is a stun gun with the ability to reach its subject from up to 35 feet. The TASER® device is shaped like a handgun and uses compressed gas to propel two small darts that are connected by wire to the TASER® device.

The TASER device is primarily used by law enforcement, the military, and security guards. However, civilians are increasingly using TASER devices as self-defense weapons.

**DFSG524. Describe the basic nomenclature and mechanics of a stun gun.**

If a person is struck by lightning or sticks a finger in an electrical outlet, the current can maim or even kill, but in smaller doses, electricity is harmless. An amp (ampere) is the measure of electrical current or power. High voltage will not injure a subject if the current (or amps) is low. For example, a harmless carpet static discharge is equal to 30,000 volts. Low voltage can injure if the current is high enough. Stun guns operate at low average currents.

Electricity follows the path of least resistance. In order for a stun gun to operate, electricity must be able to flow between the probes. The path of least resistance on a DFSG is between the probes. The wider the probes spread on the target, the greater the effectiveness of the weapon. Electricity will not pass to others in contact with the subject unless contact is made directly between or on the probes. An officer should remember that electricity can arc through clothing and even some bullet-resistant materials. If the officer were to expose a subject who was submerged or standing in water to a DFSG, it would not cause electrocution or increase the power applied to the subject.



The basic idea of a stun gun is to disrupt the body's communication system by generating a high-voltage, low-amperage electrical charge. In simple terms, the charge has a lot of pressure behind it but not much intensity. When a stun gun is pressed against a subject and the trigger is held, the charge passes into the subject's body. Because it has a fairly high voltage, the charge will pass through heavy clothing and skin, but the charge is not intense enough to damage the subject's body unless applied for extended periods. It does affect the subject's nervous system.

First, the charge combines with the electrical signals from the subject's brain, making it very difficult to decipher any messages. The subject has a hard time telling his or her muscles to move and may become confused, unbalanced, and incapacitated. Also, the current may be generated with a pulse frequency that mimics the body's own electrical signals. In this case, the current will tell the subject's muscles to do a great deal of work in a short amount of time. Depending on shot placement, the subject's torso and limbs will either contract or extend.

Conventional stun guns have a simple design. They are about the size of a flashlight and work on nine-volt batteries. The circuitry includes multiple transformers and components that boost the voltage in the circuit, typically between 20,000 and 150,000 volts, and reduce the amperage. The electrodes are simply two plates of conducting metal positioned in the circuit with a gap between them. Because the electrodes are positioned along the circuit, they have a high voltage difference between them. If this gap is filled with a conductor (the subject's body), the electrical pulses will try to move from one electrode to the other, dumping electricity into the subject's nervous system.

**DFSG526. Describe the basic nomenclature and mechanics of a dart-firing stun gun.**



TASER stun guns work the same basic way as ordinary stun guns, except the two charge electrodes are not permanently joined to the housing. Instead, they are positioned at the ends of long conductive wires attached to the gun's electrical circuit. Pulling the trigger breaks open a compressed gas cartridge inside the gun, launching the electrodes through the air; the attached conductive wires trail behind. This is the same basic firing mechanism of a BB gun.



TOP PROBE IS "HORIZONTAL" IN RELATIVITY TO THE WEAPON

BOTTOM PROBE POINTS 8 DEGREES DOWN

The electrodes are fitted with small barbs so that they will grab onto a subject's clothing. When the electrodes are attached, the current travels down the wires into the subject. The main advantage of this design is that it stuns subjects from a greater distance (typically 15 to 25 feet for patrol and 35 feet for SWAT/Special Operations). The disadvantage is that if an officer misses or only one probe hits, he or she must reload to attempt a second shot. A *cycle* is the predetermined amount of time (usually five seconds) that a stun device will discharge automatically when activated.

Some TASER guns have a built-in shooter-identification system. When fired, the gun also releases dozens of confetti-sized identification tags that tell investigators which gun was fired and at what location. Some also have a computer system that records the time and date of shots.

