UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


JULIE V. DEGRAW, as Personal Representative
of the ESTATE OF DONALD C. DEGRAW, Deceased,

      Plaintiff,      CASE NO: 8:18-cv-2116-WFJ-SPF

vs.

BOB GUALTIERI, in his individual and
supervisory capacity as Pinellas County Sheriff,
and GREGORY GOEPFERT, in his individual capacity
as a Pinellas County Deputy Sheriff,

      Defendants.
: : : : : : : : : : : : : : : : : : : : : : : : : : : : : :




DEPONENT:          JAMES A. UPTON


DATE:          MAY 21, 2019
          9:09 A.M. - 11:50 A.M.


LOCATION:          D & D REPORTING
          THE WILDER CENTER
          3000 GULF TO BAY BOULEVARD, SUITE 500
          CLEARWATER, FLORIDA


REPORTER:          VANESSA DURHAM-ANDREW
          NOTARY PUBLIC
          STATE OF FLORIDA AT LARGE


=======================================================
D & D REPORTING
THE WILDER CENTER
3000 GULF-TO-BAY BOULEVARD, SUITE 500
CLEARWATER, FLORIDA  33756
(727)  723-2002

A P P E A R A N C E S:


For the Plaintiff:


**MICHAEL T. CALLAHAN, ESQUIRE**
**CALLAHAN LAW FIRM, LLC**
**449 CENTRAL AVENUE, SUITE 203**
**ST. PETERSBURG, FLORIDA  33701**


For the Defendants:


**PAUL G. ROZELLE, ESQUIRE**
**PINELLAS COUNTY SHERIFF'S OFFICE**
**10750 ULMERTON ROAD**
**LARGO, FLORIDA  33778**


              *       *       *       *

## I   N   D   E   X

                                        <u>Page</u>


Direct Examination by Mr. Callahan . . . . . . . .   4

              *       *       *       *

*       *       *       *


### E  X  H  I  B  I  T  S

| Plaintiff's Exhibit Nos. | Description | Marked for Identification |
|---|---|---|
| 13 | Pinellas County Sheriff's Office PCSO – Supplement SO16-363788/26 Report Date: 09/09/2016 | 18 |
| 14 | Pinellas County Sheriff's Office PCSO – Supplement SO16-363788/15 Report Date: 09/09/2016 | 95 |

*       *       *       *

1  WHEREUPON,

2                    JAMES A. UPTON,

3  WAS CALLED AND AFTER BEING DULY SWORN WAS EXAMINED AND

4  TESTIFIED AS FOLLOWS:

5                    <u>DIRECT EXAMINATION</u>

6  BY MR. CALLAHAN:

7      Q    Good morning, Sergeant.  Would you give me

8  your full name, please.

9      A    It's actually detective.  And no --

10     Q    Congratulations.

11     A    -- rank here.  Thank you.  And my full name

12  is James Andrew Upton.

13     Q    When did you make detective?

14     A    Approximately five years ago or so.

15     Q    And how long have you been with the

16  Pinellas County Sheriff's Office?

17     A    Approximately 14 years.

18     Q    Is this your only law enforcement job at --

19     A    Currently, yes.

20     Q    -- Pinellas County?

21     A    Currently, yes.

22     Q    Did you work in law enforcement, prior to

23  Pinellas --

24     A    I had --

25     Q    -- County?

```
 1        A     I did 13 years with the United States Coast

 2   Guard Reserve.

 3        Q     Were you stationed here?

 4        A     Station Cortez, Bradenton area.

 5        Q     And let me ask you a little bit about your

 6   background and experience in the coast guard.  As

 7   part of your duties there, did you have any medical

 8   training?

 9        A     I did.

10        Q     Tell me about it.

11        A     Just basic first responder medical

12   training.

13        Q     And what does that consist of?

14        A     Assessing the scene, assessing the patient,

15   A, B, Cs.  Just the basics.

16        Q     And what did you do in the coast guard?

17        A     I was a machinery technician.

18        Q     And when you came over to Pinellas County

19   Sheriff's Office, what was your rank when you

20   started?

21        A     I was a detention deputy in the Department

22   of Detention & Corrections.

23        Q     And how long were you there?

24        A     Approximately seven years.

25        Q     I did two and a half years at the East
```

1    Unit at Raiford.

2        A    Did you?

3        Q    I sure did.

4        A    It's a tough job, isn't it?

5        Q    It was very challenging --

6        A    Yeah.  Right.

7        Q    -- especially up there --

8        A    Yeah.  I can imagine.

9        Q    -- in the maximum security.  After

10   detention, then what happened in the sheriff's

11   office?

12       A    I put myself through a Crossover Academy.

13   And then --

14       Q    Tell me about that.  What's that?

15       A    It's a different certification, through the

16   state.  Corrections is one certification.  Law

17   enforcement is another certification.

18       Q    I see.  So to go from corrections to law

19   enforcement, you had to get some additional training?

20       A    Another academy, yes.

21       Q    Okay.

22       A    And then you take the state exam.  And once

23   you get certified, I was able to make the transfer to

24   the law enforcement side.

25       Q    And when did that occur?

```
 1      A    Two thousand and twelve, is when I

 2   transferred.

 3      Q    And what was your rank, after you

 4   transferred and started working law enforcement?

 5      A    I was a patrol deputy.

 6      Q    And after that; sergeant?

 7      A    No.  I was then accepted into our Tactical

 8   Surveillance Unit, which is an undercover

 9   surveillance unit.

10      Q    And when did that happen?

11      A    I don't recall, specifically; '15 or '16.

12      Q    And then, what was that kind of work about?

13      A    That was assisting all the components of

14   the Investigative Operations Bureau in tracking down

15   suspects, making arrests.

16      Q    And drug work, or multiple --

17      A    No.  No.  That was -- that's left up to the

18   Narcotics Division.  Ours was all other crimes.

19      Q    And after that tactical surveillance job,

20   did you get another job?

21      A    Yes.  I -- where I'm currently at.  It's in

22   the Robbery Homicide Unit.

23      Q    And how long have you been there; five --

24      A    Three --

25      Q    -- years?
```

1    A    Three years in June, I will have been in

2    the unit.

3    Q    So the event that brings us here today

4    happened on September 7th of '16.  At that time, you

5    would have been in the unit two years, one year?

6    A    No, sir.  I believe I was fairly new at

7    that time; 2016.

8    Q    So, yeah, that's about three years ago, a

9    little less than three.

10    A    Yeah.

11    Q    Had you ever done an investigation, before

12    the one that you did involving Mr. DeGraw?

13    A    I have.

14    Q    All right.  And how many had you done,

15    prior to that?

16    A    I wouldn't be able to recall that number,

17    specifically.

18    Q    Okay.  And by investigation, I'm referring

19    to one involving a death in custody.  Have you ever

20    done one --

21    A    Prior to that --

22    Q    -- of those, before DeGraw?

23    A    -- no, sir.

24    Q    Okay.  What is the procedure for that kind

25    of investigation?

```
 1      A     For an in-custody death --

 2      Q     Yes, sir.

 3      A     -- procedure?

 4      Q     Yes.

 5      A     At the direction of the sergeant of the

 6   Robbery Homicide Unit, he assigns people with certain

 7   tasks.  And as --

 8      Q     And you --

 9      A     -- with any investigation, you're --

10   ultimately, you're investigating to see if a crime

11   occurred.

12      Q     That's the purpose of it?

13      A     That's the purpose.

14      Q     What was your role in the DeGraw

15   investigation?

16      A     I was assigned as the case agent.

17      Q     And what is the role of a case agent?

18      A     The lead investigator.

19      Q     Who else was involved in doing the

20   investigation?

21      A     My current sergeant.  At the time, it was

22   Detective Tobeck.  And he is now the sergeant of our

23   unit.

24      Q     Anybody else?

25      A     There were several people involved in the
```

1  unit.  Specifically, I would have to look at the

2  report to see who all were involved.  But there were

3  multiple people.

4      Q    So I'm aware, from the documents and having

5  deposed Tobeck, that you-all did a lot of

6  interviews --

7      A    We did.

8      Q    -- of people.  But tell me what else, if

9  anything, you did as a case agent, besides interview

10  people?

11      A    I don't recall, specifically.  I'd have to

12  look at the reports that I authored, what the titles

13  were.

14      Q    Were you involved in drawing any

15  conclusions about what happened?

16      A    Yes.  That there was no crime committed,

17  was my conclusion.

18      Q    Okay.  Beyond that, did you write a report

19  about your investigation?

20      A    I authored several reports in this

21  investigation.

22      Q    Okay.  Okay.  And who do you turn your work

23  over to when you're done?

24      A    My work goes to the supervisor, who was at

25  the time Sergeant Todd Greene, for review.

1      Q    And is that the end of your role in it,

2    once you turned it over to Greene?

3      A    All of it gets reviewed by my supervisor at

4    the time, which is Sergeant Greene.

5      Q    Right.

6      A    And once we deem that there was no crime

7    committed, then that's the end of my role.

8      Q    Okay.  Is there any kind of committee

9    review, or is it just a sole review by Todd Greene?

10     A    There's no committee review.

11     Q    So your report goes to Sergeant Greene,

12   then Sergeant Greene reviews it, signs off on it, and

13   that's the end of the investigation?

14     A    He ultimately approves my reports I author.

15     Q    Okay.  Let me ask you a little bit about

16   your understanding of medical terms, and things like

17   that.  This gentleman, Mr. DeGraw, was reported to

18   have had two seizures on the day of these events.  Do

19   you recall that?

20     A    I do not.

21     Q    Okay.  Do you recall anything, at all,

22   about him having a seizure?

23     A    I do not.

24     Q    Okay.  Do you know anything about seizures?

25     A    Other than the movement that occurs, no, I

1   know nothing about them.

2      Q    Were you aware, at the time that you were

3   doing the investigation, of anything at all about

4   what a person, you know, post-seizure condition, can

5   experience or suffer as a result of contact or

6   activity with other people?

7      A    I am not aware of what occurs after a

8   seizure.

9      Q    Did your investigation reveal if Patrolman

10  Goepfert had any such knowledge?

11     A    I do not know if Patrolman Goepfert had any

12  knowledge.

13     Q    Do you know what Goepfert's goal was in

14  dealing with Mr. DeGraw?

15     A    Yeah.  As with any scene, it's scene

16  safety, securing the scene.

17     Q    The -- I'll be happy to refer you to

18  specific answers in the statements, if you don't

19  know.  But I'm going to ask you a few things that you

20  might recall first, and then we'll go into it.  Do

21  you have a recollection of what Mr. DeGraw's

22  condition was, at the time he was first observed by

23  Goepfert?

24     A    Physical condition, no.

25     Q    Okay.  Do you have a recollection of where

1   he was?

2        A     Upstairs.

3        Q     And can you tell me whether he was

4   standing, sitting, in bed, reclining?

5        A     I cannot.  I was not there.

6        Q     Okay.  And did Goepfert tell you what

7   occurred --

8        A     Yeah.  He --

9        Q     -- in his dealings with Mr. DeGraw?

10       A     He did.  But I don't recall, specifically.

11  It would be --

12       Q     You would have to look through --

13       A     It's memorialized --

14       Q     -- the report?

15       A     -- in a report.  Yes, sir.

16       Q     Okay.  Do you have any other independent

17  recollection of any of the major events that you were

18  dealing with in investigating this matter?

19            MR. ROZELLE:  Object to form.  You

20       can -- excuse me.  Objection to form.  You

21       can answer.

22            THE DEPONENT:  I ...

23            MR. ROZELLE:  You can answer.

24            THE DEPONENT:  I do not.

25

1    BY MR. CALLAHAN:

2         Q     Okay.  What recollection do you have of

3    all --

4         A     Well, it was three --

5         Q     -- these events?

6         A     -- years ago.  So specific details, I don't

7    recall.  Just the overall scenario of what happened.

8    I've done a lot of investigations since then, so ...

9         Q     I understand.  Did you go over to the

10   scene, yourself?

11        A     I did.  I was at the scene.

12        Q     When did you get there?

13        A     I don't know what time, specifically.

14        Q     I don't mean a specific time --

15        A     The night it occurred --

16        Q     -- you arrived.

17        A     -- I was there outside at the scene.

18        Q     Did you, yourself, go into the bedroom?

19        A     Not to my recollection, no.

20        Q     Did you actually make any physical

21   assessment of the scene, yourself?

22        A     Through pictures.

23        Q     That's all?

24        A     That's all.

25        Q     So someone else took the pictures?

1    A    Yes, sir.

2    Q    I know that you had someone secure the

3  information regarding the taser discharge.  Do you

4  have any recollection of that, without looking at the

5  report?

6    A    Of getting the taser information?

7    Q    Yes.

8    A    I do recall obtaining taser information,

9  yes.

10    Q    Is that routine for you, to get a report on

11  the taser discharge --

12    A    It is.

13    Q    -- and what happened and so forth?

14    A    It is.

15    Q    And did your investigation, at all, go into

16  the appropriateness of the use of the taser by

17  Mr. Goepfert?

18    A    No.  That's not a call made by me.  That's

19  policy, that's reviewed either by Administrative

20  Investigation Division --

21    Q    Okay.

22    A    -- or a different entity.  Not me.

23    Q    Do you know who that would be, ultimately,

24  that looked at that, if anyone did, and made a

25  decision?

1      A    That would be the Administrative

2  Investigation Division, in conjunction with our

3  Training Division.

4      Q    And do you have any individuals -- do you

5  know of any individuals who may have done that, or

6  who may have been involved?

7      A    I don't know.

8      Q    Okay.  Also on the scene, as you might

9  recall, were Sergeant Street and Martinez.  Did you

10  interview them?

11      A    Yes, sir.

12      Q    All right.  And do you have a recollection

13  of anything about what either of them told you?

14      A    No, sir.  I'd have to, again, refer to the

15  report.

16      Q    Okay.  Did you have any dealings with

17  Mr. DeGraw, either in the deceased stage or

18  otherwise?

19      A    Not once.

20      Q    And did you have any dealings with

21  Mrs. DeGraw?

22      A    I did.

23      Q    Tell me about that.

24      A    I interviewed Mrs. DeGraw.  And then later,

25  towards the end of the investigation, I returned some

1   property to Mrs. DeGraw.

2       Q    Do you have a recollection of who she was,

3   what she looked like, anything like that?

4       A    If I saw a picture of her, I could probably

5   recognize her, but ...

6       Q    Was she informative when you talked to her,

7   and cooperative?

8       A    She was.

9       Q    Okay.  Let me get you the right copy here,

10  so you can look at them; interview copy.

11          MR. CALLAHAN:  I'm going to ask the

12      reporter to mark this as Exhibit 12.

13          MR. ROZELLE:  Thirteen.

14          MR. CALLAHAN:  Is it 13 now?

15          MR ROZELLE:  Yeah.

16          MR. CALLAHAN:  You've got the cover,

17      right there in front of you.  Yes.  Exhibit

18      13 for identification.  This is the

19      interview sheet on Sergeant Street.

20          MR ROZELLE:  Okay.

21          MR. CALLAHAN:  Let her mark it, first.

22          THE DEPONENT:  All right.

23          MR. ROZELLE:  Do you have a copy for

24      me?

25          MR. CALLAHAN:  I do.

```
 1            THE COURT REPORTER:  Exhibit 13 marked.

 2            (At this time Exhibit 13 was marked for

 3            identification).

 4            MR. CALLAHAN:  Here you go.

 5            MR ROZELLE:  Thank you.

 6   BY MR. CALLAHAN:

 7       Q    Detective Upton, do you have a recollection

 8   of Street, or do you know him, personally?

 9       A    Personally, no.  Professionally, yes.

10       Q    Okay.  Do you have a recollection of him?

11       A    Of the interview?

12       Q    No.  Of Mr. Street.  I mean, do you know

13   him --

14       A    Yes.  Absolutely.

15       Q    -- outside?

16       A    Yes, sir.

17       Q    Okay.  What size fellow is he, and age and

18   so forth?

19       A    Geez.  Probably 50 to 60 year-old male.  No

20   hair.  Weight; I would say 170 to 190.

21       Q    And did you have any dealings with him,

22   prior to this investigation?

23       A    No, sir.  I've never worked for Mr. Street.

24       Q    Okay.  On the date of your interview and

25   investigation of the incident, what was his role or
```

1    rank, in relation to the other two gentlemen;

2    Martinez and Goepfert?

3         A    He was the sergeant at the time.  He would

4    be the sergeant of the squad.

