IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

CASE NO:  8:18-CV-2116-WFI-SPF

JULIE V. DEGRAW,

as Personal Representative of

the ESTATE OF DONALD C. DEGRAW,

Deceased,

Plaintiff,

VS.

BOB GUALTIERI, in his individual

and supervisory capacity as

Pinellas County Sheriff, and GREGORY

GOEPFERT, in his individual capacity

as a Pinellas County Deputy Sheriff,

Defendant.

: : : : : : : : : : : : : : : : : : : : : : : : :

DEPONENT:          CHARLES STREET

DATE:              MAY 24, 2019 - 9:00 A.M. - 11:50 A.M.

LOCATION:          3000 GULF TO BAY BLVD. STE 500

                   TAMPA, FL

REPORTER:          DENISE ANN HERROLD

                   NOTARY PUBLIC

                   STATE OF FLORIDA AT LARGE

D & D REPORTING SERVICE, INC.

```
 1              3000 GULF-TO-BAY BLVD. SUITE 500

 2                   CLEARWATER, FL  33759

 3       (727) 723-2002   1-800-468-2003   FAX 727-723-2003

 4     A P P E A R A N C E S:

 5     For the Plaintiff:      MICHAEL CALLAHAN, ESQ.

 6                             CALLAHAN LAW FIRM, LLC

 7                             449 CENTRAL AVENUE, STE 203

 8                             ST. PETERSBURG, FL  33701

 9                             mcallahan@clftrialattorneys.com

10     For the Defendant:      PAUL G. ROZELLE, ESQ.

11                              PINELLAS COUNTY SHERIFF'S

12                               OFFICE

13                             10750 ULMERTON ROAD

14                             LARGO, FL  33778

15                             prozelle@pcsonet.com

16              *         *         *         *

17

18                        I N D E X
```

```
19     Direct Examination by Mr. Callahan................  3

20     Cross-Examination by Mr. Rozelle.................. 47

21     Redirect Examination by Mr. Callahan.............. 84
```

```
22                        E X H I B I T S
```

| Deposition Exhibit No. | Description | Marked for Identification |
|---|---|---|
| 24 | Composite | 3 |

**C H A R L E S    S T R E E T**

WAS CALLED AND AFTER BEING DULY SWORN WAS EXAMINED

AND TESTIFIED AS FOLLOWS:

     (At this time Plaintiff's Composite

     Exhibit No. 24 was marked for

     identification.)


       **DIRECT EXAMINATION**

BY MR. CALLAHAN:

   Q.  Would you give me your full name?

   A.  Charles Robert Street.

   Q.  What is your rank at the Pinellas County

Sheriff's Office?

   A.  Sergeant.

   Q.  And, Sergeant Street, when did you begin

your work with the Pinellas County Sheriff's Office?

   A.  In 1995.

   Q.  And have you been continuously employed by

the Sheriff's Office during that time?

   A.  Yes.

   Q.  '95 to today?

   A.  Yes.

   Q.  And what ranks have you held during your

employment?

   A.  Deputy and I was patrol corporal in the

1    north and the south districts and the current rank

2    sergeant.  I was promoted to sergeant in 2005.

3         Q.    Now, the events that bring us here today

4    involve an event involving a fellow by the name of

5    Donald DeGraw.  Do you have a recollection of the event?

6         A.    I do.

7         Q.    That occurred September the 7th, 2016.  At

8    that time you would have been sergeant as well, correct?

9         A.    Yes, sir.

10        Q.    We also know that at the scene there were

11   other deputies there.  Do you have a recollection of who

12   they were?

13        A.    Yes.  Deputy Martinez and Goepfert.

14        Q.    Do you recall any other deputies actively

15   involved in the event?

16        A.    At the end of it Deputy Baldwin was also

17   there and then several others.

18        Q.    What was your relationship to Martinez and

19   Goepfert in terms of rank?

20        A.    I was their squad supervisor.  I was the

21   sergeant that ran the squad that we were all assigned

22   to.

23        Q.    What squad was that?

24        A.    8.

25        Q.    What is the role of a squad supervisor?

```
 1          A.    Manage the day-to-day operation of the
 2    squad, approving reports, make sure the schedule is
 3    updated, time off, sick, calling out and things like
 4    that to monitor the calls for service that are going out
 5    in the squad, assist deputies if they need it.  Being --
 6    make yourself aware of what's going on within the squad.
 7          Q.    I think I recall reading -- and correct me
 8    if I'm wrong -- that you had one of the larger squads,
 9    if not the largest?
10          A.    At one time, yes, sir, in the south.
11          Q.    How many deputies were in your squad at the
12    time of this incident?
13          A.    At the time of this incident?
14          Q.    Yes.
15          A.    I don't have -- I can't bring the roster
16    right to mind.  Probably six -- I'd say five or six
17    deputies.  I'd have a corporal and then one 81, 2, 3 and
18    4, those are all sectors that are filled.  Sometimes 85
19    and the two Oldsmar cars which is what Martinez and
20    Goepfert were in.  So five, seven deputies, a corporal
21    and myself.
22          Q.    Do you have a reaction of how it was that
23    you became aware of events that led you to go over to
24    Mr. Goepfert's house -- I mean, Mr. DeGraw's house?
25          A.    The first time I became aware of it -- it
```

1    was called in the pending queue.  Typically, I -- my --

2    well, all the time my laptop view is set up where the

3    active calls -- calls that are actively being handled,

4    dispatched, deputies are in the upper portion of my

5    laptop screen.  The bottom portion are the pending -- is

6    the pending queue, calls that are still being built

7    within the communications center have not yet been

8    shipped out to deputies.  I'm kind of nosy, if you will.

9    I like to know what's going on and what's about to go

10   on.  I saw this call being built in the queue.  It's an

11   AOA, assist other agency for the fire department.  At

12   the same time I'm looking at it.  It's dispatched.

13              And at the same time, roughly the same

14   time, the radio dispatcher is telling the Oldsmar cars,

15   Martinez and Goepfert, that this is the second times

16   that the fire department has been out to that address

17   today, and I added myself to the call.  At the time I

18   had noticed the call, and it had been dispatched I was

19   in Chestnut Park towards the end of the day coming on 4

20   o'clock.  I was curious as to the second time that the

21   fire department comment that the dispatcher made, and I

22   asked her specifically, "Did they call us?"  Did the

23   fire department call us the first time because I had no

24   knowledge of any sort of call like that happening.

25         Q.    Excuse me.  "By the first time," you're

1  referring to the earlier call involving the DeGraw

2  residence in the morning?

3       A.    Yes, sir.  There was a little confusion

4  within the communication center and dispatcher and

5  whatnot, that she initially radioed back to me that it

6  was both the day shift cars -- both of my cars that had

7  been out with the fire department earlier or I knew that

8  that wasn't the case.  Then she changed it to one

9  overnight car, one night shift car, and then one of my

10  cars which didn't quite get it either.  Then as I'm

11  driving, she corrected herself, made the final

12  correction that it was actually two overnight shift cars

13  at about 5:45, just before 6 o'clock.  Right about the

14  same time she transmitted that Deputy Martinez had still

15  been in route to the call.  He sent me an a.m. computer

16  message that it wasn't them.  So it was the same -- I

17  got the same answer at the same time.

18       Q.    So in looking at your screen upper and

19  lower, do you have a recollection of who was ultimately

20  identified as the a.m. shift cars that went out in the

21  morning?

22       A.    There weren't any.  None of my cars went

23  out.  I'm sorry, you mean the a.m. Shift?

24       Q.    Yeah.  I said the a.m. shift, the morning

25  shift.

1     A.    Okay, sorry.  Because alpha shift is ours

2   and then the overnight shift.

3     Q.    Alpha being the first one of the day?

4     A.    Yes, sir.

5     Q.    And the overnight shift is Charlie shift?

6     A.    Yes, sir.

7     Q.    So from Charlie shift did you determine who

8   had been out there in the morning from your people?

9          MR. ROZELLE:  Object to the form.  You can

10         answer.

11  BY MR. CALLAHAN:

12         A.    I can't remember.

13         Q.    You don't recall?

14         A.    I can't remember that.

15         MR. ROZELLE:  Yeah.  You can answer.

16  BY MR. CALLAHAN:

17         Q.    So tell me what happened next after you

18  initially were looking at your screen?

19         A.    Well, when I was looking at the screen, I

20  added myself to the call so I was already going to the

21  scene.  So by the time that question was answered, I was

22  in the area of Tampa Road and what we call Business 611

23  or the Target, and I think there's a Wal-Mart Market

24  there and McDonald's, the overpass to Tampa Road and

25  East Lake Road.  Making a turn onto Tampa Road to

1  continue to the residence, so I just continued on.  Got

2  there.  By the time I pulled up, Deputy Goepfert and

3  Martinez were already on scene.

4        Q.    Were they inside the home by the time you

5  got there?

6        A.    Yes.

7        Q.    You said you added yourself to the call.

8  By that do you mean that you indicated that you were

9  going to the event?

10        A.    We have a function on our computer, a

11  laptop, where -- it's a button.  You self-assign to

12  calls, and we can use that, and supervisors can pretty

13  much have discretion and use it whenever they like, and

14  I routinely do that all day long, something like that,

15  but -- or it had already sparked my attention, I'm

16  definitely going to add myself to that call so I just

17  used the laptop function.

18        Q.    It was the terminology I was asking about,

19  so I want to make sure I understand what that

20  terminology means.

21        A.    The self-assign?  Yeah, it's one of the

22  choices that we have on our laptop screen.

23        Q.    That's to indicate to others that you're

24  going to go there yourself?

25        A.    It automatically adds you to the call.  It

1   puts -- it puts your unit on the call and shows you in

2   route to the call.

3        Q.    I thought you meant that, but I wanted to

4   be sure.  So you got there, and what did you see and

5   what did you do next?

6        A.    I went inside.  The door's -- the door is

7   already ajar.  A woman was standing downstairs.  It's a

8   two-story house.  The door -- well, the home is on the

9   north side of the home.  The door faces south.  Walked

10  straight in.  And I don't recall any conversation with

11  the woman at all, but as soon as I walk in, I could hear

12  the voices.  I hear deputy voices from above generally

13  right kind of straight up almost from where I'm walking

14  in the front door.  So I know there they are.  I can see

15  where they are at.

16       Q.    Take a look at Exhibit 8.  In front of you

17  we have a compilation of the exhibits for the

18  depositions thus far in this case?

19       A.    8?

20       Q.    Yeah.  If you look through the documents,

21  you'll see 8 about two-thirds of the way through the

22  papers there.

23            MR. ROZELLE:  I'll do the paper management.

24  BY MR. CALLAHAN:

25       Q.    That's a photograph obviously from inside

1    of the home.  Now that you're on the topic of what you

2    saw when you went in there, is it helpful to you to look

3    at Exhibit 8 to reference what you're talking about?

4         A.    Yes.

5         Q.    Explain to me from looking at Exhibit 8

6    what you saw when you were in the home?

7         A.    Well, it's -- it's an accurate depiction of

8    the ground floor looking up to the area of the bedroom

9    door where the deputies were, and then Mr. DeGraw

10   inside.  The angle of the photo is a little bit

11   different.  This is actually deeper into the room from

12   the doorway.  As I'm coming to the doorway -- if you

13   take my meaning, the aspect of the photo from where it

14   was taken was a little bit sharper angle than me coming

15   straight in and looking straight up.  Okay.

16        Q.    There's an arrow in that photo pointing to

17   a doorway at the top of the stairwell?

18        A.    Yes.

19        Q.    Which room does that arrow point to?  Can

20   you identify it?

21        A.    That's the bedroom that Mr. DeGraw was in.

22   Deputies were on either side of the doorway.

23        Q.    Tell me where each person was when you

24   first arrived and could see them, meaning each deputy.

25        A.    Yeah.  When I looked up, Deputy Goepfert

1  was on the right side where the cross is on the wall

2  between the two doors, and Deputy Martinez was on the

3  left side of the door frame.

4       Q.    And were both of them on the landing

5  outside of the room?

6       A.    Yes.

7       Q.    Did you hear anything being said at that

8  time?

9       A.    My attention was drawn by the sound of

10  their voices.  I don't know what was being said.

11       Q.    Do you recall what they said?

12       A.    No, sir.

13       Q.    Did you ultimately head up the stairs?

14       A.    Yes, right away.

15       Q.    As you went up the stairs, did you walk

16  continuously or pause at any point?

17       A.    It was continuous movement up the stairs.

18  Once I knew right where they were, I was going right to

19  where they were.

20       Q.    Describe for me exactly what happened as

21  best you can recall as you went up the stairs.

22       A.    When I went up the stairs?  My recollection

23  is as soon as I hit the first step going up, from the

24  ground floor.  I heard Dr. Goepfert say "Taser" and I

25  heard the pop of the Taser, Taser cartridge.  As I'm

1    continuing up the stairs, I'm hearing the cycling of the

2    Taser unit itself.  Reached the top of the stairs, and

3    at some point shortly -- probably when I get to the top

4    of the stairs, I asked the dispatcher to give us the

5    channel, clear the airway.  Nobody else gets to talk on

6    the radio except us.  I'm asking her to clear the air.

7    I'm telling her for everybody to keep quiet.

8            Q.    Us would be you, Goepfert and Martinez?

9            A.    Specifically, yes, The three of us that are

10   there, but then anybody else who is also coming to the

11   call.  The channel has been dedicated just for -- our

12   purpose is just for this call.  So anybody coming to us

13   if they need more information, they can ask us.  We're

14   not bound to stay silent.  We can also ask for more --

15   whatever we need from the communication center.  It's

16   just that everybody on that channel --

17           Q.    Stays off the radio?

18           A.    Stays off the radio.

19           Q.    Do you recall having any communications

20   with Mrs. DeGraw during the event?

21           A.    Not until the very end and very briefly.

22           Q.    Do you recall what that was at the very

23   end?

24           A.    I was walking out to my car.  I believe a

25   neighbor of hers was with her in the front yard, and

1    they stopped me briefly and asked if they could leave,

2    and I deferred to Lieutenant Nygren at the time and

3    asked if it was all right, and he said, yes, go ahead.

4    That they'd be followed up with a detective at a later

5    date or a later time.

6              Q.    Let me direct you to Exhibit 14.

7    Sergeant, this is from the Investigative Report 15, my

8    number on the top of the page, and it's obviously a

9    recital of the download from the Taser.  If you look at

10   the bottom of the page, there's a recital in the

11   sequence of the Taser.  The first one I want to direct

12   you to at the very bottom of Page 1.  It says at 1601:04

13   the trigger was pulled for two seconds?

14             A.    Yes.

15             Q.    That's the first indication on this page

16   that it was deployed.  You said to me a minute ago that

17   you heard a pop?

18             A.    Yes.

19             Q.    Would that be coincident with the first

20   deployment of the Taser?

21             A.    It would be consistent with a deployment of

22   a Taser, yes.

23             Q.    You only heard one deployment when you were

24   heading up the steps, right?

25             A.    Yes.

1    Q.    Assuming that that first deployment was the

2  two-second pull, and if you look on further -- I'm

3  sorry, then you said you heard recycling?

4    A.    I heard it cycling, cycling.

5    Q.    What do you mean by that?

6    A.    For want of a better term, it's a clacking

7  sound.  I could describe it.  I don't know if you could

8  spell it.  It's like clack, clack, clack, clack, clack.

9  It's a very rapid sound.  It's the sound of the unit

10  cycling through the charge, if you will.

11    Q.    Does that occur after it's turned off?

12    A.    No, sir.

13    Q.    When does it occur?

14    A.    Only when it's -- when the unit is

15  activated and has been deployed.

16    Q.    And does that sound last as long as the

17  trigger is pulled, if you know?

18    A.    It lasts as long as the unit is activated.

19  That the safety switch is on, it's activated, and the

20  trigger has been pulled.

21    Q.    Once the trigger is pulled, you would

22  expect the barbs to be deployed?

23    A.    You would expect that, yes.

24    Q.    On the initial?

25    A.    Yes.

1          Q.     Then if you'll look at the continuation.

2     The next indication is that the Taser was put on safe?

3          A.     Yes.

4          Q.     For 181 seconds?

5          A.     Yes.

6          Q.     What does that mean?

7          A.     Again, it was on safe.  It was not

8     activated.  When it's in safe mode, if you pull the

9     trigger, nothing happens.

10         Q.     The next indication is that 1601:07 the

11    Taser was armed?

12         A.     Yes.

13         Q.     At 1601:08 the trigger was pulled for three

14    seconds?

15         A.     Yes.

16         Q.     What happens when the trigger is pulled for

17    three seconds?

18              MR. ROZELLE:  I'm sorry.  Just to be clear,

19         are you asking about this day, or are you asking

20         about the information on the log?

21              MR. CALLAHAN: I think it would apply to

22         both.

23              MR. ROZELLE:  I object to the form as

24         compound.

25    BY MR. CALLAHAN:

1       A.      Could you repeat the question, sir?

2       Q.      Yes.  This is the next indication that the

3  trigger was pulled, and I said, What happens when the

4  trigger is pulled for three seconds?

5       A.      Right.  I'm sorry.  I wasn't sure if you

6  said it is pulled for three seconds or was pulled for

7  four seconds.

8       Q.      No.

9       A.      What happens when --

10      Q.      Yes.  Is a charge initiated when you pull

11  it?

12      A.      Yes.

13      Q.      Does it last for the three seconds?

14      A.      Well --

15      Q.      It seems obvious, but --

16              MR. ROZELLE:  Object to the form.

17  BY MR. CALLAHAN:

18      A.      Operationally, each cycle is five seconds

19  long unless cut short by the arming or disarming.

20      Q.      I understand that, yes.  So the second time

21  we have the trigger being pulled indicates 1601:08 the

22  trigger was pulled for three seconds?

23      A.      Uh-huh (nods affirmatively).

24      Q.      When the officer does that, pulls the

25  trigger for three seconds, what happens?

1          A.     It activate the unit.  The unit -- there's
2     a charge.
3          Q.     And that charge goes through the wires to
4     the subject if it's attached to the subject?
5               MR. ROZELLE:  Object to the form.  You can
6          answer.
7     BY MR. CALLAHAN:
8          A.     Yes.  If there are -- if the darts are in
9     good contact.
10          Q.     Right.  So assuming in this case that the
11     darts were lodged into Mr. DeGraw at that point at
12     1601:08 he would have sustained a shock of kind for
13     three seconds?
14               MR. ROZELLE:  Objection to form.  You can
15          answer.
16     BY MR. CALLAHAN:
17          A.     Yes.
18          Q.     Then the next indication is that the Taser
19     was put on safe for four seconds?
20          A.     Yes.
21          Q.     Then it was armed again at 1601:16?
22          A.     Yes.
23          Q.     Armed again means the safety was turned
24     off?
25          A.     Yes.

1   Q. At that time 1601:16, the trigger was

2 pulled for one second?

3   A. Yes.

4   Q. What happens when the trigger is pulled

5 again?

6   A. A charge would have been -- would have come

7 from the unit.

8   Q. For a second?

9   A. Yes.

10   Q. After that at 1601:17, the Taser was put on

11 safe for one second?

12   A. Yes.

13   Q. At 1601:34 it was armed?

14   A. Yes.

15   Q. 1601:34 the trigger was pulled for five

16 seconds?

17   A. Yes.

18   Q. And what does that indicate?  Again, that

19 the charge was deployed into person if the barbs were

20 attached?

21   MR. ROZELLE:  Objection to form.  You can

22   answer.

23 BY MR. CALLAHAN:

24   A. Well, it would indicate to me that it was a

25 full five-second cycle.

1        Q.    Explain to me what that means.

2        A.    My understanding of the unit is that the

3 trigger is not meant to be held for five seconds.

4        Q.    I do understand, yes.

5        A.    But again, my understanding of the unit has

6 always been that a full application, if you will, of the

7 Taser itself is five seconds.  It lasts five seconds.

8        Q.    Unless it's interrupted?

9        A.    Yes.

10       Q.    So in this case it wasn't interrupted for

11 the full five seconds?

12             MR. ROZELLE:  Objection to form.  You can

13            answer.

14 BY MR. CALLAHAN:

15       A.    Yes.  That's what it would appear to be,

16 yes.

17       Q.    And at 1601:41 it was put on safe for seven

18 seconds?

19       A.    Yes.

20       Q.    1601:59 it was armed again?

21       A.    Yes.

22       Q.    And at 1602:37 the trigger was pulled for

23 one second?

24       A.    Yes.

25       Q.    And again, would that be the period in

```
 1    which the charge is being applied, that one second?

 2         A.    It would indicate, yes.

 3         Q.    1602:38 the Taser was put on safe for 39

 4    seconds?

 5         A.    Yes.

 6         Q.    1603 the Taser was armed; 1603:21 the Taser

 7    was put on safe for two seconds, and at 2130:24 it was

 8    connected for download?

 9         A.    Yes.

10         Q.    Now, tell me if you can, how many, if any

11    of these deployments or the charges you actually saw?

12              MR. ROZELLE:  Objection to form.  You can

13         answer.

14    BY MR. CALLAHAN:

15         A.    Saw?

16         Q.    Yes.  How much of this total incident in

17    which we know you weren't upstairs yet when you heard

18    the pop?

19         A.    Uh-huh (nods affirmatively).

20         Q.    Were there any of these events that we just

21    described from Exhibit 14 ones that you actually saw?

22              MR. ROZELLE:  Objection to form.  You can

23         answer.

24    BY MR. CALLAHAN:

25         A.    No.
```

1    Q.    So tell me, if you can, when you actually
2  first were able to see into the room about anything that
3  was going on?
4    A.    As I'm halfway up the second flight of
5  steps to the landing, my view is opening up more to me.
6  I can see into the room, and then where I ended up I was
7  more to the left on Deputy Martinez's side of the
8  doorway.  I'm looking into some of the room.  Deputy
9  Martinez is giving me intelligence on the information
10 that they had from Mrs. DeGraw, and I'm also observing
11 Mr. DeGraw in the position that he's in, his condition
12 and then looking beyond him into the room.
13   Q.    Do you think that when you first looked
14 into the room the Taser shocks that were being applied
15 by Deputy Goepfert had concluded?
16       MR. ROZELLE:  Objection to form.  You can
17       answer.
18 BY MR. CALLAHAN:
19   A.    That was not on my mind.
20   Q.    Just don't know one way or the other?
21   A.    I don't know.
22   Q.    Did you see the barbs actually attached to
23 Mr. DeGraw?
24   A.    I couldn't say.  Again, my focus was on the
25 -- what was in the room, what Deputy Martinez was

1    telling me, and then beyond.

2            Q.      Let me refer you to your statement which

3    we've marked here as Exhibit 24 this morning.  If you'll

4    look at Exhibit 24, our Page 3.  In the third paragraph

5    down, the third line, or second line, I'm sorry, you see

6    where it states:  I got to the top of the landing there?

7            A.      Yes.

8            Q.      At the second floor?

9            A.      Yes.

10           Q.      Read what you said in your statement there

11   for the next couple of lines.  You can read it out loud

12   to me if you want to.

13           A.      "I see the subject.  Just heavyset guy just

14   wearing boxer shorts and the Taser probes.  One was in

15   his chest; one was further down in his stomach."

16           Q.      Stop there.  Does that refresh your

17   recollection that you were able to see where the probes

18   were on Mr. DeGraw?

19           A.      It does.

20           Q.      Is that consistent with your current

21   recollection?

22           A.      Yes.

23           Q.      Tell me what you saw once you looked in

24   there.  Obviously I just testified about where the

25   probes were deployed on the person.  What else did you

1  see?  Again, I'm referring to when you initially looked

2  in.

3      A.    Well, Mr. DeGraw is laying on the ground

4  actually perpendicular from where I was standing and

5  facing.  He was perpendicular to the door frame.

6      Q.    In what direction was his head versus his

7  feet?

