UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


JULIE V. DEGRAW, as Personal Representative
of the ESTATE OF DONALD C. DEGRAW, Deceased,

      Plaintiff,       CASE NO: 8:18-cv-2116-WFJ-SPF

vs.

BOB GUALTIERI, in his individual and
supervisory capacity as Pinellas County Sheriff,
and GREGORY GOEPFERT, in his individual capacity
as a Pinellas County Deputy Sheriff,

      Defendants.
: : : : : : : : : : : : : : : : : : : : : : : : : : : : : :




DEPONENT:          ROBERT K. BALDWIN


DATE:              MAY 21, 2019
                1:07 P.M. - 2:18 P.M.


LOCATION:          D & D REPORTING
                THE WILDER CENTER
                3000 GULF TO BAY BOULEVARD, SUITE 500
                CLEARWATER, FLORIDA


REPORTER:          VANESSA DURHAM-ANDREW
                NOTARY PUBLIC
                STATE OF FLORIDA AT LARGE


======================================================
D & D REPORTING
THE WILDER CENTER
3000 GULF-TO-BAY BOULEVARD, SUITE 500
CLEARWATER, FLORIDA  33756
(727)  723-2002

A P P E A R A N C E S:


For the Plaintiff:


MICHAEL T. CALLAHAN, ESQUIRE
CALLAHAN LAW FIRM, LLC
449 CENTRAL AVENUE, SUITE 203
ST. PETERSBURG, FLORIDA  33701


For the Defendants:


PAUL G. ROZELLE, ESQUIRE
PINELLAS COUNTY SHERIFF'S OFFICE
10750 ULMERTON ROAD
LARGO, FLORIDA  33778


        *       *       *       *



I   N   D   E   X

                                              Page

Direct Examination by Mr. Callahan . . . . . . . .   6

Cross-Examination by Mr. Rozelle . . . . . . . . .  40

        *       *       *       *

*      *      *      *

## E  X  H  I  B  I  T  S

| Plaintiff's Exhibit Nos. | Description | Marked for Identification |
|---|---|---|
| 15 | Photograph | 4 |
| 16 | Photograph | 5 |
| 17 | Photograph | 5 |
| 18 | Photograph | 5 |
| 19 | Pinellas County Sheriff's Office PCSO – Supplement SO16−363788/18 Report Date:  09/09/2016 | 7 |

*      *      *      *

```
 1   WHEREUPON,

 2                    ROBERT K. BALDWIN,

 3   WAS CALLED AND AFTER BEING DULY SWORN WAS EXAMINED AND

 4   TESTIFIED AS FOLLOWS:

 5             MR. CALLAHAN:  I have a few more

 6        exhibits here.  We ended up with --

 7             THE COURT REPORTER:  We're up to

 8        Exhibit --

 9             MR. CALLAHAN:  -- 13 or 14 -- 14, I

10        think --

11             MR. ROZELLE:  We're on 15.

12             MR. CALLAHAN:  -- this morning.  So

13        this will be 15.  Let's mark this next

14        photograph as Exhibit 15.  I don't have any

15        copies, so we'll just have to look at them.

16             THE COURT REPORTER:  Exhibit 15 marked.

17             (At this time Exhibit 15 was marked for

18             identification).

19             MR. CALLAHAN:  Yeah.  And I have 16.

20             MR. ROZELLE:  So you don't have any

21        copies?

22             MR. CALLAHAN:  No.  We'll just have to

23        look at them together.  I'll make this one

24        work.

25             MR. ROZELLE:  What is this?
```

```
1            THE COURT REPORTER:  Exhibit 16 marked.
2            (At this time Exhibit 16 was marked for
3            identification).
4            MR. CALLAHAN:  Mark this 17.
5            (At this time Exhibit 17 was marked for
6            identification).
7            THE COURT REPORTER:  Exhibit 17 marked.
8            MR. CALLAHAN:  And let's mark this 18.
9            THE COURT REPORTER:  Exhibit 18.
10           (At this time Exhibit 18 was marked for
11           identification).
12           MR. CALLAHAN:  Yeah.  Before we get
13      started, the reason I took these out, is
14      because I know you gave a statement that
15      you, physically, were there and saw some
16      things.  And I thought this might help you
17      identify where things were.
18           THE DEPONENT:  Okay.
19           MR. CALLAHAN:  If you want to swear the
20      witness in, and we'll get started.
21           THE COURT REPORTER:  He's already been
22      sworn.
23           MR. CALLAHAN:  So you already did.
24      Thank you.
25
```

1                    <u>**DIRECT EXAMINATION**</u>

2    BY MR. CALLAHAN:

3        Q    All right.  Would you give me your full

4    name please, sir.

5        A    Robert Keith Baldwin.

6        Q    And what do you do for a living?

7        A    I am a deputy sheriff with the Pinellas

8    County Sheriff's Office.

9        Q    And what is your rank right now?

10       A    A deputy sheriff.

11       Q    And you were involved in a case, involving

12   a gentleman by the name of Mr. DeGraw back in

13   September of 2016.  Do you have a recollection of

14   being involved in that?

15       A    I do.

16       Q    And what was your rank back then?

17       A    Deputy sheriff.

18       Q    Same?

19       A    Same.

20       Q    Okay.  Well, I have here, also, a statement

21   which was taken of you by George Moffett.

22            MR. CALLAHAN:  And I would like to mark

23       that as exhibit -- what are we up to here?

24            MR. ROZELLE:  Nineteen.

25            THE COURT REPORTER:  Exhibit 19.

1          MR. CALLAHAN:  Nineteen.

2          (At this time Exhibit 19 was marked for

3          identification).

4          MR. CALLAHAN:  I marked a few pages I

5     wanted to ask you about.  I'm trying to find

6     one, that's not marked.  Here we go.

7          THE COURT REPORTER:  Exhibit 19 marked.

8          MR. ROZELLE:  Thank you.

9   BY MR. CALLAHAN:

10      Q    Deputy Baldwin, that statement is

11   identified on the top, by the number 18 at the end of

12   the number.  Do you recognize that, on the very top

13   of the page?

14      A    It's marked 19.

15          MR. ROZELLE:  He's talking about the

16      supplement.

17          THE DEPONENT:  I'm sorry.  Yes.  Yes.

18   BY MR. CALLAHAN:

19      Q    Okay.  Tell me a little bit first about

20   your service with the Pinellas County Sheriff's

21   Office.  When did you go to work there?

22      A    I started with Pinellas County, in May of

23   2007.

24      Q    And have you worked there, continuously,

25   from then until now?

1     A   I have.

2     Q   And what is your -- what are your current

3 duties as a deputy sheriff?

