UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JULIE V. DEGRAW,
    Plaintiff,
vs.                                                  Case No.: 8:18-cv-02116-T36-SPF
BOB GUALTIERI, et al.
    Defendants.
_____/

**PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANT GOEPFERT'S MOTION FOR SUMMARY JUDGMENT**

Under § 7(b) of the Amended Case Management and Scheduling Order, Dkt. 83, at 2, Julie V. DeGraw files this Statement of Disputed Facts in support of her Response in Opposition to Defendant, Goepfert's, Motion for Summary Judgment, Dkt. 97, and responds to the numbered paragraphs of Defendant, Goepfert's Statement of Undisputed Material Facts (Dkt. 96), as follows:

    1.    Mr. DeGraw's medical history was unremarkable. Post-military, he was diagnosed with PTSD and accompanying depression, and took a sleeping pill. (DeGraw 7:19-21; 7:22-25; 8:1-4). His ailments were very well controlled with medication and he never had a psychotic breakdown. (Exhibit 28, p. 7 of 17, Dkt. 96-2).

Mr. DeGraw was medically retired after the First Gulf War. (DeGraw 6:2-6). He was having nightmares, problems sleeping, was diagnosed with PTSD and retired medically early. (DeGraw 6:6-10).

Mrs. DeGraw called 911 at 5:14am for medical help: that her husband woke up screaming, may have had a seizure. (Exibit 42a, p. 1 of 7).

Mr. DeGraw slept in the other room when he was not feeling well. (Exhibit 28, p. 4 of 17).

When she addressed him, he looked at her dazed. (DeGraw 21:18-19). He started for the door and Mrs. DeGraw was afraid he would fall down the stairs. (DeGraw 21:20-23).

1

After he called down, she opened the door and he followed her to the master bedroom, sat down and she told him she was going to make a phone call. (DeGraw 22:1-5). Mr. DeGraw did not follow her down the steps. (DeGraw 22:5-6). The master bedroom is located down the L-shaped hallway on the second floor. (DeGraw 27:7-9).

    2.    The dispatch stated that police department was being sent over for safety because Mr. DeGraw did not understand what was going on. (Exhibit 42a, p. 2 of 7). Mrs. DeGraw advised that there were guns in the house, one in Mr. DeGraw's room but the others in the family room in a case.

    Mr. DeGraw had no history of aggression. (Exhibit 42a, p. 4 of 7).

    3.    No disputed additional facts.

    4.    When the deputy asked Mrs. DeGraw if she felt safe, she confirmed that she did and that he did not need to be taken to the hospital. (DeGraw 22:24-25; 23:1-3).

    5.    The deputy invited Mr. DeGraw to come downstairs which he did. (DeGraw 22:14-16). The deputies talked to him, the paramedics assessed him and asked if he wanted to go to the hospital which he declined. (DeGraw 22:16-19). Mr. DeGraw passed the mental exam. (Exhibit 28, p. 11 of 17). He was alert and oriented. (DeGraw 28:17-18).

    6.    In the afternoon around 3:00pm or 3:30pm, Mrs. DeGraw checked on her husband after he woke up from a nap in the other bedroom. (DeGraw 23:14-15; 40:1-5). Suddenly, his whole body stiffened up straight, his eyes rolled back, he started shaking and lost control of his bladder. (DeGraw 39:20-23; 23:3-6). She heard Mr. DeGraw say a really loud "ha", like shouting. (DeGraw 40:41:3-6).

7. Mrs. DeGraw ran downstairs, called 911 at 3:42pm and asked for medical help due to seizure. (DeGraw 40:9-13). She told the operator that he was very confused this morning. (Exhibit 42a, p. 6 of 7). This might be the second or third seizure in a row and that Mr. DeGraw had no history of seizures but had PTSD. (Exhibit 42a, p. 6 of 7). She did not want to go upstairs not due to safety because she was afraid her husband would follow her and get hurt falling down the stairs. (DeGraw 41:17-25; 42:1).

Earlier that day he was running after the dogs, scratched her neck and did not understand what was going in. (Exhibit 42a, p. 1 of 7).

Mr. DeGraw had never been violent towards anyone. (DeGraw 72:13-22).

