*PINELLAS COUNTY SHERIFF'S OFFICE*
*PCSO - SUPPLEMENT SO16-363788/22*

Report Date: 09/09/2016

| Warning | |
|---|---|
| Contains entities exempt from disclosure | |

| Primary Information | |
|---|---|
| Description: | TRANSCRIBED INTERVIEW WITH FIRE LT. BRENNAN *JT* |
| Occurrence From: | 09/07/2016 20:33 |
| Occurrence To: | 09/07/2016 20:46 |
| Dissemination Code: | RESTRICTED |
| Content Evaluation: | Information |
| Reporting LEO: | TOBECK, JONATHAN S DET (56990 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Activity: | OTH SERV / ACTION |
| Approval Status: | Approved |
| Approved Date: | 09/29/2016 |
| Approved By: | CAPRA, JEFFERY P DET (53787 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |

| Synopsis |
|---|
| SEE NARRATIVE FOR DETAILS OF INTERVIEW WITH OLDSMAR FIRE DEPARTMENT LIEUTENANT THOMAS BRENNAN. |

| Addresses | |
|---|---|
| Relationship | Address |
| OCCURRED | 1739 SPLIT FORK DR, OLDSMAR, Florida 34677, UNITED STATES |
| RELATED | 737 LOUDEN AVE PCSO NORTH DISTRICT STATION, DUNEDIN, Florida 34698, UNITED STATES |

| Subjects | | | |
|---|---|---|---|
| Relationship | Name | Bio | DOB |
| COMPLAINANT | DEGRAW, JULIE (PERSON) | 56 yr. old, ORIENTAL/ASIAN, FEMALE | 07/04/1960 |
| FIREFIGHTER - EXEMPT | BRENNAN, LT. (PERSON) | WHITE, MALE | --- |
| FIREFIGHTER - EXEMPT | CASTRO, NOEL E (PERSON) | 29 yr. old, HISPANIC, MALE | |
| FIREFIGHTER - EXEMPT | GRENIER, PAUL J (PERSON) | 26 yr. old, WHITE, MALE | |
| EMERGENCY MEDICAL SERVICE | SUNSTAR (AGENCY) | | --- |
| OTH AGY - NON LAW ENFORCE | OLDSMAR FIRE DEPARTMENT 54 (AGENCY) | | --- |
| OTH AGY - NON LAW ENFORCE | PALM HARBOR FIRE DEPARTMENT #65A (AGENCY) | | --- |
| LAW ENFORCEMENT OFFICER - EXEMPT | GOEPFERT, GREGORY (LAW ENFORCEMENT OFFICIAL) | | --- |
| LAW ENFORCEMENT OFFICER - EXEMPT | MARTINEZ, EDUARDO DEP (LAW ENFORCEMENT OFFICIAL) | 31 yr. old, HISPANIC, MALE | |
| LAW ENFORCEMENT OFFICER - EXEMPT | STREET, CHARLES SGT (LAW ENFORCEMENT OFFICIAL) | | --- |
| DECEASED | DEGRAW, DONALD CHRISTOPHER (PERSON) | 58 yr. old, WHITE, MALE | 06/25/1958 |

| Narrative |
|---|
| |

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

*PINELLAS COUNTY SHERIFF'S OFFICE*
## *PCSO - SUPPLEMENT SO16-363788/22*
Report Date: 09/09/2016

**Narrative - Continued**

INTERVIEW OF THOMAS BRENNAN, #16-363788-22, 09/07/16)

(The following may contain unintelligible or misunderstood words due to the recording quality.)

JT = Detective Jonathan Tobeck
JU = Detective J. Upton
TB = Lieutenant Thomas Brennan

JT: I'm Detective Tobeck. Today's date is September 7th, 2016. It's currently 2033 hours. I'm investigating case number SO16-363788. Currently located at the Sheriff's Administration Building -- or Sheriff's North District Station at 737 Lowden Avenue in Dunedin, Florida. The occurred address is at 1739 Split Fork Drive in Oldsmar, Florida. Currently present are myself, Detective Jonathan; Detective J. Upton; and Lieutenant Brennan from the Oldsmar Fire Department. Oldsmar City payroll number's 428.

