## PINELLAS COUNTY SHERIFF'S OFFICE
## PCSO - SUPPLEMENT SO16-363788/7

Report Date: 09/08/2016

| Warning |
|---|
| Contains entities exempt from disclosure |

| Primary Information | |
|---|---|
| Description: | TRANSCRIBED INTERVIEW NOEL CASTRO "UPTON" |
| Occurrence From: | 09/08/2016 22:30 |
| Occurrence To: | 09/08/2016 22:30 |
| Dissemination Code: | RESTRICTED |
| Reporting LEO: | UPTON, J. A. DET (56961 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Approval Status: | Approved |
| Approved Date: | 09/20/2016 |
| Approved By: | GREENE, TODD A SGT (56670 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |

| Addresses | |
|---|---|
| Relationship | Address |
| RELATED | 737 LOUDEN AVE PCSO NORTH DISTRICT STATION, DUNEDIN, Florida 34698, UNITED STATES |

| Subjects | | | |
|---|---|---|---|
| Relationship | Name | Bio | DOB |
| FIREFIGHTER - EXEMPT | CASTRO, NOEL E (PERSON) | 29 yr. old, HISPANIC, MALE | 07/03/1987 |
| OTH AGY - NON LAW ENFORCE | OLDSMAR FIRE DEPARTMENT 54 (AGENCY) | | --- |

### Narrative

(INTERVIEW OF NOEL CASTRO, #16-363788-7, 9/7/16)

(The following may contain unintelligible or misunderstood words due to the recording quality.)

JU = Detective James Upton
JT = Detective Jonathan Tobeck
NC = Noel Castro

JU:  I am Detective Upton. Today's date is September 7th, 2016. The time is 2236 hours. Present with me are Detective Tobeck and Noel Castro from the Oldsmar Fire Rescue Station 54. This is in reference to SO16-363788. We are currently at the Sheriff's north district station building, located at 737 Louden Avenue. The occurred for this incident is listed at 1739 Split Fork Drive in Oldsmar.

All right. Noel, how long have you worked for, uh, Oldsmar Fire Rescue?

NC:  A year and nine months, now.

JU:  Have you worked anywhere be -- before that as -- in your capacity?

NC:  Marion County Fire Rescue.

JU:  How long did you work there?

NC:  Six years.

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

*PINELLAS COUNTY SHERIFF'S OFFICE*
## *PCSO - SUPPLEMENT  SO16-363788/7*
Report Date: 09/08/2016

### Narrative - Continued

JU: Six years for Marion County? Anywhere before that?

NC: Uh, not for a fire department or anything related to fire or EMS.

JU: Okay. And what's your title?

NC: Firefighter paramedic.

JU: Firefighter paramedic? And what shift do you work?

NC: C-shift, normally.

JU: And those hours are --

NC: Uh, 7 a.m. to 7 a.m. the next day.

JC: So 07 to 7 -- 24-hour shift?

NC: Yes, sir.

JU: And today you worked --

NC: I'm doing, uh, A-shift. A trade, 24 hours.

JU: Okay.

NC: So I just stayed on -- didn't go home.

JU: So you went from a 07 yesterday to 07 today and --

NC: To 07 tomorrow morning.

JU: Then you started a new shift today? 07 to 07?

NC: Yes, yes, yes.

JU: Okay. So you got 48 hours. You're gonna go.

NC: Uh-huh.

JU: Okay.

JT: Only get one day off then, huh?

NC: Uh, I'm back here Saturday.

JT: Oh, wow.

NC: And I'm working Sunstar tomorrow.

JU: You also work for Sunstar?

NC: Part-time.

JU: Okay. How long have you worked for them?

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

*PINELLAS COUNTY SHERIFF'S OFFICE*
## *PCSO - SUPPLEMENT SO16-363788/7*
Report Date: 09/08/2016

---

**Narrative - Continued**

NC: Uh, a year now. I guess that counts, right? Yeah. Sorry.

