## PINELLAS COUNTY SHERIFF'S OFFICE

### PCSO - SUPPLEMENT  SO16-363788/21

Report Date:  09/09/2016

| Warning |
|---|
| Contains entities exempt from disclosure |

| Primary Information | |
|---|---|
| Description: | TRANSCRIBED INTERVIEW WITH DEPUTY GOEPFERT *JT* |
| Occurrence From: | 09/07/2016 19:23 |
| Occurrence To: | 09/07/2016 19:51 |
| Source Of Info: | DEPUTY GOEPFERT |
| Dissemination Code: | RESTRICTED |
| Content Evaluation: | Information |
| Reporting LEO: | TOBECK, JONATHAN S DET (56990 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Activity: | OTH SERV / ACTION |
| Approval Status: | Approved |
| Approved Date: | 10/04/2016 |
| Approved By: | CAPRA, JEFFERY P DET (53787 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |

| Synopsis |
|---|
| For details of interview with Deputy Goepfert see narrative. |

| Addresses | |
|---|---|
| Relationship | Address |
| OCCURRED | 1739 SPLIT FORK DR,  OLDSMAR,  Florida 34677 , UNITED STATES |
| RELATED | 737 LOUDEN AVE PCSO NORTH DISTRICT STATION,  DUNEDIN,  Florida 34698 , UNITED STATES |

| Subjects | | | |
|---|---|---|---|
| Relationship | Name | Bio | DOB |
| OTHER | DEGRAW, JULIE (PERSON) | 56 yr. old, ORIENTAL/ASIAN, FEMALE | 07/04/1960 |
| OTH AGY - NON LAW ENFORCE | OLDSMAR FIRE DEPARTMENT 54 (AGENCY) | | --- |
| OTH AGY - NON LAW ENFORCE | PALM HARBOR FIRE DEPARTMENT #65A (AGENCY) | | --- |
| LAW ENFORCEMENT OFFICER - EXEMPT | GOEPFERT, GREGORY (LAW ENFORCEMENT OFFICIAL) | | --- |
| LAW ENFORCEMENT OFFICER - EXEMPT | MARTINEZ, EDUARDO DEP (LAW ENFORCEMENT OFFICIAL) | 31 yr. old, HISPANIC, MALE | |
| LAW ENFORCEMENT OFFICER - EXEMPT | STREET, CHARLES SGT (LAW ENFORCEMENT OFFICIAL) | | --- |
| DECEASED | DEGRAW, DONALD CHRISTOPHER (PERSON) | 58 yr. old, WHITE, MALE | 06/25/1958 |

| Analysis Information | |
|---|---|
| Mental Health Related: | NO |

| Narrative |
|---|

This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.

## PINELLAS COUNTY SHERIFF'S OFFICE

### PCSO - SUPPLEMENT  SO16-363788/21

Report Date:  09/09/2016

---

**Narrative - Continued**

INTERVIEW OF GREGORY GOEPFERT, #16-363788-21, 09/07/16)

(The following may contain unintelligible or misunderstood words due to the recording quality.)

JU  = Detective James Upton
JT  = Detective Jonathan Tobeck
GG = Deputy Gregory Goepfert

JT:    I'm Detective Tobeck.  Today's date is September 7th, 2016.  It's currently 1923 hours.  I'm located at the Sheriff's North District station, at 737 Louden Avenue, in Dunedin, Florida.  I'm investigating case number SO16-363788.  Uh, occurred is at 1739 Split Fork Drive in Oldsmar, Florida.  Currently present are myself, Detective Jonathan Tobeck, uh, Detective Jay Upton, and Gregory -- is it Goepfert?

GG:    Goepfert.

JT:    Goepfert.  Uh, your payroll number is 58914?  All right.  All right, Deputy Goepfert --

GG:    Yes.

JT:    -- okay.  Let me make sure I'm saying it right.  How long have you been working here at Pinellas County Sheriff's Office?

GG:    Uh, it will be two years on the 26th or 25th or something.

JT:    Of September?

GG:    Yes.  So --

JT:    Okay.

GG:    -- almost two years.

JT:    So, September of '14 you started?

GG:    Yes.

JT:    All right.  Do you have prior law enforcement before that?

GG:    Yes.

JT:    Where was that at?

GG:    Uh, Palm Beach County Sheriff's Office.

JT:    How long did you work there?
GG:    Six years.

JT:    You came straight here from there?

GG:    No.

JT:    Okay.

