JULIE V. DEGRAW,
     Plaintiff,

vs.

BOB GUALTIERI, et al.
     Defendants.

_____/

Case No.: 8:18-cv-02116-T36-SPF

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT DEPUTY GOEPFERT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, JULIE V. DEGRAW, files her Response in Opposition to Defendant Dpt. Goepfert's Motion for Summary Judgment (Dkt. 97) and in support thereof, states:

## I.    STANDARD OF REVIEW

Summary judgment is not appropriate unless "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Chapman v. Procter & Gamble Distrib.*, LLC, 766 F.3d 1296, 1312 (11th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "Courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party." *Davis v. Williams*, 451 F. 3d 759, 763 (11th Cir. 2006). If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1246 (11th Cir.1999). The court views the facts from Plaintiff's perspective because the determinative issue is "not which facts the parties might be able to prove" but rather whether "certain given facts" demonstrate a violation of clearly established law. *Crenshaw v. Lister*, 556 F.3d 1283, 1289 (11th Cir. 2009).

## ARGUMENT

## A.  QUALIFIED IMMUNITY

When considering whether an officer is entitled to qualified immunity, the courts balance "the need to hold [officers] accountable when they exercise power irresponsibly and the need to

shield [them] from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity does not extend to an officer who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982).

"[A]ll claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other `seizure' of a free citizen should be analyzed under the Fourth Amendment and its `reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395, (1989). That standard requires the Court to ask "whether the officer's conduct [wa]s objectively reasonable in light of the facts confronting the officer." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). The relevant inquiry in such a case is whether the officer's conduct was objectively reasonable under all the circumstances, regardless of any intent on the officer's part. *Graham*, citing *Scott v. US*, 436 U.S. 128 (1978). Whether an officer's use of force in a given case was excessive cannot be determined by a bright-line rule, and "[t]he hazy border between permissible and forbidden force is marked by a multifactored, case-by-case balancing test ... [which] requires weighing of all the circumstances." *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir.1997). Reasonableness in this context depends on all the circumstances relevant to an officer's decision to use force and the amount of force used. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). The circumstances must be viewed "from the perspective of a reasonable officer on the scene." Id. It is axiomatic that, "if an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making the arrest." *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1332 (11th Cir. 2006).

1. **Medical Distress Cases**

Plaintiff was unable to find any cases that would address the constitutional standard for the officer's actions when involved in a medical call to assist another agency – cases not involving arrests, for criminal or disorderly conduct or Baker Act situations. A review of cases where officers are alleged to have failed to provide post-arrest medical care may be helpful. "Due process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital." *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986). The Due Process Clause of the Fourteenth Amendment is violated if officials are deliberately indifferent to serious medical needs. *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1242-43 (9th Cir. 2010). Deliberate indifference exists when an official knows of and disregards a serious medical condition[1], i.e., when an official is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and actually draws that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "A deliberate indifference claim has both objective and subjective components." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir.2011). "The objective component requires a plaintiff to show that `the medical need at issue is sufficiently serious,'" while "[t]he subjective component requires a showing that … officials have a sufficiently culpable state of mind in denying medical care.'" *Id*. In *Est. of Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir.2005), Cincinnati police officers choked, hit, and maced a suspect who had eluded arrest in the past, and threw him into the back of a squad car. Arriving at the scene, another officer peered into the back of the cruiser where he saw that the suspect "was bleeding and appeared unable to breathe," prompting the officer to say, "this looks f[-]ed up. Can

---

[1] A serious medical need is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention". Farrow v. West, 320 F. 3d 1235, 1243 (11th Cir. 2003). A seizure, observed by a registered nurse and manifested by a serious post-seizure confusion, certainly should qualify as a serious medical need.

he breathe? It don't look like he can from the way he's laying." Id. at 600. The officers "failed to investigate [the suspect's] condition any further and did not attempt to provide him with medical care." Id. In affirming the denial of qualified immunity, the Sixth Circuit "agree[d] with the district court's conclusion that the evidence indicates that each officer did, in fact, know of and disregard the substantial risk of harm to [the suspect's] health and safety."

Another case, *Eibel v. Melton*, 904 F. Supp. 2d 785, 808 (M.D. Ten. 2012), held that if, as Plaintiff claims, Mr. Eibel was "bleeding out," and Defendants were aware of that situation but did nothing, a reasonable jury could conclude that Defendants were deliberately indifferent to his serious medical need in violation of the Fourteenth Amendment.

