UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JULIE V. DEGRAW,
    Plaintiff,
vs.                                                                       Case No.: 8:18-cv-02116-T36-SPF
BOB GUALTIERI, et al.
    Defendants.
_____/

**PLAINTIFF'S FOR RESPONSE IN OPPOSITION TO DEFENDANT GUALTIERI'S MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff, JULIE V. DEGRAW, hereby files her Response in Opposition to Defendant Gualtieri's Motion for Summary Judgment (Dkt. 99) and support thereof, states:

**I.    STANDARD OF REVIEW**

Summary judgment is not appropriate unless "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Chapman v. Procter & Gamble Distrib.*, LLC, 766 F.3d 1296, 1312 (11th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). The nonmoving party must present enough evidence to allow a jury to reasonably find in its favor. *Id*.

"Courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party." *Davis v. Williams*, 451 F. 3d 759, 763 (11th Cir. 2006). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta,* 2 F. 3d 1112, 1115 (11th Cir. 1983).

**II.    OFFICIAL CAPACITY ACTS**

While there is no respondeat superior liability making a municipality liable for the wrongful actions of its police officers, *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691, (1978), a municipality may be held liable when municipal "official policy" causes a constitutional violation. A plaintiff must "identify a municipal `policy' or `custom' that caused [his] injury." *Board of County Com'rs v. Brown*, 117 S.Ct. 1382, 1388 (1997). ("It is only when the `execution

1

of the government's policy or custom ... inflicts the injury' that the municipality may be held liable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). A municipality is only liable when it inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights. *Id.* at 389-91. Because a governmental entity will rarely formally adopt a custom or policy permitting or encouraging constitutional violations, *Monell* claims may be based upon inferences and circumstantial evidence of a custom or policy. *Grech v. Clayton Cty.*, 335 F.3d 1326, 1329-30 (11th Cir. 2003). For example, "a persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct, thereby establishing an unconstitutional custom that can subject the government to liability." *Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015).

A plaintiff may prove a city policy by showing that the municipality's failure to train evidenced a "deliberate indifference" to the rights of its inhabitants:

> We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. This rule is most consistent with our admonition ... that a municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.... "[M]unicipal liability under § 1983 attaches where-and only where- a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality-a "policy" as defined by our prior cases-can a city be liable for such a failure under § 1983.

*City of Canton*, 489 U.S. at 388-89. See also, *Jernigan v. City of Montgomery, Ala.*, 806 F. App'x 915, 919 (11th Cir. 2020) ("[A] plaintiff must prove that the violation of his or her federal rights was a highly predictable consequence of failing to train its officers.").

"[I]n a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference." *Connick v. Thompson*, 563 U.S. 51, 63 (2011). This may exist where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton,* 489 U.S. at 390. The Court in *Canton* looked to deadly force training as an example:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.
>
> Id. at 390 n.10.

Subsequent courts have extended this rationale to other contexts. See e.g., *Waller v. City of Middletown*, 89 F. Supp. 3d 279, 285 (D. Conn. 2015) (training on searches inside a residence); *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 392-93 (S.D.N.Y.2013) (training on dealing with emotionally disturbed persons). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) .

The unconstitutionality of one deadline outcome alone could arguably be enough to find a custom of tolerating excessive force. See *Simmons v. Bradshaw*, 879 F. 3d 1157, 1175 (11th Cir. 2018)(in dissent), citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 832 (1985) (Brennan, J., concurring) ("A § 1983 cause of action is as available for the first victim of a policy or custom ... as it is for the second and subsequent victims; by exposing a municipal defendant to liability on the occurrence of the first incident, it is hoped that future incidents will not occur."); *Vineyard v. Cty. of Murray*, 990 F.2d 1207, 1212 (11th Cir. 1993) (per curiam) ("We have noted that a single

constitutional violation may result in municipal liability when there is sufficient independent proof that the moving force of the violation was a municipal policy or custom."

