## PINELLAS COUNTY SHERIFF'S OFFICE
*LEADING THE WAY FOR A SAFER PINELLAS*

**RESPONSE TO INDIVIDUALS WITH MENTAL OR PHYSICAL DISABILITIES, ILL-NESS OR INJURY**

| | | | |
|---|---|---|---|
| | **EFFECTIVE:** | 07-01-16 | **General Order** |
| | **AMENDS:** | 10-23-14 | |
| | **RESCINDS:** | | |
| | **FIRST POLICY:** | 11-12-04 | **13-10** |
| | **LAST REVIEWED:** | 07-01-16 | |
| | **AUTHORITY OF:** BOB GUALTIERI, Sheriff | | |

ACCREDITATION STANDARDS:                                    CALEA  41.2.7

**PURPOSE:**

The purpose of this General Order is to establish guidelines for the recognition and appropriate handling of individuals with mental and / or physical disabilities and injuries and to provide them quality service, protect their rights and comply with the provisions of the Americans with Disabilities Act of 1990.

No single policy or procedure can address police response to all people with disabilities or illnesses. This General Order addresses common law enforcement interaction with people with physical and / or mental disabilities and illnesses, including those who are complainants, victims, witnesses, suspects, arrestees, people seeking information and uninvolved bystanders.

**DISCUSSION:**

In many urban communities, responding to people with mental and physical disabilities has become a large part of the law enforcement peacekeeping function. Since law enforcement officers are generally the first responders to such individuals during times of crisis, it is important to have someone who is calm and able to contain the situation, ensuring public safety.

When coming into contact with anyone having a disability for whatever reason or circumstance, agency members must take extra caution to ensure the person's rights are not violated and that he / she understands what is occurring. Some individuals may not have educational or communication comprehension levels to fully understand the basic Miranda rights. Simply reading the rights to someone with these types of disabilities and having the individual acknowledge they are understood may not be sufficient.

Agency members must recognize the responses of people with certain disabilities may resemble those of people who have abused substances such as alcohol or drugs. At times, such traits may be exhibited by people with diabetes, epilepsy, multiple sclerosis, hearing impairments and other disabilities.

The Pinellas County Sheriff's Office recognizes the growing need to address community mental health issues in the public safety arena. In 1988, the Memphis Police Department partnered with the Memphis Chapter of the Alliance for the Mentally Ill (AMI) to develop an agency Crisis Intervention Team. This concept became widely recognized as the Memphis Model. To that end, Crisis Intervention Team (CIT) training was adopted by the National Alliance on Mental Illness (NAMI), to provide a resource for law enforcement personnel to effectively and humanely deal with these issues. The agency deploys specially trained law enforcement officers who deal directly with the mentally ill during crisis situations.

**POLICY:**

It shall be the policy of the Pinellas County Sheriff's Office to afford individuals with mental and / or physical disabilities the same rights, dignity and access to programs and services provided to all citizens. Specially trained deputy sheriffs with Crisis Intervention Team (CIT) Training will respond to calls involving the mentally ill in crisis, and explore alternatives to arrest, when available.

**DEFINITIONS:**

A. 2-1-1 Tampa Bay Cares, Inc. – Helpline is now 211, Pinellas County's 24 hour program that provides information and referrals on local health / human services, homeless shelter locations and availability, volunteer opportunities, donation referrals, crisis intervention, problem solving and counseling for individuals.

B. Alzheimer's Disease – A physical illness and form of dementia that causes changes in the brain. Dementia affects a person's memory, mood and behavior. It usually affects people over 65 years of age. A person with this disease has trouble remembering, speaking, learning, making judgments and planning.

C. Baker Act – A provision of Florida State Statute 394 which allows a law enforcement officer to take a person who is an immediate threat to him / herself or others to a receiving facility to be involuntarily examined for mental illness. The courts may also order persons with mental illness to receive outpatient treatment. Also known as the Florida Mental Health Act.

D. CIT Coordinator – will be responsible for the administration of the CIT program at the Sheriff's Office. The coordinator will work with Bureau and Division Commanders to ensure CIT designated deputies receive specialized training, continuing education and are appropriately assigned in this capacity.

E. CIT Deputy – A Deputy Sheriff who has received at least 40 hours of specialized training provided by the CIT Committee of the Pinellas County Mental Health Coalition and who completes continuing education recognized by the agency at least every two years in working with individuals in crisis. These deputies have a history of making sound decisions, using good discretion and utilize sensitivity when working with people who have disabilities.

F. Crisis Intervention Team (CIT) – A nationwide program, originally based on the "Memphis Model" and adopted by the National Alliance on Mental Illness (NAMI) for law enforcement personnel to receive specialized training in dealing with the mentally ill. The agency's CIT law enforcement and detention deputies work in collaboration with trained mental health professionals to respond to those who may have a mental illness and which appear to be approaching a crisis level. CIT patrol deputies are specifically assigned as first responders to crisis calls in our community which may be attributed to a mental health crisis.

G. Crisis Intervention Team (CIT) Training – A nationally recognized model adopted by the Florida CIT Coalition as having the core elements of the "Memphis Model" of CIT training that provides specialized training for law enforcement officers and detention deputies in responding to situations that may involve someone who is having a mental health related crisis. This model has been adopted and applied to the training recognized by the agency's CIT program through the Pinellas County Mental Health Coalition CIT training.

