# PINELLAS COUNTY SHERIFF'S OFFICE

*LEADING THE WAY FOR A SAFER PINELLAS*

| USE OF FORCE | | | |
|---|---|---|---|
| | EFFECTIVE: | 02-12-16 | General Order 13-3 |
| | AMENDS: | 03-04-13 | |
| | RESCINDS: | | |
| | FIRST RECORD: | A-2, 02-23-81, FIREARM PROCEDURES – USE OF DEADLY FORCE | |
| | LAST REVIEWED: | 02-10-16 | |
| | AUTHORITY OF: BOB GUALTIERI, Sheriff | [signature] | |

ACCREDITATION STANDARDS: CALEA: 1.2.2, 1.3.1, 1.3.2, 1.3.3, 1.3.4, 1.3.5, 1.3.6, 1.3.7, 1.3.8, 1.3.9, 1.3.10, 1.3.12, 1.3.13, 17.3.1, 22.2.1, 22.2.3, 41.3.4, 52.2.7, 81.2.4
ACA: 4ALDF-2B-01, 2B-04, 2B-07, 2B-08, 7B-10-1, 7B-14, 7B-15, 1B-16
FMJ: 3.03

## PURPOSE:

The purpose of this General Order is to provide guidelines for the use of force by members of the Pinellas County Sheriff's Office.

## DISCUSSION:

The most important purpose of law enforcement is the PROTECTION OF HUMAN LIFE. In order to be consistent with that purpose, the use of force must be limited to situations involving resistance to arrest, defense against physical assault, or force necessary to perform official duties.

Guidelines cannot be written to encompass every possible application for the use of any weapon. However, as with any use of force, it must not be used indiscriminately or without just cause. Objective reasonableness (Graham v. Connor) defines appropriate force as that amount of force necessary to perform official duties.

When dealing with violent/combative persons, nothing in this order is intended to discourage members from using a higher level of force whenever such force is necessary and can be justified.

Members should keep in mind they must be able to articulate the actions taken by the person which caused the member to reasonably believe the situation had escalated to the degree using force was necessary. Members will use reasonable force, when force is used, to accomplish lawful objectives.

## DEFINITIONS:

A. Active Resistance – A subject's use of physically evasive movements directed toward the deputy such as bracing, tensing, pushing, or pulling to prevent the deputy from establishing control over the subject. Examples include a subject physically anchors himself to a person or object to prevent himself from being removed, the subject braces or pulls away from the deputy when the deputy grips the suspect's arm, or the subject attempts to run when the deputy touches or attempts to grab the subject's arm or shoulder.

B. Aerosol Subject Restraint (ASR) - a device which propels a liquid chemical agent such as oleoresin capsicum which is used to subdue persons. The approved aerosol subject restraints contain 5% or less oleoresin capsicum (OC).

C. Aggressive Resistance – A subject's attacking movements toward a deputy that may cause injury but are not likely to cause death or great bodily harm to the deputy or others. Examples include a subject balling up his fists as he approaches the deputy, a subject pushing the deputy back as the deputy tries to take the subject into custody or the subject grabs any part of the deputy's body.

D.   Command Pack - A generic term for a kit of multi-purpose, chemical munitions. An agency approved command pack shall include one or more aerosol "grenades" and other such chemical devices designed to safely extract a person(s) from an enclosed structure or conveyance. Each of these munitions contains one percent concentrations of the chemical agents Orthochlorbenzalmalononitrile (CS) and Oleoresin Capsicum (OC).

E.   Deadly Force – Force likely to cause death or great bodily harm.

F.   Reasonable Force - Any force necessary to compel compliance.

G   Deadly Force Resistance – A subject's hostile, attacking movements with or without a weapon that create a reasonable perception by the deputy that the subject intends to cause and has the capability of causing death or great bodily harm to the deputy or others. Examples include a subject refuses to drop a knife when ordered to by the deputy and moves toward the deputy, or a subject shoots or points a gun at a deputy or other person, or a subject tries to run a deputy down in a vehicle.

H.   Defensive Equipment - The agency approved or authorized weapons.

I.   Escapee – Any person lawfully confined in any correctional facility, while under arrest, under sentence for an offense, awaiting trial or commitment for an offense, who flees or attempts to flee, from the custody or confinement of said facility, or any person who has been lawfully arrested or any person lawfully confined in a correctional facility, who flees or attempts to flee, from the custody, of a law enforcement or correctional deputy as defined by FSS 943.

J.   Electronic Control Weapon (ECW) – A less-lethal defensive weapon that uses propelled wires to conduct energy to a remote target, thereby controlling and overriding the central nervous system of the body.

K.   Electronic Prisoner Control Device - Stun Cuff – A less lethal defensive device attached to the ankle of an in-custody defendant. The device can be remotely activated resulting in an electrical current being released into the defendant, causing pain and muscle contraction in an attempt to gain compliance or greatly inhibit the defendant's ability to fight, attack or escape.

L..  Excited Delirium – A state of extreme mental and physiological excitement, characterized by extreme agitation, hyperthermia, hostility, exceptional strength and endurance without apparent fatigue.

M.   Expandable Tactical Police Baton – A collapsible baton measuring 21-31" approved for carry by the Sheriff, designed to be worn in a holster on a duty belt.

N.   Great Bodily Harm – Injury that creates a substantial risk of death, or significant loss or impairment of any bodily member or organ.

O.   Imminent - Impending; Likely to happen without delay; ready to take place.

P.   Less-Lethal Force - Force which is not likely to cause death or great bodily harm.

Q.   Oleoresin Capsicum (OC) - A chemical compound consisting of pepper extract or synthetics which temporarily causes involuntary closing of the eyes, respiratory distress, an acute burning sensation on exposed skin and loss of motor control when sprayed about the face of a person or animal.

R.   Passive Resistance – A subject's verbal and / or physical refusal to comply with a deputy's lawful direction causing the deputy to use physical techniques to establish control. Examples include a subject refusal to move at the deputy's direction, or a subject peacefully protesting at a political event in a public location, or a subject's refusal to take his hands out of his pockets or from behind his back.

