## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JULIE V. DEGRAW,

      Plaintiff,

v.                            CASE NO. 8:18-cv-2116-T-02SPF

SHERIFF BOB GAULTIERI and
GREGORY GOEPFERT,

      Defendants.

_____/

## <u>ORDER GRANTING SUMMARY JUDGMENT</u>

Before the Court are two motions: (1) Defendant Deputy Gregory Goepfert's Motion for Summary Judgment and separate Statement of Undisputed Material Facts (Dkts. 97, 96), Plaintiff's submissions in opposition (Dkts. 108, 109, 114,), Deputy Goepfert's reply (Dkt. 112); and (2) Defendant Sheriff Bob Gualtieri's Motion for Summary Judgment and separate Statement of Undisputed Facts (Dkts. 99, 98), Plaintiff's submissions in opposition (Dkts. 110, 111), and Sheriff Gualtieri's reply.  Dkt. 113.  Having heard argument of both counsel at the hearing held August 20, 2020, and after careful review of the entire file, the Court grants summary judgment in favor of both Defendants in this excessive force case.

## Introduction

Plaintiff Julie DeGraw is the widow of Mr. DeGraw.  Mrs. DeGraw is a registered nurse, and Mr. DeGraw was medically retired from service in the U.S. Navy.  He served as a combat medic for special operations with the Marines and was deployed during the First Gulf War.  Mr. DeGraw suffered from post-traumatic stress disorder ("PTSD"), nightmares, and eventually seizures.

In the early morning of September 7, 2016, Mrs. DeGraw heard her husband making gurgling noises and screaming from the upstairs bedroom he used when he was feeling ill.  Dkt. 96-2 (DeGraw depo.) at 21 & Exh. 27; Dkt. 108-2 (transcript of first 911 call).  Wondering if he was having a seizure, she entered the bedroom. Dkt. Dkt. 96-2 at Exh. 27; Dkt. 108-2.  Upon seeing her, he screamed at her, arose from the bed, and began chasing her.  *Id*.  He scratched the back of her neck when he tried to grab her.  *Id*.

She succeeded in getting away from him and was able to call 911.  She told the dispatcher there were guns in the house.  Dkt. 96-2 at 36–37 & Exh. 27; Dkt. 108-2 at 2.  Deputies of the Pinellas County Sheriff's Office ("PCSO") and paramedics were dispatched to the DeGraw residence and, after their arrival, Mr. DeGraw voluntarily came downstairs for examination by the emergency medical technicians.  Dkt. 96-2 at 27–28; Dkt. 96-4 at 19–20 & Exh. 35 at 1, Exh. 36 at 3; Dkt. 96-5 at 9.  He told them he had a bad dream.  He did not meet the criteria of

2

the Baker Act; nor did he agree to go a hospital for follow-up. Dkt. 96-2 at 28; Dkt. 96-3 at 20, 24 & Exh. 30 at 4–6.

Later that day, Mrs. DeGraw called 911 again. Dkt. 96-2 at 39–40 & Exh. 27; Dkt. 108-2 at 5–7 (transcript of second call). This time she witnessed her husband having a seizure while he was napping in the upstairs bedroom. *Id*. She was still afraid of approaching him after the events earlier in the day. Dkt. 96-2 at 41, 43, 67 & Exh. 27; Dkt. 108-2 at 6. Different deputies came. Deputy Gregory Goepfert and another deputy went upstairs to the bedroom where Mr. DeGraw was making gurgling noises and yelling. Dkt. 96-2 at 15; Dkt. 96-7 (Martinez depo.) at 35–36, 115–17; Dkt. 96-8 (Goepfert depo.) at 142. The sad and unfortunate turn of events which followed resulted in Mr. DeGraw's death later that day. The Court discusses them below.

Mrs. DeGraw, as personal representative, brought this action pursuant to 42 U.S.C. § 1983 alleging unreasonable and excessive force in violation of her husband's rights under the Fourth Amendment against Deputy Goepfert, individually, and against Sheriff Bob Gualtieri, both in his individual and official capacities. Dkt. 48. A state law claim for negligence in the wrongful death of Mr. DeGraw was asserted against only Sheriff Gualtieri. *Id*.