**DFSG540. Explain use as a drive stun device.**

Drive stun, or touch stun, occurs when the front of the DFSG is directly touched to the body of the resisting subject, and the electrical charge is passed to the subject's body. In this mode, the DFSG works as a conventional stun gun and is a pain-compliance tool only. The drive stun can be used when the suspect is too close to the DFSG operator or when a probe application would be hard to make (e.g., a suspect and an officer are fighting, and the DFSG operator cannot get a clear shot on the suspect). The drive stun does not incapacitate a subject but may assist an officer in taking him or her into custody.

To use as a drive stun device (without firing probes), the officer should remove the live cartridge and apply the weapon directly to a subject. Ideal target areas of the body are large muscle mass areas or areas with high nerve concentration such as the side of the neck, inside of the thigh, or abdomen and leg area (excluding the chest area).

If the first choice of target area is not effective, an officer may consider a different area of application, use of an additional cycle of application, or use an alternative force option. The drive stun generally does not cause incapacitation. Because of this, officers frequently find themselves in prolonged struggles with violent suspects whom they end up drive stunning several times in several different locations on the body. This often results in multiple discharges, causing scratches on the suspect's

body and numerous signature marks, which are marks left on a subject's body after a drive stun application.



**The above are examples of drive stun signatures marks.**

An effective alternative technique is for an officer to use a drive stun with a live cartridge. For example, the officer fires a DFSG, and the probes are discharged into the resisting subject. A drive stun is then applied away from the probes to achieve neuromuscular incapacitation. In addition, if only one probe strikes a subject, the drive stun will act as a second probe by completing the cycle.

This tactic also works even if both probes strike the subject. If the probe spread is very minimal due to a close shot or a drive stun with a live cartridge, a drive stun away from the probes will increase the spread and cause incapacitation. Probe hits are almost always more desirable than drive stuns. They are more effective (neuromuscular vs. pain compliance), can be applied from a safe distance, usually require fewer cycles, and cause fewer injuries.

**DFSG527. Describe the proper maintenance, care, and storage of the dart-firing stun gun.**

While most electronic control devices have specific maintenance requirements, there are some considerations that apply to all. An officer should keep the device clean and dry as much as possible. If it gets wet, the officer should make sure it is turned off and put in a clean, dry place until it dries completely. An officer should never test the device while it is still wet. Storage will be based on the manufacturer's recommendation and agency policy. Prolonged storage in extreme temperatures should be avoided.

**DFSG528. Explain that a dart-firing stun gun is intended to prevent injury to the subject involved and other persons present.**

Although use of a DFSG is intended to prevent injury to the subject and other people present, the device itself has a very powerful physical effect.

**DFSG535. Describe the possible effects that a dart-firing stun gun has on the human body.**

The human body uses electricity to move its muscles. A DFSG essentially overwhelms that electrical system, causing temporary paralysis and/or incapacitation. A 7 to 15-watt system works as a pain compliance tool and does not interfere with a person's nervous system. A 26-watt system overrides the body's sensory and motor nervous system but has not been shown to interfere with respiration or heartbeat.

When DFSG probes hit a subject, the weapon transmits electric impulses that interfere with the electric impulses used by the human nerve system to communicate with the skeletal muscles, causing physical incapacitation, or electro-muscular disruption (EMD). Therefore, the subject immediately loses control of his or her body and falls to the ground, incapable of any coordinated action Possible effects of use could include the subject immediately falling to the ground, yelling or screaming, having involuntary muscle contractions, freezing in place with legs locked, feeling dazed for several seconds or minutes, experiencing vertigo or a temporary tingling sensation, experiencing critical stress amnesia, not remembering any pain, and/or exhibiting minor signature marks from contact.

The subject may not show any physical effects from the contact but may have sustained injuries from a fall as a result of contact with the DFSG. These injuries are usually minor in nature. However, there are circumstances where more severe injuries could occur. At this time, there is no evidence that age is a contributing factor in injuries. Also, there is no evidence that electrical energy alone causes significant injury to an unborn fetus or an expectant mother.