5         Q    And that would put him in charge of the

6    other two?

7         A    Yes.  Until somebody of a higher rank would

8    show up.

9         Q    Now, let me refer you to the statement you

10   took of him.  And let's take a look at the first

11   page.  At the bottom, it's marked Page 2, actually.

12   And there is an indication at the top of the page,

13   that you were present with Detective Tobeck in

14   interviewing Street.  And the actual question here

15   that was being asked by Tobeck, starting with, did

16   you jump the call with the deputies.  Do you see

17   that, down at the bottom?

18        A    Down at the bottom?

19        Q    Third line, third entry from the bottom.

20        A    Okay.  Well, hang on a second.

21        Q    Did you receive dispatch.  Did you jump the

22   call with the deputies.

23        A    Got you.  Yes, I see that.

24        Q    Okay.  What does that phrase mean; jump the

25   call?

1      A     Meaning, assigned.  Assigned to it.  That's

2  all.  It's just a ...

3      Q     Okay.  And what was Sergeant Street's

4  response to that question, if you can read it to me.

5      A     It says, I jumped to it with them.

6  Meaning, he self-assigned, probably --

7      Q     Right.

8      A     -- and went to the scene to assist.

9      Q     Okay.  Let's turn to the next page, and

10  look at the second paragraph.  He's continuing to

11  respond to, in narrative form, to the question.

12      A     Okay.

13      Q     Would you read the beginning of the second

14  paragraph then.

15      A     I pulled up in front of the house.

16      Q     And go ahead and continue with that

17  paragraph.

18      A     Okay.  I saw the fire department down the

19  road.  As soon as I got out of my car, I heard Deputy

20  Martinez on the radio, telling dispatcher that the

21  subject was -- was noncompliant with their commands.

22  The front door was halfway open.  It was ajar.  I

23  walked into -- in the front door, see a heavy set

24  Asian female standing by the bottom of the stairs,

25  crying.

1           You know, when I came in the door, I could

2    hear the deputies' voices, but I couldn't tell if it

3    was either downstairs or upstairs.  When I came in

4    and saw the woman, I just -- I looked up, and I could

5    see there -- where they were standing at the top of

6    the stairs, the head of the stairs, right in the

7    bedroom door.

8        Q    Now, his phrase in response to the inquire

9    was, quote, was noncompliant with their commands.

10       A    Uh-huh.

11       Q    Did your investigation reveal to you the

12   extent to which Mr. DeGraw, who was the subject, was

13   capable of complying with their commands, or

14   understanding their commands?

15       A    Yes.  My recollection, was that he was

16   noncompliant, would not comply with them.

17       Q    But did your investigation tell you if he

18   was capable of understanding, or complying?

19       A    It did not.

20       Q    Okay.  Did anyone ever tell you the extent

21   to which his condition prevented him from

22   understanding, if he did?

23       A    Can you clarify that.  I'm not sure what

24   you're -- what you're asking.

25       Q    He was in a post-seizure state --

1      A    Okay.

2      Q    -- at the time.  So my --

3           MR. ROZELLE:  Object to the form.

4      Counsel testifying.

5  BY MR. CALLAHAN:

6      Q    I'm going to tell you to assume he was in a

7  post-seizure state, for purposes of my question.  Did

8  your investigation reveal that anyone dealing with

9  him, either understood that or understood the

10 consequences of that?

11          MR. ROZELLE:  Objection to the form.

12     You can answer.

13          THE DEPONENT:  I do not -- I don't

14     not -- do not know.

15 BY MR. CALLAHAN:

16     Q    Don't know.  Okay.  I know earlier, I think

17 you expressed a minimal understanding, or a little

18 understanding with the seizure situation.  Did any of

19 these persons ever express to you that they

20 understood that?

21          MR. ROZELLE:  Objection to the form.

22     You can answer.

23          THE DEPONENT:  No.

24

25

1   BY MR. CALLAHAN:

2       Q    Okay.  Would you continue with the next

3   paragraph then, please.

4       A    Sure.  Started to go up the stairs.  As

5   soon as I hit the first step, I heard the Deputy

6   Goepfert announce, taser.  I heard the pop of the

7   taser, and the cycling of his unit.  I got to the top

8   of the landing there, at the second floor.  I see the

9   subject just -- heavy set guy, just wearing boxer

10  shorts and the taser probes.

11      Q    Okay.  Let me -- let me stop you right

12  there.

13      A    Okay.

14      Q    Do you know, from looking at this interview

15  right now, whether that was -- the taser that he

16  heard pop and the announcement by Goepfert, do you

17  know whether that was the first, or some other

18  discharge of the taser?

19      A    If there's a pop, it would be the first.

20      Q    Okay.  And at that time, he states he

21  was -- he hit the first step on the way up the stairs

22  when that happened.  Do you recall asking him where

23  the other persons were, at that time?

24      A    I do not recall.

25      Q    Okay.  Go ahead then.

1      A     Okay.

2      Q     You had just read about boxer shorts --

3      A     One was -- yeah.

4      Q     -- and the taser probes.

5      A     One was in his chest.  One was further down

6   in his stomach.  He was flailing about the -- on the

7   ground, rolling back and forth, grunting, growling,

8   grinding his teeth.  So his mouth looked bloody.

9   There was blood around the insides of his lips, and

10   around his teeth.  His eyes were -- were bulging out,

11   like bugging out.

12          Deputy Goepfert ordered him to roll over,

13   lay on his stomach.  He did not.  At some point

14   during this -- this period, one of the two deputies,

15   I don't know which one, told me there were weapons in

16   the bedroom.  The gentleman's wife said he has a --

17   keeps a pistol, keeps a gun under his pillow.

18          At that point, the gentleman was laying on

19   the floor.  His feet were against the side of the

20   bed.  He was on his -- laying on his back, and his

21   upper shoulders and shoulder blades were resting

22   against the door, up to the bedroom.  He was --

23   constant grunting, groaning, like almost a primitive

24   type of sound coming from ...  Very loud.

25      Q     All right.  Let me stop you right there.

1    Did you learn from Sergeant Street if he observed the

2    discharge of the taser any further, after the first

3    discharge?

4         A    I did not.

5         Q    And did he ever tell you that?

6         A    No.

7         Q    No.  Did he tell you how -- what position

8    he was in to see all this?

9         A    In the interview, what position he was in;

10   Sergeant Street, himself, or the subject?

11        Q    Sergeant Street.  In other words, he's just

12   described the situation where this gentleman is down

13   on the floor --

14        A    Uh-huh.

15        Q    -- and he's observing it.  So my question

16   is, did you determine where he was when he was

17   observing this stuff?

18        A    I don't recall.

19        Q    All right.  You're aware, aren't you, that

20   the taser discharged five times?

21        A    I am.

22             MR. ROZELLE:  Objection to form.  You

23        can answer.

24

25

1  BY MR. CALLAHAN:

2      Q    Well, let me ask you another way.  How many

3  times was the taser discharged?

4      A    Five times.

5      Q    And if Sergeant Street was standing there

6  observing the conduct of Mr. DeGraw on the floor

7  after the first discharge, then would you agree that

8  he was in a position to observe the discharged taser,

9  four other times?

10          MR. ROZELLE:  Objection to form.  You

11      can answer.

12          THE DEPONENT:  Yes, he would be.

13  BY MR. CALLAHAN:

14      Q    Okay.  Did he ever describe to you that --

15  those other four discharges of the taser?

16      A    I don't recall.

17      Q    Okay.  Go to the next paragraph then.

18      A    Okay.  Deputy Goepfert asking, or saying

19  out loud, how are we going to do this, guys.  Trying

20  to figure out how to -- how to get him secured, when

21  he is acting that way.  Deputy Goepfert -- or, excuse

22  me, Goepfert reached over, you know.  You know, where

23  the gentleman is laying.

24          I've got a punch hole, right there on that

25  word.

1    Q    I think that's a; right, right next --

2    A    Right.  Right next to his right arm and

3    shoulder is a six-foot step ladder, metal step ladder

4    leaning against the wall.  Goepfert reached over,

5    pulled the ladder out and passed it to me.  I tossed

6    it towards another bedroom door.  Just inside the

7    bedroom door is a small night table, night stand

8    table.  On top of it, was a -- looked like a black

9    folding knife, like a lock-blade knife.  It was

10   closed.  So I reached in, pulled the table.  As I was

11   dragging the table out, everything on top of it

12   spilled on the floor next to me.

13        I believe Deputy Martinez grabbed it from

14   me.  Got the table from me, and passed it up to the

15   right.  So I'm -- the table is going off to my right.

16   Everything that was on it, is laying on the floor

17   next to me.  And I kicked the knife a little further

18   down the hallway, so we could get a little bit more

19   room to work in the room.

20   Q    So at this point, was there any firearm

21   visible to anyone in the room --

22        MR. ROZELLE:  Objection.

23   BY MR. CALLAHAN:

24   Q    -- at the scene?

25        MR. ROZELLE:  Objection to form.  You

1      can answer.

2           THE DEPONENT:  I do not know.

3   BY MR. CALLAHAN:

4      Q    All right.  Do you have any recollection of

5   anybody telling you that any firearm was visible to

6   them, at any time --

7      A    At any time, yes.

8      Q    -- during this incident?  When?

9      A    I don't -- I don't know specifically when.

10  I just know that at some point, we were informed

11  there was a firearm, multiple firearms in the room.

12     Q    Do you have any knowledge about the -- when

13  that firearm became visible to investigators, if

14  ever, until after the incident?

15          MR. ROZELLE:  Objection to form.  You

16     can answer.

17          THE DEPONENT:  I don't.

18  BY MR. CALLAHAN:

19     Q    And do you have any knowledge about whether

20  it was loaded?

21     A    I don't.

22     Q    Do you have any knowledge about any of the

23  other firearms, whether they were available, locked

24  up, loaded or not loaded, any other condition?

25          MR. ROZELLE:  Objection to form.  You

1       can answer.

2               THE DEPONENT:  Available; yes.  In the

3       room; yes.  Loaded; don't know.

4    BY MR. CALLAHAN:

5       Q    Where were they in the room?

6       A    In various places in the room.

7       Q    Do you have a recollection that there was a

8    firearm under the pillow?

9       A    I do.

10      Q    And do you know if it was ever visible to

11   anyone, at all --

12      A    It was.

13      Q    -- until after the event?

14      A    Until after the event?  I know at some

15   point, it was visible to all the first responders.

16      Q    But you don't know when?

17      A    I don't know when.

18      Q    And do you know if it was ever visible to

19   Goepfert, Street or Martinez, during the period of

20   time they were dealing with Mr. DeGraw?

21      A    I do not.

22              MR. ROZELLE:  Objection to form.  Go

23      ahead.

24

25

1    BY MR. CALLAHAN:

2        Q    And do you -- are you aware of the location

3    of the other firearms in the room?

4        A    Through pictures, yes.

5        Q    Where were they?

6        A    I'd have to look at the pictures again.

7    But over by a dresser, next to the bed.

8        Q    And they were in cases?

9        A    Again, I'd have to look at the pictures --

10       Q    Okay.

11       A    -- to clarify that.

12       Q    So did you ever get an understanding of why

13   it was that Mr. Goepfert discharged his taser into

14   Mr. DeGraw?

15       A    I did.

16       Q    And what was your understanding?

17       A    He was not compliant, verbally, and made an

18   aggressive movement towards the deputy.

19       Q    And how did you learn of -- what was the

20   compliance that Goepfert was seeking?

21           MR. ROZELLE:  Objection to form.  You

22       can answer.

23           THE DEPONENT:  Control.

24

25

1    BY MR. CALLAHAN:

2        Q    Well, when you say not compliant, I take it

3    that means that he failed to do something.  And what

4    was it that he failed to do, if you know?

5            MR. ROZELLE:  Objection to form.  You

6        can answer.

7            THE DEPONENT:  He failed to respond to

8        his verbal commands.

9    BY MR. CALLAHAN:

10       Q    Okay.

11       A    So that he could get him assistance, that

12   he needed assistance from medical personnel.

13       Q    Okay.  And that's your understanding of why

14   Goepfert tasered him?

15       A    Because he wouldn't respond to verbal

16   commands?  No, that's not my understanding.

17       Q    Well, what is your understanding?

18       A    My understanding is, that he made an

19   aggressive movement towards the deputy.

20       Q    And what movement was that?

21       A    The forward progress.

22       Q    Can you describe it any better than that?

23       A    I cannot.

24       Q    Okay.  Let's go to the next paragraph then.

25       A    Okay.  It says, I could see in the room,

1    two long gun cases, hard cases.  One is tan and one

2    is black, leaning up against the dresser, about six

3    feet inside the bedroom door.  During the time that

4    Deputy Martinez and I were taking the table out of

5    the room, the subject somehow scooched, or wiggled

6    around, so he's now in an opposite -- from when I

7    first saw him -- now his feet are up towards the

8    door.  And his upper shoulders and shoulder blades

9    are resting up against the side of the bed, near the

10   head of his bed, actually, where the -- where the

11   nightstand used to be.

12            And right -- right about then, there was

13   like a lull in his behavior.  He took a little rest.

14   I asked Deputy Goepfert if his taser was activated.

15   And he said no.  And he said -- I said something

16   like, now, let's go, boys.  Stepped passed, in front

17   of Deputy Goepfert, stepped over the subject, and

18   grabbed his left wrist with both my hands.  And I

19   pulled back and away, to use leverage to get the

20   subject rolled over onto his stomach.  And then I

21   pulled his left wrist up behind him.

22            I was kind of squeezed in between the

23   gentleman's right side, and the bed.  Was -- I was

24   off, off to the side, but kind of pinched in there.

25   I'm fighting him, the whole time.  He was pulling

1    away, kept the grunting going.

2        Q    So let me go back and ask you a few

3    questions about this section of the statement, in

4    context to what happened previously.  Deputy Goepfert

5    said his taser was not activated.  What does -- what

6    did that mean to you?

7        A    That the -- there's a power switch on it.

8        Q    So it was turned off, at that point?

9        A    That's -- that's what I get out of this

10   paragraph.

11       Q    Okay.  So at that point, does that mean

12   that the tasering, whatever it was, had completed, or

13   was completed?

14       A    It was not active.

15       Q    Okay.  And was it ever active again, to

16   your knowledge?

17       A    I don't --

18            MR. ROZELLE:  Objection to form.

19            THE DEPONENT:  -- recall.

20            MR. ROZELLE:  No.  I'm sorry.  You can

21       go ahead.

22            THE DEPONENT:  I don't recall.

23   BY MR. CALLAHAN:

24       Q    Okay.  Did you get any description from

25   Sergeant Street, about when the tasering occurred,

1     between the time that he described what he heard was

2     the first pop, and the time that Goepfert described

3     it being not activated with the subject down on the

4     floor?

5         A    A description?  I'm not sure what you're

6     asking here, sir.

7         Q    Well, there's no -- there's nothing in this

8     statement that reflects the four other discharges of

9     the taser, between the time the first pop happened,

10    and you said that would have been the first one, and

11    the time that he says it was not activated any

12    longer.

13            MR. ROZELLE:  Objection to form.  You

14        can answer.

15            THE DEPONENT:  I -- the only thing I

16        know about that time period, is that he was

17        still noncompliant.