8      A.    His head was off to my right.  His feet

9  were up against the side of his bed.  It's not a very

10  big room.  It was cluttered and partially lit.  The

11  blinds were a little bit open.  Just inside the door to

12  my left there's a small nightstand that had several

13  articles on it.  Beyond Mr. DeGraw where he's laying in

14  the corner of the room would be the northeast corner of

15  the room.  The dresser or a desk, some manner of

16  furniture, but in between Mr. DeGraw and this piece of

17  furniture are two what seem to be rifle cases, long gun

18  cases leaning up against the wall.

19          Again, Mr. DeGraw's head and shoulders are

20  on the east wall.  Right next to him just off to his

21  right is a small metal stepladder.  There was a little

22  bit of clutter in the room.

23      Q.    Let's talk about the objects, first of all.

24  Do you have a recollection of anything being removed

25  from the room by you or anyone else?

1    A.    Yes.

2    Q.    Tell me what was removed and when and how

3    it happened.

4    A.    Shortly after I got to the top of the

5    stairway, Deputy Martinez was letting me know that he

6    had information that Mr. DeGraw keeps a gun under his

7    pillow or there were weapons in the room.  I can see two

8    rifle bags in front of me.  The Taser was not effective

9    on Mr. DeGraw from everything that I observed and heard

10   coming up the stairs and then later as I got to the

11   stairs.  We knew or I knew we were going to at some

12   point have to -- the term is go hands-on with Mr.

13   DeGraw, and we needed room to operate in the room.

14         Deputy Goepfert reached over -- Deputy

15   Goepfert grabbed the ladder and handed it to me, and I

16   believe, as I recall, I threw it or tossed it to the

17   right down the east portion of the hallway.

18   Q.    Let me stop you there.  As you're looking

19   into the room, this ladder would have been to your

20   right?

21   A.    Yes.

22   Q.    Up against the wall?

23   A.    Yes.

24   Q.    How far into the room?

25   A.    It was just -- well, the door -- it's a

past the door swing.  The door swings inward and was up

against the wall.  Mr. DeGraw is laying here

perpendicular, and the ladder is just past Mr. DeGraw.

Deputy Goepfert reached across him, handed me the

ladder, and it was kind of --

Q.    So it would have been just past the width

of the swinging door?

A.    On the other side of Mr. DeGraw, yes.

Q.    Which one of you did you say removed it?

A.    Well, Deputy Goepfert handed it back to me

and then he -- Deputy Goepfert grabbed it and handed it

to me, and then I passed it down the hallway.

Q.    Let me again stop you.  When Deputy

Goepfert grabbed it, did he step into the room to do

that?

A.    I would imagine so.  Like I say, it wasn't

a very big room, and it was a fluid -- it was a fluid

movement.  So that was not -- my focus was not on that.

My focus was in cleaning the room out.

Q.    I understand.  From the testimony I take it

these gentlemen, Goepfert and Martinez, were outside the

room when you saw them.  So up to the point where the

ladder was removed --

A.    Yes.  They were not inside the room.  They

were not fully inside the room, no.  They were both

1    outside, meaning some -- they had a little bit of cover,

2    if you will.

3           Q.    I understand.

4           A.    From the door frame.

5           Q.    The reason I ask is if they remained

6    outside of the room, I assume you had to step in to

7    remove it?

8           A.    Sure.

9           Q.    Now, let's talk about the small dresser

10   that was to your left, as you said?

11          A.    Some nightstand, a little table.

12          Q.    Was it at that point adjacent to the bed

13   itself to the head of the bed?

14          A.    It was right next to it, right next to it.

15          Q.    Did it have stuff on it?

16          A.    Several different things on it.  The

17   article that caught my attention was a folding knife, a

18   black folding blade knife.

19          Q.    Was there a lamp on it?

20          A.    I believe so, yes.

21          Q.    Some other objects?

22          A.    Yes.

23          Q.    When they were removed -- when the

24   nightstand was removed, did those things fall?

25          A.    All over the place, yes, sir.  I grabbed

1  the night table and handed it to the left between

2  Martinez and myself.  Deputy Martinez, I believe, threw

3  it pretty far down the hallway.

4       Q.    Did someone go in the room and get that

5  stand and remove it?

6       A.    No.  It was -- when I got to the top,

7  Deputy Martinez actually backed away a little bit.  I'd

8  have been blocking Deputy Martinez from that.  I just

9  reached it.  It was right inside the door, the table

10  was, and then the bed right next to that.  The only

11  reaching in was -- it was just reaching.  I reached in

12  and got it and pulled it out.  I didn't have to step in

13  at all.

14       Q.    The knife you mentioned, was that folded

15  closed?

16       A.    Yes.

17       Q.    Was there any time during these events that

18  Mr. DeGraw had possession of that knife?

19       A.    Not while I was there, no.

20       Q.    So after the table was removed and the

21  ladder was removed, did the three of you remain outside

22  of the room?

23

24            MR. ROZELLE:  Objection to form.  You can

25       answer.

BY MR. CALLAHAN:

    A.    Yes.

    Q.    For a period of time?

    A.    Well, after I made the -- we got the knife out of the room, too.  It had fallen off the table close to my feet, and I just kicked it out and down the way.

    Q.    I understood what you said.  So the answer is, yes, you were back outside of the room?

    MR. ROZELLE:  Objection to form.  You can answer.

BY MR. CALLAHAN:

    A.    We were still where we -- we were in the same spot that they were in when I got to the top of the stairs.  It was -- we were all right there.

    Q.    Let me ask it properly so that I completely understand.  Where were the three of you after the table and the ladder were removed?

    A.    We were standing in the doorway.

    Q.    Now, can you give me a description -- you told me what you saw in the room, the objects in the room and that you saw Mr. DeGraw on the floor?

    A.    Yes.

    Q.    Can you give me a description of what you saw Mr. DeGraw during the period of time from the time you first saw him until the three of you had the two

1   objects out of the room?

2        A.    He was grunting very loudly.  Like a

3   guttural type of sound, very loud.

4        Q.    What was his position?  Was it supine or

5   was he on his back, if you can recall?

6        A.    On his back.  I'm glad you added that in

7   there.  Those terms always got me.  He was on his back

8   when I first saw him.  And then at some point in time, I

9   don't know exactly when, during the -- either when the

10  ladder was going or when the table and the knife were

11  going, he rotated himself 180 degrees.  So then his feet

12  were opposite the bed where his head had been, and his

13  head and shoulders -- shoulder blades were up against

14  the side of the bed.

15       Q.    And you don't have a recollection of at

16  what sequence that occurred?

17       A.    I don't know.  I was being passed articles.

18       Q.    Did he ever say a word?  Mr. DeGraw?

19       A.    His vocalization -- it wasn't words.  It

20  was just all grunting, growling, that sound.

21       Q.    Okay.  Did you observe his mouth?

22       A.    Yes.  There was -- appeared to be blood

23  around his mouth inside -- inside his mouth.

24       Q.    Did you observe his eyes?  Were they in a

25  normal configuration or something else?

MR. ROZELLE: Objection to form. You can
answer.

BY MR. CALLAHAN:

A. I don't recall specifically looking at his
eyes, no.

Q. Let me read you from the same third
paragraph in your statement, Number 26 --

MR. ROZELLE: Number 26.

MR. CALLAHAN: No. It's Supplement 26,
exhibit 24.

BY MR. CALLAHAN:

Q. Same third paragraph I was referring you to
a minute ago. In the sixth line down 1of a describing
his lips and teeth, you say: "His eyes were bulging
out, like bugging out?"

A. Yes.

Q. Does that refresh your recollection of your
observation of his eyes?

A. It does.

Q. Look down to the next line in that same
paragraph.

A. Yes.

Q. You make a description there of "he was
laying on his back and his upper shoulders and shoulder
blades were resting against the door to the bedroom."

1       A.    Yes.

2       Q.    Was that the last position he was in before

3 you entered the room?

4       A.    No.

5       Q.    All right.  What was his position when you

6 entered the room?

7       A.    His feet were against the door and to the

8 right -- or against the wall to the right and his head

9 and shoulders were up against the bed.

10      Q.    So his final position was the reverse of

11 what you described?

12      A.    Yes.

13      Q.    Do you have a recollection of seeing how he

14 got turned around on the floor?

15      A.    No.  At some point in time during the

16 transfer of the ladder going out or the table going out

17 -- at some time during that process he rotated himself

18 around.  I didn't watch him do it.  I know when I was

19 done passing off the table to Deputy Martinez and then

20 taking care of the knife, we were at a point where we

21 were going to have to do something, and he was around.

22 He was back around.

23      Q.    During all of these events from the time

24 you got there until you entered the room to begin the

25 process of cuffing him, did he ever make any contact

1    with any of the three of you?

2              MR. ROZELLE:  Objection to form.  You can

3         answer.

4    BY MR. CALLAHAN:

5         A.    He didn't make any contact with me.

6         Q.    Do you recall him having any contact with

7    anybody?

8         A.    Not while I was there, no.

9         Q.    What was his position when you entered the

10   room again?

11        A.    His head and shoulders were up against the

12   bed.  His feet were stretched out to the opposite wall.

13        Q.    My question was directed as to whether he

14   was on his back or stomach?

15        A.    I'm sorry.  He was on his back.

16        Q.    Do you have any sense of time?  How long

17   these events occurred from the time you first heard the

18   Taser pop until you and the other deputies entered the

19   room?

20        A.    Again, it was a fluid-type event.  I hear

21   the Taser as I'm going up the stairs, get to the top,

22   being spoken to by Deputy Martinez.  I'm making my

23   observations about the room.  A minute.  I really don't

24   have a specific -- that was not my -- my focus wasn't a

25   time line.

1          Q.     The Exhibit Number 14, the time between the

2    first Taser pop and the last deployment of the Taser is

3    around 33 seconds if you add that up.  Is that

4    consistent with your recollection?

5                MR. ROZELLE:  Objection to form.  You can

6          answer.

7    BY MR. CALLAHAN:

8          A.     From the first to the last?

9          Q.     Yeah.  From the first at 1601:04 to the

10   last at 1602:37?

11         A.     No.  Again, is it consistent with it?  I

12   don't know.  I can't say specifically because I can't

13   give you an exact time of how long it took us.

14         Q.     I understand.  So describe for me what

15   happened then when you-all entered the room.

16         A.     Well, we knew at that point that we were

17   going to have to do something.  I believe it was Deputy

18   Goepfert said out loud:  How are we going to do this?

19   Then I just -- I'm not going to send my deputies in.

20   Deputy Goepfert still was on the Taser.  He was

21   maintaining the Taser, so it would be on Deputy Martinez

22   and myself.

23         Q.     So you were the first to enter the room?

24         A.     Yes.  I'm going in first.

25         Q.     tell me what you did.

1    A.   I said:  Let's go boys.  And I stepped

2    across Mr. DeGraw where he was on the ground on his

3    back.  Took hold of his left wrist and pulled it

4    downward, and then away from his body to -- my intention

5    was to gain leverage using that motion, pulling his arm

6    down and away and then rotating the wrist at the same

7    time to move his body -- to move him to his stomach so

8    then we could bring his left arm continuously behind his

9    back and begin putting him in handcuffs.  When I made

10   the movement, pulled it down and away and rotated him

11   over, he ended up with his forehead -- he was on his

12   stomach.  His forehead up against the wall where the

13   nightstand used to be.  His feet straight on along the

14   same line as the bed, and I had stepped over him.  So I

15   step over him to get his wrist.  I take his wrist.  Pull

16   him down and over, and as I'm rotating him to my left,

17   I'm stepping to my right over the top of him.  I ended

18   up kneeling pinched between the bed and Mr. DeGraw's

19   right side while holding his left wrist as Deputy

20   Martinez follows in behind me, and we're both attempting

21   to maintain control of the left arm.

22   Q.   So Deputy Goepfert followed you into the

23   room --

24   MR. ROZELLE:  Objection to form.

25   BY MR. CALLAHAN:

1   A.  I'm sorry.  Deputy Martinez followed you in

2 the room.

3   A.  Deputy Martinez did, yes.

4   Q.  Tell me what he did, if you observed.

5   A.  We both were working to secure -- maintain

6 his left -- well, control of Mr. DeGraw and control and

7 maintain grip on his left wrist to begin the process to

8 get at least one handcuffed.  We didn't know where his

9 right arm was.  His right arm was underneath him.  We

10 still had yet to gain access to that arm.  We first have

11 to secure one of the two hands, so we can continue the

12 process.

13   Q.  When he was on the floor on his stomach

14 after he rolled him over --

15   A.  Yes.

16   Q.  -- after you rolled him over, where were

17 his hands?

18   A.  Pardon me.

19   Q.  Where were his hands?  Mr. DeGraw's hands?

20   A.  His right arm and hand were underneath him,

21 pinched underneath his body.  His left arm was turned up

22 behind him.

23   Q.  At any point during this process were you

24 on top of Mr. DeGraw and with your knees, legs, body or

25 any other part of you?

1     A.    No.  I don't recall ever being on top of

2  him, no.  I know I was -- it was pretty close quarters

3  for me in between Mr. DeGraw and the side of the bed.

4  There was still carpet space between his right side and

5  the side of the bed.  So there was at least enough room

6  for me to step over and then crouch down to continue to

7  try to get leverage on that wrist.  I don't recall being

8  on his back at all.

9     Q.    Were you pushing down on him to try to get

10  leverage on his wrist?

11     MR. ROZELLE:  Objection to form.  You can

12     answer.

13  BY MR. CALLAHAN:

14     A.    No, I don't recall.  Typically, I would,

15  yeah, try to use a little bit of my own body weight, but

16  I just don't have any recollection of being on his back

17  or pushing down.  I was two hands on his wrist.  So it

18  wouldn't have been one hand on the wrist and one hand

19  pushing down.  I don't recall anything like that.

20     Q.    Was Martinez on top of him in any way or

21  any part of his body?

22     MR. ROZELLE:  Objection to form.  You can

23     answer.

24  BY MR. CALLAHAN:

25     A.    No.  Neither one of us were on top of him.

1    If Deputy Martinez had gotten on top of him, he would

2    have been blocking what I was doing.

3         Q.    I guess a better to put it is, were any of

4    you pinning him down in any way?

5              MR. ROZELLE:  Objection to form.  You can

6         answer.

7    BY MR. CALLAHAN:

8         A.    I can't speak to what Deputy Martinez's

9    body positioning was.  I just can't.

10        Q.    How about Deputy Goepfert?  Did he get

11   involved with the cuffing process?

12        A.    He eventually did, yes.  When we finally

13   were able to get a cuff on Mr. DeGraw's left wrist, we

14   still could not get his right arm out from underneath

15   him, and I looked, and that's when I noticed that his

16   forehead was touching up against the wall.  So Deputy

17   Goepfert stepped past Deputy Martinez -- actually, he

18   had already been there.  Beg your pardon.  Deputy

19   Goepfert came in and was already securing Mr. DeGraw's

20   feet during the process to keep us from being kicked.

21   Actually, I told Deputy Goepfert or asked him:  Can you

22   scooch him down towards the direction of his feet to

23   clear him from the wall.  I thought we could get a

24   little bit more room to work with, and Deputy Goepfert

25   -- I didn't watch him.  He somehow pulled Mr. DeGraw

1    further into the room away from the wall, and we were

2    able to get his right arm behind him and finally

3    complete the handcuff.

4         Q.    Do you have any idea how long that process

5    took of handcuffing him?

6         A.    The entire process?

7         Q.    From the time you entered that room with

8    that purpose in mind until it was accomplished?

9         A.    I don't have a specific time, I don't.

10        Q.    After that happened and he was successfully

11   handcuffed, did he remain face down?  Again, I'm

12   referring to Mr. DeGraw.

13             MR. ROZELLE:  Objection to form.  You can

14        answer.

15   BY MR. CALLAHAN:

16        A.    For a moment or two, yes.

17        Q.    Did he ever move again?

18             MR. ROZELLE:  Objection to form.  You can

19        answer.

20   BY MR. CALLAHAN:

21        A.    There was a little bit of movement from

22   him, yes.

23        Q.    Describe it for me.

24        A.    When we rolled him up onto his right side,

25   and I observed his lips moving, and he was breathing,

1    and when he was -- he was still on his stomach and

2    handcuffed, he was breathing quite regularly and deeply,

3    if you will.

4            Q.    Did that change?

5            A.    At some point it did.

6                  MR. ROZELLE:  Objection to form.

7    BY MR. CALLAHAN:

8            Q.    At what point?

9            A.    Well, during the process where we're -- I'm

10   taking stock of him actually breathing and catching my

11   own breath and checking on the deputies to make sure

12   they're okay.  Speaking to Mr. DeGraw and I remember

13   slapping him on the shoulder.  Talking to him just to

14   verify that he's okay.  Deputy Goepfert, I believe,

15   suggested or said that we needed to put him on his side.

16   We rotated him to his right side so facing me, and some

17   time during that assessment.

18           Q.    It was during that process that you noticed

19   that he had changed his breathing pattern?

20           A.    Yes.

21           Q.    Did he stop breathing?

22           A.    I can't say for sure when he stopped

23   breathing.  We were, you know, speaking with him.  I was

24   speaking to him.  I did a sternum rub on him, and then

25   pinched his left nipple and -- pinched and twisted his

left nipple to see if I could get any interaction.  I
thought or I did see his lips move, and I can't say for
sure -- one of the deputies took a pulse on him I think
in the neck.  It may have been Deputy Martinez thought
he felt a pulse, but then sometime in that process or
shortly after that we noticed that Mr. DeGraw's eyes
were just glazed over and that he wasn't breathing.

Q.    Did you get a response from him at all to
your verbal communications or your tapping on him as you
indicated?

A.    Not directly, no.

Q.    At what point were the fire department or
EMT personnel summoned?

A.    It was -- I recall very, very -- I mean
quick right after he -- he was handcuffed.  I recall
Deputy Baldwin being there in the -- appearing in the
door.  I remember looking up and telling -- I believe I
told Deputy Baldwin specific that the fire department
can come and clear the air.  Normal radio operations and
then the FD can come down the road.  They were staged up
the road.  They asked us to come first.  They wouldn't
go until we went in.

Q.    Do you have any estimate of how long from
the time you secured him with handcuffs that it took the
medical personnel to arrive?

1          A.      No, I don't.

2          Q.      Once the medical personnel, though, began

3     the process of tending to him, did you have any further

4     dealings with Mr. DeGraw?

5          A.      As the paramedics came into the room, I

6     removed the handcuffs, and then there were several

7     paramedics in the room, and I, more or less, got

8     trapped.  I stepped back further deeply into the room

9     and let them operate, gave them the room.

10         Q.      Do you have an estimate for me of the

11    available space inside that room?  First, let's say from

12    the bed to the wall and adjoining the landing?

13         A.      From the bed to the wall adjoining the

14    landing?  I'm trying to picture --

15         Q.      Let me try to get ourselves oriented.  As

16    you look into the room, the bed is oriented in which

17    way?  To your left?

18         A.      Yes.

19         Q.      The head of the bed is adjoining the wall

20    of the landing?

21         A.      On my left.

22         Q.      Is that correct?

23         A.      Yes.  The bed is facing north and south.

24    I'm sorry.  I'm walking upstairs.  I'm going north, I'm

25    heading north upstairs.  When I'm standing in his

doorway, I'm facing north.  The head of his bed is
facing south.  It's facing that way.  So it's the head
of the bed here just inside the door on my left.  So is
that wall the one you're referring to?

     Q.    Let me do it better than I did.  How much
space between the side of the bed and the wall itself?

              MR. ROZELLE:  You mean --

BY MR. CALLAHAN:

     A.    To the opposite side?

     Q.    Yeah.

     A.    An estimate, maybe six feet.  I'd say less
than that.  His head and shoulders were up against the
bed.  His feet were stretched to the wall.  Probably not
even six feet.

     Q.    How about in the perpendicular direction to
that, how much --

     A.    That was what I meant?  That was the
perpendicular estimate.  I'm looking into the room.

     Q.    And I'm saying 90 degrees from that how
much space was there?

     A.    Deep?

     Q.    Yes.

     A.    Six or eight feet.  It would be more than
six.  Maybe eight feet.  I really -- I'm guessing.  I
don't have a --

1      Q.     I understand I'm not wanting to be exact.

2      A.     I'm sorry.  When I walked around to the end

3  of the bed -- as the paramedics came into the room, when

4  I walked around the end of the bed, I had a little bit

5  of room between the end of the bed and the window on the

6  north side of the house, upper north side of the house.

7  There was a little bit of space for me to go.  I'm

8  sorry.  I can't give you a number.

9      Q.     When the three of you entered the room and

10  were dealing with Mr. DeGraw?

11      A.     Yes.

12      Q.     Can you give me an estimate of how much

13  available space you had to work with him?

14          MR. ROZELLE:  Objection to form.  You can

15          answer.

16  BY MR. CALLAHAN:

17          A.     Just with him?

18          Q.     Yes.

19          A.     Very little space.  There was space enough

20  for me to step in and over him.  I'm not trying to be

21  difficult.

22          Q.     I understand.

23          MR. ROZELLE:  If you know, you know.  If

24          you don't know, you don't know.

25  BY MR. CALLAHAN:

1      A.     I don't have a number for you.  I can see
2 it, I'm looking at it.  I can describe it.  I don't have
3 a number.  I just don't.  We did not have a whole lot of
4 room to work in there.
5      Q.     I got that impression.  I was just seeing
6 if you could quantify it in any way.
7      A.     Sorry.
8      Q.     Who dealt with the gun that had earlier
9 been under the pillow, if you know?
10     A.     I did.
11     Q.     Did you remove it from under the pillow?
12     A.     I didn't remove it.  I rotated it 180
13 degrees.  When we secured Mr. DeGraw, I lifted the
14 pillow up, and the gun was laying on the bed under the
15 pillow with the muzzle pointed actually towards where we
16 were in our direction.  So I knew that the fire
17 department was coming upstairs, and I knew that that
18 would make them very nervous, a weapon in that
19 configuration right next to where they were going to be
20 working, so I rotated the weapon 180 degrees so the
21 muzzle would be pointing away from the paramedics.
22     Q.     Did you eventually secure it yourself?
23     A.     No, I did not.
24     Q.     Do you know who did?
25     A.     I do not know.

1          Q.     Let me ask you a little bit about Mr.

2     DeGraw's medical condition.  Did you have any awareness

3     of his medical condition prior to your arrival?

4          A.     I had no acknowledge of Mr. DeGraw's

5     medical conditions.

6          Q.     At all?

7          A.     No.

8          Q.     Do you know if either Deputy Goepfert or

9     Deputy Martinez had any knowledge prior to their

10     dealings with him of his medical condition?

11          A.     I don't know that.

12          Q.     Did you ever acquire any knowledge of Mr.

13     DeGraw's medical condition?

14          A.     I don't recall.  I don't believe so.

15          Q.     Did you yourself interview either Deputy

16     Martinez or Deputy Goepfert after these events?

17          A.     No.

18          Q.     Do you recall having any conversations with

19     them after these events about the events?

20          A.     No.  I remember we specifically did not

21     speak to each other about the events, because we were

22     waiting at the NDS for our interviews.

23          Q.     You were aware there was going to be an

24     interview because you had an in-custody death?

25          A.     Yes, sir.

MR. CALLAHAN:  That's all I have.  Thank
you.

MR. ROZELLE:  I've got a few.  Can we go
off the record?

(At this time a brief recess was taken.)

**CROSS-EXAMINATION**

BY MR. ROZELLE:

Q.    Sergeant Street, take a look at what has
been previously marked in this case as Exhibit 17.
Would you please?  Let me know when you've had an
opportunity to look at it.

A.    Okay.

Q.    Do you recognize what's depicted in Exhibit
17?

A.    The landing at the top of the stairs and
the bedroom door.

Q.    So the bedroom door, that's the door to the
room that you saw Mr. DeGraw in when you first made
visual contact with him?