4     A   I'm assigned to the Patrol Operations

5 Bureau.

6     Q   And back in September of 2016, were you

7 also in Patrol Operations?

8     A   I was.

9     Q   All right.  Do you get training when you

10 become a Pinellas County Deputy Sheriff?

11     A   Yes.

12     Q   And what kind of training do you have?

13     A   We'll have in-house training.  And then we

14 have, also, in-service training, yearly.

15     Q   In-service is an actual --

16     A   Correct.

17     Q   -- event?  And have you gotten in-service

18 training each year you've been a deputy sheriff?

19     A   Yes.

20     Q   And the initial training, I take it, has

21 all phases of law enforcement; the basics?

22     A   Essentially, yes.

23     Q   All right.  And do you have a recollection

24 of your initial training anymore?

25     A   I'll do the best I can.  Yeah.

```
1      Q    All right.  In the years leading up to the
2  event here in September of '16, did you get any
3  in-service training, annually, on tasers and their
4  use?
5      A    Yes.
6      Q    All right.  What do you recall about that,
7  if anything?
8      A    We go out to the range.  We will utilize a
9  training taser.  There's a dummy.  I say dummy,
10  that's how I describe it.  A mannequin, if you will,
11  placed in front of us.  We're trained to give verbal
12  commands, taser, taser, taser, before deploying.  And
13  then we'll actually deploy the taser at the
14  mannequin, if you will.
15      Q    Are you given training on recognizing the
16  signs and the conditions that may involve a subject
17  who is impaired, medically, or by drugs?
18      A    Yes, we have.
19      Q    Okay.  And what have you learned about
20  that, in your in-service training?
21      A    Basically, you know, before deploying a
22  taser, you're going to take certain things into
23  consideration; environment, where you're at.  Certain
24  times, you're not going to want -- you know, if
25  somebody is pregnant, for example.  There's certain
```

1    factors that you want to, you know, think about,

2    prior to deploying a taser, if it's -- if you're able

3    to do so.

4         Q    Are there any other factors you can recall

5    from your training?

6         A    Not off the top of my head.

7         Q    Did you learn during your taser training,

8    in-service training, at any time, that the use of

9    tasers can be lethal?

10        A    I would say the specific use of a taser to

11   be lethal, no.  It's a non-lethal weapon.

12        Q    Did anybody ever teach you that under

13   certain circumstances, it could be lethal?

14        A    Yes.

15        Q    Okay.  And what did they tell you about

16   that in your training?

17        A    Depending on the level of where somebody

18   is; for example, if they're standing on top of a

19   building, per se'; or if somebody is in the water,

20   you know.  Those aren't really ideal situations where

21   you're going to want to deploy a taser, if they fall,

22   hit their head, things of that nature.

23        Q    If you look at Exhibit 5 -- do you have the

24   exhibits in front of you?  No?  I'm going to have to

25   bring them over here.

1          THE COURT REPORTER:  The exhibits are

2      here.

3          MR. CALLAHAN:  No.  Exhibit 5.  There's

4      a whole bunch of exhibits together here.

5      Let's just give him the whole stack of them.

6          THE DEPONENT:  Okay.

7  BY MR. CALLAHAN:

8      Q    I'm going to make it easier on you.  Hand

9  me these photographs as exhibits --

10     A    Okay.

11     Q    -- for the moment, and I'll get them out of

12 your way.

13     A    Here you go.

14     Q    Thank you.  Exhibit 5, on its face,

15 represents to be a Taser Handheld CEW Warning

16 Instruction and Information for Law Enforcement.  Do

17 you see that on the top?

18     A    Yes.

19     Q    Do you recall having seen this, as part of

20 your in-service training at any time?

21     A    Off the top of my head, I don't.  But I'm

22 sure that we have, yes.

23     Q    This document contains warnings, and some

24 information regarding bad outcomes for CEWs.  Can we

25 go through it for just a minute.

1    A    Yes.

2    Q    And on the top, right-hand side, you'll see

3  a warning box.

4    A    Yes.

5    Q    And in that box, it states repeated,

6  prolonged or continuous CEW applications may

7  contribute to cumulative exhaustion, stress, cardiac,

8  physiologic, metabolic, respiratory and associated

9  medical risks, which could increase the risk of death

10  or serious injury.  Minimize repeated, continuous, or

11  simultaneous exposures.

12         Was that information part of your training?

13    A    Yes.

14    Q    Okay.  Have you ever had a situation where

15  you had to use your taser?

16    A    I have not.

17    Q    And have you -- have you ever been familiar

18  with a situation where someone exposed to a taser

19  application, suffered serious injury or death from

20  the circumstance?

21    A    Under death --

22    Q    I don't mean by falling off a building.

23    A    No.

24    Q    But because of a medical or physiological

25  condition.

1       A    Where somebody ultimately died, where a

2  taser was used, yes.

3       Q    All right.  Where -- what are you familiar

4  with?  Was it prior to this DeGraw incident?

5       A    No.  I'm referring to this case.

6       Q    Is this the only one you're familiar with?

7       A    That I am, personally, yes.

8       Q    Okay.  And the next paragraph is entitled,

9  Physiologic and Metabolic Effects.  And it says,

10  these effects include changes in blood chemistry,

11  blood pressure, respiration, heart rate and rhythm,

12  and adrenaline and stress hormones, among others.  In

13  humans, studies of electrical discharge from a single

14  CEW up to 15 seconds, the effects on acid/base

15  balance, Creatine Kinase, electrolytes, stress

16  hormones and other (Phonetic) vital signs were

17  comparable to, or less than changes expected from

18  physical exertion.

19          My question to you is, were you aware of

20  this?

21          MR. ROZELLE:  Object to form.  You can

22      answer.

23  BY MR. CALLAHAN:

24       Q    Let me be a little more specific.  As part

25  of your training, were you taught that there could be

```
 1    physiological or chemical changes in a victim who had

 2    a taser applied to them?

 3         A    Are you saying how many times -- or when

 4    you say, taser applied, is it one application of five

 5    seconds?

 6         Q    One or multiple.

 7         A    Yes.

 8         Q    Okay.  And then the next paragraph states,

 9    some individuals may be particularly susceptible to

10    the effects of CEW use.  These susceptible

11    individuals include the elderly, those with heart

12    conditions, asthma or other pulmonary conditions, and

13    people suffering from excited delirium, profound

14    agitation, severe exhaustion, drug intoxication or

15    chronic drug abuse, and/or over-exertion from a

16    physical struggle.  In a physiologically or

17    metabolically compromised person, any physiologic or

18    metabolic change may cause or contribute to sudden

19    death.

20              Was that information available to you, as

21    part of your in-service training?

22         A    It was.

23         Q    And, specifically, are you expected as part

24    of your duties, to try to be aware or ascertain if

25    somebody is suffering from some medical or other
```

1   condition --

2           MR. ROZELLE:  Object to the form.  You

3       can answer.