8. When the Fire Department (FD) paramedics received the call, the lieutenant in charge saw in the dispatch notes that the wife was afraid of the patient. (SO16-363788/22, p. 3 of 8). He was told by the paramedic from the previous shift that he had been there earlier, the patient had behavioral or psych problem, was very difficult to deal with, refused treatment and there were a lot of weapons in the house. (SO16-363788/22, p. 3 of 8). The paramedic stated he told the lieutenant that he had responded to the residence, there were reports of weapons in the house, the patient had PTSD and took psych meds. (SO16-363788/7, p. 8 of 17). Although Mr. DeGraw had not been aggressive, his body language indicated he didn't want to go to the hospital. (SO16-363788/7, p. 8 of 17). As a result, the FD decided to ask for law enforcement assistance to make sure the residence was safe to enter. (SO16-363788/22, p. 3 of 8).

9. Deputy Martinez has been employed at PCSO since January 2013. (Exhibit 1, SO16-363788/8, p. 1 of 11). He has specialty raining in CIT. (Exhibit 1, SO16-363788/8, p. 2 of

3

11).

10. When both deputies arrived together, Mrs. DeGraw advised that her husband had a seizure and PTSD. (Exhibit 1, SO16-363788/8, p. 2 of 11). Deputy Goepfert started upstairs while Deputy Martinez remained to talk to Mrs. DeGraw. (Exhibit 1, SO16-363788/8, p. 2 of 11).

Goepfert is 5-10, 47 years old. (SO16-363788/8/21, p. 11 of 15). He weighted 180 pounds. (/21, p. 12 of 15). He has been practicing martial arts since he was 4 years old. (Goepfert 6:14-17). He has been doing Taekwondo (kicking and striking) for 20 years and holds the highest ranking possible. (Goepfert 6:22-25; 7:1-16). He is proficient in Jiu jitsu (a grappling art with ground fighting and self-defense)(Goepfert 7:17-25) as well as in Krav Maga, Israeli martial art developed by the Israeli military special forces. (Goepfert 8:2-9). While at the Air Force, he trained special forces in hand-to-hand combat, knife fighting defense, and gun takeaways. (Goepfert 10:19-21;11:20-25; 11:1-5). He trained in ability to overcome the opponent and kill if necessary. (Goepfert 11:6-8).

11. Mrs. DeGraw explained to the deputies: "My husband had a seizure. He's confused. He's upstairs. He's a vet. He has PTSD." (DeGraw 44:1-8). They could hear Mr. DeGraw saying a loud "ha". (DeGraw 45:15-19; 46:23-24).

Martinez told Goepfert that Mrs. DeGraw had advised that he had a seizure and Goepfert acknowledged that he understood. (Martinez 57:18-25; 58:1-4). In the same conversation, Martinez advised Goepfert that Mrs. DeGraw said he suffered from PTSD, and Goepfert acknowledged understanding. (Martinez 59:1-11).

Although he was aware of symptoms of an active seizure, Dpt. Goepfert had never

experienced a post-seizure situation before. (Goepfert 38:15-22; 39:1-4). He was aware that mental confusion, fogginess and speech impairment are typical symptoms of post-seizure. (Goepfert 39:16-21; 39:22-23; 40: 2-5). He did not consider that Mr. DeGraw might be in post-seizure state. (Goepfert 59:22-24).

Goepfert knew Martinez was CIT trained. (Goepfert 46:12-16).

12. She said the guns were in the foot locker in the family room. (DeGraw 16:3-5). Dpt. Goepfert immediately headed upstairs and half-way up, asked if there was anything he needed to know. (DeGraw 15:14-16). Mrs. DeGraw told him that her husband slept with a gun under his pillow for comfort and security. (DeGraw 15:16-18; 46:11-14). Mrs. DeGraw did not say that "there were guns everywhere". (DeGraw 16:1-3). Both deputies took out their Tasers. (DeGraw 15:18-23; 44:13-18).

13. No disputed additional facts.

14. Goepfert told Martinez to get his gun out just in case. (SO16-363788/21, p. 8 of 15). When he went upstairs to assess the situation, to see if Mr. DeGraw was okay as he had no idea what was going on. (SO16-363788/21, p. 10 of 15).

15. The staircase has a 180 degree turn as it goes up, with Mr. DeGraw's bedroom being staring ahead at the top of the stairs. (DeGraw 46:1-6).