All right. Lieutenant, um, let's gut some basic background from you first, sir.

TB: Okay.

JT: How long you -- you been with Oldsmar FD?

TB: Eight years.

JT: Okay. Did you work anywhere before that?

TB: Yes. I worked here in Dunedin.

JT: Okay. How long did you do that for?

TB: Uh, 15 years.

JT: Wow. And are you a paramedic, EMT?

TB: EMT.

JT: EMT? So you're like the -- you're the shift supervisor at the firehouse?

TB: Yes. We're called the company officer.

JT: Okay. And you were on A shift?

TB: Yes, sir.

JT: So it'd be Engine 54A or --

TB: That's correct.

JT: Okay. What time did you guys get to work this morning, sir?

TB: 7:00.

JT: Okay. All right. This afternoon, did you have the, um, privilege of responding to 1739 Split Fork Drive?

TB: Yes.

JT: Okay. And how -- how did that happen? Did you guys get dispatched or --

TB: Yeah. We got dispatched by Pinellas County 911.

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

*PINELLAS COUNTY SHERIFF'S OFFICE*
*PCSO - SUPPLEMENT SO16-363788/22*

Report Date: 09/09/2016

### Narrative - Continued

JT: Okay. What was the nature of the dispatch?

TB: A seizure patient.

JT: Had you been to address before?

TB: No, I have not.

JT: Okay. All right. And my understanding is the Sheriff's Office was called to secure the scene beforehand.

TB: Yes.

JT: Why -- why was that done?

TB: I did it based on, um, notes from the call and information from Paramedic Castro.

JT: Okay.

TB: Um, while en route, we had our computer up, and you can see the 911 dispatcher typing the notes, and it indicated that the -- the wife was the caller. She was afraid of the patient. She did not wanna go near the patient and that she was basically hiding in the house away from the patient. And then, um, Paramedic Castro, who responded to the incident earlier that day at that house, like, sometime at 5:00 in the morning, he made a comment, "Oh, we were there earlier today."

And I asked him, "Well, what happened?" He basically said it was, um, like, a behavioral problem, maybe a -- a psych problem. Um, and they went out there. Um, the guy was difficult to deal with, very difficult to deal with, and, um, he refused to go get treatment and, um, that he had a lotta weapons in the house. And based on his information and the information I'm reading on the screen, I decided that it was not a safe scene for -- for me and my crew to go to. So at that time, I asked our dispatcher to, uh, respond to SO, um, to assist us.

JT: Okay. So did you guys get in the area and stage or --

TB: Yeah. We staged at, um -- uh, what's it called -- Split Fork and, uh, Gray Bark. That's about 12 houses away.

JT: Okay. Um, how long were you staged before you got the clear to come in?

TB: Uh, we -- we staged, and, um, two deputies passed us.

JT: Okay.

TB: And then so what we did, we kinda rolled into it and got closer to the scene. We were now about two or three houses away and then we -- we stopped there. And, um, we waited there for them to signal us to come into the scene.

JT: So you were physically signaled by a deputy?

TB: Yes.

JT: And so you go on the scene. You go in the front door of the house?

TB: Yes, we did.

JT: Okay. And what'd you see when you got in the front door?

TB: Um, Sunstar paramedics were with us staging, and they came in with us. There was six of us going in. I was the fifth one in the door, so they had already established that everything was going on upstairs. So they were heading upstairs -- or a couple of 'em were already at the top of the stairs before I even got in the -- in the house. Um, and obviously, there were deputies around, and, um, when I got up there, um, my two paramedics, which is Paramedic Paul Grenier and Paramedic Castro, were assessing the patient in a

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

*PINELLAS COUNTY SHERIFF'S OFFICE*
## *PCSO - SUPPLEMENT SO16-363788/22*
Report Date: 09/09/2016

---

**Narrative - Continued**

very small room. It was a -- a small room. And, um, I was asking 'em, "So, Paul, what do we got?" 'cause I didn't know what was happening. I didn't know what the situation was.