JU: All right. And, uh, your day today -- it's my understanding that you were, uh -- you were sent to this address, 1739 Split Fork Drive. Can you tell me what time that occurred, about?

NC: Five -- I think the note said 5:15, the dispatch. Around 5:15.

JT: This morning?

NC: Yes. Yes, sir.

JU: And what did you get dispatched there for? In regards to what?

NC: I want to say it's a sick person.

JU: Sick person?

NC: Yeah.

JU: Okay.

NC: Could be wrong. I don't want to speculate.

JU: Do you -- do you recall what the, uh, call notes stated that you were going to? Sick person for what type of -- what type of illness, or --

NC: No.

JU: No?

NC: I didn't get to read the call notes 'cause I was driving.

JU: Okay.

NC: Our lieutenant reads that kind of stuff.

JU: Okay.

NC: Uh, so -- but he did give us a heads up that there was weapons in the house for the call notes, so --

JU: And who -- who -- how was he advised of weapons in the house? Do you know if the person that called 9-1-1 said that, or --

NC: I don't know how he knew that, but it shows up in our computer call notes, so --

JU: Okay.

NC: -- I don't know for sure if he said anything or not. The party calling, or --

JU: All right. So some -- sometime early this morning, uh, a little after five, uh, you were dispatched to a sick person at this address, 1739 Split Fork Drive. When you get there, uh, tell me what happens.

JU: Well, we staged, so we -- we don't go responding to the emergency, so we staged, almost half a mile down the street. Um, Sunstar's right behind us.

JU: And -- uh, let me -- let me just stop you there, briefly. You were staged for what reason?

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

*PINELLAS COUNTY SHERIFF'S OFFICE*
*PCSO - SUPPLEMENT SO16-363788/7*
Report Date: 09/08/2016

### Narrative - Continued

NC: 'Cause we heard there was weapons in the house.

JU: You just -- because you knew there was weapons in the house?

NC: Right. That's pretty much our policy if we heard there was --

JU: Okay.

NC: -- weapons, and -- we don't, uh --

JU: Okay. So go ahead. I'm sorry for interrupting you.

NC: No, it's fine. We staged, and then we see a deputy pass us. A few minutes later, uh, he clears us. We go in, and -- I don't know what the deputy's name was, but he comes out and meets us in the yard, and, uh, basically tells, uh, you know, here's our patient. Um, kid walks down the stairs as we walk into the house. He walks down the stairs.

JU: Who walked down the stairs?

NC: The patient.

JU: The patient walked down the stairs?

NC: Yeah.

JU: And did you, uh, learn of his name or anything? Was it --

NC: I asked him what his name was. Said, "Hey, what's your name, Bud?" You know?

JU: Okay.

NC: It was Ronald. So then I call him Ron. "Hey, Ron, how you feeling?" And he was basically telling me he was fine.

JU: Okay.

NC: He was --

JU: When the deputy said that the scene was clear, you're free to come in, did he notify you via radio, or how -- how did he do that one on that --

NC: Uh --

JU: -- particular time?

NC: Dispatch told us.

JU: Okay.

NC: Dispatch told us, and then when we park, he comes out and meets us.

JU: So you -- you get there. You go inside the house. Who else is inside the house at that time?

NC: Uh, I think it was the wife and the deputy and the patient. That's it. Just the wife and --

JU: Oh, only one deputy?

NC: Another deputy was already --

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

## PINELLAS COUNTY SHERIFF'S OFFICE
### PCSO - SUPPLEMENT SO16-363788/7
Report Date: 09/08/2016

**Narrative - Continued**

JU: Okay. Okay. --

NC: So --

JU: So one was outside, and one's inside?

NC: Yeah.

JU: And the patient's coming down the stairs? You introduce yourself to him?

NC: Uh-huh.

JU: And tell me about what type of treatment he received.