GG:    I had a year with DOD as a federal law enforcement officer as well.

JT:    Okay.  So, you were -- what years were you at Palm Beach County?

GG:    Uh, geez.

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

PINELLAS COUNTY SHERIFF'S OFFICE

**PCSO - SUPPLEMENT  SO16-363788/21**

Report Date:  09/09/2016

---

Narrative - Continued

JT:   Roughly.

GG:   2003 to 2009.

JT:   Okay.

GG:   Something like that.

JT:   All right.

GG:   I'm not positive that's --

JT:   And you worked with DOD too?

GG:   Yes, 2009 to 2010-ish.  About a year.

JT:   Okay.

GG:   As a federal LEO.

JT:   Doing base security, or --

GG:   Yeah, actually.

IT:   Okay.

GG:   I was supposed to, but that's what it turned out to be.

JT:   All right.  Um --

GG:   That's why it was only a year.

JT:   During the multiple years you've been a police officer, did you attend any advanced training classes?

GG:   Yes.

JT:   Name those for me, if you remember them all.

GG:   Uh --

JT:   Or what you do remember.

GG:   What do you mean by advanced?

JT:   Well, any kind of, you know, training.  You know, instructor schools --

GG:   Okay.

JT:   -- investigative schools, anything like that.

GG:   Yeah.  Well, I'm a FDLE fireman instructor.  FDLE driving instructor.  FDLE defensive tactics instructor.  Uh -- uh, I was an instructor with rifle, Taser, pepperball, sage, OC, Monadknock baton.

JT:   So, pretty much all the high liability stuff.

GG:   All high liability stuff.  I've been to, I mean, tons of other schools.  Um, community policing schools, um, things like that too.

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

PINELLAS COUNTY SHERIFF'S OFFICE

## PCSO - SUPPLEMENT  SO16-363788/21

Report Date:  09/09/2016

---

| Narrative - Continued |
|---|

don't know if those are advanced, or whatever.

JT:   Um --

GG:    I was an instructor for the Palm Beach college -- adjunct instructor for them.

JT:    Okay.  So, you talking -- talk like in-service, or police academy?

GG:    Yeah, police academy.

JT:    Okay.

GG:    I was a full-time instructor with Palm Beach for two years.  And --

JT:    So, you were Palm Beach's training unit?

GG:    Yeah, for two years.  Over 16 -- almost 1,700 deputies at the time, I believe.

JT:    Okay.

GG:    Stop sticks, all that stuff.  Yeah, so --

JT:    All right.  And you're assigned to North District day shift?

GG:    Yes.

T:    Okay.  Where were you working today?

GG:    Uh, Olds 2.  Olds 1 and 2.

JT:    Okay.  Um, what time did you come into work this morning?

GG:    7 a.m.

JT:    All right.  Did you have the opportunity to respond to 1739 Split Fork Drive, in Oldsmar?

GG:    Yes.

JT:    Okay.  Did you get a call or you flagged down?  How did that happen?

GG:    Uh, dispatched.

JT:    Okay.  Do you remember roughly what time that was?

GG:    It was 3:30-ish, or something -- 3:45.  I'm not sure --

JT:    Okay.

GG:    -- of the exact --

JT:    Did you get there quickly, or was traffic bad?

GG:    Traffic is always bad, but, um, probably ten minutes tops.  It wasn't a -- like a -- it was a, you know, standard call.  It wasn't a lights and sirens call or anything like that.

JT:    Okay.  And what was the nature of the call when it was dispatched?

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

## PINELLAS COUNTY SHERIFF'S OFFICE

### PCSO - SUPPLEMENT  SO16-363788/21

Report Date:  09/09/2016

---

**Narrative - Continued**

GG:    It was an assist agency, I believe. Uh, fire rescue. They wanted to attend to this person, basically Baker Act, I think. Uh, they wanted us to go in and make sure that it was safe before they went in.

JT:    Okay.

GG:    They dealt with him earlier in the morning, I think. At like 5 in the morning. We were called out there.

JT:    So, you were -- you were there to make sure the scene was safe for FD -- FD?

GG:    Yes. Uh-huh.

JT:    Okay.

GG:    I believe that's what it came out as.

JT:    All right. I'm going to let you go through it and tell me in your own words what happened when you arrived, who you spoke to, what you saw. And if I need to ask you any questions on the back end, Detective Upton and I will do that.

GG:    Can I -- can I read it off, or can I -- do I have to go off --

JT:    If you want to look at your notes.