It is undisputed that Mrs. DeGraw, a nurse with many years of experience, saw her husband experience seizures. She conveyed this information to Dpt. Goepfert and Dpt. Martinez before they approached his bedroom. Dpt. Martinez confirmed that he also made Dpt. Goepfert aware of this. Dpt. Goepfert was familiar with seizures. He also knew that mental confusion, fogginess, and speech impairment are typical symptoms of a person in a postictal state. When Dpt. Goepfert approached the doorway to Mr. DeGraw's bedroom, he saw an individual, clad in just his undershorts, laying on the bed "doing nothing". Dpt. Goepfert noted that when Dpt. Goepfert talked to him, Mr. DeGraw responded with non-verbal, yelling sound like "yaah" or "ahhh". When Dpt. Goepfert was not speaking, Mr. DeGraw was silent. During the entire encounter, Mr. DeGraw did not talk. It seemed to Dpt. Goepfert that Mr. DeGraw did not know what was going on, and that he wanted to communicate, but could not. Mr. DeGraw gave no indication that he understood who the deputies were or what they were doing in his bedroom.

Dpt. Goepfert approached Mr. DeGraw's bedroom upstairs with his Taser drawn. He gave Mr. DeGraw repeated commands, even though he realized that Mr. DeGraw was unable to

communicate. He recognized that Mr. DeGraw got agitated whenever Dpt. Goepfert ordered him to do things. He issued commands in rapid succession from the doorway to his bedroom, which had to be repeated 3-4 times for Mr. DeGraw to respond[2].

Dpt. Goepfert claims that he wanted to get Mr. DeGraw off his bed and away from a gun (not seen), but believed to be under his pillow[3]. After arousing Mr. DeGraw, in his bed, Dpt. Goepfert told him to stop moving and turn back to where Dpt. Goepfert could see his hands, and Mr. DeGraw complied after Dpt. Goepfert repeating the command 3-4 times. Dpt. Goepfert then repeatedly said, "Sir, come out towards me". Mr. DeGraw stood up and made a step towards Dpt. Goepfert and the doorway. Even though he had told Mr. DeGraw several times to come out towards him, when Mr. DeGraw did that, Dpt. Goepfert abruptly ordered him back on the bed. Mr. DeGraw eventually complied by sitting on the edge of the bed, but then stood up again and took another step towards Dpt. Goepfert, and the doorway, like he had been instructed to do previously. Instead of allowing him to come out of the room and away from the bed, Dpt. Goepfert then Tasered Mr. DeGraw, then only 3 feet away. Dpt. Goepfert knew that the Taser was not going to get full incapacitation from that distance, and that it was going to cause immediate pain and distress.

The deputies understood that Mr. DeGraw was in medical destress, mentally confused, and unable to communicate. Their failure to allow Mr. DeGraw to walk out of the room, as he started to do, then be treated by the medical help waiting on them, instead subjecting Mr. DeGraw to the grueling effects of Tasering, put him at substantial risk of harm, ultimately resulting in his death.

---

[2] Mr. DeGraw had a similar seizure event that morning. Paramedics assisted him out of his bedroom to downstairs. The paramedics stayed with Mr. DeGraw and assisted him until he came out of his confused mental during the morning event. They determined that he did not need to be "Baker Acted" nor hospitalized.
[3] In fact, a gun was under his pillow with a magazine but no bullet was advanced into the chamber, making it incapable of firing without a two handed loading action which Mr. DeGraw was incapable of.

This constituted deliberate indifference to Mr. DeGraw's substantial post seizure medical needs compounded by the direct medical harm caused by the stress of Tasering him, an objectively unreasonable use of force and a violation of Mr. DeGraw's constitutional rights in both instances.

## 2. The Use of Force was Unreasonable Under the Fourth Amendment

### (a) No Force was Justified

The Fourth Amendment's protection against unreasonable seizure includes protection against arrest without probable cause. *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004). With regard to a qualified immunity analysis, arguable probable cause exists if, under all of the facts and circumstances, an officer reasonably could—not necessarily would—have believed that probable cause was present." Id. Mr. DeGraw had not committed any crime and was not a candidate for Backer Act[4], was not subject to detention. He had no history of violence. He was unable to demonstrate a consistent, clear, purposeful intent. He was non-verbal and demonstrated no threat toward the officers. There is no evidence that he ever attempted to touch a gun, much less use it, later found under his pillow, nor to use a folded penknife, later found on the floor. Dpt. Goepfert had no right to make an arrest, nor to detain Mr. DeGraw and, therefore, he had no right to use any degree of force. See *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1332 (11th Cir. 2006).