### A. Gualtieri Exhibited Deliberate Indifference to Taser Use and Training[1]

The causal link can be shown by an expert testimony. See *Vineyard*, 990 F.2d at 1213 (upholding the causation element of a *Monell* claim based on expert testimony).

PCSO[2] knew to a moral certainty that the officers would be required to assist other agencies and that such calls would involve individuals with mental and other illnesses, as such calls are common and PCSO responds to many calls in conjunction with EMS. It is common for officers on such calls to carry their Tasers. PCSO's decision to arm them with Tasers was voluntary. PCSO provided Tasers to its officers, in part, to accomplish the task of assisting other agencies, as the Tasers were issued for use on all calls. Yet Dpt. Goepfert was not properly trained in the Taser use under the circumstances presented to him in the field, namely, in dealing with a person who experienced a neurological or mental health episode. The need for better training is obvious when police administrators know that their officers will be encountering events involving people with mental illness. Then it is important that the officers are trained to deal with the situation, always considering the safety of the person who is suffering from the mental or medical condition. Indisputably, information indicates that Tasers can kill people. Even the Taser manufacturer acknowledges that the risk of death after Taser application is not zero and that the chest area should be avoided to prevent cardiac arrest, the exact condition that killed Mr. DeGraw. The police officer training becomes particularly important when Taser-armed officers interact with persons suffering

---

[1] Throughout the operative Complaint, Plaintiff alleged that the Taser use was not proper, although the allegations focused on the Taser application specifically in the chest area. While Taser application in the chest area is the event that killed Mr. DeGraw, discovery has revealed that the entire Tasering episode was not proper, that Mr. DeGraw should not have been Tasered at all, either in the chest nor otherwise.
[2] Pinellas County Sheriff's Office

from medical or mental distress. Mr. DeGraw's death was a highly predictable consequence of Sherrif Gualtieri's failure to train and supervise his officers on Taser use, particularly when dealing with people in mental health episodes. Such probability is even higher in Pinellas county which is the home of the large veterans administration hospital that treats PTSD and other mental health conditions.

While PCSO has appropriate Taser use policies and training on paper, Sheriff Gualtieri's enforcement of these policies was inadequate. According to Plaintiff's expert Charles Drago[3], "No policy can be effective if officers become aware that the department does not … impose sanctions for noncompliance[4]".

According to expert Drago, a police administrator's philosophy affects the officer training, understanding and performance. In that sense, Sheriff Gualtieri is personally involved in the deputy training in that it influences the training. When there are mixed messages (one expressed in written policies and another expressed by the Sheriff), the deputies act in accordance with that unofficial message, as opposed to the written policy, expert Drago opines.

Sheriff Gualtieri has consistently and repeatedly stated that he does not believe that Tasers can directly kill. Although he agrees that improperly used, the Taser can be an application of unreasonable force, the Sheriff also believes that "in about all cases, the Taser is the desired tool versus all the other tools that you have available to you, because the other tools result in injury". The Sheriff does not believe that Taser contributed to Mr. DeGraw's death even though the medical

---

[3] Charles Drago is a 30 year career law enforcement officer who has acted as assistant police chief, police chief as well as deputy chief of staff and senior law enforcement advisor to the Governor of Florida. His report is attached to the Plaintiff's statement of facts.

[4] Drago Report, ¶ 89 (Int'l Assoc. of Chiefs of Police, Concepts and Issues Paper, Reporting Use of Force).

5

examiner listed Taser as a contributing cause of death. After the tragic death of Mr. DeGraw, "The Taser does not kill people," the sheriff said. "It incapacitates people[5]."

Although Sheriff Gualtieri is generally aware that there is literature indicating Tasers may cause cardiac arrest, he disregards it[6]. Despite the fact that Taser manufacturer's own training material contains a "warning" of cardiac capture and potential serious injury or death, Sheriff Gualtieri believes this is an inconsequential document. To him, "That's noting that gives us any concern[7]". Even though Taser manufacturer states that its own product may cause death and estimates it causes death in 1 out of 100,000 applications, Sheriff Gualtieri was unaware of this statistic as he considers the entire Taser warnings a meaningless document created by some lawyers to protect the company from litigation[8]. He went as far as to call it a "C.Y.A.-type document[9]". These statements reveal Sheriff Gualtieri's complete disdain for any information that contradicts his personal belief that Tasers are harmless and should be used whenever possible.