H. Developmentally Disabled – retardation, autism, cerebral palsy, spina bifida or Prader-Willi syndrome that constitutes a substantial handicap that can reasonably be expected to continue indefinitely.

I. Incompetent to Consent to Treatment – A person's judgment is so affected by their mental illness that the person *lacks the capacity* to make a well-reasoned, willful and knowing decision concerning their mental health treatment.

J. Marchman Act – Florida Statute 397 allows persons to be taken into protective custody by law enforcement when they are substance abuse impaired, lost the power of self-control with regard to substances and either is harmful to self or others or can't appreciate his / her need for such services.

K. Mental Health Crisis – A situation in which an individual who is believed to have a mental illness displays one or more of the following:

   1. Having delusions;

   2. Exhibiting erratic behavior;

3.  Creating a disturbance;

4.  Real and present threat of substantial harm due to self-neglect;

5.  Threatening harm to oneself or others or;

6.  Displays other activity or behavior that causes alarm.

L.  Mental Illness – An impairment of the mental or emotional processes that exercise conscious control of one's actions or of the ability to perceive or understand reality, which impairment substantially interferes with a person's ability to meet the ordinary demands of living, regardless of etiology. For the purpose of this General Order, the term specifically *excludes* mental retardation or developmental disabilities as defined in Chapter 393, simple intoxication, drug addiction and conditions manifested only by antisocial behavior or substance abuse impairment.

M.  Receiving Facility - Any hospital, community facility, public or private facility, or receiving or treatment facility providing for the evaluation, diagnosis, care, treatment, training or hospitalization of persons who appear to have a mental illness and meet certain criteria for voluntary admission or involuntary examination.

N.  Substance Abuse Impairment – A condition involving the use of alcoholic beverages or any psychoactive or mood altering substance in such a manner as to induce mental, emotional or physical problems and cause social dysfunctional behavior.

O.  Autism or Autism Spectrum Disorder ("ASD") - Autism spectrum disorder (ASD) is a developmental disorder that affects a person's ability to socialize and communicate with others. ASD can also result in restricted, repetitive patterns of behavior, interests or activities. The term "spectrum" refers to the wide range of symptoms, skills and levels of impairment or disability that people with ASD can display. Some people are mildly impaired by their symptoms, while others are severely disabled.

## PROCEDURES:

**13-10.1   Dispatching Calls Involving Subjects with Mental, Emotional and Psychological Disabilities**

A.  Communications personnel receiving a complaint or report involving a subject believed to have a mental, emotional or psychological disability should endeavor to obtain as much information about the subject and their condition as possible.

B.  If it is determined the complaint involves a subject who has a "mental illness," the Call Taker should obtain the following information, but not limited to:

1.  Subject's name, age, race, sex, date of birth.

2.  Height and weight.

3.  Hair and eye color.

4.  Clothing description.

5.  The subject's relationship to the complainant.

6.  If the subject has left the area, find out

a.  The location where last seen.

b.  Method of transportation used and description (e.g. vehicle, bicycle, foot, etc.) and direction of travel.

7. If the subject has left the area prior to the deputy's arrival, it may be necessary for the deputy to broadcast a radio or laptop computer Be-On-The-Lookout to alert other law enforcement personnel about the circumstances involving the mentally ill subject.

8. By questioning the complainant regarding the circumstances, the Call Taker should obtain the following information:

    a. Is the subject armed?  Are there weapons or firearms at the occurred?

    b. Does the subject have any violent tendencies or a history of suicide attempts or violence?

    c. The type of mental illness involved, the name(s) of any prescribed medications and if they are being taken, if known.

    d. Where is the subject in the occurred and what is he / she doing?  Is he / she delusional or hallucinating, hearing or seeing things which are not there?  Is the subject frightened or aggressive?  Is the complainant frightened or feeling threatened?

    e. Name of local doctor, psychiatrist, case manager, history of hospitalization and name of facility.

    f. Any other important information available.

9. If the call is determined to involve a mental health crisis, such as a person threatening suicide or causing others to be concerned about their mental health, a deputy with Crisis Intervention Team (CIT) training shall be dispatched to the occurred, if available.

10. If no CIT deputy is available, the responding deputy may request assistance from a CIT supervisor, if available.

**13-10.2   Recognizing Subjects with Mental, Emotional and Psychological Disabilities**

A. The terms "mental illness," "emotional illness" and "psychological illness" describes varying levels of a group of disabilities causing disturbances in thinking, feeling and relating.  These terms should not be confused with developmentally disabled (see Section 13-10.11).

B. The following are generalized signs and symptoms of behavior that may suggest mental illness, although deputies should not rule out other potential causes such as reactions to narcotics or temporary emotional disturbances that are situationally motivated.

Subjects with mental illness who may need further evaluation typically exhibit a combination of the following characteristics or indicators of their illness:

1. *Degree of Reactions* – Persons with mental illness may show signs of strong and unrelenting fear of persons, places or things.  The fear of people or crowds, for example, may make the individual extremely reclusive or aggressive without apparent provocation.