S   Physical Force / Control - Force used in defense of oneself or others, or to achieve compliance or custody. Examples include the use of defensive equipment, pain compliance, transporters, restraint devices, takedowns, and striking techniques. Physical force is force in excess of the mere touching or grabbing of an individual. Note: Handcuffing an individual generally does not constitute the use of physical force as defined above.

T. Reasonable Belief - When facts or circumstances known to the member are likely to cause an ordinary and prudent person to act or think in a similar way in similar circumstances.

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight."
Graham v. Connor, 109, U.S. Supreme Court. 1865,1872. (1989)

"...reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments - in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."
Graham v. Connor, 109, U.S. Supreme Court. 1865,1872. (1989)

U. Show of Force - The display of an agency approved weapon to make it ready for use. Examples of the display of a defensive weapon could include: the removal of a weapon from its holster/storage container, the shaking of an ASR canister, the expanding of a baton, arcing the electronic control weapon or projecting the weapon's laser beam.

V. Specialty Impact Munitions – A projectile designed to temporarily incapacitate a violent person, with minimal potential for causing serious injury or death. There are two types of projectiles authorized by the Sheriff.

1. The standard approved Pepperball Launcher is a semi-automatic launcher which uses air pressure to propel the plastic, 2 gram Pepperball, containing oleoresin capsicum (OC), an inert powder, or a colored dye marker.

2. The Beanbag is a 40 gram, lead shot-filled fabric projectile, which is designed to be fired from a 2.75" cartridge in a 12 gauge shotgun. It is designed to be non-penetrating and is intended to deliver kinetic energy over a broad surface area.

W. Use of Force - The completed use of an agency approved weapon as it was intended or designed and/or physical force. Some examples of a completed use of a defensive weapon include: the spraying of an ASR, the striking of an individual with a baton, or discharging an electronic control weapon at an individual. All Uses of Force must be documented on a Use of Force Supplement Report.

## *LESS-LETHAL FORCE*

## PROCEDURE:

### 13-3.1 General Requirements

A. In accordance with Pinellas County Sheriff's Office General Orders, members shall use only necessary force to perform official duties. The member shall not strike or use physical force against a person except when necessary in self-defense, in defense of another, to overcome physical resistance to arrest, to take an individual into protective custody, or to prevent escape of an arrested person.

B. Only those weapons and munitions authorized by the Sheriff will be used on or off duty for official business. The use of less-lethal weapons other than those authorized by the Sheriff's Office is not permitted.

C. Nothing in this order shall prevent a member of the Sheriff's Office from utilizing any readily available object which may substitute as a defensive weapon, as defined herein, under exigent circumstances which may have resulted in his/her being disarmed or otherwise having justifiable need to employ such object during the course of his/her duties.

D. Less-lethal weapon(s) should not be used on the operator of a ***moving*** conveyance unless exigent circumstances exist.

E. After using any less-lethal weapon on a subject, the individual(s) should be restrained by deputies as soon as practical in accordance with General Order 14-1, *Handcuffs, Physical Restraints, and Prisoner Searches.*

F. All uses of force should be constantly evaluated for effectiveness. If the force option chosen is, or becomes ineffective, other authorized force options should be considered by the member.

G. As with firearms, less-lethal weapons cannot be taken into the Pinellas County Jail booking facility and must be secured prior to entering unless authorized by the Detention and Corrections Bureau Commander or designee.

H. Department of Detention and Corrections Specific

1. A medical staff member shall, at the earliest practical opportunity following the incident, see any inmate(s) involved in a physical force incident.

2. The use of physical force or mechanical restraints for punishment is strictly prohibited.

**13-3.2 Training and Proficiency**

A. All certified members shall receive annual training on the agency's use of force and defensive tactics policies and will demonstrate proficiency with all approved less-lethal weapons and munitions the member is authorized to carry. This training shall be monitored by a certified weapons instructor. Training and proficiency shall be documented by the Training Division.

B. Members shall initially receive eight hours of electronic control weapon training. Continuous electronic control weapon training will occur annually and will include use of force policies and a proficiency demonstration with the electronic control weapon. A certified electronic control weapon instructor shall monitor this training. The Training Division shall document training and proficiency.

1. Members failing to demonstrate proficiency during re-qualification shall be given immediate remedial training by a certified electronic control weapon instructor.

2. If a member cannot demonstrate proficiency after remedial training, he/she will be prohibited from carrying the agency issued electronic control weapon until proficiency is demonstrated.

C. Only members demonstrating proficiency in the use of agency-authorized weapons will be approved to carry such weapons, both on and off-duty. Off duty Department of Detention and Corrections personnel shall adhere to General Order 13-1, *Authorized Possession of Firearms.*

1. Members failing to demonstrate proficiency during re-qualification shall be given immediate remedial training by a certified instructor.

2. If a member cannot demonstrate proficiency after remedial training, he/she will be prohibited from carrying the agency issued less-lethal weapon until proficiency is demonstrated.

3. Further remedial training will be scheduled by the Training Division within 30 days.

**13-3.3 Physical Force / Control**

Physical force is force in excess of mere touching or grabbing of an individual. Physical control is achieving compliance or custody through the use of empty-handed or leverage-enhanced techniques. Examples include: use of defensive equipment, pain compliance, transporters, restraint devices, takedowns and striking techniques. Note: Handcuffing an individual generally does not constitute the use of physical force as defined above.

## *LESS-LETHAL WEAPONS*

**13-3.4 Expandable Tactical Police Baton**

A. The standard approved expandable tactical police baton for use by agency members of the Sheriff's Office are as follows; Armament Systems and Procedures (A.S.P.) in size 21", 26" or 31"; Winchester Expandable Batons and Peacekeeper Products International in size 21", 24", 26", or 29" or Monadnock Expandable Baton in size 21" 22" or 26."

B. The use of an expandable tactical police baton may be an appropriate response to "active resistance" by the individual who is about to be taken into custody. The use of an expandable tactical police baton can be justified whenever it appears the utilization of other control techniques will most likely result in a physical altercation that may cause injury to either members or the person being taken into custody.

C. Striking a subject with an expandable tactical police baton to the head and groin should be avoided.

D. The issue and replacement of the expandable tactical police batons is in accordance with procedures outlined in General Order 5-1, *Uniforms and Appearance.*

### 13-3.5 Aerosol Subject Restraint

A. Only members assigned to the Special Weapons and Tactics Team (SWAT) and the Corrections Response Team (CRT) are authorized to carry the issued Aerosol Subject Restraint (ASR) approved by the Sheriff- when activated for any tactical and/or security situation.