3

## Pertinent Facts at Summary Judgment

At the summary judgment stage, even in cases of excessive force, the facts are "what a reasonable jury could find from the evidence viewed in the light most favorable to the non-moving party." *Cantu v. City of Dothan, Ala.*, 2020 WL 5270645, at *2 (11th Cir. Sept. 3, 2020) (quoting *Scott v. United States*, 825 F.3d 1275, 1278 (11th Cir. 2016)).  Where versions of what happened are somewhat varying, disputed, or unclear, the proper standard "requires us to adopt the account most favorable" to the non-moving party.  *Id.* (quoting *Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016)).  In determining the narrative, all inferences are to be drawn and inconsistencies resolved in favor of Mrs. DeGraw as the non-moving party.

In the first 911call, Mrs. DeGraw stated her husband "woke up screaming" in a bedroom upstairs and when she walked in the room, she was unable to tell if he had experienced a seizure.  Dkt. 96-2 at Exh. 27; Dkt. 108-2 at 1–4.  He arose and ran, screaming, after her.  She was "running away" from her husband when he "scratched [her] in the back of [her] neck" trying to pull her out of the master bedroom down the hall.  Dkt. 108-2 at 1–2.  She told the call taker he suffered from depression and PTSD, and he kept guns in the house, including his room.  *Id.* at 2.  She confirmed he did not have a history of verbal or physical aggression with the exception of one episode three and a half years prior.  *Id.* at 4.  After the

4

officers and emergency medical technicians arrived and Mr. DeGraw was able to walk downstairs to be checked, Mrs. DeGraw confirmed she felt safe and her husband did not need to be taken to the hospital. Dkt. 96-2 at 22–23.

In the second 911 call about 10 hours later, Mrs. DeGraw told the dispatch she was afraid to go upstairs because she heard him gurgling again as he had done that morning when "he was ready to attack me." Dkt. 96-2 at Exh. 27; Dkt. 108-2 at 6. She conveyed he had PTSD and that it was possible this could be his third seizure of the day, if he had in fact suffered a seizure that morning. *Id*. She said she would not go upstairs to check on him until help arrived. *Id*. Mrs. DeGraw, at her deposition, affirmed she told the call taker she was scared but said a more accurate reason for her not going upstairs was because she did not want her husband to get hurt falling down the stairs as he was prone to following her. Dkt. 96-2 at 41–43.

Deputies Goepfert and Martinez were sent to the residence first because the paramedics deemed it an unsafe situation. Until they received an all-clear, the paramedics stayed downstairs. Mrs. DeGraw testified she told them her husband had a seizure, was confused, and was a combat vet diagnosed with PTSD. Dkt. 96-2 at 44. Deputy Goepfert, who was the first to climb the stairs, had reached the mid-way landing when she told both deputies he slept with a gun under his pillow; Deputy Goepfert then drew his taser. Dkt. 96-2 at 44–46; Dkt. 96-7 at 57–58, 91–

5

92, 107–08; Dkt. 96-8 at 37, 59.  The deputies could hear her husband saying a loud "ha."  Dkt. 96-2 at 45, 46, 50.

From the doorway of the upstairs bedroom, Deputy Goepfert saw Mr. DeGraw in his undershorts, lying in bed with his head on the pillow.  Dkt. 96-8 at 37–38, 41, 118.  His mouth was covered with old, dry blood, and his hands were touching the pillow.  *Id*. at 36, 118.  In the room, described as small, cluttered, and poorly lit, were gun cases and a knife on the floor.  *Id*. at 40–41, 82–83; Dkt. 96-10 (Street depo.) at 23–24, 29–30; 52–53; Dkt. 96-11 at Exh. 18 (photograph of room).[1]