Manufacturers and independent studies assert that the use of these devices has no residual medical impact on subjects. There is no basis to establish that stun guns pose unacceptable health risks when used appropriately on healthy subjects. The fall that results from use of a DFSG, if it occurred from elevated heights or other hazardous areas, could cause more significant injuries.

**DFSG549. Explain medical considerations involving dart-firing stun gun use.**

Sudden In-custody Death Syndrome (SDS) is a broad classification for unexplained in-custody deaths, usually occurring 20 minutes to 2 hours after the suspect has been taken into custody. In nearly all cases of unexplained deaths involving in-custody subjects, the victim has exhibited bizarre behavior due to delusional, agitated, or stimulant drug-induced mental states.

SDS is an emerging medical diagnosis for the following well-documented medical maladies: excited delirium and drug-induced psychosis, which is a form of psychosis resulting from drug use. It can cause hallucinations and/or delusions, or positional asphyxia, which is death as a result of body position that interferes with one's ability to breathe.

Researchers have noted this phenomenon for more than a century. Though there are few diagnostic methods to accurately predict an onset of SDS, there are some consistent indicators that alert a trained professional that a subdued person is more susceptible to the onset of SDS.

The most common factors that are relevant to criminal justice officers are the visible signs of distress or indicators that a subject may be suffering from excited delirium. Some indicators of this condition include unusual or psychotic behavior, disorientation, intense sweating, hot, feverish skin, delirious and/or delusional behavior, extreme paranoia, continuously racing pulse, and/or a history of drug abuse or use.

The quickest and safest way for an officer to handle a subject in this state is to notify EMS as soon as possible, use a DFSG to incapacitate, if necessary, and restrain the subject at the earliest possible point using the least restrictive means possible.

**DFSG550. Explain how to handle an impaired, ill, injured, or pregnant subject.**

In as safe and practical a manner as possible, an officer should attempt to discern if a subject is impaired.

Although most subjects who are emotionally or mentally disturbed or under the influence of drugs or alcohol usually comply, some do not. Agency policy should be followed in these situations. An officer must be aware that the typical physiological responses to the DFSG are not always present in impaired subjects. As in any high-risk situation, the officer should be prepared to adapt to the situation and take other tactical action. In general, the best approach to handling subjects suffering from any form of psychosis is to restrain them as quickly as possible to protect them and others from potential injury. Also, an officer should follow agency policy when encountering an obviously pregnant or ill subject.

**DFSG551. Explain the after-care considerations of dart-firing stun gun use.**

All persons who have been subjected to DFSG use should be monitored regularly while in custody, even if they are receiving medical care. In accordance with training and agency policy, an officer should consider removing the probes if all signs of resistance are gone. Probes that have been removed from the skin should be treated as biohazard sharps. If excessive bleeding is observed, medical attention should be sought immediately. Additionally, an officer should clean and bandage any wounds in accordance with agency policy. An officer should look for and treat any possible secondary injuries and seek medical attention if the condition requires it. Trained medical professionals should remove all deeply embedded probes or probes that penetrate sensitive tissue areas (i.e., neck, face, groin, female breast, etc.).

**DFSG520. Explain legal justification of use of a dart-firing stun gun**

Claims that officers used excessive force in the course of an arrest, investigatory stop, or other seizure, are analyzed under the Fourth Amendment's objective reasonableness standard (*Graham v. Conner*, 490 U.S. 386 1989).

Use of force incidents are judged on whether officers considered that a reasonable person would believe the officer's actions were justifiable based on the totality of circumstances known to officers at the time the force was used. The officer must consider, without regard to underlying intent or motivation, his or her authority to use force and the totality of the circumstances, much of which

officers may have no control over. In these instances, the officer must be able to articulate justification verbally for why he or she chose to utilize the DFSG. Florida Statute also requires officers to consider using a DFSG only when a subject is actively, physically resisting.