18    BY MR. CALLAHAN:

19        Q    So the description from Sergeant Street

20    appears to be that he was on the floor the whole

21    time.  Does that comport with your recollection of

22    what --

23        A    That's what it appears to be, yes.

24        Q    Okay.  Now, he also describes that

25    Mr. DeGraw is on the floor, taking a little rest.

```
 1    And there was a lull in his behavior.  And then the
 2    next statement is; now let's go, boys, to begin the
 3    cuffing process.
 4           Do you know why it is that they determined
 5    that they should cuff him, when he was lying on
 6    the --
 7        A    Yes.  To pre --
 8        Q    -- floor calmly?
 9        A    Yes.  To prevent injury to him, and them.
10        Q    Okay.  And did they tell you that, or is
11    that your assumption?
12        A    That's -- that's training.  That's ...
13        Q    Okay.  Do you have experience with the
14    reaction of people who are tasered?
15        A    I do.
16        Q    Is the description that Sergeant Street
17    gave you of his conduct, thrashing around on the
18    floor, consistent with people who have been
19    tasered --
20           MR. ROZELLE:  Objection to form.
21    BY MR. CALLAHAN:
22        Q    -- from your experience?
23        A    No, sir.
24        Q    What is your experience, in that regard?
25    Have you actually tasered somebody, yourself?
```

1      A    I have.  And I have been tased, myself.

2      Q    Okay.  Yeah.  I had one of those

3  experiences at Raiford, too.

4      A    Did you?

5      Q    With spray.

6      A    With the spray.  I've been sprayed --

7      Q    I volunteered.

8      A    -- multiple times.  I've been tasered.  And

9  I've utilized the taser to compel compliance.

10     Q    Right.  So from your experience with a

11  normal reaction of someone that's been tasered, tell

12  me what the normal reaction is.

13          MR. ROZELLE:  Objection to form.  You

14      can answer.

15          THE DEPONENT:  Neuromuscular

16      incapacitation.  Meaning, you're not moving.

17      And you're going to comply, because it hurts

18      like --

19  BY MR. CALLAHAN:

20     Q    Right.

21     A    -- an expletive.

22     Q    I understand.  And so, would you

23  characterize Mr. DeGraw's reaction being tasered

24  here, as abnormal?

25          MR. ROZELLE:  Objection to form.  You

1       can answer.

2              THE DEPONENT:  I would.

3    BY MR. CALLAHAN:

4       Q    Okay.  Tell me how you would describe

5    Mr. DeGraw's reaction, as related by Sergeant Street,

6    from your experience using tasers?

7              MR. ROZELLE:  Objection to form.  You

8         can answer.

9              THE DEPONENT:  Okay.  Are you asking my

10        opinion on how I -- why I think he was

11        acting that way.

12   BY MR. CALLAHAN:

13      Q    In other words, you had a description

14   here -- let me rephrase it -- of somebody thrashing

15   around on the floor --

16      A    Uh-huh.

17      Q    -- for a considerable period of time, in

18   reaction to being tasered.  And my question to you

19   is -- well, let me say this.  Have you ever seen that

20   kind of reaction before, from someone being tasered?

21             MR. ROZELLE:  Objection to form.  You

22        can answer.

23             THE DEPONENT:  I have not seen that

24        kind of reaction, other than on videos, that

25        I was not involved in, whatsoever.

1    BY MR. CALLAHAN:

2         Q    Okay.  Did you do any investigation about

3    whether his postictal; meaning, his post-seizure

4    state, had anything to do with that?

5         A    I did --

6              MR. ROZELLE:  Objection to form.

7              THE DEPONENT:  -- not.

8              MR. ROZELLE:  You can answer.

9    BY MR. CALLAHAN:

10        Q    Okay.  Do you have any -- do you have any

11   knowledge of post-seizure states, and the reaction of

12   people in them?

13        A    I do not.

14        Q    Do you have any knowledge or training in

15   the consequences of a struggle for somebody in a

16   postictal state?

17        A    In a post, what, state.

18        Q    Postictal; meaning, post-seizure.

19        A    I do not.

20        Q    Okay.  Do you have any knowledge of how

21   long a postictal state can last?

22        A    I do not.

23        Q    Did your investigation get any of that kind

24   of information from any of the witnesses involved?

25        A    No.

1    Q    Did you ever get any information about what

2    drugs Mr. DeGraw was on, what prescription

3    medication?

4    A    Later in the investigation, yes.

5    Q    And did you draw any conclusions or learn

6    of any conclusions about the extent to which that may

7    have had anything to do with his state of mind?

8    A    I don't recall.

9    Q    All right.  Let's go to the last paragraph

10   there.

11   A    Okay.  Um, Deputy Goepfert moved towards

12   the gentleman's feet to, um -- I believe to secure

13   his feet.  And, um, Deputy Martinez came in, because

14   I asked -- I said, we need -- we need some cuffs.  We

15   need him handcuffed.  Deputy Martinez cuffed his left

16   wrist, and we just couldn't -- we couldn't get his

17   right hand out from underneath him.  And I saw that

18   his -- the forehead, the top part of his forehead,

19   was resting up against the wall, right next to the

20   bed.

21        So I thought if Deputy Goepfert could pull

22   his legs, Deputy Martinez and I could scoot the

23   gentleman to the left, and get more -- more space,

24   where he could get access to that right wrist.  So I

25   told Deputy Goepfert to pull, pull on his legs.  And

1    we can move him over a little to the left.  We did.

2            We were able to get his right wrist behind

3    him.  Deputy Martinez cuffed his right wrist.  And

4    when he kind of took a deep breath and I looked up,

5    and -- I saw Baldwin in the doorway.  Uh, I told

6    Deputy Baldwin to clear the air, because we had asked

7    for 10-3 traffic.  Baldwin cleared the air.  I said

8    that, you know, the FD can come in.  That was relayed

9    over the radio.

10       Q    The latter part of this statement has to

11   do -- about the clearing the air, and getting the FD

12   in, is about summoning medical help, is it -- isn't

13   it?

14       A    It's not about somebody needing medical

15   help.  No, sir.

16       Q    No.  About summoning.

17       A    Summoning?

18       Q    Yeah.

19       A    No.  Clearing the air, is getting the

20   channel back active for the other deputies that are

21   not at that particular location.  It's a Code 10-8.

22       Q    Okay.  So the purpose of that is?

23       A    To get the radio back in-service, just in

24   case anybody else needs it --

25       Q    Okay.

1    A    -- elsewhere throughout the county.

2    Q    And so, it was out of service to allow them

3    to use it at the moment?

4    A    That's correct.  The channel is 10-3 for

5    them, at that time.

6    Q    When he says we can get the FD, the FD can

7    come in, he's referring to the fire department?

8    A    Correct.

9    Q    All right.  Let's go to Page 4.  There's

10   an, okay, after some answers that he gave about

11   whether he had gloves on or not.  And then the

12   narrative continues.

13   A    Okay.

14   Q    Would you read that; got back down, and so

15   forth.

16   A    The one that starts, I got back down on my

17   knees?

18   Q    Right.  So Sergeant Street is continuing to

19   describe what happened.

20   A    Okay.  Uh, I got back down on my knees

21   to -- on the gentleman's right side.  Uh, shook his

22   shoulder a couple of times.  Uh, tried to communicate

23   with him.  I asked the deputies what -- what his name

24   was.  They told me his name was Don.  Um, I tried to

25   talk to him, you know, hey, Don, how you doing.  Got

1   no response.

2            Deputy Goepfert said he -- said we should

3   roll him up to the -- to his -- onto his side.  So

4   Deputy Goepfert knelt down, and I pulled -- and I --

5   Deputy -- knelt down and I pulled, and Deputy

6   Goepfert pushed.  And we rolled him onto his right

7   side.  Deputy Martinez reached down, and I felt for a

8   pulse on the left side of his neck.  Deputy Martinez

9   said he thought he felt a pulse.  I did a sternum rub

10  on the gentleman, and I pinched his left nipple,

11  squeezed it and turned it.

12           When I did that, his mouth opened and

13  closed a couple of times.  It appeared as if he

14  was -- he was conscious.  And we just, right after

15  that, noticed that his eyes were -- were just glazed

16  over.

17      Q    And have you ever had experience, yourself,

18  with a subject failing to breathe or having other

19  medical conditions, post-tasering?

20      A    No, sir.

21           MR. ROZELLE:  Objection to form.  You

22       can answer.

23           THE DEPONENT:  Sorry.

24           MR. ROZELLE:  You're good.

25

1    BY MR. CALLAHAN:

2        Q    Are you familiar with any other case in

3    which deputies of Pinellas County, prior to this one,

4    had a situation where the subject of the

5    investigation or whatever they were involved in, had

6    medical conditions or death after being tasered?

7        A    No, sir.

8        Q    And are you aware of any situations since?

9        A    No, sir.

10       Q    Did any of your training at Pinellas County

11   Sheriff's Office involve dealing with persons who

12   might have medical conditions, or might be unable to

13   communicate and respond?

14       A    You receive a baseline training in the

15   academies.  Further training, beyond that, no, sir.

16       Q    And what is your understanding of what is

17   appropriate in the circumstance where you are dealing

18   with someone who might be having difficulty

19   responding?

20           MR. ROZELLE:  Objection to form.  You

21       can answer.

22           THE DEPONENT:  Regardless of what you

23       may observe their behaviors to be,

24       ultimately it's our job as scene safety,

25       securing the scene.

1    BY MR. CALLAHAN:

2        Q    Is there any consideration, at all, to be

3    given for the person's condition; mental or physical?

4        A    There is.  You take it into consideration.

5    But you still react appropriately.

6        Q    Do you know if either of the three deputies

7    involved in this situation, ever took Mr. DeGraw's

8    medical condition into consideration at the time they

9    were dealing with him?

10            MR. ROZELLE:  Objection to form.  You

11        can answer.

12            THE DEPONENT:  I do not know that.  You

13        would have to ask them.

14    BY MR. CALLAHAN:

15        Q    Did they ever tell you that they took it

16    into consideration?

17        A    I do not recall.

18        Q    What do you recall about Mr. Goepfert, from

19    your investigation?

20        A    Absolutely nothing.  I couldn't even tell

21    you what he looks like today.

22        Q    Did you observe him at the morgue?

23        A    I was not at --

24            MR. ROZELLE:  I'm sorry, Mr. DeGraw --

25            THE DEPONENT:  -- the morgue.

1        MR. ROZELLE:  -- or are you asking

2    about --

3        MR. CALLAHAN:  I'm sorry, I said

4    Goepfert.

5        MR. ROZELLE:  -- Deputy Goepfert?  You

6    said Goepfert.

7        THE DEPONENT:  Yeah.

8  BY MR. CALLAHAN:

9    Q    I'm sorry, let me ask it again.  I meant

10  DeGraw.

11    A    I was not at the morgue, sir.

12    Q    Okay.  And did you ever observe the photos

13  of him?

14    A    I did.

15    Q    All right.  Do you have a recollection from

16  those photos, anything at all about his size or

17  appearance?

18    A    If you're asking me specifically how tall

19  he was, or how much he weighed.

20    Q    Yes, sir.

21    A    No.  I could tell you that he was a little

22  bit overweight.

23    Q    You don't remember his size, or anything

24  like that?

25    A    Not specifically, no.

1    Q    Okay.  Let me refer you to the exhibits

2    that are in front of us here today.  And ask you to

3    look at Exhibit 4.  You can just put that on the

4    bottom with the others, if you don't mind.

5    A    Sure.

6    Q    There you go.  It's going to be way down in

7    there.  Those are all the interviews on top.

8    A    Okay.

9         MR. ROZELLE:  General Order 13-3.

10        THE DEPONENT:  Got it.

11   BY MR. CALLAHAN:

12   Q    Got it?

13   A    Yeah.

14   Q    Exhibit 4 purports to be General Order

15   13-3, from the Pinellas County Sheriff's Office.  Are

16   you aware of this general order?

17   A    Yes, sir, I am.

18   Q    And the first page on the discussion phase,

19   would you read the first line.

20   A    The most important purpose of law

21   enforcement is the protection of human life.

22   Q    Would you agree with that?

23   A    It is.

24   Q    And would you agree that that purpose -- in

25   accomplishing that purpose, one might have to

1    understand the medical and physical condition of a

2    subject in dealing with them?

3         MR. ROZELLE:  Objection to form.  You

4      can answer.

5         THE DEPONENT:  Medical?  I'm not sure

6      what you mean, as far as medical.  We're not

7      doctors, certainly.  To recognize those

8      signs, yes.

9    BY MR. CALLAHAN:

10     Q    And go to the definitions.

11     A    Okay.

12     Q    And would you read Paragraph A.

13     A    Active Resistance.  A subject's use of

14   physically evasive movements directed towards the

15   deputy, such as bracing, tensing, pushing or pulling,

16   to prevent the deputy from establishing control over

17   the subject.  Examples include: A subject physically

18   anchors himself to a person, or object, to prevent

19   himself from being removed.  The subject braces or

20   pulls away from the deputy when the deputy grips the

21   suspect's arm.  Or the subject attempts to run, when

22   the deputy touches or attempts to grab the subject's

23   arm or shoulder.

24     Q    Are you aware of any active resistence by

25   Mr. DeGraw in this situation from your investigation?

1          MR. ROZELLE:  Objection to form.  You

2     can answer.

3          THE DEPONENT:  Yes.

4  BY MR. CALLAHAN:

5     Q    And what would that be?

6     A    Bracing, tensing, pulling.

7     Q    Pulling?

8     A    Not surrendering his arm.

9     Q    And where would that have occurred, when he

10 was on the floor?

11     A    Yes, sir.

12     Q    All right.  Let's go to Page 3, under

13 General Requirements, Subparagraph A.

14     A    Okay.

15     Q    And would you read that paragraph, please.

16     A     In accordance with Pinellas County

17 Sheriff's Office General Orders, members shall use

18 only necessary force to perform official duties.  The

19 members shall not strike or use physical force

20 against a person, except when necessary in

21 self-defense, in defense of another, to overcome

22 physical resistance to arrest, to make an

23 individual -- or, excuse me, to take an individual

24 into protective custody, or to prevent escape from an

25 arrested person.

```
 1        Q    And in this situation, was that complied

 2   with in your opinion?

 3             MR. ROZELLE:  Objection to form.  You

 4        can answer.

 5             THE DEPONENT:  Yes.

 6   BY MR. CALLAHAN:

 7        Q    In what manner?

 8        A    All of it.

 9        Q    Was there any attempt to escape, that you

10   know of, from this investigation?

11        A    I do not know that.

12        Q    Okay.  And was anyone there trying to

13   defend another person?

14             MR. ROZELLE:  Objection to form.  You

15        can answer.

16             THE DEPONENT:  I do not know that.

17   BY MR. CALLAHAN:

18        Q    Okay.  And to what extent was it necessary

19   in self-defense to use necessary force in this case

20   with Mr. DeGraw?

21             MR. ROZELLE:  Objection to form.  You

22        can answer.

23             THE DEPONENT:  Just from the external

24        behavior that he displayed.

25
```

1   BY MR. CALLAHAN:

2       Q    Specifically, what?

3       A    Specifically, what?  The knowledge of;

4   there's a gun under his pillow, him coming at the

5   deputies, and acting erratically.

6       Q    What evidence do you have that he, quote,

7   came at the deputies?

8       A    The interview.

9       Q    Tell me where.  You have it in front of

10  you.  Look at it.

11      A    I would have to refer to the actual

12  transcription of the interview with the deputy that

13  deployed the taser.

14      Q    All right.  We'll go to that, on that

15  point.  And then we'll come back to this.  If we look

16  at Page 6 on Exhibit 1, right there.

17           MR. ROZELLE:  Yeah.  Hang on a second.

18      Let's find ...  So you're in Exhibit 1.

19           THE DEPONENT:  I'm in Exhibit 4.

20           MR. ROZELLE:  Set that --

21           MR. CALLAHAN:  Yeah.  If you'll set

22      four aside for a minute.

23           THE DEPONENT:  Okay.

24           MR ROZELLE:  So you're looking for --

25      just for our record, you're looking for

1    Deputy Goepfert's interview?

2        MR. CALLAHAN:  I have it, yes.  And

3    I'll give it --

4        MR. ROZELLE:  And so, I just -- are you

5    directing him to certain places, or -- I had

6    understood, he had a need to look through it

7    and --

8        MR ROZELLE:  I just directed him to it,

9    if you'll let me do it.  I directed him to

10   Page 6 of 15, of Goepfert.

11       MR. ROZELLE:  All right.  So take a

12   look.  Here, let's find it.