A.    Yes.

Q.    When you first saw him -- and I'll describe
it and let me know if I've got it right.  The door swing
is inside to the room and to the right?

A.    Yes.

Q.    Then there's a blue wall that you see

1    beyond that?

2         A.    Yes.

3         Q.    Then you can barely make it out.  It

4    appears there to be some kind of Chester drawers or a

5    dresser at the opposite hall, which would be, as you've

6    described it here in your testimony, the north wall of

7    the room, is that right?

8         A.    North/northeast, yeah.

9         Q.    Let's take a look and what we'll do is

10   we'll work with these two in conjunction here and try to

11   make it all make sense.  Look at Exhibit 18, if you

12   would.

13        A.    Okay.

14        Q.    Do you recognize what's depicted in Exhibit

15   18?

16        A.    Yes.  This is further into the room.

17   Deeper into the -- well, a little bit into the room.

18   here's the door swing right here.

19        Q.    So, yeah, or orient us to what we're

20   looking at in Exhibit 18, the door knob in the lower

21   right-hand corner, is that your understanding that's the

22   door knob that's associated with the door that is shown

23   in Exhibit 17?

24        A.    Yes.

25        Q.    And so we're looking further into the same

 1   room, is that right?

 2        A.    Yes.

 3        Q.    So that blue wall to the extreme right edge

 4   of the photograph in Exhibit 18, is that the wall that

 5   you were earlier giving some testimony about where when

 6   you first saw Mr. McGraw his head was oriented kind of

 7   against that wall, is that correct?

 8        A.    Yes.

 9        Q.    Or toward that wall?

10        A.    Head and shoulders, yeah.

11        Q.    Was it actually resting up against the

12   wall?  Touching the wall?

13        A.    That's my recollection, yes.

14        Q.    And at some point in time you gave some

15   testimony about he's going to move himself into a

16   different position, basically rotated 180 degrees.  So

17   his feet are going to be against that wall, and his head

18   and shoulders are going to be in the vicinity of or up

19   against the bed, is that correct?

20        A.    Yes.

21        Q.    The bed that you were giving testimony

22   about, do you see that in Exhibit 18?

23        A.    Yes.

24        Q.    That's in the lower left-hand corner?

25        A.    Yes.

1      Q.     Let me just ask you.  Do you see any
2  firearms or evidence of firearms depicted in Exhibit 18?
3      A.     There's a long, hard plastic case here,
4  rifle case.
5      Q.     That's brown or tan?  What looks like some
6  duct tape on it, is that right?
7      A.     Yes.
8      Q.     Where that is depicted in Exhibit 18, did
9  you see that case when you first visualized this room?
10     A.     Yes.  But it in a, as I recall, a black
11  rifle bag were both leaning up against the wall, more --
12  not where it is now, this brown one is, but the two of
13  them were leaning on the diagonal across the front of
14  this dresser when I first noticed them.
15     Q.     When you first noticed them, they weren't
16  in the position in which they're depicted -- or at least
17  the brown one is depicted and the tan one is depicted in
18  Exhibit 18?
19     A.     No.
20     Q.     By that wall, do you mean the wall to the
21  right there?  So the corner between the right side of
22  the dresser and the wall that's to the right?
23     A.     Yes.
24     Q.     Did you come to find out that there were
25  other firearms in this room?  You gave testimony about a

1   gun under the pillow, and we've been talking about this

2   long gun case here.  Were there any other firearms in

3   the room?

4            A.     Yes.  There were two handguns in the room

5   as well.

6            Q.     Where were they?

7            A.     Exact location, they were around towards

8   the foot of the bed, the cases were.  I recall putting

9   both the cases on the bed, and then looking inside of

10  them.

11           Q.     Did they have firearms now?

12           A.     Yes.

13           Q.     You said two other handguns, so it's two in

14  addition to the one that was under the pillow?

15           A.     Yes.

16           Q.     Had you seen either of these handgun cases

17  during the time that you were -- or any time before you

18  had successfully secured Mr. DeGraw in handcuffs?

19           A.     The handgun case?

20           Q.     Yeah.

21           A.     No.

22           Q.     So you had seen the two rifles or rifle

23  cases, rather?

24           A.     Yes.

25           Q.     The gun under the pillow, you never saw

1    that until you moved the pillow, correct?

2          A.     Correct.

3          Q.     Yourself.  Do you know whether that gun

4    could have been visualized by anybody else prior to your

5    moving the pillow?

6          A.     I don't know.

7          Q.     You were asked to give some testimony

8    basically describing the circumstances of the room you

9    had to operate within this bedroom here.  Do you

10   remember that testimony?

11         A.     Yes.

12         Q.     I think you described the room as

13   cluttered, is that right?

14         A.     Yes.

15         Q.     I think you said it was dimly lit or low

16   light or words to that effect?

17         A.     Yes.

18         Q.     In Exhibit 18, is there a window depicted

19   there?

20         A.     Yes, yes.

21         Q.     Is that the only window in the room that

22   you recall?

23         A.     Yes.

24         Q.     In the photograph there's some vertical

25   blinds and they're open.  Were they in that position

1    when you came on scene, do you recall?

2         A.    No.   They were closed, partially.

3         Q.    So were they -- this is where my interior

4    decorating skills are going to fail me.   My

5    understanding of the manner of these blinds is that they

6    can open or close to expose the window, and then at

7    least once they're in a closed position, you can rotate

8    the slats 90 degrees to then block the light out.   Does

9    that appear to be the type of blinds that are hanging up

10   there?

11        A.    Yes.   They're vertical blinds, yes.   The

12   lighting is also -- for this photograph is artificial.

13   The flashing that was used by the forensic technician,

14   you can see the shadows of the fan blades up in the

15   ceiling, as well as the shadow from the main bulb of the

16   light further back in the corner of the room and a

17   little bit of flare, if you will, from the side of the

18   flash on the left side of the photograph.   I have a bit

19   of experience in photography, and I knew this was an

20   artificially lit room, and because of those reasons, I

21   can see those two shadows.   It's not a doubled-plated

22   ceiling fan.   That's a single blade and that's a shadow,

23   shadow, shadow, shadow.   It's not lit the way it was

24   when we first -- when I first got to the top of the

25   steps, no.

1          Q.    So Exhibit 18 does not accurately depict

2    the lighting conditions in which you operated when you

3    were securing Mr. DeGraw in handcuffs, does it?

4          A.    No.

5          Q.    The distance that you were asked to give

6    some testimony about between the edge of the bed there

7    that we see in Exhibit 18, and the wall that is to the

8    right when you first walk into the door, whatever that

9    distance is, is that what's depicted in the photograph,

10   meaning you didn't move the bed or you're not aware of

11   anybody else moving the bed?

12         A.    No.

13         Q.    Is that the relative position of the wall,

14   the door, that large Chester drawers and the bed when

15   you were working to secure Mr. DeGraw in handcuffs?

16         A.    Yes.

17         Q.    All the rest of the stuff that we see in

18   the photograph here up against the north wall, do you

19   see that stuff?

20         A.    Yes.

21         Q.    Was that all in the room when you were

22   trying to secure Mr. DeGraw in handcuffs?

23         A.    Yes.

24         Q.    The ladder that you gave some testimony

25   about, where would that have been in this photograph?

1  Can you see that area?

2          A.    It would have been in this -- in this area

3  here.  Whatever this is, I don't know if that's -- I

4  don't know what that is, a bag or some dark object here.

5          Q.    So if we look at Exhibit 17, there is -- we

6  see the bottom of the door, a white switch plate, do you

7  see that?

8          A.    Yes.

9          Q.    Then below that and further deeper into the

10  photograph into the room, there's some kind of black

11  bag.  Is that what you're giving some description on?

12          A.    Right here.  Because the baseboard stops

13  here at this dark object.  So this space here between

14  this dark object and the door was where the ladder was

15  leaning.

16          Q.    So where the white baseboard is in Exhibit

17  17 is where the ladder was located?

18          A.    Yes.

19          Q.    That's the ladder that was removed from the

20  room so that you could -- tell me why did you remove it

21  from the room?

22          A.    For safety.  I don't want to be hit with a

23  ladder, but to get room to work and to operate.

24          Q.    You gave some testimony about hearing the

25  Taser that Deputy Goepfert deployed pop and cycle.  Do

```
 1   you remember that testimony?

 2        A.    Yes.

 3        Q.    How many times did you hear it cycle?

 4        A.    One time for sure.

 5        Q.    Do you know whether it cycled more than

 6   that?

 7        A.    No, I don't.

 8        Q.    Why not?

 9        A.    I didn't hear cycling.  From my

10   observations and Mr. DeGraw, it did not appear to be

11   doing any good with the initial cycling and application

12   that I heard.  It wasn't effective.  I don't recall, or

13   I can't say I heard any other applications of it.

14        Q.    Is there a reason that you didn't hear it

15   or don't know how many times you heard it cycle?

16        A.    That's not my focus.  It's further --c

17   advancing the -- our activity further is -- I'm looking

18   and making the overall observation of the room, what we

19   have.  I'm listening to the information from Deputy

20   Martinez.  I'm listening to all of these things while

21   I'm hearing Mr. DeGraw and watching him flail about and

22   listening to those sounds he's making, continuously

23   making.  Trying to get the details worked out in my own

24   head how we were going to proceed from here.  It's on

25   me.  I'm supervisor.  I'm there.  We're going to have to
```

1    do something beyond what has been done so far.

2        Q.    You gave some testimony a moment ago about

3    the Taser not being effective. Can you just describe

4    for me what it is that you mean by that? How was it not

5    effective?

6        A.    Mr. DeGraw appeared to be really unaffected

7    by it. He was still whirling around, rolling around.

8    Still making his noises, grunting, groaning. From my

9    experience through the training and being Tasered

10    myself, I know what it feels like and what it did to me

11    and what I have experienced it has done to other

12    individuals that it has been applied to. It did not

13    appear that it had any effect on Mr. DeGraw.

14        Q.    Do you know when Deputy Goepfert's use of

15    the Taser on Mr. DeGraw concluded?

16        A.    No. Well, at least -- at least when we

17    started to go hands-on with him, because I specifically

18    asked Deputy Goepfert if it was on or activated. I

19    believe I asked is it on because we're not going to go

20    hands-on with somebody if the -- if it's cycling through

21    or going through a cycle. We're not going to do that or

22    we're going to get shocked ourselves.

23        Q.    Do you know whether Deputy Goepfert cycled

24    the Taser while you were hands-on with Mr. Goepfert?

25        A.    I don't know that. I wasn't shocked.

1        Q.    Do you know whether it's possible you could

2   have been hands-on with him at a time that Deputy

3   Goepfert cycled the Taser?  Is that possible that you

4   could have been hands-on with him, Deputy Goepfert

5   cycles the Taser, and yet you're not shocked?

6               MR. CALLAHAN:  Objection to form.

7   BY MR. ROZELLE:

8        A.    Could have, could have.  Depending on where

9   we're located in regard to the Taser darts, whether or

10   not they're still attached.  If we're in close enough

11   proximity to the wires, the Taser wires hooked to the

12   probe.  Many different variables in that.

13        Q.    During the time that you are working to

14   clear an area to where you can get Mr. DeGraw

15   handcuffed, and you described earlier in your testimony

16   the activities that you and others were doing during

17   that time, what was Mr. DeGraw doing during that time?

18               MR. CALLAHAN:  Objection to form.

19   BY MR. ROZELLE:

20        A.    During the time we were moving the items

21   out of the room?

22        Q.    Yes.

23        A.    It was during that time that he moved

24   himself from the 180 degree position.  Here again, he's

25   moving -- he's moving around, following the application

of the Taser, but while we're cleaning the room to get

him ready to continue our process, he's still moving

himself around on the ground.  Still moving on the

ground.

Q.   Is he verbal at all during this time?

A.   Not with words.  Just the ongoing noises.

Q.   Describe as best you can what these noises

were.

A.   From loud, very guttural, kind of, you

know, animal like.  He was -- he was not happy.

Q.   Can you describe the frequency with which

he would make these noises?

A.   No.  It was kind of continuous ongoing.

There was no rhythm or pattern to them.  It was all

during the process.

Q.   When you first went hands-on with Mr.

DeGraw, I believe -- and just to orient us in the

sequence of events here -- which arm did you go to?

A.   His left wrist.

Q.   Did Mr. -- tell me what happened.  What did

you feel when you took ahold of his left wrist?

A.   What did I feel?  He was not allowing me to

work.  I had to physically draw his wrist down sharply

and away to gain the twist that I needed to get a little

bit of leverage, enough leverage to move him over to his

stomach, and then so I could step over to the right and
bring him in.  I had both hands on the left wrist.

Q.    What was he doing specifically that was not
allowing you to work as you say?

A.    He was very tense.  He was tensing against
us.  There was no cooperation.  Just he was fighting us.
We were fighting for his arm to get control or maintain
control of him.  Once I had his wrist, I didn't change
my focus from anything other than keeping my grip, both
hands on that wrist and then making the movement to
bring him around to his stomach when Deputy Martinez
could get his placement, and then it took both of us to
maintain control over that wrist before we could at
least get one handcuff on him.

Q.    Who got that handcuff on the left wrist?

A.    Deputy Martinez.

Q.    Could you have done that yourself, doing
what you're describing here?

A.    No.

Q.    During the time that you are trying to get
that left wrist secured in a handcuff with Deputy
Martinez's assistance, was Mr. DeGraw alive?

A.    Yes.

Q.    How do you know that?

A.    He was still making the sounds.  He was

breathing. He was still basically fighting for control

of his wrist, and Deputy Goepfert had to get in and keep

his legs secure so we wouldn't be kicked.

    Q.    Just to orient us here. After you get the

left hand with the cuff on it, you then step over him

into this area between Mr. DeGraw and the bed? Was that

correct?

    A.    Yes, after we get it secured.

    Q.    After you get the cuff on the left wrist?

    A.    No. The stepover was -- the stepover was

continuous of my movement --

    Q.    Got it.

    A.    -- of getting the wrist. I stepped across

his legs, got his wrist and then pulled down and back,

and as he's rotating to the left --

    Q.    You step across?

    A.    -- I step across and secured his left

wrist, and then Deputy Goepfert had to scooch him down

away from the wall so we could manage to get his right

wrist out from underneath him.

    Q.    At any point in time while you are trying

to secure Mr. DeGraw in handcuffs, do you sit on him?

    A.    No.

    Q.    Do you straddle him?

    A.    No.

Q.    Do you see either of the other deputy
sheriffs on scene sit on him or straddle him?

A.    No.  Deputy Goepfert was behind me the
whole time at that point, and Deputy Martinez did not.
He was just as intent on keeping hold of the left wrist
while it was cuffed.  If he were -- if Deputy Martinez
were on Mr. DeGraw's back, he would have been in the
way.  He would have been in the way.  Frankly, if he had
been on his back, I would have told him to move.  We
needed that space that we had to maintain control of the
wrist until it was cuffed.

Q.    Did you ever put your full body weight on
Mr. DeGraw?

A.    No.

Q.    Do you know whether anybody else did?

A.    No.

Q.    That's a bad question.  No, you don't know
or no, they didn't, if you know?

A.    No, I don't know.

Q.    Then you're going to try to get his right
wrist secured in the handcuffs; that's the next thing
that going to happen in the sequence?

          MR. CALLAHAN:  Objection to form.
BY MR. ROZELLE:

Q.    Is that correct?

A.    Yes.

Q.    Let me ask you.  Is there anything that happened between the time that you've gotten the left wrist secured as you described it and repositioned both Mr. DeGraw and yourself and the beginning of your efforts to secure the right wrist?  Is there anything else that occurred in this sequence of events?

A.    Yes.  I asked Deputy Goepfert if he could help move Mr. DeGraw -- his head away from the wall, Mr. DeGraw's head away from the wall to try to give us a little bit more space.  My hope was that it would also dislodge his right arm.  He was holding his right arm underneath him tightly, get a little bit of movement towards the feet.  Could maybe get some kind of gap or space to work with where I could work some leverage underneath his right arm and get it back around behind him.

Q.    Mr. DeGraw ultimately was successfully repositioned, I guess, further away from that wall?

A.    Yes.

Q.    Was that successful in dislodging his right arm from under him?

A.    Yes.  We were able to eventually bring his right arm back and then finally secure that in a handcuff.

1      Q.    Tell me how that happened.  How did you get

2  the right arm?

3      A.    At some point during the movement,  it

4  disrupted Mr. DeGraw's advantage, I guess, was

5  disrupted, and I was able to get enough of a hand hold

6  in around his arm and wrist, right arm and wrist to work

7  it around behind him, but it was -- again, we were

8  working at it.  While I'm working at that, Deputy

9  Martinez is maintaining the left wrist and the left arm

10  to keep that...

11      Q.    So you go hands-on his right lower

12  arm/wrist?

13      A.    Yes.

14            MR. CALLAHAN:  Objection to form.

15  BY MR. ROZELLE:

16      A.    Yes.

17      Q.    Using one hand?  Both hands?

18            MR. CALLAHAN:  Objection to form.

19  BY MR. ROZELLE:

20      A.    I had to use both hands to get his arm out

21  from underneath him.  Where exactly they were, I don't

22  remember.

23      Q.    I apologize.  The question was bad.  Did it

24  take both of your hands to position his right arm where

25  you wanted it?

1        A.     Yes.

2        Q.     Describe for me what you felt for Mr.

3   DeGraw as you were trying to do that.

4        A.     It's no different than the left hand or

5   left arm.  It was just he was resisting continuously,

6   constant pressure to try to fight from what I was doing.

7   It was like a tug of war almost.  Hand out from

8   underneath him and around to the back.  It was work.  It

9   was a bit of work.

10       Q.     Who placed the second handcuff on Mr.

11  DeGraw?

12       A.     Deputy Martinez.

13       Q.     What happened after the second handcuff got

14  placed?

15       A.     A little taking stock.  I'm checking on my

16  guys, catching my breath.  Asking Deputy Goepfert and

17  Deputy Martinez are they okay.  That's first.  And then

18  continue the process.  Then I spoke to Deputy Baldwin.

19  We're assessing Mr. DeGraw.

20       Q.     Did you assess Mr. DeGraw?

21       A.     Yes.

22       Q.     Tell me how you did that.

23       A.     Well, I'm hearing him breathing.  We're

24  confident now that he's -- for now at least he's in a

25  secure position.  Breathing steady, regularly, and then

1    later on we rolled him up to his side, saw his lips

2    move.  So I mean he's still breathing.

3            Q.    So after the handcuffing was completed, Mr.

4    DeGraw was still alive?

5            A.    Yes.

6            Q.    I mean, as soon as the right cuff goes on.

7    Let me ask you this way.  Did that right wrist ever go

8    limp before that second handcuff got placed?

9            A.    No.

10           Q.    At this point in time playing the sequence

11   of events forward all the way from when you got on scene

12   up until FD shows up on scene, did you ever put your

13   body weight on Mr. DeGraw?

14           A.    No.

15           Q.    Did you ever deliver any strikes?  Feet,

16   hands?  Any weapons at all to Mr. DeGraw?

17           A.    No.

18           Q.    Did anybody else on that scene that you're

19   aware of?

20           A.    No.

21           MR. ROZELLE:  I would like to take a slight

22           pause here while I set up our computer.  I'm

23           going to have him listen to the radio traffic,

24           which is exhibit -- I can't remember what order

25           they came in.  22, I think.  Radio traffic    is

1          Exhibit 23, and Deputy Baldwin looks like it's

2          22.  Give me a minute to queue the audios here.

3               Just a couple of other housekeeping things.

4          Mr. Callahan, you're invited to look on

5          here.  We can set this up in a manner so that you

6          can kind of see what we're looking at on this

7          computer.  I'm setting up in front of us.  And

8          for Madam Court Reporter, do you worry about an

9          attempt to -- and in fact, do not take down what

10         you're going to hear come from the computer

11         screen.  If it turns out we want to or need to

12         do that, we will.

13              (At this time there was a discussion

14               off the record.)

15  BY MR. ROZELLE:

16       Q.    Sergeant Street, I want to work with you

17  with a couple of exhibits that were previously marked in

18  the case.  The first one we'll go to is Exhibit 23,

19  which is the recording of -- it's labeled as Patrol

20  Radio Traffic.  Let me go ahead and play this from the

21  start and just let me know what you --

22              MR. CALLAHAN:  I'd like the Reporter to

23         take down anything she understands from this

24         recording, if anything.

25              MR. ROZELLE:  I just paused it here.  I

1    kind of went over that and gave exactly the

2    contrary instructions.  You want the Court

3    Reporter to take down what she hears from Exhibit

4    23?

5         MR. CALLAHAN:  Correct, if anything.

6         THE COURT REPORTER:  Gentlemen, if we can

7    have the agreement that if it's inaudible, I'm

8    going to put it in my transcript that I can't

9    hear it.

10        MR. CALLAHAN:  You can put inaudible to

11   tell --

12        MR. ROZELLE:  Yeah.  I'm not going to turn

13   a Court Reporter into a witness here.

14        THE COURT REPORTER:  Well, I've got to do

15   something if there's missing words, so.  If I

16   can't hear words, I've got to put something in

17   there.

18        MR. CALLAHAN:  You can put down what you

19   don't hear.

20        THE COURT REPORTER:  What?

21        MR. CALLAHAN:  You can put inaudible if

22   you don't hear it.  I'm not going to call you to

23   say whether or not it's audible.

24        MR. ROZELLE:  Well, that's where we're

25   headed.

1    BY MR. ROZELLE:

2         Q.    All right, Sergeant.  I'm going to go ahead

3    and play this, and since we're doing it this way, we're

4    going to go slow and be by the book.

5              Do you see the player we're using here to

6    play this, Sergeant?

7         A.    Yes.

8         Q.    Do you agree that it's set up at triple

9    zeros in the timer in the lower left?

10        A.    Yes.

11        Q.    I'm going to hit play, and I'll pause at

12   some point.

13             (At this time the recording was played.)

14             THE COURT REPORTER:  I can't hear that.

15             MR. CALLAHAN:  Very well.

16   BY MR. ROZELLE:

17        Q.    I paused it at 11 seconds.  Sergeant

18   Street, did you hear any of that we played in the 11

19   seconds?

20        A.    I didn't hear any of that.  There are

21   voices in there.  It's very low.

22        Q.    I'm going to rewind it here, and I'll play

23   it again for you.

24             (At this time the recording was played.)

25   BY MR. ROZELLE:

1    Q.    I paused it again at 11 seconds.  Could you
2    make any of that out?
3    A.    It's a discussion between a deputy and the
4    dispatcher.  Sorry, there's --
5    Q.    All right.  Is the deputy you, do you know?
6    A.    I couldn't tell you.  It may be.  It sounds
7    a little deeper like my voice.
8    Q.    You can't tell from --
9    A.    I can't tell just from that.
10   Q.    Let me just ask you this since we're doing
11   all of this on the record here.  Is this a volume issue
12   with this laptop or describe to me why it is you can't
13   understand what we're hearing?
14   A.    Well, if there were an external speaker
15   plugged into this laptop, it would amplify it.  I think
16   the laptop -- the application playing the audio is set
17   at the maximum.  There's a bit of outside noise.
18   Q.    We got Gulf to Bay out the window here.
19   Bear with me for 11 seconds.  We're at triple zeros.
20   Sergeant Street, I have a pair of headphones here.  do
21   you mind listening to this through the headphones?
22           MR. ROZELLE:  Counsel, you're invited to do
23        the same.
24           MR. CALLAHAN:  I object to the use of the
25        headphones in the manner of which we can't hear

1         what he's hearing.

2              MR. ROZELLE:  We're going to do a couple of

3         things.  First of all, while he's listening to

4         this through the headphones, I'll indicate on the

5         record when I'm starting and stopping this.  As

6         I've extended the invitation to you, both today

7         and previously in this case, you were invited to

8         come over here, which you've not done, and view

9         what it is I'm doing with this laptop.