4           MR. CALLAHAN:  I'm not through.

5   BY MR. CALLAHAN:

6       Q    If somebody is suffering from any medical

7   or other condition, prior to encountering them, where

8   a taser might be used?

9           MR. ROZELLE:  Objection to form.  You

10      can answer.

11          THE DEPONENT:  Can you repeat the

12      question.  I'm sorry.

13  BY MR. CALLAHAN:

14      Q    Yeah.  As part of your training, were you

15  taught or aware of a situation in which a person that

16  you might encounter when you -- when a taser might be

17  used, could have some physiological, or medical, or

18  drug condition --

19          MR. ROZELLE:  Objection.

20  BY MR. CALLAHAN:

21      Q    -- which -- which you should try to

22  ascertain before dealing with a victim?

23          MR. ROZELLE:  Objection to the form of

24      the question.  You can answer.

25          THE DEPONENT:  Typically, when you go

1           into a situation, you're not planning on

2           tasing anybody.  So, you know, to say that I

3           respond to a call, and before I get there

4           I'm asking certain questions.  My --

5    BY MR. CALLAHAN:

6           Q    Right.

7           A    -- intent is not to get to that point, if

8    you will.  So, you know, I can't say that.

9           Q    Well, my question is, does your training

10   teach you to be aware of that, if it's possible to be

11   aware of it?

12          A    If it's possible.

13          Q    Okay.  Were you taught to minimize or use

14   the shortest duration that's possible?

15          A    If possible, yes.

16          Q    And to use control and restraint

17   procedures, as soon as reasonably safe, to prevent

18   the cumulative effects of all the exertion that goes

19   with a struggle?

20          A    Yes.

21          Q    All right.  What were you taught about

22   where to apply the taser, if anywhere?

23          A    We are trained, lower torso and below.

24          Q    All right.  If possible, is it your

25   understanding from your training, that you should

1    avoid the chest area?

2        A    If possible.

3        Q    Yeah.  Does your training include any

4    procedures that you should follow if someone lacks

5    understanding of the circumstance; that is, the

6    victim or the person that you're dealing with?

7            MR. ROZELLE:  Objection to form.  You

8        can answer.

9            THE DEPONENT:  You have to go off of

10       their actions, not their thoughts, if that

11       makes sense.

12   BY MR. CALLAHAN:

13       Q    If you're advised in advance that somebody

14   has a specific medical condition they're suffering

15   from, like just having suffered a seizure, would you

16   take that into account as part of your training,

17   prior to dealing with them?

18           MR. ROZELLE:  Objection to form.  You

19       can answer.

20           THE DEPONENT:  That's something, yeah,

21       you want to know, if -- yes.

22   BY MR. CALLAHAN:

23       Q    And what would that inform you, if

24   anything, about what to do?

25       A    Ultimately, you're going to -- your actions

1  are going to be based on what they're doing,

2  physically.  I mean, in the back of your head, if you

3  know that there's something medically underlying,

4  would that be helpful, yes.

5          But then, again, even if there is that

6  medical condition, based on what they're doing,

7  physically, actions, you know, to protect yourself

8  and everybody else on-scene, you've got to take that,

9  ultimately, into consideration.

10      Q    Now, in this particular case, I take it you

11  did not have interaction with Mr. DeGraw?

12      A    I did not.

13      Q    All right.  Your involvement was, at some

14  point in the proceedings, after he was tased?

15      A    Correct.

16      Q    All right.  Let's take a look at your

17  statement, which was acquired by Detective Moffett.

18  That's marked Number 18.  I believe it's Exhibit --

19          MR. ROZELLE:  It's 19.

20          MR. CALLAHAN:  -- 19.

21          THE DEPONENT:  Exhibit 19.

22  BY MR. CALLAHAN:

23      Q    But it's Number 18 in the statement

24  numbering.

25          MR. ROZELLE:  Supplement 18, Exhibit

1      19.

2   BY MR. CALLAHAN:

3      Q    Correct.  Do you recall talking with

4   Detective Moffett about what you learned, and your

5   participation in this event?

6      A    I do.

7      Q    Okay.  Tell me, from your own recollection,

8   how you came to know that there was an event in

9   progress at the DeGraw home?

10     A    On the date in question, I was on duty.  I

11  overheard yelling or screaming, on our radio channel.

12  And then I immediately heard our channel go 10-3, for

13  80 Alpha, which was Sergeant Street's unit

14  designation for that day.

15     Q    And what does 10-3 mean?

16     A    Ten-three means close the channel for

17  emergency traffic, only.

18     Q    All right.  And that would be limited to

19  the persons involved in the event?

20     A    That's correct.

21     Q    And so, I noticed from your statement, that

22  you made reference to this background noise and

23  screaming.  What was that about?  Can you describe

24  it?

25     A    I cannot.  Just that it sounded like a male

1    voice, yelling.  It got my attention, as quick as it

2    happened.  It got my attention enough that when they

3    said the channel was 10-3 for 80 Alpha, I knew enough

4    to look at my screen, see where he was, to determine

5    I was close, and respond.

6        Q    Were there any words that you determined

7    from the -- hearing that yelling?

8        A    Not from the yelling.

9        Q    Any way you could identify who it was?

10       A    Not that time, no.

11       Q    Okay.  So tell me what happened.  You got

12   the call.

13       A    I self-assigned, and responded lights and

14   sirens, which is known as 10-18, to the address where

15   80 Alpha was checked out at.

16       Q    And you did that, because you happened to

17   be nearby?

18       A    Correct.  And just the --

19       Q    Okay.

20       A    -- screaming, and then the channel going

21   10-3.

22       Q    Okay.  So what happened when you arrived?

23       A    I get there.  Immediately, I notice fire

24   rescue is what we would refer to as staging, outside

25   the residence.  I go inside the residence.  The door

1    is open.  And that --

2         Q    By staging, you mean they're being held

3    back while law enforcement investigates?

4              MR. ROZELLE:  Object to form.  You can

5         answer.

6    BY MR. CALLAHAN:

7         Q    Well, you tell me what it means.

8         A    Yeah.  Stage -- staging, I wouldn't say is

9    held back.  Staging is a term they use, that if the

10   scene is not safe; they don't feel it's safe for them

11   to go until law enforcement gets there, and deems the

12   scene is safe.  Then they respond.  So it's referred

13   to as staging.

14        Q    Okay.  So you saw that.  And then you

15   arrived at the household.