Deputy Martinez went upstairs and stood by the wall where he could see Dpt. Goepfert but not see Mr. DeGraw or the room. (SO16-363788/8, p. 3 of 11 11). Subsequently he learned that the bed was to the left, with the head of the bed on the wall to the left of where Goepfert was standing outside the doorway. (Martinez 74:21-25; 75:1-3).

Goepfert cautiously approached to where he could see Mr. DeGraw. (SO16-363788/21, p. 6 of 15). Mr. DeGraw was laying on the bed in his underwear. "[H]e was just laying there. He wasn't doing anything." (SO16-363788/21, p. 6 of 15).

16. At one point, Deputy Goepfert said Mr. DeGraw's arms were "towards his head" and he asked Deputy Martinez to "go lethal' (draw his firearm). (SO16-363788/8, p. 3 of 11).

17. When Mr. DeGraw yelled, Goepfert could see that Mr. DeGraw's whole mouth was bloody, there was blood in his mouth, his teeth and around his lips. (SO16-363788/21, p. 10 of 15).

18. No disputed additional facts.

19. No disputed additional facts.

20. No disputed additional facts.

21. No disputed additional facts.

22. After Mrs. DeGraw told the deputies that her husband had been in the military, Dpt. Goepfert advised he was a marine and stated to Mr. DeGraw several times, "I'm a marine. Can we talk?" (DeGraw 16:14-22; 15:22-23; 44:13-18). Mrs. DeGraw said twice that her husband was confused, that he just had a seizure, that he does not understand and that he has PTSD. (DeGraw 16:22-25).

23. He did not yell any words, just made an "ahhh" noise. (SO16-363788/21, p. 6 of 15).

24. Goepfert did not say that Dr. DeGraw had reached under the pillow. (Martinez 193:3-5).

But then "he kept like turning over to the side. …[A]lmost like he was reaching for something." (SO16-363788/21, p. 6 of 15). He had started leaning towards his left away from where Goepfert could see his hands. (SO16-363788/21, p. 6 of 15). Goepfert kept saying, "Don't' do that. I'm going to have to Taser you". (SO16-363788/21, p. 6 of 15). Goepfert ordered him to turn back where he could see his hands. (SO16-363788/21, p. 6 of 15). With a yell, Mr. DeGraw complied. (SO16-363788/21, p. 6 of 15). This happened 3 or 4 times. (SO16-363788/21, p. 6 of 15). Martinez did not see any guns, just boxes for long guns and they were closed. (SO16-363788/8, p. 7 of 11; Martinez 182:20-23). Once Mr. DeGraw was restrained, the deputies looked under the pillow and there was gun under the pillow. (SO16-363788/8, p. 7 of 11). The gun was not exposed from under the pillow during the events. (Martinez. 59:12-20). Martinez was unaware if the gun was armed. (Martinez 193:6-10).

Goepfert saw the gun under the pillow after they had gotten Mr. DeGraw in cuffs. (SO16-363788/21, p. 13 of 15). At no time when Goepfert was dealing with Mr. DeGraw was the gun ever exposed. (Goepfert 40:14-16). Mr. DeGraw never had an opportunity to touch the gun under the pillow. (Goepfert 41:6-11).

After Mr. DeGraw was cuffed, lifted up the pillow and saw a pistol laying on the mattress under the pillow, pointed in the direction of the door. (SO16-363788/26, Dkt. 96-9, p. 3-4 of 6). Sgt. Street did not secure the gun, he does not know who did. (Street 45:22-25).

West of the lamp on the bed is a Springfield Armory .45 caliber with a magazine. The (gun) Model is 1911-A1. The barrel of the firearm is pointed in a southwestern direction. After photographs were taken, I made the firearm safe, I found no rounds in the chamber and six in the

magazine. There were 5 CVC 45 auto and 1 WCC93 rounds in the chamber. (sic) magazine[1]. (Investigative Report / SO16-363788/10, Dkt. 96-12, p. 2 of 4).

25.     No disputed additional facts.

26.     At one point, Deputy Goepfert said Mr. DeGraw's arms were "towards his head" and he asked Deputy Martinez to "go lethal' (draw his firearm). (SO16-363788/8, p. 3 of 11).