And, um, he goes, "I don't know. I'm -- I'm doing an assessment." And, uh, Castro asked, you know, "Is he breathing?" And Paul goes, "I don't know. I'm trying to check that." And then Paul goes, "No, he's not breathing." And then, um, I believe -- I believe it was Paul -- 'cause I was outside in the hallway, so I was a good, like, eight feet away from the -- the room. And I think Paul asked, said, "Can we remove the handcuffs, um, from the -- from the, um -- the patient?" And there was a sergeant in that room, and he removed the handcuffs. And that way we can roll him over and start working him, um, to see his, um -- and so we -- we started the -- what we call ALS, advanced life support, um, procedures on him at that time.

JT: So he didn't have a pulse?

TB: He had no pulse. Um, he was asystole, which means that on the heart monitors, he's a flat line. There's no electrical activity in the heart at all.

JT: So he -- for all intents and purposes, he was dead?

TB: Correct. He was not breathing, and he had no pulse.

JT: Were you guys able to deliver a shock or anything?

TB: We never delivered a shock 'cause he had -- never had a rhythm that was shockable. There's only certain rhythms that you can shock, and he did not present with one.

JT: Did you touch the patient at all?

TB: Uh, no. I never touched the patient.

JT: Okay. Did you see any injuries on the patient?

TB: I did observe, uh, I believe it was a little -- little bit of blood from the mouth when we got there at first, um, just looking at, you know -- when I was talking to Paul, "Hey, what do you got?" Um, but I did not observe any other injuries.

JT: Did you see any weapons in the house?

TB: Yes. Um, when we -- when the patient was moved from the room, um, I went in to -- to -- to clear equipment outta there, and I saw a handgun on the -- on the bed.

JT: Um, so we're talking -- so we're talking about the same place, the room's the room as soon as you go right up the stairs in there. And Tampa Road's, we're saying, is just to the north there.

TB: Okay.

JT: The bed woulda been on the south wall?

TB: No. The bed woulda been on the west wall.

JT: West wall.

TB: Yeah. The -- the room -- the room faces -- Tampa Road's here. The house -- the -- the back of the house faces Tampa Road.

JT: Right.

TB: This is north.

JT: Right.

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

*PINELLAS COUNTY SHERIFF'S OFFICE*

*PCSO - SUPPLEMENT SO16-363788/22*

Report Date: 09/09/2016

---

**Narrative - Continued**

TB: And the bedroom was -- if you came up the stairs, it was the first bedroom just to the left of the stairwell. But, um -- and the patient was laying close to the door well -- door -- doorway and the bed was to the patient's -- well, my left, the patient's right --

JT: Okay.

TB: -- when we rolled him over.

JT: Okay.

TB: So the -- the bed was against the west wall. Well, the west and south. I guess the head of the bed was towards the south wall.

JT: Okay.

TB: Yeah.

JT: All right.

TB: The southwest.

JT: Southwest corner of the --

TB: Yes.

JT: -- room? Okay.

TB: Yeah.

JT: Um, and where was the gun on the bed?

TB: It was just right there in the open. I mean, it -- I guess the area where if you laid down on the bed, it woulda kinda be, like, at your head or neck area, I guess, that -- that high up on the bed.

JT: Was it a handgun, a long gun?

TB: Handgun.

JT: Do you know what color it was?

TB: It was -- it was dark, probably black.

JT: Did you see any other weapons up there?

TB: No, but it looked like there -- well, actually I saw a knife in the hallway. There was a knife in the hallway. Um --

JT: Can you describe the knife, sir?

TB: It's a -- a switchblade-type knife, but it was closed.

JT: Okay. Do you know what color it was?

TB: Black. And I would assume that they're -- they're, like -- I'm no expert on weapons, but like, weapon bags, like, maybe there were weapons inside the bags type of thing, like, canvas bags that were in the room.

JT: Okay.