NC: Um, we didn't treat him at all. We just assessed him. We took his blood -- I -- I asked him some simple questions. I asked him, uh, what year is it? Uh, what city is he in? Who's the president? So we're just trying to assess how alert he is.

JU: Uh-huh.

NC: So we -- he answers all those appropriately. Tells me 2016, Oldsmar, and the president's Obama. Uh, took his blood pressure, his pulse. We, uh, put him on a cardiac monitor. And we took his blood -- his blood glucose level.

JU: Uh-huh.

NC: And, um, that's basically it. We assessed him. We did -- um, we tried -- we tried to convince him to go to the hospital, um, ecause of what we heard. One of my partners talked to the wife.

JU: Uh-huh.

NC: He said that he woke up -- sounded like it was a nightmare, maybe. Screaming, yelling. Um, she called 911. She was scared. Um, so we basically convinced them, hey, you know, you should probably go to the hospital, you know. And nothing's changed lately with your health. We asked him if his health has been okay. If he's taking any new meds, any extracurricular meds, alcohol, anything like that. He's denied all that. Said he feels fine. Want me to slow down? Sorry.

JU: No. You're okay.

NC: So he – basically doesn't want to go to the hospital. We --

JU: So you -- you -- you take his vitals and everything. You do his blood sugar [sic] and everything checks out fine?

NC: Yeah.

JU: How about his, uh, his speech and everything. Appeared normal?

NC: I mean, he just woke up. I just woke up, so -- as far as my knowledge, it didn't sound like he, you know -- it was anything slurred --

JU: Uh-huh.

NC: -- or anything like that. It sounded normal, yeah.

JU: And the, uh -- the color of his skin, the eye -- the pupils of the eyes, everything -- that was all normal, as well?

NC: Yeah. I mean, it -- it -- it's -- it's nothing like that carried in the back of my mind that, hey, you know --

JU: Uh-huh.

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

## PINELLAS COUNTY SHERIFF'S OFFICE
## PCSO - SUPPLEMENT SO16-363788/7

Report Date: 09/08/2016

### Narrative - Continued

NC: -- we should assess further. And, um, you know -- basically tell him to go to the hospital. We did a -- actually, we also did a full cognitive exam. It's a series of 24 questions. And we asked him simple questions.

JU: Uh-huh.

NC: And everything was answered appropriately, so that -- and that's a really detailed, like, basic exam.

JU: Okay.

NC: So after doing that, it's kind of like, we -- we really can't force him. It's --

JU: Right.

NC: If he wants to refuse, he can refuse. And that's what he did. So --

JU: Did you notice anything, uh, abnormal? Any injuries or anything or on his person?

NC: No.

JU: Nothing at all? No cuts on the lip? No --

NC: Trying to think back. I'm gonna say no, because I don't want to -- like I say, I was just waking up, so if I didn't notice anything --

JU: Okay. Nothing that stands out to you?

NC: Yeah, that -- yeah.

JU: Okay. All right. Um, uh, and then after -- after you spoke with him, he didn't want to go to the hospital?

NC: Uh-huh.

JU: Is that pretty much the end of is your involvement on that trip?

NC: Yeah.

JU: Uh-huh.

NC: Like I said, we did the full assessment with vital signs and everything. We did the full cognitive exam, all those questions. Um, and he -- we -- we had him sign the computer. It's a report saying that, hey, you don't want to go to the hospital with us or with Sunstar, and then you accept the risk of liability if anything may happen afterwards. And that's basically it. We talked -- we made sure that the -- one of the deputies that was -- that was there first -- said, "Hey, you -- you good? You know, do you need us for anything else?" You know. That's --

JU: Did you -- did you speak to the wife at all?

NC: No, I did not.

JU: You did not? Did you treat her, or look at any injuries she may have had, or anything like that while you were there?

NC: No. No. Not at all. No, I didn't. My partner went to go talk to her, um, so I just saw her kind of just we went in, and -- and then she came out after we were done assessing him.

JU: Uh-huh.