GG:    I mean, I -- when I was in my car earlier I was just writing it down. I mean, I can do it without it, probably. Um, arrived on scene. The door was open. Came in. Talked to the wife. I never did get the wife's name or the guy's name. Spoke to the wife. She was on the couch.

JT:    Downstairs?

GG:    Downstairs.

JT:    Okay.

GG:    Uh, asked her what was going on. She said that, uh, her husband is upstairs. Uh, she thinks he might have had a seizure earlier. He was being irrational, erratic. She was worried about him. Uh, she warned me that he had a gun under his pillow, and multiple guns throughout the house -- hidden throughout the house.

JT:    Was anybody else there when you got there?

GG:    Uh, as in other --

JT:    Deputies?

GG:    Yes. Deputy Martinez -- we got there pretty much at the same time.

JT:    How long did you talk to the wife for?

GG:    Not long. Probably three, four minutes tops.

JT:    Okay. Did she tell you where he was at?

GG:    She did.

JT:    Where was that?

GG:    Said he was upstairs, in the, uh -- in a bedroom directly in front of where you come up in the hallway, the stairs, and in the -- basically, there's a little upstairs hallway and the bedroom.

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

PINELLAS COUNTY SHERIFF'S OFFICE

## PCSO - SUPPLEMENT  SO16-363788/21

Report Date:  09/09/2016

---

**Narrative - Continued**

JT:   All right.  We were on the scene earlier.  So, you go up the stairs and then there's a bedroom to the west once you go up the stairs -- or, to the north.

GG:   Yes.

JT:   Okay.  All right.  So, after you spoke with her what -- what did you do?

GG:   Well, after I spoke to her I went upstairs to see what was going on.  And, you know, came into the bedroom.  Knowing -- or, being told that he has a gun under the pillow and multiple weapons, you know, cautiously approached.  Um, came to the -- you know, where I could see him -- you know, like cut the pie, basically, if you want to call it that.  So I could see him.  He was laying on the, uh, bed, uh, in his underwear.  Uh, blood in his mouth.  His mouth was all bloody.  Um, and he was just laying there.  He wasn't doing anything.  And then I started to speak to him.  I think I said, you know, "Sir, what's going on?  What can we do for you?  Are you okay?"  And then he just basically yelled, "Yaaah" or "Ahhh."  Not -- you know, he didn't like yell anything.  He just was making an ahhh noise.  Um, I don't know how -- I put it down as yaaah, but -- um, so, I continued the communication with him for probably a good three, four minutes, five minutes.  I -- time frame, I'm not exactly sure.  Um, but basically the same thing.  Sir, let me see your hands.  Sir -- because I knew, you know, if there's a gun under his pillow -- he was laid out like this, with his hands where he could just grab it, you know, and shoot.

JT:   So, his hands -- we're on -- we're on audio here, so --

GG:   Yes.  Right.  Okay.

JT:   So, his hands were over his head?

GG:   So, his hands were -- his hands were above his head.  Um, towards --

JT:   And he was laying on his back.

GG:   -- towards his -- you know, by his pillow.  He was laying on his back, again in his underwear.  Feet, you know, toward the bottom of the bed.  But then he kept, um -- he kept like turning over to the side.  Like, almost like he was reaching for something.  Um, and I kept saying, "Sir, I -- you know, don't do that.  Don't do that.  I'm going to have to Taser you."  Um, and then he would come back and he would go, "Ahhh."  Uh, so he --

JT:   You -- you were looking -- so, his right -- him laying on the bed the way he was, it would have been his right side was towards you?

GG:   His right side.  Yes.

JT:   So, he would lean over to the right or left?

GG:   He would lean to his left.

JT:   Okay.

GG:   Away -- away from where I could see what he was doing -- where his hands were going.  And when I gave him the -- you know, the commands to turn back towards me, let me see your hands, he did so and he did, again, the yell.

JT:   How many times did that happen?