### (b) The First Taser Use was not Justified

Even if a reasonable officer believed that Mr. DeGraw posed any degree of threat to himself or to others, the use of a Taser under these circumstances was excessive and unreasonable. When an officer permissibly makes an arrest or investigatory stop, he may use "some degree of physical

---

[4] The Baker Act is a Florida law that permits a person to be "involuntarily examin[ed]" by a mental health facility "if there is reason to believe that the person has a mental illness and because of his or her mental illness ... [t]here is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others...." Fla. Stat. § 394.463(1)(b)(2).

coercion or threat thereof to effect it." *Patel v. City of Madison,* 959 F.3d 1330 (11th Cir. 2020), citing *Graham v. Connor, 490 U.S. 386, 396-97 (1989).* To determine whether an officer's force was unreasonable, the court considers (1) the severity of the crime; (2) whether the individual "pose[d] an immediate threat to the safety of the officers or others"; and (3) whether the individual "actively resist[ed] arrest or attempt[ed] to evade arrest by flight." Id. Courts have also considered (4) the need for force to be applied; (5) the amount of force applied in light of the nature of the need; and (6) the severity of the injury. Id. citing *Lee*, 284 F.3d at 1197-98. Courts may also consider the number of persons the police have to deal with at one time, the duration of the action, and the dangerousness of the person subject to the police action in making this objective assessment. *Crosby v. Paulk*, 187 F.3d 1339, 1351 (11th Cir. 1999).

In a case where an officer uses "gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands," "we have repeatedly ruled that the officer violates the Fourth Amendment and is denied qualified immunity." *Sebastian v. Ortiz*, 918 F.3d 1301, 1308 (11th Cir. 2019); *Stephens v. DeGiovanni*, 852 F.3d 1298, 1326 (11th Cir. 2017).

"While this force may have been reasonable had Byron been in custody as the result of a lawful arrest, he was merely a mentally disturbed patient who may or may not have been subject to the Baker Act. The officers therefore may not have been acting reasonably." *Owens v. City of Ft. Lauderdale*, 174 F. Supp. 2d 1282, 1293 (SD Florida 2001).

Mrs. DeGraw called 911 asking for medical help. She clearly stated that her husband had the second or third seizure of the day, and that he had a history of some PTSD[5]. When the Fire Department (FD) paramedics received the call, the lieutenant in charge decided to ask for law

---

[5] Mr. DeGraw was a combat medic in the Navy attached to ANGELICO special ops group diagnosed with PTSD in 1996. The FD conveyed this to one of the deputies, there is no evidence that Dpt. Goepfert was told that Mrs. DeGraw was afraid of her husband. In any event, he did not take the time to clarify, if that was the case. She clearly was not.

enforcement assistance to make sure the residence was safe to enter due to the FD's prior engagement[6]. There is no evidence that Dpt. Goepfert was told that Mrs. DeGraw told the dispatch that she was afraid of her husband. In any event, he did not take the time to clarify, if that was the case.

Upon arrival, Dpt. Goepfert and Dpt. Martinez were met by Mrs. DeGraw who told them twice her husband had a seizure, was confused, was a military vet and had a history of PTSD. She told Dpt. Martinez that paramedics and deputies had been at the residence earlier, but it is unclear if Dpt. Goepfert was aware of that. Dpt. Goepfert stated he had assumed that the paramedics were there to "Baker Act" Mr. DeGraw, but did not know on what basis. He did not suspect Mr. DeGraw of any crime nor did he hear any threat.

Dpt. Goepfert knew that he was possibly dealing with a person with PTSD (a mental health condition) and definitely knew that he was dealing with a person who had suffered multiple seizures, which he acknowledged to Dpt. Martinez. Dpt. Goepfert did not ask about Mr. DeGraw's condition. He did not consider any of the policies and procedures applicable to mentally disturbed individuals, or to talk to Dpt. Martinez, who was CIT[7] trained, when he accompanied him to the bedroom doorway. Instead, he immediately headed upstairs with his Taser drawn. Dpt. Goepfert unholstered and armed his Taser even before he had first laid eyes on Mr. DeGraw in his bed. Dpt. Goepfert knew about seizures and about post-seizure state so he should have known to expect Mr. DeGraw to be suffering from disorienting symptoms. The most common complaint of patients is an inability to think clearly, specifically "poor attention and concentration, poor short term

---

[6] The lieutenant in charge saw in the dispatch notes that the wife was afraid of the patient. He was told by the paramedic from the previous shift that he had been there earlier, the patient had behavioral or psych problem, was very difficult to deal with, refused treatment and there were a lot of weapons in the house. Although Mr. DeGraw had not been aggressive, his body language indicated he didn't want to go to the hospital. As a result, the FD decided to ask for law enforcement assistance to make sure the residence was safe to enter.