Even though there is no internal document, there are newspaper quotes and statements by the Sheriff in at least two depositions regarding his philosophy on Tasers. It must be known to his staff. When such philosophy is communicated to the command or the training division, it trickles down from the top and becomes the culture of the agency. When the deputies know that the Sheriff holds such beliefs, it is a form of training. Additionally, the Sheriff's office does not do any specific training regarding application of Tasers on people affected by mental illness, even though Sheriff Gualtieri knows that his Taser-armed officers frequently operate in conjunction with EMS on medical calls. This is despite the fact that in Pinellas county, the Sheriff should have known

---

[5] https://www.tampabay.com/news/crime/2019/11/21/police-are-limiting-tasers-as-people-die-but-pinellas-sheriff-wont/
[6] Gualtieri xxxx
[7] Gualtieri xxxx
[8] Gualtieri xxxx
[9] Gualtieri xxxx

6

that his deputies would engage with people with mental illness and mentally incapacitating ailments. According to expert Drago, "This would be especially true since Pinellas County is the home of Bay Pines Veterans Administration Healthcare System. As such, Bay Pines officers services for veterans in need of mental health services such as PTSD. One would then expect to have a larger than average population of veterans living or visiting Pinellas County […] many of which would need mental healthcare. ". … "Therefore, it is all the more reason why Sheriff Gualtieri should have ensured that deputies were well trained in identifying persons with mental illness and in following proper procedures for their care". Id.

According to expert Drago, "One way to know whether training is proper, is to look how deputies act on the street". This case evidences the fact deputies were not properly trained and/or they disregarded the training and followed the Sheriff's philosophy. Dpt. Goepfert acted consistent with the Sheriff's philosophy that Tasers do not kill.

One evidence that PCSO has adopted Sheriff Gualtieri's philosophy that the Taser cannot kill, is found in how the agency tracks in-custody death. Although PCSO keeps record any time someone dies in custody, they do not keep specific numbers as to "this person died and it was with a Taser". There is no form that tracks this. PCSO does not keep statistics on situations where the medical examiner's conclusion in autopsy was that the Taser was the cause or the contributing cause of death. Therefore, the agency does not know how many persons have died where the Taser was at least one of the contributing causes. Even though <u>Tampa Bay Times</u> reports that at least four persons have died of Taser use by Pinellas County sheriff's deputies, Sheriff Gualtieri states that no one has died[10]. Expert Drago opines that every administrator knows: "If you don't track it, it doesn't happen". Sheriff Gualtieri deliberately does not track Taser deaths so as to avoid the

---

[10] Gualtieri xxxx

problem knowing of the existence of such deaths and having been held responsible. The Sheriff certainly knows how to keep track of the issues he considers important – PCSO keeps track of firearm deaths. Yet because of Sheriff Gualtieri's philosophy that Tasers are harmless and his desire to use them as much as possible, he deliberately does not keep track and thus is willfully unaware of the scope and breath of Taser-caused problems within his agency. News agencies have determined there are 1,005 death linked in the US law enforcement incidents involving Tasers[11]. Miami-Dade has had 17 death, Hillsborough has had 4 but Pinellas has had 10 such death[12]. The cases explored by Reuters reveal that Taser encounters can turn deadly and often, those killed include people struggling with mental illness, emotion breakdowns or seizure disorders[13]. One in every 100 police calls involves a person with a mental health disorder[14].