2. *Appropriateness of Behaviors* - An individual who demonstrates extremely inappropriate behavior for a given context may be emotionally / mentally ill.  These behaviors may include rapid speech, flight of thought, no eye contact, quick movements, disconnected speech patterns, constantly moves or paces, cannot concentrate, mood changes quickly from highs to lows, disorganized thoughts, disoriented to time or place, acts of violence, cutting self, combative / aggressive behavior, inappropriate dress or nudity.

3. *Extreme Rigidity or Inflexibility* - Emotionally ill persons may be easily frustrated in new or unforeseen circumstances and may demonstrate inappropriate or aggressive behavior in dealing with situations.

4. In addition to the above, a person with mental illness may exhibit one or more of the following characteristics:

a. Abnormal memory loss related to such common facts as name, home address, wandering at night, leaving things on a stove unattended, not eating or sleeping or caring for personal needs, uncontrolled anxiety, confusion, quantity and age of unused foods in refrigerator (although these  maybe signs of other physical ailments such as injury or Alzheimer's disease).

b. The belief in thoughts about oneself that have no basis in realty or are delusional; such as, being a famous person or they are God or everyone is out to get them.

c. Hallucinations of any of the five senses (e.g. seeing people who are not there, hears voices telling them to hurt themselves or others, smelling strange odors, etc.).

d. The belief that one suffers from extraordinary physical maladies that are not possible (e.g. such as a person who is convinced their heart has stopped beating for extended periods of time or their stomach has rotted away, etc.).

e. The subject may have suicidal tendencies, have access to weapons, speak about previous attempts, make direct comments about dying or hurting self and possibly has evidence of previous attempts such as scars on the wrists.

f. The subject may either have insomnia or an increase in sleep, has not eaten in days, their home is in disarray, neglects household, property or personal hygiene to the point of putting themselves or others at risk.

g. The subject may have low self-esteem, feelings of hopelessness or no reaction and feeling or interest at all.

h. There may be evidence of abuse of prescribed medications or the subject has not taken their medications, has abused alcohol or illegal substances while taking medications (if substance abuse appears to be the only issue, the Marchman Act may be more appropriate).

**13-10.3   Dealing with Subjects with Mental, Emotional and Psychological Disabilities**

A. Determining Danger

Not all subjects with mental illness are dangerous while some may represent danger only under certain circumstances or conditions.  Deputies may use several indicators to determine whether an apparent mentally ill person represents an immediate or potential danger to themselves, the deputy or others.  These include the following:

1. The availability of weapons or potential weapons to the subject.

2. Statements and actions by the subject that suggest to the deputy the subject is prepared to commit a violent or dangerous act, such as innuendos or direct threats, taken in conjunction with other information.

3. A personal history that reflects prior violence under similar or related circumstances.  The subject's personal history may be known by the deputy or the complainant, the subject's family, friends or neighbors may be able to provide such information.

4. Failure to act prior to the arrival of deputies does not guarantee there is no danger, but it does tend to diminish the potential for danger.

5. The amount of control the subject demonstrates is significant, particularly the amount of physical control over emotions of rage, anger, fright or agitation.  Signs of a lack of control include extreme agitation, inability to sit still or communicate effectively, wide eyes and rambling thoughts and speech.  Clutching oneself or other objects to maintain control, begging to be left alone or offering frantic assurances that one is all right may also suggest the individual is close to losing control.

6.   The volatility of the environment is a particularly relevant factor deputies must evaluate. Agitators that may affect the subject or a particular combustible environment that may incite violence should be taken into account.

B.   Encountering / Interviewing Subjects Who May Have a Mental Illness

If a deputy determines during the course of an interview or a street encounter the subject he / she is dealing with may have a mental illness and a potential threat to themselves, the deputy or others or may otherwise require law enforcement intervention as provided by statute, the following should be done:

1.   Notify the Communications Division of the situation and request a CIT deputy back-up if available.

2.   Maintain good officer safety. Watch the subject's hands and be mindful of anything within the subject's proximity which could possibly be used as a weapon.

3.   Take steps to calm the situation. When possible, eliminate emergency lights and sirens, disperse crowds and assume a quiet non-threatening manner when approaching or conversing with the subject. Give the subject some space, do not corner them. Where violence or destructive acts have not occurred, avoid physical contact and take time to assess the situation.

4.   The subject should be handled calmly and spoken to in a reassuring voice. Try to establish a comfort zone by showing respect and dignity for the subject. Explain to the subject you are there to help them. Listen to them, but neither endorse nor argue with their delusions / hallucinations, etc.

5.   Frequently, a family member or friend is of great value in calming a subject exhibiting unusual behavior as a result of mental or emotional impairment. However, when seeking this assistance, be mindful family members and friends can, at times, *cause* the problems experienced by the subject to escalate.

6.   Communicate with the subject in an attempt to determine what is bothering them. Speak slowly. Ask short direct questions. Repeat yourself as needed. Relate your concern and respect for their feelings, and allow them to vent their feelings. Be patient with the subject.

7.   Do not threaten the individual with arrest or in any manner as this will create additional fright, stress and potential aggression.

8.   Avoid topics that may agitate the person and guide the conversation towards the subjects that help bring the individual back to reality.