B. The use of an ASR can be justified whenever it appears the utilization of other control techniques will most likely result in a physical altercation that may cause injury to-members, other persons or property, or the involved subject(s).

1. A verbal warning shall be issued to all subjects about to be sprayed, prior to discharge with an ASR except when such warning would create a tactical disadvantage for the member.
2. Members should use bursts of one second in duration.

C. Due to the potential of some ASR sprays to ignite, ASRs should never be sprayed into an open flame of any kind or in the proximity of any electrical device that could be a source of ignition, such as an electronic control weapon.

D. After administering an ASR, adequate measures to ensure the safety of both staff and the involved subject should be taken. This includes beginning the decontamination as soon as possible, providing the subject is compliant.

1. Decontamination is accomplished with generous amounts of cool water and flowing air.
2. Ensure the exposed area is flushed with gently running water and away from affected areas or sensitive skin areas, particularly the eyes, ears, and genital area. Do not allow the subject to use oil-based soaps or lotions as they will seal in the agent and the decontamination process will be prolonged.
3. Decontamination for confinement cells or any populated area should take place in one of the showers on the respective wing.
4. Decontamination for the intake area should be accomplished in the express intake shower area.
5. All washable items (clothing, linens, etc.) seized will be placed in a plastic bag marked "Contaminated with OC." If the items are the inmate's personal property, the tag shall also list the inmate's name, docket number, and housing assignment. All non-washable items seized will be placed in a plastic bag marked, "Contaminated with OC" and forwarded to the Property Room.

E. Handling Individuals Sprayed with an ASR

1. The maximum effects of a properly applied burst of OC last approximately 45 minutes. Persons who have been sprayed may not require medical treatment.

2. Persons who have been sprayed with OC should be monitored and verbally reassured they will fully recover and the effects will subside in approximately 45 minutes.

3. Provided the person is passive and when conditions permit, persons sprayed with OC should be allowed to face the wind and / or dab with a wet towel to expedite the recovery period.

4 Any person unintentionally exposed to OC should be afforded the utmost assistance with recovery until they return to their normal state or condition.

F. Booking Prisoners Contaminated With OC

1. Transporting deputies must immediately advise booking personnel upon arrival at the jail the prisoner being booked was sprayed with OC.

2. The potential does exist for OC to contaminate others. Booking personnel will be given the discretion to seize the clothing of all persons who have been sprayed with OC and direct the prisoner to a shower prior to the booking process, if necessary.

G. Confronting Persons Armed With an Aerosol Subject Restraint

The mere possession of an ASR canister by another person does not necessarily create a threat of imminent death or great bodily harm. Members must evaluate all relevant factors to determine the intentions and ability of persons armed with an ASR to use the spray against a member and the appropriate degree of force necessary, including deadly force if applicable, to gain control of the situation.

### 13-3.6 Electronic Control Weapons

A. Members are only authorized to carry the issued electronic control weapon approved by the Sheriff.

B. Electronic control weapons shall be carried in an agency-approved holster on the member's duty belt and in the cross-draw configuration. The member's Bureau Commander must approve any deviation to this method of carry.

C. The use of an ECW may be an appropriate response to any type of "active resistance" on the part of an individual who is about to be taken into custody for any reason. The use of an ECW can be justified whenever it appears the utilization of other control techniques will most likely result in a physical altercation that may cause injury to either members or the person being taken into custody.

D. A verbal warning shall be issued prior to deployment of the Electronic Control Weapon unless such warning would create a tactical disadvantage for the member.

E. Guidelines cannot be written to encompass every possible application for the use of the electronic control weapon, and members should keep in mind that not every subject displaying "active resistance" as defined in this order will necessitate the use of the electronic control weapon. Subject age and physical ability should be considered before deploying the electronic control weapon.

F. The electronic control weapon may be used to immediately cease or prevent:

1. Physical combat.

2. Violent acts against a member, other persons or property.

3. Persons who have committed or are in the process of committing a crime and are going to be taken into custody.

4. Self-inflicted injury.

G.   The electronic control weapon may be used pursuant to training and is authorized to be used as a drive / contact stun weapon, when necessary. This specifically includes when a prisoner, inmate, or person taken into custody is handcuffed and becomes violent / combative after being placed in an agency vehicle and/or attempts to damage the vehicle by their violent physical actions; i.e., kicking out the windows/protective cages / doors, or during placement into the Pro-Straint Safety Chair.

H.   The electronic control weapon should not be intentionally aimed at the head, neck, groin or female breasts. The preferred target zone on the front of a subject's body is the lower torso and below. The preferred target zone on the rear of a subject's body is below the neck and down.

I.   Minus exigent circumstances, multiple electronic control weapon applications or the prolonged duration of an application should be minimized or avoided.

J.   The electronic control weapon is not intended to be used for the sole purpose of intimidation or coercion.

K.   The electronic control weapon will not be used during the following circumstances, unless exigent circumstances exist:

1.   Near flammable gases or liquids to include flammable oleoresin capsicum spray/foam.

2.   As a sole means against a lethal threat.

3.   Against a known or apparent pregnant female.

1.   When the potential exists for injury to the subject due to their location at the time of deployment.

L.   Immigration and Customs Enforcement (ICE) detainees identified by a purple wristband cannot be subjected to an electronic control weapon under any circumstances.

M.   Any discharge other than the function test, either intentional or unintentional, shall necessitate the immediate notification of the deputy's immediate supervisor and shall be documented as required.

N.   The serial number of each cartridge will be documented by the issuing authority.

O.   Issuance of Electronic Control Weapons

The Training Division is authorized to issue an electronic control weapon to all sworn members who have successfully completed the approved course. The serial number of the electronic control weapon will be documented by the Training Division. The Training Division is responsible for maintenance of the electronic control weapons. Any damaged or malfunctioning units are to be returned to the Training Division immediately for service.