Remaining in the doorway, Deputy Goepfert identified himself, asked Mr. DeGraw what was wrong, and told him he wanted to get him out of the room to the be checked by paramedics.  Dkt. 96-8 at 39; Dkt. 96-7 at 22, 112, 117; Dkt. 96-2 at 47, 48, 52, 68.  Although Deputy Goepfert attempted to engage Mr. DeGraw in conversation, Mr. DeGraw only screamed and yelled.  Dkt. 96-7 at 117. There appears to be some conflict about the exact noises Mr. DeGraw was making, whether it was yelling and screaming or a loud "ha" or "yah"-like shouting, but Mrs. DeGraw agreed it was loud.  Dkt. 96-2 at 46, 50.  Setting aside the lack of any

---

[1] The photograph shows the one window in the room with the blinds open, but Sergeant Street testified that the blinds were only partially open and the room was dimly lit on the day in question.  Dkt. 96-10 at 52–53.

precise or agreed upon description of the noise, Mr. DeGraw was not using words to communicate.

Because several times Mr. DeGraw reached under the pillow and between the bed and the wall, Deputy Goepfert asked him to stop and to show his hands. Dkt. 96-8 at 40–41, 44, 53–54; Dkt. 96-7 at 117. This action prompted Deputy Goepfert to tell Deputy Martinez, who was standing on the other side of the doorway away from view, to "go lethal," which meant to holster his taser and draw his firearm. Dkt. 96-7 at 35–36, 82–83, 110–11, 114-15; 117–18, 189–90.

Deputy Goepfert tried to coax Mr. DeGraw out of bed and away from the gun under the pillow. Dkt. 96-8 at 44, 51–54, 139. Trying to relate to and engage Mr. DeGraw, Deputy Goepfert told him that he, too, was a vet and went to Desert Storm. Dkt. 96-8 at 51; Dkt. 96-2 at 16, 49. Mr. DeGraw continued to scream and sat up on the far end of the bed. Dkt. 96-8 at 41, 44, 61–63, 80, 104, 118. He then stood, balled up his fists, and advanced toward Deputy Goepfert. *Id*. The deputy told him to stop and calm down, but he continued moving toward the deputy and the door. Dkt. 96-8 at 104; Dkt. 96-7 at 83. Mr. DeGraw did not follow the deputy's commands. At this point, Deputy Martinez, who was listening, holstered his firearm, re-drew his taser, and communicated to dispatch that Mr. DeGraw was noncompliant to verbal commands. Dkt. 96-7 at 35–36, 113–15, 118–20, 134-37 & Exh. 23.

As Deputy Goepfert was backing up toward the staircase as Mr. DeGraw came forward, he deployed his taser, which hit Mr. DeGraw in the chest instead of his torso or leg. Dkt. 96-8 at 63, 81–82, 122–23, 147–48. The two men were only three-and-a-half feet apart when the trigger was pulled. Dkt. 96-8 at 63,122–23. Mr. DeGraw fell against the wall. Deputy Goepfert short-cycled the taser at two seconds, as opposed to letting it run the full five seconds. Dkt. 96-8 at 104–05; Dkt. 96-7 at 144. Both deputies tried to calm Mr. DeGraw down and told him to stay on the floor, but Mr. DeGraw did not comply and continued to scream and yell and started to stand up. Dkt. 96-8 at 124.

The cycle of activating the taser, cutting it short, attempting to calm him, instructing him to stay on the floor followed by Mr. DeGraw yelling, clenching his fists, and trying to get up, continued four more times. Dkt. 96-7 at 144–45; Dkt. 96-8 at 65, 95–96, 104–05, 123–28. The second activation lasted three seconds, the third for one second, the fourth for the full five seconds, and the fifth for one second. In all, the activations lasted 12 seconds over a 94-second span. Dkt. 96 ¶ 66; Dkt. 96-9 at Exh. 14 (taser download). After each of the five separate activations, Mr. DeGraw continued to yell loudly, once using the expletive "mother-f****r," and to groan, and he "seemed very angry and very intense." Dkt. 96-2 at 51; Dkt. 96-8 at 126.