The court has established law on the use of a TASER in the case of *Draper vs. Reynolds*, 369 F3d 1270 (11th Cir. 2004). Video of the traffic stop led the court to conclude that if the officer had attempted handcuffing without the use of the TASER, it would have escalated into a serious physical struggle. The one-time shock of a suspect with a TASER did not constitute excessive force and was reasonably proportionate when the subject repeatedly refused verbal commands and became hostile, belligerent, and uncooperative during the stop.

Many law enforcement officials claim that in some situations, stun guns can be an effective alternative to more harmful methods such as traditional firearms and batons.

> "Independent medical and scientific expert's studies…have determined TASER devices to be a safer response to resistance option compared to traditional use-of-force tools. Field studies have reaffirmed the life-saving value of TASER devices. Independent studies…including an extensive, multi-million dollar three-year study conducted by the United Kingdom's Association of Chief Police Officers (ACPO) in consultation with the British Police Scientific Development Branch (PSDB), the British Defense Science and Technology Laboratory (DSTL) and the British Defense Scientific Advisory Council Sub-committee on the Medical Implications of Less-lethal Weapons (DOMILL), as well as a U.S. Department of Defense (DOD) study involving approximately 20 medical and research doctors from a dozen academic, government and private institutions…have reaffirmed the overall safety and effectiveness of TASER's life-saving technology." (www.taser.com)

**DFSG530. Describe how to use proper verbal skills to de-escalate a situation and avoid the use of the dart-firing stun gun when practical.**

An officer should first attempt to gain control of a situation by using verbal commands. Many physical encounters can be avoided by this process, often referred to as verbal de-escalation. By disengaging or de-escalating, an officer gives the subject another opportunity to comply with lawful commands and avoid the use of the DFSG. If all efforts to verbally de-escalate the situation are exhausted or are not feasible, the use of a DFSG may be warranted.

**DFSG529. Explain why not every subject displaying an active physical resistance will necessitate the use of a dart-firing stun gun.**

Not every subject who displays an active physical resistance will need the use of a DFSG. During these encounters, an officer must continually assess whether to engage or disengage and decide on the appropriate force option. Many times, the most prudent approach may be for the officer to fend off the initial assault then disengage and reassess. From this point, the officer can either escalate to a higher force option or de-escalate to a lower force option as the situation dictates. Whenever possible, this should be done from a position of cover. If an officer decides to use a DFSG, he or she will be

expected to articulate that, based on training, experience, and assessment of the circumstances, use of the device was the best force option for the situation.

**DFSG534. Explain why use of a dart-firing stun gun in a punitive manner is prohibited.**

The DFSG is not to be used to coerce a subject to give statements or perform an illegal act. Use of a DFSG in a punitive manner without lawful authority may be violating a citizen's civil rights and subject to the following decision:

> U.S. Code Title 42 Chapter 21 Subchapter 1 Section 1983: Civil action for deprivation of rights states that "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

**DFSG537. Identify that a dart-firing stun gun is not a substitute for a firearm.**

The use of a DFSG is not a substitute for the use of a firearm. However, this does not exclude its use in place of a firearm when an officer is afforded the time, reasonable cover, and a backup officer.

**DFSG532. Describe primary and alternative sites on the body to target with a dart-firing stun gun.**

Once the decision to use a DFSG has been made, an officer must consider a number of tactical factors including the following:

- What is the most effective area of the body to target?
- What is the physical environment around the subject?
- Are there officer safety concerns or danger to the subject or nearby public?
- Is there cover or concealment available for an officer?
- Is there a time constraint?
- Is backup present or en route?
- At what point in the encounter might an additional DFSG application be required?

The primary target of a subject's body should be large muscle groups such as the back, buttocks, and legs. Alternative target sites might be the back near the shoulders or the back of the legs where, if clothed, the clothing fits tighter and the probes will conduct electricity to the subject more effectively.

**LESSON OUTLINE**

## DFSG531. Describe areas to avoid targeting with a dart-firing stun gun.

The physical positioning of a subject, the clothing he or she is wearing, and how he or she is wearing it could also play a big role in the effectiveness of a DFSG application. The DFSG may not be as effective when the subject has on loose-fitting or very thick clothing. The intentional targeting of a subject's head, neck, face, female breasts, or groin should be avoided when possible because of a higher likelihood of potential for injury to the subject.