13       THE DEPONENT:  Exhibit ...

14       MR. ROZELLE:  Yeah.  It's --

15       MR. CALLAHAN:  Exhibit 1.

16       MR. ROZELLE:  -- 21.

17       THE DEPONENT:  Twenty-one.  Okay.

18       MR. ROZELLE:  And that's his 15-page

19   interview.  So if you want to look at it,

20   you're free to do so.  If counsel has

21   questions for you about specific parts of

22   it, that's fine, too.

23       THE DEPONENT:  I've made it through

24   Page 6.

25

1    BY MR. CALLAHAN:

2        Q    Okay.  Let me refer you on Page 6, in the

3    first large paragraph on the page, at the top.

4        A    Uh-huh.

5        Q    So, again, Tobeck asked him, what did you

6    do.  And the response given by Patrolman Goepfert

7    was -- let me refer you to where he was.  He was

8    laying on the bed in his underwear, blood in his

9    mouth.  His mouth was all bloody.  And he was just

10   laying there.  He wasn't doing anything.  And I

11   started to speak to him.

12            So at that point, how would you

13   characterize Mr. DeGraw's behavior?

14            MR. ROZELLE:  Objection to form.  You

15       can answer.

16            THE DEPONENT:  After that portion,

17       after he was observed laying in the bed?

18   BY MR. CALLAHAN:

19       Q    Yes.  He said that he was there for four or

20   five minutes.

21       A    Uh-huh.

22       Q    Well, would you characterize that as

23   aggressive --

24            MR. ROZELLE:  Objection to form.  You

25       can answer.

 1          THE DEPONENT:  No.

 2   BY MR. CALLAHAN:

 3       Q    -- contact by Mr. DeGraw?  Okay.  And then

 4   later -- let's go down to the bottom.  There's an,

 5   okay, by Tobeck.  And then Goepfert says, away from

 6   where I could see what he's doing, what his hands

 7   were doing.

 8       A    Uh-huh.

 9       Q    And I gave him, you know, the commands to

10   turn towards me, so I can see your hands, to do ...

11   He did so.  And, again, the yell.

12          And you remember that the subject kept

13   saying, ahhh or yahhh, or something like that.

14       A    Yes.

15       Q    He never spoke, at all, did he; Mr. Goep --

16   Mr. DeGraw?

17          MR. ROZELLE:  Objection to form.

18          THE DEPONENT:  I was not there.  I

19      don't know.

20   BY MR. CALLAHAN:

21       Q    Let me quickly refer you ahead, to the

22   bottom of Page 9.

23       A    Okay.

24       Q    Question from Tobeck.  Other than yelling

25   or grunting or moaning, or however you describe it.

```
 1   Yeah, it was just, yahhh.  He had the yahhhs.  We'll

 2   call it yahhhs.  Did he make any other statements to

 3   you.  Answer:  No, he didn't talk once.

 4          Does that refresh your recollection?

 5          MR. ROZELLE:  Objection to form.

 6          You're refreshing his recollection with a

 7          question asked by another detective, of

 8          another subject.  I just want to make sure I

 9          know what we're doing here.

10   BY MR. CALLAHAN:

11     Q    You understand?

12     A    Yes.  Now that I've read that, that was

13   obviously what was said.

14     Q    So from your investigation then, you don't

15   recall him -- anybody, reflecting that he ever spoke?

16     A    No.

17     Q    Okay.  Let me take you back to Page 6

18   again.  And then Goepfert says, and I kept asking

19   him, sir, come out towards me.  I wanted to try to

20   get him out of the bedroom, at first, because I knew

21   there were guns in there.

22          Okay.  Do you recall that response?

23     A    After reading it, yes, sir.

24     Q    Okay.  Is there anything that you think is

25   aggressive about his description of that conduct?
```

1          MR. ROZELLE:  Objection to form.

2      You're skipping over all the other conduct

3      here.  I just want to make sure --

4          MR. CALLAHAN:  You are making

5      statements, not objections.

6          MR. ROZELLE:  Sir, you're doing the

7      same thing.  So I want us to be clear about

8      what we're each doing here.

9          MR. CALLAHAN:  I'm just -- excuse me,

10      I'm doing -- let's go off the record.

11          (At this time a discussion was held off the

12          record).

13          THE COURT REPORTER:  Back on the

14      record.

15  BY MR. CALLAHAN:

16      Q   Let's go back.  How many times did it

17  happen.  Three or four times.  And I kept asking him,

18  sir, come out towards me.  I wanted to try to get him

19  out of the bedroom first.

20      A   Okay.

21      Q   Okay.  You recall that.  Did you

22  characterize anything about that as aggressive?

23          MR. ROZELLE:  Objection to form.  You

24      can answer.

25          THE DEPONENT:  At that point, no.

1   BY MR. CALLAHAN:

2       Q    Okay.  Then, the description continuing by

3   Goepfert.  There was not a lot of room really to do

4   anything in there, or even get two deputies in there.

5   Um, he finally sat on the edge of the bed.  Okay.

6            Anything aggressive about --

7            MR. ROZELLE:  Objection.

8            MR. CALLAHAN:  -- that description?

9            MR. ROZELLE:  Objection to form.  You

10      can answer.

11           THE DEPONENT:  Not yet.

12  BY MR. CALLAHAN:

13      Q    Okay.  And I'm asking you all these

14  questions, because you characterized a portion of his

15  conduct as aggressive.  And I'm trying to pin down

16  what --

17      A    Okay.

18      Q    -- you mean by that.

19           MR. ROZELLE:  Objection to counsel

20      testifying.

21  BY MR. CALLAHAN:

22      Q    He stood up towards me again, yahhh, you

23  know, with that yell.  He kind of came toward me.  I

24  said, sir, stay where you're at, you know, it's --

25  you know, because I was waiting, trying to wait for

1    back-up, trying to wait for one more deputy to get

2    there.  Because I felt that would be -- you know, be

3    able to handle it better.

4              All right.  Anything aggressive about that?

5              MR. ROZELLE:  Objection to form.  You

6         can answer.

7              THE DEPONENT:  Yes.

8    BY MR. CALLAHAN:

9         Q    And what?

10        A    That would be -- I wasn't there.  But

11   that -- I get from that, reading that, that the

12   person came off the bed growling, or making some sort

13   of strange noise, towards the deputy.  And didn't

14   comply with him, when he told him to stop.

15        Q    And he said, right after that, he sat back

16   down on the bed.  You see that?

17        A    It -- okay.  I do see that.

18        Q    Okay.  So you get from this, that he told

19   him at some point when he stood up, to not do that,

20   and he sat back down on the bed?

21             MR. ROZELLE:  Objection to form.  You

22        can answer.

23             THE DEPONENT:  It does say that he sat

24        back down on the bed.

25

1    BY MR. CALLAHAN:

2        Q    Okay.  And then the next -- Goepfert

3    describes next, and then he got up and he -- he came

4    towards me.  He took the step.  Got that.

5             Do you take that to be aggressive behavior,

6    taking that step?

7             MR. ROZELLE:  Objection to the form.

8        You can answer.

9             THE DEPONENT:  That's in the eyes of

10        the person that's there.  I can't say.

11   BY MR. CALLAHAN:

12       Q    Okay.  I said, you know, sir, don't.  You

13   know, just stay there, stay there.  And he took

14   another step, and he put his hands, like out in front

15   of him, like almost like to grab me.  And he started

16   coming towards me.  And that's when I deployed the

17   taser?

18             MR. ROZELLE:  Objection to form.  Plus,

19        misread the testimony.

20             MR. CALLAHAN:  How did I misread it?

21             MR. ROZELLE:  You skipped some of the

22        words, but you may answer.

23             MR. CALLAHAN:  I didn't skip any words,

24        but I'll --

25             MR. ROZELLE:  Sir, the record will --

1        MR. CALLAHAN:  -- read it again.

2        MR. ROZELLE:  I lodged my objection.

3        MR. CALLAHAN:  Let me -- let me read it

4     again, sir.

5        MR. ROZELLE:  That would be fair.

6   BY MR. CALLAHAN:

7     Q    Sir, you know, just stay there, stay there.

8   Uh, he took another step, and then he put his hands

9   kind of like, uh, out in front of him, like almost

10  like going to grab me.  And he started coming towards

11  me.  Uh, that's when I deployed the taser.

12        All right.  Do you have an understanding of

13  what Deputy Goepfert meant when saying, like almost

14  like going to grab me?

15    A    I don't know what he means by that, no.

16    Q    Okay.  And so, there's a description here

17  of two steps that this gentleman DeGraw took,

18  correct?

19        MR. ROZELLE:  Objection to form.  You

20     can answer.

21  BY MR. CALLAHAN:

22    Q    It says he took another step.

23    A    Okay.

24    Q    He had taken a first step from sitting,

25  then another step.  And then he deployed the taser.

1    So is this the point at which you had earlier

2    described behavior, which you would characterize as

3    aggressive by Mr. DeGraw?

4        A    Yes.

5        Q    Okay.  Do you have any other facts, or

6    circumstances, or descriptions about what happened at

7    that moment, other than what Goepfert told you right

8    here?

9        A    I --

10            MR. ROZELLE:  Objection to form.

11            THE DEPONENT:  -- do not.

12            MR. ROZELLE:  You can answer.

13   BY MR. CALLAHAN:

14       Q    All right.  Thank you.  And do you know why

15   it was that Deputy Goepfert deployed his taser five

16   times?

17            MR. ROZELLE:  Objection to form.  Plus,

18        it's been asked and answered.  You may

19        answer it again.

20            THE DEPONENT:  I do not.

21   BY MR. CALLAHAN:

22       Q    Do you know why it was that Goepfert,

23   Martinez and Street felt compelled to cuff

24   Mr. DeGraw, after he was lying calmly on the floor?

25            MR. ROZELLE:  Objection to form.  You

1   can answer.

2     THE DEPONENT:  Ultimately, to secure

3   him, so they could get help from medical

4   personnel.

5  BY MR. CALLAHAN:

6   Q Do you know Sergeant Goep -- I mean, Deputy

7  Goepfert just didn't allow him to walk out of the

8  room?

9     MR. ROZELLE:  Objection to form.  You

10   can answer.

11     THE DEPONENT:  Because of his erratic,

12   aggressive behavior.

13  BY MR. CALLAHAN:

14   Q Well, he had started to work towards the

15  door earlier, than the time that he got tasered.  Do

16  you know why, at that stage, he didn't allow him to

17  walk out of the room?

18     MR. ROZELLE:  Objection to form.

19   Counsel testifying again.  You may answer.

20     THE DEPONENT:  Again, I wasn't the

21   person there.  I hate to Monday morning

22   quarterback his decisions, but --

23  BY MR. CALLAHAN:

24   Q Okay.

25   A Based off of my readings.

1     Q     Okay.  Let's go back to where we were.

2     A     In ...

3     Q     We were discussing Exhibit Number 4.

4     A     Number 4.  Okay.

5     Q     Go to Page 4, on Training and

6   Proficiency --

7     A     Okay.

8     Q     -- Sub-B.  And what does General Order 13-3

9   say in Sub-B about training?

10    A     It says, members shall initially receive

11  eight hours of electronic control weapon training.

12  Continuous electronic control weapon training will

13  occur annually, and will include use of force

14  policies, and a proficiency demonstration in which

15  the electronic -- excuse me, proficiency

16  demonstration with the electronic control weapon.

17          A certified electronic control weapon

18  instructor shall monitor this training.  The Training

19  Division shall document training and proficiency.

20    Q     Did you check to see what Deputy Goepfert's

21  training and proficiency was in the past, prior to

22  this event?

23    A     I don't recall, specifically.

24    Q     All right.  I didn't see it anywhere in

25  your report.  Do you know -- do you have any

 1    recollection of seeking out those records?

 2              MR. ROZELLE:  Objection to form.  You

 3         can answer.

 4              THE DEPONENT:  I do not.

 5    BY MR. CALLAHAN:

 6         Q    Okay.  Did you have a discussion with

 7    Goepfert, at all, about his training and proficiency?

 8         A    In this interview, his training proficiency

 9    that we just went over, it's in there.

10         Q    Okay.

11         A    That's my recollection.

12         Q    Okay.  Let me go to Page 6 of Exhibit 4,

13    under Electronic Control Weapons.  And look at

14    Subparagraph E, please.  Would you read that one for

15    me.

16         A    Yes.  It says, guidelines cannot be written

17    to encompass every possible application for the use

18    of the electronic control weapon, and members should

19    keep in mind that not every subject displaying active

20    resistance, as defined in the order, will necessitate

21    the use of the electronic control weapon.

22              Subject age and physical ability should be

23    considered before deploying the electronic control

24    weapon.

25         Q    And would you read D, just above that,

1    please.

2         A    A verbal warning shall be issued prior to

3    deployment of the electronic control weapon, unless

4    such warning should create a tactical disadvantage

5    for the member.

6         Q    Do you know if Goepfert gave Mr. DeGraw a

7    verbal warning?

8         A    We just read that in the -- I recall from

9    reading it in the supplement, yes.

10             MR. ROZELLE:  That was the part you

11         skipped.

12             MR. CALLAHAN:  Again, you're engaging

13         in inappropriate conduct.

14             MR. ROZELLE:  As are you, sir.

15             MR. CALLAHAN:  All right.  Let's take a

16         break.  I have to consider what I'm going to

17         do about this.  Let's take five minutes.

18             (At this time a discussion was held off the

19             record).

20             THE COURT REPORTER:  Back on.

21    BY MR. CALLAHAN:

22         Q    We were discussing electronic control

23    weapons at the time we took a break, Detective.

24         A    Could you specify --

25         Q    It was on Page 6 of the --

1    A    -- where I'm at?

2    Q    -- Pinellas County Sheriff's Office General

3  Order 13-3, which is Exhibit 4.

4    A    Okay.

5    Q    I think I had you recite Subsection E of

6  the 13-3.6.

7    A    Correct.

8    Q    And then, we were discussing D, a Verbal

9  Warning, at the time we had an interruption.  So

10  would you read D again, please.

11    A    I will.  Verbal warnings shall be issued,

12  prior to deployment of the electronic control weapon,

13  unless such warning would create a tactical

14  disadvantage for the member.

15    Q    And I think I asked you just a moment ago,

16  if you recalled if Goepfert told you that he had done

17  that.

18    A    I don't recall if he told me he did that.

19  But I recall reading it in this report, just to

20  you -- prior to you having me read --

21    Q    Okay.  And show --

22    A    -- that paragraph.

23    Q    -- me where you read that, if you don't

24  mind.

25    A    I believe that was said by Charlie Street.

1    Is that correct?  Am I in the wrong supplement here,

2    where he --

3        Q   We were discussing --

4        A   -- heard him verbalize.

5        Q   -- Goepfert, just before.  But Charlie

6    Street is Exhibit Number 13, if you want to look at

7    that one.

8        A   No.  That's okay.  I think I'm in the right

9    spot here now.  There was a portion of an interview

10   that we read, where you asked me about before, that

11   said the pop.  Prior to that, it was heard by --

12       Q   That was Sergeant Street.

13       A   -- Sergeant Street, a verbalization of

14   taser.  Where that's at -- I don't know what

15   supplement that's in, where we read that.

16       Q   I'll show you that.  My recollection, was

17   that the sergeant said he heard that word.  But

18   you're welcome to look at it yourself again.

19       A   Yes.  That would be great.  If you could

20   just tell me which supplement it's in.

21       Q   All right.

22       MR. ROZELLE:  I'll just speed this

23      along here, if you'd like.  Exhibit 13,

24      Supplement 26, is Charlie Street's --

25      MR. CALLAHAN:  Correct.

1          MR. ROZELLE:  -- interview right there.

2          THE DEPONENT:  Okay.  Deputy Goepfert

3     announced taser.