10             MR. CALLAHAN:  I saw it yesterday.

11             MR. ROZELLE:  Let me speak.  You were also

12        invited to listen to this through the exact same

13        set of headphones, and I will extend you the

14        professional courtesy to listen to it as many

15        times as you would like, both here and at any

16        other occasions.

17             MR. CALLAHAN:  I get that, but I still

18        object to the procedure that you're deploying

19        here.

20  BY MR. ROZELLE:

21         Q.    Sergeant, let me know when you're ready.

22         A.    Okay.

23         Q     I've pushed play.

24             (At this time the recording was played.)

25  BY MR. ROZELLE:

1          Q.     I've pushed pause at 12 seconds.  What did

2     you hear?

3          A.     Deputy Martinez telling the dispatcher be

4     advised the subject is not -- is complying -- not

5     complying with their command.

6          Q.     Do you remember on September 7th of 2016

7     hearing that radio transmission at all?

8          A.     I believe I did.

9          Q.     I'm going to skip us forward, and, again,

10    with the invitation to counsel that if you want to let

11    this play through to this point in time, I'm glad to do

12    that.  Otherwise, I'm going to pull out the headphone

13    jack, and we're going to play this through our laptop

14    speaker.  I turned up the maximum volume.  Do you see

15    that?

16         A.     Yes.

17         Q.     Just verify that.  I've got this queued at

18    two minutes and 18 seconds and I'll push play.

19                (At this time the recording was played.)

20    BY MR. ROZELLE:

21         Q.     I'll pause it because I think I screwed

22    this up.  Try it again here.  It's at 2:15 at this time.

23    Push play.

24                (At this time the recording was played.)

25    BY MR. ROZELLE:

1          A.      That's the channel marker.

2          Q.      I'll pause it at 2:28.  What did you hear?

3          A.      Channel marker.  It's a beep that

4   specifically sounds when we ask for the radio channel to

5   clear the air.  The dispatcher will announce channel 4

6   is ten three, which means it's emergency traffic only,

7   and that's a marker as a reminder to everybody else to

8   stay off the radio.  That's computer generated.  That's

9   automatic.

10         Q.      You heard that -- how would you describe

11  it?  Beep?  Tone?

12         A.      It's a tone.  It's a marker.  It's a

13  channel marker that marks a radio channel.  It's a

14  reminder.  It's an audible reminder.

15         Q.      Bear with me just a moment, please.  That's

16  what I was looking for.  Here we are down here.  Let's

17  go back and queue this back to one minute and 20

18  seconds.  Do you see that, sir?

19         A.      Yes.

20         Q.      Couple of old men over here.  I'm going to

21  push play at one minute and 20 seconds on Exhibit 23.

22  Let me know what you hear.

23                 (At this time the recording was played.)

24  BY MR. ROZELLE:

25         Q.      I pushed pause at one minute and 28

1   seconds.  Did you hear anything?

2         A.    Yes.

3         Q.    What did you hear?

4         A.    The very first sound is Mr. DeGraw and some

5   of the noises that he was making, some of the sounds.

6   That's me on the radio telling the dispatcher to give us

7   the air, give us the radio channel, and from that

8   forward on that's when the channel is dedicated to just

9   us.  The extra noises, not me.  Those are all Mr.

10  DeGraw.  Those are the noises that he was continuously

11  making.

12        Q.    When you had given some testimony earlier

13  this morning about the noises that he was making, is

14  that what you were describing?

15        A.    Yes.

16              MR. ROZELLE:  I don't have anything further

17        for him about Exhibit 23.  This is a little out

18        of the ordinary, but since we have it queued up,

19        if you did, I would invite you to inquire so we

20        don't have to queue this up again if you want to

21        use it.

22              MR. CALLAHAN:  No, thank you.

23  BY MR. ROZELLE:

24        Q.    In that case we'll proceed to Exhibit 22,

25  which is on the laptop.

1          In front of you, Sergeant Street, I have

2    what was previously marked as Exhibit 22 in this case?

3    Do you recognize that?

4          A.    Yes.

5          Q.    What is it?

6          A.    It's an in-car COBAN video from Deputy

7    Baldwin's cruiser On that particular day.

8          Q.    I am -- with the same invitation here,

9    there's some things I'm going to ask you about on this

10   and get everybody oriented, and I will extend the

11   invitation to counsel to observe what it is I'm doing

12   here.  Similarly, if there's other things that he wants

13   to work with this witness with this exhibit, he's

14   invited to do so, and I'll assist him with that in using

15   the laptop and making sure we look at what needs to be

16   looked at and listen to what needs to be listened to.

17   Similarly, Sergeant, although I'm going to be skipping

18   around here, if there's anything else that you want to

19   look at or you want to see something again or you want

20   me to go back or pause, would you just let me know that?

21   All right.

22          I'm going to bring us forward here in time.

23   Let me just ask here on the initial frame of this when

24   it's loaded up and make sure we have that.  What time

25   does that indicate?

1          A.    406:13 in the afternoon.

2          Q.    Tell me, if you know, what is your

3     understanding of where that time comes from?

4          A.    That's from the COBAN unit itself.  That's

5     the video, the video unit.  It's set.  Kind of automatic

6     -- automatic clock, my understanding of it.

7          Q.    Do you know how it's oriented to other

8     timekeeping devices that it might come into contact

9     with?  Whether it's radio or CAD or the internal time on

10    a Taser device?  Do you have any understanding at all of

11    whether those clocks all read the same time?

12         A.    I don't have any understanding of that.

13    That display is particular to that COBAN unit.

14         Q.    So COBAN thinks it's 406:13, at least Keith

15    Baldwin's COBAN thinks it's 406:13?

16         A.    Yes.

17               (At this time the recording was played.)

18    BY MR. ROZELLE:

19         Q.    I've got it paused here, and we're going to

20    use the clock time off of the COBAN here as reference

21    points as we take testimony.  I've got it paused at

22    408:30.  Do you see that?

23         A.    Yes.

24         Q.    I'm going to hit play, and I'm going to

25    pause it almost immediately, and the question to you is

as --

                    (At this time the recording was played.)

BY MR. ROZELLE:

        Q.    I paused it at 408:43.  Do you see that?

        A.    Yes.

        Q.    Do you see anything you recognize in this
frame?

        A.    Three cruisers, two Tahoes and a Crown
Victoria on the left side of the screen, north side of
the road.

        Q.    Do you know who any of those vehicles
belong to?

        A.    I know the Crown Victoria is mine.  The
other Tahoes belong to -- the Tahoes belong to the other
two deputies.  I don't know which is which, but the
Crown Vic is mine, the Ford in the middle of the three.

        Q.    Facing against the direction of traffic?  I
guess facing east?

        A.    Yes.

        Q.    I'm going to hit play at 408:43.

                    (At this time the recording was played.)

BY MR. ROZELLE:

        Q.    I paused it at 408:58?  Where does it
appear to you that Deputy Baldwin stopped his vehicle?

        A.    It appears to be the driveway right in

 1    front of the house.

 2              Q.    The house is the DeGraws' residence?

 3              A.    Yeah.

 4              Q.    I'm going to hit play on this, and I'm

 5    going to let it play through for the full, I'll

 6    represent, two minutes.  At some point this is going to

 7    become muted, and I will stop playing at that point in

 8    time.  I'm going to let it play through for that

 9    duration, and then I'll pause it and have a few

10    questions for you.

11              (At this time the recording was played.)

12    BY MR. ROZELLE:

13              Q.    I paused it here at 410:56.  Let me just

14    ask you.

15              MR. CALLAHAN:  Let me ask you before you go

16         on, was that initiated at 408:58?

17              MR. ROZELLE:  The sequence that we just

18         started?

19              MR. CALLAHAN:  Yes.

20              MR. ROZELLE:  I believe so.  It might have

21         been 52 or 53.  Somewhere in the fifties.

22              MR. CALLAHAN:  Okay.  I wrote down 408:58.

23         I just meant was it initiated after that last

24         number you gave.

25              MR. ROZELLE:  You mean when I pushed play?

```
1              MR. CALLAHAN:  Yeah.

2              MR. ROZELLE:  Yeah, that's about right.

3         Just in fairness to you, sir, I missed pausing it

4         after it was muted by a couple of seconds.

5              MR. CALLAHAN:  That's all right.  I just

6         wanted to make sure that I had the sequence

7         right.

8   BY MR. ROZELLE:

9         Q.    Sergeant Street, do you hear yourself on

10  any of that audio that we just listened to?

11        A.    I do.

12        Q.    What part of that is you?

13        A.    I'm telling Deputy Baldwin that he can open

14  up the air.  I'm asking Deputy Goepfert if he's okay.

15  Are you okay?  The higher-pitched whoosh of breath with

16  a little whistle in it is mine catching my breath.

17  Those are the ones that stand out for me.

18        Q.    I think that's the cast of the question is

19  just listen and just hear this once.  What do you think

20  on this is Charlie Street?  That's the whoosh of --

21  high-pitched whoosh of air.  And how would you describe

22  that?  What was your state here?

23        A.    A little whistle at the end.  It was to

24  catch my breath.  It was -- decompress, I guess, a

25  little bit because, you know.
```

1       Q.    Were you out of breath at the end of the

2  struggle?

3       A.    Yes, absolutely.

4       Q.    Do you hear any of the other individuals

5  associated with this incident?  And that would be Deputy

6  Goepfert, Deputy Martinez, Deputy Baldwin, Mr. DeGraw on

7  that portion of audio we just listened to?

8       A.    Yes.

9       Q.    Let's start with Mr. DeGraw.  What on this

10  portion of audio is Mr. DeGraw?

11       A.    The regular, the deeper breathing sounds,

12  the deeper -- the deeper sounds.  The more regular

13  pattern of breathing.

14       Q.    All right.

15       A.    A little bit of a moan with it, but it's

16  this -- that's Mr. DeGraw.  The higher -- I would say

17  the higher-pitched whoosh of air is myself.  I think

18  Deputy Goepfert who has a bit of a higher voice.  He

19  responds to me when I asked him if he's okay.  He said

20  yes.  I hear Deputy Baldwin on the radio asking for the

21  fire department.  It's opening the air radio channels as

22  well.  Lower pitched conversation.  You can't make out

23  between me, myself and Deputy Martinez.  Just more --

24  I'm taking stock of the deputies.

25       Q.    Is there any other conversation or --

1  conversations or verbalizations you can make out on this

2  audio?

3       A.   The volume might be working against us on

4  this recording, and it seems like the volume on this

5  recording is to the extreme where it's maybe -- the

6  volume is maybe too high.

7       Q.   We're hitting the squelch on the speakers.

8  I'll turn it down here a little bit.  I've backed this

9  up to 408:48, which is admittedly a few seconds before

10 he's on scene here.  We're going to play through it

11 again at 408:48, and I'm going to pause it a couple

12 times this time.  That said, the same invitation stands.

13 If you want me to hit pause for any reason.  Would you

14 just ask me to do that, and I'll do so.

15            (At this time the recording was played.)

16 BY MR. ROZELLE:

17       Q.   Now pause to answer a question from

18 counsel.  408:53 is when the vehicle comes to a full

19 stop in front of the driveway.  Now, we'll hit play and

20 I missed it by a second here.  So 408:54 is where I'm

21 playing.

22            (At this time the recording was played.)

23 BY MR. ROZELLE:

24       A.   Stop it right there, please.

25       Q.   I've paused it at 409:31 at the sergeant's

1    request.  Was there anything that we listened to in this

2    sequence from 0408:40 to 0409:31 significant to you?

3         A.    Yes.

4         Q.    What?

5         A.    One of the voices -- one of the voices says

6    "give me your hand."  Give me your hand one time.

7         Q.    Was that you?

8         A.    No.

9         Q.    Do you know who it was?

10        A.    I believe it would be Deputy Martinez, the

11   voice -- I know it's not my voice.  It's not a higher

12   voice like Deputy Goepfert's.  It would be Deputy

13   Martinez.

14        Q.    The deeper, regular breathing sound that

15   you had described when we listened to this the first

16   time, did you hear that in this sequence we just played?

17        A.    Just before you paused it at the very end,

18   yes.  That's as the hand -- we're secure and that's when

19   you hear my first whoosh of breath.

20        Q.    Let me back this up just a little here.  If

21   I've done this correctly, it's 0409:13.  Then I'll hit

22   play.

23              (At this time the recording was played.)

24   BY MR. ROZELLE:

25        Q.    I hit pause at 0409:27.  Why did you ask me

```
1   to pause?
2          A.    You can hear that breathing.  I can hear
3   that deeper, regular breathing.
4          Q.    I'll push play at 0409:27.
5                (At this time the recording was played.)
6   BY MR. ROZELLE:
7          Q.    I pushed pause at 0409:40 through the time
8   that I paused it.  Do you still hear Mr. DeGraw on that?
9          A.    Yes.
10         Q.    Did you hear somebody say it sounds like
11  you are good?
12         A.    That's me asking Deputy Goepfert if he's
13  good.
14               (At this time the recording was played.)
15  BY MR. ROZELLE:
16         Q.    I'll pause it at 0409:46.  What did you
17  hear in that last segment of play?
18         A.    That was me telling Deputy Baldwin to open
19  the radio traffic, open the air now.
20         Q.    Did you hear anything else?
21         A.    Movement in the room.
22         Q.    Do you still hear Mr. DeGraw on that?
23         A.    I was listening for my voice.
24         Q.    I'll push play.
25               (At this time the recording was played.)
```

BY MR. ROZELLE:

    Q.    I paused it at 0409:52.  Did you hear anything in that last little bit?

    A.    Deputy Baldwin on the radio again, and that's the high-pitched exhale with a little whistle to it.  That was mine.  Again catching my breath.

        MR. ROZELLE:  I don't have anything further for you, sir.  Thank you so much for your time.

        MR. CALLAHAN:  I just have a few follow-up.

**REDIRECT EXAMINATION**

BY MR. CALLAHAN:

    Q.    Assuming that the timing in Exhibit Number--

        MR. ROZELLE:  14.

BY MR. CALLAHAN:

    Q.    Let me find it in my pile here.

        MR. ROZELLE:  Supplement 15, report of the Taser log.

        MR. CALLAHAN: I know what it is.  I just can't find it in my exhibit stack here.

        MR. ROZELLE:  It's 14.

BY MR. CALLAHAN:

    Q.    I know the number.  Okay.  I've got it, sir.

1          Assuming that the timing in Exhibit 14 is

2   accurate that the last time the trigger was pulled on

3   the Taser was 1602:37 for one second?

4          MR. ROZELLE:  Objection to form.  You can

5      answer.

6   BY MR. CALLAHAN:

7      A.    Is that the supplement?

8          MR. ROZELLE:  Let's get it in front of you

9      here.

10  BY MR. CALLAHAN:

11     A.    Yes, sir.

12     Q.    Look at Page 2, Exhibit 14.

13     A.    Yes, sir.

14     Q.    The third line from the bottom would be

15  timing description.  It says 1602:37 the trigger was

16  pulled for one second?

17     A.    Yes, sir.

18     Q.    That's the last time it was pulled in that

19  the description on Exhibit 14?

20     A.    Yes.

21     Q.    Assuming that time is accurate being

22  0402:48 when it would have ended?

23     A.    Yes.

24     Q.    And assuming that the time is accurate on

25  Deputy Baldwin's COBAN, that you engaged in -- your

comment "Are you all right, Buddy?"  And the deep sigh.

At the end of the cuffing sequence, somewhere like

409:46?

      A.    Yes.

      Q.    Can you tell me what happened in those

seven minutes?

           MR. ROZELLE:  Objection to form.  You can

          answer.

           MR. CALLAHAN:  What's your objection?

           MR. ROZELLE:  I will represent to you, as I

          have before, these clocks don't match.  They're

          not accurate.  So it's an improper hypothetical,

          and there's been no testimony that the sergeant

          was on scene for seven minutes.  I mean ask him

          that.

BY MR. CALLAHAN:

      Q.    Go ahead, sir.  Answer the question.

      A.    I wasn't on scene that long.  There's no

sync.  The CAD is not synced to COBAN.  It's not synced

to each Taser that's on the road or that's issued.  It

is not.  We were not in that room for seven minutes

before the fire department arrived.

      Q.    How long do you think you were in the room?

           MR. ROZELLE:  Objection to form.  You can

          answer.  No.  You can answer that.  That's

1      fine.

2   BY MR. CALLAHAN:

3      Q.    Again, from the end of the last discharge

4   of the Taser until the time you stood up and sighed

5   after the handcuffing occurred?

6          MR. ROZELLE:  Objection to form.  I don't

7          believe he testified about any sighing.  That's a

8          total misstatement of the evidence.

9   BY MR. CALLAHAN:

10     Q.    Exhale of the breath.

11     A.    The exhale of the breath, the whoosh of air

12  that I guess I'm describing is I was not standing up

13  when I delivered any of those.  I was still kneeling

14  next to Mr. DeGraw.  At that point I had not --

15     Q.    Let me rephrase it.

16         MR. ROZELLE:  Hang on, hang one.  He's

17         answering the question.

18  BY MR. CALLAHAN:

19     A.    At that point I had not regained my feet.

20  I didn't stand up again until after I removed the

21  handcuffs from Mr. DeGraw and backed into the room for

22  the fire department to work.

23     Q.    So let me rephrase it.  From the time of

24  the last discharge of the Taser until the time you

25  either exhaled of breath after the cuffing, how much

1    time do you think did pass?

2                   MR. ROZELLE:  If you know.

3    BY MR. CALLAHAN:

4          A.    I don't know because I don't know -- I

5    don't know firsthand when the last Taser activation was

6    or if it was effective.

7          Q.    Let me ask you.  You had testified earlier

8    that there were four cases in the room?

9          A.    Yes.

10         Q.    During the events that the three of you

11   were involved with Mr. DeGraw, those were never opened,

12   were they?  The four cases that had guns in them?

13         A.    They weren't opened before -- at least as

14   far as I know before I walked further in the room.  I

15   opened the pistol cases myself.

16         Q.    This is after the EMTs were there?

17         A.    Yes.

18         Q.    After the events dealing with him were all

19   done?

20         A.    Yes.

21         Q.    You testified that you asked Deputy

22   Goepfert if his Taser was still on?

23         A.    Yes.

24         Q.    What was his answer?

25         A.    He said no, it was not.

```
 1          Q.      When did you ask him that?

 2          A.      Before I put my hands on Mr. DeGraw.

 3          Q.      Do you know if Mr. DeGraw -- do you know

 4   anything about his state of mind when you were dealing

 5   with him?

 6                  MR. ROZELLE:  Objection.  Beyond the scope.

 7   BY MR. CALLAHAN:

 8          A.      No, I don't.

 9          Q.      Do you have any idea if he knew even who

10   you were?

11                  MR. ROZELLE:  Objection form.  Beyond the

12          scope.

13   BY MR. CALLAHAN:

14          A.      I have no idea.

15          Q.      Do you have any idea if he even knew that

16   you-all were deputies?

17                  MR. ROZELLE:  Objection.  You can answer.

18   BY MR. CALLAHAN:

19          A.      We were all three dressed in our Class A

20   uniforms.

21          Q.      I understand that.  The question is, do you

22   know what he knew?

23                  MR. ROZELLE:  Objection.

24   BY MR. CALLAHAN:

25          A.      I do not know what he knew.
```

1          MR. CALLAHAN:   What's the objection?

2          MR. ROZELLE:   Beyond the form of the

3      examination of the witness, and you're asking

4      does one witness know what another individual

5      knows.  There's no possible way that that is

6      admissible in evidence.  It's outside the bounds

7      of Rule 26.

8          MR. CALLAHAN: There's many possible ways

9      that a witness could know that.

10  BY MR. CALLAHAN:

11      A.    I would have no way of knowing what Mr.

12  DeGraw thought of me and my appearance or my deputies

13  and theirs.  My uniform looks slightly different than

14  the other deputies because I have chevrons on both my

15  arms.

16      Q.    You would agree with me, wouldn't you, that

17  any witness could indicate somehow that -- some

18  awareness to those facts?

19          MR. ROZELLE:  Objection to form.  You can

20      answer.

21  BY MR. CALLAHAN:

22      A.    I can't answer to what Mr. DeGraw thought

23  or didn't think.  I can't answer that.

24      Q.    Did he ever give any indication to any of

25  you that he had an understanding of who you were or what

1   you were doing there?

2          MR. ROZELLE:  Objection to form.  Compound.

3   BY MR. ROZELLE:

4          A.    If he indicated to us --

5          Q.    Who you were or what you were doing there?

6          A.    No.  In fact, every indication from his

7   behavior was that he was -- he was not going to comply

8   with the deputies.  That was from the radio traffic of

9   Deputy Martinez.

10         Q.    The question was --

11         MR. ROZELLE:  Were you finished?

12  BY MR. CALLAHAN:

13         A.    And did not want to cooperate with what he

14  was being told to do or us trying to secure him.  I

15  don't know what he thought.  I don't.  Did he give any

16  indication of I know you were deputies?  No, he did not.

17         Q.    Let me show you Exhibit 21, which appears

18  to be a photograph of Mr. DeGraw.  Do you recognize that

19  as Mr. DeGraw?

20         A.    It's from the shoulders neck down to the

21  waist of a subject.  I do not know who this is.  If you

22  say this is Mr. DeGraw --

23         Q.    I'll represent to you that it's from the

24  officers' photographs.  You can see marks on his chest

25  and ribs there?

1    A.    Yes.

2    Q.    From your observation where the barbs

3    landed on him, are those two round marks consistent with

4    where he got shot with the Taser?

5         MR. ROZELLE:  Objection to form.  You can

6         answer.

7    BY MR. CALLAHAN:

8    A.    It would be consistent, yes.

9    Q.    Would you mark them for me, the two places

10   that are consistent with where the barbs went in?  Just

11   put on a little arrow or something to indicate which two

12   you're talking about.

13        Let me see which you marked.  You put an

14   arrow on each one, thank you.

15        MR. CALLAHAN:  That's all I have.  Thank

16        you so much.

17        MR. ROZELLE:  Nothing further.  If it's

18        ordered, we'll read.

19             (At this time the deposition

20              in the above-captioned matter

21              was concluded at 11:50 a.m.)

22

23

24

25

<u>CERTIFICATE OF REPORTER</u>

STATE OF FLORIDA      )

COUNTY OF PINELLAS    )

     I, DENISE HERROLD, Court Reporter, certify that I was authorized to and did stenographically report the foregoing deposition; and that the transcript is a true record of the testimony given by the witness.

     I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

     I, the undersigned authority, certify that CHARLES STREET personally appeared before me and was duly sworn.

     WITNESS my hand and official seal this 26TH DAY OF JUNE, 2019.

                DENISE A. HERROLD

                NOTARY PUBLIC – STATE OF FLORIDA

                COURT REPORTER

                Commission #GG001610

                Expires 6/29/2020

**DEPONENT'S CERTIFICATE**

I have read the foregoing transcript of my oral deposition taken on the date and at the location indicated on the title page of the transcript, and I certify that said deposition is true and correct, with the provisions that any errors appearing therein have been corrected by me by listing on a separate sheet as to page number, line and content of said error(s), and further indicating the language to be substituted.

I also understand that upon completion of the reading and signing and correcting of the deposition, I am to return this original signature page, my list of corrections and said file copy provided for my inspection to the person or company listed on the Errata Sheet and returned by email or U.S. Mail.

I further understand that if I do not carry out the instructions stated above within a reasonable period of time from the date I receive the deposition, I automatically waive my right to read and sign the deposition.

_____          _____

CHARLES STREET                              DATE

DATE OF DEPOSITION:  MAY 24, 2019

ERRATA SHEET

      READING AND SIGNING OF THE DEPOSITION
OF STEVEN GAINES TAKEN ON MAY 24, 2019, IN DEGRAW .
GUALTIERI, ET AL TAKEN BY DENISE HERROLD.