16        A    Yes.

17        Q    All right.  And tell me what happened.

18        A    I enter into the residence.  The door was

19   open.  I noticed a female inside.  I did not have

20   conversation with her, initially.  And she would have

21   been in the living room of the residence.  And then I

22   heard talking and voices, upstairs.  The stairway was

23   pretty much directly almost in -- as you walk in.

24        Q    Did you later learn who that person was

25   that -- who was just inside the door?

1     A   Yes.

2     Q   And who was that?

3     A   That would have been Ms. DeGraw.

4     Q   Let me show you what's been marked as

5 Exhibit 15.  And tell me if you recognize that as the

6 front door of the DeGraw residence you're referring

7 to.

8     A   Yes.

9     Q   Okay.  So do you have any recollection of

10 what Mrs. DeGraw said, or what you said to her?

11    A   I did not have conversation with her.

12    Q   And you said you heard some voices coming

13 from upstairs.

14    A   I did.

15    Q   All right.  Were you able to discern

16 anything about those voices; who was saying what?

17    A   Initially, no.

18    Q   Okay.  So what did you do?

19    A   Hearing the voices, that led me to proceed

20 up to the second floor of the residence -- or second

21 story, I'm sorry, of the residence.

22    Q   Had you communicated to those persons

23 upstairs that you were on the way up?

24    A   No.

25    Q   Okay.  So did you head upstairs?

1    A    I did.

2    Q    All right.  And what did you see?

3    A    There's a room as you get up the stairs,

4    you get up onto the second floor.  Sergeant Street

5    was in that room.  Deputy Martinez and Deputy

6    Goepfert were in that room, as well.  And then there

7    was the subject, who was later known to me to be

8    Donald DeGraw.  He was on the floor, on his stomach.

9    Q    So at the moment you arrived at the room,

10   there were four people in it?

11   A    Correct.  Including Mr. DeGraw.

12   Q    Okay.  Let me show you a couple of

13   photographs, and see if we can get a reference here.

14   Exhibit 17 appears to depict an entry to a room.  Do

15   you recognize that, at all?

16   A    I'm -- this is going to be the room where

17   they were, I believe, up on the second story of the

18   residence.

19   Q    I notice that there is a -- there's some

20   debris dropped, and objects on the floor.  Did you

21   ever find out where they came from?

22   A    I did not.

23   Q    Okay.  Exhibit 16 appears to depict a

24   stairwell and landing.  Do you recognize that?

25   A    I do.

1      Q     And what does that depict?

2      A     This is the stairway, going to the second

3   story of the residence in question.

4      Q     Okay.  And the door there, is that -- does

5   that depict the door where the gentlemen were in the

6   room?

7      A     I believe it does, yes.

8      Q     Okay.  And now, I have another exhibit,

9   which has been marked 18.  And I'll ask you if you

10  can recognize that, at all?

11     A     Yes.

12     Q     And what is that?

13     A     The room where everyone who I just

14  described was.

15     Q     Okay.  Did you ever come to learn in your

16  investigation about any change in the objects in the

17  room; any that were removed, or put in any particular

18  place?

19            MR. ROZELLE:  Object to form.  You can

20        answer.

21            THE DEPONENT:  Later on, I believe I

22        had learned there was a ladder or some type

23        of ladder that was moved, I believe.

24  BY MR. CALLAHAN:

25     Q     Anything else?

1      A      Not that I recall.

2      Q      And do you recall the purpose of why they

3   were moved?

4      A      No.

5      Q      So you're at the top of the stairs,

6   approaching the room.  And you had mentioned that

7   there were four people inside.  Did you know these

8   people?

9      A      Yes.

10     Q      Obviously, not Mr. DeGraw.  But did you

11  know the other three deputies --

12     A      Yes.

13     Q      -- or law enforcement officers?

14     A      Yes.

15     Q      And so, what did you first see?  Tell me

16  exactly what you saw, when you observed the bedroom

17  through that door.

18     A      Mr. DeGraw was on the floor, on his

19  stomach.  And Sergeant Street was finishing

20  handcuffing his arms behind his back.

21     Q      All right.  Let's take a look at Exhibit

22  17, which shows a bit of a peek into the room there.

23  Can you tell me, from Exhibit 17, where Mr. DeGraw

24  would have been lying?

25     A      He would have been in this -- his head

1   would have been closest to the door.  His feet would

2   have been from -- if I'm recalling the way the house

3   is -- to the north.  And he was on his stomach.

4       Q    So would you mind taking my pen here and

5   just marking, if you can, the place where you think

6   his head was.  You put an X there?

7       A    Yes.

8       Q    Okay.  And from your description, it sounds

9   like his body was at an angle then in the room, with

10  his feet towards the wall.

11      A    The north wall, yes.

12      Q    Okay.

13      A    Do you want me to mark where that -- where

14  he --

15      Q    Yeah.  Why don't you just draw a line,

16  indicating to us sort of the configuration of where

17  his body might have been.

18      A    Okay.

19      Q    Obviously, it's not to scale.

20      A    I understand.

21      Q    But just to help us understand.

22      A    Okay.

23      Q    Okay.  And you said he was face-down?

24      A    He was on his stomach.

25      Q    Okay.  And Sergeant Street was in the

1   process of handcuffing him?

2        A    Finishing handcuffing.

3        Q    Okay.  Was Mr. DeGraw saying anything?

4        A    He -- there were some moans being -- he had

5   made moans and groans.  Nothing that I could

6   understand, though.

7        Q    No wording?

8        A    No.

9        Q    Did you -- what did you observe, after

10  that?

11       A    Sergeant Street --

12       Q    Well, let me back you up.  Did you go into

13  the room, or just stay outside?

14       A    I couldn't.  It was too congested in there.

15       Q    Okay.

16       A    And there would have been no reason, at

17  that point, for me.  He was already secured.

18       Q    All right.  When Street was handcuffing

19  Mr. DeGraw, what were the other two gentlemen doing,

20  if you can recall?

21       A    Deputy Martinez would have been by

22  Mr. DeGraw's feet.  And Deputy Goepfert -- or

23  Goepfert would have been to the right, my right,

24  which would have been east of Mr. DeGraw.

25       Q    So in looking at this diagram that you

1    marked, which side of that line would Goepfert have

2    been on?

3        A    Right there.

4        Q    And Martinez was on the other side of

5    Mr. DeGraw.  Okay.  You've indicated that, by an

6    M and a G.

7        A    Yes.

8        Q    Were any of them actively doing anything

9    with Mr. DeGraw?

10           MR. ROZELLE:  Objection to form.  You

11       can answer.

12           THE DEPONENT:  No.

13   BY MR. CALLAHAN:

14       Q    Did you observe what happened, after Street

15   handcuffed Mr. DeGraw?