27.     Deputy Martinez holstered the Taser, drew his weapon and remained in the same position where he could not see Mr. DeGraw. (SO16-363788/8, p. 3 of 11).

28.     Goepfert kept saying to Mr. DeGraw, "Sir, come out towards me". (SO16-363788/21, p. 6 of 15). Goepfert wanted to get Mr. DeGraw out of the bedroom as he knew there were guns there. (SO16-363788/21, p. 6 of 15).

Then he stood up towards Goepfert and gave out the yell. (SO16-363788/21, p. 6 of 15). He "kind of came toward" Goepfert.

29.     At one point, Deputy Goepfert mentioned that Mr. DeGraw stood up. (SO16-363788/8, p. 3 of 11). Goepfert said, "Hey, sir, back up, back up, back up." (SO16-363788/8, p. 3 of 11).

Goepfert said, "Sir, stay where you're at". (/21, p. 6 of 15). Mr. DeGraw sat back down on the bed. (SO16-363788/21, p. 6 of 15).

Mr. DeGraw sat on the edge of the bed. (SO16-363788/21, p. 6 of 15).

And then he got up, turned towards Goepfert and took a step. (/21, p. 6 of 15).

Goepfert said, "Sir, … just stay there." (SO16-363788/21, p. 6 of 15). Mr. DeGraw took

---

[1] The last sentence must be a typo and refer to a magazine not chamber, as it contradicts with the previous sentence and the chamber can have only one bullet at a time, not six.

another step and then he put his hands out in front of him. (SO16-363788/21, p. 7 of 15).

30. No disputed additional facts.

31. No disputed additional facts.

32. Martinez did not know anything at all about what state of mind a person would be post-seizure. (Martinez 175:6-11). Martinez did not know what state of mind Mr. DeGraw's prior special ops experience would put him in. (Martinez 175:11-21). Although Goepfert stated "Sheriff's Office" upon arrival, Mr. DeGraw never gave any indication that he knew they were deputies, as he responded to everything that Goepfert said with only a scream. (Martinez 175:22-25; 176:1-16). (SO16-363788/8, p. 4 of 11).

33. No disputed additional facts.

34. Mr. DeGraw was not making any verbal communication during the entire event. (Martinez 23:24-25; 24:1-9). During the entire event, Mr. DeGraw did not verbally threaten anyone. (Martinez 173:4-9). Mr. DeGraw did not indicate that he understood what the deputies were saying. (Martinez. 33:22-25; 34:1).

He was coming at Goepfert like a zombie. (SO16-363788/21, p. 7 of 15). Goepfert characterized it as "weird … but interesting". (SO16-363788/21, p. 7 of 15).

Goepfert described it as "hands out, fists down". (Goepfert 62:19-23). While walking towards the doorway, Mr. DeGraw made no motion to reach for any gun or towards the pillow on the bed. (Goepfert 83:24-25; 84: 1-16).

35. No disputed additional facts.

36. No disputed additional facts.

37. Street was Goepfert's and Martinez's squad supervisor. (Street 4:18-22). When Street was on the stairs, he heard Goepfert announce, "Taser" and heard the pop. (SO16-363788/26, Dkt. 96-10, p. 3 of 6).

38. Martinez saw Goepfert move backwards towards the stairway. (Martinez 120:15-22). Then Goepfert deployed his Taser. (SO16-363788/8, p. 3 of 11; Martinez 120:21-22).

DeGraw was 2-3 feet from Goepfert when the Taser was deployed. (SO16-363788/8, p. 5 of 11).

They were 3 feet from each other. (SO16-363788/21, p. 7 of 15). Mr. DeGraw fell down on his buttocks against the east wall where the ladder was. (SO16-363788/21, p. 7 of 15). Goepfert knew he needed 7 feet of distance to have 12 inches of Taser probe spread. (Goepfert 82:10-14). Goepfert was 3 feet away so he only got 6 inches of spread. (Goepfert 82:14-15).

39. The first time Martinez saw him, Mr. DeGraw was fighting the pain of the Taser by continuously moving, taking small steps forward, slowly "inching, shuffling" in the direction of the deputies, while bumping into things. (Martinez 43:10-25; 44:1-4). Martinez does not know how many steps Mr. DeGraw took; they were small steps not full strides. (Martinez 44:5-8).