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

*PINELLAS COUNTY SHERIFF'S OFFICE*
*PCSO - SUPPLEMENT SO16-363788/22*

Report Date: 09/09/2016

| | |
|---|---|
| **Narrative - Continued** | |
| TB: | And I -- I don't -- |
| JT: | Like a Molly system bag, is that what -- you know -- |
| TB: | Well -- |
| JT: | -- that's got, like, the -- the straps that go up and down, like, you can wire your stuff into that's -- |
| TB: | No. |
| JU: | Gun cases? |
| TB: | It had zippers. |
| JU: | Gun cases? |
| TB: | It had zippers on 'em. |
| JT: | Okay. |
| TB: | Okay? Um, and I don't even own a weapon, so I don't know. I'm not very familiar with weapons and stuff like that. |
| JT: | All right. Um -- |
| TB: | And there was a clip on the ground -- on the -- there was a clip on the bedroom floor, too, when I went in there. |
| JT: | Like, a gun magazine? |
| TB: | Yeah. |
| JT: | Okay. |
| TB: | Yeah. |
| JT: | Where was that on the floor? |
| TB: | It was just inside the doorway on the left, um, near the bed. |
| JT: | Did it have any bullets in it? |
| TB: | I don't know. |
| JT: | Okay. Did you have any -- any -- talk to any deputies about anything? |
| TB: | Yes. Um, I believe it was, uh, Officer Martinez -- uh, Deputy Martinez was up there. |
| JT: | Okay. |
| TB: | And I kinda asked him what happened, and he said that, um -- that, "We had to tase him." And he said I think it was either three or four times or -- or multiple times, but I'm not quite sure what -- what words he used. But, I mean, he said, like, they were -- a normal tase and, like, uh, short tases or something like that. |
| JT: | Okay. |
| TB: | Um -- |

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

## PINELLAS COUNTY SHERIFF'S OFFICE
## PCSO - SUPPLEMENT SO16-363788/22

Report Date: 09/09/2016

---

**Narrative - Continued**

**JT:** And the decision to transport him, did he ever regain a pulse? Did he ever --

**TB:** No, he did jot. According to the paramedics -- 'cause I didn't ride in the ambulance with him, but, um, according to my medics, he never -- he stayed flat line or asystole the whole way.

**JT:** And that was done at the discretion of the doctor, the County doctor?

**TB:** He told us to transport, yes.

**JT:** Anything we didn't ask you that you think's important that we should know?

**TB:** No, not really, 'cause I was mostly out -- outta the room out doing the -- the computer report.

**JT:** Okay.

**TB:** So, like I said, I didn't go hands on or --

**JT:** Besides the patient and the deputies, was anybody else in the house?

**TB:** Well, the wife was.

**JT:** Okay.

**TB:** I, uh -- I saw her downstairs. I never interacted with her. Um, and then, yeah, the -- the Sunstar crew and --

**JT:** Okay.

**TB:** -- there was also a crew from Squad 65 from Palm Harbor.

**JT:** Okay.

**TB:** I'm assuming that was the wife.

**JT:** Okay. Squad 65, is that the one at, like, Tampa Road and Lake St. George?

**TB:** Well, yeah, West Lake.

**JT:** Okay.

**TB:** Yeah.

**JT:** Yeah, West Lake. Got anything?

**JU:** I don't have nothing else to add.

**JT:** Okay. All right. Sir, we thank you for your time. It is now 2046 hours. End of this interview.

(CONCLUSION OF INTERVIEW)

Transcribed by: krd/krd/eam

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

## PINELLAS COUNTY SHERIFF'S OFFICE
### *PCSO - SUPPLEMENT  SO16-363788/22*

Report Date: 09/09/2016

| Record Status Information | |
|---|---|
| Record Origination Operator: | TOBECK, JONATHAN S DET (56990 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Record Origination Date: | 09/09/2016 08:48 |
| Last Update Operator: | CAPRA, JEFFERY P DET (53787 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Last Update Date: | 09/29/2016 08:47 |

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| TOBECK, JONATHAN S DET (56990 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 | CAPRA, JEFFERY P DET (53787 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 |
| | | | |

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.