NC: So by -- I -- no. I didn't -- I didn't check or anything like that, so --

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

*PINELLAS COUNTY SHERIFF'S OFFICE*

## PCSO - SUPPLEMENT SO16-363788/7

Report Date: 09/08/2016

**Narrative - Continued**

JU: Okay. Have you ever been dispatched to this place before?

NC: No.

JU: Before today?

NC: No. Not that I recall.

JU: Have you ever heard of any of your, uh -- your teammates or people on your crew --

NC: No.

JU: -- being dispatched or have any issues with this guy?

NC: No.

JU: Um, you didn't make it upstairs --

NC: The --

JU: -- when you went inside the house?

NC: The first time, no.

JU: The first time.

NC: Not the first time.

JU: All right.

NC: We all stayed downstairs.

JU: Okay. So did you see any weapons or anything in the house at that time?

NC: No.

JU: You -- downstairs?

NC: Not the first time.

JU: Okay. All right. So then everybody departs. He says he's fine. He passes all your tests and everything.

NC: Uh-huh.

JU: And then sometime later on, uh, do you recall being dispatched there again?

NC: Uh-huh. Yeah.

JU: At approximately what time was that?

NC: I'd say around four o'clock, give or take half an hour or fifteen minutes.

JU: Okay.

NC: So --

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

## PINELLAS COUNTY SHERIFF'S OFFICE
### PCSO - SUPPLEMENT SO16-363788/7

Report Date: 09/08/2016

---

**Narrative - Continued**

JU: And what was the nature of that, uh call? Do you -- do you remember?

NC: That one came in as seizures.

JU: That one came in as seizures?

NC: Yeah.

JU: And -- and -- I know the first time, you said you guys staged, uh, for safety reasons. Did that occur again?

NC: Yeah. It happened again. I told, uh, the L.T. that, hey, we were going to this house earlier today and that there was weapons reports -- reports of weapons in the house. And that, you know, he had PTSD and took psych meds and -- so I was like, all right, you know, based on what you're telling me, we're gonna make a respond downgrade 2.

JU: Uh-huh.

NC: So we basically didn't go non -- we go non-emergency, stage like we did last time, and wait for the deputy to get there and clear everything.

JU: The -- the earlier -- let's revert back to earlier in the morning, when you talked to the guy. Did he give you a hard time at all at any time, or was he polite, or was he rude, or did he seem aggressive, anything like that?

NC: No. I mean, he stayed in his chair with his legs crossed. And he just kept saying, "No, no, no. I don't want to go to the hospital. I feel fine." Um, and he never, like, cussed, or --

JU: Okay.

NC: The body language. Just didn't seem like he wanted, you know --

JU: All right.

NC: Just didn't want to go.

JU: So the second call, you're dispatched out there, uh, for seizures. You stage again.

NC: Uh-huh.

JU: Uh, once the -- what happens when the deputies arrive on scene?

NC: Uh-huh, deputies arrive on scene --

JU: And -- and at what point are you told that --

NC: I know four show up

JU: -- come on?

NC: All together. And I want to say maybe ten, fifteen minutes go by from the time we got there before they tell us to come in.

JU: Were you the first ones on scene -- medical personnel?

NC: Yes. Uh, yes, sir. Yeah.

JU: Okay.

NC: We, um -- Sunstar was right -- they -- they got there right behind us when we staged, so we kind of all went in together.

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

## PINELLAS COUNTY SHERIFF'S OFFICE
### PCSO - SUPPLEMENT SO16-363788/7
Report Date: 09/08/2016

| Narrative - Continued |
| --- |

JU: Uh-huh.

NC: Uh, we were both -- me and my partner were, like, the first ones, like, actually to him.

JU: Okay. So how did you get the, uh, notification from the deputies that the scene was clear and free to go in?

NC: The L.T. told you.

JU: L.T. told you? Okay.

NC: I'm not sure if he got a wave, or if he got on the radio, but --

JU: Okay.