GG:   Three, four times.  And I kept asking him, "Sir, come out towards me."  I wanted to try to get him out of the bedroom at first, because I knew there was guns in there.  I don't want to try to go in there.  And it was -- you know, there was a ladder right there and a table.  There was not a lot of room to really do anything in there, or even get two deputies in there.  Um, he finally sat on the edge of the bed.  He stood up towards me.  Again, "Yaaah" you know, with that yell.  Um, he kind of came toward me.  I said, "Sir, stay where you're at."  You know, it's -- you know, because I was waiting -- trying to wait for backup, trying to wait for one more deputy to get there.  Because I felt that would be -- you know, be able to handle it better.  Um, he sat back down on the bed.  And then he got up.  He came -- he turned towards me.  He took the step.  I said, you know, "Sir, don't -- you know, just stay there.  Stay there."  Uh, he

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

### PINELLAS COUNTY SHERIFF'S OFFICE

## PCSO - SUPPLEMENT  SO16-363788/21

### Report Date:  09/09/2016

---

**Narrative - Continued**

took another step and then he put his hands kind of like, uh, out in front of him.  Like almost like going to grab me.  And he started coming towards me.  Uh, that's when I deployed the Taser.

JT:    What happened when you deployed the Taser?

GG:    Uh, he -- he fell back kind on his, uh, rear end.  Kind of fell like -- almost like sitting.  Um, it didn't get a full effect of the Taser, because we were so close that the -- the -- the probes were probably six inches apart.

JT:    Okay.

GG:    You know, we were -- I don't know, we were probably three, four -- I don't know, three feet away from each other.  It was pretty close.  But it -- it did, you know, what we needed it to do.

JT:    Okay.  So, you guys were -- he -- he got within three feet of you before you deployed the Taser?

GG:    Yeah.

JT:    With his arms out --

GG:    Yes.

JT:    -- like he was going to grab you.

GG:    Yes.  Yeah.  Kind of coming at me, like it was -- almost like a zombie.  It was "Ahhh."  It was kind of weird, but --

IT:    All right.

GG:    Interesting.

JT:    So, he fell down on his butt like he's sitting -- in a seated position.

GG:    Yes.  Um, on the -- I guess if I'm looking in the room, to the right where that ladder was.  He kind of fell down --

JT:    So, on the --

GG:    -- against the wall.

JT:    -- east wall?

GG:    East, yes.

JT:    Okay.

GG:    Um, he then -- so, and i -- I didn't give him a full, you know, five second ride.  It was, like, two seconds -- maybe three.  Um, I didn't -- I wasn't there to torture him.  I was there just to try to control him.  So, I turned it off.  And he started to be aggressive again, and -- and the yelling and, you know, the spit and the -- the blood coming out of his mouth.  Um, and again, we're still just two -- two deputies not wanting to really go into that room where there is weapons.  I Tased him again, just so we could get more control of him.  Again, for probably a two to three second burst or ride, whatever you want to call it.

JT:    So, he started being aggressive before you Tased him the second time?

GG:    Yes, again.  Yeah.

JT:    How so?

GG:    Um, again, the "Yaaah" yelling, starting to -- to get up.  Um, not listening to my verbal communication -- verbal commands.  And I believe, uh -- I think I believe I did it one more time.  I'm not sure.  It could have been two.  To be honest, I -- at that point, I'm

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

PINELLAS COUNTY SHERIFF'S OFFICE

**PCSO - SUPPLEMENT  SO16-363788/21**

Report Date:  09/09/2016

---

**Narrative - Continued**

not counting how many times I'm Tasing him.

JT:   Were -- were you letting the Taser fully cycle each time?

GG:   No.  No.

JT:   Okay.

GG:   There were two seconds, like I said.  Two, three seconds tops.  I wasn't doing dah, dah, dah, dah -- five second.  You know, that's -- no, that didn't happen.  My -- my thing was just to get him to stop being aggressive, until we could get in.  Like I said, there is the table here, the doorway, and him right there.  I mean, it's not where we're able to just grab him and -- and -- and do what we need to do.  Especially if I got the Taser and trying to get Martinez in.  Uh, it's just -- and then, I guess, the next part was what -- basically, um -- uh, Sergeant Street showed up.  And once he was there, he went in while I had the Taser, grabbed him, got him onto his stomach.  Uh, he was --

JT:   Who -- who did that?  All of you, or --

GG:   Street.

JT:   Okay.

GG:   I had the Taser.  You know, based on my training and experience, you -- if the Taser guy is going to have to Tase him again, we don't jump in.  Because that's -- we're going to control that guy.

JT:   Okay.