[7] CIT – Crisis Intervention Team - is a nationwide program for law enforcement to receive specialized training in dealing with the mentally ill.

memory, decreased verbal and interactive skills, and a variety of cognitive defects specific to individuals[8]."

Dpt. Goepfert positioned himself at the doorway of the bedroom, facing the bed. Dpt. Martinez assumed a position on the other side of the doorway, with his gun drawn, and where he could see Dpt. Goepfert but could not see Mr. DeGraw or inside the room. Neither entered the room until after Mr. DeGraw was Tasered.

Dpt. Goepfert first saw an individual, clad in just his undershorts, laying on the bed "doing nothing". It seemed to Dpt. Goepfert that Mr. DeGraw wanted to communicate, but he could not. Mr. DeGraw did not give any indication that he understood who the deputies were or what they were doing there. For the first 3-5 minutes, Dpt. Goepfert repeatedly asked Mr. DeGraw "what was going" on and Mr. DeGraw responded with a loud "yahhh" sound, during which Dpt. Goepfert saw blood inside Mr. DeGraw's mouth[9]. Mr. DeGraw was laying on his back in his bed with his hands above his head by the pillow. At one point it seemed to Dpt. Goepfert he was turning over to the side, in Dpt. Goepfert's words "almost like he was reaching for something", although he did not. Mr. DeGraw turned toward Dpt. Goepfert 3 or 4 times as Dpt. Goepfert commanded, "Sir, **come out towards me**". Dpt. Goepfert ordered him to turn back towards him each time and threatened that he would Taser Mr. DeGraw if he did not. Mr. DeGraw then sat up on the edge of the bed, then stood up and "kind of came towards" Dpt. Goepfert, as he was ordered to do. Despite just having ordered him repeatedly to come towards Dpt. Goepfert, he then ordered Mr. DeGraw to "stay where you're at". Mr. DeGraw sat down on the bed, then he stood up again and turned

---

[8] Fisher, RS; Schachter, SC (2000), "The Postictal State: A Neglected Entity in the Management of Epilepsy.", Epilepsy & Behavior, 1 (1): 52–59, doi:10.1006/ebeh.2000.0023, PMID 12609127. The postictal state is the altered state of consciousness after an epileptic seizure. It usually lasts between 5 and 30 minutes, but sometimes longer in the case of larger or more severe seizures, and is characterized by drowsiness, confusion, nausea, hypertension, headache or migraine, and other disorienting symptoms. https://en.wikipedia.org/wiki/Postictal_state

[9] Tongue-biting is one of the manifestations of seizure. *Stewart v. Waterman Steamship Corp.*, 288 F. Supp. 629, 633 (ED Louisiana 1968).

towards Dpt. Goepfert and took a step. Dpt. Goepfert then ordered him to "just stay there". Mr. DeGraw took another step with his hands out, fists down, towards Dpt. Goepfert "like a zombie[10]" in Dpt. Goepfert's words. During the interview on the day of the event, Dpt. Goepfert characterized the behavior as "weird but interesting", not as threatening. In response to Mr. DeGraw's merely taking a shuffling step toward the doorway while yelling out "yahhh", Dpt. Goepfert shot the Taser probes into Mr. DeGraw's chest from 3 feet away causing Mr. DeGraw to fall on his buttocks against the wall[11]. Dpt. Goepfert has a 40 year teaching history in multiple martial arts and defense skills. He was standing in the doorway with Dpt. Martinez who had a firearm. They cannot be said to be concerned about their safety from a confused man who was uncoordinated, unbalanced and not verbally threatening them. Mr. Degraw made no attempt to reach for any gun or for the pillow on the bed he had just stepped away from. In any event, it would have been impossible for him to make a move to reach the gun under the pillow, especially as it was a queen size bed[12] and would require stepping toward the head of the bed, reaching in over the edge of the bed, under the pillow, and using both hands to secure the gun and advance a round into the chamber.

According to Dpt. Goepfert, he first approached the bedroom with the stated intent of getting Mr. DeGraw out of the room. Mr. DeGraw was confused but eventually mostly complaint to repeated and sometimes contradicting commands, and nonviolent throughout the interaction. Even when Dpt. Goepfert changed his mind (from trying to get Mr. DeGraw off the bed and out of the room to telling him to stay), Mr. DeGraw was mostly complaint. Dpt. Goepfert's repeated

---

[10] As well depicted in popular culture, a zombie walk is characterized by misaligned body, awkward and erratic steps with no pattern, lost coordination, lumbering around aimlessly https://www.wikihow.com/Walk-Like-a-Zombie.