    PCSO is proud of its statistics that Taser use comes in as third among its uses of force. Yet, at PCSO, what counts as one instance of force, is the deputy's interaction with a subject not the number of Taser applications: whether the deputy uses the Taser once for one second, or ten times for five seconds each, it counts as one use. Additionally, the statistics at PCSO lump together as one category the deputies' use of hands, feet, elbows and such, and does not differentiate whether such use was while in escort, takedown, or otherwise, according to expert Drago. It is misleading as every time an officer handcuffs a person, whether to escort them to jail or otherwise, it is a use of hands. Obviously, such use of hands is very different from when an officer would have to use his hands as a means of force to restrain a resisting subject. Therefore, such statistic is misleading. The true use of Tasers at PCSO is unknowable as multiple Taser applications during

---

[11] https://www.reuters.com/investigates/special-report/usa-taser-911/
[12] Id.
[13] Id.
[14] Id.

one event are counted as one and compared against a misleading category of miscellaneous uses of force.

Sheriff Gualtieri's philosophy that Tasers cannot kill, also trickles down in how PCSO conducts its investigations. According to expert Drago, it was the failure to investigate fully and thoroughly is the moving force behind the deputy's use of force against Mr. DeGraw as such perfunctory investigation allows officers to believe that they will not be held accountable.

PCSO did its own investigation of Mr. DeGraw's death. Typically, agencies seek outside assistance when investigating deaths. Performing its own investigation is a rarity, uncommon, inappropriate and contrary to the best practices in Florida. According to expert Drago, "An in-custody death can be one of the most divisive occurrences within a police department. It is imperative that all investigations are conduced in an open, transparent and fair way. The public must believe that the police are truly conducting a complete and though investigation and any police officers who committed criminal ats will be identified and charged appropriately". PCSO conducted the interviews with deputies regarding Mr. DeGraw's death in a perfunctory manner without investigating obvious discrepancies in their statements. For example, there are clear inconsistencies between the statements of Dpt. Martinez and Dpt. Goepfert regarding who had what conversations with Mrs. DeGraw and, therefore, information in Dpt. Goepfert's possession[15]. There are inconsistencies as to when the Tasers were drawn[16]. There are inconsistencies between what Dpt. Goepfert stated he said to Mr. DeGraw and what Dpt. Martinez heard him say[17]. Dpt. Goepfert admitted that he Tasered Mr. DeGraw for failing to follow his commands yet all present admitted that he may have understood nothing they said nor even understood who they were or

---

[15] See Plaintiff's Statement of Disputed Facts in Opposition to Defendant Goepfert's Motion for Summary Judgment.
[16] Id.
[17] Id.

what they were doing in his bedroom. There are inconsistencies between Dpt. Martinez and Sgt. Street regarding who checked for Mr. DeGraw's pulse and whether one was detected[18]. There are multiple inconsistencies in Sgt. Street's and Dpt. Goepfert's accounts, where they repeatedly stated that they thought Mr. DeGraw was fine after Tasering, yet they rolled him to the side, checked for pulse, did a sternum rub, etc[19]. One does not perform resuscitation efforts while believing that the person is fine. Yet the detectives nothing to follow up on the inconsistencies. Detectives never clarified from Dpt. Goepfert the basis for each of the Taser applications after the initial use of Taser. Each Taser application is a use of force that must be investigated separately. The Sheriff never questioned this investigation or its conclusions.

Additionally, the investigative interviews are deplete with leading questions to the primary deputies, Goepfert and Martinez. Leading questions should cause a policy maker such as Sheriff Gualtieri concern about the integrity of this investigation. Yet, Sheriff Gualtieri never questioned this investigation or investigated as to why the detectives were asking such leading questions.

Sheriff Gualtieri has finally recognized that such internal investigations are not proper. After Plaintiff's expert Mr. Drago pointed this out in his expert report in March 2020, Sheriff Gualtieri has now announced that they will hand those cases over to partner departments. "In an effort to root out a perceived conflict of interest, major Pinellas law enforcement agencies will no longer investigate their own officers after use-of-force incidents[20]". The new Pinellas County Use of Deadly Force Investigative Task Force will include homicide detectives from the county's major police agencies. Clearly, Sheriff Gualtieri's prior practice – in force during the investigation of Mr. DeGraw's death – was not proper by his own admission and has been abandoned.