9.   Always attempt to be truthful with a mentally ill individual. If the subject becomes aware of a deception, he / she may withdraw from the contact in distrust and may become hypersensitive or retaliate in anger.

**13-10.4   Voluntary Admissions**

A.   Law enforcement has no responsibility for persons on voluntary status. These individuals can go to whatever facility desired, by any manner of transportation.

B.   If an individual is both willing to voluntarily be evaluated by a mental health professional and is making well-reasoned decisions about his / her mental health care, he / she meets the criteria for voluntary admission. Because of this, the person does not meet the requirements established in the Baker Act for involuntary examination, a less restrictive means of transportation, such as willing family members, a friend or a taxi cab, should be used to transport the individual to a receiving facility.

C.   Even if an individual initially agrees to a voluntarily evaluation by a mental health professional, continue to observe the subject to determine if Baker Act criteria for law enforcement initiated involuntary examination are met. If the criteria are met, continue with an involuntary examination.

**13-10.5   Court-Ordered Admissions**

A.   A judge may sign an ex parte order after a family member or other concerned person goes to the Clerk of Court probate office and fills out the required paperwork under oath.

B.   Paperwork is picked up by a Court Processing Unit Deputy that responds to the Clerk of Court probate office and an attempt is made to serve the order.  An ex parte order can be executed any hour of the day or night, any day of the week and use reasonable physical force as is necessary to gain entry to any structures on the premises to take custody of the person who is subject of the ex parte order.

C.   If the Court Processing Unit personnel are unable to locate the subject for service, the Court Processing Unit will maintain a folder for pending court orders needing to be served.

D.   At times, family members or persons involved with the subject will contact the agency, advising the location of the subject to be served.  If this occurs, the Communications Division may dispatch a patrol unit to locate and transport the subject to a receiving facility.

E.   If the subject of a Court Ordered Ex-Parte appears to have an emergency medical condition, the subject should be taken to the nearest emergency room, regardless of whether it is designated as a Baker Act receiving facility.  Once the medical clearance is obtained, the hospital is legally responsible for arranging for safe and appropriate transportation of the person to a Baker Act receiving facility.

**13-10.6   Health Care Professional Initiated Admissions**

A.   A Baker Act may also be initiated by a physician, licensed clinical psychologist, psychiatric nurse, licensed clinical social worker, licensed mental health counselor or licensed marriage and family therapist.

B.   A patrol unit shall be dispatched to transport the subject from the doctor's office, his / her residence, a nursing home or an assisted living facility, to a receiving facility; unless medical or physical limitations indicate a medical transport or other form of transport is more appropriate.

**13-10.7   Law Enforcement Initiated Admissions**

A.   The Baker Act is a civil procedure which empowers law enforcement officers to initiate an involuntary evaluation of someone based on the following facts:

   1.   The deputy must have reason to believe the person has a mental illness, as defined in this General Order and as a result of the mental illness;

   2.   Have refused voluntary examination **or**;

   3.   Is unable to determine the psychiatric examination is needed **and**;

   4.   Without care and treatment and / or help of willing and responsible friends or family would suffer from neglect or refuse to care for themselves in such a way that a real and present danger exists **or**;

   5.   There is substantial likelihood that without care or treatment the subject will cause serious bodily harm to themselves or others in the near future.

B.   The role of deputies under these circumstances is not to diagnose subjects, but rather recognize behavior that is potentially destructive and / or dangerous to self or others.  Deputies should determine if the subject meets the criteria for an evaluation under the Baker Act.

C.   **Under the Baker Act, deputies do not need to witness all of the behaviors of the subject personally.**  The Baker Act is a civil procedure, not requiring the same probable cause required under criminal law.  Deputies can consider credible eyewitness accounts from others in determining

the need for further assessment. If relying on credible witnesses, it can be a good idea to have the witnesses complete an affidavit which can be attached to the officer's incident report.

D. Baker Acts Involving Minors

1. Parents or legal guardians are required to give consent ONLY for voluntary admission.

2. Parents or legal guardians may NOT sign a child into a facility against the child's will. Minors must agree and certify that they agree to voluntary admission or must be initiated if criteria are met under involuntary examination. (See section 13-10.7)

3. Minors who are voluntary may request release against their parent's wishes.

4. Any child through age 17 *must* be transported to PEMHS Pinellas Park Campus or Morton Plant Hospital unless an emergency medical condition exists.

5. If an emergency, they can be transported to the closest emergency room. Once delivered to the ER, it is the responsibility of the ER staff to contact the Baker Act facility and transfer the juvenile to that facility.

6. If the receiving facility is at capacity, it is the responsibility of the receiving facility to find another facility for the minor and to provide transportation for the juvenile to the other facility.

E. Baker Act Transport Initiated by Law Enforcement

If the deputy determines the subject needs to be transported under the Baker Act, or because of a court-ordered transport, the following should be done:

1. Using restraints on mentally ill persons can aggravate their aggression. Deputies should be aware of this fact, but take those measures necessary to protect their safety, the safety of the subject and others.

2. A back-up deputy, preferably a CIT deputy, should assist in placing handcuffs on the subject, if available.

3. Once the decision has been made to take the subject into custody, do it as soon as possible to avoid prolonging a potentially volatile situation.