P.   Maintenance and Pre-Operation

1.   Deputies who are issued an electronic control weapon must function test it daily, prior to the start of their shift to ensure:

a.   The battery pack is fully charged.

b.   Data port cover is in place.

c.   Power indicator light is visible.

d.   Unit's laser beam is projecting and not off sight.

e.   The Taser M26 functions properly for an entire five second cycle with the cartridge removed and pointed in a safe direction.

f.   The Taser X26 has a visible spark and a digital reading no lower than 20.

    2. Deputies will charge the battery pack on the Taser M26 daily or weekly, depending on electronic control weapon use.

3. No changes, alterations, modifications or substitutions shall be made to the electronic control weapon, including the agency issued electronic control weapon holster. All repairs to electronic control weapons shall be completed by an authorized vendor.

Q. After Deploying the Electronic Control Weapon

After a deputy uses an electronic control weapon to control or take a subject into custody, the deputy shall:

1. Remove the electronic control weapon probes at the earliest opportunity. The electronic control weapon probes shall only be removed by deputies who have completed agency-approved training in removal of the probes.

   a. Electronic control weapon probes that have struck the face, neck, head, groin, female breasts, or male nipples shall only be removed by medical personnel.

   b. Electronic control weapon probes that have struck a person's body shall be considered a biomedical hazard and shall be handled accordingly.

2. Department of Detention and Corrections deputies will ensure the inmate receives a medical evaluation by the medical staff.

Any individual who is experiencing or complains of symptoms other than those normally associated with the use of the electronic control weapon (i.e., excited delirium), or does not show signs of recovering within the normally expected period of time, should be afforded immediate medical attention. Unusual symptoms would include: loss of consciousness, profuse sweating, chest pains or slow, shallow breathing. In the event these symptoms occur, the member shall perform any necessary first aid in which the member has been trained and summon emergency medical services immediately.

**13.3.7 Electronic Prisoner Control Device:**

A. The approved electronic prisoner control devices used by certified members of the Judicial Services Division is the Stun-Cuff Magnum.

B. The electronic prisoner control devices can be utilized when dealing with potentially violent defendants making court appearances.

C. Activation of the electronic prisoner control device shall be considered before "hands on" techniques or the use of impact weapons when possible.

D. Members shall activate the approved electronic prisoner control device when a defendant attempts to escape, attempts to attack others, or engages deputies with Active Resistance or higher.

E. The above circumstances are not the only instances where discretion and judgment by the deputy to deploy the electronic prisoner control device exist. Deputies are expected to articulate that, based on their training, experience and assessment of the circumstances, deployment of the electronic prisoner control device was determined to be the best force option to prevent potential violence and injury to the deputy, the subject or innocent by-standers.

F. The electronic prisoner control device may be used to immediately cease or prevent:

   1. Physical combat.

   2. Violent acts against a member, other persons or property.

   3. Escape.

4.  Self-inflicted injury.

G.  An electronic prisoner control device shall only be attached and used on "Special Risk" in-custody defendants.

H.  When using the Stun-Cuff electronic prisoner control device, except under exigent circumstances, the device shall be attached to a defendant's ankle, over the sock, towards the Achilles Tendon region (back of ankle) with the electrical points facing upward, away from the foot.  The strap should be secured firmly, but not overly tight, which can reduce the effectiveness of the device.  Should the need arise, the device can be attached to a defendants bare ankle or wrist.

I.  When used, the Force Stun Belt electronic prisoner control device will be fitted to the defendant's waist with the battery pack to the rear of the subject to prevent tampering.  The defendant's forearms will be secured in the Velcro retention straps located on the left and right sides of the "D" ring attachment and one set of standard handcuffs will be positioned through the "D" ring and secured on the subject's wrists.

J.  Electronic prisoner control devices shall not be used in the following situations, unless exigent circumstances exist:

1.  Near flammable gases or liquids to include flammable oleoresin capsicum spray/foam;

2.  As a sole means against a lethal threat;

3.  Against a known or apparent pregnant female;

4.  Where the potential exists for the subject to experience unnecessary injury from a fall (e.g. from top of a stairwell, an escalator, or other obvious hazards likely to cause severe injury).

K.  Maintenance and Pre-Operation

1.  Deputies who are issued an electronic prisoner control device must test fire and perform a function test of the unit before deploying it to ensure the battery is fully charged and the device is operational.

2.  Supervision shall ensure the electronic prisoner control device is kept charged and ready for use should the occasion arise.

3.  No changes, alterations, modifications or substitutions shall be made to the electronic prisoner control device.  All repairs to electronic control devices or accessories shall be completed by an authorized vendor.

4.  At the end of the shift, the electronic prisoner control device shall be returned to its charging station, and depending upon use, be re-charged for use the following day.

L.  Post Activation Procedures

1.  After activating the electronic prisoner control device on a defendant, the individual shall be restrained by deputies as soon as practical in accordance with General Order 14-1, Handcuffs, Physical Restraints and Prisoner Searches.

2.  Immediately notify the on-duty supervisor.  If none are available, Building Security shall be notified and will, in turn, contact supervision so they are aware of the incident.

3.  Jail personnel, to include the jail medical staff, shall be contacted as soon as possible and informed of the subjects actions and informed the electronic prisoner control device had been deployed.

4.  Any individual who is experiencing or complains of symptoms other than those normally associated with the use of the electronic control device (i.e. excited delirium), or does not show signs of recovering within the normally expected period of time, shall be afforded immediate medical

attention. Unusual symptoms would include: loss of consciousness, profuse sweating, chest pains or slow, shallow breathing. In the event any of these symptoms occur, the member shall perform any necessary first aid in which the member has been trained and summon emergency medical services immediately.

5. When the electronic prisoner control device is deployed, the member shall ensure photographs are taken of any signature marks made by the electronic prisoner control device electrical points.

6. Prior to the end of the shift, the deputy deploying the electronic prisoner control device shall author an ACISS report and a Use of Force report detailing the incident.

### 13.3.8 Command Packs

A. The purpose of the command pack is:

1. To disperse threatening crowds (i.e., civil disturbances).

2. To extract a barricaded person, who will be taken into custody, from an enclosed / confined area. A reasonable belief must exist that the barricaded person does ***not*** pose a threat in which "innocent persons and/or law enforcement officers are at a disadvantage and subject to extreme danger", (i.e., "high risk") as defined in General Order 18-1, *High Risk Situations.*

   a. In a barricaded situation, the purpose of the command pack is to cause the subject to exit the confined area to an area in which deputies are deployed in a challenge / arrest team formation.

   b. Deputies should not, while wearing a chemical agency mask, be deployed into a residence or other structure in order to tactically clear, locate and subsequently arrest the suspect, unless exigent circumstances exits.