8

When Sergeant Street arrived, he started up the stairs.  While at the bottom of the staircase, he heard Deputy Goepfert announce "taser" and the sound of activation.  Dkt. 96-10 at 10, 12.  At the top of the stairs, he found both deputies waiting outside the bedroom.  Sgt. Street was informed of the weapons in the room, including the gun under the pillow, and the ineffectiveness of the tasering. *Id.* at 25. Sgt. Street heard Mr. DeGraw "grunting . . . like a guttural type of sound very loudly."  *Id.* at 24, 29–30, 56, 59; Dkt. 96–7 at 153–54.  He concluded that the taser was not fully effective.  Dkt. 96-10 at 25, 57.  He observed two rifle cases and a knife on the nightstand. *Id.* at 24.

All three officers began to remove some of the clutter in the room so they could enter to handcuff Mr. DeGraw.  *Id.* at 25–29, 55.  Sgt. Street took hold of Mr. DeGraw and he tensed.  *Id.* at 60–61. Both Sgt. Street and Deputy Martinez worked to gain control over one wrist for handcuffing.  Dkt. 96-7 at 128–29. Deputy Goepfert tried to control Mr. DeGraw's feet because he was thrashing and kicking.  Dkt. 96-10 at 38–39, 60; Dkt. 96-8 at 69, 129–30; Dkt. 96-7 at 48, 133–34.  Mr. DeGraw, even after one wrist was handcuffed, resisted them by holding his right arm tightly underneath him.  Dkt. 96-10 at 36, 63–65; Dkt. 96-7 at 46–47, 49, 128–29, 131; Dkt. 96-8 at 72.  When both handcuffs were finally secure, Mr. DeGraw's lips were moving and his breathing was steady and regular.  Dkt. 96-7 at

158–61, 186; Dkt. 96-8 at 130, 138–39: Dkt. 96-10 at 39–40, 65–66, 80–83; Dkt.

96-11 (Baldwin depo.) at 27, 37. He continued to groan and grunt. *Id.*

The three officers rolled him on his side.  At this point they noticed his

breathing had changed.  Dkt. 96-10 at 39–41, 78, 83; Dkt. 96–7 at 50–52, 157–59,

161–64; Dkt. 96-8 at 139.  They felt a pulse.  Dkt. 96-7 at 50–51; Dkt. 96-8 at 71;

Dkt. 96-10 at 41.  Mrs. DeGraw noticed the noise had stopped and she called up

from downstairs and asked if her husband was still breathing.  Dkt. 96-2 at 53.

They confirmed he was still breathing.  *Id.*  They tried to revive him, but Mr.

DeGraw did not respond.  Dkt. 96-8 at 72.

Meanwhile a fourth officer, Deputy Baldwin, arrived, having heard the

"yelling or screaming" on the cleared emergency radio channel.  Dkt. 96-11 at 19.

He was in the hallway upstairs by the time Mr. DeGraw was unresponsive, and he

summoned the paramedics who were waiting downstairs until it was safe enough

for them to enter.  Dkt. 96-10 at 41; Dkt. 96-11 at 29.  As the paramedics came

upstairs to the room, Sgt. Street removed the handcuffs.  Dkt. 96-10 at 42.  Mr.

DeGraw was transported to the hospital where he died later that day.  Dkt. 96-2 at

55–56; Dkt. 96-3 at Exh. 30; Dkt. 96-7 at 165–66.  The cause of death was excited

delirium syndrome with contributing causes of hypertensive heart disease,

supratherapeutic venlafaxine level, and electro-muscular disruption device (the

10

taser).  Dkt. 96-12 at 11.  For purposes of this summary judgment, the Court will presume his death was caused by the tasering.[2]

There is no evidence any of the law enforcement officers ever sat on Mr. DeGraw, straddled him, or put body weight on him.  Dkt. 96-7 at 47, 49, 160–61; Dkt. 96-10 at 36–37, 61–62, 66.  Sgt. Street found under the pillow a semi-automatic pistol, loaded with six rounds in the magazine and pointed at the door. Dkt. 96-10 at 45.  Also found in the room were rifles in the rifle cases, two handguns in cases toward the foot of the bed, shotguns, pistol magazines, and ammunition on the floor.  Dkt. 96-10 at 45, 50–51; Dkt. 96-8 at 145; Dkt. 96-12 at 5, 8–9.