## DFSG533. Describe environmental conditions to consider prior to using a dart-firing stun gun.

Officers must observe the subject and be aware at all times of the methods subjects may use to defeat a DFSG including where a subject's hands are. He must also be prepared to intervene as necessary with an additional application/cycle or other methods of control.

There are a number of environmental safety factors to consider prior to the use of a DFSG. For instance, if a subject is encountered in an elevated position, such as a ledge or stairwell, the officer should consider that if he or she fires a DFSG, the subject may become incapacitated and injure him- or herself upon falling. If a subject is operating a vehicle or machinery and is incapacitated by a DFSG, there is a possibility that the subject could turn the vehicle into an uncontrolled, deadly object. If a subject is in or could fall into water when hit with a DFSG, the subject could drown. If a flammable chemical spray has been deployed on a subject, the DFSG could ignite the subject. An officer should follow his or her agency's policy and procedures regarding the use of OC sprays and DFSGs. If a subject is in an environment containing hazardous materials or potentially flammable, volatile, or explosive materials that could be ignited as a result of firing the DFSG , the subject could ignite when hit with a DFSG.

## DFSG501. Explain how to properly utilize backup officer(s) to gain compliance and handcuff a subject during use of a dart-firing stun gun.

An officer should try to have at least one backup officer present to handcuff the subject after the officer with the DFSG has gained compliance. The primary officer will be operating the DFSG and the backup officer(s) will take physical control of the subject. By taking advantage of the time the subject is incapacitated, the backup officer moves in and secures him or her, while the primary officer maintains control through the use of a DFSG.

While the cycle (five seconds) is active, the officer will not be able to manipulate the subject's arms or legs to handcuff. At this point, the subject is usually no longer trying to resist and wants to comply but has little or no muscular control and may appear to be resisting. It is for the officer's (and the subject's) safety that the officer be aware of the subject's potential uncontrollable overreaction in these situations.

## DFSG502. Explain the use of multiple exposures to gain compliance.

Experts in the field agree that there is no definitive number of exposures to the electricity that a DFSG produces. The reasonableness standard will help in the decision-making process. For example, an

officer who is left alone for several minutes away from the nearest backup and is facing a large subject who threatens to do serious bodily harm to the officer may decide to use a DFSG. At the end of the cycle, the subject still refuses to comply. An officer may continue demanding compliance and deliver another cycle. Several cycles may be necessary until another officer arrives on scene to assist or until the subject stops physically resisting.

**DFSG503. Summarize the need to stay current on dart-firing stun gun policy issues and trends.**

An officer should stay up to date on case law, department policies, and current trends that may impact the officer's use of a dart-firing stun gun. The agency, manufacturers of the dart-firing stun gun, and local States Attorneys may provide these updates.

It has recently been noted that subjects expecting encounters with law enforcement may be putting objects or shields under their clothing to render the DFSG ineffective. They may also "stop, drop, and roll" to pull out darts. If a subject begins to roll, an officer should close the distance, move with the subject, and keep sufficient slack in the wire to maintain electrical contact. Additionally, subjects may wait for the cycle to stop then pull out the darts and may even begin to run away. An officer must be prepared to close in and utilize a drive stun or transition to another force option to stop the suspect from leaving.

**DFSG504. Demonstrate how to properly document use of force reports involving dart-firing stun gun use.**

Prompt and accurate reporting of this decision and the use of a DFSG is required. An officer's employing agency will have specific policy and training on when and how to document this use.

**Summary**

This lesson provides you with fundamental knowledge and use of a DFSG. Not all criminal justice agencies authorize their officers to carry DFSGs. If you are employed by an agency that does, you may be required to complete supplemental agency training before you are authorized to operate a DFSG. Once authorized you will then be required by Florida statute to complete annual retraining requirements.