4  BY MR. CALLAHAN:

5     Q    All right.  That's what you're referring to

6  as the warning?

7     A    That is the warning.

8     Q    Okay.  And could you explain to me how that

9  constitutes a warning; the word taser?

10    A    He just told somebody he was going to tase,

11 use a taser.

12    Q    That's not what I take this statement to

13 mean.  So could you explain that to me.

14    A    I --

15         MR. ROZELLE:  Objection to form.  You

16    can answer.  Hang on.

17         THE DEPONENT:  I'm so sorry.

18 BY MR. CALLAHAN:

19    Q    Let me put it another way.  All I heard you

20 say, sir, was just the word taser.  And not, I'm

21 going to use a taser, or some such language to that

22 effect.  So how do you -- let me ask you this.  How

23 do you take a warning out of that one word?

24         MR. ROZELLE:  Objection to form.  You

25    can answer.

1          THE DEPONENT:  So this is Sergeant's

2     Street's recollection of what he heard

3     verbally, correct?

4  BY MR. CALLAHAN:

5     Q    Yes, sir.

6     A    Okay.  If you refer back to Supplement 21,

7  which is the person who actually deployed the taser,

8  he told Mr. DeGraw that he might get tased, did he

9  not?  That's what I -- that's what I read.  And then

10  he verbalized, taser.  I would say that's sufficient

11  warning.

12     Q    Would you show me where it is that --

13     A    Yes, sir --

14     Q    -- he told him?

15     A    -- I will.

16     Q    I found it.  Yeah.

17     A    You found it?

18     Q    Yeah.  Middle of the page; 6.

19     A    I'm going to have to taser you.

20     Q    Correct.

21     A    That's what it says.

22     Q    Okay.  Don't do that.  I'm going to have to

23  taser you.  And the context of that, was when

24  Mr. DeGraw was where?

25     A    On his bed, reaching for something.

1    Q    So that was not in the context of the later

2   event, where he actually deployed the taser?

3          MR. ROZELLE:  Objection to form.  You

4        can answer.

5          THE DEPONENT:  When he actually

6        deployed the taser, he gave the warning.  On

7        this, context of this, I took it as; stop

8        doing that, or you're -- I might have to use

9        the taser.

10   BY MR. CALLAHAN:

11   Q    All right.  But my question to you is,

12  weren't these descriptions in two different events?

13          MR. ROZELLE:  Objection to form.

14  BY MR. CALLAHAN:

15   Q    The first was --

16   A    They are.

17   Q    Okay.  So in the second event, does -- did

18  sergeant -- I mean, did Deputy Goepfert tell you that

19  he deployed the taser, after giving him a warning in

20  any way?

21   A    I do not see that in the -- what's written

22  in this report.  And I don't -- have no recollection.

23   Q    Okay.

24          THE DEPONENT:  Is this one mine?

25          MR. ROZELLE:  I'm sorry, let me --

1        sorry, this one is mine.  That's yours.

2    BY MR. CALLAHAN:

3        Q    Okay.  Going forward, with General Order

4    13-3.

5        A    Okay.

6        Q    Do you know what it says about aiming

7    tasers?

8        A    Specifically, no.  I'd have to read it to

9    you out of here.

10       Q    All right.  Do you have knowledge of how

11   long -- how a taser should be appropriately aimed?

12       A    How it --

13            MR. ROZELLE:  Objection to form.  I'm

14       sorry.  You can answer.

15   BY MR. CALLAHAN:

16       Q    I said do you have knowledge about how a

17   taser should be appropriately aimed?

18       A    I do.

19       Q    And how is that?

20       A    It's got --

21       Q    Where --

22       A    -- a laser pointer on it, that should be

23   from the torso, below.  Or if it's in the back, below

24   the neck.

25       Q    And why is that, to your knowledge?

```
 1      A    That's what's recommended by the

 2  manufacturer.

 3      Q    Okay.  And do you know of any admonition by

 4  the manufacturer, or any regulation by the Pinellas

 5  County Sheriff's Office, about multiple electronic

 6  weapon applications?

 7           MR. ROZELLE:  Objection to form.  You

 8      can answer.

 9           THE DEPONENT:  I do not.

10  BY MR. CALLAHAN:

11      Q    All right.  Let me direct you to General

12  Order 13-10, Exhibit 3.

13           MR. ROZELLE:  Here.  I'll do your

14      housekeeping for you.  Hand me all that

15      stuff.

16           THE DEPONENT:  Okay.  I have the

17      General Order.

18  BY MR. CALLAHAN:

19      Q    Second paragraph, first sentence, would you

20  read that to me.

21      A    No single policy; that particular

22  paragraph?

23      Q    Yes, sir.

24      A    Okay.  No single policy or procedure can

25  address police response to all people with
```

1    disabilities or illness.

2       Q    And what does that mean to you?

3       A    Meaning that every situation is different.

4       Q    All right.  And a discussion section below

5    that, in the second paragraph, would you read the

6    first sentence there.

7       A    When coming into contact with anyone having

8    a disability, for whatever reason or circumstance,

9    agency members must take extra caution, to insure the

10    person's rights are not violated.  And that he or she

11    understands what is occurring.

12       Q    Did you determine from your investigation

13    whether Mr. DeGraw ever understood what was

14    occurring?

15       A    I did not.

16       Q    And the next paragraph, first sentence,

17    would you read that for me.

18       A    The one that begins with, agency?

19       Q    Yes.

20       A    Agency members must recognize the responses

21    of people with certain disabilities may resemble

22    those of people who have abused substances, such as

23    alcohol or drugs.

24       Q    And the second sentence.

25       A    At times, such traits may be exhibited by

1    people with diabetes, epilepsy, multiple sclerosis,

2    hearing impairments, or other disabilities.

3        Q    And from reading -- from doing your

4    investigation, did you determine if Mr. DeGraw was

5    exhibiting any traits that may be covered by that

6    paragraph?

7        A    I did not.

8        Q    You do recall in your investigation, don't

9    you, that his wife advised the deputies, prior to

10   these events, that he had had a seizure?

11           MR. ROZELLE:  Objection to form.  You

12       can answer.

13           THE DEPONENT:  I can tell you that my

14       recollection, is that he had a seizure

15       earlier.

16   BY MR. CALLAHAN:

17       Q    All right.  Do you have any recollection

18   that he had one in the afternoon?

19       A    I do not.

20       Q    Okay.  During the interview that you and

21   Detective Tobeck conducted of Julie DeGraw,

22   Mr. DeGraw's spouse, that's in Exhibit 1, it's Number

23   6 among the interviews.

24       A    Exhibit 1, Supplement -- do you have --

25           MR. ROZELLE:  Supplement 6 --

1          THE DEPONENT:  -- a supplement number,

2      or is it --

3          MR. ROZELLE:  -- I think.

4          THE DEPONENT:  Supplement 6.

5          MR. CALLAHAN:  Supplement 6, correct.

6          MR. ROZELLE:  These aren't in order, so

7      it's towards the back.

8  BY MR. CALLAHAN:

9      Q    It is near the back.

10     A    Okay.  I have that particular supplement.

11     Q    If you look at Page 12 of that interview.

12     A    Okay.

13     Q    If you look at the second full paragraph

14  there, this is DeGraw's response to inquiry from

15  Tobeck.  And at the bottom, she goes on to state --

16  and he goes, I wish you would not do that.  And after

17  that, he said that Kenzie jumped off the bed, and he

18  had a seizure.  And I -- you know, he started

19  posturing, and he just went into a full-blown

20  seizure.

21     A    Okay.

22     Q    Does that refresh your recollection about

23  what she told you?

24          MR. ROZELLE:  Objection to form.  You

25      can answer.

1          THE DEPONENT:  After you stating that

2      and me reading it here, that it was earlier,

3      yes, at 1:00.

4  BY MR. CALLAHAN:

5      Q    Okay.  And down below.  Question: Were you

6  downstairs when this was happening.  This is

7  Detective Tobeck asking -- Sergeant Tobeck asking the

8  question.  And her answer, I was downstairs.  And

9  I'm -- I told the deputy, I said, he's going to be

10 confused, because he was confused this morning.  And

11 so -- well, thank you for telling me about the gun.

12 And -- okay.  I said he -- he has PTSD.  That's why

13 I'm trying to do -- be slow, and taking my time with

14 him, ma'am.  Okay.  And then I heard my husband yell

15 a couple more times.  And I don't know if he got up,

16 because he said the M word; mother, whatever.

17          Do you have a recollection now about

18 Mrs. DeGraw relating that she had told the deputies

19 that he was going to be confused; her husband?

20     A    I do.

21     Q    Okay.  Let me direct you to Page 3 of

22 General Order 13-10.

23     A    Okay.

24     Q    Sub A, in the middle of the paragraph;

25 Dispatching Calls.  Would you read Sub A to me,

1    please.

2        A    I would.  Communications: Personnel

3    receiving a complaint or report involving a subject

4    believed to have a mental, emotional, or

5    psychological disability should endeavor to obtain as

6    much information about the subject and their

7    condition, as possible.

8        Q    Do you know what information the deputies

9    obtained from -- about Mr. DeGraw, prior to the

10   event?

11       A    I do not.

12       Q    Would you think it appropriate that they

13   learn as much as possible about him, before they

14   dealt with him?

15           MR. ROZELLE:  Objection to form.  You

16       can answer.

17           THE DEPONENT:  Time permitting.

18   BY MR. CALLAHAN:

19       Q    And would it be consistent with department

20   policy for them to do so?

21           MR. ROZELLE:  Objection to form.  You

22       can answer.

23           THE DEPONENT:  It would.

24

25

1   BY MR. CALLAHAN:

2       Q    Do you recognize, Detective, that there are

3   certain conditions and disabilities that may not be

4   immediately obvious to a deputy when confronting a

5   subject?

6       A    I --

7            MR. ROZELLE:  Objection to form.

8            THE DEPONENT:  -- do.  I'm sorry.

9            MR. ROZELLE:  You can answer.

10  BY MR. CALLAHAN:

11      Q    Let me direct you to Page 13 of General

12  Order 13-10.

13      A    Okay.

14      Q    Would you read the first paragraph, under

15  13-10.15; Invisible Disabilities.

16      A    Yes.  Many disabilities are difficult to

17  notice or detect.  A deputy's failure to recognize

18  characteristics associated with certain invisible

19  disabilities, could have serious consequences for the

20  person with the disability.  Outward signs of a

21  disability, such as epilepsy, generally do not exist

22  unless the person with the disability experiences a

23  seizure.

24      Q    Would you agree with me that it's

25  department policy that deputies confronting a subject

```
1    should attempt to recognize the characteristics that

2    a person may have, if they've had a seizure?

3            MR. ROZELLE:  Objection to form.  You

4        can answer.

5            THE DEPONENT:  They should attempt.

6    BY MR. CALLAHAN:

7        Q    All right.  Do you know if they attempted

8    to, in this case?

9        A    I do not.

10       Q    Under Invisible Disabilities, there's a few

11   more comments under the General Order 13-10 I'd like

12   to go over with you.  Sub A, would you read that one

13   to me.

14       A    A deputy's patience and understanding of

15   the characteristics commonly associated with

16   invisible disabilities will often lead to successful

17   resolution.

18       Q    Would you agree that that's department

19   policy?

20           MR. ROZELLE:  Objection to form.  You

21       can answer.

22           THE DEPONENT:  It is.  It's written in

23       the policy.

24

25
```

1    BY MR. CALLAHAN:

2       Q    Okay.  And B, would you read that for me.

3       A    An inaccurate assessment of a subject may

4    lead to unnecessary confrontation, injury, and denial

5    of needed medication, and/or treatment.

6       Q    Would -- do you know in this case, from

7    your investigation, if an accurate assessment of

8    Mr. DeGraw was ever made by the deputies confronting

9    him?

10      A    I do not.

11      Q    And would you read C for me.

12      A    As with all types of disabilities, a

13   deputy's first obligation is to protect the

14   individual from unnecessary harm.

15      Q    Would you agree with me, that's policy of

16   the department?

17           MR. ROZELLE:  Objection to form.  You

18       can answer.

19           THE DEPONENT:  It's written in the

20       policy.

21   BY MR. CALLAHAN:

22      Q    And E, would you read that for me, please.

23      A    Deputies should realize involuntary

24   behavior associated with some invisible disabilities

25   may resemble behavior characteristically exhibited by

1    intoxicated or less frequently combative individuals.

2    For example, a person experiencing a mild seizure may

3    appear incoherent and physically imbalanced.  The

4    condition may be temporary.

5         Q    Do you know, from your investigation,

6    whether Mr. DeGraw's behavior was associated with any

7    of his disabilities, if any?

8         A    I do --

9              MR. ROZELLE:  Objection to form.

10             THE DEPONENT:  -- not.

11             MR. ROZELLE:  You can answer.

12   BY MR. CALLAHAN:

13        Q    Are you familiar with the contents of

14   Exhibit 5?  Take a look at it, please.

15        A    I am not familiar with it.  But let me see.

16   Okay.

17        Q    That's the manufacturer's taser warning

18   sheet that was produced by the department, the

19   sheriff's office.

20             MR. ROZELLE:  Objection.  And a

21        preparatory statement.

22             MR. CALLAHAN:  Well, didn't you --

23        didn't you-all produce it?

24             THE DEPONENT:  This --

25             MR. ROZELLE:  It's not a warning sheet.

1   BY MR. CALLAHAN:

2       Q    I understand.  Let me identify the

3   document. by what it says on top.  Detective, it's

4   labeled Taser Handheld CEW Warnings, Instructions and

5   Information, colon, Law Enforcement.

6            Prior to coming here today, do you have a

7   recollection of whether you're familiar with this

8   sheet?

9       A    I am not.

10      Q    All right.  Do you know if it was ever

11  produced by anyone, or taught in the course on CEW

12  use?

13      A    I do not.

14      Q    Let's go over a few of them, and see if you

15  understand or agree with them.

16      A    Okay.

17      Q    The first warning states, on the upper

18  right-hand side.

19      A    Okay.

20      Q    Repeated, prolonged, or continuous CEW

21  applications may contribute to cumulative exhaustion,

22  stress, cardiac, physiolog -- physiologic, metabolic,

23  respiratory and associated medical risks, which could

24  increase the risk of death or serious injury.

25  Minimize repeated, continuous, or simultaneous

1    exposures.

2              Would you agree with that warning?

3              MR. ROZELLE:  Objection to form.  You

4         can answer.

5              THE DEPONENT:  I do not -- I don't have

6         any education on believing any of that.

7         That's what's written here.  That's what the

8         manufacturer is saying.

9    BY MR. CALLAHAN:

10        Q    Yeah.  So my question to you is, it was not

11   part of your training with tasers --

12             MR. ROZELLE:  Objection.

13             MR. CALLAHAN:  -- this warning?

14             MR. ROZELLE:  Objection to form.  You

15        can answer.

16             THE DEPONENT:  No.

17   BY MR. CALLAHAN:

18        Q    Okay.  Do you recall if any of this

19   material in the right-hand column was part of your

20   training for use of CEW?

21        A    Just in this particular warning box, is

22   that what you're referring to?

23        Q    Well, let's go down and find out.  Do you

24   know if -- well, let me ask you about the warning, as

25   well.  Do you know if that particular warning was

1    part -- any part of the Pinellas County Sheriff's

2    Office department policy?

3        A    I do not know that.

4        Q    Okay.  And let me read you a bit under the

5    second paragraph.  It says, these effects include

6    changes in blood chemistry, blood pressure,

7    respiration, heart rate and rhythm, and adrenaline,

8    stress (Phonetic), among others.

9            Were you aware of that particular

10   statement?

11       A    I'm not sure where you're reading from,

12   sir.

13       Q    Under Physiologic and Metabolic Effects,

14   directly below the warning.

15       A    Okay.  That's what it says.

16       Q    Were you aware of that, prior to today?

17           MR. ROZELLE:  Objection to form.  I'm

18       sorry, you're -- that's fine.  Withdrawn.