TO THE DEPONENT:  IN COMPLIANCE WITH THE RULES OF CIVIL
PROCEDURE THIS IS ATTACHED FOR YOUR INSPECTION AND
SIGNATURE.  ANY CHANGES IN THE DEPOSITION IN FORM OR
SUBSTANCE WHICH YOU CARE TO MAKE ARE TO BE MADE ON THIS
SHEET WITH YOUR REASON THEREFORE.

      DO NOT WRITE ON THE DEPOSITION ITSELF
RETURN THIS FORM AND THE ORIGINAL SIGNATURE PAGE WITHIN
14 DAYS OF _____ TO D & D REPORTING SERVICE.
FOR THE PLAINTIFF:   MICHAEL CALLAHAN, ESQ.
                     ST. PETERSBURG, FL
FOR THE DEFENDANT:   PAUL ROZELLE, ESQ.
                     CLEARWATER, FL


PAGE & LINE NO.     CHANGE OR CORRECTION AND REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____        _____

CHARLES STREET                       DATE

ERRATA SHEET

READING AND SIGNING OF THE DEPOSITION
OF STEVEN GAINES TAKEN ON MAY 24, 2019, IN DEGRAW .
GUALTIERI, ET AL TAKEN BY DENISE HERROLD.

TO THE DEPONENT:  IN COMPLIANCE WITH THE RULES OF CIVIL
PROCEDURE THIS IS ATTACHED FOR YOUR INSPECTION AND
SIGNATURE.  ANY CHANGES IN THE DEPOSITION IN FORM OR
SUBSTANCE WHICH YOU CARE TO MAKE ARE TO BE MADE ON THIS
SHEET WITH YOUR REASON THEREFORE.

DO NOT WRITE ON THE DEPOSITION ITSELF
RETURN THIS FORM AND THE ORIGINAL SIGNATURE PAGE WITHIN
14 DAYS OF _____ TO D & D REPORTING SERVICE.
FOR THE PLAINTIFF:  MICHAEL CALLAHAN, ESQ.
                    ST. PETERSBURG, FL
FOR THE DEFENDANT:  PAUL ROZELLE, ESQ.
                    CLEARWATER, FL


PAGE & LINE NO.      CHANGE OR CORRECTION AND REASON

6/15                 times -> time
_____
10/9                 home -> road
_____
25/10-11             got to the stairs -> got to the
_____top of the stairs_____
48/4, 54/14          chester drawers -> chest of drawers
_____
53/21                double-plated -> doubled bladed
_____
_____
_____
_____
_____
_____
_____

_____      _____

CHARLES STREET                          DATE

D & D REPORTING SERVICE, INC.
ddreportingservice@yahoo.com
727-723-2002

# Transcript of the Testimony of **CHARLES STREET**

**Date:** May 24, 2019
**Volume:**

**Case:** DEGRAW v. GUALTIERI

Printed On: June 27, 2019

D & D REPORTING SERVICE, INC.
Phone:727-723-2002
Fax:727-723-2003
Email:ddreportingservice@yahoo.com
Internet: www.ddreportingservice.com

**A**

**a.m** 1:19,19 7:15
7:20,23,24
92:21
**able** 22:2 23:17
38:13 39:2
63:23 64:5
**above-caption...**
92:20
**absolutely** 80:3
**access** 36:10
**accomplished**
39:8
**accurate** 11:7
85:2,21,24
86:12
**accurately** 54:1
**acknowledge**
46:4
**acquire** 46:12
**action** 93:11,12
**activate** 18:1
**activated** 15:15
15:18,19 16:8
57:18
**activation** 88:5
**active** 6:3
**actively** 4:14 6:3
**activities** 58:16
**activity** 56:17
**add** 9:16 34:3
**added** 6:17 8:20
9:7 30:6
**addition** 51:14
**address** 6:16
**adds** 9:25
**adjacent** 27:12
**adjoining** 42:12
42:13,19
**admissible** 90:6
**admittedly** 81:9
**advancing** 56:17
**advantage** 64:4
**advised** 72:4
**affirmatively**
17:23 21:19
**afternoon** 76:1
**agency** 6:11
**ago** 14:16 31:13

57:2
**agree** 69:8 90:16
**agreement** 68:7
**ahead** 14:3
67:20 69:2
86:17
**ahold** 59:21
**air** 13:6 41:19
73:5 74:7
79:14,21 80:17
80:21 83:19
87:11
**airway** 13:5
**ajar** 10:7
**AL** 95:3
**alive** 60:22 66:4
**allowing** 59:22
60:4
**alpha** 8:1,3
**amplify** 70:15
**angle** 11:10,14
**animal** 59:10
**ANN** 1:22
**announce** 73:5
**answer** 7:17
8:10,15 18:6
18:15 19:22
20:13 21:13,23
22:17 28:25
29:7,10 31:2
33:3 34:6
37:12,23 38:6
39:14,19 44:15
81:17 85:5
86:8,17,25,25
88:24 89:17
90:20,22,23
92:6
**answered** 8:21
**answering** 87:17
**anybody** 13:10
13:12 33:7
52:4 54:11
62:15 66:18
**AOA** 6:11
**apologize** 64:23
**appear** 20:15
53:9 56:10
57:13 77:24

**appearance**
90:12
**appeared** 30:22
57:6 93:14
**appearing** 41:16
94:6
**appears** 48:4
77:25 91:17
**application** 20:6
56:11 58:25
70:16
**applications**
56:13
**applied** 21:1
22:14 57:12
**apply** 16:21
**approving** 5:2
**area** 8:22 11:8
55:1,2 58:14
61:6
**arm** 35:5,8,21
36:9,9,10,20
36:21 38:14
39:2 59:18
60:7 63:12,12
63:16,22,24
64:2,6,6,9,20
64:24 65:5
**arm/wrist** 64:12
**armed** 16:11
18:21,23 19:13
20:20 21:6
**arming** 17:19
**arms** 90:15
**arrival** 46:3
**arrive** 41:25
**arrived** 11:24
86:22
**arrow** 11:16,19
92:11,14
**article** 27:17
**articles** 24:13
30:17
**artificial** 53:12
**artificially** 53:20
**asked** 6:22 13:4
14:1,3 38:21
41:21 52:7
54:5 57:18,19

63:8 80:19
88:21
**asking** 9:18 13:6
16:19,19 65:16
79:14 80:20
83:12 90:3
**aspect** 11:13
**assess** 65:20
**assessing** 65:19
**assessment**
40:17
**assigned** 4:21
**assist** 5:5 6:11
75:14
**assistance** 60:22
**associated** 48:22
80:5
**assume** 27:6
**assuming** 15:1
18:10 84:13
85:1,21,24
**attached** 18:4
19:20 22:22
58:10 95:4
**attempt** 67:9
**attempting**
35:20
**attention** 9:15
12:9 27:17
**attorney** 93:9,11
**audible** 68:23
73:14
**audio** 70:16
79:10 80:7,10
81:2
**audios** 67:2
**authority** 93:13
**authorized** 93:5
**automatic** 73:9
76:5,6
**automatically**
9:25 94:19
**available** 42:11
44:13
**A VENUE** 2:7
**aware** 5:6,23,25
46:23 54:10
66:19
**awareness** 46:2

90:18

**B**

**B** 2:22
**back** 7:5 26:10
29:8 30:5,6,7
31:24 32:22
33:14,15 35:3
35:9 37:8,16
42:8 53:16
61:14 62:7,9
63:16,24 65:8
73:17,17 75:20
82:20
**backed** 28:7
81:8 87:21
**bad** 62:17 64:23
**bag** 50:11 55:4
55:11
**bags** 25:8
**Baldwin** 4:16
41:16,18 65:18
67:1 77:24
79:13 80:6,20
83:18 84:4
**Baldwin's** 75:7
76:15 85:25
**barbs** 15:22
19:19 22:22
92:2,10
**barely** 48:3
**baseboard** 55:12
55:16
**basically** 49:16
52:8 61:1
**Bay** 1:20 70:18
**Bear** 70:19
73:15
**bed** 24:9 27:12
27:13 28:10
30:12,14 32:9
33:12 35:14,18
37:3,5 42:12
42:13,16,19,23
43:1,3,6,13
44:3,4,5 45:14
49:19,21 51:8
51:9 54:6,10
54:11,14 61:6

**bedroom** 11:8 11:21 31:25 47:16,17 52:9
**beep** 73:3,11
**Beg** 38:18
**began** 42:2
**beginning** 63:5
**behavior** 91:7
**believe** 13:24 25:16 27:20 28:2 34:17 40:14 41:17 46:14 57:19 59:17 72:8 78:20 82:10 87:7
**belong** 77:12,14 77:14
**best** 12:21 59:7
**better** 15:6 38:3 43:5
**beyond** 22:12 23:1 24:13 48:1 57:1 89:6 89:11 90:2
**big** 24:10 26:17
**bit** 11:10,14 24:11,22 27:1 28:7 37:15 38:24 39:21 44:4,7 46:1 48:17 53:17,18 59:25 63:11,13 65:9 70:17 79:25 80:15,18 81:8 84:3
**black** 27:18 50:10 55:10
**blade** 27:18 53:22
**blades** 30:13 31:25 53:14
**blinds** 24:11 52:25 53:5,9 53:11
**block** 53:8
**blocking** 28:8 38:2
**blood** 30:22

**blue** 47:25 49:3
**BLVD** 1:20 2:1
**BOB** 1:11
**body** 35:4,7 36:21,24 37:15 37:21 38:9 62:12 66:13
**book** 69:4
**bottom** 6:5 14:10,12 55:6 85:14
**bound** 13:14
**bounds** 90:6
**boxer** 23:14
**boys** 35:1
**breath** 40:11 65:16 79:15,16 79:24 80:1 82:19 84:6 87:10,11,25
**breathing** 39:25 40:2,10,19,21 40:23 41:7 61:1 65:23,25 66:2 80:11,13 82:14 83:2,3
**brief** 47:5
**briefly** 13:21 14:1
**bring** 4:3 5:15 35:8 60:2,11 63:23 75:22
**brown** 50:5,12 50:17
**Buddy** 86:1
**bugging** 31:15
**built** 6:6,10
**bulb** 53:15
**bulging** 31:14
**Business** 8:22
**button** 9:11

———————
**C**
**c** 1:7 2:4 3:1 56:16
**CAD** 76:9 86:19
**call** 6:10,17,18 6:22,23,24 7:1 7:15 8:20,22

9:7,16,25 10:1 10:2 13:11,12 68:22
**Callahan** 2:5,6 2:19,21 3:9 8:11,16 10:24 16:21,25 17:17 18:7,16 19:23 20:14 21:14,24 22:18 29:1,11 31:3,9,11 33:4 34:7 35:25 37:13,24 38:7 39:15,20 40:7 43:8 44:16,25 47:1 58:6,18 62:23 64:14,18 67:4,22 68:5 68:10,18,21 69:15 70:24 71:10,17 74:22 78:15,19,22 79:1,5 84:9,12 84:16,20,23 85:6,10 86:9 86:16 87:2,9 87:18 88:3 89:7,13,18,24 90:1,8,10,21 91:12 92:7,15 95:8
**called** 3:2 6:1
**calling** 5:3
**calls** 5:4 6:3,3,6 9:12
**capacity** 1:12,14
**car** 7:9,9 13:24
**care** 32:20 95:5
**carpet** 37:4
**carry** 94:16
**cars** 5:19 6:14 7:6,6,10,12,20 7:22
**cartridge** 12:25
**case** 1:4 7:8 10:18 18:10 20:10 47:9 50:3,4,9 51:2 51:19 67:18

71:7 74:24 75:2
**cases** 24:17,18 51:8,9,16,23 88:8,12,15
**cast** 79:18
**catch** 79:24
**catching** 40:10 65:16 79:16 84:6
**caught** 27:17
**ceiling** 53:15,22
**center** 6:7 7:4 13:15
**CENTRAL** 2:7
**CERTIFICATE** 93:1 94:1
**certify** 93:4,8,13 94:5
**change** 40:4 60:8 95:11
**changed** 7:8 40:19
**CHANGES** 95:5
**channel** 13:5,11 13:16 73:1,3,4 73:5,13,13 74:7,8
**channels** 80:21
**charge** 15:10 17:10 18:2,3 19:6,19 21:1
**charges** 21:11
**Charles** 1:18 3:11 93:14 94:22 95:24
**Charlie** 8:5,7 79:20
**checking** 40:11 65:15
**chest** 23:15 91:24
**Chester** 48:4 54:14
**Chestnut** 6:19
**chevrons** 90:14
**choices** 9:22
**circumstances** 52:8

**CIVIL** 95:4
**clack** 15:8,8,8,8 15:8
**clacking** 15:6
**Class** 89:19
**cleaning** 26:19 59:1
**clear** 13:5,6 16:18 38:23 41:19 58:14 73:5
**CLEARWAT...** 2:2 95:10
**clock** 76:6,20
**clocks** 76:11 86:11
**close** 29:5 37:2 53:6 58:10
**closed** 28:15 53:2,7
**clutter** 24:22
**cluttered** 24:10 52:13
**COBAN** 75:6 76:4,13,14,15 76:20 85:25 86:19
**coincident** 14:19
**come** 19:6 41:19 41:20,21 50:24 67:10 71:8 76:8
**comes** 76:3 81:18
**coming** 6:19 11:12,14 13:10 13:12 25:10 45:17
**command** 72:5
**comment** 6:21 86:1
**Commission** 93:22
**communication** 7:4 13:15
**communicatio...** 6:7 13:19 41:9
**company** 94:14
**compilation**

10:17
**complete** 39:3
**completed** 66:3
**completely**
29:15
**completion**
94:10
**COMPLIANCE**
95:4
**comply** 91:7
**complying** 72:4
72:5
**Composite** 2:25
3:4
**compound**
16:24 91:2
**computer** 7:15
9:10 66:22
67:7,10 73:8
**concluded** 22:15
57:15 92:21
**condition** 22:11
46:2,3,10,13
**conditions** 46:5
54:2
**confident** 65:24
**configuration**
30:25 45:19
**confusion** 7:3
**conjunction**
48:10
**connected** 21:8
93:11
**consistent** 14:21
23:20 34:4,11
92:3,8,10
**constant** 65:6
**contact** 18:9
32:25 33:5,6
47:19 76:8
**content** 94:8
**continuation**
16:1
**continue** 9:1
36:11 37:6
59:2 65:18
**continued** 9:1
**continuing** 13:1
**continuous**

12:17 59:13
61:11
**continuously**
3:18 12:16
35:8 56:22
65:5 74:10
**contrary** 68:2
**control** 35:21
36:6,6 60:7,8
60:13 61:1
62:10
**conversation**
10:10 80:22,25
**conversations**
46:18 81:1
**cooperate** 91:13
**cooperation**
60:6
**copy** 94:13
**corner** 24:14,14
48:21 49:24
50:21 53:16
**corporal** 3:25
5:17,20
**correct** 4:8 5:7
42:22 49:7,19
52:1,2 61:7
62:25 68:5
94:5
**corrected** 7:11
94:7
**correcting** 94:11
**correction** 7:12
95:11
**corrections**
94:13
**correctly** 82:21
**counsel** 70:22
72:10 75:11
81:18 93:9,11
**County** 1:13,15
2:11 3:12,16
93:3
**couple** 23:11
67:3,17 71:2
73:20 79:4
81:11
**Court** 1:1 67:8
68:2,6,13,14

68:20 69:14
93:4,21
**courtesy** 71:14
**cover** 27:1
**cross** 12:1
**Cross-Examin...**
2:20 47:6
**crouch** 37:6
**Crown** 77:8,13
77:16
**cruiser** 75:7
**cruisers** 77:8
**cuff** 38:13 61:5,9
66:6
**cuffed** 62:6,11
**cuffing** 32:25
38:11 86:2
87:25
**curious** 6:20
**current** 4:1
23:20
**cut** 17:19
**cycle** 17:18
19:25 55:25
56:3,15 57:21
**cycled** 56:5
57:23 58:3
**cycles** 58:5
**cycling** 13:1
15:4,4,10 56:9
56:11 57:20

**D**
**D** 1:25,25 2:18
95:8,8
**dark** 55:4,13,14
**darts** 18:8,11
58:9
**date** 1:19 14:5
94:3,18,22,23
95:24
**day** 6:19 7:6 8:3
9:14 16:19
75:7 93:17
**day-to-day** 5:1
**DAYS** 95:8
**dealing** 44:10
88:18 89:4
**dealings** 42:4

46:10
**dealt** 45:8
**death** 46:24
**Deceased** 1:8
**decompress**
79:24
**decorating** 53:4
**dedicated** 13:11
74:8
**deep** 43:21 86:1
**deeper** 11:11
48:17 55:9
70:7 80:11,12
80:12 82:14
83:3
**deeply** 40:2 42:8
**Defendant** 1:16
2:10 95:9
**deferred** 14:2
**definitely** 9:16
**DeGraw** 1:5,7
4:5 7:1 11:9,21
13:20 18:11
22:10,11,23
23:18 24:3,13
24:16 25:6,9
25:13 26:2,3,8
28:18 29:21,24
30:18 35:2
36:6,24 37:3
38:25 39:12
40:12 42:4
44:10 45:13
47:18 51:18
54:3,15,22
56:10,21 57:6
57:13,15 58:14
58:17 59:17
60:22 61:6,22
62:13 63:5,9
63:18 65:3,11
65:19,20 66:4
66:13,16 74:4
74:10 80:6,9
80:10,16 83:8
83:22 87:14,21
88:11 89:2,3
90:12,22 91:18
91:19,22 95:2

**DeGraw's** 5:24
24:19 35:18
36:19 38:13,19
41:6 46:2,4,13
62:7 63:10
64:4
**DeGraws'** 78:2
**degree** 58:24
**degrees** 30:11
43:19 45:13,20
49:16 53:8
**deliver** 66:15
**delivered** 87:13
**DENISE** 1:22
93:4,19 95:3
**department**
6:11,16,21,23
7:7 41:12,18
45:17 80:21
86:22 87:22
**Depending** 58:8
**depict** 54:1
**depicted** 47:13
48:14 50:2,8
50:16,17,17
52:18 54:9
**depiction** 11:7
**deployed** 14:16
15:15,22 19:19
23:25 55:25
**deploying** 71:18
**deployment**
14:20,21,23
15:1 34:2
**deployments**
21:11
**DEPONENT**
1:18 95:4
**DEPONENT'S**
94:1
**deposition** 2:23
92:19 93:6
94:3,5,11,18
94:20,23 95:2
95:5,7
**depositions**
10:18
**deputies** 4:11,14
5:5,11,17,20

6:4,8 11:9,22
33:18 34:19
40:11 41:3
77:15 80:24
89:16 90:12,14
91:8,16
**deputy** 1:15
3:25 4:13,16
7:14 9:2 10:12
11:24,25 12:2
22:7,8,15,25
25:5,14,14
26:4,10,11,13
28:2,7,8 32:19
33:22 34:17,20
34:21 35:19,22
36:1,3 38:1,8
38:10,16,17,18
38:21,24 40:14
41:4,16,18
46:8,9,15,16
55:25 56:19
57:14,18,23
58:2,4 60:11
60:16,21 61:2
61:18 62:1,3,4
62:6 63:8 64:8
65:12,16,17,18
67:1 70:3,5
72:3 75:6
77:24 79:13,14
80:5,6,6,18,20
80:23 82:10,12
82:12 83:12,18
84:4 85:25
88:21 91:9
**describe** 12:20
15:7 34:14
39:23 45:2
47:21 57:3
59:7,11 65:2
70:12 73:10
79:21
**described** 21:21
32:11 48:6
52:12 58:15
63:4 82:15
**describing** 31:13
52:8 60:18

74:14 87:12
**description** 2:24
29:19,23 31:23
55:11 85:15,19
**desk** 24:15
**details** 56:23
**detective** 14:4
**determine** 8:7
**device** 76:10
**devices** 76:8
**diagonal** 50:13
**different** 11:11
27:16 49:16
58:12 65:4
90:13
**difficult** 44:21
**dimly** 52:15
**direct** 2:19 3:8
14:6,11
**directed** 33:13
**direction** 24:6
38:22 43:15
45:16 77:17
**directly** 41:11
**disarming** 17:19
**discharge** 87:3
87:24
**discretion** 9:13
**discussion** 67:13
70:3
**dislodge** 63:12
**dislodging** 63:21
**dispatched** 6:4
6:12,18
**dispatcher** 6:14
6:21 7:4 13:4
70:4 72:3 73:5
74:6
**display** 76:13
**disrupted** 64:4,5
**distance** 54:5,9
**DISTRICT** 1:1
1:2
**districts** 4:1
**DIVISION** 1:3
**documents**
10:20
**doing** 38:2 56:11
58:16,17 60:3

60:17 65:6
69:3 70:10
71:9 75:11
91:1,5
**Donald** 1:7 4:5
**door** 10:6,8,9,14
11:9 12:3 24:5
24:11 25:25
26:1,1,7 27:4
28:9 31:25
32:7 41:17
43:3 47:16,17
47:17,22 48:18
48:20,22,22
54:8,14 55:6
55:14
**door's** 10:6
**doors** 12:2
**doorway** 11:12
11:12,17,22
22:8 29:18
43:1
**doubled-plated**
53:21
**download** 14:9
21:8
**downstairs** 10:7
**downward** 35:4
**Dr** 12:24
**draw** 59:23
**drawers** 48:4
54:14
**drawn** 12:9
**dressed** 89:19
**dresser** 24:15
27:9 48:5
50:14,22
**driveway** 77:25
81:19
**driving** 7:11
**duct** 50:6
**duly** 3:2 93:15
**duration** 78:9

_____
**E**

**E** 2:4,4,18,22
3:1,1,1
**earlier** 7:1,7
45:8 49:5

58:15 74:12
88:7
**east** 8:25 24:20
25:17 77:18
**edge** 49:3 54:6
**effect** 52:16
57:13
**effective** 25:8
56:12 57:3,5
88:6
**efforts** 63:6
**eight** 43:23,24
**either** 7:10
11:22 30:9
46:8,15 51:16
62:1 87:25
**email** 94:15
**emergency** 73:6
**employed** 3:18
**employee** 93:9
93:10
**employment**
3:24
**EMT** 41:13
**EMTs** 88:16
**ended** 22:6
35:11,17 85:22
**engaged** 85:25
**enter** 34:23
**entered** 32:3,6
32:24 33:9,18
34:15 39:7
44:9
**entire** 39:6
**Errata** 94:14
95:1
**error(s)** 94:8
**errors** 94:6
**ESQ** 2:5,10 95:8
95:9
**ESTATE** 1:7
**estimate** 41:23
42:10 43:11,18
44:12
**ET** 95:3
**event** 4:4,5,15
9:9 13:20
33:20
**events** 4:3 5:23

21:20 28:17
32:23 33:17
46:16,19,19,21
59:18 63:7
66:11 88:10,18
**eventually** 38:12
45:22 63:23
**everybody** 13:7
13:16 73:7
75:10
**evidence** 50:2
87:8 90:6
**exact** 34:13 44:1
51:7 71:12
**exactly** 12:20
30:9 64:21
68:1
**examination**
2:19,21 3:8
84:11 90:3
**EXAMINED**
3:2
**Excuse** 6:25
**exhale** 84:5
87:10,11
**exhaled** 87:25
**exhibit** 2:24 3:5
10:16 11:3,5
14:6 21:21
23:3,4 31:10
34:1 47:9,13
48:11,14,20,23
49:4,22 50:2,8
50:18 52:18
54:1,7 55:5,16
66:24 67:1,18
68:3 73:21
74:17,24 75:2
75:13 84:13,21
85:1,12,19
91:17
**exhibits** 10:17
67:17
**expect** 15:22,23
**experience**
53:19 57:9
**experienced**
57:11
**Expires** 93:23