16       A    I could see that Sergeant Street was out of

17   breath.  I would describe him, in my own terms, as

18   being gassed, if you will.  And trying to catch his

19   breath.

20       Q    What about the other two gentlemen.

21       A    No.  I -- I just remember, because of the

22   condition Sergeant Street was in.

23       Q    Was Mr. DeGraw moving, at all?

24       A    I did not see him moving.

25       Q    And how much time passed, while the three

1    of them were there -- and you say under the

2    circumstances where Street was gassed -- before

3    something else happened?

4           MR. ROZELLE:  Objection to form.  You

5       can answer.

6           THE DEPONENT:  I can't tell you,

7       time-wise.  I'd have to refer to CAD times.

8       I know that once Street, Sergeant Street,

9       told me to 10-8, which -- 10-8 the channel,

10      which would basically mean open the channel,

11      which I did, and said that the subject was

12      in custody.

13   BY MR. CALLAHAN:

14      Q    Did you make any effort to secure fire

15   rescue to come in?

16      A    I did.  I got on the radio and -- to inform

17   them that the scene was safe.  It was secure to --

18   they can make entry now.

19      Q    And did they do so, while you were still

20   there?

21      A    Initially, no.

22      Q    So what happened?

23      A    I, ultimately, with the prior knowledge

24   that they're outside, go down the stairs, go outside,

25   and physically wave them in, like, you know, trying

1    to tell them it's -- the scene is safe, get in here.

2        Q    Where were they located, in relation to the

3    house?

4        A    I don't remember.

5        Q    Close enough to see you wave?

6        A    Yes.  Yes.

7        Q    Okay.  And did they respond to your waving

8    them in?

9        A    They did.

10        Q    Okay.  Do you remember who it was that came

11    in?

12        A    I don't.  I know -- I don't, specifically.

13    Oldsmar Fire Rescue was on-scene, and SunStar.  But I

14    couldn't tell you particular names, or individuals.

15        Q    Did you, or any of the three other deputies

16    in the room, have an awareness after he was

17    handcuffed, that Mr. DeGraw was in some sort of

18    medical trouble?

19            MR. ROZELLE:  Objection to form.  You

20        can answer.

21            THE DEPONENT:  I can't speak for what

22        they were aware of.  I was not.

23    BY MR. CALLAHAN:

24        Q    When did you, or the others, have any

25    awareness that Mr. DeGraw had any problem?

1          MR. ROZELLE:  Object to form.  You can

2       answer.

3          THE DEPONENT:  While -- once fire

4       rescue got up there, and it was pretty

5       evident that there was an issue.  They

6       started working him, or working on him, per

7       se'.  And at that time -- because like I

8       said before, there was no room for me up

9       there -- I went back downstairs.  And that's

10       when I spoke with Mrs. DeGraw, while that

11       was occurring.

12    BY MR. CALLAHAN:

13       Q    Was there any communication between the

14    deputies and Mr. DeGraw, at all, when you observed

15    the scene?

16       A    Yes.

17       Q    And what did you observe, or hear?

18       A    Sergeant Street was making attempts to get

19    him to respond to him.  I believe he was saying, are

20    you okay.  I think he referred to him as Buddy; are

21    you okay, Buddy.  And tapping him, you know, trying

22    to get him to respond to --

23       Q    Did he get any response out of Mr. DeGraw?

24       A    No.

25       Q    And how soon after that event did the

1    medical people enter the room?

2        A    I can't tell you, without looking at the

3    CAD, CAD notes -- I'm sorry, the CAD times, if you

4    will.  Yeah.  I know I initially requested them on

5    the radio, and then went downstairs to get them, you

6    know.

7        Q    So it's however long it took you to get

8    down the stairs, wave at them, and then --

9        A    For them --

10       Q    -- for them to get back up into the room?

11       A    Correct.

12       Q    All right.  Did you precede the medical

13   people back to the room?

14       A    Initially, I don't believe I went upstairs,

15   once they got up there.  Because, like I said, there

16   was not enough room, and I didn't want to get in

17   there way.  And I was speaking with Mrs. DeGraw, at

18   that point.  But at some point in time, I did go back

19   up, briefly.  And then came back down.

20       Q    And tell me about your conversation with

21   Mrs. DeGraw, at that point.

22       A    The main thing that I remember of my

23   conversation with her, was that when she had summoned

24   911, or summoned emergency help for her husband, she

25   was afraid of him.  She was afraid to go upstairs.

1    And she had made reference that there was a desire, I

2    believe, on the call taker, or the 911 dispatcher, if

3    you will, for her to check on him or see what he was

4    doing.  And she was afraid to do that, and wouldn't

5    do that.

6        Q    Did she relay to you about what his

7    medication condition was, from her observations and

8    interaction with him?

9        A    The only thing I remember, I believe she

10   had mentioned PTSD.  But that's -- that's the best of

11   my recollection.

12       Q    Did she have a conversation with you about

13   his having a prior seizure?

14       A    I don't remember.

15       Q    Okay.  I understand you took the decedent's

16   body temperature, is that correct?

17       A    I did --

18            MR. ROZELLE:  Object to form.

19            THE DEPONENT:  -- not.

20   BY MR. CALLAHAN:

21       Q    How was that obtained?

22       A    Once I was directed to follow SunStar to

23   the hospital, and -- which I did.  And I stayed there

24   with the deceased.  At some point in time, I had a

25   phone conversation with Sergeant Greene, who was the

         1    sergeant of homicide at that time.  And upon his

         2    request and direction, I had asked that his

         3    temperature be taken by medical staff.

         4         Q    Were you there when it was taken?

         5         A    Yes.

         6         Q    And did you learn what it was?

         7         A    I did.

         8         Q    Do you recall what that is?

         9         A    I don't.

        10         Q    The supplement sheet says 97.9.  Does that

        11    refresh your recollection?

        12              MR. ROZELLE:  Object to form.  You can

        13         answer.

        14              THE DEPONENT:  I ...  I don't ...

        15    BY MR. CALLAHAN:

        16         Q    Don't know?

        17         A    I don't know.

        18         Q    You'd have to rely on the records?

        19         A    I would.

        20         Q    And did you have an understanding of why

        21    Greene asked you to do that?

        22         A    No.

        23         Q    All right.  And do you take steps to record

        24    that information, or do they do it differently,

        25    themselves?

1           MR. ROZELLE:  Object to form.  You can

2      answer.

3           THE DEPONENT:  I would have noted it.

4      And then it would have been relayed to

5      either detectives, or whoever needed it at

6      that time.  I don't recall who, though.

7  BY MR. CALLAHAN:

8      Q    Okay.  Fair enough.  Let me ask you about

9  three gentlemen involved; Martinez, Goepfert and

10 Street.  Did you have subsequent conversations with

11 any of the three of them, about what went on in that

12 room?