40. No disputed additional facts.

41. Mrs. DeGraw heard scuffles and somebody said, "Stay down". (DeGraw 53:12-14). She then heard her husband say "mother fucker", and then all noise stopped, there was no more noise, it was his last word. (DeGraw 50:22-25; 51:1-9). He did not make the "ha" sound thereafter and he had cursed only once. (DeGraw 60:1-10).

Then he fell towards the wall and landed on his buttocks into a stepladder. (SO16-

363788/8, p. 6 of 11). He saw Mr. DeGraw fighting the Taser, bracing for it. (SO16-363788/8, p. 5 of 11). By "bracing", Martinez meant Mr. DeGraw was trying to fight the Taser probes, not that he was going to get up and punch the deputies. (SO16-363788/8, p. 6 of 11).

42. No disputed additional facts.

43. No disputed additional facts.

44. No disputed additional facts.

45. No disputed additional facts.

46. No disputed additional facts.

47. Mr. DeGraw was trying to get up while the deputies were telling him to get down. (SO16-363788/8, p. 3 of 11). When Mr. DeGraw tried to get up, it was not with an intent to "come and get" the deputies, he was just trying to get up. (SO16-363788/8, p. 7 of 11). He never actually fully get up from the floor. (Martinez 38:10-18).

48. Mr. DeGraw was "flailing about on the ground, rolling back and forth, grunting, growling and grinding his teeth". (SO16-363788/26, p. 3 of 6). There was blood around the insides of his lips and around his teeth. (SO16-363788/26, p. 3 of 6). Goepfert ordered him to roll over and lay on his stomach, which he did not do. (SO16-363788/26, p. 3 of 6). Mr. DeGraw was laying on the floor, with his feet against the side of the bed, perpendicular to the door frame. (SO16-363788/26, p. 3 of 6). He was constantly grunting and groaning in a very loud primitive way. (SO16-363788/26, p. 3 of 6). The Taser was not effective on Mr. DeGraw, from Street's observation and he knew they would have to go hands-on. (Street 25:8-13)

49. Street had no knowledge of Mr. DeGraw's state of mind or any idea of he knew

11

who Street was or even if he knew that they were deputies. (Street 89:9-25). Mr. DeGraw did not give any indication that he understood who the deputies were and what they were doing. (Street 90:24-25; 91:1-16).

50. Goepfert recognized that Mr. DeGraw was not thinking right or acting right. (SO16-363788/21, p. 12 of 15).

51. Goepfert gave him another zap with the Taser which caused him to brace again. (SO16-363788/8, p. 7 of 11).

52. No disputed additional facts.

53. No disputed additional facts.

54. No disputed additional facts.

55. No disputed additional facts.

56. No disputed additional facts.

57. No disputed additional facts.

58. No disputed additional facts.

59. When Goepfert turned the Taser off, Mr. DeGraw started to yell again, with spit and blood coming out of his mouth. (SO16-363788/21, p. 7 of 15).

Mr. DeGraw was never able to stand up, he did not even get up on one knee before he was Tasered. (Goepfert 80:16-22).

Goepfert did not know if Mr. DeGraw was understanding him. (Goepfert 67:3-6). Goepfert deployed his Taser because Mr. DeGraw was not obeying his commands and in Goepfert's mind, a little bit of Tasering was better than the deputies "kicking his ass". (SO16-363788/21, p. 12 of

15).

60. No disputed additional facts.

61. No disputed additional facts.

62. No disputed additional facts.

63. No disputed additional facts.

64. According to records, the Taser was deployed on Mr. DeGraw for 1 min 33 seconds, for the following duration: 2 seconds, 3 seconds, one second, 5 seconds, and 1 second. (Martinez 29:7-17).

65. Martinez does not know how many times Goepfert deployed his Taser. (SO16-363788/8, p. 3 of 11).

During the entire encounter, Mr. DeGraw did not talk once. (SO16-363788/21, p. 9 of 15). He did not know what was going on. (SO16-363788/21, p. 10 of 15). It seemed that Mr. DeGraw wanted to communicate but could not. (SO16-363788/21, p. 10 of 15). Whenever Goepfert said something to Mr. DeGraw, he would yell in response. (SO16-363788/21, p. 10 of 15). If Goepfert did not say anything, Mr. DeGraw was fine. (SO16-363788/21, p. 10 of 15).