NC: -- I told him hey, we're clear. We're going on. So (unintelligible).

JU: All right. So you -- you enter the house and, uh, downstairs, did you see anybody in the, uh, downstairs portion of the home?

NC: The wife.

JU: The wife is downstairs?

NC: As soon as we walk in, she's to the left.

JU: Okay.

NC: She's there.

JU: Nobody else?

NC: I want to say -- not -- downstairs?

JU: Yeah.

NC: Not --

JU: Upon entry at the front door.

NC: Not that I can remember, beside the deputy walking us in.

JU: Okay. All right. And then tell me about, uh, what happens after that.

NC: Um, we basically walk upstairs. I remember being directed to walk upstairs to where the patient's at. And we get to him, see him. He's face down. He's cuffed, and we start assessing him.

JU: Were you briefed downstairs before you went upstairs by the deputy that was telling you that -- well, you know what -- come on in? Were you briefed about anything, about his condition, or what had occurred before you get there, or anything?

NC: Um, I don't want to tell you any false information. Um --

JT: If you don't remember, say "I don't remember."

NC: Yeah. I don't -- I'll say I don't remember it, honestly.

JU: Okay.

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

## PINELLAS COUNTY SHERIFF'S OFFICE
### PCSO - SUPPLEMENT SO16-363788/7
Report Date: 09/08/2016

**Narrative - Continued**

JT: So he was face down when you got there?

NC: Yeah.

JT: In handcuffs?

NC: Yes, sir.

JU: How many people were in the room?

NC: It was the deputy, the patient, and that was it. And then me and all the crew got there. So it was just two --

JU: Okay.

NC: -- in the room. The hallway does -- the deputy to my right.

JU: Right. Now, was anybody touching the patient at that time?

NC: I --

JU: When you -- when you -- when you first enter the room, uh -- where is the room in proximity to the, uh, stairwell when you go up to it, first of all?

NC: As soon as you -- it's right in front of the stairwell.

JU: Right in front of the stairwell?

NC: Yeah. As soon as you get up the stairwell, there's the little patch of hallway, and then there's the -- the room that he's in.

JU: Okay. So you enter the room. There's two deputies in there and a patient?

NC: Uh, in the room there's one deputy --

JU: Okay.

NC: -- the patient -- and then outside -- just outside the room to the right in the -- in the hallway is another deputy.

JU: Okay. Is anybody touching the patient at that time, or is he just on his stomach in handcuffs, uh, with -- by himself?

NC: I honestly don't remember.

JU: Okay.

NC: I don't -- I don't want to -- I don't want to say.

JU: All right. So tell me about what -- what -- what do you do from that point?

NC: Uh, check his ABCs. His airway -- uh, if he's breathing.

JU: Did you roll him over to do that, or you just did it where he was?

NC: Uh, I wasn't up there right, like, touching him. I wasn't the first one to him. It was my partner, Paul. I was right behind Paul.

JU: Uh-huh.

NC: So we're -- and I'm asking him, "Hey, what's going on? Is he breathing? What you got?" You know? So I didn't -- I didn't -- I

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

## PINELLAS COUNTY SHERIFF'S OFFICE
### PCSO - SUPPLEMENT SO16-363788/7
Report Date: 09/08/2016

---

**Narrative - Continued**

didn't touch him or anything, so -- uh, from what he was telling me, it sounded like he wasn't breathing. Or if he was breathing it was very agonal, very slow, very -- you know, shallow. Um, so at that point I'm already thinking, hey, it's probably gonna be a cardiac arrest. So we start getting our stuff out -- oxygen, monitor, and all that kind of stuff.

JU: Uh-huh.

NC: So like I said, I wasn't the one that got to him first.

JU: Did your partner roll him over?

NC: Um, it was him and the deputy, I want to say.

JU: Okay.

NC: After he uncuffed him.

JU: Did you notice any, uh -- what's -- any type of abnormalities, any injuries or anything at that time on the, uh -- the patient?