GG:   It's the other person's job to, you know -- or the other two, which it should be, um, to go in there and secure him.  Um, I don't -- maybe back up just a -- a tad before that.  When we first got there, um, Martinez had his Taser out.  And knowing there was guns, I said, "Hey, do you -- you know, uh, Martinez, get your gun out so we have a lethal and a nonlethal, in case he gets to that gun.  We need to do that."  So, that was before, obviously, I had Tased.  Whether that's important or not I don't know.  Um, so, Sergeant Street grabbed him, put him down, tried to cuff him.  He was fighting us.  Uh, fighting them.  He couldn't get his -- I believe -- I believe he had his left hand back behind him, and he could not get his right hand.  So, Martinez jumped in and they were able to get his other hand behind him and get it cuffed.  It took -- it took a lot.  Um, I had to -- I had -- I had the Taser, plus I grabbed his legs because he was kicking and thrashing.  So, I kind of trapped his legs, uh, and trying to maintain the Taser at the same time as well.  Um --

JT:   So, while you guys were trying to handcuff him he was kicking and thrashing?

GG:   Yeah.  I -- I -- I secured his legs.

JT:   Okay.  How did you do that?

GG:   Uh, I had my leg on him.

JT:   Okay.

GG:   And then --

JT:   With your shin or your foot or --

GG:   My shin.  And I think I had my foot on one and my shin on the other.  I just had them pushed down.  And then Sergeant Street said, "Hey, pull him -- pull him away from the wall, so we can get" -- so I grabbed -- I actually had to put my Taser down, grabbed his feet.  Pulled him towards me, which actually helped them get his arm out and -- and cuff him.

JT:   What do you mean -- you say you pulled him towards him.  So, you were still, like, kind of in that doorway?  Where you were kind of --

GG:   I moved into the room, because --

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

PINELLAS COUNTY SHERIFF'S OFFICE

## PCSO - SUPPLEMENT  SO16-363788/21

Report Date:  09/09/2016

---

**Narrative - Continued**

JT:   Okay.

GG:   -- Martinez had to get in. I mean, I -- there was -- like I said, there was no -- no room. So, I came -- and that -- to -- when I came in, that's when I grabbed the ladder. Because Street -- you know, I'm in the doorway. Street has to come in. So, I -- the ladder was there. So, I grabbed the ladder, actually pulled it over the -- the Taser cord and gave it to Street. Put it out in the hallway.

JT:   Okay. The ladder was standing up?

GG:   It was.

JT:   Against the east wall?

GG:   Yes.

JT:   Okay. Um --

GG:   So, I mean, the -- that's how nice we were trying to be, as, you know, not -- you know, get this ladder out of here. Let's try to do this -- instead of just pummeling the guy, you know.

JT:   Okay. So, you guys get him handcuffed. How long does this last? After Sergeant Street rolls him over. You're trying to get his hands. You're on his shins. How long does that go on for?

GG:   I don't -- a minute. A minute and a half. I mean, it seemed like a long time but it probably wasn't.

JT:   All right. So, what happens after you guys get him handcuffed?

GG:   Get him handcuffed. We kind of backed away. Um, he's not moving. Um, so, I'm like, "Is he okay?" And I believe -- we said, "Yeah, he's okay. He's breathing." And then he's kind of still sitting there, you know, not really moving too much. I said, "Is he okay?" I said, "Let's check." I said, "Let's roll him to his side to make sure that he's, you know, not asphyxiating or something." So, we rolled him to his side. Uh, his mouth kind of moved, so we thought he was okay. Then he kind of didn't move. Uh, I believe Sergeant Street checked -- tried to check his pulse. I don't know if he got anything or not. I didn't ask. Um, then he -- Sergeant Street gave him, like, a sternal rub. And I believe his mouth opened again, or moved. So, we thought he was okay. Um, then I -- I -- I told Baldwin to -- I said, "Get EMS in here now." Uh, I believe he tried to call and the radio didn't work. I said, "Go out and get EMS, bring them in." You know, because they're -- you know, they're right there. They're right outside the door. They're trained to -- to do more than we are. So --

JT:   Okay. How long was it from the time you guys got him handcuffed and rolled him over, uh, did it take the EMS to get there?

GG:   A minute, a minute and a half. I mean, they were staged outside. You know, we came there. They staged. So, they were right there. Again, he seemed --

JT:   Did he stay handcuffed the whole time EMS was working on him?

GG:   I don't know. Once -- uh, once they came I was out of the room and -- and there was so many guys -- Sergeant Street was the only one in the room with him at that time. I mean, there was literally like five or six or seven of them in there.

JT:   Other than that yelling or grunting or moaning or -- you -- however you described it --

GG:   Yeah, it was just, "Yaaah."

JT:   Yeah, the "Yaaahs". We'll call it yaaahs. Um, did he make any other statements to you?