[11] Dpt. Goepfert acknowledged that at least a 7 foot distance is required to achieve proper Taser probe spread for the Taser to serve its purpose, i.e., a complete immobilization of the subject. So when he Tasered Mr. DeGraw, there was not even a theoretical possibility of this achieving its intended purpose.

[12] A queen size bed measures 60" x 80".

and sometimes opposite commands would have been confusing to a person with a clear mind. Dpt. Goepfert had just observed that it took 3-4 times for Mr. DeGraw to understand his prior commands. He realized that Mr. DeGraw did not fully understand what was going on.

Dpt. Goepfert claims that force was justified because he was in a "small clattered room full of guns within easy reach", (not true), not that force was applied as Mr. DeGraw was attempting to leave the room. Dpt. Goepfert saw only a closed gun case in the room[13]. Dpt. Martinez only saw closed "boxes" for long guns. Sgt. Street, who arrived at the doorway after the Tasering commenced, saw the two closed long gun cases only.

Given his confusion, Mr. DeGraw was not in a position to formulate any intent to resist. Dpt. Goepfert admitted he did not know what was going through Mr. DeGraw's mind as Mr. DeGraw was not able to communicate either verbally or otherwise. There can be no refusal to resist commands when there is marginal ability to understand. One or two disoriented steps toward the doorway did not amount to refusal to comply, given his confused mental state and given that repeated previous commands directed him to do just that. There was certainly no need to apply any force when the only stated goal was to get Mr. DeGraw to leave his room. Other factors that courts have considered are not applicable here. The lack of any real or immediate threat to the officers, the lack of evasion by flight or conscious resistance, the lack of need for force and the excessive force applied all point to an objective assessment that the use of force was unreasonable. Mr. DeGraw was the only subject for three able-bodied, armed deputies. Mr. DeGraw was not objectively capable of formulating a plan to harm anyone. As a result of being Tasered, Mr. DeGraw died. The first Taser application was objectively unreasonable under the circumstances.

---

[13] The gun that had been under Mr. DeGraw's pillow did not have a round in the chamber. To advance a round, one would have to hold the gun with one hand and slide the loader with the other hand. It would have taken both hands and significant coordination to go back into bed, reach the out of sight gun under the pillow, then load a round into its chamber. There was simply no threat of this ever happening. The other guns were in closed and secured cases.

**(c) Subsequent Taser Applications Unreasonable**

A single Taser shock may be acceptable means of attempting to calm an agitated person. *Oliver v. Fiorino*, 586 F.3d 898, at 906. The 11th Circuit has held there was no qualified immunity where police discharged a Taser numerous times on people who were not suspected of any crime and/or who were compliant with police orders. See also, *Glasscox v. Argo*, 903 F.3d 1207 (11th Cir. 2018) (finding that police officer was not entitled to qualified immunity for discharging a Taser repeatedly and in rapid succession on a person who was not resisting); *Fils v. City of Aventura*, 647 F.3d 1272 (11th Cir. 2011)(finding that police were not entitled to qualified immunity where they used a Taser on a person who was compliant with police requests and who was suspected of only a minor crime); *Oliver*, 586 F.3d 898 (finding that police were not entitled to qualified immunity for discharging a Taser eight to twelve times on a person who was not suspected of any crime and who was not resistant).

"The critical time period for purposes of determining whether" the repeated use of a Taser on an arrestee constituted unconstitutional excessive force spans ... just before the first activation... through ... the time of the [final] [t]aser deployment." *Wate v. Kubler*, 839 F.3d 1012, 1020 (11th Cir. 2016). Even if the arrestee's resistance justified deployment of a Taser initially, if he has "stopped resisting ... during this time period," further Taser deployments are excessive. Id. at 1021.

The first Taser shock to Mr. DeGraw lasted 2 seconds. Dpt. Goepfert activated the Taser again applying an electrical charge to Mr. DeGraw for 3 seconds, then 1 second, then 5 seconds, and finally 1 second, for a total of 12 seconds of shock, applied over 93 seconds. According to Dpt. Goepfert, every time he turned off the Taser, Mr. DeGraw would yell "ahh" and try to stand up. He was never able to stand up. Dpt. Goepfert Tased him repeatedly before he could even get up on one knee. Dpt. Martinez said they told Mr. DeGraw to "stay on the ground" while Sgt.