---

[18] Id.
[19] Id.
[20] https://www.tampabay.com/news/2020/07/21/its-time-to-change-police-in-pinellas-to-partner-on-use-of-force-investigations/

Sheriff Gualtieri's philosophy that Tasers cannot kill, is also reflected in the fact that the PCSO investigators did not find any violations by the deputies. The deputies violated multiple PCSO General Orders, Taser training and best practices[21]. Additionally, Dpt. Goepfert stated and testified that "potential threats" and "immediate threats" are indecipherable, yet PCSO Taser training states that Taser may only be used on an immediate threat, not a potential threat[22]. According to expert Dago, "The failure to understand that DeGraw at most represented a potential threat when he walked towards the deputy or when he attempted to stand up, or the disregard of the fact that the treat was not immediate, resulted in Deputy Goepfert's decision to deploy/active the [Taser] against DeGraw five times demonstrates the supervision Deputy Goepfert received in this critical area was contrary to best police practices." Yet, PCSO did not find any violations of law and did not issue any discipline.

### B. Gualtieri Provided Inadequate Supervision

A plaintiff may also bring a *Monell* claim by showing that a government has shown a "persistent failure to take disciplinary action against officers." *Fundiller,* 777 F.2d at 1443 ("[A] persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct, thereby establishing a `custom' within the meaning of *Monell*.") See also *Kopf v. Wing*, 942 F.2d 265, 269 (4th Cir.1991) (stating the standard as the "irresponsible failure by municipal policymakers to put a stop to or correct a widespread pattern of unconstitutional conduct by police officers of which the specific violation is simply an example."); *McConney v. Houston*, 863 F.2d 1180, 1184 (5th Cir.1989) ("[A] persistent, widespread practice of city officials or employees that [is] common and well settled."); *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994)("A municipality's failure to correct the constitutionally

---

[21] Plaintiff's Statement of Disputed Facts in Opposition to Defendant Goepfert's Motion for Summary Judgment
[22] Drago Report, ¶ 99.

offensive actions of its police department may rise to the level of a `custom or policy' if the municipality tacitly authorizes these actions or displays deliberate indifference toward the police misconduct.")

An agency's disciplinary system is a crucial reinforcement of its policies and rules. According to expert Drago, "An important function of the disciplinary action is the message that is sent to others when an officer is disciplined or when he or she is not disciplined for a policy violation." "Failure to conduct a proper investigation, a failure to discipline this officer for disobeying and failing to follow Department policy, as well as accepted police practices, for the use of the Taser and the use of force in general, they create an environment for the Department to believe that excessive force, whether it be by Taser or not, is excusable and allowable".

"For as long as anyone in Pinellas County can remember, lethal interactions between law enforcement officers and the public were dealt with in the same way: The agency conducted a criminal investigation of their own employee's actions." PCSO did its own investigation of Mr. DeGraw's death, which was conducted improperly as set out in detail above. Sheriff Gualtieri never questioned the quality or integrity of the investigation and no officer was disciplined. No officer was disciplined even though they improperly interpreted this medical case as an assault, evidencing their inadequate training for medical and mental crises. In recognition that the prior investigative methods were inadequate, Sheriff Gualtieri has now abandoned the practice and in the future, such investigations will be conducted by an outside task force.

Additionally, the deputies' performance review was inadequate as it did not include Taser use. In *Chaney v. City of Orlando*, 483 F. 3d. 1221 (11th Cir. 2007), although the police officer use of force records were reviewed annually during "an evaluation prior", the supervisors who are required to conduct the evaluations are not directly by any written policy to review the documents

detaining an officer's Taser use for the previous year. The chief testified that when an officer comes up for review, the extent to which he had been using a taser is not necessarily known. When denying the city's motion for summary judgment, the court concluded that under the system of supervision described by the chief, rogue taser usage could go virtually unchecked as, while the police department did conduct use of force investigations, those investigations were isolated from the officer evaluation process, "a process that goes hand in hand with officer supervision". Id.