4. Handcuffs used on subjects with mental illness, should be used in accord with <u>General Order 14-1, *Handcuffs, Physical Restraints and Prisoner Searches,*</u> and <u>General Order 14-2, *Prisoner Transportation*</u>. *Since the Baker Act prohibits the use of restraint devices on persons with mental illness except for the protection of the person or others, such notation should be made in the incident report when restraining devices are used.*

5. The subject should be transported to the authorized receiving facility (see Section 13-10.8) as specified in the Pinellas County Transportation Exception Plan approved by the Board of County Commissioners and the Secretary of DCF as follows:

   a. Minors – To Morton Plant or PEMHS mid-county, whichever is closest.

   b. Age 65 or older – to nearest receiving facility.

   c. Age 18-64 -- to PEMHS Access Centers in St. Petersburg or Pinellas Park.

   d. All Ages with Emergency Medical Conditions – to nearest emergency room.

6. The locations of the above facilities are as follows:

   a. PEMHS Adult & Child Access Centers 11254 58th St N. Pinellas Park & 401 16th Street North, St. Petersburg.

    b.   Saint Anthony's Hospital, 1200 7th Ave N, St. Petersburg.

    c.   Windmoor Healthcare, 11300 U.S. 19 S, Clearwater.

    d.   Largo Medical Center - Indian Rocks Rd Campus, 2025 Indian Rocks Road, Largo.

    e.   Morton Plant Hospital, 300 Pinellas St, Clearwater.

    f.   Veterans Administration Hospital (restricted to VA eligible persons)

7.   If a Baker Act subject is being transported by a patrol deputy, other than a court-ordered Ex-Parte, (see 13-10.5 (E)), and should require *emergency medical attention* during the transport, the subject may be first transported to a hospital for emergency medical treatment, regardless of whether the hospital is a designated psychiatric receiving facility.

   If a subject is taken to a hospital for *emergency medical treatment*, the hospital will then assume the responsibility of transporting the subject to the Baker Act receiving facility, when appropriate.

8.   Florida Statute 394.462 states the *nearest* designated receiving facility must *accept* persons brought by law enforcement officers for involuntary examination. The designated receiving facility for adults between the ages of 18 and 65 is the Personal Enrichment Through Mental Health Services (PEMHS) (Pinellas Park Campus and South Campus). The designated facilities for juveniles is PEMHS (Pinellas Park Campus) and Morton Plant Hospital. For individuals 65 years of age and older the nearest receiving facility is the designated facility.

9.   Upon arrival at the facility, deputies may secure their firearms in their vehicle or a lock box at the facility, if available. Deputies may also utilize their discretion and choose to keep their firearms secured in their holster.

10.  Deputies must complete two state forms when initiating a Baker Act. The two forms are Report of Law Enforcement Officer Initiating Involuntary Examination (CF-MH2052a) and Transportation to a Receiving Facility-Part 1 (CF-MH 3100).

11.  Deputies are also required to file an ACISS Offense / Incident Report, documenting the circumstances of the incident and reasons for initiating the Baker Act.

12.  Deputies shall transport in an appropriate agency vehicle unless a medical condition, physical limitation, advanced age or other condition would dictate a more appropriate medical transport.

F.   Baker Acts Involving Subjects With Criminal Charges.

1.   If a juvenile is under arrest for any reason and meets the statutory guidelines for involuntary examination under the Baker Act (§ 394.463), the deputy shall transport the juvenile to either PEMHS or Morton Plant Hospital. A Juvenile Complaint form will still be completed in VIPAR. If the deputy determines that transportation directly to the receiving facility would create an imminent danger to the public, then the deputy will transport the juvenile directly to PJAC and notify PEMHS.

2.   If an adult is under arrest for an ordinance violation or a misdemeanor and the person meets the statutory guidelines for involuntary examination under the Baker Act (§ 394.463), the deputy shall transport the individual to PEMHS. When practical, Criminal charges should be handled as a *Notice to Appear* or State Attorney's Office misdemeanor referral.

3.   If an adult is under arrest for a **felony** and the person meets the statutory guidelines for involuntary examination under the Baker Act (§ 394.463), the deputy is required, using VIPAR, to complete the appropriate mandatory Baker Act form in addition to completing the criminal affidavit. The arrested adult will not be accepted at the jail until the arresting deputy completes the required Baker Act form in VIPAR. Upon arrival at the jail, the booking deputy

will process the Baker Act form in VIPAR and ensure it is delivered to the medical staff. The medical staff will then notify PEMHS.

4. A receiving facility is not required to admit a person with a felony charge if the facility determines and documents it is unable to provide adequate security.

**13-10.8   Mental Health Receiving Facilities**

Before leaving the receiving facility, deputies should check with the appropriate receiving staff to ensure the subject has been properly secured.

**13-10.9   Mental Health Resources**

A. For additional resource information on the topic of mental illness, refer to General Order 12-4, *Social Service Referral System*.

B. The National Alliance on Mental Illness (NAMI) is a grassroots, family and consumer self-help support and advocacy organization, dedicated to improving the lives of people with severe mental illnesses. Additional information can be found at www.nami.org.