B. The command pack should be deployed only when it is the safest alternative to accomplish a necessary law enforcement mission.

C. The command pack is ***not*** to be deployed as an ***alternative*** to the activation of a Special Weapons and Tactics (SWAT) Team. Should the situation deteriorate to the point that members are at a tactical disadvantage and subject to "extreme danger," the SWAT Team shall be requested.

D. Prior to deployment into a conveyance, the vehicle must be disabled or obstructed, to prevent any attempt to drive it away.

E. Under the authority of the Commander of the Patrol Operations Bureau, a designated administrative supervisor(s) shall issue replacement chemical munitions. Records shall be created whenever a replacement occurs, and the Central District Administrative deputy will maintain those records for the bureau.

F. Issued command packs will only contain chemical munitions approved by the Sheriff.

### 13.3.9 Specialty Impact Weapons and Projectiles

A. Use of Specialty Impact Weapons and Projectiles

Discharging a specialty impact weapon/projectile should only be used when it provides the best alternative, under the circumstances, to prevent injury to the member or others.

B. Restrictions to Discharging Specialty Impact Weapons and Projectiles

1. Discharging a specialty impact projectile from a known distance that is less than the minimum incapacitation range is not permitted unless the use of deadly force is necessary.

2. Intentional projectile strikes to the head, neck and genitals are not permitted unless the use of deadly force is necessary.

C. The on-scene commander must ensure appropriate alternatives are available in the event the use of deadly force is necessary.

D. Members will only be authorized to use specialty impact weapons / projectiles approved by the Sheriff.

E. Beanbags

   1. Special Beanbag Considerations - Loading / Unloading Beanbag Projectiles

      a. Whenever possible, trained members shall be issued a dedicated weapon which shall be loaded with no other rounds than the agency approved beanbag projectile. Such weapons shall be prominently marked, and/or colored, to help ensure immediate identification by other members.

      b. Detention and Corrections will use a dedicated weapon specific for specialty impact projectiles, which will be prominently marked and colored to help ensure immediate identification by other members. Dedicated 12-gauge shotguns intended for beanbag projectiles will not be stored with 12-gauge shotguns which are intended for lethal ammunition.

      c. When it becomes necessary to load a non-dedicated 12-gauge shotgun with beanbag projectiles, the following procedure will be followed;

         (1) The trained member will unload all lethal ammunition from the 12-gauge shotgun. The lethal ammunition shall be stored so it will not be mixed with the beanbag projectiles.

         (2) Another sworn member will inspect the shotgun to ensure it is empty of any type of projectile. This law enforcement officer need not have completed the beanbag projectile training.

         (3) The shotgun shall be appropriately marked so as to distinguish that it is a non-deadly weapon.

         (4) The trained member shall then load the shotgun with the beanbag projectiles.

         (5) When the threatening incident is completed, the trained member will utilize the same procedures, to ultimately replace the beanbag projectiles with lethal ammunition. The markings shall be removed from the shotgun immediately after the beanbag projectiles have been removed.

F. Whenever the discharge of a specialty impact projectile is anticipated, other sworn members should be forewarned to prevent premature lethal fire. A verbal warning shall be issued prior to deployment of the specialty impact projectile unless such warning would create a tactical disadvantage for the member.

G. The member should evaluate the effectiveness of each projectile's impact and be prepared to discharge additional projectiles to subdue the subject, if justified.

H. Under the authority of the appropriate Bureau Commander, designated administrative supervisors at each division or district station shall issue replacement specialty impact projectiles. Records shall be created whenever a replacement occurs and the administrative supervisor at each division or district station shall maintain those records.

**13.3.10     Medical Attention**

In the event a subject is injured or complains of an injury following the use of less-lethal force by a member, the member shall perform any necessary first aid in which the member has been trained and summon emergency medical services immediately. In addition:

A. Members will advise Booking Personnel at the jail if a subject under arrest has received an application of any less-lethal force so jail medical personnel can place a medical watch on the subject, if necessary.

B. In the event an inmate is injured, or complains of injury, after being struck by electronic control weapon probes, the member shall perform any necessary first aid in which the member has been trained and shall summon the medical staff immediately.

C. Any person struck by a beanbag projectile shall be medically evaluated and will not be booked until medically cleared. In the event the inmate is already in custody within Detention and Corrections, the inmate will be immediately evaluated by medical staff.

D. Any individual who is experiencing or complains of symptoms other than those normally associated with the use of chemical munitions, or does not show signs of recovering within the normally expected period of time, should be afforded immediate medical attention. Unusual symptoms would include: loss of consciousness, profuse sweating, chest pains or slow, shallow breathing. In the event these symptoms occur, the member shall perform any necessary first aid in which the member has been trained and summon emergency medical services immediately.

### 13.3.11 Reporting Requirements

In the event death or great bodily harm occurs, the investigative procedures, reporting procedures and the administrative relief from duty, as defined in the section of this general order titled *Deadly Force*, shall apply, otherwise:

A. A member using physical force / control against any person shall immediately contact a supervisor and apprise the supervisor of the circumstances surrounding the incident.

B When any less lethal weapon is used upon a threatening animal or any circumstances not involving an arrest, an on-duty supervisor must be notified as soon as possible. The circumstance of the discharge must be documented within 24 hours in an Augmented Criminal Investigative Support System (ACISS) report, if applicable, or a memorandum directed to the deputy's bureau commander via chain of command when no report is written.

C. Members shall complete a Use of Force Supplement as a part of an Incident / Offense report when the member uses physical force or control or any less lethal equipment on any individual.

D. The display of a less-lethal weapon as a ***show of force*** will be documented in the narrative potion of an ACISS Report or in an incident report for Department of Detention and Corrections personnel.

E. Detention and Corrections Specific

1. Detention and Corrections members witnessing an incident where physical force was used but who were not involved shall complete, a Serious Incident Report and submit no later than the conclusion of the tour of duty. In addition, a report must be generated if an inmate remains in restraints at the end of the shift.