### Liability of the Sheriff

Sheriff Gualtieri was not at the DeGraw residence on September 7, nor did he take or attend any investigative interviews.  Because he did not personally participate in the alleged constitutional violation and there was no causal connection between his actions and the alleged constitutional violation, individual liability does not attach to Sheriff Gualtieri.  *See Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir.) (citing *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003)), *cert. dismissed*, *Timoney v. Keating*, 562 U.S. 978 (2010).  Not only was he

---

[2] The facts accepted at summary judgment may not be the actual facts of the case.  *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009).

not present, but Sheriff Gualtieri did not 1) direct his subordinates to act

unlawfully or 2) know his subordinates would act unlawfully and fail to stop them.

*Id*.

　　　To establish official capacity liability of the sheriff in a § 1983 action, a

policy, custom, or practice must have caused the deprivation of civil rights.

*Monell v. Dep't of Social Servs*., 436 U.S. 658, 693–94 (1978).  Liability under

*Monell* arises in three situations: (1) a formally adopted policy statement or

ordinance, or a governmental custom that has not been formally approved, *see id.*

at 690–91; (2) a failure to train amounting to deliberate indifference to the rights of

persons with whom untrained employees come into contact, *City of Canton v.*

*Harris*, 489 U.S. 378, 388 (1989); or (3) a ratification based on a single incident

after policymakers had an opportunity to review the subordinate's decision and

agreed with both the decision and its basis.  *See Thomas ex rel. v. Roberts*, 261

F.3d 1160, 1174 n.12 (11th Cir. 2001), *cert. granted*, *judgment vacated sub nom.*

*Thomas v. Roberts*, 536 U.S. 953 (2002), *opinion reinstated*, 323 F.3d 950 (2003)).

The policies at issue are PCSO's use of force policy, General Order 13-3, and its

mental illness policy, General Order 13-10.  Dkt. 114-1 (Gen. Ord. 13-10); Dkt.

114-2 (Gen. Ord. 13-3).

Neither Plaintiff nor her experts claim either policy is unconstitutional.[3]  She relies on the failure to train and the PCSO's ratification of Deputy Goepfert's "entire tasering episode."  Dkt. 111 at 4 n.1.  As to failure to train, Plaintiff cannot attribute *Monell* liability on inadequacies in, or the lack of, training because not one instance of a PCSO deputy's use of a taser has been found to be unconstitutional, let alone in circumstances similar to this case.  In the four years preceding the events of September 2016, there were no substantiated complaints involving allegations of deputies tasering someone.  Dkt. 98-7 ¶ 18.  In use of force cases, PCSO collects, maintains, and reviews data (Dkt. 98-8 at 44; Dkt. 98 ¶¶ 33–47), which shows PCSO deputies used tasers less than half as often as other agencies and there were no taser-involved deaths in the four years prior to Deputy Goepfert's use of a taser on Mr. DeGraw.  Dkt. 98 ¶¶ 46, 47.  This is not a case of complete lack of training, which would evidence a "deliberate indifference," and no prior incidents involving similar facts occurred to place PCSO on notice of any constitutional shortcomings.  *City of Canton*, 489 U.S. at 390 n.10.

---

[3] "PCSO has appropriate mental illness policies on paper[.]"  Dkt. 111 at 13.  Her experts did not find any of PCSO's policies, including use of force, unconstitutional.  Dkt. 98-9 (Van Blaricom depo.) at 37; Dkt. 98-10 (Drago depo.) at 8–9, 17.  Although expert Van Blaricom initially criticized the use of force policy concerning electronic control weapons because it stated "avoid using the chest area" as opposed to "prohibit using the chest area," he admitted prohibiting was his preference and a "best practice."  Dkt. 98-9 at 25, 37.  He later said he was not critical of the use of force policy with respect to the circumstances in which a taser could be used.  Dkt. 98-9 at 41.