19           THE DEPONENT:  I am not aware of that;

20       the changes.

21   BY MR. CALLAHAN:

22       Q    Okay.  The last paragraph -- well, the next

23   full paragraph states, some individuals may be

24   particularly susceptible to the effects of CEW use.

25           Were you aware of that?

1      A     No.  No, sir.

2      Q     And were you aware of the last sentence; in

3    a physiologically or metabolically compromised

4    person, any physiologic or metabolic change may cause

5    or contribute to sudden death?

6      A     I am not aware of that.

7      Q     As part of your training prior to doing

8    this investigation, were you made aware by the

9    Pinellas County Sheriff's Office of certain hazards

10   of the use of CEW?

11          MR. ROZELLE:  Objection to form.  You

12       can answer.

13          THE DEPONENT:  It would be speculation,

14       on my part.  I know it would probably happen

15       during training.  But to my recollection, I

16       don't recall specifically what they ...

17   BY MR. CALLAHAN:

18      Q     Okay.  Fair enough.  Let me go over two

19   more things with you.  Under Number 3, about reducing

20   risk from CEW exposure, the manufacturer states here,

21   begin control and restraint procedures, including CEW

22   exposure, cuffing under power, as soon as reasonably

23   safe and practical to minimize CEW cumulative

24   effects, and the total duration of exertion and

25   stress experienced by the subject.

 1          Were you aware of that admonition, prior to

 2   today?

 3          MR. ROZELLE:  Objection to form.  You

 4      can answer.

 5          THE DEPONENT:  No, sir.

 6   BY MR. CALLAHAN:

 7      Q    Anybody ever taught you, in your training

 8   at the Pinellas County Sheriff's Office, about the

 9   control and restraint timing reflected in this

10   paragraph?

11      A    Yes.

12      Q    What did they tell you?

13      A    That it's possible for you to get part of

14   the effect from that, if you reach in the middle of

15   where that circuit is.

16      Q    And how about on the victim, itself, of the

17   tasering or the CEW exposure.

18          MR. ROZELLE:  Objection to form.  You

19      can answer.

20   BY MR. CALLAHAN:

21      Q    Were you aware of any procedures that

22   should be employed to reduce the effects of it?

23      A    I do not recall, no.

24      Q    Okay.  You've already testified about

25   targeting.  Let me read a statement from the warning.

```
 1    When possible, avoid targeting the frontal chest area

 2    near the heart, to reduce the risk of potential

 3    serious injury or death.

 4            Were you aware of that, prior to coming

 5    here today?

 6       A    I was.

 7            MR. ROZELLE:  Objection to form.  You

 8       can answer.

 9    BY MR. CALLAHAN:

10       Q    All right.  And tell me what -- how you

11    were aware of it?

12       A    Just through our training, our in-service

13    annual training.

14       Q    What do they tell you in your in-service

15    annual training about targeting CEWs, and what not to

16    do?

17       A    They tell you, specifically, the lower

18    torso and below, for the front side.  Not pregnant

19    women, if you know that they're pregnant.  And on the

20    rear side, below the neck.

21       Q    And do they explain why that is so, in the

22    training?

23       A    They do not.

24       Q    Never learned that, at all?

25       A    Not that I recall.
```

1      Q    Okay.  And did you ever learn anything, as

2  part of your Pinellas County Sheriff's Office

3  training, about the hazards associated with the use

4  of CEW?

5            MR. ROZELLE:  Objection, asked and

6        answered.

7            THE DEPONENT:  I do not.

8  BY MR. CALLAHAN:

9      Q    Okay.  I'd like to direct you to Page 2 of

10  the Taser Handheld CEW Warnings, Exhibit 5, upper

11  right.  It says, when practicable, avoid using a CEW

12  on a person who -- and then down below it says, is

13  incapacitated, or has impaired reflexes.

14            Were you aware of that, prior to coming

15  here today?

16            MR. ROZELLE:  Objection to form.  You

17        can answer.

18            THE DEPONENT:  I've got to read that

19        again, sir.  When practicable, avoid using

20        CEW on a person who ...  And what bullet

21        point did you read there, specifically?

22  BY MR. CALLAHAN:

23      Q    Number 4, including incapacitated.  And

24  five, has impaired reflexes.

25            MR. ROZELLE:  Yeah.  Objection to form.

1       You can answer.

2              THE DEPONENT:  I am aware of that.

3   BY MR. CALLAHAN:

4       Q   All right.  And what were you aware of in

5   your training about that, if any --

6       A   Specifically, just the --

7       Q   -- thing?

8       A   -- Number 4 bullet point there; persons

9   that are elevated, whether it be on a bicycle or in a

10  tree or something.  That's not a proper response.

11      Q   What about somebody who has impaired

12  reflexes from drugs, or a medical condition --

13      A   No, I'm not --

14      Q   -- incapacitated.

15      A   I'm not aware of that.

16      Q   Okay.  Now, Detective, you did have

17  occasion, did you not, to interview Deputy Martinez

18  who was on the scene, as well?

19      A   If you would refer me to that supplement.

20      Q   Yes, sir.  It's Number 8.

21      A   In Exhibit --

22      Q   It's part of Exhibit 1.

23      A   Exhibit 1.  Okay.  I have here Supplement

24  Number 8.

25      Q   Okay.

```
 1      A     And this is, yes, an interview with Deputy

 2   Martinez.

 3      Q     Okay.  Prior to the conclusion of the taser

 4   event by Deputy Goepfert, do you know if Deputy

 5   Martinez ever saw Mr. DeGraw?

 6      A     I do not --

 7            MR. ROZELLE:  Objection to form.

 8            THE DEPONENT:  -- know that.

 9            MR. ROZELLE:  You can answer.

10   BY MR. CALLAHAN:

11      Q     Let me direct you to the bottom of Page 3.

12      A     Okay.

13      Q     The question was -- actually, the context

14   of it, prior to this, was that he was explaining

15   where he was standing, where he was located.  And if

16   you look down at the eighth line down, and it says --

17   this is, again, Deputy Martinez.

18            And I, at some point -- again, I didn't see

19   him, at any time.  I was just looking at Deputy

20   Goepfert.  He was continuing to try to talk to him.

21   At some point, Goepfert mentioned that he stood up.

22   And I could see Goepfert tell him, hey, sir, back up,

23   back up.  And then he deployed the taser.

24      A     That's what it says, yes.

25      Q     Yeah.  And so, do you know, now that your
```

1    recollection is refreshed, whether Martinez was ever

2    able to see Mr. DeGraw during the tasering event?

3         A    I do.

4              MR. ROZELLE:  Objection to form.  You

5         can answer.

6    BY MR. CALLAHAN:

7         Q    And what did he tell you about it?

8         A    I didn't see him, at any time.

9         Q    Okay.  Okay.  Do you know where Mr. DeGraw

10   ended up in the room, at the end of the tasering

11   event?

12        A    I do not.

13        Q    Do you know where he was in the room, when

14   he was being tasered?

15        A    I do not.

16        Q    Do you know what occurred during the

17   tasering event; in other words, who did what?

18        A    I do not.

19        Q    Do you know if anyone was in the room

20   during the tasering event, other than Deputy Goepfert

21   and Mr. DeGraw?

22        A    I do not.

23        Q    Do you know what Martinez saw, when he was

24   able to see Mr. Goepfert (Phonetic) on the floor?

25        A    I could read it here.  But I don't recall.

1    Q    Let me direct you to page -- I'm sorry,

2    that page, my number is missing.  But I guess it's

3    six.

4        A    Okay.  Page 6.

5        Q    So Martinez is describing what he believed

6    happened after the tasering.  And it starts at

7    page -- at the top of the page.  All right.  How did

8    he land; do you see that portion?

9        A    I do see that.  Yeah.

10       Q    And what did Martinez say about Mr. DeGraw?

11       A    On his butt.

12       Q    And further, what did he say?

13       A    The statement that he makes, after the next

14   question by Sergeant Tobeck?

15       Q    Yes.

16       A    Is -- and he kind of -- he kind of like hit

17   the -- hit the ladder.  Because I noticed the ladder

18   shaking when he hit -- when he landed on it.  He's

19   still kind of bracing.

20       Q    And Question: Did you guys continue to give

21   him verbal commands, at that point.  Answer.

22       A    Answer: We told him, sir, calm down.  Sir,

23   relax.  Relax.  Relax.  And we kept, unintelligible

24   in parentheses, fighting.  He just kept fighting it.

25       Q    And then the next question is, okay.  And

1    what was the answer?

2         A    So then, at that point, once -- once he

3    kept fighting it, I think I -- I don't -- I'm not

4    sure.  I'm not sure how many times Goepfert gave him

5    the taser.  But he -- he just continued to try and

6    get up, and try to fight, so ...

7         Q    And if you go down to the bottom, where he

8    says, okay.  And Martinez says, so.

9         A    So when he -- when we first tased him, he

10   kept just bracing in this position.  Like he was

11   bracing.

12        Q    Do you know what that means?

13        A    I do not.

14        Q    And then the next question, right after

15   that sentence.

16        A    Sergeant Tobeck asked him, like, he was

17   going to get up and punch you.  And Deputy Martinez

18   said no.  No.  Bracing, like he was trying to fight

19   the taser probes.

20        Q    Okay.  Do you recall that, now that you

21   read it?

22        A    I do.

23        Q    And do you know anything more about what

24   Mr. DeGraw was doing, at that moment, as described by

25   Deputy Martinez?

1      A    He was trying to defeat the taser probes,

2   according to Deputy Martinez.

3      Q    Well, you say defeat.  But that word isn't

4   in the statement, is it?

5      A    It's not in there, no.  His actual words

6   were, trying to fight the taser probes.  Excuse me.

7      Q    Okay.  Okay.  Let's look at the next page.

8   Again, the interviewer says, okay.  And what did

9   Martinez respond?

10     A    That -- his second response on here?

11     Q    Yes.

12     A    He started to try to get up.  And we say,

13  sir, get on -- stay on the ground, stay on the

14  ground, sir.  Then he started to get up.  And I'm

15  assuming Deputy Goepfert tased him again, because he

16  started bracing.

17     Q    And the next question; okay.

18     A    It says -- Sergeant Tobeck asked him, okay,

19  when he was getting up, was he like getting up, like

20  I'm going to come, I'm going to come get you.  Or was

21  he just trying to get up from -- and Deputy

22  Martinez's response is, no, he was just trying to get

23  up.

24     Q    Okay.  Does that refresh your recollection

25  about what occurred?

```
 1      A    It --

 2           MR. ROZELLE:  Objection to form.

 3           THE DEPONENT:  -- does.

 4           MR. ROZELLE:  You can answer.

 5  BY MR. CALLAHAN:

 6      Q    Okay.  You were there the whole time

 7  listening to Martinez's answers, as well as Tobeck,

 8  were you not?

 9      A    I was.

10      Q    Okay.  Do you know how the situation

11  concluded, from your interview of Martinez?

12      A    I don't.

13      Q    Do you know when it was that Mr. DeGraw

14  stopped struggling?

15      A    Specifically, no.

16      Q    Did you have an understanding from this

17  interview, that Mr. Martinez felt that he was bracing

18  or fighting the wires, in reaction to the taser being

19  deployed on him?

20      A    That's what I just --

21           MR. ROZELLE:  Objection to form.  You

22      can answer.

23           THE DEPONENT:  That's what I just read,

24      yes.

25
```

1    BY MR. CALLAHAN:

2        Q    I would like to ask you about another

3    document, which I'll mark as Exhibit Number 14.

4        A    This Supplement Number 8 was in Exhibit

5    Number 1, is that correct?

6        Q    Yes, it was.

7             MR. ROZELLE:  Before Number 7.  It's

8        out of order.

9             THE DEPONENT:  And then, I'm sorry,

10       what was the next one you're referring me

11       to?

12            MR. CALLAHAN:  Let's get the exhibits

13       right, and then I'll ask you.  All set?

14       I'll let the reporter mark this next

15       document as Exhibit 14.  And I'll give

16       you --

17            (At this time Exhibit 14 was marked for

18            identification).

19            MR. ROZELLE:  Do you have a copy for

20       me?

21            MR. CALLAHAN:  Yeah, I do.

22            MR. ROZELLE:  Thank you.

23   BY MR. CALLAHAN:

24       Q    You have it in front of you?

25       A    I have it.  Yes, sir.

1    Q    Okay.  This appears to be a summary of the

2    taser use, which was obtained by Detective DeLeon.

3    A    Yes, sir.

4    Q    Is that how you read it?

5    A    That's correct.

6    Q    Okay.  And tell me how this works.  How

7    does one obtain such a summary, if you know?

8    A    By actually physically viewing the actual

9    taser, and getting the numbers off of it.

10    Q    Okay.  So tell me how that looks.  I mean,

11    is there a place on the taser that has readings on

12    it, after its use?

13    A    Readings?

14    Q    Or does it have to be downloaded?

15    A    It has to be downloaded.

16    Q    Okay.  So just tell me, physically, how

17    that happens.  What happens when you download a taser

18    and --

19    A    It's taken to the armory.  And the armory

20    staff does that on the computer.

21    Q    Okay.  And these folks who are being

22    referenced here, are people over at the armory who

23    take care of that?

24    A    That's correct.

25    Q    And the summary, as done by DeLeon, states

1    a series of readings off the taser, starting with

2    when it was put on safe, when it was armed, and then

3    each time it was pulled, and for how long.  Got that?

4         A    Yeah.  I see that, where it's written

5    there.  Yeah.

6         Q    All right.  Did you review this, as part of

7    your investigation?

8         A    I did.

9         Q    And did you take that information that was

10   provided by the download of the taser, and compare it

11   to the statements of any of the witnesses, to see

12   that they were consistent?

13        A    Not to my recollection.

14        Q    Okay.  Was there anything about this

15   deployment that you were interested in, other than

16   the fact that it was read out?

17        A    No.

18        Q    Did you make inquiry of any of the

19   deputies, or in particular of Deputy Goepfert, about

20   the purpose for each of the deployments?

21        A    It would be part of my interview, or the

22   interview with him.  But I don't --

23        Q    Other than what's in the interview --

24        A    Yeah.  Other than --

25        Q    -- was there anything else?

1    A   No, sir.

2    Q   Is there anything about the Pinellas County

3  Sheriff's Office regulations that deal with the

4  frequency and duration of the deployment of taser

5  charges --

6          MR. ROZELLE:  Objection to --

7          MR. CALLAHAN:  -- to your knowledge?

8          MR. ROZELLE:  You may answer.

9          THE DEPONENT:  Not to my knowledge.

10  BY MR. CALLAHAN:

11    Q   All right.  Let me direct you to Deputy

12  Goepfert's statement about deployment of the taser,

13  on Page 7.

14    A   What specific supplement was that?

15    Q   I'm sorry.  Again, that's number -- that's

16  Number 21, the first one on the exhibit.

17    A   Thank you.  Okay.  Where are you at,

18  specifically, in the statement?

19    Q   Down at the -- near the bottom of the page.

20    A   Page -- what page?

21    Q   Seven.

22    A   Page 7.  Okay.

23    Q   Okay.  Starting at, inquiry from, again,

24  Tobeck.  Okay.  So you guys were -- he got within

25  three feet of you, before you deployed the taser.

1    Answer: Yeah.  Are you up there?  First third of

2    the ...

3         A    The first paragraph?

4         Q    No.  About the first -- third of the way

5    down.

6         A    Okay.  Yes, I see that.  Okay.  So you guys

7    were -- he got within three feet of you, before he

8    deployed the taser.  Question.

9         Q    Okay.  And then, yeah, like coming at me,

10   like it was almost like a zombie.  It was, ahhh, it

11   was kind of weird.  But, all right.  Interesting.

12   Got that?

13        A    I have that.

14        Q    Do you have a recollection of that?

15        A    I see that written there now.

16        Q    Yeah.  Do you remember him telling you that

17   Mr. DeGraw was almost like a zombie acting?

18        A    I do not.

19        Q    Okay.  And then, there's a portion here,

20   that relates that he fell down against the wall.  And

21   then, okay, is the comment -- or the question, before

22   his next comment.  Would you read then what Goepfert

23   said?