**Explain** 11:5 20:1
**expose** 53:6
**extend** 71:13 75:10
**extended** 71:6
**external** 70:14
**extra** 74:9
**extreme** 49:3 81:5
**eyes** 30:24 31:5 31:14,18 41:6

**F**

**face** 39:11
**faces** 10:9
**facing** 24:5 40:16 42:23 43:1,2,2 77:17 77:18
**fact** 67:9 91:6
**facts** 90:18
**fail** 53:4
**fairness** 79:3
**fall** 27:24
**fallen** 29:5
**fan** 53:14,22
**far** 10:18 25:24 28:3 57:1 88:14
**FAX** 2:3
**FD** 41:20 66:12
**feel** 59:21,22
**feels** 57:10
**feet** 24:7,8 29:6 30:11 32:7 33:12 35:13 38:20,22 43:11 43:13,14,23,24 49:17 63:14 66:15 87:19
**fellow** 4:4
**felt** 41:5 65:2
**fifties** 78:21
**fight** 65:6
**fighting** 60:6,7 61:1
**file** 94:13
**filled** 5:18

**final** 7:11 32:10
**finally** 38:12 39:2 63:24
**financially** 93:12
**find** 50:24 84:17 84:21
**fine** 87:1
**finished** 91:11
**fire** 6:11,16,21 6:23 7:7 41:12 41:18 45:16 80:21 86:22 87:22
**firearms** 50:2,2 50:25 51:2,11
**FIRM** 2:6
**first** 5:25 6:23 6:25 8:3 11:24 12:23 14:11,15 14:19 15:1 22:2,13 24:23 29:25 30:8 33:17 34:2,8,9 34:23,24 36:10 41:21 42:11 47:18,21 49:6 50:9,14,15 53:24,24 54:8 59:16 65:17 67:18 71:3 74:4 82:15,19
**firsthand** 88:5
**five** 5:16,20 17:18 19:15 20:3,7,7,11 19:25
**five-second** 19:25
**FL** 1:21 2:2,8,14 95:9,10
**flail** 56:21
**flare** 53:17
**flash** 53:18
**flashing** 53:13
**flight** 22:4
**floor** 11:8 12:24 23:8 29:21 32:14 36:13
**FLORIDA** 1:2 1:24 93:2,20

**fluid** 26:17,17
**fluid-type** 33:20
**focus** 22:24 26:18,19 33:24 56:16 60:9
**folded** 28:14
**folding** 27:17,18
**follow-up** 84:9
**followed** 14:4 35:22 36:1
**following** 58:25
**follows** 3:3 35:20
**foot** 51:8
**Ford** 77:16
**foregoing** 93:6 94:2
**forehead** 35:11 35:12 38:16
**forensic** 53:13
**form** 8:9 16:23 17:16 18:5,14 19:21 20:12 21:12,22 22:16 28:24 29:9 31:1 33:2 34:5 35:24 37:11,22 38:5 39:13,18 40:6 44:14 58:6,18 62:23 64:14,18 85:4 86:7,24 87:6 89:11 90:2,19 91:2 92:5 95:5 95:7
**forward** 66:11 72:9 74:8 75:22
**four** 17:7 18:19 88:8,12
**frame** 12:3 24:5 27:4 75:23 77:7
**Frankly** 62:8
**frequency** 59:11
**front** 10:14,16 13:25 25:8 50:13 67:7 75:1 78:1

81:19 85:8
**full** 3:10 19:25 20:6,11 62:12 78:5 81:18
**fully** 26:25
**function** 9:10,17
**furniture** 24:16 24:17
**further** 15:2 23:15 39:1 42:3,8 48:16 48:25 53:16 55:9 56:16,17 63:19 74:16 84:7 88:14 92:17 93:8 94:9,16

**G**

**G** 2:10
**gain** 35:5 36:10 59:24
**GAINES** 95:2
**gap** 63:14
**generally** 10:12
**generated** 73:8
**gentlemen** 26:21 68:6
**getting** 61:13
**GG001610** 93:22
**give** 3:10 13:4 29:19,23 34:13 44:8,12 52:7 54:5 63:10 67:2 74:6,7 82:6,6 90:24 91:15
**given** 74:12 93:7
**giving** 22:9 49:5 49:21 55:11
**glad** 30:6 72:11
**glazed** 41:7
**go** 5:23 6:9 9:24 14:3 25:12 28:4 35:1 41:22 44:7 47:3 57:17,19 59:18 64:11

66:7 67:18,20 69:2,4 73:17 75:20 78:15 86:17
**Goepfert** 1:14 4:13,19 5:20 6:15 9:2 11:25 12:24 13:8 22:15 25:14,15 26:4,10,11,14 26:21 34:18,20 35:22 38:10,17 38:19,21,24 40:14 46:8,16 55:25 57:18,23 57:24 58:3,4 61:2,18 62:3 63:8 65:16 79:14 80:6,18 83:12 88:22
**Goepfert's** 5:24 57:14 82:12
**goes** 18:3 66:6
**going** 5:4,6 6:9 8:20 9:9,16,24 12:18,23 22:3 25:11 30:10,11 32:16,16,21 33:21 34:17,18 34:19,24 42:24 45:19 46:23 49:15,17,18 53:4 56:24,25 57:19,21,21,22 62:20,22 66:23 67:10 68:8,12 68:22 69:2,4 69:11,22 71:2 72:9,12,13 73:20 75:9,17 75:22 76:19,24 76:24 77:20 78:4,5,6,8 81:10,11 91:7
**good** 18:9 56:11 83:11,13
**gotten** 38:1 63:3
**grabbed** 25:15 26:11,14 27:25

**GREGORY**
1:13
**grip** 36:7 60:9
**groaning** 57:8
**ground** 11:8
12:24 24:3
35:2 59:3,4
**growling** 30:20
**grunting** 30:2
30:20 57:8
**GUALTIERI**
1:11 95:3
**guess** 38:3 63:19
64:4 77:18
79:24 87:12
**guessing** 43:24
**Gulf** 1:20 70:18
**GULF-TO-B...**
2:1
**gun** 24:17 25:6
45:8,14 51:1,2
51:25 52:3
**guns** 88:12
**guttural** 30:3
59:9
**guy** 23:13
**guys** 65:16

**H**

**H** 2:22 3:1
**halfway** 22:4
**hall** 48:5
**hallway** 25:17
26:12 28:3
**hand** 36:20
37:18,18 61:5
64:5,17 65:4,7
82:6,6,18
93:16
**handcuff** 39:3
60:14,15,21
63:25 65:10,13
66:8
**handcuffed** 36:8
39:11 40:2
41:15 58:15
**handcuffing**
39:5 66:3 87:5
**handcuffs** 35:9

41:24 42:6
51:18 54:3,15
54:22 61:22
62:21 87:21
**handed** 25:15
26:4,10,11
28:1
**handgun** 51:16
51:19
**handguns** 51:4
51:13
**handled** 6:3
**hands** 36:11,17
36:19,19 37:17
60:2,10 64:17
64:20,24 66:16
89:2
**hands-on** 25:12
57:17,20,24
58:2,4 59:16
64:11
**hang** 87:16,16
**hanging** 53:9
**happen** 62:22
**happened** 8:17
12:20 25:3
34:15 39:10
59:20 63:3
64:1 65:13
86:5
**happening** 6:24
**happens** 16:9,16
17:3,9,25 19:4
**happy** 59:10
**hard** 50:3
**head** 12:13 24:6
24:8,19 27:13
30:12,13 32:8
33:11 42:19
43:1,2,12 49:6
49:10,17 56:24
63:9,10
**headed** 68:25
**heading** 14:24
42:25
**headphone**
72:12
**headphones**
70:20,21,25

71:4,13
**hear** 10:11,12
12:7 33:20
56:3,9,14
67:10 68:9,16
68:19,22 69:14
69:18,20 70:25
72:2 73:2,22
74:1,3 79:9,19
80:4,20 82:16
82:19 83:2,2,8
83:10,17,20,22
84:2
**heard** 12:24,25
14:17,23 15:3
15:4 21:17
25:9 33:17
56:12,13,15
73:10
**hearing** 13:1
55:24 56:21
65:23 70:13
71:1 72:7
**hears** 68:3
**heavyset** 23:13
**held** 3:23 20:3
**help** 63:9
**helpful** 11:2
**HERROLD**
1:22 93:4,19
95:3
**high** 81:6
**high-pitched**
79:21 84:5
**higher** 80:16,18
82:11
**higher-pitched**
79:15 80:17
**hit** 12:23 55:22
69:11 76:24
77:20 78:4
81:13,19 82:21
82:25
**hitting** 81:7
**hold** 35:3 62:5
64:5
**holding** 35:19
63:12
**home** 9:4 10:8,9

11:1,6
**hooked** 58:11
**hope** 63:11
**house** 5:24,24
10:8 44:6,6
78:1,2
**housekeeping**
67:3
**hypothetical**
86:12

**I**

**idea** 39:4 89:9
89:14,15
**identification**
2:24 3:6
**identified** 7:20
**identify** 11:20
**imagine** 26:16
**immediately**
76:25
**impression** 45:5
**improper** 86:12
**in-car** 75:6
**in-custody** 46:24
**inaudible** 68:7
68:10,21
**incident** 5:12,13
21:16 80:5
**indicate** 9:23
19:18,24 21:2
71:4 75:25
90:17 92:11
**indicated** 9:8
41:10 91:4
94:4
**indicates** 17:21
**indicating** 94:7
**indication** 14:15
16:2,10 17:2
18:18 90:24
91:6,16
**individual** 1:11
1:14 90:4
**individuals**
57:12 80:4
**information**
13:13 16:20
22:9 25:6

56:19
**initial** 15:24
56:11 75:23
**initially** 7:5 8:18
24:1
**initiated** 17:10
78:16,23
**inquire** 74:19
**inside** 9:4 10:6
10:25 11:10
24:11 26:24,25
28:9 30:23,23
42:11 43:3
47:23 51:9
**inspection** 94:14
95:4
**instructions**
68:2 94:17
**intelligence** 22:9
**intent** 62:5
**intention** 35:4
**interaction** 41:1
**interested** 93:12
**interior** 53:3
**internal** 76:9
**interrupted** 20:8
20:10
**interview** 46:15
46:24
**interviews** 46:22
**Investigative**
14:7
**invitation** 71:6
72:10 75:8,11
81:12
**invite** 74:19
**invited** 67:4
70:22 71:7,12
75:14
**involve** 4:4
**involved** 4:15
38:11 88:11
**involving** 4:4
7:1
**inward** 26:1
**issue** 70:11
**issued** 86:20
**items** 58:20

**J**

**jack** 72:13
**JULIE** 1:5
**JUNE** 93:17

**K**

**keep** 13:7 38:20
  61:2 64:10
**keeping** 60:9
  62:5
**keeps** 25:6
**Keith** 76:14
**kicked** 29:6
  38:20 61:3
**kind** 6:8 10:13
  18:12 26:5
  48:4 49:6
  55:10 59:9,13
  63:14 67:6
  68:1 76:5
**kneeling** 35:18
  87:13
**knees** 36:24
**knew** 7:7 12:18
  25:11,11 34:16
  45:16,17 53:19
  89:9,15,22,25
**knife** 27:17,18
  28:14,18 29:4
  30:10 32:20
**knob** 48:20,22
**know** 4:10 6:9
  10:14 12:10
  15:7,17 21:17
  22:20,21 25:5
  30:9,17 32:18
  34:12 36:8
  37:2 40:23
  44:23,23,24,24
  45:9,24,25
  46:8,11 47:10
  47:22 52:3,6
  55:3,4 56:5,15
  57:10,14,23,25
  58:1 59:10
  60:24 62:15,17
  62:18,19 67:21
  70:5 71:21
  73:22 75:20

76:2,7 77:11
  77:13,15 79:25
  82:9,11 84:20
  84:24 88:2,4,4
  88:5,14 89:3,3
  89:22,25 90:4
  90:9 91:15,16
  91:21
**knowing** 90:11
**knowledge** 6:24
  46:9,12
**knows** 90:5

**L**

**L** 3:1
**labeled** 67:19
**ladder** 25:15,19
  26:3,5,23
  28:21 29:17
  30:10 32:16
  54:24 55:14,17
  55:19,23
**Lake** 8:25
**lamp** 27:19
**landed** 92:3
**landing** 12:4
  22:5 23:6
  42:12,14,20
  47:15
**language** 94:9
**laptop** 6:2,5
  9:11,17,22
  70:12,15,16
  71:9 72:13
  74:25 75:15
**large** 1:24 54:14
**larger** 5:8
**largest** 5:9
**LARGO** 2:14
**lasts** 15:18 20:7
**LAW** 2:6
**laying** 24:3,13
  26:2 31:24
  45:14
**leaning** 24:18
  50:11,13 55:15
**leave** 14:1
**led** 5:23
**left** 12:3 22:7

24:12 27:10
  28:1 35:3,8,16
  35:19,21 36:6
  36:7,21 38:13
  40:25 41:1
  42:17,21 43:3
  53:18 59:19,21
  60:2,15,21
  61:5,9,15,17
  62:5 63:3 64:9
  64:9 65:4,5
  69:9 77:9
**left-hand** 49:24
**legs** 36:24 61:3
  61:14
**let's** 24:23 27:9
  35:1 42:11
  48:9 73:16
  80:9 85:8
**letting** 25:5
**leverage** 35:5
  37:7,10 59:25
  59:25 63:15
**Lieutenant** 14:2
**lifted** 45:13
**light** 52:16 53:8
  53:16
**lighting** 53:12
  54:2
**limp** 66:8
**line** 23:5,5 31:13
  31:20 33:25
  35:14 85:14
  94:8 95:11
**lines** 23:11
**lips** 31:14 39:25
  41:2 66:1
**list** 94:12
**listed** 94:14
**listen** 66:23
  71:12,14 75:16
  79:19
**listened** 75:16
  79:10 80:7
  82:1,15
**listening** 56:19
  56:20,22 70:21
  71:3 83:23
**listing** 94:7

**lit** 24:10 52:15
  53:20,23
**little** 7:3 11:10
  11:14 24:11,21
  27:1,11 28:7
  37:15 38:24
  39:21 44:4,7
  44:19 46:1
  48:17 53:17
  59:24 63:11,13
  65:15 70:7
  74:17 79:16,23
  79:25 80:15
  81:8 82:20
  84:3,5 92:11
**LLC** 2:6
**loaded** 75:24
**located** 55:17
  58:9
**location** 1:20
  51:7 94:3
**lodged** 18:11
**log** 16:20 84:19
**long** 9:14 15:16
  15:18 17:19
  24:17 33:16
  34:13 39:4
  41:23 50:3
  51:2 86:18,23
**look** 10:16,20
  11:2 14:9 15:2
  16:1 23:4
  31:20 42:16
  47:8,11 48:9
  48:11 55:5
  67:4 75:15,19
  85:12
**looked** 11:25
  22:13 23:23
  24:1 38:15
  75:16
**looking** 6:12
  7:18 8:18,19
  11:5,8,15 22:8
  22:12 25:18
  31:4 41:17
  43:18 45:2
  48:20,25 51:9
  56:17 67:6

73:16
**looks** 50:5 67:1
  90:13
**lot** 45:3
**loud** 23:11 30:3
  34:18 59:9
**loudly** 30:2
**low** 52:15 69:21
**lower** 7:19 48:20
  49:24 64:11
  69:9 80:22

**M**

**Madam** 67:8
**Mail** 94:15
**main** 53:15
**maintain** 35:21
  36:5,7 60:7,13
  62:10
**maintaining**
  34:21 64:9
**making** 8:25
  33:22 56:18,22
  56:23 57:8
  60:10,25 74:5
  74:11,13 75:15
**manage** 5:1
  61:19
**management**
  10:23
**manner** 24:15
  53:5 67:5
  70:25
**mark** 92:9
**marked** 2:23 3:5
  23:3 47:9
  67:17 75:2
  92:13
**marker** 73:1,3,7
  73:12,13
**Market** 8:23
**marks** 73:13
  91:24 92:3
**Martinez** 4:13
  4:18 5:19 6:15
  7:14 9:3 12:2
  13:8 22:9,25
  25:5 26:21
  28:2,2,7,8

32:19 33:22 34:21 35:20 36:1,3 37:20 38:1,17 41:4 46:9,16 56:20 60:11,16 62:4 62:6 64:9 65:12,17 72:3 80:6,23 82:10 82:13 91:9
**Martinez's** 22:7 38:8 60:22
**match** 86:11
**matter** 92:20
**maximum** 70:17 72:14
**mcallahan@cl...** 2:9
**McDonald's** 8:24
**McGraw** 49:6
**mean** 5:24 7:23 9:8 15:5 16:6 41:14 43:7 50:20 57:4 66:2,6 78:25 86:14
**meaning** 11:13 11:24 27:1 54:10
**means** 9:20 18:23 20:1 73:6
**meant** 10:3 20:3 43:17 78:23
**medical** 41:25 42:2 46:2,3,5 46:10,13
**men** 73:20
**mentioned** 28:14
**message** 7:16
**metal** 24:21
**MICHAEL** 2:5 95:8
**middle** 1:2 77:16
**mind** 5:16 22:19 39:8 70:21 89:4

**mine** 77:13,16 79:16 84:6
**minute** 14:16 31:13 33:23 67:2 73:17,21 73:25
**minutes** 72:18 78:6 86:6,14 86:21
**missed** 79:3 81:20
**missing** 68:15
**misstatement** 87:8
**moan** 80:15
**mode** 16:8
**moment** 39:16 57:2 73:15
**monitor** 5:4
**morning** 7:2,21 7:24 8:8 23:3 74:13
**motion** 35:5
**mouth** 30:21,23 30:23
**move** 35:7,7 39:17 41:2 49:15 54:10 59:25 62:9 63:9 66:2
**moved** 52:1 58:23
**movement** 12:17 26:18 35:10 39:21 60:10 61:11 63:13 64:3 83:21
**moving** 39:25 52:5 54:11 58:20,25,25 59:2,3
**muted** 78:7 79:4
**muzzle** 45:15,21

——————
**N**
——————
**N** 2:4,18
**name** 3:10 4:4
**NDS** 46:22
**neck** 41:4 91:20

**need** 5:5 13:13 13:15 67:11
**needed** 25:13 40:15 59:24 62:10
**needs** 75:15,16
**neighbor** 13:25
**Neither** 37:25
**nervous** 45:18
**never** 51:25 88:11
**night** 7:9 28:1
**nightstand** 24:12 27:11,24 35:13
**nipple** 40:25 41:1
**nods** 17:23 21:19
**noise** 70:17
**noises** 57:8 59:6 59:7,12 74:5,9 74:10,13
**normal** 30:25 41:19
**north** 4:1 10:9 42:23,24,25 43:1 44:6,6 48:6 54:18 77:9
**North/northeast** 48:8
**northeast** 24:14
**nosy** 6:8
**NOTARY** 1:23 93:20
**noticed** 6:18 38:15 40:18 41:6 50:14,15
**number** 14:8 31:7,8 34:1 44:8 45:1,3 78:24 84:24 94:8
**Number--** 84:14
**Nygren** 14:2

——————
**O**
——————
**o'clock** 6:20

7:13
**object** 8:9 16:23 17:16 18:5 55:4,13,14 70:24 71:18
**objection** 18:14 19:21 20:12 21:12,22 22:16 28:24 29:9 31:1 33:2 34:5 35:24 37:11,22 38:5 39:13,18 40:6 44:14 58:6,18 62:23 64:14,18 85:4 86:7,9,24 87:6 89:6,11,17,23 90:1,19 91:2 92:5
**objects** 24:23 27:21 29:20 30:1
**observation** 31:18 56:18 92:2
**observations** 33:23 56:10
**observe** 30:21 30:24 75:11
**observed** 25:9 36:4 39:25
**observing** 22:10
**obvious** 17:15
**obviously** 10:25 14:8 23:24
**occasions** 71:16
**occur** 15:11,13
**occurred** 4:7 30:16 33:17 63:7 87:5
**Office** 2:12 3:13 3:16,19
**officer** 17:24
**officers'** 91:24
**official** 93:16
**okay** 8:1 11:15 30:21 40:12,14 47:12 48:13 65:17 71:22

78:22 79:14,15 80:19 84:24
**old** 73:20
**Oldsmar** 5:19 6:14
**once** 12:18 15:21 23:23 42:2 53:7 60:8 79:19
**ones** 21:21 79:17
**ongoing** 59:6,13
**open** 24:11 52:25 53:6 79:13 83:18,19
**opened** 88:11,13 88:15
**opening** 22:5 80:21
**operate** 25:13 42:9 52:9 55:23
**operated** 54:2
**operation** 5:1
**Operationally** 17:18
**operations** 41:19
**opportunity** 47:11
**opposite** 30:12 33:12 43:9 48:5
**oral** 94:3
**order** 66:24
**ordered** 92:18
**ordinary** 74:18
**orient** 48:19 59:17 61:4
**oriented** 42:15 42:16 49:6 75:10 76:7
**original** 94:12 95:7
**outside** 12:5 26:21 27:1,6 28:21 29:8 70:17 90:6
**overall** 56:18
**overnight** 7:9,12

8:2,5
**overpass** 8:24

---

**P**

**P** 2:4,4
**page** 14:8,10,12
  14:15 23:4
  85:12 94:4,8
  94:12 95:7,11
**pair** 70:20
**paper** 10:23
**papers** 10:22
**paragraph** 23:4
  31:7,12,21
**paramedics** 42:5
  42:7 44:3
  45:21
**pardon** 36:18
  38:18
**Park** 6:19
**part** 36:25 37:21
  79:12
**partially** 24:10
  53:2
**particular** 75:7
  76:13
**parties** 93:9
**parties'** 93:10
**pass** 88:1
**passed** 26:12
  30:17
**passing** 32:19
**patrol** 3:25
  67:19
**pattern** 40:19
  59:14 80:13
**PAUL** 2:10 95:9
**pause** 12:16
  66:22 69:11
  72:1,21 73:2
  73:25 75:20
  76:25 78:9
  81:11,13,17
  82:25 83:1,7
  83:16
**paused** 67:25
  69:17 70:1
  76:19,21 77:4
  77:23 78:13

81:25 82:17
  83:8 84:2
**pausing** 79:3
**pending** 6:1,5,6
**people** 8:8
**period** 20:25
  29:3,24 94:18
**perpendicular**
  24:4,5 26:3
  43:15,18
**person** 11:23
  19:19 23:25
  94:14
**Personal** 1:6
**personally** 93:14
**personnel** 41:13
  41:25 42:2
**PETERSBURG**
  2:8 95:9
**photo** 11:10,13
  11:16
**photograph**
  10:25 49:4
  52:24 53:12,18
  54:9,18,25
  55:10 91:18
**photographs**
  91:24
**photography**
  53:19
**physically** 59:23
**picture** 42:14
**piece** 24:16
**pile** 84:17
**pillow** 25:7 45:9
  45:11,14,15
  51:1,14,25
  52:1,5
**pinched** 35:18
  36:21 40:25,25
**Pinellas** 1:13,15
  2:11 3:12,16
  93:3
**pinning** 38:4
**pistol** 88:15
**pitched** 80:22
**place** 27:25
**placed** 65:10,14
  66:8