13     A    On-scene, is when I learned that the

14 deceased had been tased.  And that it was Deputy

15 Goepfert that had tased him.  But --

16     Q    Let me back -- let me back you up, and ask

17 you.  How did you -- did you see him with his taser

18 out of the holster?

19     A    Yes.

20     Q    Okay.  And when and where did you see that?

21     A    When I initially got up to the second

22 story, Deputy Goepfert still had his taser in his

23 hand.

24     Q    And was there any other evidence in the

25 room that made it obvious that the taser had been

1   deployed?

2           MR. ROZELLE:  Objection to form.  You

3       can answer.

4           THE DEPONENT:  Not that I saw, that I

5       remember.

6   BY MR. CALLAHAN:

7       Q    Do you recall ever seeing the taser wires?

8       A    I don't remember.

9       Q    All right.  And beyond the fact that the

10  taser had been deployed, did you have any other

11  conversation with Goepfert about what happened in

12  that room?

13          MR. ROZELLE:  Objection to form.  You

14      can answer.

15          THE DEPONENT:  Once I left, and we went

16      back -- ultimately, once I finished what I

17      needed, and was relieved at the hospital and

18      responded to the North District Station, no,

19      we did not have conversation amongst

20      ourselves.

21  BY MR. CALLAHAN:

22      Q    And the same would be true of the other two

23  gentlemen, you didn't learn anything more about what

24  went on in the room --

25      A    No.

1      Q    -- from them?  Is the extent of what you

2    know about the event, contained within the statement

3    that you gave previously --

4              MR. ROZELLE:  Objection.

5    BY MR. CALLAHAN:

6      Q    -- as far as you know?

7              MR. ROZELLE:  Objection to form.  It

8         also implicates the attorney/client

9         privilege.  So within the constrains of not

10        responding to conversations that you had

11        with counsel, you may answer.

12   BY MR. CALLAHAN:

13     Q    Yeah.  No, I'm not interested in your

14   conversations with counsel.  But I do want to know if

15   you learned anything else that -- about the event,

16   that you haven't talked about here today.

17     A    In reviewing the case, yes.

18     Q    What did you learn?

19     A    Through the audio portion of my COBAN,

20   there was mention of a gun under a pillow.  There was

21   also the groaning, which I believe was from

22   Mr. DeGraw, that I did not recall until listening to

23   that audio.

24     Q    Okay.  And who imparted that information to

25   you, on the audio?

```
 1      A     That would --

 2      Q     Or were you just overhearing it?

 3      A     When I listened to the audio, I wasn't

 4   directed in any way, shape, or form.  It was just,

 5   here's the audio.  I listened to it, and that's what

 6   I heard.

 7      Q     Well, my question to you, what was the

 8   source of the audio?

 9      A     The sheriff's office COBAN video -- or

10   video and audio system.

11      Q     And could you determine who made those

12   remarks, or the source of those sounds?

13      A     The groaning and ...  Yes.

14      Q     And who was that?

15      A     Mr. DeGraw.

16      Q     And how about the gun under the pillow

17   comment, where did that come from?

18      A     It would have been one of those deputies,

19   on-scene.  As -- to be able to say who, exactly, I

20   can't.

21      Q     And what exactly did it say?  Did it make

22   reference to observations, or information, or what?

23      A     Just information, I believe, at that time.

24      Q     So you didn't take that to mean that

25   somebody saw a gun?
```

1          MR. ROZELLE:  Objection to form.  You

2     can answer.

3          THE DEPONENT:  No.  I did not see it

4     that way.

5     BY MR. CALLAHAN:

6     Q    Okay.  When you saw Mr. DeGraw lying on the

7     floor as you testified here a few minutes ago, during

8     the time you observed him, did he have any movement,

9     at all?

10    A    I did not see any movement from him.

11    Q    You mentioned his torso, but not his head.

12    How was his head aligned?

13    A    I don't remember how his head was.  My main

14    focus getting up there, were the hands and the

15    handcuffs.  The hands are what's going to hurt you.

16    Q    All right.  But his head wasn't on the

17    floor -- I mean, off the floor, was it?  It was on

18    the floor, with his body?

19    A    I ...

20    Q    If you could tell.

21    A    I don't.  I don't know.

22    Q    In any event, you detected no movement?

23    A    I -- no.  I did not see any movement.

24    Q    Okay.  Did you ever come to learn anything,

25    at all, from Goepfert, about the number of times he

1  used his taser?

2      A    No.

3      Q    Or why?

4      A    No.

5      Q    And did any of the gentlemen, in the course

6  of your dealings with them, say anything at all about

7  the physical circumstance of Mr. DeGraw on the floor;

8  in other words, his movements, his reactions,

9  anything like that?

10     A    No.

11          MR. CALLAHAN:  Okay.  Well, I thank

12     you.  I appreciate your time.

13          THE DEPONENT:  Okay.

14          MR. CALLAHAN:  Questions?

15          MR. ROZELLE:  Give me just one minute.

16     Hang on for a second.  Briefly, off the

17     record.

18          (At this time a short recess was held).

19                 <u>CROSS-EXAMINATION</u>

20  BY MR. ROZELLE:

21     Q    I have just one question for you, Deputy.

22  Actually, let's make it two.  I think you said

23  80 Alpha was Sergeant Street.  That was his assigned

24  radio call that day?

25     A    Yes.

1      Q    What was yours, do you remember?

2      A    Eighty-four Alpha.

3      Q    Is it 84, or 82?

4      A    Eighty-four Alpha.

5      Q    Eighty-four Alpha?

6      A    Yes.

7      Q    That -- whatever it was, it would be

8   refrec -- be reflected in the CAD, correct --

9      A    Yes.

10     Q    -- for that day?

11     A    Correct.

12          MR. ROZELLE:  No further questions.

13          MR. CALLAHAN:  Thank you.  I appreciate

14      it very much.  Good luck to you.

15          (At this time the deposition of

16          ROBERT K. BALDWIN, in the

17          above-captioned matter was concluded

18          at 2:18 P.M.).

19                    <u>STIPULATION</u>

20   hereby stipulated and agreed by and between counsel

21   present and the deponent, that the reading and signing

22   of this deposition by the deponent IS NOT waived.