66. No disputed additional facts.

67. No disputed additional facts.

68. No disputed additional facts.

69. No disputed additional facts.

70. No disputed additional facts.

71. No disputed additional facts.

72. No disputed additional facts.

73. No disputed additional facts.

74. They cleared out the stepladder and the table so that there would be more room on the floor. (SO16-363788/8, p. 5 of 11). There was a "knife/scissor thing" they pushed to the side. (SO16-363788/8, p. 5 of 11).

75. No disputed additional facts.

76. No disputed additional facts.

77. No disputed additional facts.

78. No disputed additional facts.

79. Street walked into the room to hold Mr. DeGraw so he could be detained. (SO16-363788/8, p. 4 of 11). Street pushed Mr. DeGraw on his stomach face-down on the ground. (SO16-363788/8, p. 5, 8 of 11).

Then Street showed up, went in and was able to grab Mr. DeGraw and get him on his stomach. (SO16-363788/21, p. 8 of 15). Martinez jumped in to help and they were able to get Mr. DeGraw cuffed. (SO16-363788/21, p. 8 of 15).

Meanwhile, Mr. DeGraw had wiggled around so he was now in the opposite, with his feet up towards the door and his shoulder blades resting against the side of the bed, near the head of the bed. (SO16-363788/26, p. 3 of 6). Street did not see how Mr. DeGraw did this. (Street 32:13-15). Street stepped in, grabbed Mr. DeGraw's left wrist to roll him over onto his stomach. (SO16-363788/26, p. 3 of 6). Goepfert secured the legs and Martinez cuffed his left wrist. (SO16-363788/26, p. 3 of 6). Street told Goepfert to pull Mr. DeGraw's legs to get his shoulders off of

the wall next to the bed. (SO16-363788/26, p. 3 of 6).

Goepfert had his foot on one of Mr. DeGraw's legs and his shin on the other. (SO16-363788/21, p. 8 of 15). Then he pulled Mr. DeGraw by the legs away from the wall. (/21, p. 8 of 15).

80. Street was holding Mr. DeGraw's left arm so Martinez got it cuffed first. (SO16-363788/8, p. 4 of 11). As Street was trying to move Mr. DeGraw's right arm to the left, Mr. DeGraw was kind of trying to grab Martinez's hand and the cuffs. (SO16-363788/8, p. 4 of 11). Goepfert grabbed Mr. DeGraw's legs and pulled him away from the wall. (Martinez 48:20-25). Once Mr. DeGraw was cuffed, Martinez and Street got up. (SO16-363788/8, p. 4 of 11). Mr. DeGraw was "just kinda still". (SO16-363788/8, p. 4 of 11). He never moved again after he was handcuffed. (Martinez 50:5-7).

81. No disputed additional facts.

82. No disputed additional facts.

83. No disputed additional facts.

84. No disputed additional facts.

85. No disputed additional facts.

86. After Mr. DeGraw was cuffed, the deputies backed away and he was not moving. (SO16-363788/21, p. 9 of 15).

87. Thereafter, Martinez was able to cuff both hands. (SO16-363788/26, p. 3 of 6). Street told Baldwin to tell FD to come in. (SO16-363788/26, p. 3 of 6). Thereafter, Street got down on his knees and shook Mr. DeGraw's shoulder a couple of times but he was non-responsive.

(SO16-363788/26, p. 4 of 6).

88.    Goepfert looked down and saw that Mr. DeGraw did not look quite right. (Goepfert 70:20-23). They rolled Mr. DeGraw on his side and his mouth kind of moved making the deputies think he was ok. (SO16-363788/21, p. 9 of 15). When he still did not move, Street tried to check his pulse but Goepfert did not know if he got any. (SO16-363788/21, p. 9 of 15).

During the rolling over process, Street noticed that Mr. DeGraw's breathing pattern changed but he could not tell when Mr. DeGraw stopped breathing. (Street 40:18-20). Right after that, Street noticed Mr. DeGraw's eyes were glazed over. (SO16-363788/26, p. 4 of 6).