NC: No. Just that he wasn't responding to us. Like, hey, hey. What's going on? I gave him a sternal rub, here, just to see if he's awake or not, and he's not responding to that. So --

JU: Have you ever seen, uh, Taser probes or leads -- the wires that come off of the, uh -- the probes before?

NC: No.

JU: You're never seen them before?

NC: Not in real life.

JU: Did -- did you notice any type of, uh --

NC: Sorry.

JU: -- little metal dart-looking things, or electrical wires, or anything coming off the, uh --

NC: I noticed a wire. Uh -- there was a wire. It was, like, maybe copper -- like, brown looking.

JU: Okay.

NC: But I didn't see where it was coming from.

JU: Okay.

NC: So --

JU: And you didn't notice any type of, uh, discoloration or blood or anything on the patient's face or arms, or anything?

NC: Um, he wasn't as -- I guess you could say, like his -- wasn't as white. Like you know he's a white male, so --

JU: Uh-huh.

NC: -- he wasn't like -- it looked -- looked like a little more color, like a little more maybe pink, reddish. Like, flushed almost, maybe.

JU: Okay.

NC: Um -- so that -- that's about it. After they turn him over, that's when I noticed, so --

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

## PINELLAS COUNTY SHERIFF'S OFFICE
## *PCSO - SUPPLEMENT  SO16-363788/7*

Report Date: 09/08/2016

**Narrative - Continued**

JU: So you -- your partner tells you that, uh -- what -- what did he say to you, exactly? He didn't have a pulse? He's in the breathing? What --

NC: No -- well, he and I were just kind of back and forth with the dialogue, I mean, a lot's going on right there, you know? Saying hey, and -- um, trying to -- is he breathing, and we were -- we were both kind of going back and forth, like, you know -- real quick, like within ten seconds, we just determined that he's not breathing

JU: Okay.

NC: And we checked for a pulse, carotid pulses --

JU: All right.

NC: No pulse there. Approach cardiac arrest, and we started working him as cardiac arrest.

JU: Okay. And what was your -- what was your role in -- at -- at that point --

NC: Um --

JU: Were you doing chest compressions, or --

NC: I started off with putting him on the cardiac monitor, checking to see what kind of activity he's got. Um --

JU: Not the A -- AED, or --

IC: Yeah. The AED.

JU: The AED? Okay.

NC: Yeah. It's the -- pretty much the AED, but it's got -- yeah. A little more than that, but yeah. It's the AED -- I -- I started putting that on him, and -- want to say Sunstar EMT started doing something. I -- I started off with the monitor --

JU: Okay.

NC: -- but in cardiac arrest, you all switch off --

JU: Sure.

NC: -- 'cause it's compressions, and you get -- so I started off with the monitor -- putting him on the monitor.

JU: And when you were doing that, was he still handcuffed, or --

NC: No. He was uncuffed.

JU: Somebody uncuffed him?

NC: He -- yeah. Yeah, he was -- he was uncuffed already.

JU: Okay. All right. So when you hook up the monitor --

NC: Uh-huh.

JU: -- uh, what happens with the -- with the monitor? What does that tell you?

NC: It's -- there's no pulse. Asistoly [phonetic, which means, means there's -- there's no electrical activity. So that he -- means it's in cardiac arrest.

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

*PINELLAS COUNTY SHERIFF'S OFFICE*
## *PCSO - SUPPLEMENT  SO16-363788/7*
Report Date: 09/08/2016

---

**Narrative - Continued**

JU: Okay. Um, Detective Tobeck?

JT: How long did you guys work on him?

NC: I want to say it was almost an hour.

JT: That's with transport too, or --

NC: With transport. From the time we basically -- our monitor, from the moment we turn it on, has a timer on it. So I didn't look at the exact time on it, but it was -- it was near an hour.

JT: Okay. Um, when you got up there, and you said he was face down --

NC: Yeah, he was face down.