GG:   No, he didn't talk once.

JT:   Um, the wife -- did she -- other than telling you that -- what did she tell you, he had a seizure?

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

*PINELLAS COUNTY SHERIFF'S OFFICE*

**PCSO - SUPPLEMENT  SO16-363788/21**

Report Date:  09/09/2016

---

**Narrative - Continued**

GG:    She said something about maybe having a seizure.  She wasn't sure.  He had PTSD, I believe.  She said something about that.

JT:    Did she tell you she had any medical background or anything?

GG:    No.  I believe I heard that she was a nurse, or something.

JT:    But she didn't say anything to you?

GG:    After the fact -- no.  No.  I was --

JT:    Did you inquire any on the PTSD, as to what caused it or why or --

GG:    No, I didn't.

JT:    Okay.

GG:    My -- my main concern was to get up there, uh, and see what was going on.  Make sure he was okay.  Make sure he doesn't come out, you know, shooting or something.  Because, you know, the -- she's telling me that he's got a gun under his bed and he's got guns all throughout the house.  So, I don't want to wait to --

JT:    Well, when you went up there to check on him was it under the guise to make sure medically he was okay, or was it something --

GG:    Yeah, to assess the situation.  I mean, to see if he's okay.  To see what's going on.  I mean, I have no idea, really, what's going on.

JT:    When you got up there he was injured, you said, bleeding from his mouth?

GG:    Yeah.  I mean, I don't know if he's injured.  But his -- when he was going, "Ahhh," you know, you could just see the blood all in his mouth, his teeth, around his, uh, lips.  And I don't think -- don't remember seeing it on his face, really.  But, I mean, it could have been.  I just remember that his whole mouth was, like, bloody.  It was -- you know, it was weird.

JT:    Did that -- your training and experience, is that saying anything to you when somebody is bleeding from the mouth?  As far as what could be going on.

GG:    Maybe an internal injury or something.  I mean, I -- but, I don't know.  I don't know.

JT:    Did you see any other injuries?

GG:    I did not.  Again, I -- I was, you know, really fixated on -- on his hands.  You know, um, and what he was -- his motions, more than, like, looking to see if there was any injuries or anything wrong with him.

JT:    Did he seem to know what was, um --

GG:    Going on?

JT:    -- going on?

GG:    No.  I don't think he -- I mean, it -- it -- it seemed like he wanted to communicate, but he couldn't.  Um, that's why all we were getting was that -- that yell.  And, um -- and I would say something to him.  He would yell.  And if I didn't, he was fine.  I'd say something to him, he would yell.  And then at the end he just, I guess, got agitated and --

JT:    When you got up to the room, did you see any signs of weapons in the room?

GG:    Um, I noticed -- I -- I think it was, like, a gun case.  A kind of -- you know, and other than that I didn't see anything.

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

## PINELLAS COUNTY SHERIFF'S OFFICE

### PCSO - SUPPLEMENT  SO16-363788/21

Report Date:  09/09/2016

---

**Narrative - Continued**

JT:   Where was the gun case at?

GG:   Uh, the east wall by the ladder, I believe.

JT:   Okay.

GG:   I think it said H&K or something on it.

JT:   Do you know what color it was?

GG:   Brown. I'm colorblind. Green or brown. I don't know.

JT:   Okay. I am too.

GG:   Yeah. So -- but, the other -- you know, I guess there was other -- as you know, there was other guns, uh, at the end of the bed. On the other side, ! guess.

JT:   Could you see those at the time when you --

GG:   No. No. I saw them when -- I -- I don't know, they were on the bed when I came back in, with -- with you, I think.

JT:   Um, anything else he could use as a weapon that you saw laying around?

GG:   Uh --

T:   Baseball bats --

GG:   Uh, yeah. There was a knife. Um, I had forgotten about the knife. Um, there was a black, uh -- just like a regular pocketknife, like we carry. Um, we're -- when we had him down, it was right by him. So, I'm like, "The knife." So, I don't remember if I kicked it out or Sergeant Street kicked it out -- one of us. But, I recognized that -- saw it, and we got that out in the hallway and -- that's why there's so much stuff in the hallway. We were trying to get it out, so that, you know, the -- we weren't going to hurt him with, you know, a table or all the other stuff.

JT:   The -- the -- with the knife, was it, um -- was it folded? Was it --

GG:   It was folded.

JT:   Okay.

GG:   It was a black folding knife.

JT:   Okay. But it wasn't out? The blade wasn't out?