Street said they ordered him to "roll over on his stomach" while he was being Tasered. Dpt. Goepfert did not know if Mr. DeGraw understood what was being said to him. According to Dpt. Martinez, all that Mr. DeGraw did, was "fight the Taser probes" he was entangled in, causing his pain, and try to get up. Dpt. Martinez did not perceive Mr. DeGraw's efforts as an attempt to "come and get" the deputies, he was just trying to get up. Dpt. Martinez noted that Mr. DeGraw never actually got up from the floor. According to Sgt. Street, Mr. DeGraw was "flailing about on the ground, rolling back and forth, grunting, growling and grinding his teeth". His feet were generally against the bed while his head was against the opposite wall, away from the bed, as Dpt. Goepfert kept Tasering Mr. DeGraw. The Taser applications gave Mr. DeGraw no chance to understand or comply with any of the deputies' further commands.

Mr. DeGraw did not offer anything that can be reasonably viewed as resistance. The Pinellas County Sheriff's Office deputies testified that the Taser delivers excruciating pain. All of Mr. DeGraw's movements were involuntary responses to the Taser pain, the first jolt knocking him to the floor.

The 11th Circuit has held that such repeated Tasering is not justified where, after the first Tasering, what the person did thereafter was involuntary reaction to the Taser and such involuntary reaction cannot be viewed as resistance. See *Glasscox*, 903 F.3d at 1215. There, in the time spanning the second to fourth tasings, Mr. Glasscox did nothing that reasonably could be viewed as resistance. During the second Taser shock, Mr. Glasscox's movements were entirely involuntary: his hands and arms curled up toward his chest while he shook and writhed. Id. Then, mere seconds after the second shock ended, without giving Mr. Glasscox time to [comply with the command], the officer tased him a third time. Id. Here, the deputies claim that Mr. DeGraw

resisted handcuffing while they pinned him to the floor face down, after repeated Tasering. It is irrelevant to the Court's analysis, as it stops with the last Taser application. *Wate*, 839 F. 3d 1012.

Because Mr. DeGraw was not being arrested or detained, or fleeing, and because a jury could reasonably find that Mr. DeGraw's movements were not resisting lawful commands, it could reasonably conclude that Dpt. Goepfert "had no reason to use the force he did on [DeGraw] that resulted in [death]." *DeGiovanni*, 852 F.3d at 1326. In *Patel*, the 11th Circuit recently held that the officer's use of force was "obviously unnecessary" when dealing with a subject who did not speak or understand English and thus was unable to understand the officer's commands. *Patel v. City of Madison,* 959 F.3d 1330 (11th Cir. 2020). He did not menace the officers and did not flee. All he did was take "a total of about twenty slow and non-consecutive steps away from the officers". In response, the officer delivered a leg sweep so forceful that it knocked Patel's shoe off and caused permanent partial paralysis. The court concluded that in viewing the facts in the light most favorable to Patel, the leg sweep was "obviously unnecessary" because Patel did not resist. Even if the previous steps Patel took towards home and away from the officers reasonably gave the officers the impression that Patel was evading them, Patel was not being "fractious" at the time the officer took him to the ground. The court denied summary judgment finding that a reasonable jury could conclude it was unnecessary for the officer to forcefully throw Patel down. Mr. DeGraw, while confused and thus unlikely to formulate any coherent course of action, took one or two unbalanced, disorganized steps toward the door before he was shocked by Taser repeatedly, without an opportunity to further comply with the officer's contradictory commands. Mr. DeGraw can hardly be said to have been menacing or fractious as he stepped forward when force was applied, nor when he was standing on the floor during repeated shocks from the Taser.

Defendant's reliance on *Draper v. Reynolds*, 369 F. 3d 1270 (11th Cir. 2004) is unavailing as the suspect there was belligerent with the officers and ignored 5 requests for documentation. Mr. DeGraw was confused and unable to engage in deliberate non-compliance. Likewise, *Buckley v. Haddock*, 292 F. App'x 791 (11th Cir. 2008) is inapplicable as the subject there was under arrest for refusal to sign a speeding ticket, sat down and refused to stand up. Mr. DeGraw was not under arrest and was not resistant.

### B. Taser was Inappropriate for Dealing with a Mentally Impaired Person

A person with neurological impairment may not understand commands. PCSO General Order 13-10 mandates that deputies "must recognize the responses of people with certain disabilities may resemble" alcohol or drug abuse and warns that such traits can be exhibited by people with epilepsy, a seizure-inducing condition. Officers should take steps to calm the situation by assuming a quiet, non-threating manner, by engaging a family member in calming the subject, speaking slowly, asking short direct questions and repeating oneself as needed[14]. "Do not threaten the individual with arrest or in any manner as this will create additional fight, stress and potential aggression[15]". "Deputies should realize that involuntary behavior associated with some invisible disabilities may resemble behavior characteristically exhibited by intoxicated or less frequently, combative individuals. For example, a person experiencing a mild seizure may appear incoherent and physically imbalanced[16]". Dpt. Martinez was a CIT-trained officer – one who had received at least 40 hours of specialized training in responding to situations that involve someone who is having a mental health related crisis[17], and was beside Dpt. Goepfert in the doorway during these events. Dpt. Goepfert did not seek Dpt. Martinez' assistance on how he should deal with Mr.