Likewise, at PCSO each deputy's use of force (including Taser) reports are approved by the supervisor but such reports not become a part of the deputy's personnel file. Deputies change shifts (and, therefore, their supervising sergeants) every 6 months. Deputies are subject to annual performance reviews. Because the reviews are once a year but the deputy would have two separate supervising sergeants during that they, the reviewing sergeant will not know of all the use of force instances of the deputy, as they supervise such deputies only 6 months. Yet, at PCSO, the reviewing supervisor (usually a sergeant) is not required to incorporate the deputy's use-of-force data in their annual reviews. They are not required to document the deputy's Taser use in the annual performance evaluation. Therefore, PCSO's use of force approvals and, therefore, the deputies use of force record is isolated from the officer evaluation process, "a process that goes hand in hand with officer supervision". *Chaney*, supra.

**C. Gualtieri's Level Of Supervision And Enforcement Of Training Is Inadequate In Regard To Their Duty To Provide Medical Care**

While PCSO has appropriate Mental Illness policies on paper, the enforcement of those policies and the supervision of Dpt. Goepfert was inadequate.

Police officers are required to protect individuals in custody, yet the officers in this case failed to take the minimum steps necessary to ensure Mr. DeGraw's safety and Sheriff Gualtieri failed to perform a meaningful investigation of this tragic death. Officers are legally responsible

for the safety of the arrestee and must take all steps reasonably necessary to protect the arrestee from injury. PCSO GO 13-10 outlines procedures for a deputy who encounters subjects who may have a mental illness[23]. Dpt. Goepfert's actions were inconsistent with GO 13-10[24]. Dpt. Martinez did not have any knowledge about seizures. The Sheriff did not know if there is any training to recognize seizure situations and post-seizure mental status.

Dpt. Goepfert did not understand and did not follow the policy as it relates to the use of CIT officers. Dpt. Goepfert failed to take time required to understand Mr. DeGraw's post-seizure condition, or to consult with the CIT-trained Dpt. Martinez who accompanied him. Sgt. Street, the supervisor, did not stop the officers and he did not interject, he just joined in on the apprehension of Mr. DeGraw. He did the same thing as the other two officers and he did not take into consideration that Mr. DeGraw's condition. He showed the same lack of training as the other officers in dealing with a person with a mental illness episode. He did not utilize Dpt. Martinez as a CIT officer either. CIT officers have advanced training in dealing with people with mental illness and incapacity, and are better judges of how they should act, including they recognize when people cannot follow commands, not due to disobedience, but due to lack of comprehension. For these reasons, CIT officers should take the lead. In contrast, Dpt. Martinez was not only not consulted, he was eliminated from where he could help as he could not even see what was going on in Mr. DeGraw's room. According to expert Drago, because the deputies were unprepared to deal with Mr. DeGraw's mental and medical condition, they took actions that contradict generally accepted principles for dealing with persons suffering from seizures or PTSD. This evidences their lack of proper training. As noted above, such lack of training is particularly egregious given the diverse population of Pinellas county and the presence of the VA hospital.

---

[23] Plaintiff's Disputed Statement of Facts in Opposition to Defendant Goepfert's Motion for Summary Judgment.
[24] See Plaintiff's Response in Opposition to Defendant Goepfert's Motion for Summary Judgment.

**D. Gualtieri Ratified Deputy Goepfert's Actions**

Sheriff Gualtieri failed to take any disciplinary action against Dpt. Goepfert for his failures to comply with PCSO General Orders. According to expert Drago, "As such, Sheriff Gualtieri has given tacit approval to all deputies to violate these policies".

Municipal liability may attach if final policymakers have acquiesced in a longstanding practice that constitutes the entity's standard operating procedure. See *Hoefling v. City of Miami*, 811 F. 3d 1271 (11th Cir. 2016). A municipality may also be held liable "on the basis of ratification when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority." Id.