C. 211 Tampa Bay Cares, Inc., also serves as a resource for mental health services in Pinellas County. For additional information dial 211 or visit www.211pinellas.org.

D. The Pinellas County Sheriff's Office CIT Coordinator is also a source for mental health referrals and information.

**13-10.10  Marchman Act**

A. Marchman Act individuals may be placed in protective custody by a law enforcement officer and not charged with a criminal offense.

B. A hospital or licensed detoxification receiving facility shall be contacted to arrange placement of the individual. If no bed space is available, the deputy will transport the adult to the Pinellas County Jail. Juveniles will be transported to the appropriate juvenile addiction receiving facility located at PEMHS in Pinellas Park.

C. In cases of juveniles, per FSS 397.6772, the nearest relative of the minor in protective custody must be notified by the deputy, as must the nearest relative of an adult, unless the adult requests there be no notification.

D. Jail Admission and Release

1. The Intake booking deputy will verify proper notification has been made to a hospital or detoxification center prior to accepting the individual and will retain the yellow copy of the Marchman Act form.

2. At the time of arrival, the screening nurse shall examine the person for any obvious signs of injury or illness which may be misinterpreted as intoxication such as insulin shock or stroke. If problems are perceived, it will be the delivering deputy's responsibility to transport or arrange EMS transport of the individual to the nearest hospital for medical treatment.

3. No information will be placed in the Jail Information Management System (JIMS). Per FSS 397.6772, the officer in charge will notify a licensed service provider within the first eight hours after detention to determine if bed space has become available.

a. If bed space is available, a Central Division member will transport the individual to the service provider.

b. If no bed space is available, the individual will be retained in detention and be assessed by a qualified professional (i.e. nurse) within eight hours.

c.  In addition, persons taken into protective custody being retained at the jail must be assessed by the attending physician within the 72 hour period and without unnecessary delay, to determine the need for further services.

4.  The individual will be thoroughly searched and all personal property shall be removed, inventoried and receipted prior to being housed.

5.  Male and female Marchman Act detainees will be housed separately.

6.  Marchman Act individuals must be housed separately from prisoners charged with a criminal offense.

7.  A 15-minute watch will be placed on all Marchman Act detainees housed in single cells.

8.  Marchman Act detainees shall be released only when the shift supervisor and medical staff feel the person is no longer impaired.  At the time of release, medical staff will screen the individual.

   a.  If the individual exhibits impaired behavior and medical staff determines not to authorize the release, the nurse will notify the appropriate medical / mental health staff to evaluate and diagnose the individual.

   b.  If the individual has stabilized, medical personnel will authorize the release.  They will be released from custody using standard release procedures.

9.  At no time will a Marchman Act detainee be held in protective custody for more than 72 hours.

**13-10.11  Developmental Disabilities**

Developmental disabilities encompass a broad range of characteristics from mild to profound.  Developmental disabilities and mental illness are distinct conditions.

A.  General Characteristics of Developmental Disabilities

1.  A lifelong disability.

2.  Individuals with developmental disabilities are typically *less* violent than the general population.

3.  Limited communication skills, impaired impulse control, poor memory and slow learning.

4.  Limited ability to distinguish between right and wrong and situations beyond a person's control.

5.  Lack of abstract reasoning sufficient to form intent.

6.  Some of the general characteristics for mental retardation might also be found in an individual suffering from a head injury, trauma or disease.

7.  Despite limitations, the majority of persons identified as having mental retardation can learn, live and work independently in the community.

B.  Dealing with Developmentally Disabled Individuals

1.  Generally, individuals with developmental disabilities do not have abnormal physical characteristics.

2.  Deputies should recognize that people who have developmental disabilities have varied degrees of limited intellectual functions.

3.  In responding to the needs of people with severe or profound developmental disabilities, the aid of family, friends and neighbors may be helpful.

4.  Persons with developmental disabilities should be asked short questions and given clear, simple instructions.

5.  Be patient with persons with developmental disabilities as they may need additional time to respond to questions.  Repeat questions as necessary and provide reassurance.

7.  A person with a developmental disability may plead guilty to a crime which he / she did not commit, but which occurred in his / her presence, because people with these disabilities are easily intimidated, eager to please and generally agree with authority.

## 13-10.12  Memory Impaired Persons

Alzheimer's disease and dementia may cause intellectual deterioration in adults severe enough to dramatically interfere with occupational or social performance.

A.  The changes include:

1.  Disturbances in memory – loss of short term memory with distant past remembered with some clarity.

2.  Language use – unable to speak coherently.

3.  Perception loss – reduced ability to learn or retain necessary skills.

4.  In some cases, paranoid symptoms are displayed that may result in violent behavior.

5.  Hallucinations – may see and hear things not really there.

B.  These disorders are not only found in older people.  Onset of these disorders may occur in people in their forties.  Many Alzheimer victims have a tendency to wander, mentally and physically, sometimes in an attempt to return to their past.  The rate of deterioration differs from individual to individual.