2. When physical force / control is used, the Inmate Healthcare medical supervisor or designee will perform a medical evaluation.

3. The Department of Detention and Corrections deputies may be required to use force to assist with the administration of medical treatment. This shall only be authorized by a shift commander or designee after consultation with a physician or designee. Reporting of such use of force shall be in accordance with agency policy.

4. The Squad Supervisor shall review and approve the ACISS Use of Force supplement.

5. The Squad Supervisor shall investigate the incident and will include a review of all documents relating to the incident and an interview of members and witnesses involved in the event. The results of the investigation will be documented in the Serious Incident Report. Upon completion of the report, it will be forwarded to the Shift Commander for review and approval.

   a. If approved, the Serious Incident Report and all related documents shall be forwarded to the Division Commander for review and signature. The Bureau Commander will review and approve the report before forwarding it to the Support Division for filing.

   b. If disapproved, the Division Commander will immediately notify the Bureau Commander for review_and the Administrative Investigation Division in accordance with GO 10-1, *Administrative Inquiries and Investigations.*

F. Photographs of Use of Force incidents shall be taken in the following circumstances:

1. There is visible injury to the arrested subject/inmate or to the member.

2. There is complaint of injury by the arrested subject / inmate or by the member.

3. The arrested subject / inmate or the member requires medical attention.

4. To photograph the signature marks of the electronic control weapon probes on the subject's body.

   Detailed photographs of the intact probes and the serial number of the spent electronic control weapon cartridge will be taken. The photograph(s) shall be referenced to the ACISS Use of Force Supplemental report.

G. The Incident / Offense report, including the Use of Force Supplement will be electronically routed by the supervisor approving the report to the member's chain-of-command, which shall review the report to ensure compliance with agency policy on the Use of Force.

H. An annual analysis of the use of force will be produced by the Administrative Investigation Division.

***Lethal Force***

**PROCEDURE:**

**13.3.12 Authorized Use of Deadly Force**

A. In accordance with Pinellas County Sheriff's Office General Orders, members shall use only that degree of force necessary to perform official duties.

B. Member may use deadly force only when the member reasonably believes that the action is in defense of human life:

1. Including the member's own life.

2. In defense of any person in imminent danger of serious physical injury

**13.3.13 Restrictions on the Authorized Use of Deadly Force**

A. Under no circumstances will warning shots or shots to wound be fired.

B. Members shall not discharge their weapons at or from a moving vehicle unless it is absolutely necessary to do so in order to protect a law enforcement officer or other persons from death or great bodily harm.

C. When encountering a vehicle, members shall use appropriate tactics to avoid unnecessarily placing themselves in harm's way. If the vehicle or its occupants are deemed a perceived threat, members

should be mindful of their cover and concealment. The police vehicle itself offers some measure of both. Members should evaluate the urgency and risk of leaving their position to advance on the vehicle posing the threat. Members should avoid standing or moving in front of the vehicle, standing or moving behind a vehicle or reaching inside a moving vehicle. Tinted windows obscure visibility and add risk to vehicle encounters. Members should not compromise their tactics by moving to the front of the vehicle to improve their view, but instead, create distance to achieve a better tactical angle.

### 13.3.14 Unholstering the Firearm

A. The decision to unholster a firearm is left to the discretion of the member based on the facts and circumstances known to him/her at the time.

B. A member may unholster his/her firearm when the member reasonably believes the possibility of danger, death or great bodily harm exists to the member or another person.

### 13.3.15 Administrative Relief from Duty (Non-Disciplinary)

A. In every instance in which a member uses deadly force against a person, the member shall be relieved of normal duties following the tour of duty in which deadly force was used.

B. A member so relieved shall remain on the relieved duty status, with full pay and benefits. This status is referred to as "non-disciplinary administrative relief from duty."

C. The member involved in a use of deadly force incident will be placed on Administrative Leave by a supervisor assigned to the Crimes Against Persons Section. The Crimes Against Persons Section supervisor shall notify the Commander of the Administrative Investigations Division of this action as soon as possible.

D. The Administrative Investigation Division, in consultation with the Bureau Commander of the affected member, the Human Resources Director or designee and the Contract Psychologist will make recommendations to the Sheriff regarding the member's return to normal duty, a modified assignment, or extended administrative leave.

E. The member shall be available to Sheriff's investigators until the investigation of the incident is concluded.

### 13.3.16 Reporting Use of Deadly Force or Discharging of Firearms

Whenever a member of the Pinellas County Sheriff's Office discharges a firearm, either accidentally or intentionally, and a person is injured or killed, the following procedures shall be used:

A. The member who discharged the firearm shall immediately:

1. Summon sufficient back-up personnel, if necessary.

2. When safe to do so, perform any necessary first aid in which the member has been trained and summon emergency medical services.

3. Isolate or secure the firearm without unloading it.

4. Law Enforcement deputies shall notify the Communications Division of the incident and request the nearest available on-duty supervisor respond to the scene. Corrections deputies shall notify the Shift Commander.

5. Secure the scene.

B. The on-duty supervisor shall immediately:

1. Respond to and assume control of the scene.

2. Ensure that the member(s) who discharged the firearm(s) is / are separated and the firearm(s) is/are holstered or otherwise secured without unloading.

3. Identify and separate all potential civilian witnesses and other agency members who are involved in the incident or present at the scene.

4. Notify the Shift Commander of the incident.

5. Notify the Communications Division to have the on-duty Forensic Sciences Division Supervisor or designee respond to the scene. The Corrections supervisor shall notify the appropriate Division Commander.

6. Maintain control of the scene until relieved by appropriate authority.

C. The Shift Commander shall immediately notify:

1. The Robbery / Homicide Unit Sergeant or designee who shall respond to the scene and assume command of the investigation.

2. The appropriate Bureau Commander of the affected member(s)

3. A member of the Public Information Office.

4. The on-call Victim Advocate, if necessary.

5. The Administrative Investigations Division who will then be responsible for notifying the Sheriff and / or Chief Deputy of the incident.