Plaintiff's theory that Deputy Goepfert's conduct was ratified is based on alleged shortcomings in the investigation and the failure to discipline him for his acts. Dkt. 111 at 15–17. A sheriff, however, cannot be held liable under § 1983 for a single failure to investigate a constitutional violation. *Salvato v. Miley*, 790 F.3d 1286, 1296–98 (11th Cir. 2015) (reversing denial of summary judgment on excessive force where plaintiff argued sheriff ratified unconstitutional conduct by inadequately performing internal investigation after a single incident of shooting). The approval of the subordinate's decision must occur before the subordinate acts. Here, as in *Salvato* and *Thomas*, the sheriff did not review, much less ratify, any part of Deputy Goepfert's actions before he used his taser.

The PCSO policies on use of force and mental illness are not unconstitutional under *Monell* or under any alternate theory espoused by Plaintiff.[4] Summary judgment is granted in favor of the sheriff on Count II of the Second Amended Complaint.

### Liability of Deputy Goepfert

The defense of qualified immunity is available to a law enforcement officer if acting within his or her discretionary authority unless the acts violate "clearly

---

[4] Plaintiff refers to a "trickle down" theory based on alleged statements concerning tasers made by Sheriff Gualtieri to the press and in depositions of other cases. Dkt. 111 at 6–12. She contends his philosophy that tasers cannot cause death constituted a form of training and also permeated the investigation. This argument has no basis in law or fact.

14

established [federal] statutory or constitutional rights of which a reasonable person would have known." *Keating*, 598 F.3d at 762 (quotations omitted).  To defeat qualified immunity, Plaintiff must show both 1) a constitutional violation occurred, and 2) at the time of the challenged acts, the law clearly established the unconstitutionality of the conduct.  *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (establishing constitutional violation is necessary); *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (demonstrating clearly established law is necessary), *receded from*, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Singletary v. Vargas*, 804 F.3d 1174, 1180–81 (11th Cir. 2015) (reversing denial of qualified immunity for failure to meet both requirements).

It is uncontested that Deputy Goepfert was acting within his discretionary authority.  This is not a false arrest case, as Plaintiff conceded at the hearing.  Only the use of unreasonable and excessive force violative of the Fourth Amendment is claimed.  In deciding whether an officer has used excessive force, the Court must "slosh . . . through the fact[ual] morass of 'reasonableness' because, in the end, all that matters is whether [the officer's] actions were reasonable." *Vargas*, 804 F.3d at 1180 (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)).  Even if the officer's acts are unconstitutional, the officer is liable only if clearly established law would have placed a reasonable officer under the same circumstances on notice that the objectionable conduct violated the plaintiff's constitutional rights.  *Id*. at 1180–81.

15

The facts will be taken in the light most favorable to Mrs. DeGraw, who has endured unexpected, tragic loss resulting from a simple call for help after her husband had a seizure.  The circumstances and facts of the scene on September 7, 2016 will be viewed from the perspective of a reasonable officer, recognizing that "split-second judgments" about the amount of force necessary are often made in "tense, uncertain, and rapidly evolving" situations.[5]

Plaintiff argues that none of the five tasering applications were justified because it is objectively unreasonable and inappropriate to use a taser in a medical distress case like this one.  Plaintiff readily admits, however, the absence of case law addressing the constitutional standard for an officer's actions when involved in a purely medical assistance call with no attendant arrest or planned Baker Act arrest.  Dkt. 109 at 3.  Although Plaintiff raises the issue of whether Deputy Goepfert was deliberately indifferent to Mr. DeGraw's serious medical need, this case neither alleges nor supports such a claim, particularly where the paramedics were already waiting at the DeGraw residence for the situation to be made safe, and were summoned quickly by the officers after Mr. DeGraw was handcuffed.

---

[5] The analysis must allow for "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of forced that is necessary in a particular situation."  *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)); *Vargas*, 804 F.3d at 1181.