24        A    Sure.  He says, um, he then -- so -- and

25   I -- I didn't give him a full, you know, five second

1    ride.  It was like two seconds, maybe three.  I

2    didn't -- I wasn't there to torture him.  I was there

3    just to try to control him.  So I turned it off.  And

4    he started to be aggressive again.  And -- and the

5    yelling.  And, you know, the split, and the blood --

6    excuse me, the spit and the blood coming from --

7    coming out of his mouth.

8           Um, and, again, we're still just two -- two

9    deputies, not wanting to really go into that room

10   where there is weapons.  I tased him again, just so

11   we could get more control of him.  Again, for

12   probably a two to three-second burst, or ride,

13   whatever you want to call it.

14          (At this time someone enters the

15          proceedings).

16          STAFF MEMBER:  I'm sorry,

17      Mr. Callahan.

18          MR. CALLAHAN:  Yes.

19          STAFF MEMBER:  Jenny is on the line.

20      And she said it's very important that she

21      talk to you.  If you can't come to the phone

22      right now, can you please call her.

23          MR. CALLAHAN:  No.  We'll take a short

24      break.

25          MR. ROZELLE:  Take a break.

1          MR. CALLAHAN:  That's all right.

2          THE COURT REPORTER:  Off the record.

3          (At this time a short recess was held).

4  BY MR. CALLAHAN:

5      Q    Let's go back on the record.  At the very

6  bottom, on Page 7, Detective, after the description

7  that he had given about tasering, the second time.

8  Then the question is, so he started being aggressive,

9  before you tased him the second time.  Yeah.  How so.

10  And would you read Goepfert's comment.

11      A    I would.  It says, um, again, the yahhh,

12  yelling.  Started to get up -- to get up.  Not

13  listening to my verbal communication, verbal

14  commands.  And I believe, uh, I think -- I believe I

15  did it, one more time.  I'm not sure.  It could have

16  been two, to be honest.  I -- at that point, I'm not

17  counting how many times I'm tasing him.

18      Q    And the next question.

19      A    Sergeant Tobeck asks, were you letting the

20  laser fully cycle, each time.  And his response was,

21  no.  No.

22      Q    What does fully cycle mean?

23      A    The taser is fully cycled, means five

24  seconds.

25      Q    Okay.  So do you have the option to

 1    interrupt that cycle, up to five seconds, or let it

 2    go the full five?

 3        A    You do.

 4        Q    Okay.  And then the last paragraph I would

 5    like to ask you about here, is his response -- his

 6    further response to Goepfert -- I mean, to Tobeck.

 7        A    Okay.  It says, there were two seconds,

 8    like I said, two, three seconds, stopped -- or,

 9    excuse me, two, three seconds, tops.  I wasn't doing,

10    dah, dah, dah, dah; five second, you know.  That's

11    not -- that didn't happen.  My thing was, we just --

12    my thing was, just to get him to stop being

13    aggressive, until we could get in.

14            Like I said, there is the table here, the

15    doorway, and him, right there.  I mean, it's not

16    where we're able to just grab him, and -- and do what

17    we need to do.  Especially if I got the taser, and

18    trying to get Martinez in.  Uh, it's just -- and

19    then, I guess, the next part was what basically, um,

20    uh, Sergeant Street showed up.  And once he was

21    there, he went in, while I had the taser.  Grabbed

22    him, got him onto his stomach.  Uh, he was ...

23        Q    And then the next question is, who did

24    that.  And the answer was, Street.

25        A    Yes.

1    Q    Okay.  So I preceded all of this, by asking

2    you what you learned about the taser event, itself.

3    And now that you've had the comments from Goepfert

4    refreshing your recollection, is there anything else,

5    other than what you just read, that was told to you

6    by Goepfert that you recall him saying about the

7    event, the tasering event?

8    A    I do -- I do not.

9    Q    Okay.  Does the download, itself, indicate

10   the time of day that the tasering event started?

11   A    Is that in this supplement?  Or did we view

12   that in -- Number 14, I believe that was.

13   Q    Yes --

14   A    Exhibit Number 14.

15   Q    -- in 14.  It's right in front of you

16   there.

17   A    Okay.  It does.  It specifies times, down

18   to the second.

19   Q    Okay.  So when was the taser armed?

20   A    At sixteen zero one, and seven seconds.

21   Q    Look at the bottom of Page 1.

22   A    Okay.

23   Q    Would you take a look at that, and see if

24   that comports with what you just told me.

25   A    The paragraph where it says, a copy of all

1    four, downloaded information?

2         Q    No.  Under the narrative, at the bottom, it

3    says Deputy Goepfert --

4              MR. ROZELLE:  He's on the prior page.

5    BY MR. CALLAHAN:

6         Q    Page 1.

7         A    I'm sorry.  Yeah.  And where would you like

8    me to read you to -- from.

9         Q    I just asked where it was armed.  And

10   there's a statement about that, at the very bottom of

11   the page there.

12        A    Deputy Goepfert, on 9/7/2016, fifteen

13   fifty-eight, and zero five seconds, the taser was

14   armed.  I'm sorry, I read you the wrong one,

15   previously.  I read on the second page.

16        Q    Okay.  So what does armed mean; the safety

17   comes off?

18        A    It -- depending on how you say it.  The

19   safety comes off, meaning that it's active, ready to

20   use.  Or if the safety comes on, that there's no

21   power to it, you can't deploy it.  Some people take

22   that different ways.

23        Q    So do you know what it meant here, when it

24   was armed at fifteen fifty --

25        A    I do.  I do know exactly what that means.

1     Q    And what's it mean?

2     A    It means that it's powered on, ready for

3 use.

4     Q    Okay.  And then the next statement, is at

5 sixteen 0 one 0 four, the trigger was pulled for two

6 seconds.

7     A    Yeah.

8     Q    To your understanding, was that the first

9 time it was deployed?

10    A    That's correct.

11    Q    And that would be --

12    A    Approximately three minutes later.

13    Q    Three minutes.  Well, two minutes, 59

14 seconds later.

15    A    Yes.

16    Q    Do you know where Deputy Goepfert was, when

17 he armed the taser?

18    A    I do not.

19    Q    I thought I had that reference in his

20 testimony.  I can't locate it quickly.  But I'll get

21 to that, with the witnesses themselves.  And then, at

22 what time was the trigger last deployed?

23    A    At sixteen zero two, and 37 seconds.

24    Q    So the total amount of time, from the time

25 it was first pulled to shock Mr. DeGraw, was at 0 one

1    0 four.  And the last time, was at 0 two 37?

2        A    Yes.

3        Q    So that's a minute and 34 seconds -- 33

4    seconds, for the entire event?

5            MR. ROZELLE:  Objection to form.  You

6        can answer.

7            THE DEPONENT:  It -- approximately,

8        yes.  Sixteen 0 one 0 four, to sixteen 0 two

9        37, yes.

10   BY MR. CALLAHAN:

11       Q    So from this read-out, you were able to

12   determine that the five deployments occurred within a

13   minute and 33 seconds?

14       A    Correct.

15       Q    All right.  I'm looking at your other

16   entries, Detective.  And I'll make sure I don't have

17   anything else to ask you about them.

18       A    Okay.

19       Q    These records reflect that you took in the

20   autopsy report.  And they were able to release

21   property to Mrs. DeGraw.  Do you have a recollection

22   of anything else you did in the case?

23       A    I do not.

24       Q    All right.  Detective, did you do anything

25   with the autopsy, other than collect it?

 1      A    Other than receive it for review, no, I did

 2   nothing with the autopsy.

 3      Q    All right.  Was there anything about the

 4   autopsy photos that were significant to you in your

 5   investigation?

 6      A    No.

 7      Q    Is there anything else that I didn't ask

 8   you here today, that you found significant to your

 9   investigation?

10           MR. ROZELLE:  Objection to form.  You

11      can answer it.

12   BY MR. CALLAHAN:

13      Q    Any topic that I didn't ask you about.

14           MR. ROZELLE:  Same objection.  You can

15      answer.

16           THE DEPONENT:  No.

17   BY MR. CALLAHAN:

18      Q    Who was Deputy Goepfert's immediate

19   supervisor?

20      A    On-scene, was Sergeant Street.

21      Q    And who was, administratively, back at the

22   sheriff's department?

23      A    That -- I do not know that.  I would have

24   to ...

25           MR. CALLAHAN:  Okay.  I think that's

1        all I have.  Thank you.

2            MR. ROZELLE:  I have no questions.  If

3        it's ordered, he will read.

4            THE DEPONENT:  I will read.

5            MR. CALLAHAN:  Very good.  And you'll

6        get the pleasure to.  I'm ordering.

7            (At this time the deposition of

8            JAMES A. UPTON, in the

9            above-captioned matter was concluded

10           at 11:50 A.M.).

11                    <u>STIPULATION</u>

12    hereby stipulated and agreed by and between counsel

13    present and the deponent, that the reading and signing

14    of this deposition by the deponent IS NOT waived.

15

16

17

18

19

20

21

22

23

24

25

<u>**CERTIFICATE OF REPORTER**</u>

1

2

3   STATE OF FLORIDA          )

4   COUNTY OF HILLSBOROUGH    )

5            I, VANESSA DURHAM-ANDREW, Court Reporter,

6   certify that I was authorized to and did

7   stenographically report the foregoing deposition; and

8   that the transcript is a true record of the testimony

9   given by the deponent.

10           I further certify that I am not a relative,

11  employee, attorney or counsel of any of the parties,

12  nor am I a relative or employee of any of the parties'

13  attorneys or counsel connected with the action, nor

14  am I financially interested in the action.

15           I, the undersigned authority, certify that

16  JAMES A. UPTON, personally appeared before me

17  and was duly sworn.

18           WITNESS my hand and official seal this

19  10TH day of JUNE, 2019.

20

21                      -----------------------
                        VANESSA DURHAM-ANDREW
22                      COURT REPORTER

23

24

25



EXHIBIT

13

J. Upton

| Warning |
| --- |
| Contains entities exempt from disclosure |

## Primary Information

| | |
| --- | --- |
| Description: | TRANSCRIBED INTERVIEW WITH SGT STREET *JT* |
| Occurrence From: | 09/08/2016 00:11 |
| Occurrence To: | 09/08/2016 00:35 |
| Source Of Info: | SGT. STREET |
| Dissemination Code: | RESTRICTED |
| Content Evaluation: | Information |
| Reporting LEO: | TOBECK, JONATHAN S DET (56990 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Activity: | OTH SERV / ACTION |
| Approval Status: | Approved |
| Approved Date: | 10/04/2016 |
| Approved By: | CAPRA, JEFFERY P DET (53787 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |

## Synopsis

| Synopsis |
| --- |
| For details of interview with Sergeant Street see narrative. |

## Addresses

| Relationship | Address |
| --- | --- |
| OCCURRED | 1739 SPLIT FORK DR,  OLDSMAR,  Florida 34677 , UNITED STATES |
| RELATED | 737 LOUDEN AVE PCSO NORTH DISTRICT STATION,  DUNEDIN,  Florida 34698 , UNITED STATES |

## Subjects

| Relationship | Name | Bio | DOB |
| --- | --- | --- | --- |
| OTHER | DEGRAW, JULIE (PERSON) | 56 yr. old, ORIENTAL/ASIAN, FEMALE | 07/04/1960 |
| OTH AGY - NON LAW ENFORCE | OLDSMAR FIRE DEPARTMENT 54 (AGENCY) | | --- |
| OTH AGY - NON LAW ENFORCE | PALM HARBOR FIRE DEPARTMENT #65A (AGENCY) | | --- |
| LAW ENFORCEMENT OFFICER - EXEMPT | BALDWIN, ROBERT K DEP (LAW ENFORCEMENT OFFICIAL) | WHITE, MALE | --- |
| LAW ENFORCEMENT OFFICER - EXEMPT | GOEPFERT, GREGORY (LAW ENFORCEMENT OFFICIAL) | | --- |
| LAW ENFORCEMENT OFFICER - EXEMPT | MARTINEZ, EDUARDO DEP (LAW ENFORCEMENT OFFICIAL) | 31 yr. old, HISPANIC, MALE | |
| LAW ENFORCEMENT OFFICER - EXEMPT | STREET, CHARLES SGT (LAW ENFORCEMENT OFFICIAL) | | --- |
| ATTORNEY | GELL, DEBORAH ATTY (PERSON) | WHITE, FEMALE | --- |
| DECEASED | DEGRAW, DONALD CHRISTOPHER (PERSON) | 58 yr. old, WHITE, MALE | 06/25/1958 |

## Narrative

| Narrative |
| --- |
| 'INTERVIEW OF CHARLES STREET, #16-363788-26, 09/08/16) |

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.

**Narrative - Continued**

(The following may contain unintelligible or misunderstood words due to the recording quality.)

JU  = Detective James Upton
JT  = Detective Jonathan Tobeck
CS  = Sergeant Charles Street
DG  = Debra Gell

JT:    I'm Detective Tobeck.  Today's date is now September 8th, 2016.  It's currently 0011 hours.  Located at the Sheriff's North District Station, 737 Louden Avenue.  Currently present are myself, Detective Jonathan Tobeck, Detective Jay Upton, and Sergeant Charles Street.

CS:    That's right.

JT:    And attorney Debra Gell.  G-E-L-L.  All right, Sergeant.  Can I get your payroll number, sir?

CS:    4119.

JT:    You've been with the sheriff's office how long?

CS:    '95, October.

JT:    You've been a sergeant over ten years, haven't you?

CS:    Yes.

T:    Where have you worked since you've been here, sir?

CS:    Uh, patrol mostly.  Um, I was a field training officer in patrol.  I was in the Mait team.  Echo, DUI squad, for a short period of time.  Um, I was a corporal in the North District for several years.  Transferred to, uh, criminal intelligence, uh, for two months, and then got called for promotion --

JT:    Okay.

CS:    -- in July of 2005.

JT:    All right.  And it would have been yesterday morning, I guess, on the 7th.  You came to work around seven.

CS:    Six.

JT:    Six?  Okay.  And you were the squad 8 sergeant?

CS:    Yes.

JT:    Okay.  And you had the opportunity to go to 1739 Split Fork Drive.

CS:    Yes.

JT:    Okay.  Did you receive dispatch?  Did you jump the call with the deputies?

CS:    Uh, I jumped into it with them.  Uh, I was in Chestnut Park.  It was around 4:00 -- just before 4.  Driving -- driving around near the boat ramp.  I saw the call -- an AOA call being built in the pending queue.  And just read the notes, and the dispatcher -- when she sent the two Oldsmar cars, she also said on the radio that it was the second time the fire department had been to that address on that day.  Um, I -- I don't really recall if I self-assigned, or I let the dispatcher know that I was going to.  But, at any rate, I -- I went.

Um, while I was driving towards the exit of the park, I asked the dispatcher if the fire department had called us the first time that they went out to the scene, because I -- I did not recall hearing that type of call go out in the morning.  Um, and as I got going, excuse me, on

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

**Narrative - Continued**

East Lake Road, dispatcher came back to me and first said that it was a -- one of the nighttime cars, and one of my cars had been to the scene. And then right after that she -- she changed and said that it was both of the day shift cars that had been to the scene. And I still didn't really any -- any type of call like that for -- for the day shift. Um, so I got into the CAD history to -- to find out who was there. Um, as I saw -- just as I was getting results, said it was the -- the nighttime cars, I think about 5:45. Um, Deputy Martinez sent me an AM message that they -- neither one of -- neither he nor Goepfert were -- were at that house this morning. So, it kind of answered the questions at the same time.

Um, I pull up in front of the house. Uh, I saw the fire department down the road. As soon as I got out of my car, I heard Deputy Martinez on the radio telling dispatcher that the subject was -- was non-compliant with their commands. The front door was halfway open. It was ajar. I walked in the front door. See a heavyset Asian female standing by the -- the bottom of the stairs, um, crying. You know, when I came in the door I could hear the deputies' voices, but I couldn't tell if it was either downstairs or upstairs. Um, when I came in and saw the woman, I just -- I looked up, and I could see their -- where they were standing at the top of the stairs -- the head of the stairs, right in the bedroom door.