**placement** 60:12
**places** 92:9
**Plaintiff** 1:9 2:5
  95:8
**Plaintiff's** 3:4
**plastic** 50:3
**plate** 55:6
**play** 67:20 69:3
  69:6,11,22
  71:23 72:11,13
  72:18,23 73:21
  76:24 77:20
  78:4,5,8,25
  81:10,19 82:22
  83:4,17,24
**played** 69:13,18
  69:24 71:24
  72:19,24 73:23
  76:17 77:2,21
  78:11 81:15,22
  82:16,23 83:5
  83:14,25
**player** 69:5
**playing** 66:10
  70:16 78:7
  81:21
**please** 47:10
  73:15 81:24
**plugged** 70:15
**point** 11:19
  12:16 13:3
  18:11 25:12
  26:22 27:12
  30:8 32:15,20
  34:16 36:23
  40:5,8 41:12
  49:14 61:21
  62:4 64:3
  66:10 69:12
  72:11 78:6,7
  87:14,19
**pointed** 45:15
**pointing** 11:16
  45:21
**points** 76:21
**pop** 12:25 14:17
  21:18 33:18
  34:2 55:25
**portion** 6:4,5

25:17 80:7,10
**position** 22:11
  30:4 32:2,5,10
  33:9 49:16
  50:16 52:25
  53:7 54:13
  58:24 64:24
  65:25
**positioning** 38:9
**possession** 28:18
**possible** 58:1,3
  90:5,8
**pressure** 65:6
**pretty** 9:12 28:3
  37:2
**previously** 47:9
  67:17 71:7
  75:2
**prior** 46:3,9
  52:4
**probably** 5:16
  13:3 43:13
**probe** 58:12
**probes** 23:14,17
  23:25
**procedure** 71:18
  95:4
**proceed** 56:24
  74:24
**process** 32:17,25
  36:7,12,23
  38:11,20 39:4
  39:6 40:9,18
  41:5 42:3 59:2
  59:15 65:18
**professional**
  71:14
**promoted** 4:2
**properly** 29:15
**provided** 94:13
**provisions** 94:6
**proximity** 58:11
**prozelle@pcso...**
  2:15
**PUBLIC** 1:23
  93:20
**pull** 15:2 16:8
  17:10 35:15
  72:12

**pulled** 9:2 14:13
  15:17,20,21
  16:13,16 17:3
  17:4,6,6,21,22
  19:2,4,15
  20:22 28:12
  35:3,10 38:25
  61:14 85:2,16
  85:18
**pulling** 35:5
**pulls** 17:24
**pulse** 41:3,5
**purpose** 13:12
  39:8
**push** 72:18,23
  73:21 83:4,24
**pushed** 71:23
  72:1 73:25
  78:25 83:7
**pushing** 37:9,17
  37:19
**put** 16:2 18:19
  19:10 20:17
  21:3,7 38:3
  40:15 62:12
  66:12 68:8,10
  68:16,18,21
  89:2 92:11,13
**puts** 10:1,1
**putting** 35:9
  51:8

---

**Q**

**quantify** 45:6
**quarters** 37:2
**question** 8:21
  17:1 33:15
  62:17 64:23
  76:25 79:18
  81:17 86:17
  87:17 89:21
  91:10
**questions** 78:10
**queue** 6:1,6,10
  67:2 73:17
  74:20
**queued** 72:17
  74:18
**quick** 41:15

**quiet** 13:7
**quite** 7:10 40:2

**R**

**R** 2:4 3:1,1
**radio** 6:14 13:6
   13:17,18 41:19
   66:23,25 67:20
   72:7 73:4,8,13
   74:6,7 76:9
   80:20,21 83:19
   84:4 91:8
**radioed** 7:5
**ran** 4:21
**rank** 3:12 4:1,19
**ranks** 3:23
**rapid** 15:9
**reached** 13:2
   25:14 26:4
   28:9,11
**reaching** 28:11
   28:11
**reaction** 5:22
**read** 23:10,11
   31:6 76:11
   92:18 94:2,19
**reading** 5:7
   94:11 95:2
**ready** 59:2 71:21
**really** 33:23
   43:24 57:6
**reason** 27:5
   56:14 81:13
   95:6,11
**reasonable**
   94:17
**reasons** 53:20
**recall** 4:14 5:7
   8:13 10:10
   12:11,21 13:19
   13:22 25:16
   30:5 31:4 33:6
   37:1,7,14,19
   41:14,15 46:14
   46:18 50:10
   51:8 52:22
   53:1 56:12
**receive** 94:18
**recess** 47:5

**recital** 14:9,10
**recognize** 47:13
   48:14 75:3
   77:6 91:18
**recollection** 4:5
   4:11 7:19
   12:22 23:17,21
   24:24 30:15
   31:17 32:13
   34:4 37:16
   49:13
**record** 47:4
   67:14 70:11
   71:5 93:7
**recording** 67:19
   67:24 69:13,24
   71:24 72:19,24
   73:23 76:17
   77:2,21 78:11
   81:4,5,15,22
   82:23 83:5,14
   83:25
**recycling** 15:3
**Redirect** 2:21
   84:11
**refer** 23:2
**reference** 11:3
   76:20
**referring** 7:1
   24:1 31:12
   39:12 43:4
**refresh** 23:16
   31:17
**regained** 87:19
**regard** 58:9
**regular** 80:11,12
   82:14 83:3
**regularly** 40:2
   65:25
**relationship**
   4:18
**relative** 54:13
   93:8,10
**remain** 28:21
   39:11
**remained** 27:5
**remember** 8:12
   8:14 40:12
   41:17 46:20

52:10 56:1
   64:22 66:24
   72:6
**reminder** 73:7
   73:14,14
**remove** 27:7
   28:5 45:11,12
   55:20
**removed** 24:24
   25:2 26:9,23
   27:23,24 28:20
   28:21 29:17
   42:6 55:19
   87:20
**repeat** 17:1
**rephrase** 87:15
   87:23
**report** 14:7
   84:18 93:5
**Reporter** 1:22
   67:8,22 68:3,6
   68:13,14,20
   69:14 93:1,4
   93:21
**REPORTING**
   1:25 95:8
**reports** 5:2
**repositioned**
   63:4,19
**represent** 78:6
   86:10 91:23
**Representative**
   1:6
**request** 82:1
**residence** 7:2
   9:1 78:2
**resisting** 65:5
**responds** 80:19
**response** 41:8
**rest** 54:17
**resting** 31:25
   49:11
**return** 94:12
   95:7
**returned** 94:15
**reverse** 32:10
**rewind** 69:22
**rhythm** 59:14
**ribs** 91:25

**rifle** 24:17 25:8
   50:4,11 51:22
**rifles** 51:22
**right** 5:16 7:13
   10:13 12:1,14
   12:18,18 14:3
   14:24 17:5
   18:10 24:8,20
   24:21 25:17,20
   27:14,14 28:9
   28:10 29:14
   32:5,8,8 35:17
   35:19 36:9,9
   36:20 37:4
   38:14 39:2,24
   40:16 41:15
   45:19 47:22,23
   48:7,18 49:1,3
   50:6,21,21,22
   52:13 54:8
   55:12 60:1
   61:19 62:20
   63:6,12,12,16
   63:21,24 64:2
   64:6,11,24
   66:6,7 69:2
   70:5 75:21
   77:25 79:2,5,7
   80:14 81:24
   86:1 94:19
**right-hand**
   48:21
**road** 2:13 8:22
   8:24,25,25
   41:20,21 77:10
   86:20
**Robert** 3:11
**role** 4:25
**rolled** 36:14,16
   39:24 66:1
**rolling** 57:7
**room** 11:11,19
   12:5 22:2,6,8
   22:12,14,25
   24:10,14,15,22
   24:25 25:7,13
   25:13,19,24
   26:14,17,19,22
   26:24,25 27:6

28:4,22 29:5,8
   29:20,21 30:1
   32:3,6,24
   33:10,19,23
   34:15,23 35:23
   36:2 37:5
   38:24 39:1,7
   42:5,7,8,9,11
   42:16 43:18
   44:3,5,9 45:4
   47:18,23 48:7
   48:16,17 49:1
   50:9,25 51:3,4
   52:8,12,21
   53:16,20 54:21
   55:10,20,21,23
   56:18 58:21
   59:1 83:21
   86:21,23 87:21
   88:8,14
**roster** 5:15
**rotate** 53:7
**rotated** 30:11
   32:17 35:10
   40:16 45:12,20
   49:16
**rotating** 35:6,16
   61:15
**roughly** 6:13
**round** 92:3
**route** 7:15 10:2
**routinely** 9:14
**Rozelle** 2:10,20
   8:9,15 10:23
   16:18,23 17:16
   18:5,14 19:21
   20:12 21:12,22
   22:16 28:24
   29:9 31:1,8
   33:2 34:5
   35:24 37:11,22
   38:5 39:13,18
   40:6 43:7
   44:14,23 47:3
   47:7 58:7,19
   62:24 64:15,19
   66:21 67:15,25
   68:12,24 69:1
   69:16,25 70:22

71:2,11,20,25
72:20,25 73:24
74:16,23 76:18
77:3,22 78:12
78:17,20,25
79:2,8 81:16
81:23 82:24
83:6,15 84:1,7
84:15,18,22
85:4,8 86:7,10
86:24 87:6,16
88:2 89:6,11
89:17,23 90:2
90:19 91:2,3
91:11 92:5,17
95:9
**rub** 40:24
**Rule** 90:7
**RULES** 95:4

**S**

**S** 2:4,22 3:1,1
**safe** 16:2,7,8
18:19 19:11
20:17 21:3,7
**safety** 15:19
18:23 55:22
**saw** 6:10 11:2,6
21:11,15,21
23:23 26:22
29:20,21,24,25
30:8 47:18,21
49:6 51:25
66:1 71:10
**saying** 43:19
**says** 14:12 82:5
85:15
**scene** 4:10 8:21
9:3 53:1 62:2
66:11,12,18
81:10 86:14,18
**schedule** 5:2
**scooch** 38:22
61:18
**scope** 89:6,12
**screen** 6:5 7:18
8:18,19 9:22
67:11 77:9
**screwed** 72:21

**seal** 93:16
**second** 6:15,20
17:20 19:2,8
19:11 20:23
21:1 22:4 23:5
23:8 65:10,13
66:8 81:20
85:3,16
**seconds** 14:13
16:4,14,17
17:4,6,7,13,18
17:22,25 18:13
18:19 19:16
20:3,7,7,11,18
21:4,7 34:3
69:17,19 70:1
70:19 72:1,18
73:18,21 74:1
79:4 81:9
**sectors** 5:18
**secure** 36:5,11
45:22 54:15,22
61:3,22 63:6
63:24 65:25
82:18 91:14
**secured** 41:24
45:13 51:18
60:21 61:8,17
62:21 63:4
**securing** 38:19
54:3
**see** 10:4,14,21
11:24 22:2,6
22:22 23:5,13
23:17 24:1
25:7 41:1,2
45:1 47:25
49:22 50:1,9
53:14,21 54:7
54:17,19 55:1
55:6,7 62:1
67:6 69:5
72:14 73:18
75:19 76:22
77:4,6 91:24
92:13
**seeing** 32:13
45:5
**seen** 51:16,22

**segment** 83:17
**self-assign** 9:11
9:21
**send** 34:19
**sense** 33:16
48:11
**sent** 7:15
**separate** 94:7
**September** 4:7
72:6
**sequence** 14:11
30:16 59:18
62:22 63:7
66:10 78:17
79:6 82:2,16
86:2
**sergeant** 3:14,15
4:2,2,8,21 14:7
47:8 67:16
69:2,6,17
70:20 71:21
75:1,17 79:9
86:13
**sergeant's** 81:25
**service** 1:25 5:4
95:8
**set** 6:2 66:22
67:5 69:8
70:16 71:13
76:5
**setting** 67:7
**seven** 5:20 20:17
86:6,14,21
**shadow** 53:15
53:22,23,23,23
**shadows** 53:14
53:21
**sharper** 11:14
**sharply** 59:23
**sheet** 94:7,15
95:1,6
**Sheriff** 1:13,15
**Sheriff's** 2:11
3:13,16,19
**sheriffs** 62:2
**shift** 7:6,9,12,20
7:23,24,25 8:1
8:2,5,5,7
**shipped** 6:8

**shock** 18:12
**shocked** 57:22
57:25 58:5
**shocks** 22:14
**short** 17:19
**shortly** 13:3
25:4 41:6
**shorts** 23:14
**shot** 92:4
**shoulder** 30:13
31:24 40:13
**shoulders** 24:19
30:13 31:24
32:9 33:11
43:12 49:10,18
91:20
**show** 91:17
**shown** 48:22
**shows** 10:1
66:12
**sick** 5:3
**side** 10:9 11:22
12:1,3 22:7
24:9 26:8
30:14 35:19
37:3,4,5 39:24
40:15,16 43:6
43:9 44:6,6
50:21 53:17,18
66:1 77:9,9
**sigh** 86:1
**sighed** 87:4
**sighing** 87:7
**sign** 94:19
**signature** 94:12
95:5,7
**significant** 82:2
**signing** 94:11
95:2
**silent** 13:14
**Similarly** 75:12
75:17
**single** 53:22
**sir** 4:9 5:10 7:3
8:4,6 12:12
15:12 17:1
27:25 46:25
73:18 79:3
84:8,25 85:11

85:13,17 86:17
**sit** 61:22 62:2
**six** 5:16,16 43:11
43:14,23,24
**sixth** 31:13
**skills** 53:4
**skip** 72:9
**skipping** 75:17
**slapping** 40:13
**slats** 53:8
**slight** 66:21
**slightly** 90:13
**slow** 69:4
**small** 24:12,21
27:9
**somebody** 57:20
83:10
**soon** 10:11
12:23 66:6
**sorry** 7:23 8:1
15:3 16:18
17:5 23:5
33:15 36:1
42:24 44:2,8
45:7 70:4
**sort** 6:24
**sound** 12:9 15:7
15:9,9,16 30:3
30:20 74:4
82:14
**sounds** 56:22
60:25 70:6
73:4 74:5
80:11,12 83:10
**south** 4:1 5:10
10:9 42:23
43:2
**space** 37:4 42:11
43:6,20 44:7
44:13,19,19
55:13 62:10
63:11,15
**sparked** 9:15
**speak** 38:8 46:21
71:11
**speaker** 70:14
72:14
**speakers** 81:7
**speaking** 40:12

40:23,24
**specific** 33:24
  39:9 41:18
**specifically** 6:22
  13:9 31:4
  34:12 46:20
  57:17 60:3
  73:4
**spell** 15:8
**spoke** 65:18
**spoken** 33:22
**spot** 29:13
**squad** 4:20,21
  4:23,25 5:2,5,6
  5:11
**squads** 5:8
**squelch** 81:7
**ST** 2:8 95:9
**stack** 84:21
**staged** 41:20
**stairs** 12:13,15
  12:17,21,22
  13:1,2,4 25:10
  25:11 29:14
  33:21 47:15
**stairway** 25:5
**stairwell** 11:17
**stand** 28:5 79:17
  87:20
**standing** 10:7
  24:4 29:18
  42:25 87:12
**stands** 81:12
**start** 67:21 80:9
**started** 57:17
  78:18
**starting** 71:5
**state** 1:24 79:22
  89:4 93:2,20
**stated** 94:17
**statement** 23:2
  23:10 31:7
**states** 1:1 23:6
**stay** 13:14 73:8
**Stays** 13:17,18
**STE** 1:20 2:7
**steady** 65:25
**stenographica...**
  93:5

**step** 12:23 26:14
  27:6 28:12
  35:15 37:6
  44:20 60:1
  61:5,16,17
**stepladder** 24:21
**stepover** 61:10
  61:10
**stepped** 35:1,14
  38:17 42:8
  61:13
**stepping** 35:17
**steps** 14:24 22:5
  53:25
**sternum** 40:24
**STEVEN** 95:2
**stock** 40:10
  65:15 80:24
**stomach** 23:15
  33:14 35:7,12
  36:13 40:1
  60:1,11
**stood** 87:4
**stop** 23:16 25:18
  26:13 40:21
  78:7 81:19,24
**stopped** 14:1
  40:22 77:24
**stopping** 71:5
**stops** 55:12
**straddle** 61:24
  62:2
**straight** 10:10
  10:13 11:15,15
  35:13
**Street** 1:18 3:11
  3:15 47:8
  67:16 69:18
  70:20 75:1
  79:9,20 93:14
  94:22 95:24
**stretched** 33:12
  43:13
**strikes** 66:15
**struggle** 80:2
**stuff** 27:15 54:17
  54:19
**subject** 18:4,4
  23:13 72:4

91:21
**SUBSTANCE**
  95:5
**substituted** 94:9
**successful** 63:21
**successfully**
  39:10 51:18
  63:18
**suggested** 40:15
**SUITE** 2:1
**summoned**
  41:13
**supervisor** 4:20
  4:25 56:25
**supervisors** 9:12
**supervisory** 1:12
**supine** 30:4
**supplement** 31:9
  84:18 85:7
**sure** 5:2 9:19
  10:4 17:5 27:8
  40:11,22 41:3
  56:4 75:15,24
  79:6
**sustained** 18:12
**swing** 26:1
  47:22 48:18
**swinging** 26:7
**swings** 26:1
**switch** 15:19
  55:6
**sworn** 3:2 93:15
**sync** 86:19
**synced** 86:19,19

---

**T**

**T** 2:22 3:1,1
**table** 27:11 28:1
  28:9,20 29:5
  29:16 30:10
  32:16,19
**Tahoes** 77:8,14
  77:14
**take** 10:16 11:13
  26:20 35:15
  47:8 48:9
  64:24 66:21
  67:9,23 68:3
  76:21

**taken** 11:14 47:5
  94:3 95:2,3
**talk** 13:5 24:23
  27:9
**talking** 11:3
  40:13 51:1
  92:12
**Tampa** 1:3,21
  8:22,24,25
**tan** 50:5,17
**tape** 50:6
**tapping** 41:9
**Target** 8:23
**Taser** 12:24,25
  12:25 13:2
  14:9,11,20,22
  16:2,11 18:18
  19:10 20:7
  21:3,6,6 22:14
  23:14 25:8
  33:18,21 34:2
  34:2,20,21
  55:25 57:3,15
  57:24 58:3,5,9
  58:11 59:1
  76:10 84:19
  85:3 86:20
  87:4,24 88:5
  88:22 92:4
**Tasered** 57:9
**technician** 53:13
**teeth** 31:14
**tell** 8:17 11:23
  21:10 22:1
  23:23 25:2
  34:25 36:4
  55:20 59:20
  64:1 65:22
  68:11 70:6,8,9
  76:2 86:5
**telling** 6:14 13:7
  23:1 41:17
  72:3 74:6
  79:13 83:18
**ten** 73:6
**tending** 42:3
**tense** 60:5
**tensing** 60:5
**term** 15:6 25:12

**terminology**
  9:18,20
**terms** 4:19 30:7
**testified** 3:3
  23:24 87:7
  88:7,21
**testimony** 26:20
  48:6 49:5,15
  49:21 50:25
  52:7,10 54:6
  54:24 55:24
  56:1 57:2
  58:15 74:12
  76:21 86:13
  93:7
**thank** 47:1
  74:22 84:8
  92:14,15
**theirs** 90:13
**they'd** 14:4
**thing** 62:21
**things** 5:3 27:16
  27:24 56:20
  67:3 71:3 75:9
  75:12
**think** 5:7 8:23
  16:21 22:13
  41:3 52:12,15
  66:25 70:15
  72:21 79:18,19
  80:17 86:23
  88:1 90:23
**thinks** 76:14,15
**third** 23:4,5 31:6
  31:12 85:14
**thought** 10:3
  38:23 41:2,4
  90:12,22 91:15
**three** 13:9 16:13
  16:17 17:4,6
  17:13,22,25
  18:13 28:21
  29:16,25 33:1
  44:9 73:6 77:8
  77:16 88:10
  89:19
**threw** 25:16
  28:2
**tightly** 63:13

**time** 3:4,19 4:8
5:3,10,12,13
5:25 6:2,12,13
6:14,17,20,23
6:25 7:14,17
8:21 9:2,4 12:8
14:2,5 17:20
19:1 28:17
29:3,24,24
30:8 32:15,17
32:23 33:16,17
33:25 34:1,13
35:7 39:7,9
40:17 41:24
47:5 49:14
51:17,17 56:4
58:2,13,17,17
58:20,23 59:5
60:20 61:21
62:4 63:3
66:10 67:13
69:13,24 71:24
72:11,19,22,24
73:23 75:22,24
76:3,9,11,17
76:20 77:2,21
78:8,11 81:12
81:15,22 82:6
82:16,23 83:5
83:7,14,25
84:8 85:2,18
85:21,24 87:4
87:23,24 88:1
92:19 94:18
**timekeeping**
76:8
**timer** 69:9
**times** 6:15 56:3
56:15 71:15
81:12
**timing** 84:13
85:1,15
**title** 94:4
**today** 3:21 4:3
6:17 71:6
**told** 29:20 38:21
41:18 62:9
91:14
**tone** 73:11,12

**top** 11:17 13:2,3
14:8 23:6 25:4
28:6 29:13
33:21 35:17
36:24 37:1,20
37:25 38:1
47:15 53:24
**topic** 11:1
**tossed** 25:17
**total** 21:16 87:8
**touching** 38:16
49:12
**traffic** 66:23,25
67:20 73:6
77:17 83:19
91:8
**training** 57:9
**transcript** 68:8
93:6 94:2,4
**transfer** 32:16
**transmission**
72:7
**transmitted**
7:14
**trapped** 42:8
**trigger** 14:13
15:17,20,21
16:9,13,16
17:3,4,21,22
17:25 19:1,4
19:15 20:3,22
85:2,15
**triple** 69:8 70:19
**true** 93:7 94:5
**try** 37:7,9,15
42:15 48:10
62:20 63:10
65:6 72:22
**trying** 42:14
44:20 54:22
56:23 60:20
61:21 65:3
91:14
**tug** 65:7
**turn** 8:25 68:12
81:8
**turned** 15:11
18:23 32:14
36:21 72:14

**turns** 67:11
**twist** 59:24
**twisted** 40:25
**two** 5:19 7:12
12:2 14:13
21:7 24:17
25:7 29:25
36:11 37:17
39:16 48:10
50:12 51:4,13
51:13,22 53:21
72:18 77:8,15
78:6 92:3,9,11
**two-second** 15:2
**two-story** 10:8
**two-thirds** 10:21
**type** 30:3 53:9
**Typically** 6:1
37:14

**U**

**U.S** 94:15
**Uh-huh** 17:23
21:19
**ULMERTON**
2:13
**ultimately** 7:19
12:13 63:18
**unaffected** 57:6
**underneath** 36:9
36:20,21 38:14
61:20 63:13,16
64:21 65:8
**undersigned**
93:13
**understand** 9:19
17:20 20:4
26:20 27:3
29:16 34:14
44:1,22 70:13
89:21 94:10,16
**understanding**
20:2,5 48:21
53:5 76:3,6,10
76:12 90:25
**understands**
67:23
**understood** 29:7
**uniform** 90:13

**uniforms** 89:20
**unit** 10:1 13:2
15:9,14,18
18:1,1 19:7
20:2,5 76:4,5
76:13
**UNITED** 1:1
**updated** 5:3
**upper** 6:4 7:18
31:24 44:6
**upstairs** 21:17
42:24,25 45:17
**use** 9:12,13
37:15 57:14
64:20 70:24
74:21 76:20

**V**

**V** 1:5
**variables** 58:12
**vehicle** 77:24
81:18
**vehicles** 77:11
**verbal** 41:9 59:5
**verbalizations**
81:1
**verify** 40:14
72:17
**versus** 24:6
**vertical** 52:24
53:11
**Vic** 77:16
**vicinity** 49:18
**Victoria** 77:9,13
**video** 75:6 76:5
76:5
**view** 6:2 22:5
71:8
**visual** 47:19
**visualized** 50:9
52:4
**vocalization**
30:19
**voice** 70:7 80:18
82:11,11,12
83:23
**voices** 10:12,12
12:10 69:21
82:5,5