23

24

25

1          <u>**CERTIFICATE OF REPORTER**</u>

2

3    **STATE OF FLORIDA          )**

4    **COUNTY OF HILLSBOROUGH    )**

5              **I, VANESSA DURHAM-ANDREW, Court Reporter,**

6    **certify that I was authorized to and did**

7    **stenographically report the foregoing deposition; and**

8    **that the transcript is a true record of the testimony**

9    **given by the deponent.**

10             **I further certify that I am not a relative,**

11   **employee, attorney or counsel of any of the parties,**

12   **nor am I a relative or employee of any of the parties'**

13   **attorneys or counsel connected with the action, nor**

14   **am I financially interested in the action.**

15             **I, the undersigned authority, certify that**

16   **ROBERT K. BALDWIN, personally appeared before me**

17   **and was duly sworn.**

18             **WITNESS my hand and official seal this**

19   **10TH day of JUNE, 2019.**

20

21                          ------------------------
                            **VANESSA DURHAM-ANDREW**
22                          **COURT REPORTER**

23

24

25

# DEPONENT'S CERTIFICATE

I have read the foregoing transcript of my oral Deposition taken on the date and at the location indicated on the title page of the Deposition, and I certify that said transcript is true and correct, with the provisions that any errors appearing therein have been corrected by me by listing on a separate sheet as to page number, line and content of said error(s), and further indicating the language to be substituted.

I also understand that upon completion of the reading, signing and correcting of the transcript, I am to return this original signature page, my list of corrections and said file copy provided for my inspection, to the person or company listed on the pre-addressed envelope provided to me.

I further understand that if I do not carry out the instructions stated above within 30 days from the date I receive the transcript, I automatically waive my right to read and sign the deposition.

DATE: 12/02/2019          NAME: _____ 57527
                                ROBERT K. BALDWIN

# ERRATA SHEET
## READING AND SIGNING OF DEPOSITION TRANSCRIPT

TO BE ATTACHED TO THE DEPOSITION TRANSCRIPT OF **ROBERT K. BALDWIN,**

TAKEN IN THE MATTER OF JULIE V. DEGRAW, as Personal Representative of the

Estate of DONALD C. DEGRAW, Deceased, vs. BOB GUALTIERI, in his individual and

supervisory capacity, as Pinellas County Sheriff, and GREGORY GOEPFERT., TAKEN

ON MAY 21, 2019, BY VANESSA DURHAM-ANDREW.

TO THE DEPONENT: IN COMPLIANCE WITH THE RULES OF CIVIL PROCEDURE, THIS

IS ATTACHED FOR YOUR INSPECTION AND SIGNATURE. ANY CHANGES IN THE

DEPOSITION, IN FORM OR SUBSTANCE, WHICH YOU CARE TO MAKE ARE TO BE MADE ON THIS

SHEET WITH YOUR REASON THEREFORE.

    \*        \*        \*        \*        \*        \*

## DO NOT WRITE ON THE DEPOSITION TRANSCRIPT, ITSELF

    \*        \*        \*        \*        \*        \*

RETURN THIS FORM AND THE ORIGINAL SIGNATURE PAGE WITHIN 14 DAYS FROM

JUNE 11, 2019, TO D & D REPORTING SERVICE.

APPEARANCES FOR:

THE PLAINTIFF:                  MICHAEL T. CALLAHAN, ESQUIRE
                                    ST. PETERSBURG, FLORIDA

THE DEFENDANTS:               PAUL G. ROZELLE, ESQUIRE
                                    LARGO, FLORIDA

LINE & PAGE NO.               CHANGE/CORRECTION & REASON

---

32/17                           there   $\rightarrow$   their

---

---

---

---

---

---

---

* * Continued * *

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

57527

ROBERT K. BALDWIN                                    12/02/2019
                                                      DATE



EXHIBIT 15

PENGAD 800-631-6989

**EXHIBIT**

16

PENGAD 800-651-6989





EXHIBIT
17
PENGAD 800-631-6989

EXHIBIT

18

PENGAD 800-631-6989



EXHIBIT

*19*

R. Baldwin

PEN/AD 800-631-6989

---

**Warning**

Contains entities exempt from disclosure

---

**Primary Information**

| | |
|---|---|
| Description: | TRANSCRIBED INTERVIEW OF DEPUTY BALDWIN **MOFFETT** |
| Occurrence From: | 09/07/2016 20:00 |
| Occurrence To: | 09/07/2016 20:30 |
| Source Of Info: | DET. MOFFETT |
| Source Reliability: | CONFIRMED |
| Dissemination Code: | RESTRICTED |
| Content Evaluation: | CONFIRMED |
| Reporting LEO: | MOFFETT, GEORGE D. DET (57088 / ROBBERY / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Approval Status: | Approved |
| Approved Date: | 10/12/2016 |
| Approved By: | CAPRA, JEFFERY P DET (53787 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |

---

**Synopsis**

This supplement was generated to document the recorded interview I conducted of Deputy R. Baldwin pertaining to this investigation. See narrative for details.

---

**Addresses**

| Relationship | Address |
|---|---|
| OCCURRED | 1739 SPLIT FORK DR, OLDSMAR, Florida 34677, UNITED STATES |
| RELATED | 6001 WEBB RD TAMPA COMMUNITY HOSPITAL, TAMPA, Florida, UNITED STATES |

---

**Subjects**

| Relationship | Name | Bio | DOB |
|---|---|---|---|
| EMERGENCY MEDICAL SERVICE | OLDSMAR FIRE DEPARTMENT 54 (AGENCY) | | --- |
| EMERGENCY MEDICAL SERVICE | SUNSTAR (AGENCY) | | --- |
| MEDICAL CARE FACILITY | TAMPA COMMUNITY HOSPITAL (BUSINESS) | | --- |
| LAW ENFORCEMENT OFFICER - EXEMPT | BALDWIN, ROBERT K DEP (LAW ENFORCEMENT OFFICIAL) | WHITE, MALE | --- |
| DECEASED | DEGRAW, DONALD CHRISTOPHER (PERSON) | 58 yr. old, WHITE, MALE | 06/25/1958 |
| NEXT OF KIN | DEGRAW, JULIE (PERSON) | 56 yr. old, ORIENTAL/ASIAN, FEMALE | 07/04/1960 |

---

**Narrative**

(INTERVIEW OF DEPUTY ROBERT BALDWIN, #SO16-363788-18, 09/07/16)

(The following may contain unintelligible or misunderstood words due to the recording quality.)

GM = Detective George Moffett
?B = Deputy Robert Baldwin

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

---

**Narrative - Continued**

GM:    This is Detective Moffett with the Pinellas County Sheriff's Office. Today's date is September 7th, 2016. Approximate time is 2000 hours. This is reference case number SO16-363788, regarding a death investigation. I'm currently here with Deputy Baldwin, to obtain his statement pertaining to his response to 1739 Split Fork Drive in Oldsmar, Florida, 34677 as well as his involvement while on scene at the listed location.

  Deputy Baldwin, approximately what time did you receive the dispatched call in question?

RB:    Well, I would have to look at the CAD. I don't know the exact time.