89.    After a while, she heard Deputy Martinez say, "Sir. Sir. Wake up." (DeGraw 17:8-10; 51:17-19). "Open your eyes". (DeGraw 53:16-17). When she inquired, the deputy told her, "He lost consciousness". (DeGraw 17:10-11). When Mrs. DeGraw asked if her husband was breathing, the deputy said, "yes". (DeGraw 17:11-12; 53:19-20; 58:12-13). He was just not waking up, they told her. (Exhibit 28, SO16-363788/6, p. 13 of 17).

90.    No disputed additional facts.

91.    No disputed additional facts.

92.    The deputies said, "hey, hey, Don? Don? Wake up". (SO16-363788/8, p. 4 of 11). Mr. DeGraw was non-responsive. (SO16-363788/8, p. 8 of 11). Street rubbed his arm on Mr. DeGraw's chest. (SO16-363788/8, p. 4 of 11). It appeared to Martinez that Mr. DeGraw's lips moved or fluttered. (SO16-363788/8, p. 4 of 11; Martinez 51:9-14; 158:22-25; 159:1-2). Street gave Mr. DeGraw a sternum rub to check his pulse and see if he was breathing but he did not come and they could not get a pulse. (Martinez 50:23-25; 51:1-4). They asked Deputy Baldwin to call

the EMTs. (SO16-363788/8, p. 4 of 11). Baldwin had arrived while the deputies were handcuffing Mr. DeGraw. (Martinez 51:19-23).

    93.    No disputed additional facts.

    94.    No disputed additional facts.

    95.    No disputed additional facts.

    96.    No disputed additional facts.

    97.    The FD came in, assessed Mr. DeGraw and realized he was not breathing. (SO16-363788/6/26, p. 4 of 6). They were hooking Mr. DeGraw up to EKG leads and Street uncuffed him. (SO16-363788/6/26, p. 4 of 6). After about 20 minutes, paramedic loaded Mr. DeGraw on the backboard and carried him to the ambulance. (SO16-363788/6/26, p. 4 of 6). When the paramedics arrived, Mr. DeGraw had no pulse, there was no electrical activity in the heart at all. (SO16-363788/6/22, p. 4 of 8).

    98.    See disputed facts in No. 24.

    99.    West of the lamp on the bed is a Springfield Armory .45 caliber with a magazine. The (gun) Model is 1911-A1. The barrel of the firearm is pointed in a southwestern direction. After photographs were taken, I made the firearm safe, I found no rounds in the chamber and six in the magazine. There were 5 CVC 45 auto and 1 WCC93 rounds in the chamber[2]. (sic) magazine. (Investigative Report SO16-363788/10, p. 2 of 4).

    100.    No disputed additional facts.

    101.    No disputed additional facts.

---

[2] The last sentence must be a typo and refer to a magazine not chamber, as it contradicts with the previous sentence and the chamber can have only one bullet at a time, not six.

102. No disputed additional facts.

103. No disputed additional facts.

104. No disputed additional facts.

105. Donald DeGraw was a 58 years old, 5'5", 160 pound man.  (Exhibit 28, p. 16 of 17).  Mr. and Mrs. DeGraw were married for thirty years.  (Exhibit 28, p. 1 of 17).  Mr. DeGraw was in the military for 17 or 18 years, first in the Air Force, then in the Navy as a medic. (DeGraw 4:18-25).  He was a combat medic for the ANGELICO special ops group.  (DeGraw 5:10-11).  He served out in the field during the First Gulf War. (DeGraw 5:16-19).  He participated in "special ops" operations that his wife was not allowed to know.  (DeGraw 5:19-20).  He would get a call in the middle of the night and be gone for eight months.  (Exhibit 28, p. 5 of 17).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via e-party by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

Dated: August 7, 2020

/s/ Inguna Varslavane-Callahan
Inguna Varslavane-Callahan, Esq.
FBN:  183873
Michael T. Callahan, Esq.
FBN: 160940
CALLAHAN LAW FIRM, LLC
449 Central Ave., Ste. 203
St. Petersburg, Florida 33701
Phone: (727) 209-1504
Fax: (727) 289-4800
E-mail: mcallahan@clftrialattorneys.com
         icallahan@clftrialattorneys.com
         jmasters@clftrialattorneys.com
Attorneys for Plaintiff