JT: Like, face down --

NC: No. It was like --

JT: Was his head turned to the side --

NC: No, he was --

JT: -- where he can breathe?

IC: His body was prone, but it was like, you know what I mean? Like if he's sleeping, like -- you know, if you sleep on your side like this a little bit.

JT: You remember which side of his face was turned? Was it his right, or --

NC: I want to say it was left -- I want to say the left side of his face was facing -- like to the --

JU: Was it away from the floor?

JT: So the --

NC: Yeah. It was like -- you know what I mean? Like, if you sleep on a pillow, face down, like that kind of -- but like I said, the position is prone. It's called -- called prone --

JT: Yeah.

NC: Which you guys probably know it. So it -- but his body position was prone, but his face was --

JT: So he could have been breathing through if -- if he was able to --

NC: If he was able to breathe, yeah. He -- he -- it was clear on that -- and -- as far as that goes.

JT: Okay. All right. Um --

JU: Did you notice anything, uh -- anything in the room? Did you see any weapons or anything in the room?

NC: Yeah. There was a pistol on the bed, not two feet from him. And --

JU: What -- and can you describe the pistol to me?

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

## PINELLAS COUNTY SHERIFF'S OFFICE
### PCSO - SUPPLEMENT SO16-363788/7
Report Date: 09/08/2016

### Narrative - Continued

**NC:** Looked like a 1911. I don't know if it was a Kimber or what kind of 1911 it was, but it liked like a 1911 to me.

**JU:** Do you have, uh, training and experience in firearms?

**NC:** Um, very minimal. Uh --

**JU:** Very minimal?

**NC:** (Unintelligible) --

**JU:** What would make you -- make you believe or lead you to believe that it was a 1911?

**NC:** I mean, I've got a bunch of friends that have them.

**JU:** Okay.

**NC:** I want to get one.

**JU:** You've seen 'em, you've handled 'em, you've looked at them.

**NC:** I've shot them. I've shot them.

**JU:** Okay.

**NC:** My fiancée's dad shoots -- he's a gunsmith, so I've shot his a lot, you know, so --

**JU:** Okay.

**NC:** And there was also a rifle case, um -- like not behind the bed, but in -- you know. Here's the bed, little space probably to walk through in -- in and out of the room --

**JU:** Uh-huh.

**NC:** And there was a -- like a dresser, or whatever.

**JU:** Uh-huh.

**NC:** And a little -- it was like -- looks like it was a rifle case. A hard rifle case that had tape on it, like duct tape or something like that.

**JU:** Where was the gun on the bed?

**NC:** In the pretty much right in the middle, towards like -- middle towards the head, kind of. But it was in plain sight. I -- I'm not sure if someone --

**JU:** It wasn't hidden by anything? It was just right in plain sight?

**NC:** No. It wasn't under the pillow or -- I -- I don't know if it was loaded or anything kind of thing, um --

**JU:** All right. Did you see any other weapons in there besides the, uh -- you said a rifle, and you saw or case or something?

**NC:** It was a rifle case.

**JU:** Okay.

**NC:** I -- it wasn't open. I didn't -- obviously, I didn't check and touch anything. But there was just a pistol and then a rifle case.

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

*PINELLAS COUNTY SHERIFF'S OFFICE*
## *PCSO - SUPPLEMENT SO16-363788/7*
Report Date: 09/08/2016

---

**Narrative - Continued**

JU: Anything else on the floor?

NC: I'm trying to think back. Um, I don't --

JU: If you don't remember, it's okay.

NC: Yeah, I don't remember. It's just -- just him.

JU: We're just trying to get as much detail as we can.

NC: Yeah, yeah.

JU: So if you don't remember, then --

JT: Did -- did you speak to the family, or --

NC: Nope. Only -- only family I know who was there was the wife, and she was -- she was off in the corner.

JU: Any -- any deputies making statements to you, other than saying you can come in and --

NC: You can come in.