GG:   No, the blade wasn't out.

JT:   Okay.

GG:   But, again, I don't think -- it doesn't take long to open up a knife, if you know what you're doing.

JT:   Yeah. Um, how, uh -- how tall are you?

GG:   Uh, 5-10.

JT:   How old are you?

GG:   Forty-seven.

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE. Neither it nor its contents may be disseminated to unauthorized personnel.*

*PINELLAS COUNTY SHERIFF'S OFFICE*

**PCSO - SUPPLEMENT  SO16-363788/21**

Report Date:  09/09/2016

---

**Narrative - Continued**

JT:   Okay.

GG:   As of -- well, 46.  On the 12th, I'll be 47.

JT:   All right.  Close enough, right?

GG:   Yeah, I don't want to lie and --

JT:   Um, how much do you weigh?  If you don't mind me asking.

GG:   180.

JT:   180?  How big do you think this guy was?

GG:   Huh, I don't know.  He was probably -- that's a good question.  I didn't think to -- it's probably my height, maybe a little shorter.  Uh, probably a little heavier.  It was -- seemed like he had kind of a belly and -- again, I -- you know, I -- it's funny, because I didn't really even think of that when everything was going on.  I'm just seeing a guy yelling and coming at me.  I didn't really say how big or how tall he was.

JT:   Okay.

JU:   Did you see -- is that -- is that what you were talking about?

GG:   Yeah.  Yeah, that's it.  Where -- is that the hallway?  Yeah.

  T:   Is that the knife, Detective Upton.

JU:   Yeah.  Is that the knife that you saw?

JT:   Yeah, it looks -- yeah, that looks -- that looks like it.  I mean, it was black.  Looked like a kind of military looking type of knife. So --

JT:   Um, when he would try to stand back up when you would redeploy the Taser, you  said he was -- he was yelling, or --

GG:   Yeah, he was yelling, "Ahhh" and then -- and like just wanted to get up and fight.  I mean, you just -- you just know, you know, if --

JT:   Was he clenching his fists?

GG:   Yeah.  Clench his fists and, you know, that look in his eyes like, "I'm going to kill you."  I mean, he -- he -- he wanted to hurt somebody.  I mean, there's --

JT:   So, every time -- when you would deploy the Taser, you were in fear that he was going to get up and --

GG:   Absolutely.  Yeah, he's not -- he's not listening.  He's not obeying, you know, my -- my lawful commands.  Um, I'm just -- like I said, I'm trying to -- I'm -- I've -- in my -- you know, my mind I feel that a little bit of Tasing, in the couple of seconds that I was Tasing him, was going to be better than us, you know, kicking his ass, I mean, for lack of a better expression.  So --

JT:   Okay.  Um --

GG:   I mean, I --

JT:   -- and so, just -- just so I'm clear, you -- when you saw the blood and stuff, you were concerned about his medical or mental -- or, what -- what state were you more -- I mean, what was -- what was going through your mind when you got up there?

GG:   Well, in my mind he's not -- I mean, he's not right.  He's not thinking right.  He's not, you know, acting right.  I mean, he's just

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

*PINELLAS COUNTY SHERIFF'S OFFICE*

*PCSO - SUPPLEMENT  SO16-363788/21*

Report Date:  09/09/2016

---

**Narrative - Continued**

 not in his right mind.  So, I --

JT:    Okay.

GG:    -- don't know if he's on drugs.  I don't know anything.  All I know is he's very aggressive, he's very, uh, angry.  You know, it's intense.  Very intense.

JT:    Did you feel he needed to be checked out by medical personnel?

GG:    Yeah.  Yes, absolutely.  ! mean, it -- but the whole reason we were there is because they dealt with him earlier and they called us there to make sure the scene was safe.  I mean, they didn't -- you know, and they even said, "Thank God we called you guys before we went up there."  So, I mean, yeah, it's -- you know, the guy's got a 1911 under his pillow, that his hands are two seconds, you know, from grabbing.  That's not a good situation.

JT:    When did you see the gun under the pillow?

GG:    Um, ! saw the gun after we got done, um -- uh, restraining him -- getting him in cuffs.

JT:    Where was -- where was -- where was it at?

GG:    Um, it was at the -- do you need like north, south -- south side, uh, where his pillow was.

JT:    Okay.

GG:    Where he was laying, uh, down with his hands above his head.  That pillow that his head was on or by --

JT:    Okay.