---

[14] 13-10.3 (B), p. 6.
[15] 13-10.3 (B)(7), p. 6.
[16] 13-10.15 (E), p. 13.
[17] 13-10 DEFINITIONS E-G, p. 2

DeGraw, instead delivering repeated commands to Mr. DeGraw and repeatedly threating him with the Taser for not complying promptly with his commands.

The use of a Taser is at least an intermediate, if nonlethal, level of force [18]. Like any generally non-lethal force, the Taser is capable of being employed in a manner to cause the victim's death. See, e.g., *Oliver v. Fiorino*, 586 F.3d 898, at 906. PSCO General Order 13-3 defines Taser as a weapon "that uses propelled wires to conduct energy to a remote target, thereby controlling and overriding the central nervous system of the body[19]". In Pinellas County, the use of Taser <u>may be</u> an appropriate response "to any type of "active resistance" on the part of the individual who is about to be taken into custody. The use of the [Taser] can be justified whenever it appears the utilization of other control techniques will most likely result in a physical altercation that may cause injury to either members or the person being taken into custody[20]", (emphasis added). Mr. DeGraw did not meet the definition of 'active resistance'. "Active resistance" is a subject's use of physical evasive movements directed towards the Dpt. such as bracing, tensing, pushing, or pulling to prevent the Dpt. from establishing control over the subject[21]. The subject's age and physical ability should be considered before deploying a Taser[22]. Mr. DeGraw was not a threat of injury to the martial arts expert, Dpt. Goepfert, who was backed-up by two other deputies. His movements were uncoordinated, not all consciously made, nor reasonably viewed as resisting the Dpt.'s stated efforts to have him simply leave the room in his underwear.

---

[18] See, e.g., *Oliver v. Fiorino*, 586 F.3d 898, 903 (11th Cir.2009) (recognizing that the Taser is "designed to cause significant, uncontrollable muscle contractions"); *Orem v. Rephann,* 523 F.3d 442, 447-48 (4th Cir.2008) (rejecting the contention that a Taser constitutes a minor or de minimus level of force); *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir.1993) ("We find defendants' attempt, on appeal, to minimize the pain of being shot with a stun gun... to be completely baseless. The defendants' own testimony reveals that a stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless.")
[19] 13-3: Use of Force (J)
[20] 13-3: Use of Force (C)
[21] 13-3, Definitions, p. 1.
[22] 13-3.6 (E), p. 6.

Taser may be used pursuant to training[23]. Taser training states that Taser application may produce physiological or metabolic effects including on the heart rate and rhythm[24]. "Reasonable effort should be made to minimize the number of [Taser] exposures[25]". "Minus exigent circumstances, multiple [Taser] applications or the prolonged duration of any application should be minimized or avoided". Dpt. Goepfert made no effort to minimize the exposures.

"[Taser] use on [the infirm] could increase the risk of death or serious injury[26]". "Law enforcement personnel are called upon to deal with individuals in crises that are often physiologically or metabolically compromised and may be susceptible to arrest-related death. … Any physiologic or metabolic change may cause or contribute to death or serious injury[27]". "Risk of an [Taser] application having a negative effect on a person's heart rate and/or rhythm is not zero. The risk of an [Taser] causing cardiac arrest in humans from ventricular fibrillation is sufficiently remote that making accurate estimates is very difficult. Current estimates of the risk are on the order of 1 in 100,000 applications[28]". Taser manufacturer has lowered the recommended point of aim from center of mass to lower-center of mass. "When possible, avoiding chest shots with [Taser] reduces the risk of affecting the heart and avoids the controversy about whether [Tasers] do or do not affect the human heart[29]". Dpt. Goepfert did not consider Mr. DeGraw's infirmed state and deployed his Taser directly into Mr. DeGraw's chest area at close range. It is undisputed Mr. DeGraw suffered cardiac arrest as a result[30].

---

[23] 13-3.6 (G), p. 7.
[24] Taser Training Manual, V. 18, p. 20.
[25] Id.
[26] Taser Training Manual, V. 18, p. 22.
[27] Taser Training Manual, V. 18, p. 23.
[28] Taser Training Manual, V. 18, p. 7.
[29] Taser Training Manual, V. 18, p. 9.
[30] Werner Spitz, M.D. testified that but for the injudicious use of Taser (EDM) on Donald DeGraw, he would not have died. Vernard Adams, M.D., the Defendant's expert, testified that the Taser discharge contributed to Mr. DeGraw's death through the mechanism of pain, increased autonomic tone, and stress.