The 11th Circuit, contrary to other Federal circuits, has held that "the failure to investigate a single incident, of which the sheriff was unaware until after-the-fact, cannot ratify a constitutional violation[25]." *Salvato v. Miley*, 790 F.3d 1286, 1295 (11th Cir. 2015) see also *Thomas ex rel. Thomas v. Roberts,* 261 F.3d 1160, 1174 n.12 (11th Cir. 2001)("[W]hen plaintiffs are relying not on a pattern of unconstitutional conduct, but on a single incident, they must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis before a court can hold the government liable on a ratification theory."). A plaintiff advancing a ratification theory in support of her *Monel*l claim must still establish a "widespread practice" of the relevant constitutional violations. See *Threats v. City of Bessemer*, 2013 WL 2338701, at *5 (N.D. Ala. Apr. 29, 2013) (regarding ratification, "the prior violations must have been sufficiently similar in nature to the violation in the plaintiff's case").

---

[25] It appears that the 11th Circuit has started questioning the advisability of the high bar on municipal liability. See *Simmons v. Bradshaw*, 879 F. 3d 1157, 1169 (11th Cir. 2018)( "Whether or not this high bar [on establishing municipal liability] is advisable as a general policy matter" is a question).

15

However, the 11th Circuit has also consistently held that, without doubt, "[p]ost-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Salvato v. Miley*, 790 F. 3d 1286 (11th Cir. 2015) citing *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir.1989). But "[t]he inferences to be made from these [post-event] facts merely lend weight" to a finding that there was a policy "behind the actions which led to" the constitutional violation. *Id*. citing *Kibbe v. City of Springfield*, 777 F.2d 801, 809 (1st Cir.1985). A "persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct." Id. citing *Thomas*, 261 F.3d at 1174 n. 12. See also, *Kimbrough v. City of Cocoa*, a decision from the Middle District of Florida, that ruled that a "jury could find that the City was aware of the actions taken by its officers and their justifications, and that its failure to inquire any further or reprimand any of the Officers, shows that the City sanctioned not only their actions, but also the reasons behind those actions." 2006 WL 3335066, at *8 (M.D.Fla. Nov. 16, 2006).

Here, despite the egregious and tragic outcome, Sheriff Gualtieri conducted an in-house investigation instead of an independent review that would have lead more credence into the thoroughness, validity and impartiality of the investigation. As recognized by the Plaintiff's expert and dictated by logic, it is difficult if not impossible for colleagues to impartially investigate colleagues after a traumatic event. Yet an impartial investigation is needed to ensure the public's trust that the the matter had been thoroughly investigated and disciplinary steps taken to ensure that no other members of public would suffer the same outcome. Here, the PSCO investigated its own and found no grounds for discipline despite the fact that multiple clear violations of the written policies are present. That sheds light on the prevailing policy and practice at the PSCO – that such

deviations are not considered violations, in the light of the fact that Gualtieri does not believe that Tasers kill and does not keep statistics on such death.

According to expert Drago, "The in-house investigation of an in-custody death is in and of itself a rarity, uncommon, inappropriate and contrary to best practices in Florida". Yet this is what the Sheriff has been doing since memory. It evidences a "widespread practice" of relevant constitutional violations.

Because of the Sheriff's longstanding philosophy that Tasers do not kill and the longstanding practice at PCSO to conduct their own investigations, are constitutional violations, municipal liability is warranted.

### III. INDIVIDUAL CAPACITY ACTS

A supervisor "can be held personally liable when there is a causal connection between the actions of the supervisor and the alleged constitutional violation." *Mann v. Taser Int'l, Inc*., 588 F.3d 1291, 1308 (11th Cir. 2009). This connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," the supervisor's "custom or policy . . . result[s] in deliberate indifference to constitutional rights," or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone v. Jenne*, 326 F.3d 1352, 1360-61 (11th Cir. 2003).

For both claims, the thrust of Plaintiff's theory is the same: Sheriff Gualtieri's policies and customs concerning Taser use, his philosophy that Tasers do not kill despite mounting evidence to the contrary, failure to keep track of Taser deaths, the internal investigations of use of force conducted by colleagues less likely to find violations of policy thus encouraging future violations,

and the failure to discipline Dpt. Goepfert despite the clear presence of multiple violations, constitutes deliberate indifference to constitutional rights.