C.  Establishing a level of communication with memory impaired persons is essential in order to render assistance.

1.  Deputies should exercise caution when encountering memory impaired persons.

2.  If the victim feels threatened or intimidated, they can become violent.

3.  Victims should be handled calmly and spoken to in a reassuring voice.

4.  It is not advisable to touch the person until rapport has been established.

5.  It is advisable to be patient and to not challenge or argue with the individual's perception of reality.

D.  It is very important to assist with reuniting memory impaired victims, if separated, with family members or primary care providers, utilizing available resources.

1.  Memory impaired persons reported missing should be handled using guidelines set forth in General Order 12-11, *Missing / Abducted Adults and Children* (see General Order 12-11, definition for "Unusual Circumstances," 2, (b)).

2.  A memory impaired missing person should be regarded with the level of intensity as a missing small child.

3.  Recovered victims identification should be checked to ascertain identification.  Also, check for ID bracelets or medallions which may contain personal information to help in assisting and reuniting victims with care givers.

4.  Recovered missing victims should be assisted with being reunited with their caregiver, emergency medical assistance, etc., as needed.

**13-10.13  Mobility Impairments**

Among the disabilities that are the most identifiable are mobility impairments.  Subjects with mobility-related impairments include those who have difficulty walking, those who use a wheelchair or other mobility aid and those who are immobile.

A.   In a critical or emergency situation, deputies should be aware of the safest and most rapid methods for assisting people with mobility impairments to avoid causing them unnecessary strain or injury.

B.   In an arrest encounter, utilizing a Notice to Appear and / or State Attorney Office referrals and paper investigations, should be considered instead of incarceration, as practical.

C.   When there is a need to incarcerate a person who is confined to a wheelchair due to a physical disability, the deputy should refer to the guidelines set forth in <u>General Order 14-2, *Prisoner Transportation*</u>.

**13-10.14  Agency Training on Mentally Ill Issues**

A.   The Southeastern Public Safety Institute (SEPSI), the regional law enforcement academy, provides training on mental health illness and related issues.  As new law enforcement recruits are hired by the agency, they receive training on "Baker Act" issues prior to entering field training and during the time they are in the Field Training Program.  Upon their release of the Field Training Program, deputies continue to receive annual training and updates on "Baker Act" issues during in-service training.  Along with this, deputies are also afforded the opportunity to attend Crisis Intervention Team (CIT) training, after approval by the CIT Coordinator.  This 40 hour course is offered two times per year by the Pinellas County Mental Health and Substance Abuse Coalition.  The training provides options for de-escalating situations involving the mentally ill in crisis.

B.   All support staff will receive documented entry level training on guidelines for recognizing individuals suspected of being mentally ill, procedures for accessing community health resources and receive refresher training at least three years thereafter.

**13-10.15  Invisible Disabilities**

Many disabilities are difficult to notice or detect.  A deputy's failure to recognize characteristics associated with certain invisible disabilities could have serious consequences for the person with the disability.  Outward signs of a disability such as epilepsy generally do not exist unless the person with the disability experiences a seizure.

People with diabetes may have reactions from either too little insulin or too much insulin.  Low blood sugar reactions are common and are usually treated by ingesting sugar.  Detaining someone and preventing them from getting sugar could have serious health implications for the individual and liability consequences for the deputy and the agency.

A.   A deputy's patience and understanding of the characteristics commonly associated with invisible disabilities will often lead to a successful resolution.

B.   An inaccurate assessment of a subject may lead to unnecessary confrontation, injury and denial of needed medication and / or treatment.

C.   As with all types of disabilities, a deputy's first obligation is to protect the individual from unnecessary harm.

D.   Establishing good communication in calm, reassuring approach can help diffuse difficult situations.

E.   Deputies should realize involuntary behavior associated with some invisible disabilities may resemble behavior characteristically exhibited by intoxicated or less frequently, combative individuals.  For example, a person experiencing a mild seizure may appear incoherent and physically imbalanced.  This condition may be temporary.

F.  Family members, friends and neighbors should be sought to provide information and assistance. Their presence may prove invaluable in understanding the needs of the person with the disability and guiding the deputy's actions.

G.  Summon Emergency Medical Services (EMS) through the Communications Division when emergency medical assistance is required.

## 13-10.16  Visual Disabilities

One of the most difficult issues facing people in need who are blind or vision impaired, is identifying law enforcement.

A.  Members should offer detailed information in identifying themselves as members of the agency.

B.  Whenever possible, if presence of a visual disability is known, deputies may have the Communications Division contact the complainant or the victim to verify to him / her that a member of the agency has arrived.

C.  If needed, the deputy's star and identification card should be offered to verify the officer's identity.

D.  Knowing what not to do is as important as knowing what to do to assist a person who is vision impaired.

　　1.  You need not raise your voice when speaking to a visually impaired person.

　　2.  Do not grab the person's arm to lead him / her in a particular direction.  If needed, the individual will take your arm for guidance.

　　3.  Never leave a visually impaired person standing alone without their cane, guide dog or physical contact.

E.  When handling calls involving visually impaired individuals, deputies should provide reasonable assistance to help them understand the contents of documents, if needed.  At times, friends and relatives of visually impaired subjects can also provide additional assistance.

If there is a need to physically arrest a visually impaired person, refer to <u>General Order, 14-1, Handcuffs, Physical Restraints, and Prisoner Searches,</u> regarding the use of handcuffs on subjects with physical disabilities.