6. The on-call Critical Incident Stress Management Team Leader.

D. The Robbery / Homicide Unit Sergeant or designee shall:

1. Immediately notify the Crimes Against Persons Section Lieutenant or the Investigative Operations Bureau Commander.

2. Call out a sufficient number of Robbery / Homicide detectives to investigate the incident.

3. Notify the State Attorney's Office at an appropriate time in the investigation.

4. Notify the Medical Examiner's Office at an appropriate time in any case in which a civilian or deputy is killed or is likely to die as a result of the incident.

5. Call out the agency armorer when appropriate.

E. The Communications Division Supervisor, upon receipt of information that a deputy has been involved in the discharge of a firearm shall:

1. Immediately make all notifications requested by the involved member(s), the on-duty supervisor and the Shift Commander.

2. Copy and label tapes of all radio transmissions and/or telephone calls related to the incident so they can be located at a later date by Robbery / Homicide detectives.

### 13.3.17 Reporting Use of Deadly Force Other Than Firearms

A. Whenever a member of the Pinellas County Sheriff's Office uses deadly force other than by discharging a firearm, and a person is killed, or is likely to die, the same procedures outlined under 13-3.15, of this order shall be followed.

B. The Major Accident Investigation Team shall investigate all deadly force incidents related to the use of vehicle immobilization techniques to end pursuits as defined in General Order 15-2, *Pursuit Operation of Sheriff's Office Vehicles.*

**13.3.18 Member Wounded or Killed**

Whenever a member of the Pinellas County Sheriff's Office is wounded or killed through the discharge of a firearm or the use of any other weapon, the same procedures outlined under 13-3.15, paragraphs A through E of this order shall be followed.

**13.3.19 Intentional Use of Deadly Force Where No Injury or Death Resulted**

Whenever a member intentionally discharges a firearm at another person, but no injury or death results, the same procedures outlined under 13-3.15, paragraphs A through E of this order shall be followed.

**13.3.20 Accidental Discharge of Firearm Where No Injury or Death Resulted**

A. Whenever a member accidentally discharges a firearm and no injury or death results, the same procedures outlined under 13-3.15 paragraphs A and B of this order shall be followed.

B. The Shift Commander will immediately notify the Administrative Investigation Division and the Bureau Commander of the affected member.

C. The Administrative Investigation Division will assume command of the investigation and will be responsible for notifying the Sheriff and / or Chief Deputy of the situation.

**13.3.21 Intentional Discharge of Firearm in Other Situations**

A. Whenever a member discharges a firearm to kill an injured or dangerous animal, the member shall notify an on-duty supervisor of the incident as soon as possible. The on-duty supervisor shall be responsible for notifying the shift commander of the incident.

B. The killing of an injured or dangerous animal does not require the Shift Commander to make any notifications.

C. The discharging of a firearm for training or recreational purposes does not require the member to make any notifications.

**13.3.22 Investigative Procedures**

A. The Crimes Against Persons Section, Robbery / Homicide Unit, shall be responsible for overseeing and controlling the entire investigation of incidents involving the intentional discharge of a firearm at any person and / or accidental discharges involving an injury or death.

1. The Robbery / Homicide sergeant or designee shall act as the investigation coordinator and oversee all aspects of the investigation.

2. The Robbery / Homicide sergeant or designee shall assign a team of detectives to adequately investigate the incident. At any time, detectives from other investigative units may be assigned to assist the Robbery / Homicide Unit with any aspect of the investigation. While assisting the Robbery / Homicide Unit, detectives from other units are considered to be members of the Robbery / Homicide Unit for purposes of this general order.

3. The Crimes Against Persons Lieutenant will act as a liaison between the Robbery / Homicide Unit and all other agency members.

B. All members involved in the investigation are under the direct supervision and control of the Crimes Against Persons Section and the Robbery / Homicide Unit.

C. All bureau commanders or their designees shall provide assistance to any member of the Crimes Against Persons Section as requested.

D.  The Robbery / Homicide Unit shall respond to the scene to assure proper crime scene preservation and to maintain control of members, witnesses, and other subjects.  The Robbery / Homicide Sergeant or designee may assign other department personnel and detectives to other tasks and locations as necessary.

E.  All witnesses, including the affected member(s) will be separated.  No one, other than Robbery / Homicide Unit detectives shall interview witnesses unless directed to do so by a Robbery / Homicide Unit detective.  This does not preclude a first responding supervisor from asking basic questions in order to find what has occurred so proper notifications can be made.  Care should be taken by the investigation coordinator to fully explain the investigative process to the involved member(s) in order to ease any concerns.

F.  The Forensic Sciences Division Supervisor and Specialist(s) under the direction of a Robbery / Homicide Unit detective will be responsible for ensuring the scene is properly and thoroughly processed.  The scene processing may include, but not be limited to, ground level, digital and 35 MM photos, aerial 35 MM photos, videotaping, and detailed drawings / sketches of all relevant scenes and evidence.  All evidence, including but not limited to, firearms, spent shell casings, spent projectiles, ammunition, clothing and other weapons will be collected by the Forensic Sciences Division.

G.  If necessary, the agency armorer will be called to the scene to assist the Forensic Sciences Division in unloading any firearms.  All unloading of firearms involved in a deadly force incident will be photographed and properly documented.  If replacement firearms are needed, the agency armorer will make arrangements to re-issue firearms to involved members.  The agency armorer will provide information to detectives on all firearms including but not limited to make, model, serial number of firearm, magazine capacity and types of ammunition issued.

H.  The Robbery / Homicide sergeant will notify the State Attorney's Office at an appropriate time in the investigation.  Notification to the State Attorney's Office will be made as soon as sufficient facts are available in order to provide a detailed summary of the incident.

I.  If a death has occurred or is likely to occur, the Medical Examiner's Office will be notified by the Robbery / Homicide sergeant at an appropriate time in the investigation.

J.  The Robbery / Homicide Unit will immediately initiate an area canvas to locate any witnesses who have pertinent information regarding the incident.  All witness information will be brought to the immediate attention of the Robbery / Homicide sergeant or case agent.  Whenever possible, witnesses will be transported to an appropriate facility for interviews.

K.  As part of the fact-finding mission, the Robbery / Homicide Unit detective will conduct preliminary interviews, at the scene, of civilian witnesses and members, not directly involved in the incident.