It is not inherently unlawful to detain someone experiencing a medical emergency.  *City & Cnty. of San Francisco, Cal. v. Sheehan*, 135 S. Ct. 1765 (2015) (concluding Fourth Amendment does not prohibit officers from detaining someone experiencing medical emergency).  Even if a deputy acts contrary to his training including general orders of policy promulgated by the agency, qualified immunity is not denied if "a reasonable officer could have believed his conduct was justified." *Sheehan*, 135 S. Ct. at 1777 (citations omitted).[6]  Although Plaintiff urges that Deputy Goepfert should have handled the situation differently, her experts' opinions and arguments do not alter, in hindsight, the gravity of the situation firsthand.  *Sheehan*, 135 S. Ct. at 1777–78 (noting expert's report of inappropriate handling would not negate qualified immunity).

To accept Plaintiff's preferred version of the facts would require disregarding the circumstances as perceived by a reasonable officer in the same situation encountered by Deputy Goepfert, a feat this Court must not attempt. Plaintiff adamantly asserts as fact that "from the victim's perspective," no reasonable officer could have found Mr. DeGraw should have been tasered.  Dkt. 109 at 20.  In Plaintiff's words, Mr. DeGraw was just a man "lying calmly in his bed, a man not guilty of any crime, clad in just his underwear, suffering from effects of a seizure in a postictal state which the officer knew would make him

---

[6] In any event, Plaintiff has not shown any officers failed to act in conformity with their training.

confused, a man struggling to understand what was going on and trying to comply with the conflicting, rapid succession, and often confusing commands, a man not attempting to reach for use for any weapon." *Id*.

Three of these "facts" must be questioned because they do not conform to any conceivable narrative based on the evidence in the record. First, the modifier "calmly" used to describe Mr. DeGraw's behavior is unsupported by the record. The deputies witnessed Mr. DeGraw on the bed and heard him yelling, screaming, or, at the very least, making loud grunting or guttural noises. Even Mrs. DeGraw concedes he was making noises loud enough for her to hear from downstairs. That she may disagree as to the deputy's description of the noise does not alter the fact he was making unintelligible sounds and was never silent until after he was handcuffed.

Next, the terms "conflicting" and "often confusing" used to describe the commands given by Deputy Goepfert represent Plaintiff's argument concerning the verbal and non-verbal exchange, such that it was, between her husband and the deputy. There is no evidence other than the recounting of the events at the scene by the deputies who were upstairs; again, Mrs. DeGraw was downstairs and could not see her husband's actions in response to any one particular command. According to Deputy Goepfert, he did begin telling Mr. DeGraw to stop until he was advancing toward the deputy with raised fists.

18

Finally, the reference to Mr. DeGraw's reaching for a weapon is undisputed. It occurred before Mr. DeGraw moved to the foot of the bed and thereafter arose to move toward Deputy Goepfert with raised fists.  The uncontradicted evidence shows Deputy Goepfert had been told by Mrs. DeGraw a gun was kept under the pillow, and he saw various gun cases in the small, cluttered, dimly lit room as well as a knife in plain view on the floor or on the nightstand.

Deputy Goepfert did not associate Mr. DeGraw's non-verbal sounds with a state of calmness, especially when coupled with a room full of guns and a knife. Plaintiff suggests her husband remained calm until he was tasered, despite his intermittent reaching under the pillow where he kept the gun and his continuous shouting, yelling, or groaning.  Fearing for the physical safety of both of Mr. DeGraw and himself, Deputy Goepfert conveyed to Deputy Martinez to draw his firearm and directed Mr. DeGraw to get up out of the bed to move out of the room. A reasonable officer would have asked a person with easy and ready access to a firearm to move away from the gun and to step out of a room full of weapons.

After Mr. DeGraw moved to the foot of the bed, he suddenly arose, clenched his fists, and started moving toward the door and Deputy Goepfert, all the while making loud, incoherent sounds.  It was at this point that Deputy Goepfert told him to stop.  Mr. DeGraw did not obey the command.  Deputy Goepfert backed up and continued to order him to stop, but he did not comply.  At this point, the deputy

deployed his taser, even though he was unable to maintain the recommended six-foot distance.  He aimed for the torso and limbs, but the prongs connected to the chest because he was turning to move farther away from Mr. DeGraw.