Um, started to go up the stairs. Uh, as soon as I hit the first step up I heard the -- Deputy Goepfert announce, "Taser." I heard the pop of the Taser and the cycling of his unit. I got to the top of the landing there, at the second floor. Um, I see the subject, just heavyset guy just wearing boxer shorts and the Taser probes. One was in his chest. One was further down in his stomach. Uh, he was flailing about on the ground, rolling back and forth. Grunting, growling. Grinding his teeth. So, his -- his mouth looked bloody. There was blood around the insides of his lips and around his teeth. His eyes were -- were bulging out -- like bugging out. Um, Deputy Goepfert ordered him to -- to roll over, lay -- lay on his stomach. He did not. Okay. At -- at some point during this, uh -- this period, um, one of the two deputies -- I don't know which one -- told me there were weapons in the bedroom. The gentleman's wife said he has a -- keeps a pistol -- keeps a gun under his pillow. Uh, at that point the gentleman was laying on the floor. His feet were against the side of the bed. He was on his -- laying on his back, and his upper shoulders and shoulder blades were resting against the door to the bedroom. Um, he was constant grunting, groaning. Like, almost a primitive type of sound coming from -- very loud.

Um, Deputy Goepfert asking -- or saying out loud, "How are we going to do this, guys?" Um, trying to figure out how to -- how to get im secured, when he is, uh, acting that way. Um, Goepfert reached over -- you know -- you know, where the gentleman is laying, right next to his right arm and shoulder is a six foot stepladder -- metal stepladder, leaning against the wall. Goepfert reached over, pulled the ladder out and passed it to me. I tossed it, um, towards another bedroom door. Just inside the bedroom door is a small night table -- nightstand table. Um, on top of it was a -- looked like a black folding knife, like a lock blade knife. It was closed. So, I reached in, pulled the table -- uh, as I was dragging the table out everything on top of it spilled on the floor next to me. I believe Deputy Martinez grabbed it from me -- got the table from me and passed it up to the right. So, I'm -- the table is going off to my right. Everything that was on it is laying on the floor next to me. And I kicked the knife a little further down the hallway. Um, so we could get a little bit more room to work in the room.

Uh, I could see in the room two long gun cases -- hard cases. One is tan and one is black. Leaning up against the dresser about six feet inside the bedroom door. During the time that Deputy Martinez and I were taking the -- the table out of the room, the subject somehow scooched or wiggled around so he's now in an opposite -- from when I first saw him, now his feet are up towards the door and his upper shoulders and shoulder blades are resting up against the -- the side of the bed, near the head of his bed, actually. Where the -- where the nightstand used to be. And right -- right about then, there was, like, a lull in his behavior. Um, he took -- took a little rest. Um, I asked Deputy Goepfert if his Taser was activated, and he said no. And he said -- I said something like, "Now, let's go, boys." Uh, stepped past -- in front of Deputy Goepfert, stepped over the subject and grabbed his left wrist with both my hands, and I pulled back and away, to use leverage to get the subject rolled over onto his stomach. And then I pulled his left wrist up behind him. Um, i was kind of squeezed in between the gentleman's right side and the bed was -- I was off -- off to the side, but kind of pinched in there. Um, fighting him the whole time. He was pulling away. Kept the grunting going.

Um, Deputy Goepfert moved towards the gentleman's feet to, um -- I believe to secure his feet. And, um, Deputy Martinez came in because I asked -- I said, "We need -- we need some cuffs. We need him handcuffed." Deputy Martinez cuffed his left wrist, and we -- we just couldn't -- we couldn't get his right hand out from underneath him. Um, so -- and I saw that his -- the forehead -- the top part of his forehead was resting up against the wall, right next to the bed. So, I thought if, uh, Deputy Goepfert could pull his legs Deputy Martinez and I could scoot the gentleman to the left and get more -- more space where we could get access to that right wrist. Um, so I told Deputy Goepfert to pull -- pull on his legs, and we can move him over a little to the left. Uh, we did. Um, we were able to get his right wrist behind him. Deputy Martinez, um, cuffed his right wrist. And when he kind of took a deep breath, and I looked up and I saw Baldwin in the doorway. Uh, I told Deputy Baldwin to clear the air, because we -- we had asked for 10-3 traffic. Um, Baldwin cleared the air. Uh, I said that, you know, the FD can come in. Um, and that was relayed over the radio.

Uh, I stood up and lifted up the pillow that was at the head of the bed, right next to where he had been laying, and saw a Springfield --

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

**Narrative - Continued**

it looked like a .45 caliber pistol, uh, laying on the mattress under the -- under the pillow, pointed in the direction of the door. Um, I knew the fire department was coming in. There was going to be paramedics coming into the room. I -- I lifted the gun up. I rotated it around so it's facing away, uh, from where the paramedics were going to be working. But, I left it laying on the bed. Uh --

JT: Did you have gloves on then, Sergeant?

CS: Sorry?

JT: Did you have gloves on then?

CS: No.

JT: Okay.

CS: Uh, I got back down on my knees to -- on the gentleman's right side. Uh, shook his shoulder a couple times. Uh, tried to -- tried to communicate with him. Um, I asked the deputies what -- what his name was. They told me his name was Don. Um, I tried to talk to him. You know, "Hey, Don. How are you doing?" Um, got no response. Uh, Deputy Goepfert said we should roll him up to his -- onto his side. Um, so, Deputy Goepfert knelt down and I pulled and Deputy Goepfert pushed and we rolled him onto his right side. Um, Deputy Martinez reached down and felt for a pulse on the left side of his neck. Deputy Martinez said he thought he felt a pulse. Um, I did a sternum rub on the gentleman, and, uh, I pinched his left nipple -- squeezed it and turned it. Uh, when I did that, um, his mouth, uh, opened and closed a couple of times. Uh, it appeared as if he was, uh -- he was conscious. Um, and we, uh -- just right after that, noticed that his eyes were -- were just glazed over.

Um, and the FD came in. Did their assessment. And they realized that -- that he wasn't breathing. Uh, they began, uh -- they were hooking EKG leads up to him and I, uh -- I uncuffed the gentleman, and, uh -- and backed further into the room. Kind of got, um, more room to work, I moved the black, uh, rifle case from where it was leaning against the dresser and moved that aside. Uh, there were also two hard -- hard, uh, pistol cases -- boxes, blue in color, on the ground. I picked them up and put them on the bed. Um, took a quick look inside them. Those both had handguns in them. Um, called Lieutenant Nygren on the radio. Asked him to -- to be in route. And then, uh, I was -- I was out of it from then. I couldn't leave, because I was kind of in the room. After Um, 20 minutes or so paramedics loaded the gentleman on a backboard, carried him down the stairs, out to the ambulance.

Uh, when I got outside, Deputy Baldwin told me that Lieutenant Nygren had, uh, detailed him to follow the ambulance to the hospital. Uh, I told him okay. Uh, spoke briefly with the gentleman's wife, and I think a neighbor or a friend of hers that was standing in the front yard. Um, they asked if they could leave -- could they go. Um, I asked Lieutenant Nygren were -- were they okay to go, and he said yes. Um, Lieutenant Nygren just told her that detectives would be speaking with her later. Um, and they were free to go. They followed -- followed off behind the ambulance.

JT: Did you have any other contact with the wife?

CS: No.

JT: When you went up to the room, Sergeant, was -- could you see in there? Was it dark? Were the windows open?

CS: Uh, the blinds were pulled. It wasn't dark. It was light -- light -- the light was not on. The blinds were closed. But, I mean, there was -- there was lights in the room. It wasn't dark.

JT: Okay. Other than the guns you told us about, did you see any other weapons in there?

CS: Yeah, the knife that was on the nightstand.

JT: Okay.

CS: And there was a -- and once -- once -- after the gentleman was -- was out, and down the stairs, um, there was also a soft-sided HK rifle bag leaning against the wall by the door. Uh, didn't look in it -- didn't look in any other rifle bags or cases, but the pistol -- pistol cases each.

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

**Narrative - Continued**

JT: When -- when you guys were trying to get him cuffed, was -- was his -- was he facedown?

CS: Yes.

JT: Was his head turned either way?

CS: I mean, I -- I think it was turned to the left. I -- I -- I can't say for sure. It was -- we were -- we were struggling with him, just to get the -- the one hand back behind him, and then the -- to hang onto it.

JT: He was still fighting with you guys at this point?

CS: He was. Yes.

JT: Okay. Was he making that grunting sound?

CS: Yes. He was.

JT: Okay. Um, when you went hands on with him did he seem cold? Did he seem hot? As far as body temperature-wise.

CS: I didn't notice.

JT: Okay.

CS: I just wanted to get ahold of him and get him secured.

T: And your purpose for doing that -- obviously, you weren't there for the beginning of it. Was that just to get him medical treatment, or --

CS: Uh, we needed to -- we needed to secure him. I mean, I -- I glanced at the -- the CAD notes from the morning call, when I was driving past the target. I was on Business -- Business 611, getting to Tampa Road. And there -- the first call mentioned weapons -- that there were weapons in the house. But in the morning call, the gentleman was in a different room than where the weapons are. But then when I got to where -- to the call that we were on, the deputies were saying that, "There -- there is weapons in this room where he is, and the wife says he has one under this pillow." So, um, with him being Tasered and the way he's acting, even after being Tasered, you need to get him secured. Um, ideally he'd come out of the room. We want to remove him from the weapons.

JT: Okay. You said you heard the initial Taser cycle.

CS: Yes.

JT: Did you hear it cycle again after you got upstairs?

CS: I -- no. I -- I -- I don't -- I don't recall hearing another cycle. No.

JU: Okay. Did Deputy Goepfert ever yell, "Taser" again?

CS: Uh, not after the first one. No.

JU: Okay.

JT: You mentioned the blood around his mouth. Did you see any other injuries?

CS: No.

JT: After you did the sternum rub and nipple twist, and he opened his mouth a couple of times, how long did it take for FD to get there after that, just approximately?

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

## Narrative - Continued

CS:     Well, a few minutes.  I mean, we -- we told them they could come down the road.  And then when it looked like he was -- his eyes were glazing over, one of -- one of the deputies -- Goepfert or -- or Martinez, I think, said to Baldwin, you know, "What's keeping them?"  A couple -- a couple minutes.  I mean, they were just down the road.  Six -- six or eight lots down the road.

JT:     Okay.  What position was he in after you -- you saw his mouth open?

CS:     He was leaning on his right side.

JT:     Okay.

CS:     He was on his right side.  I was kneeling behind him.  Deputy Goepfert was kneeling in front of him.  Um, I'm -- I'm looking at his left profile with his mouth open.

JT:     Is there anything we didn't ask you, Sergeant, or you didn't tell us you think we need to know?  Deputy Upton, you got anything?

JU:     I have nothing further to add.

JT:     Ms. Gell?  Okay.  It is now 0035 hours, and we're going to end this interview.

(CONCLUSION OF INTERVIEW)

Transcribed by:     jwg/jwg/eam

## Record Status Information

| | |
|---|---|
| Record Origination Operator: | TOBECK, JONATHAN S DET (56990 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Record Origination Date: | 09/09/2016 08:53 |
| Last Update Operator: | CAPRA, JEFFERY P DET (53787 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Last Update Date: | 10/04/2016 10:19 |

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| TOBECK, JONATHAN S DET (56990 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 | CAPRA, JEFFERY P DET (53787 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 |

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*



EXHIBIT
14
J. Upton

## Warning

Contains entities exempt from disclosure

## Primary Information

| | |
|---|---|
| Description: | TASER DOWNLOAD *DELEON* |
| Occurrence From: | 09/07/2016 21:00 |
| Occurrence To: | 09/07/2016 23:00 |
| Source Of Info: | DET. DELEON |
| Dissemination Code: | RESTRICTED |
| Reporting LEO: | DELEON, N. A. DET (54900 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Approval Status: | Approved |
| Approved Date: | 09/15/2016 |
| Approved By: | GREENE, TODD A SGT (56670 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |

## Synopsis

This report will document the collection and download of the department Tasers that were issued to Sergeant Street, Deputies Goepfert, Martinez, and Baldwin. See narrative for details.

## Subjects

| Relationship | Name | Bio | DOB |
|---|---|---|---|
| LAW ENFORCEMENT OFFICER - EXEMPT | BALDWIN, ROBERT K DEP (LAW ENFORCEMENT OFFICIAL) | WHITE, MALE | --- |
| LAW ENFORCEMENT OFFICER - EXEMPT | GOEPFERT, GREGORY (LAW ENFORCEMENT OFFICIAL) | | --- |
| LAW ENFORCEMENT OFFICER - EXEMPT | MARTINEZ, EDUARDO DEP (LAW ENFORCEMENT OFFICIAL) | 31 yr. old, HISPANIC, MALE | --- |
| LAW ENFORCEMENT OFFICER - EXEMPT | STREET, CHARLES SGT (LAW ENFORCEMENT OFFICIAL) | | --- |

## Narrative

On 09-07-2016, I took custody of Sergeant Street, Deputies Goepfert, Martinez, and Baldwin department issued Tasers and unused cartridges. Deputy Knight with the Pinellas County Sheriff's Office responded to the Pinellas County Sheriff's Office North District Office, where Sergeant Street, Deputies Goepfert, Martinez, and Baldwin were issued new Tasers.

The following are the model and serial numbers for the members Tasers:

Deputy Goepfert: Model X26P Serial number X120019DV.

Sergeant Street: Model X26 Serial number X00-546026. Cartridge numbers C4103CKT0 and C4101YF4k.

Deputy Martinez: Model X26 serial number X00-575208. Cartridge numbers C4101YECF and C4104VAP0.

Deputy Baldwin: Model X26 serial number X00-546967. Cartridge numbers T07-1494983 and C3100HD29.

Shortly thereafter, I responded to the Pinellas County Sheriff's Office Administration Building, where Deputy Knight downloaded the above listed Tasers. The following is the results of the download that was obtained from Deputy Knight:

Deputy Goepfert: On 09-07-2016 at 15:58:05 the Taser was armed. At 16:01:04 the trigger was pulled for 2 seconds. At 16:01:06 the

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

## Narrative - Continued

Taser was put on safe for 181 seconds. At 16:01:07 the Taser was armed. At 16:01:08 the trigger was pulled for 3 seconds. At 16:01:11 the Taser was put on safe for 4 seconds. At 16:01:16 the Taser was armed. At 16:01:16 the trigger was pulled for 1 second. At 16:01:17 the Taser was put on safe for 1 second. At 16:01:34 the Taser was armed. At 16:01:34 the trigger was pulled for 5 seconds. At 16:01:41 the Taser was put on safe for 7 seconds. At 16:01:59 the Taser was armed. 16:02:37 the trigger was pulled for 1 second. At 16:02:38 the Taser was put on safe for 39 seconds. At 16:03:19 the Taser was armed. At 16:03:21 the Taser was put on safe for 2 seconds. At 21:30:24 the USB was connected for download.

Sergeant Street: Did not get used during this incident.

Deputy Martinez: Did not get used during this incident.

Deputy Baldwin: Did not get used during this incident.

A copy of all four downloaded information is attached to this report. Copies were also submitted to the Pinellas County Sheriff's Office Property and Evidence Section as evidence in this case. The four Tasers were also submitted to the Pinellas County Sheriff's Office Property and Evidence Sections as evidence in this case.

Disposition: This case will remain open.

## Record Status Information

| | |
|---|---|
| Record Origination Operator: | DELEON, N. A. DET (54900 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Record Origination Date: | 09/08/2016 15:09 |
| Last Update Operator: | GREENE, TODD A SGT (56670 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Last Update Date: | 09/15/2016 12:46 |

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| DELEON, N. A. DET (54900 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 | GREENE, TODD A SGT (56670 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 |
| | | | |

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*