**uniforms** 89:20
**volume** 70:11
72:14 81:3,4,6
**VS** 1:10

**W**

**waist** 91:21
**waiting** 46:22
**waive** 94:19
**Wal-Mart** 8:23
**walk** 10:11
12:15 54:8
**walked** 10:9
44:2,4 88:14
**walking** 10:13
13:24 42:24
**wall** 12:1 24:18
24:20 25:22
26:2 32:8
33:12 35:12
38:16,23 39:1
42:12,13,19
43:4,6,13
47:25 48:6
49:3,4,7,9,12
49:12,17 50:11
50:20,20,22
54:7,13,18
61:19 63:9,10
63:19
**want** 9:19 14:11
15:6 23:12
55:22 67:11,16
68:2 72:10
74:20 75:18,19
75:19 81:13
91:13
**wanted** 10:3
64:25 79:6
**wanting** 44:1
**wants** 75:12
**war** 65:7
**wasn't** 7:8,16
17:5 20:10
26:16 30:19
33:24 41:7
56:12 57:25
86:18
**watch** 32:18
38:25

**watching** 56:21
**way** 10:21 22:20
29:6 37:20
38:4 42:17
43:2 45:6
53:23 62:8,8
66:7,11 69:3
90:5,11
**ways** 90:8
**we'll** 48:9,10
67:18 74:24
81:19 92:18
**we're** 13:13
35:20 40:9
48:19,25 56:25
57:19,21,22
58:9,10 59:1
65:19,23 67:6
68:24 69:3,3,5
70:10,13,19
71:2 72:13
76:19 81:7,10
82:18
**we've** 23:3 51:1
**weapon** 45:18
45:20
**weapons** 25:7
66:16
**wearing** 23:14
**weight** 37:15
62:12 66:13
**went** 7:20,22
10:6 11:2
12:15,21,22
41:22 59:16
68:1 92:10
**weren't** 7:22
21:17 50:15
88:13
**whatnot** 7:5
**whirling** 57:7
**whistle** 79:16,23
84:5
**white** 55:6,16
**whoosh** 79:15
79:20,21 80:17
82:19 87:11
**width** 26:6
**window** 44:5

52:18,21 53:6
70:18
**wires** 18:3 58:11
58:11
**witness** 68:13
75:13 90:3,4,9
90:17 93:7,16
**woman** 10:7,11
**word** 30:18
**words** 30:19
52:16 59:6
68:15,16
**work** 3:16 38:24
44:13 45:4
48:10 55:23
59:23 60:4
63:15,15 64:6
65:8,9 67:16
75:13 87:22
**worked** 56:23
**working** 36:5
45:20 54:15
58:13 64:8,8
81:3
**worry** 67:8
**wouldn't** 37:18
41:21 61:3
90:16
**wrist** 35:3,6,15
35:15,19 36:7
37:7,10,17,18
38:13 59:19,21
59:23 60:2,8
60:10,13,15,21
61:2,9,13,14
61:18,20 62:5
62:11,21 63:4
63:6 64:6,6,9
66:7
**WRITE** 95:7
**wrong** 5:8
**wrote** 78:22

_____
**X**
_____
**X** 2:18,22
_____
**Y**
_____
**yard** 13:25
**yeah** 7:24 8:15
9:21 10:20

11:25 34:9
37:15 43:10
48:8,19 49:10
51:20 68:12
78:3 79:1,2
**yesterday** 71:10
**you-all** 34:15
89:16
_____
**Z**
_____
**zeros** 69:9 70:19
_____
**0**
_____
**0402:48** 85:22
**0408:40** 82:2
**0409:13** 82:21
**0409:27** 82:25
83:4
**0409:31** 82:2
**0409:40** 83:7
**0409:46** 83:16
**0409:52** 84:2
_____
**1**
_____
**1** 14:12
**1-800-468-2003**
2:3
**10750** 2:13
**11** 69:17,18 70:1
70:19
**11:50** 1:19 92:21
**12** 72:1
**14** 14:6 21:21
34:1 84:15,22
85:1,12,19
95:8
**15** 14:7 84:18
**1601:04** 14:12
34:9
**1601:07** 16:10
**1601:08** 16:13
17:21 18:12
**1601:16** 18:21
19:1
**1601:17** 19:10
**1601:34** 19:13
19:15
**1601:41** 20:17
**1601:59** 20:20
**1602:37** 20:22

34:10 85:3,15
**1602:38** 21:3
**1603** 21:6
**1603:21** 21:6
**17** 47:9,14 48:23
55:5,17
**18** 48:11,15,20
49:4,22 50:2,8
50:18 52:18
54:1,7 72:18
**180** 30:11 45:12
45:20 49:16
58:24
**181** 16:4
**1995** 3:17
**1of** 31:13
_____
**2**
_____
**2** 5:17 85:12
**2:15** 72:22
**2:28** 73:2
**20** 73:17,21
**2005** 4:2
**2016** 4:7 72:6
**2019** 1:19 93:17
94:23 95:2
**203** 2:7
**21** 91:17
**2130:24** 21:7
**22** 66:25 67:2
74:24 75:2
**23** 67:1,18 68:4
73:21 74:17
**24** 1:19 2:25 3:5
23:3,4 31:10
94:23 95:2
**26** 31:7,8,9 90:7
**26TH** 93:17
**28** 73:25
_____
**3**
_____
**3** 2:19,25 5:17
23:4
**3000** 1:20 2:1
**33** 34:3
**33701** 2:8
**33759** 2:2
**33778** 2:14
**39** 21:3

_____
**4**
_____
**4** 5:18 6:19 73:5
**406:13** 76:1,14
76:15
**408:30** 76:22
**408:43** 77:4,20
**408:48** 81:9,11
**408:53** 81:18
**408:54** 81:20
**408:58** 77:23
78:16,22
**409:31** 81:25
**409:46** 86:3
**410:56** 78:13
**449** 2:7
**47** 2:20
_____
**5**
_____
**5:45** 7:13
**500** 1:20 2:1
**52** 78:21
**53** 78:21
_____
**6**
_____
**6** 7:13
**6/29/2020** 93:23
**611** 8:22
_____
**7**
_____
**723-2002** 2:3
**727** 2:3
**727-723-2003**
2:3
**7th** 4:7 72:6
_____
**8**
_____
**8** 4:24 10:16,19
10:21 11:3,5
**8:18-CV-2116...**
1:4
**81** 5:17
**84** 2:21
**85** 5:18
_____
**9**
_____
**9:00** 1:19
**90** 43:19 53:8
**95** 3:21

## PINELLAS COUNTY SHERIFF'S OFFICE
## PCSO - SUPPLEMENT  SO16-363788/26
### Report Date:  09/09/2016



### Warning
Contains entities exempt from disclosure

### Primary Information

| | |
|---|---|
| Description: | TRANSCRIBED INTERVIEW WITH SGT STREET *JT* |
| Occurrence From: | 09/08/2016 00:11 |
| Occurrence To: | 09/08/2016 00:35 |
| Source Of Info: | SGT. STREET |
| Dissemination Code: | RESTRICTED |
| Content Evaluation: | Information |
| Reporting LEO: | TOBECK, JONATHAN S DET (56990 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Activity: | OTH SERV / ACTION |
| Approval Status: | Approved |
| Approved Date: | 10/04/2016 |
| Approved By: | CAPRA, JEFFERY P DET (53787 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |

### Synopsis
For details of interview with Sergeant Street see narrative.

### .ddresses

| Relationship | Address |
|---|---|
| OCCURRED | 1739 SPLIT FORK DR,  OLDSMAR,  Florida 34677 , UNITED STATES |
| RELATED | 737 LOUDEN AVE PCSO NORTH DISTRICT STATION,  DUNEDIN,  Florida 34698 , UNITED STATES |

### Subjects

| Relationship | Name | Bio | DOB |
|---|---|---|---|
| OTHER | DEGRAW, JULIE (PERSON) | 56 yr. old, ORIENTAL/ASIAN, FEMALE | 07/04 |
| OTH AGY - NON LAW ENFORCE | OLDSMAR FIRE DEPARTMENT 54 (AGENCY) | | --- |
| OTH AGY - NON LAW ENFORCE | PALM HARBOR FIRE DEPARTMENT #65A (AGENCY) | | --- |
| LAW ENFORCEMENT OFFICER - EXEMPT | BALDWIN, ROBERT K DEP (LAW ENFORCEMENT OFFICIAL) | WHITE, MALE | --- |
| LAW ENFORCEMENT OFFICER - EXEMPT | GOEPFERT, GREGORY (LAW ENFORCEMENT OFFICIAL) | | --- |
| LAW ENFORCEMENT OFFICER - EXEMPT | MARTINEZ, EDUARDO DEP (LAW ENFORCEMENT OFFICIAL) | 31 yr. old, HISPANIC, MALE | |
| LAW ENFORCEMENT OFFICER - EXEMPT | STREET, CHARLES SGT (LAW ENFORCEMENT OFFICIAL) | | --- |
| ATTORNEY | GELL, DEBORAH ATTY (PERSON) | WHITE, FEMALE | --- |
| DECEASED | DEGRAW, DONALD CHRISTOPHER (PERSON) | 58 yr. old, WHITE, MALE | 06/25 |

### Narrative
'INTERVIEW OF CHARLES STREET, #16-363788-26, 09/08/16)

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

---

### Narrative - Continued

(The following may contain unintelligible or misunderstood words due to the recording quality.)

JU = Detective James Upton
JT = Detective Jonathan Tobeck
CS = Sergeant Charles Street
DG = Debra Gell

JT: I'm Detective Tobeck. Today's date is now September 8th, 2016. It's currently 0011 hours. Located at the Sheriff's North District Station, 737 Louden Avenue. Currently present are myself, Detective Jonathan Tobeck, Detective Jay Upton, and Sergeant Charles Street.

CS: That's right.

JT: And attorney Debra Gell. G-E-L-L. All right, Sergeant. Can I get your payroll number, sir?

CS: 4119.

JT: You've been with the sheriff's office how long?

CS: '95, October.

JT: You've been a sergeant over ten years, haven't you?

CS: Yes.

T: Where have you worked since you've been here, sir?

CS: Uh, patrol mostly. Um, I was a field training officer in patrol. I was in the Mait team. Echo, DUI squad, for a short period of time. Um, I was a corporal in the North District for several years. Transferred to, uh, criminal intelligence, uh, for two months, and then got called for promotion --

JT: Okay.

CS: -- in July of 2005.

JT: All right. And it would have been yesterday morning, I guess, on the 7th. You came to work around seven.

CS: Six.

JT: Six? Okay. And you were the squad 8 sergeant?

CS: Yes.

JT: Okay. And you had the opportunity to go to 1739 Split Fork Drive.

CS: Yes.

JT: Okay. Did you receive dispatch? Did you jump the call with the deputies?

CS: Uh, I jumped into it with them. Uh, I was in Chestnut Park. It was around 4:00 -- just before 4: Driving -- driving around near the boat ramp. I saw the call -- an AOA call being built in the pending queue. And just read the notes, and the dispatcher -- when she sent the two Oldsmar cars, she also said on the radio that it was the second time the fire department had been to that address on that day. Um, I -- I don't really recall if I self-assigned, or I let the dispatcher know that I was going to. But, at any rate, I -- I went.

Um, while I was driving towards the exit of the park, I asked the dispatcher if the fire department had called us the first time that they went out to the scene, because I -- I did not recall hearing that type of call go out in the morning. Um, and as I got going, excuse me, on

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

### Narrative - Continued

East Lake Road, dispatcher came back to me and first said that it was a -- one of the nighttime cars, and one of my cars had been to the scene. And then right after that she -- she changed and said that it was both of the day shift cars that had been to the scene. And I still didn't really any -- any type of call like that for -- for the day shift. Um, so I got into the CAD history to -- to find out who was there. Um, as I saw -- just as I was getting results, said it was the -- the nighttime cars, I think about 5:45. Um, Deputy Martinez sent me an AM message that they -- neither one of -- neither he nor Goepfert were -- were at that house this morning. So, it kind of answered the questions at the same time.

Um, I pull up in front of the house. Uh, I saw the fire department down the road. As soon as I got out of my car, I heard Deputy Martinez on the radio telling dispatcher that the subject was -- was non-compliant with their commands. The front door was halfway open. It was ajar. I walked in the front door. See a heavyset Asian female standing by the -- the bottom of the stairs, um, crying. You know, when I came in the door I could hear the deputies' voices, but I couldn't tell if it was either downstairs or upstairs. Um, when I came in and saw the woman, I just -- I looked up, and I could see their -- where they were standing at the top of the stairs -- the head of the stairs, right in the bedroom door.

Um, started to go up the stairs. Uh, as soon as I hit the first step up I heard the -- Deputy Goepfert announce, "Taser." I heard the pop of the Taser and the cycling of his unit. I got to the top of the landing there, at the second floor. Um, I see the subject, just heavyset guy just wearing boxer shorts and the Taser probes. One was in his chest. One was further down in his stomach. Uh, he was flailing about on the ground, rolling back and forth. Grunting, growling. Grinding his teeth. So, his -- his mouth looked bloody. There was blood around the insides of his lips and around his teeth. His eyes were -- were bulging out -- like bugging out. Um, Deputy Goepfert ordered him to -- to roll over, lay -- lay on his stomach. He did not. Okay. At -- at some point during this, uh -- this period, um, one of the two deputies -- I don't know which one -- told me there were weapons in the bedroom. The gentleman's wife said he has a -- keeps a pistol -- keeps a gun under his pillow. Uh, at that point the gentleman was laying on the floor. His feet were against the side of the bed. He was on his -- laying on his back, and his upper shoulders and shoulder blades were resting against the door to the bedroom. Um, he was constant grunting, groaning. Like, almost a primitive type of sound coming from -- very loud.

Um, Deputy Goepfert asking -- or saying out loud, "How are we going to do this, guys?" Um, trying to figure out how to -- how to get im secured, when he is, uh, acting that way. Um, Goepfert reached over -- you know -- you know, where the gentleman is laying, right next to his right arm and shoulder is a six foot stepladder -- metal stepladder, leaning against the wall. Goepfert reached over, pulled the ladder out and passed it to me. I tossed it, um, towards another bedroom door. Just inside the bedroom door is a small night table -- nightstand table. Um, on top of it was a -- looked like a black folding knife, like a lock blade knife. It was closed. So, I reached in, pulled the table -- uh, as I was dragging the table out everything on top of it spilled on the floor next to me. I believe Deputy Martinez grabbed it from me -- got the table from me and passed it up to the right. So, I'm -- the table is going off to my right. Everything that was on it is laying on the floor next to me. And I kicked the knife a little further down the hallway. Um, so we could get a little bit more room to work in the room.

Uh, I could see in the room two long gun cases -- hard cases. One is tan and one is black. Leaning up against the dresser about six feet inside the bedroom door. During the time that Deputy Martinez and I were taking the -- the table out of the room, the subject somehow scooched or wiggled around so he's now in an opposite -- from when I first saw him, now his feet are up towards the door and his upper shoulders and shoulder blades are resting up against the -- the side of the bed, near the head of his bed, actually. Where the -- where the nightstand used to be. And right -- right about then, there was, like, a lull in his behavior. Um, he took -- took a little rest. Um, I asked Deputy Goepfert if his Taser was activated, and he said no. And he said -- I said something like, "Now, let's go, boys." Uh, stepped past -- in front of Deputy Goepfert, stepped over the subject and grabbed his left wrist with both my hands, and I pulled back and away, to use leverage to get the subject rolled over onto his stomach. And then I pulled his left wrist up behind him. Um, i was kind of squeezed in between the gentlemen's right side and the bed was -- I was off -- off to the side, but kind of pinched in there. Um, fighting him the whole time. He was pulling away. Kept the grunting going.

Um, Deputy Goepfert moved towards the gentleman's feet to, um -- I believe to secure his feet. And, um, Deputy Martinez came in because I asked -- I said, "We need -- we need some cuffs. We need him handcuffed." Deputy Martinez cuffed his left wrist, and we -- we just couldn't -- we couldn't get his right hand out from underneath him. Um, so -- and I saw that his -- the forehead -- the top part of his forehead was resting up against the wall, right next to the bed. So, I thought if, uh, Deputy Goepfert could pull his legs Deputy Martinez and I could scoot the gentleman to the left and get more -- more space where we could get access to that right wrist. Um, so I told Deputy Goepfert to pull -- pull on his legs, and we can move him over a little to the left. Uh, we did. Um, we were able to get his right wrist behind him. Deputy Martinez, um, cuffed his right wrist. And then when he kind of took a deep breath, and I looked up and I saw Baldwin in the doorway. Uh, I told Deputy Baldwin to clear the air, because we -- we had asked for 10-3 traffic. Um, Baldwin cleared the air. Uh, I said that, you know, the FD can come in. Um, and that was relayed over the radio.

Uh, I stood up and lifted up the pillow that was at the head of the bed, right next to where he had been laying, and saw a Springfield --

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

| Narrative - Continued |
| --- |

it looked like a .45 caliber pistol, uh, laying on the mattress under the -- under the pillow, pointed in the direction of the door. Um, I knew the fire department was coming in. There was going to be paramedics coming into the room. I -- I lifted the gun up. I rotated it around so it's facing away, uh, from where the paramedics were going to be working. But, I left it laying on the bed. Uh --

JT:   Did you have gloves on then, Sergeant?

CS:   Sorry?

JT:   Did you have gloves on then?

CS:   No.

JT:   Okay.

CS:   Uh, I got back down on my knees to -- on the gentleman's right side. Uh, shook his shoulder a couple times. Uh, tried to -- tried to communicate with him. Um, I asked the deputies what -- what his name was. They told me his name was Don. Um, I tried to talk to him. You know, "Hey, Don. How are you doing?" Um, got no response. Uh, Deputy Goepfert said we should roll him up to his -- onto his side. Um, so, Deputy Goepfert knelt down and I pulled and Deputy Goepfert pushed and we rolled him onto his right side. Um, Deputy Martinez reached down and felt for a pulse on the left side of his neck. Deputy Martinez said he thought he felt a pulse. Um, I did a sternum rub on the gentleman, and, uh, I pinched his left nipple -- squeezed it and turned it. Uh, when I did that, um, his mouth, uh, opened and closed a couple of times. Uh, it appeared as if he was, uh -- he was conscious. Um, and we, uh -- just right after that, noticed that his eyes were -- were just glazed over.

Um, and the FD came in. Did their assessment. And they realized that -- that he wasn't breathing. Uh, they began, uh -- they were hooking EKG leads up to him and I, uh -- I uncuffed the gentleman, and, uh -- and backed further into the room. Kind of got, um, twisted at the foot of the bed, as the paramedics came in and started their procedures. Um, to give -- to give the paramedics a little iore room to work, I moved the black, uh, rifle case from where it was leaning against the dresser and moved that aside. Uh, there were also two hard -- hard, uh, pistol cases -- boxes, blue in color, on the ground. I picked them up and put them on the bed. Um, took a quick look inside them. Those both had handguns in them. Um, called Lieutenant Nygren on the radio. Asked him to -- to be in route. And then, uh, I was -- I was out of it from then. I couldn't leave, because I was kind of in the room. After Um, 20 minutes or so paramedics loaded the gentleman on a backboard, carried him down the stairs, out to the ambulance.

Uh, when I got outside, Deputy Baldwin told me that Lieutenant Nygren had, uh, detailed him to follow the ambulance to the hospital. Uh, I told him okay. Uh, spoke briefly with the gentleman's wife, and I think a neighbor or a friend of hers that was standing in the front yard. Um, they asked if they could leave -- could they go. Um, I asked Lieutenant Nygren were -- were they okay to go, and he said yes. Um, Lieutenant Nygren just told her that detectives would be speaking with her later. Um, and they were free to go. They followed -- followed off behind the ambulance.

JT:   Did you have any other contact with the wife?

CS:   No.

JT:   When you went up to the room, Sergeant, was -- could you see in there? Was it dark? Were the windows open?

CS:   Uh, the blinds were pulled. It wasn't dark. It was light -- light -- the light was not on. The blinds were closed. But, I mean, there was -- there was lights in the room. It wasn't dark.

JT:   Okay. Other than the guns you told us about, did you see any other weapons in there?

CS:   Yeah, the knife that was on the nightstand.

JT:   Okay.

CS:   And there was a -- and once -- once -- after the gentleman was -- was out, and down the stairs, um, there was also a soft-sided HK rifle bag leaning against the wall by the door. Uh, didn't look in it -- didn't look in any other rifle bags or cases, but the pistol -- pistol cases each.

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

---

**Narrative - Continued**

JT: When -- when you guys were trying to get him cuffed, was -- was his -- was he facedown?

CS: Yes.

JT: Was his head turned either way?

CS: I mean, I -- I think it was turned to the left. I -- I -- I can't say for sure. It was -- we were -- we were struggling with him, just to get the -- the one hand back behind him, and then the -- to hang onto it.

JT: He was still fighting with you guys at this point?

CS: He was. Yes.

JT: Okay. Was he making that grunting sound?

CS: Yes. He was.

JT: Okay. Um, when you went hands on with him did he seem cold? Did he seem hot? As far as body temperature-wise.

CS: I didn't notice.

JT: Okay.

CS: I just wanted to get ahold of him and get him secured.

T: And your purpose for doing that -- obviously, you weren't there for the beginning of it. Was that just to get him medical treatment, or --

CS: Uh, we needed to -- we needed to secure him. I mean, I -- I glanced at the -- the CAD notes from the morning call, when I was driving past the target. I was on Business -- Business 611, getting to Tampa Road. And there -- the first call mentioned weapons -- that there were weapons in the house. But in the morning call, the gentleman was in a different room than where the weapons are. But then when I got to where -- to the call that we were on, the deputies were saying that, "There -- there is weapons in this room where he is, and the wife says he has one under this pillow." So, um, with him being Tasered and the way he's acting, even after being Tasered, you need to get him secured. Um, ideally he'd come out of the room. We want to remove him from the weapons.

JT: Okay. You said you heard the initial Taser cycle.

CS: Yes.

JT: Did you hear it cycle again after you got upstairs?

CS: I -- no. I -- I -- I don't -- I don't recall hearing another cycle. No.

JU: Okay. Did Deputy Goepfert ever yell, "Taser" again?

CS: Uh, not after the first one. No.

JU: Okay.

JT: You mentioned the blood around his mouth. Did you see any other injuries?

CS: No.

JT: After you did the sternum rub and nipple twist, and he opened his mouth a couple of times, how long did it take for FD to get there after that, just approximately?

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

### Narrative - Continued

CS:   Well, a few minutes. I mean, we -- we told them they could come down the road. And then when it looked like he was -- his eyes were glazing over, one of -- one of the deputies -- Goepfert or -- or Martinez, I think, said to Baldwin, you know, "What's keeping them?" A couple -- a couple minutes. I mean, they were just down the road. Six -- six or eight lots down the road.

JT:   Okay. What position was he in after you -- you saw his mouth open?

CS:   He was leaning on his right side.

JT:   Okay.

CS:   He was on his right side. I was kneeling behind him. Deputy Goepfert was kneeling in front of him. Um, I'm -- I'm looking at his left profile with his mouth open.

JT:   Is there anything we didn't ask you, Sergeant, or you didn't tell us you think we need to know? Deputy Upton, you got anything?

JU:   I have nothing further to add.

JT:   Ms. Gell? Okay. It is now 0035 hours, and we're going to end this interview.

(CONCLUSION OF INTERVIEW)

Transcribed by:   jwg/jwg/eam

### Record Status Information

| | |
|---|---|
| Record Origination Operator: | TOBECK, JONATHAN S DET (56990 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Record Origination Date: | 09/09/2016 08:53 |
| Last Update Operator: | CAPRA, JEFFERY P DET (53787 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Last Update Date: | 10/04/2016 10:19 |

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| TOBECK, JONATHAN S DET (56990 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 | CAPRA, JEFFERY P DET (53787 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 |
| | | | |

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*