GM:    Okay. Were you dispatched to the call.

RB:    No. I was responding back from PES enroute back to my patrol area. I was at McMullen Booth Road and Curlew Road heading northbound currently stopped at the light, when I heard screaming on the radio. And then I heard, um, channel 4 go 10-3 for 80 Alpha. At that point I saw where they were and saw that I wasn't that far and responded 10-18 to the scene self assigning myself to the call.

GM:    Do you know who was screaming on the radio? Was it a deputy?

RB:    I couldn't tell. I could just hear what I thought was a male voice yelling in the background, and then the channel went 10-3.

GM:    Okay. So you respond to the scene 10-18?

RB:    Correct.

GM:    Was your patrol car COBAN activated?

RB:    It was once I activated my lights and sirens.

GM:    Okay. So you arrive on scene shortly thereafter?

RB:    I do.

GM:    Okay. Once you get on scene, what was your actions?

RB:    I first noticed fire rescue and Sunstar staged a couple houses down to the east of the occurred location. I immediately went inside the residence through the front door that was already open. I heard talking coming from the second floor of the residence. I immediately walked up the stairs towards the voices I heard. I observed a bedroom room pretty much right as you get up to the second floor. I saw the male subject later identified as Donald DeGraw lying on his stomach, and handcuffs were being placed on him. It looked like Sergeant Street was securing those handcuffs.

GM:    During this time was he on the floor or the bed?

RB:    When I got there, the deceased male was on the floor.

GM:    Okay. What area of the floor was the deceased male lying?

RB:    Directly in front of the bedroom door because I was unable to get into the bedroom.

GM:    Okay.

GM:    Do you know if the deceased male had already been Tasered by the deputies that were already on scene?

RB:    I believe at that point he had already been Tased.

GM:    Okay. Did you witness the deputies Tase him a second time?

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

| Narrative - Continued |
|---|

**RB:**   I did not.

**GM:**   Okay.  Upon entering into the residence, did you make contact with anybody?

**RB:**   Initially I made contact with the deceased's wife, Julie DeGraw, who was on the first floor of the residence.  I don't believe I said anything to her but I believe I saw her standing in the living room of the residence.

**GM:**   Okay.  So after you make contact with the other deputies on the second floor of the residence, what was you actions afterwards?

**RB:**   Sergeant Street directed me to go ahead and clear the channel because we were still at 10-3.  I informed Dispatch to 10-8 the channel and stated the male subject was in custody.

**GM:**   Okay. At that time, did you observe the male subject breathing?

**RB:**   At that time I did not know.

**GM:**   Okay.  Was the male subject making any sounds or making any type of movement?

**RB:**   No.

**GM:**   Okay.  So after you clear the channel what was your actions afterwards?

**RB:**   I asked for fire rescue to respond to the residence.  After a few minutes passed, I got back on the radio a second time saying that we needed Fire Rescue inside the residence ASAP.  I then went downstairs and actually waved Fire Rescue to come in because they were only staged a few houses down. Fire Rescue arrived on scene.

**GM:**   Okay.  While on scene did you remove your Taser from your holster at any point and time?

**RB:**   I did not.

**GM:**   Okay.  Did you observe the other deputies on scene draw or deploy their Taser?

**RB:**   I believe Deputy Goepfert had his Taser out.

**GM:**   Okay.  Do you know what Deputy actually Tased the decedent?

**RB:**   At the time I did not, but later on I learned that Deputy Goepfert was the one that Tased the deceased male subject.

**GM:**   Okay.  After the paramedic's arrive on scene, did you observe paramedic's perform rescue efforts on the deceased male?

**RB:**   Once the paramedic's got upstairs, I got out of the way because as I said before, I couldn't even get into the room because of the position of the deceased male lying on the floor.

**GM:**   Okay.  After the paramedic's get up stairs, what were your actions?

**RB:**   I had gone down the stairs and began talking with the deceased's wife, Julie.

**GM:**   Okay.  While up stairs, at any point did you touch the deceased male?

**RB:**   I did not.

**GM:**   Okay.  What was you actions after speaking with Julie DeGraw?

**RB:**   I just stood by inside the residence until Fire Rescue was ready to transport the deceased male.

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

**Narrative - Continued**

GM:    Okay.

GM:    During this time, did you ever return back upstairs?

RB:    I believe I might have gone back up the stairs one time but I never went into the room. I stayed in the hallway of the second floor.

GM:    Okay. So after paramedic's put the decedent on a stretcher and escorted him downstairs and exit the residence, what was your actions from there?

RB:    I asked Lieutenant Nygren if he wanted me to follow Sunstar to the hospital which he requested I do so, therefore I followed Sunstar to Tampa Community Hospital.

GM:    Okay. Did you have your COBAN activated while following Sunstar?

RB:    No, I did not.

GM:    Okay. So after you arrive at the hospital, what was your actions while inside the hospital?

RB:    I observed the paramedic's still actively working on the deceased male as a code, performing CPR. I basically stood by out of the way of rescue efforts. Afterwards, the male was pronounced deceased.

GM:    Okay. What did you do next?

RB:    I obtained Sunstar and Fire Rescue's information and then I got the pronounced time of the deceased male.

GM:    What was the pronounced time?

RB:    The deceased was pronounced at 1715 hours by Dr. David Degenhardt.

GM:    Is Dr. Degenhardt the emergency room doctor?

RB:    Yes.

GM:    Okay. Did you speak with Dr. Degenhardt at any point?

RB:    Just to get the spelling of his last name.

GM:    Okay. After contact with the Dr., what did you do next?

RB:    I obtained the chart number for the deceased male from one of the nurses. I then briefly spoke with Sergeant Greene of the Homicide Unit.

GM:    Okay. What did Sergeant Greene advise?

RB:    Sgt. Greene asked me to obtain the decedent's body temperature.

GM:    Okay. Was that all your involvement with this case?

RB:    Yes.

GM:    Did you leave anything out or have anything to add reference this investigation?

RB:    No

GM:    Okay. This concludes the interview with Deputy Baldwin. It's approximately 2005 hours on September 7th, 2016.

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

**Narrative - Continued**

(CONCLUSION OF INTERVIEW)

Transcribed by:  jah/jah/clk

---

**Record Status Information**

| | |
|---|---|
| Record Origination Operator: | MOFFETT, GEORGE D. DET (57088 / ROBBERY / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Record Origination Date: | 09/08/2016 16:53 |
| Last Update Operator: | CAPRA, JEFFERY P DET (53787 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Last Update Date: | 10/12/2016 15:50 |

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| MOFFETT, GEORGE D. DET (57088 / ROBBERY / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 | CAPRA, JEFFERY P DET (53787 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 |
| | | | |

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*