JU: Based on your training and experience, um, the patient -- no pulse, no breathing. Is he considered deceased at that time, up there?

IC: At the time we got to him, or how far into the -- the assessment do you --

JU: While you were still up in the bedroom.

NC: Um, he's apneic and pulseless, but it's -- it's -- we didn't call it. We didn't call him a signal 7, which means he's dead --

JU: Right.

NC: -- and we are gonna stop, you know? We get calls all the time, we get to someone, they're cold, stiff, they're dead. We're not gonna work it. But, so -- if they're apneic and pulseless, if you want to go from that, that means they're in cardiac arrest. You know, so if they're in cardiac arrest, maybe we still work them, to get them out of cardiac arrest. But we didn't pronounce him dead.

JU: And is there somebody that's, uh -- say a higher pay grade or different rank than you that tells you when and if you can --

NC: Um --

JU: -- stop treatment?

NC: Um, we -- yeah. The -- the medical director. Um, but like I said, based on our, uh, initial assessment --

JU: Uh-huh.

NC: Um, we still had -- we still had to do our job, which is a -- you know, try to get him back, um, but not -- at that point, yeah, he was -- he was still a work -- what was called a workable cardiac arrest.

JU: Okay.

NC: So -- but yeah. The -- if -- if -- if -- that's why we called the doctor later on at the call. You know, we got (unintelligible), but twenty minutes into a call, like that, cardiac arrest, you call the medical director and based on what we tell him, um, he can tell us where they to stop or keep going. Obviously, he told us keep going, 'cause of what we told him. So you know this is -- we had a call earlier in the day when the lady was cold, stiff. We don't have to call the doctor on that kind of person.

---

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

*PINELLAS COUNTY SHERIFF'S OFFICE*
## *PCSO - SUPPLEMENT SO16-363788/7*
Report Date: 09/08/2016

**Narrative - Continued**

JU: Right.

JT: Uh-huh.

NC: Cold, stiff. It's been a last -- it's been an hour since we last saw the patient. We're not gonna work it. There's no point. As far as that goes, it's gonna -- this is -- no effort's gonna be, uh, given.

JU: Okay. Um is -- is there anything that we haven't asked you that you feel that we should know or would be important for us to know?

NC: Um, I mean, we had to change the hospital destination so that delayed his care to a -- a -- an ER by, um, maybe ten, fifteen minutes.

JU: That delayed his care to the ER for --

NC: Right. It delayed by about ten, fifteen minutes.

JU: That was due to, uh, overcrowding or the emergency room at Countryside was --

NC: Yeah, (unintelligible) divert.

JU: Okay.

NC: Some reason we're not taking patients.

U: Okay.

NC: So I don't -- that happened. I mean I -- honestly, I don't know how much more a -- a -- the hospital's gonna do --

JU: Uh-huh.

NC: -- but it was a -- a while longer to get there, um, so --

JU: Okay. All right. Detective Tobeck, you have anything else to add?

JT: That's it, man. We'll let you go and get some sleep. We know you've had a long day.

NC: Okay.

JT: I appreciate it.

NC: All right.

JT: Thanks for coming back here.

NC: Oh, no problem.

JU: Time is 2259 hours. We'll end this, uh, interview.

(CONCLUSION OF INTERVIEW)

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.

## PINELLAS COUNTY SHERIFF'S OFFICE
## PCSO - SUPPLEMENT SO16-363788/7

Report Date: 09/08/2016

### Narrative - Continued

Transcribed by: jiz/ms

### Record Status Information

| | |
|---|---|
| Record Origination Operator: | UPTON, J. A. DET (56961 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Record Origination Date: | 09/08/2016 11:01 |
| Last Update Operator: | GREENE, TODD A SGT (56670 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Last Update Date: | 09/20/2016 15:17 |

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| UPTON, J. A. DET (56961 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 | GREENE, TODD A SGT (56670 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 |
| | | | |

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.