GG:    -- that's right where the gun was.  And it was facing me.  So, the barrel -- you know, all he would have had to do is -- is pretty quick movement, you know.  He's trained.

JT:    So, the barrel was facing --

GG:    Facing the doorway -- facing us --

JT:    Okay.

GG:    -- as we come in.

JT:    And you said that later got moved, at some point?

GG:    I believe so.

JT:    Okay.  What makes you believe that?

GG:    It was facing the other way.

JT:    Okay.  When you did --

GG:    I don't know if --

JT:    -- the walk-through with me it was facing a different direction --

GG:    Yes.

JT:    -- than where you originally saw.

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

## PINELLAS COUNTY SHERIFF'S OFFICE

### PCSO - SUPPLEMENT  SO16-363788/21

Report Date:  09/09/2016

---

**Narrative - Continued**

GG:   Right.

JT:   Is that what you're saying?

GG:   Yes.

JT:   Okay.  I'm not putting words in your mouth.

GG:   No.  No.

JT:   Um, is there anything I didn't ask you you think I should know about?

GG:   No, I think that's pretty thorough.

JT:   When -- when you guys went up and you told Deputy Martinez to, um, go lethal and you were going to go less lethal, what was your thought process there?

GG:   Well, again, the whole -- I came in the house.  The wife is telling me, "He's got a gun under his pillow.  He's laying on the bed. Uh, he's got guns, you know, hidden throughout the house."  I mean, I should have had -- maybe had my gun out.  I mean, really.  I mean, you think about it.  Um, but, I feel confident in my training and skill level that, you know, we can work that out, if I had to move back and Martinez -- whatever, you know.  So, yeah, I mean, it's not a good situation.  I know his hands are here.  He's doing all this. He's moving.  I know he's -- 99 percent of my mind said he had a gun under the pillow, which he did.  And I got my Taser out.  So, I mean, uh -- that's why I said -- I looked at Martinez.  He had his Taser out.  I said, "No, bro, you need to get your gun out.  So -- in case this goes bad."  So, he did.

T:   Detective Upton, you got anything?

JU:   Yeah, just a -- just a couple things about the, uh, physical features or, uh, his -- the blood coming from his mouth.  Did you notice anything else?  Was -- was he sweating?  Was his pupils dilated?  That type of thing.

GG:   To be honest with you, I -- I couldn't tell you.  And it -- it didn't -- it wasn't like bleeding like it was fresh blood.  It was like dry blood.  If that --

JU:   So, were all his teeth intact?  Was he showing his --

GG:   Yeah, teeth looked --

JU:   -- was he showing his teeth?

GG:   -- fine.  Yeah, he's yelling.  And it just -- and he opened his mouth really wide, and it just -- you could -- it was just red and bloody, you know.  I -- and it might not even be blood.  It might be something -- I -- but it was dark and reddish, it looked like.  It looked like blood to me.

JU:   Okay.

GG:   Um, and it -- but it wasn't like it was bleeding, you know, like fresh blood.  It was like old, like it's -- you know --

JU:   And when you went hands on with him, did you note any -- notice anything abnormal about his body temperature or anything like that?

GG:   No.

JU:   Okay.

GG:   No, I just -- I --

---

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*

## PINELLAS COUNTY SHERIFF'S OFFICE

### PCSO - SUPPLEMENT  SO16-363788/21

Report Date:  09/09/2016

---

**Narrative - Continued**

JU:    And no -- no -- no sweating --

GG:    -- I grabbed his legs, and they didn't seem -- that I could remember -- clammy or cold or hot.  Didn't seem like that at all.

JT:    Okay.

JU:    All right.

JT:    It is now 1951 hours, and we're going to end this interview.

(CONCLUSION OF INTERVIEW)

Transcribed by:    jwg/jwg/ms

---

**Record Status Information**

| | |
|---|---|
| Record Origination Operator: | TOBECK, JONATHAN S DET (56990 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Record Origination Date: | 09/09/2016 08:47 |
| Last Update Operator: | CAPRA, JEFFERY P DET (53787 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) |
| Last Update Date: | 10/04/2016 10:19 |

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| TOBECK, JONATHAN S DET (56990 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 | CAPRA, JEFFERY P DET (53787 / HOMICIDE / PINELLAS COUNTY SHERIFF'S OFFICE) | 2/14/2017 |
| | | | |

*This report is property of PINELLAS COUNTY SHERIFF'S OFFICE.  Neither it nor its contents may be disseminated to unauthorized personnel.*