## C. The law was clearly established that Dpt. Goepfert's use of force was unconstitutional

In its Order on the motions to dismiss, this Court held that Mr. DeGraw's Fourth Amendment right was clearly established from the allegations. Dkt. 47, p. 11-13.

The law is clearly established that a particular amount of force was excessive in any of three ways. *Patel v. City of Madison,* 959 F.3d 1330, 11th Circuit, 2020. First, a plaintiff may "point to a materially similar case [that has] already decided that what the police officer was doing was unlawful." Id. citing *Lee*, 284 F.3d at 1198. Second, if the plaintiff cannot find a materially similar factual case from the Supreme Court, this Court, or Florida Supreme Court, a plaintiff can "show that a broader, clearly established principle should control the novel facts in this situation." Id. citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). Third, a plaintiff may rely on the "obvious clarity" path, which applies when "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw." Id. citing *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000). Both the second and third analysis leads to the conclusion that, under the Plaintiff's version of the facts, the law was clearly established that Mr. DeGraw had constitutional right to be free from multiple Taser discharges into his chest area which caused or contributed to cardiac arrest and his death.

The 11th Circuit has "repeatedly ruled that a police officer violates the Fourth Amendment, and is to be denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014). Such cases date to at least the year 2000. See id. If a jury believes the Plaintiff's version of the facts—under which Mr. DeGraw was complying with the officers' commands the best he could in his confused state and did not physically struggle until after he was

Tasered, and on the floor, it could reasonably find that Dpt. Goepfert knowingly violated this principle when he Tasered Mr. DeGraw for stepping toward him and toward his bedroom door, in his own words, "in a weird but interesting" manner.

The third method of demonstrating that a right was clearly established also applies here. The 11th Circuit has previously concluded that employing gratuitous force against a non-resistant suspect can meet the "obvious clarity" test. For instance, in *DeGiovanni*, the Court held that the officer's use of gratuitous force on a suspect who was not resisting presented "obvious-clarity facts" that rendered "particularized preexisting case law" irrelevant. 852 F.3d at 1328; see also *Sebastian*, 918 F.3d at 1311-12; *Priester*, 208 F.3d at 927 (finding that where the suspect offered no resistance, "[n]o reasonable police officer could believe that this force was permissible given these straightforward circumstances").

The 11th Circuit held that as of 2009, it was clearly established that the repeated Tasering of a suspect who had ceased any resistance was unlawful. *Glasscox,* 903 F. 3d 1207 relying on *Oliver,* 586 F. 3d 898, and *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997).

In *Oliver*, a Taser case, the court held that the force employed was so utterly disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized that his actions were unlawful. Id. at 908. The need for force was exceedingly limited, where the plaintiff was not accused of or suspected of any crime, let alone a violent one; he did not act belligerently or aggressively; he complied with most of the officers' directions; and he made no effort to flee. Id. The Court held that the officers' repeated Tasering of the plaintiff was "so plainly unnecessary and disproportionate that no reasonable officer could have thought that this amount of force was legal under the circumstances". Id. The court concluded it violated a clearly established right. Id. Oliver was Tasered at least eight and as many as eleven or twelve times over

a two-minute span without attempting to arrest or otherwise subdue the plaintiff, including Tasering Oliver while he was writhing in pain on the hot pavement and after he had gone limp and immobilized. Id.

Here, when the court views the case from the victim's perspective, no reasonable officer could have thought that finding a man lying calmly in his bed, a man not guilty of any crime, clad in just his underwear, suffering from effects of a seizure in a postictal state which the officer knew would make him confused, a man struggling to understand what was going on and trying to comply with the conflicting, rapid succession, and often confusing commands, a man not attempting to reach for use for any weapon, should be Tasered because it was objectively necessary and because it constituted a reasonable use of force.

Wherefore, Plaintiff requests that the Court should deny the Defendant's motion for summary judgment.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via e-party by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

Dated: August 7, 2020

/s/ Inguna Varslavane-Callahan
Inguna Varslavane-Callahan, Esq.
FBN: 183873
Michael T. Callahan, Esq.
FBN: 160940
CALLAHAN LAW FIRM, LLC
449 Central Ave., Ste. 203
St. Petersburg, Florida 33701
Phone: (727) 209-1504
Fax: (727) 289-4800
E-mail: mcallahan@clftrialattorneys.com

icallahan@clftrialattorneys.com
jmasters@clftrialattorneys.com
Attorneys for Plaintiff