A supervisor can be held personally liable when there is a causal connection between the actions of the supervisor and the alleged constitutional violation. There is a causal connection between Sheriff Gualtieri's philosophy on Taser use and the in-house death investigations, which have created an atmosphere where Taser death are not tracked and deputies do not treat Tasers seriously as they know the negative outcome will either not be known as statistics is not kept, or they will not be disciplined as a result of a superficial and biased investigation. Plaintiff's expert Drago does not differentiate between individual and official capacity acts under these circumstances.

## IV. STATE LAW CLAIMS

Defendant alleges that Plaintiff's claims fail in that, although alleging negligence, Plaintiff's claims are worded in terms of "intentional acts" and there is no cause of action for negligent use of excessive force.

Plaintiff's complaint, ¶ 58, alleges in part that, in responding to a call for medical assistance to a person who had just suffered a seizure, Deputies, Goepfert, Martinez and Street were negligent in their attempt to gain custody of and control over Donald C. DeGraw in his own home, by restraining him under circumstances where he was medically disabled, and unable to understand what was going on and he negligently failed to recognize that Tasering a man for not following commands which he is unable to understand is negligent conduct. These are broad allegations that include the deputies' actions that are outside of the actual intentional deployment of the Taser.

Florida recognizes a cause of action for "the negligent handling of a firearm and the negligent decision to use a firearm separate and distinct from an excessive force claim." *Lewis v.*

18

*City of St. Petersburg*, 260 F.3d 1260, 1263 (11th Cir. 2001) (citing *City of Miami v. Sanders*, 672 So. 2d 46, 48); see also *Trianon Park Condo. v. City of Hialeah*, 468 So. 2d 912, 920 (Fla. 1985) (stating that the common law duties of care apply to police officers' handling of firearms); *Mazzilli v. Doud*, 485 So. 2d 477, 479 (Fla. 3d DCA 1986) (upholding negligence claims arising from law enforcement's failure to exercise reasonable care when utilizing firearms). Three deputies, not just Dpt. Goepfert, negligently failed to deal with Mr. DeGraw as a medical patient who was mentally incapacitated. They negligently continued to attempt to communicate orders and commands to a man who was unable to verbalize any responses and whose comprehension level was slow to non-existent. Additionally, Dpt. Goepfert and Sgt. Street were negligent in their failure to utilize the CIT-trained Dpt. Martinez on the scene who was trained to have superior knowledge regarding handling patients with mental incapacity. Additionally, the deputies were negligent in that they struggled to handcuff a confused, disoriented and afraid victim whose stress levels after just being Tasered five times contributed to his death.

Plaintiff also alleges in ¶ 59 that Sheriff Gualtieri was negligent in the implementation and/or operation of the deputy training program as a result of which the deputies did not receive adequate, current training as to how to deal with persons medically disabled or perceived to be emotionally or mentally disturbed. Defendant claims that Plaintiff's claims are barred because there is no evidence of negligent training and enactment of training is a discretionary function protected by Florida's sovereign immunity.

In *Lewis v. City of St. Petersburg*, 260 F. 3d 1260 (11th Cir. 2001), the court held that a plaintiff may not bring a cause of action against a municipality for the city's policy decisions regarding what to include in the training of its police officers as it is a discretionary function. It would be proper for a plaintiff to challenge "the implementation or operation of the City's police

training program". Id. at 1266. Plaintiff here does not challenge the content of the sheriff's training program. She challenges the negligent implementation and operation of the Sheriff's training program, as stated above and in Plaintiff's Statement of Disputed Facts. Her claims are not barred.

## CERTIFICATE OF SERICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via e-party by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

Dated: August 7, 2020

/s/ Inguna Varslavane-Callahan
Inguna Varslavane-Callahan, Esq.
FBN: 183873
Michael T. Callahan, Esq.
FBN: 160940
CALLAHAN LAW FIRM, LLC
449 Central Ave., Ste. 203
St. Petersburg, Florida 33701
Phone: (727) 209-1504
Fax: (727) 289-4800
E-mail: mcallahan@clftrialattorneys.com
      icallahan@clftrialattorneys.com
      jmasters@clftrialattorneys.com
Attorneys for Plaintiff