F.  If it is necessary for safety reasons to take the subject's white cane away from him / her, guidance must be given by placing their hand on your arm or shoulder.

## 13-10.17  Speech and Hearing Disabilities

Deputies may confuse the behavior of individuals with hearing and speech disabilities, with those of people who intentionally refuse to cooperate or those who abuse illegal substances.  Deputies should be aware an individual's failure to comply with or respond to verbal orders does not always constitute defiance, but may be the result of that individual's inability to hear the officer or respond verbally.  This may be the result of a stroke, brain injury or other disorder.

Before committing to a course of action, deputies should attempt to identify whether or not they are dealing with a person who has a communication-related disability.

A.  Should a deputy suspect he / she has encountered an individual who has speech or hearing disabilities, and needs the services of a sign language interpreter, he / she should contact a Communications Division Supervisor and make a request for an interpreter to respond.

B.  A Communications Division Supervisor will contact the vendor providing interpreting services under contract with the Pinellas County Sheriff's Office.  A request will be made for an emergency response to be made to the deputy's location.  An emergency response provides services within two hours of the request.

C.   Jail Admission, Court / Advisory, and Release

1.   Inmates with speech and hearing disabilities shall be processed for admission in accordance with established procedures.  The following additional resources are available to aid staff and inmates with the admission and Court / Advisory processes:

a.   A TDD (Telecommunication Device for the Deaf) is located in Intake Processing and at each housing facility.

b.   Interpreters will be contacted through Deaf Services Center or other available service centers.

2.   Medical Screening and Classification will determine any special needs that are required when assigning the inmate to housing.

3.   Inmates with speech and / or hearing disabilities shall be provided the same opportunity to participate in programs, work assignments and services as those provided to inmates in general population.

4.   Speech and / or hearing impaired inmates shall be released according to established procedures.  The following additional procedures shall be initiated during the release:

a.   The release member shall determine if there are special telecommunication needs to arrange for transportation.

b.   The releasing member shall ensure the inmate understands any conditions of release.

**13-10.18  Arrest of Persons with Disabilities**

Consideration should be given to the special needs of some people with disabilities in an arrest situation.  The response of deputies in these situations requires discretion, and will be based largely on the officer's knowledge of the characteristics and severity of the disability, the level of resistance exhibited by the suspect and the immediacy of the situation.

A.   Deputies should always employ appropriate precautions and safety techniques in arresting and incarcerating a person, whether or not they have a disability.

B.   A subject whose disability affects the muscular and / or skeletal system may not be able to be restrained using handcuffs or other standard type restraints.  Alternative methods should be sought, such as transport vans equipped to carry wheel chairs, seat belts, etc.  For additional information, see General Order 14-1, *Handcuffs, Physical Restraints and Prisoner Searches* and General Order 14-2, *Prisoner Transportation*.

C.   Some people with disabilities require physical aids (canes, wheel chairs, leg braces) to maintain their mobility.  Once the immediate threat / presence of danger has diminished and / or the suspect has been taken to the jail, the booking staff should be advised of their disability and the equipment they require for mobility for security reasons.

D.   Prescribed medications may be required at regular intervals by subjects with disabilities (diabetes, epilepsy, etc.).  Deputies should advise fire rescue personnel, hospital personnel, jail booking staff, etc., of any known medications the arrested may be taking.

E.   Lack of speech or other impairment may make it difficult for the suspect to notify the arresting deputy of an urgent need.  The arrested subject should be monitored frequently by the deputy and Jail booking staff should be notified of the disability to ensure the subject receives special monitoring, as needed.

**13-10.19  Persons Ill or Unconscious in Public**

If a deputy encounters a subject that is ill, has an injury or is unconscious, they should be provided

with immediate first aid, as needed.  Emergency Medical Services (EMS) should be summoned for assistance through the Communications Division, as necessary.

**13-10.20  Interviewing a Victim, Suspect or Defendant has Autism or ASD (Autism Spectrum Disorder)**

A law enforcement officer, correctional officer or other public safety official SHALL upon request of an individual with autism or an autism spectrum disorder or his or her parent or guardian, make a good faith effort to ensure that a psychiatrist, psychologist, mental health counselor, special education instructor, clinical social worker, or related professional is present at all interviews of the individual.

   A.  Request for Medical Professional to be present during interview

      1.  can be requested by the individual, individual's parent or individual's guardian

      2.  all LEO must make good faith effort to ensure..

   B.  Appropriate Medical Professional

      1.  psychiatrist, psychologist, mental health counselor, special education instructor or clinical social worker; or

      2.  a related professional who professional has experience treating, teaching, or assisting patients or clients who have been diagnosed with autism or an autism spectrum disorder.

   C.  Expense - all expenses are paid by the individual requesting the medical professional be present

**13-10.21  Training**

Member training on interviewing a suspect, victim or defendant with autism or ASD who requests a profession to be present will be conducted during Deputy Recruit Training and/or In-Service Training and/or computer based training.

**13-10.22  Policy Review**

The Professional Standards Bureau will ensure that the Accreditations Division will perform an annual review of the policies / procedures regarding interviewing a victim, suspect or defendant with autism or ASD who requests a professional to be present.