L.  Upon completion of on-scene interviews, the Robbery / Homicide Unit will make an evaluation of the incident based upon the facts and circumstances of the case.  A decision will be made whether or not to issue a Miranda Warning to involved member(s) prior to conducting any tape-recorded interviews.  Involved members are to be treated as any citizen involved in a similar incident.  If, during the course of the investigation, a member is suspected of committing a criminal violation or it is determined that criminal charges may be filed against the member, the member will be advised of his / her Miranda Rights and a Rights Advisement Form completed.

M.  Once the investigation progresses to the interview stage, the Robbery / Homicide Unit detective will take tape-recorded statements from all members who used deadly force.  Recorded statements will be taken from other members or civilian witnesses as deemed necessary.  Only Robbery / Homicide Unit personnel will take tape-recorded statements.  Two Robbery / Homicide Unit detectives will take each taped statement.  No other persons will be permitted to sit in on or take part in the interviews.  However, the attorney or representative of a member who used deadly force may be present during the affected member's interview.

N.  The Robbery / Homicide Unit detectives will interview all involved members and civilian witnesses prior to any interviews with the State Attorney's Office or the Administrative Investigations Division.

### 13.3.23 Administrative Investigation Division Responsibilities

The Administrative Investigation Division (AID) shall be responsible for overseeing and controlling the entire investigation of incidents involving accidental discharges of a firearm where no injury or death results. AID investigative procedures shall be in accordance with General Order 10-1, *Administrative Inquiries and Investigations.*

### 13.3.24 Member Cooperation

A. All members shall cooperate fully with the Robbery / Homicide Unit and /or Administrative Investigation Division during the course of the investigation.

B. All members shall cooperate fully with the State Attorney's Office during the course of the investigation.

### 13.3.25 Written Reports

A. In incidents involving the intentional discharge of a firearm at any person, accidental discharges involving an injury or death, or an incident involving the death of any person by the actions of the responding member(s), the initial responding member(s) on the scene will complete an initial report or supplements on the original incident (example; burglary, robbery, domestic dispute, suspicious person, escape, riot, etc.). These reports will be completed prior to the end of the member's tour of duty unless otherwise directed by a supervisor.

1. Any member who actually discharges a firearm under these circumstances will only be asked to give a recorded statement to Robbery / Homicide Unit detectives. No additional reports or memos will be required from any member who actually discharges a firearm. In addition, any member who did not discharge a firearm, but gives a tape-recorded statement to the Homicide/Robbery Unit will also be exempt from writing any other memos or reports.

2. All information pertaining to the investigation will be documented in an appropriate ACISS report under a case number designated by the Robbery / Homicide Unit supervisor or designee. Copies of all reports from other units within the Sheriff's Office or other agencies will be supplied to the Robbery / Homicide Unit. The Robbery / Homicide Unit will be the clearing-house for all information involving the investigation. All press releases shall be coordinated with the Robbery / Homicide Unit and released through the Public Information Office, with the approval of the Sheriff.

B. In incidents involving accidental discharges of a firearm where no injury or death occurred and incidents involving the killing of dangerous or seriously wounded animal, members shall submit the following documentation:

A standard incident / offense report describing in detail the circumstances surrounding the discharge of the firearm. The report shall be titled "Discharge of Firearm" and shall be completed prior to the end of the member's tour of duty unless otherwise directed by a supervisor. The member's supervisor shall forward a copy of the report and all supplements to the Administrative Investigation Division.

### 13.3.26 Deadly Force Review Board

A. The Deadly Force Review Board shall act as a finder of fact whenever a member of the Pinellas County Sheriff's Office uses deadly force or accidentally discharges a firearm and causes death or injury to another person.

B. The Chief Deputy or designee, appointed by the Sheriff, shall chair the Deadly Force Review Board. In addition to the Chief Deputy, the permanent members of the board shall be the Commanders of the Inspections Bureau, Investigative Operations Bureau, Patrol Operations Bureau and the Training Division or their designees. In the event the affected member is assigned to the Department of Detention and Corrections, the commander of the Department of Detention and Corrections or designee will take the place on the board of the Patrol Operations Bureau Commander.

1. At the conclusion of the investigations by the Crimes Against Persons Section and the State Attorney's Office, the Crimes Against Persons Section designee will distribute the appropriate reports to the members of the Deadly Force Review Board.

2. The Chairman will set the date, time and location of the Deadly Force Review Board within 10 working days of the distribution of reports.

3. The Deadly Force Review Board shall not have subpoena powers. However, Robbery / Homicide Unit personnel or technical witnesses, etc. may be required to attend the Deadly Force Review Board at the direction of the Chairman.

C. The findings of the Board shall be written in memorandum form to the Sheriff and shall include the name, rank and current assignment of each board member and whether they agree / disagree with the findings.

1. If the Board determines the member did not violate policy, the Board shall recommend to the Sheriff that no further action be taken.

2. If the Board determines that the member may have violated agency policy, the Board shall recommend to the Sheriff that their findings be routed to the Administrative Investigation Division for further investigation.

D. The Board shall submit their findings, along with a copy of the case file, to the Training Division as reference material to be used in curriculum development and assessment.

E. Other agency members may attend the Deadly Force Review Board at the discretion of the Sheriff or Chairman.

### 13.3.27 Psychological Services

A. In all cases where a member uses deadly force, or accidentally discharges a firearm and causes death or injury to another person, the involved member shall be required to undergo a psychological consultation by a psychologist or qualified mental health professional of the Sheriff's choice within three days of the incident, unless there are extenuating circumstances. The involved member shall revisit the psychologist, of the Sheriff's choice, between 11 and 12 months after the date of the deadly force incident. Additional consultations may be required at the discretion of the Sheriff.

If a member is involved in two deadly force situations within a 12 month period (See GO 6-10.2, A, 4), the member will undergo a formal psychological evaluation with a psychologist or qualified mental health professional of the Sheriff's choice.

B. All consultations with the psychologist will be arranged through the Administrative Investigations Division at Sheriff's Office expense.

C. The psychologist will provide, to the Sheriff, a psychological Status Report concerning the involved member.

D. Following the deadly force incident, the member will be offered access to psychological services, such as the Employee Assistance Program, Critical Incident Stress Management Team, the agency's volunteer clergy and the agency's Insurance Program for the purpose of emotional and psychological support.