Once Mr. DeGraw was on the floor of the bedroom, Deputy Goepfert instructed him to remain there.  Mr. DeGraw did not follow the repeated directives to stay on the floor and calm down but instead kept trying to get up from the floor.  The taser was activated briefly each time he tried to get up.  Even after the activations, it took three officers to handcuff him.  At no time did any of them put weight on him.  Mr. DeGraw never stopped giving resistance.  A reasonable officer would have used nonlethal force to gain compliance of a delirious man advancing toward him with raised clenched fists making loud noises in a room with guns and a knife.[7]

Finally, Plaintiff contends that as of September 2016 the law clearly established Deputy Goepfert used unconstitutional excessive force by activating his taser multiples times.  *See Patel v. City of Madison, Ala.*, 959 F.3d 1330, 1343 (11th Cir. 2020) (listing three methods to show a particular amount of force is clearly established as excessive).  Under Plaintiff's version of the facts, however, Mr. DeGraw was under control and complying with the officers' commands given

---

[7] A taser generally is not considered a deadly weapon.  *Fils v. City of Aventura*, 647 F.3d 1272, 1276 n.2 (11th Cir. 2011); *see also* cases cited by Defendants at docket 97, pages 8 through 10.

his confused state.  Mrs. DeGraw does not dispute that Deputy Goepfert backed up in retreat before deploying his taser or that her husband continued to yell and scream and disobey commands to stay on the ground.  Plaintiff may not divine a set of facts unsupported by the record.  This is not a case of a compliant, unresisting person or one where the initial combative conduct ceases and the use of force continues.  *See*, *e.g*., *Sebastian v. Ortiz*, 918 F.3d 1301, 1308 (11th Cir. 2019) (noting qualified immunity denied in gratuitous force cases involving suspects who were "under control, not resisting, and obeying commands"); *Wate v. Kubler*, 839 F.3d 1012, 1021 (11th Cir. 2016) (holding use of force grossly disproportionate where suspect was shocked five times after being handcuffed); *Oliver v. Fiorino*, 586 F.3d 898, 906 (11th Cir. 2009) (holding use of force grossly disproportionate to threat posed initially where individual was repeatedly tasered after compliance).

It is undisputed there is no case law on point that renders the challenged conduct unreasonable and excessive force.  Plaintiff has failed to demonstrate that a broader, clearly established principle should control the novel facts of this case or that this case is an exception to the requirement of prior case law because it so "obviously violates" the constitution.  Even if there were a constitutional violation taking the facts in the light most favorable to Plaintiff, it was not clearly established.  Deputy Goepfert is entitled to qualified immunity; summary judgment is granted as to Count I of the Second Amended Complaint.

Accordingly, the motions for summary judgment (Dkts. 97, 99) are granted. All federal claims (Counts I and II of the Second Amended Complaint) have been resolved in favor of Defendants.  In the interest of judicial economy, convenience, and comity, the Court declines to exercise supplemental jurisdiction over the remaining state law claim for wrongful death (Count III).[8]  Count III of the Second Amended Complaint is dismissed without prejudice to refiling in state court, and the statute of limitations on the state law claim is tolled for thirty (30) days.[9]  The Clerk is directed to enter judgment in favor of Defendants on Counts I and II of the Second Amended Complaint, to terminate any pending motions and deadlines, and to close the case.

**DONE AND ORDERED** at Tampa, Florida, on September 21, 2020.

**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record

---

[8] Dismissal of supplemental state law claims is strongly encouraged where the federal claims are dismissed prior to trial.  *Farquharson v. Citibank, N.A.*, 664 F. App'x 793, 798 (11th Cir. 2016) (citing *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997)).
[9] *See Artis v. Dist. of Columbia*, 138 S. Ct. 594 (2018) (construing 28 U.S.C. § 1367(d)).